## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WOLFRAM ARNOLD, ERIK FROESE,
TRACY HAWKINS, JOSEPH KILLIAN,
LAURA CHAN PYTLARZ, and ANDREW
SCHLAIKJER,

                Plaintiffs,

    v.

X CORP. f/k/a TWITTER, INC., X
HOLDINGS CORP. f/k/a X HOLDINGS I,
INC. and ELON MUSK,

                Defendants.

C.A. No. 1:23-cv-00528 CFC

**Jury Trial Demanded**

## AMENDED COMPLAINT

Plaintiffs Wolfram Arnold ("Arnold"), Erik Froese ("Froese"), Tracy Hawkins

("Hawkins"), Joseph Killian ("Killian"), Laura Chan Pytlarz ("Pytlarz"), and Andrew Schlaikjer

("Schlaikjer"), by and through their undersigned counsel, bring this complaint for compensatory,

punitive, and other damages, specific performance, civil penalties, and declaratory relief, against

Defendants, X Corp. f/k/a Twitter Inc. ("Twitter"), X Holdings Corp. f/k/a X Holdings I, Inc.

("X Holdings I"), and Elon Musk ("Musk").

## INTRODUCTION

1.    Plaintiffs are each long-time former employees of Twitter (colloquially and

hereinafter referred to as "Tweeps"), who collectively have more than 60 years of experience

working for the company, and who were fired or constructively discharged by Twitter in the

aftermath of Musk's acquisition of the company.

2.      As one might expect given their long service, some of the Plaintiffs were relatively senior – with titles like "Vice President" or "Global Lead" – at the time their employment with Twitter ended.

3.      And due to that seniority, some of them were "in the room where it happened" after Musk's takeover of Twitter, privy to – and participants in – high-level discussions and deliberations among Twitter's new leadership after the merger.

4.      Led by Musk and the cadres of sycophants who were internally referred to as the "transition team," Twitter's new leadership deliberately, specifically, and repeatedly announced their intentions to breach contracts, violate laws, and otherwise ignore their legal obligations.

5.      And they put those words into action. Plaintiff Killian was forced to resign from Twitter after being repeatedly and specifically directed to violate California's building codes in ways that potentially put Tweep lives at risk by building the "Twitter Hotel" rooms Musk wanted for Tweeps he would be pushing to work through the night. Plaintiff Hawkins was forced to resign after Musk and his transition team fundamentally changed the nature of her job and threatened her professional reputation by directing Twitter to breach its leases and, essentially, steal space from its landlords.

6.      "Elon doesn't pay rent," one member of the transition team told Hawkins. Another member of the transition team put it more bluntly to Killian: "Elon told me he would only pay rent over his dead body."

7.      Both Killian and Hawkins were told that for Musk, the fact that Twitter was legally or contractually obligated to pay a particular sum would be irrelevant to the decision of whether to actually pay it when that amount came due; that Musk operated on a "zero cost basis"

and that Twitter would therefore simply decide afresh, for each significant expense, whether or not it wanted to pay what it owed.

8.      And Arnold, Froese, Pytlarz, and Schlaikjer learned that in the bluntest way possible. Musk's Twitter fired them after the acquisition, and then flatly refused to pay them their contractually required severance. This was severance that Twitter and Musk had – in order to induce Tweeps to stay through the close of the merger – promised would be paid if Musk conducted a layoff, and which Twitter and X Holdings I had bound themselves to pay under the terms of the Merger Agreement.[1]

9.      Indeed, it is clear that neither Musk nor X Holdings I ever intended to comply with that obligation. As to employee obligations specifically, Musk proceeded in line with the principle on which he generally operates: that keeping his contractual promises is optional. Musk went so far as to insist publicly that Tweeps he fired are not entitled to any severance at all beyond WARN Act notice. In hindsight, it appears that he also inserted a legally ineffective, specific "no third-party beneficiaries" clause in the Merger Agreement's provisions relating to severance in a failed attempt to prevent Tweeps from enforcing those provisions.

10.     Plaintiffs bring this action for a declaratory judgment that the Merger Agreement, and the related but independent promises and representations to the Tweeps, entitle them to the promised severance, to recover that severance as well as punitive damages for Defendants' flagrant bad faith, to recover compensatory and punitive damages for Defendants' fraud, and to seek redress for Twitter's violations of the federal WARN, California WARN and New York WARN Acts and federal and state family leave laws, and the myriad California Labor Code violations in which Twitter engaged.

---

[1] Defined below.

## PARTIES

11.     Plaintiff Arnold is a citizen of the State of California, residing in Northern California.

12.     He was employed by Twitter from November 2013 through his termination on January 4, 2023, most recently as a Staff Software Engineer.

13.     At the time of his termination, he was performing in a satisfactory manner. His performance evaluations had rated him as on- or ahead-of-track, and he had not been informed of deficiencies in his performance.

14.     Plaintiff Froese is a citizen of the State of New York, residing in Westchester.

15.     He was employed by Twitter from January 2013 through his termination on February 27, 2023, most recently as a Senior Manager, Software Engineering.

16.     At the time of his termination, he was performing in a satisfactory manner. His performance evaluations had rated him as on- or ahead-of-track, and he had not been informed of deficiencies in his performance.

17.     Plaintiff Hawkins is a citizen of the State of California, residing in Northern California.

18.     She was employed by Twitter from May 2013 through her resignation on November 4, 2022, most recently as Vice President, Real Estate and Workplace.

19.     Plaintiff Killian is a citizen of the State of California, residing in Northern California.

20.     He was employed by Twitter from March 2010 through his resignation on December 10, 2022, beginning his employment with Twitter as a receptionist and being promoted through the ranks to his final position, Lead Project Manager of Global Design and

4

Construction, where he was responsible for overseeing the construction and design of Twitter's physical offices around the world.

21.     Plaintiff Pytlarz is a citizen of the State of Texas, residing in Central Texas.

22.     She was employed by Twitter from January 2013 through January 2023, most recently as Twitter's Global Strategy and Operations Lead, Food and Events.

23.     At the time of her termination, she was performing in a satisfactory manner. Her performance evaluations had rated her as on- or ahead-of-track, and she had not been informed of deficiencies in her performance.

24.     Plaintiff Schlaikjer is a citizen of the State of California, residing in Northern California.

25.      He was employed by Twitter from July 2011 through January 20, 2023, beginning as an intern and rising through the ranks to become a Senior Staff Machine Learning Engineer, and reported directly to two consecutive VPs of Consumer Engineering. At the time of his termination, one of his projects involved fulfillment of Twitter's data privacy obligations relating to Twitter Communities, a task that the chaos at Twitter rendered effectively impossible.

26.     At the time of his termination, he was performing in a satisfactory manner. His performance evaluations had rated him as on- or ahead-of-track, and he had not been informed of deficiencies in his performance.

27.     Defendant X Corp., a Nevada corporation, is the successor to Twitter, Inc., a Delaware corporation, by merger. Pursuant to 8 *Del. C.* § 259, X Corp. succeeded to all of Twitter, Inc.'s obligations upon its merger with Twitter Inc. Accordingly, since the corporate body owing the duties that are the subject of this complaint was known as Twitter during the relevant times, this complaint refers to Twitter rather than X Corp. On information and belief, X

Corp. is a citizen of the States of California and Nevada, with a principal place of business located at 1355 Market St #900, San Francisco, CA 94103.

28.     Defendant X Holdings Corp., a Nevada Corporation, is the successor to X Holdings I, Inc., a Delaware corporation, by merger. Pursuant to 8 *Del. C.* § 259, X Holdings Corp. succeeded to all of X Holdings I, Inc.'s obligations upon its merger with X Holdings I, Inc. Accordingly, since the corporate body owing the duties that are the subject of this complaint was known as X Holdings I during the relevant times, this complaint refers to X Holdings I rather than X Holdings Corp.  On information and belief, X Holdings Corp. is a citizen of the States of California and Nevada, with a principal place of business located at 1355 Market St #900, San Francisco, CA 94103.

29.     Defendant Musk is, on information and belief, a citizen of the State of Texas residing in Boca Chica, Texas.

## JURISDICTION AND VENUE

30.     Jurisdiction of this Court is proper under 28 U.S.C. § 1331 and 29 U.S.C. § 2104(a)(5).

31.     Venue is proper in this Court pursuant to the Merger Agreement's forum selection clause and 28 U.S.C. § 1391(b)(2).

32.     This Court has personal jurisdiction over the Defendants because the Merger Agreement contains each of the Defendants' (or its predecessor's) express consent to jurisdiction in this district.

## FACTUAL BACKGROUND

### A.  Overview

33.     This litigation arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

34.     Twitter made these promises many times and in many ways. Twitter made these promises in their initial offer letters to the plaintiffs. Twitter made this same promise explicit in its agreement to sell the company to Musk, negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

35.     Twitter broke all these promises, breaching its enforceable agreements with its former employees in the process.

36.     The saga surrounding this breach of faith began in late March 2022, when Musk vehemently criticized Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after first accepting, then declining, a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

37.     On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022, Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

38.     The Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to

7

provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

39.     Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

40.     That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited: "Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that its severance policy and the terms of the Merger Agreement would protect them from that result if Twitter carried out a layoff in the year after the merger, and that they would be able to keep at least some of their unvested RSUs in that event.

41.     After Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash

contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

42.     The reference to "at a minimum" was a shorthand reference to Twitter's existing policy of also providing each employee with severance of an additional week of salary for each full year at Twitter, and to the fact that Twitter's severance policy for Vice Presidents and above was even more generous (six months of salary and RSU vesting).

43.     Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and induce Twitter employees to stay at Twitter through the merger.

44.     As detailed below, that worked; as part of their decisions to remain at Twitter after the merger was announced, Plaintiffs relied on Twitter's representation that they would have a safety net if they were terminated after the merger.

45.     After the close of the merger, Twitter laid off Plaintiffs Arnold, Froese, Pytlarz, and Schlaikjer, and constructively discharged Plaintiffs Hawkins and Killian. Yet Defendants refused to provide them with the severance they promised.

**B.  Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply with the Terms of the Agreement He Voluntarily Entered**

46.     Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million monthly active users.

47.     Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

48.     Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

49.     During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

50.     He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

51.     On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

52.     Following the disclosure, Musk was offered, and first accepted but then declined, a position on Twitter's Board of Directors.

53.     Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

54.     He offered to purchase the outstanding shares for $54.20 each and take the company private.

55.     After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

56.     Musk's efforts to breach the Merger Agreement began barely two weeks later.

57.     On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

58.     On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

59.     On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

60.     After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

61.     The deal closed on October 27, after many Tweeps – including Arnold – voted their shares in favor of the merger in reliance on the promises described below.

62.     On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture[2] and took the self-created title "Chief Twit."

### C.  Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.

63.     With the promise of Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

64.     Layoffs had already been discussed as a possibility even prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

---

[2] Specifically, Musk tweeted to "let that sink in" while attempting to walk in holding a loose sink.

65. Given his criticisms, it was also viewed as likely that Musk would make material changes at Twitter, and that these could well include changes in personnel.

66. These concerns were widespread amongst the Tweeps, and Tweeps asked questions specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

67. Twitter took these concerns very seriously.

68. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

69. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

70. Twitter therefore took several steps to reassure its employees.

71. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

72. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least one-year after the acquisition closed (the "Severance Stability Promise").

73. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation**

**Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, <u>during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.</u>

(emphasis added).

74.     And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

75.     Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

76.     On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

77.     The employees who received the benefit of the Severance Stability Promise were intended beneficiaries.

78.     Moreover, the Severance Stability Promise provided benefits to all involved.

79.     Twitter employees who decided not to exercise their right to seek or obtain new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

80.     Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

81.     And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

82.     Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

83.     Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

84.     The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

85.     It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

86.     After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

87.     Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

88.     In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

89.     Plaintiffs in fact learned that information from Twitter.

90.     Even after these verbal representations and promises, Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

91.     After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

92.     Tweeps continued to raise similar questions in the company Slack channels during the first half of May.

93.     At one point, a Tweep posted to Twitter's internal Slack, tagging Twitter's C-Suite leadership and communicating that the details of Twitter's severance would be critical to employees' decisions to remain pending the close of the merger.

94.     In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

95.     On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter

through the merger, despite Musk's evident dissatisfaction with Twitter as a company and erratic personality.

96.     The email represented and promised that:

Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

- Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

- Pro-rated Performance Bonus Plan compensation at target

- Cash value of equity that would have vested within three months from the separation date

- A cash contribution for health care continuation.

(bullet points in original).

97.     The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

98.     Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

99.     On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

100.    On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

101.    On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

102.    It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to the post-acquisition company's severance obligations. Twitter's additional promises and representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

103.    Plaintiffs did, in fact, rely upon these promises and representations.

104.    The promised severance in fact factored into Plaintiffs' decisions to remain at Twitter through the closing of the merger.

105.    To put it simply, Plaintiffs were aware of and relied on the fact that they had a safety net if Musk conducted a mass layoff or even targeted firings: if terminated, they would receive a significant sum as a severance payment, which would help provide time to find a new job without severe economic pressure.

106.    Had it not been for the Severance Stability Promise and Twitter's communications about severance, Plaintiffs would have begun the interview process to find a more stable employment situation in mid-May, or adjusted their approach to other opportunities when they arose between May and the close of the merger.

107.    Instead, Plaintiffs chose to remain at Twitter.

**D.  Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

108.    On October 26, 2022, Musk took over as the owner of Twitter.

109.    According to public reports, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

110.    On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement regarding severance.

111.    On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

112.    In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had only reluctantly agreed to close.

113.    In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

114.    Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

115.    On information and belief, this occurred in some cases within hours of the takeover.

116.    On information and belief, Musk refused to pay those executives the agreed-upon compensation.

117.    In fact, on information and belief, Musk did not even intend to have Twitter pay the Directors' and Officers' Indemnification and Insurance premiums, as required by Section 6.6 of the Merger Agreement.

118.    On information and belief, a Twitter employee with access to Twitter's accounts and capacity to execute the payment made that payment despite Musk's specific objections, preventing a breach of the Merger Agreement.

119.    On information and belief, that employee was fired for doing so.

18

120.    Very shortly after the merger, Musk began a mass layoff of thousands of Twitter employees.

121.    On information and belief, Twitter had, prior to the merger, policies and practices for ensuring that layoffs were conducted in an equitable and objective manner.

122.    On information and belief, these policies and practices were entirely ignored when determining who would be included in the mass layoff.

123.    On information and belief, layoff decisions were based on lists that various managers submitted, which had not been subjected to review by human resources.

124.    On information and belief, managers were not provided with objective criteria to use in formulating their lists, and instead made decisions based on their subjective discretion.

125.    On information and belief, those lists were then modified, and all final decisions made, by the transition team.

126.    On information and belief, the transition team was made up largely of managers drawn from his other companies, including Tesla, Inc. ("Tesla") and the Space Exploration Technologies Corporation ("SpaceX").

127.    As discussed below, Tesla and SpaceX each have documented histories of discrimination in employment.

128.    On information and belief, the transition team did not – and, given their very limited time at Twitter, could not – base their decisions on objective criteria.

129.    Instead, their decisions were made subjectively.

130.    The result was a termination list that discriminated on a range of axes, including on the basis of sex, on the basis of race, and on the basis of sexual orientation.

19

131.    On November 3, 2022 Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

132.    On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

133.    The next day, roughly half of Twitter's workforce – including Froese and Pytlarz – were notified that they were being laid off.

134.    The email informing the affected employees that they were being terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

135.    Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

136.    But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

137.    These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

138.    In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

139.    He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

140.    Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

141.    Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's – undefined and unarticulated – standards.

142.    As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

143.    But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box would be deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

144.    Due to the previous rounds of layoffs, many of the employees who were asked to make this choice had managers assigned who had never worked with them before.

145.    Many of them had no actively assigned manager at all.

146.    In some employees' cases, their entire management chain had been laid off.

147.    Between the tight timelines and the lack of managerial availability, employees who needed accommodations in order to return to work in the office were unable to discuss those needs with Twitter.

148.    As part of this wave of layoffs, a substantial number of employees, including Arnold and Schlaikjer, were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

149.    Twitter did not immediately discharge every employee who did not check the box.

150.    On information and belief, the decisions of who to retain were made by the same group of managers drawn from Tesla and SpaceX and implemented in an entirely subjective manner.

151.    And yet again, that still wasn't enough.

152.    After the November 17 layoff, Musk again turned to engineers from his other companies to conduct "code reviews" of code written by Twitter employees.

153.    The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

154.    After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

155.    Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

156.    The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees that the managers had placed on PIPs that the employees should "keep doing what they were doing" because their performance did not require improvement. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

157.    All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

158.    The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

159.    Instead, Twitter has simply refused to pay the severance it promised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

### E.  Twitter Constructively Discharges Hawkins and Killian

160.    Unlike the other Plaintiffs, and the thousands of their colleagues in a similar situation, Plaintiffs Hawkins and Killian were not chosen for termination by Twitter.

161.    Instead, they were constructively discharged when Twitter drastically changed the terms and conditions of their employment after the Musk acquisition such that, for each of them, resigning was the only rational option available to them.

a.   <u>Tracy Hawkins</u>

162.    In 2022, Hawkins was Twitter's Vice President of Real Estate and Workplace, responsible for its office leases and managing its physical offices.

163.    Hawkins reached that position through years of hard work, building relationships with other corporate real estate management ("CREM") professionals, including property owners, brokers, managers, and peers.

164.    Indeed, she was a Board Member of the Northern California chapter of CoreNet Global, the global professional association for CREM professionals.

165.    In Hawkins' line of work, reputation is critical; it is impossible to negotiate viable terms on behalf of any employer if you have a reputation for breaking your word.

166.    And that practical reality is incorporated into the ethical rules CREM professionals are expected to abide by.

167.    As detailed below, Hawkins was forced to resign when Elon Musk and his transition team insisted that she violate her professional ethics by causing Twitter to intentionally breach its leases and other contracts.

168.    Doing so would not only have been deeply unethical but would also have effectively ended her career by rendering her unemployable as a CREM professional, at Twitter or anywhere else.

169.    Unlike some employees at Twitter prior to Musk's takeover, Hawkins was not opposed to the merger or the concept of Musk as Twitter's new CEO.

170.    Hawkins received word of the impending merger deal while on a family vacation, and did not know much about Musk at the time.

171.     Given the uncertainty, her focus in the period leading up to the merger, and the leadership she provided her team, centered around one basic principle: "Let's focus on doing our jobs and protecting our people."

172.     During the pendency of the merger, employee retention was a critical concern for the company and a focus of discussions among leadership.

173.     As the closing of the merger approached, Musk's behavior heightened Hawkins' concerns; he showed up to an all-hands meeting exactly once, arriving late and spending his time talking about extraterrestrials.

174.     Even after that meeting, Hawkins kept an open mind, hoping that Musk's odd behavior would not impact his leadership once he took over Twitter and the employees were part of "his" team.

175.     But Hawkins also formed a strong determination to remain at Twitter at least throughout any transition period, in order to shepherd her team through the transition.

176.     The reality of Musk's new directives and operation of Twitter almost immediately shattered that determination.

177.     Upon Musk's arrival at Twitter, he brought with him a transition team of executives and sycophants from his other companies, from whom Musk directed Twitter's employees to take direction (the "Transition Team").

178.     He also brought over Tesla engineers to, upon information and belief, make retention and termination decisions.

179.     The Transition Team decreed that no managers were allowed to communicate with their teams via Slack – the primary form of internal communication within Twitter – making ordinary business almost impossible.

25

180.   The Transition Team also froze all payments to vendors until they could be "verified."

181.   Neither the Transition Team nor anyone else in Twitter leadership ever explained what needed to be "verified" and, upon information and belief, no efforts were ever made to conduct such "verification."

182.   Instead, upon information and belief, the "verification" rhetoric was a way for the Transition Team to terminate vendor payments without immediately announcing to vendors that Twitter was deliberately breaching its contracts with them.

183.   But that was what Twitter was doing.

184.   Faced with tens or hundreds of thousands of dollars in outstanding invoices with no reasonable expectation of timely payment, many of these vendors informed Twitter that they would not be performing further work for Twitter until those invoices were paid.

185.   In response, Twitter simply fired these vendors, canceling their contracts and refusing to pay both the outstanding invoices and any termination fees.

186.   Musk's deliberate breaches of contract did not stop with the vendors.

187.   On information and belief, Musk had attempted to halt the payment of the employees' contractually mandated November RSU vests.

188.   On information and belief, Robert Kaiden – the company's Chief Accounting Officer – took it upon himself to ensure that the employees received their November vest, as required by Section 3.6(d)(ii) of the Merger Agreement, by making the $54.20-per-RSU payment to which Twitter had committed itself.

189.   Robert Kaiden was fired shortly after the November vest payments went through.

190.    On information and belief, Kaiden was fired because of his actions in making the November RSU payment in compliance with Twitter's obligations and over Musk's objections.

191.    Dalana Brand, Twitter's Chief People Officer and Hawkins' direct manager, handed in her notice within days after the merger closed because she was disgusted at how people were being treated.

192.    On or about October 30, 2022, Hawkins attended a meeting with Steve Davis, Jared Burchall, and many of Twitter's global leaders.

193.    In that meeting, Davis announced several changes that boded ill for Hawkins' team and her role at Twitter.

194.    First, he announced that Twitter's Sourcing and Procurement team should handle all lease negotiations from that point forward, despite lacking both personnel and experience sufficient to handle this task.

195.    Next, he announced that the company would no longer be working with brokers to procure and negotiate leases.

196.    This choice ran in conflict with every established standard and practice of commercial real estate management and stood to further increase the burden on the in-house staff substantially.

197.    The meeting gave no opportunities for feedback or discussion – it was merely a series of nonsensical pronouncements.

198.    The only justification given for the changes was "Elon wants this."

199.    Very soon thereafter, Davis informed Hawkins that Twitter needed to find five hundred million dollars in annual savings.

200.    To accomplish this, each Global Lead was given a massive spreadsheet that had to be filled out every single day, identifying possible savings opportunities.

201.    Hawkins' spreadsheet covered thirty locations and upwards of fifty leases.

202.    The pressure to fill in the spreadsheet on time was immense. Expectations from above made it clear that compliance was prioritized above accuracy.

203.    Nonetheless, Hawkins and her team strove to deliver reliable, well-contextualized information.

204.    For example, Twitter instructed Hawkins to identify leases for cancellation.

205.    When she identified potential sites and leases that could be terminated for cost savings, Hawkins and her team took the time to document the risk factors involved in downsizing or terminating these leases, such as large termination fees.

206.    However, when the time came to present their conclusions, this added context was not well received.

207.    When informed of the risks of termination fees during a meeting on November 3, 2022, Steve Davis said "well, we just won't pay those. We just won't pay landlords."

208.    Davis also told Hawkins "We just won't pay rent."

209.    Those are direct quotes of Davis per Hawkins's best recollection; to the extent that they are not word-for-word accurate they are an extremely tight paraphrase.

210.    Hawkins was shocked.

211.    Twitter specifically directed Hawkins to breach its leases, whether by terminating without any good faith justification under the terms of the applicable lease, or by simply stealing from the landlords by intentionally remaining on the premises without any intention of paying amounts Twitter knew and believed were its legal obligation to pay.

212.    Unwilling to be involved in (let alone responsible for) such thefts, Hawkins resigned the next day.

213.    She did so despite her internal commitment to remain through the transition, to protect her team, because she had no other choice.

214.    Her options were stark: resign, and leave with her professional integrity and reputation intact and without being involved in a crime, or remain and be complicit in and held professionally responsible for a scheme to defraud landlords out of the rent or other fees admittedly due to them, destroying her own reputation and career in the process.

215.    Twitter's plan also ran in conflict with Twitter's own ethics policy, which every employee at the company – including Hawkins – was required to sign annually.

216.    That policy reads, in relevant part, "Each employee, officer and director should endeavor to deal fairly with Twitter's customers, suppliers, competitors and employees. No employee, officer or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing practices."

217.    Hawkins delayed her resignation only long enough to let her team know she was leaving.

218.    Indeed, Hawkins' resignation was required by the code of professional ethics CREM professionals hold to.

219.    Hawkins' role as a commercial real estate and facilities manager required her to maintain robust and healthy relationships with real estate professionals outside of Twitter.

220.    Indeed, Hawkins would not have been able to achieve her stellar levels of performance within her role at Twitter without those relationships, which she had built over years.

221.    The professional expectation of CREM professionals asked to violate their professional ethics was clear: you must quit rather than comply.

222.    Had Hawkins executed Twitter's plans, the trust that forms the foundation of the relationships necessary to perform in her role would have been shattered.

223.    Once broken, trust returns slowly – if at all.

224.    In the wake of that loss of trust, Hawkins would have been unable to be professionally effective in any CREM role she took thereafter.

225.    In effect, if she had done what Twitter was asking her to do, Hawkins would have become permanently unemployable in her field.

226.    Under the circumstances, any objectively reasonable person in Hawkins' position would have recognized what Hawkins did: that Twitter's conduct and new demands required her to quit.

    b.  Joseph Killian

227.    After Hawkins left Twitter, Killian, who was Twitter's Global Head of Construction and Design, was immediately assigned Hawkins's duties and given responsibility for managing Twitter's portfolio of nearly fifty leases.

228.    Killian worked directly with the Transition Team to effect the transition from Twitter 1.0 (pre-Musk) to Twitter 2.0 (post-Musk) and bring Twitter in line with Musk's standard business practices.

229.    Like Hawkins, Killian was required to – and did – sign and re-confirm the Ethics Policy on an annual basis.

230.    Killian was directed in these activities by Steve Davis and Liz Jenkins, who worked for the Boring Company, and Pablo Mendoza, a venture capitalist who invested with Musk.

231.    Killian was also directed in these activities by Nicole Hollander.

232.    On information and belief, Hollander was not employed by any of Musk's companies.

233.    On information and belief, Hollander is Steve Davis's girlfriend and the mother of his child.

234.    On information and belief, Hollander was living at Twitter headquarters with Davis and their infant child, who was a month old.

235.    Despite not being employed by any of Musk's companies, Hollander nonetheless had full instructional authority over Killian and the rest of his team with regards to the transition.

236.    Almost immediately, Musk's "zero-cost basis" policy reared its head.

237.    Killian was informed by the Transition Team that he would have to justify his spend to Musk personally, and that if Musk was not convinced that the expenses were necessary, he would simply default on his contractual obligations and let the expenses go unpaid.

238.    In early December, Davis sent a 3:00 a.m. email to 15 or 20 managers complaining about Twitter's rent obligations, which totaled $130M annually.

239.    In this email, Davis specifically compared Twitter's rent obligations to SpaceX's, noting that Twitter had 1/10th as many employees as SpaceX but paid five times as much rent annually.

240.    Of course, Twitter had significantly more employees when it first incurred its rent obligations.

241.    Killian quickly became concerned that Musk intended to stop paying rent on Twitter's outstanding leases, breaching the contracts and placing the company at risk of being evicted.

242.    Indeed, Musk's attorney, Alex Spiro, loudly opined that it was unreasonable for Twitter's landlords to expect Twitter to pay rent, since San Francisco was a "shithole."

243.    Moreover, during his month working at Elon Musk's Twitter, Killian repeatedly watched as Twitter would obtain services from brokers and vendors only to fire those brokers and vendors when they demanded payment pursuant to their agreements with Twitter.

244.    Musk even went so far as to prevent Twitter from paying the janitorial staff for the work they had already provided after the janitors complained about being fired.

245.    In essence, it quickly became clear to Killian that Musk's intended method of operation was to obtain services from vendors without any intention of keeping the agreements or paying for services requested and received.

246.    Killian's concern that Musk truly intended to apply this approach to Twitter's rent obligations was confirmed for the last time when, on December 9, 2022, Mendoza specifically informed Killian that Musk had decided Twitter would no longer be paying rent, globally.

247.    By the time of that conversation with Mendoza, Killian had already been instructed to break all of Twitter's leases and close offices regardless of Twitter's outstanding obligations on those leases.

248.    Killian attempted to convince Musk, via Mendoza, of the danger of Musk's new position that no rent would be paid whatsoever, pointing out that any attempt to renegotiate the terms of Twitter's many leases would be doomed to failure if Twitter had defaulted on the rent.

249.    In response, Mendoza told Killian that Musk had decided that Twitter would only pay rent "over [his] dead body."

250.    Mendoza conveyed that Musk had made that statement during a 4:00 a.m. conversation that day.

251.    Mendoza conveyed that the decision was final.

252.    That conversation, and the confirmation to Killian that he would be unable to address Twitter's desire to decrease its spend on rent in any ethical fashion came just a day before he tendered his resignation.

253.    Musk's instruction to simply ignore Twitter's contractual obligations and force Killian to breach contracts and destroy relationships he had spent more than a decade building would have been more than enough to render it impossible for Killian – or any reasonable employee -- to remain employed at Twitter.

254.    But that was not the only issue.

255.    Musk was also making clear that his reckless disregard included disregard for both the law and for the lives and safety of his colleagues and employees.

256.    For example, Davis told Killian that Musk wanted to add a bathroom next to his office so that Musk didn't have to wake his security team and cross half the floor to use the bathroom in the middle of the night.

257.    Killian explained that it would take time to get the necessary permits, but promised to begin that process right away.

258.     In response, Davis instructed Killian not to bother with obtaining permits because, to paraphrase, "we don't do that, we don't have to follow those rules."

259.     Shocked, Killian reminded Davis that if they did not get a permit, no licensed plumber would perform the work for fear of jeopardizing their license.

260.     Davis responded by instructing Killian to hire an unlicensed plumber instead.

261.     Now thoroughly bewildered, Killian attempted to explain that the use of licensed tradespeople was a condition of their lease, and that failure to abide by it would put them in breach of that lease.

262.     Davis responded that management did not care about any of this, that they weren't interested in ensuring that the work was performed in accordance with the standards required by the lease, by the City of San Francisco, by the State of California, or any other authority, they just wanted it done.

263.     It got worse.

264.     Musk announced via the Transition Team that he was going to be installing "hotel rooms" at Twitter HQ.

265.     Killian was initially told that the "hotel rooms," soon renamed to "sleeping rooms" to avoid triggering the suspicions of the city inspectors, were just being installed to give exhausted and overworked employees a place to nap.

266.     Though the changes had initially been simple, if unorthodox – removing a conference table and installing a bed – Davis instructed Killian to begin planning for and implementing the addition of features like en-suite bathrooms and other changes to the physical plant.

267.    Concerned about how city inspectors would react to Twitter's plans, Killian emailed the Transition Team to note that the changes they had made thus far were limited to 'just furniture' and therefore were code compliant, but that Twitter's future planned changes would require permits and more complicated code compliance.

268.    In response, Hollander visited him in person and emphatically instructed him to never put anything about the project in writing again.

269.    Hollander appeared surprised and distressed that Killian did not inherently understand that this was not a project for which Musk and the Transition Team wanted a written record.

270.    Hollander specifically conveyed that Davis in particular was upset that Killian had sent the email.

271.    When the city inspectors came to inspect the hotel rooms, they expressed surprise and relief to Killian, saying "This is just furniture! We expected more drastic changes."

272.    As instructed by the Transition Team, Killian did not tell the inspectors of the future plans to expand the changes to the sleeping rooms.

273.    But he realized, with growing unease, that his silence was effectively a lie of omission, and one that would be undeniable and obvious once the planned changes had been completed in the near future.

274.    Killian began to understand that his loyalty to Twitter and his desire to protect the company he loved from Musk and the Transition Team was going to be increasingly challenged by his employer's expectation that he would lie, defraud, and even break the law at Musk's direction.

35

275.    Killian was soon instructed to circumvent the landlord's lighting control system, which was motion-sensitive in compliance with California's Title 24 energy code, because the lights were bothering people living in the hotel rooms when their small movements at night would trigger the lights.

276.    Killian submitted these requests to the landlord, who denied them,

277.    When the landlord denied Twitter's requests, Killian was instructed to disconnect the lighting himself, which was not safe and which he was not qualified to do.

278.    When he objected, Hollander berated him for refusing to do the work himself.

279.    She was not satisfied until he brought her in and had her look into the drop-ceiling and see what the electrical system looked like, to understand that he could not safely do the work himself.

280.    Caught between a rock and a hard place, Killian hired an electrician to disconnect these rooms independently, putting Twitter in violation of both the building code and their lease.

281.    It got worse.

282.    Killian was instructed to install space heaters in the "hotel rooms" in further violation of Twitter's lease.

283.    Killian was also instructed to place locks on the "hotel room" doors – a request that betrayed the lie that these were intended to be temporary rest spaces for exhausted Tweeps.

284.    California code requires locks that automatically disengage when the building's fire suppression systems are triggered.

285.    Killian was repeatedly told that compliant locks were too expensive and instructed to immediately install cheaper locks that were not compliant with life safety and egress codes.

286.     Again, Killian protested that no licensed tradesperson would perform work that violated the building code.

287.     Killian protested that installing these locks would put lives at risk – that in case of an earthquake or fire (the latter of which was made dramatically more likely by the non-compliant electrical work and the presence of the space heaters he had been instructed to install), these locks would remain locked, blocking first responders from being able to access the rooms and the Tweeps within.

288.     Nobody cared.

289.     The first of the locks was installed by Twitter's on-site handymen on December 8, 2022, at Nicole Hollander's insistence.

290.     The next eight or nine locks were installed on December 9, 2022, the day Killian realized that he would have to quit.

291.     Between the demands that he effectively participate in theft and fraud and instructions to take actions in violation of California law and that could put his colleagues' lives at risk in the event of a fire – a possibility only increased by the unlicensed use of space heaters – Killian had no choice but to walk away from the job he had dedicated over a decade of his life to.

292.     Rather than continue to be complicit, Killian resigned his position on December 10, 2022.

**F.  Allegations Relating to Piercing the Corporate Veil**

293.     There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

294.     Musk, through X Holdings I, owns more than 50% of Twitter.

295.     Musk dominates Twitter's decision-making and operations.

296.    For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

297.    Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

298.    Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

299.    At Musk's direction, Twitter restored Anglin's account.

300.    Twitter has engaged in other content moderation decisions at Musk's whims.

301.    For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

302.    After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

303.    Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

304.    On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

305.    On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

306. On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

307. Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

308. On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

309. On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

310. Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

311. Twitter operates from California and Musk's relevant activity occurred in California.

312. As such, and applying California law, Plaintiffs are entitled to an order holding Musk personally liable for any amounts awarded on their other claims.

## CAUSES OF ACTION

### COUNT I

### DECLARATORY JUDGMENT
(All Plaintiffs, Against X Corp., X Holdings Corp., and Musk)

313. Plaintiffs repeat and reallege paragraphs 1-312 above as though fully restated herein.

314. Section 6.9(a) of the Merger Agreement required Twitter to maintain its pre-merger severance policy – the Severance Package or, for Vice Presidents and above, the

enhanced severance they were entitled to under Twitter's prior policy – without diminution for at least a year post-merger.

315.    Plaintiffs, as ex-Tweeps who were "Continuing Employees" as defined in the Merger Agreement, are third-party beneficiaries of the Merger Agreement with standing to enforce Section 6.9(a) of the Merger Agreement.

316.    Twitter and X Holdings I have asserted that Section 6.9(a) of the Merger Agreement does not obligate Twitter to provide any particular severance to its Continuing Employees.

317.    Twitter and X Holdings I have asserted that Continuing Employees are not third-party beneficiaries of the Merger Agreement and therefore have no standing to enforce the Merger Agreement.

318.    There is therefore an actual dispute between the parties as to the construction of the Merger Agreement and Plaintiffs' rights thereunder.

319.    As such, Plaintiffs are entitled to a declaration that Continuing Employees have standing to enforce the Merger Agreement and that the Merger Agreement required Twitter to provide Continuing Employees with severance consistent with Twitter's severance policy as it existed prior to the merger.

## COUNT II

**BREACH OF MERGER AGREEMENT**
(All Plaintiffs, Against X Corp., X Holdings Corp., and Musk)

320.    Plaintiffs repeat and reallege paragraphs 1-319 above as though fully restated herein.

321.    Plaintiffs are intended third-party beneficiaries of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

322.     Twitter has breached the Merger Agreement by refusing to pay Plaintiffs the severance outlined in the Severance Package, or, for Plaintiff Hawkins, the enhanced severance available to her as well as other benefits that were required to remain unchanged.

323.     X Holdings I has breached the Merger Agreement by failing to require Twitter to pay the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

324.     As such, Plaintiffs are entitled to an award of damages in an amount to be calculated at trial, but reasonably believed to exceed $1,000,000.00, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

## COUNT III

### BREACH OF CONTRACT
(All Plaintiffs, Against Twitter and Musk)

325.     Plaintiffs repeat and reallege paragraphs 1-324 above as though fully restated herein.

326.      The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide its pre-merger severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

327.     Plaintiffs accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

328.     Plaintiffs provided Twitter with consideration for its promise by continuing to work at Twitter through that period until they were laid off or resigned.

329.     As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Plaintiffs with the severance outlined in the Severance Policy Email or as

otherwise provided for by Twitter's pre-merger severance policies, which Plaintiffs fully performed.

330.    Twitter has breached this agreement by refusing to pay Plaintiffs the severance outlined in the Severance Policy Email and diminishing the benefits it made available to them.

331.    As such, Plaintiffs are entitled to an award of damages in an amount to be calculated at trial, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**COUNT IV**

**PROMISSORY ESTOPPEL**
(All Plaintiffs, In the Alternative, Against X Corp. and Musk)

332.    Plaintiffs repeat and reallege paragraphs 1-331 above as though more fully stated herein.

333.    To the extent that Twitter's communications and the Plaintiffs' subsequent conduct somehow did not create an enforceable contract between Plaintiffs' and Twitter, Twitter's representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

334.    The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

335.    Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

336.    It was reasonable for Plaintiffs to rely upon that promise.

337.    Plaintiffs did in fact rely upon that promise.

338.    Plaintiffs were damaged by that reasonable reliance, in that it negatively impacted their ability to find alternative employment in advance of the merger.

339.    Twitter's promise to provide Plaintiffs with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Plaintiffs with such severance.

340.    As such, Plaintiffs are entitled to an award of damages in an amount to be calculated at trial, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

## COUNT V

### BREACH OF OFFER LETTER
(All Plaintiffs, Against X Corp. and Musk)

341.    Plaintiffs repeat and reallege paragraphs 1-340 above as though fully restated herein.

342.    Prior to commencing work at Twitter, each of Plaintiffs executed an offer letter that constituted a binding contract between themselves and Twitter with respect to their employment at Twitter.

343.    Plaintiff Killian executed his offer letter on or about March 19, 2010.

344.    Plaintiff Froese executed his offer letter on or about November 26, 2012.

345.    Plaintiff Pytlarz executed her offer letter on or about January 22, 2013.

346.    Plaintiff Arnold executed his offer letter on or about October 16, 2013.

347.    Plaintiff Hawkins executed her offer letter on or about March 2013.

348.    Plaintiff Schlaikjer executed his offer letter on or about October 6, 2011.

349.    Each of Plaintiffs' offer letters provided that they were eligible to receive benefits under the terms of Twitter's benefit plans.

350.     Twitter's severance policy constituted a benefit plan that Plaintiffs were entitled to receive the benefit of at the end of their employment with Twitter.

351.     Twitter did not provide Plaintiffs with severance in accordance with its benefit plan.

352.     As such, Plaintiffs are entitled to an award of damages in an amount to be calculated at trial, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

## COUNT VI

### FRAUD
(All Plaintiffs, Against All Defendants)

353.     Plaintiffs repeat and reallege paragraphs 1-352 above as though fully restated herein.

354.     In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

355.     Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

356.     In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

357.     On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

358.     Plaintiffs did rely upon these representations.

44

359.    On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

360.    Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

361.    Musk has in fact instituted a policy of having Twitter refuse to follow through on its contractual obligations to vendors, landlords, and employees.

362.    Musk did so immediately upon taking over Twitter, indicating that he always intended to institute such a policy.

363.    Moreover, Section 6.9(e) of the Merger Agreement contained a provision reciting that the employees who were to be protected by the Severance Stability Promise were not third-party beneficiaries (the "Breach Immunization Clause").

364.    On information and belief, the Breach Immunization Clause was included in the Merger Agreement at Musk's (and his entities') request.

365.    While the Breach Immunization Clause is ineffective under Delaware law, the only reason to include the Breach Immunization Clause in the Merger Agreement was because Musk had a pre-existing intent to maintain an option to not pay the severance that Section 6.9(a) would otherwise require.

366.    On information and belief, Twitter either knew or was reckless to the fact that its representations to the Tweeps were untrue.

367.    When it laid off Plaintiffs, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

368.   As a result of Defendants' fraud, Plaintiffs suffered damages.

369.   As such, Plaintiffs are entitled to an award of damages in an amount to be calculated at trial, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

## COUNT VII

## FEDERAL WARN ACT
(Plaintiffs Arnold, Froese, Pytlarz and Schlaikjer, Against X Corp. and Musk)

370.   Plaintiffs repeat and reallege Paragraphs 1-369 above as though fully restated herein.

371.   At all relevant times, Twitter employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

372.   At all relevant times, Twitter was an "employer," as that term is defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a).

373.   At all relevant times, Plaintiffs were employees of Twitter as that term is defined by 29 U.S.C. §2101.

374.   Twitter ordered mass layoffs, as that term is defined by 29 U.S.C. § 210l(a)(2).

375.   The mass layoffs resulted in "employment losses," as that term is defined by 29 U.S.C. §2101(a)(2) for at least fifty of Twitter's employees as well as thirty–three percent of Defendant's workforce.

376.   Plaintiffs were terminated by Twitter without cause, as part of the mass layoffs.

377.   Plaintiffs are "affected employees" of Defendant, within the meaning of 29 U.S.C. § 2101(a)(5).

378.    Twitter was required by the WARN Act to give Plaintiffs at least 60 days advance written notice of their terminations.

379.    Twitter purported to comply with the WARN Act by informing Arnold and Pytlarz, and that they had been placed on "non-working leave" from November 20, 2022 through January 20, 2023.

380.    Twitter did not advise Schlaikjer that he had been placed on "non-working leave" during this period. Instead, they merely cut off his access to Twitter's internal systems until they stopped paying him.

381.    Compliance with the WARN Act, moreover, required Twitter to provide Plaintiffs with full benefits during their "non-working leave" and to treat them (and the other employees it put on "non-working leave") exactly as it would have had it not provided them notice of their impending layoff.

382.    Twitter failed to do so.

383.    For instance, although Twitter provided its employees with annual benefits – such as wellness allowances, or learning allowances – that refreshed each January, it prohibited the Tweeps it placed on "non-working leave," including Plaintiffs, from taking advantage of such benefits.

384.    Similarly, although Twitter provided its employees with a $2,000 annual donation matching benefit, it prohibited the Tweeps it placed on "non-working leave," including Plaintiffs, from taking advantage of that benefit.

385.    While Twitter provided its employees with reimbursement for home wifi and cell phone bills, it prohibited the Tweeps it placed on "non-working leave," including Plaintiffs, from taking advantage of those benefits.

47

386.     Indeed, Twitter specifically and expressly informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

387.     Moreover, while Twitter policies allowed Tweeps to submit expense reimbursement requests for the prior calendar year through the end of January of the succeeding calendar year, it only permitted Tweeps placed on non-working leave to submit such expenses through the end of November, 2022.

388.     In other words, Twitter repeatedly, deliberately, and expressly violated the WARN Act.

389.     Plaintiff s are "aggrieved employees" of Twitter as that term is defined in 29 U.S.C. § 2104(a)(7).

390.     As a result of Twitter's violation of the WARN Act, Plaintiffs are entitled to damages to be proven at trial, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

## COUNT VIII

### VIOLATION OF THE CALIFORNIA WARN ACT
(Plaintiffs Arnold, Pytlarz, and Schlaikjer, Against X Corp. and Musk)

391.     Plaintiffs repeat and reallege paragraphs 1-390 above as though more fully stated herein.

392.     Plaintiff Arnold was employed at Twitter's San Francisco, California office.

393.     Plaintiff Pytlarz worked remotely from her home, and was assigned and reported to Twitter's San Francisco office.

394.    As such, for WARN Act purposes, her single site of employment is the San Francisco office, and she is entitled to the protections of the California WARN Act.

395.    Plaintiff Schlaikjer was employed at Twitter's San Francisco office until COVID, and thereafter worked remotely from his home, and was assigned and reported to Twitter's San Francisco office.

396.    As such, for WARN Act purposes, his single site of employment is the San Francisco office, and he is entitled to the protections of the California WARN Act.

397.    Given the number of Tweeps laid off in that office within the relevant timeframe, the California WARN Act, Cal. Labor Code § 1400 et seq., required Twitter to provide Plaintiffs Arnold, Pytlarz, and Schlaikjer with 60 days' notice before it could terminate them.

398.    Twitter purported to comply with the California WARN Act by informing Arnold and Pytlarz that they had been placed on "non-working leave" from November 20, 2022 through January 20, 2023.

399.    Twitter did not advise Schlaikjer that he had been placed on "non-working leave" during this period. Instead, they merely cut off his access to Twitter's internal systems until they stopped paying him.

400.    Compliance with the California WARN Act, moreover, required Twitter to provide Plaintiffs with full benefits during their "non-working leave" and to treat them (and the other employees it put on "non-working leave") exactly as it would have had it not provided them notice of their impending layoff.

401.    As described above in connection with the Federal WARN Act, Twitter failed to do so.

402.     Rather, as with the Federal WARN Act, Twitter repeatedly, deliberately, and expressly violated the California WARN Act.

403.     As a result of Twitter's violation of the California WARN Act, Arnold, Pytlarz, and Schlaikjer are entitled to damages to be proven at trial, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

## COUNT IX

### VIOLATION OF THE NEW YORK WARN ACT
(Plaintiff Froese, Against X Corp. and Musk)

404.     Plaintiffs repeat and reallege paragraphs 1-403 above as though fully restated herein.

405.     Plaintiff Froese's single site of employment was Twitter's New York City office.

406.     The New York WARN Act similarly required Twitter to provide Froese with notice – 90 days' notice – before it could terminate him as part of a mass layoff.

407.     Twitter purported to comply with the New York WARN Act by placing Froese on "non-working leave" from November 20, 2022 through February 20, 2023.

408.     Compliance with the New York WARN Act, however, required Twitter to provide Froese with full benefits during his "non-working leave" and to treat him (and the other employees it put on "non-working leave") exactly as it would have had it not provided him notice of his impending layoff.

409.     As described above in connection with the Federal WARN Act, Twitter failed to do so.

410.     Indeed, as with the Federal and California WARN Act, Twitter repeatedly, deliberately, and expressly violated the New York WARN Act.

411.    As a result of Twitter's violation of the New York WARN Act, Froese is entitled to damages to be proven at trial, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

## COUNT X

### WAGE THEFT
(All Plaintiffs, Against All Defendants)

412.    Plaintiffs repeat and reallege paragraphs 1-411 above as though fully restated herein.

413.    Under each of New York, Texas, and California law, promised severance counts as "wages."

414.    Under New York and California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

415.    Under California law, fired employees are entitled to be paid all amounts due on the date of their termination, while employees who resign are entitled to be paid all such amounts on their final day or, if not feasible, within 72 hours of their last day.

416.    Each of New York and Texas law likewise impose deadlines by which employers must pay employees their final wages.

417.    Twitter violated each such deadline by failing, to date, to provide any of Plaintiffs with the severance to which they are entitled.

418.    Under California law, engaging in such wage theft triggers waiting time penalties in the amount of $1/365^{th}$ of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

419.     Under California law, the definition of "employer" against whom Plaintiffs may bring claims for wage theft includes not only Twitter, but X Holdings I and Musk as an individual.

420.     As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Plaintiffs' unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

## COUNT XI

### PENALTIES UNDER THE CALIFORNIA PRIVATE ATTORNEY GENERAL ACT FOR VIOLATIONS OF CAL. LABOR CODE §§ 201-203, 226, 227.3, and 1400 *et seq.*
(Killian and Arnold, Individually and in a Representative Capacity, Against all Defendants)

421.     Plaintiffs repeat and reallege paragraphs 1-420 above as though more fully stated herein.

422.     On January 18, 2023, pursuant to the California Private Attorney General Act ("PAGA"), Plaintiffs Arnold and Killian filed a notice of claim with the California Labor and Workforce Development Agency ("LWDA"), alleging violations of California Labor Code §§ 201, 202, and 203 (failure to provide timely final paychecks), 226 and 227.3 (failure to provide accurate final paystubs), and the California WARN Act.

423.     The LWDA has not provided notice that it will or will not investigate the identified violations.

424.     Each of Killian and Arnold was personally impacted by at least one of the identified labor code violations, including the failure to provide timely final paychecks.

425.     Indeed, Twitter delayed multiple days in providing Killian with his final paycheck.

426.    As alleged above, neither Killian nor Arnold received their contractually mandated severance wages on their final paychecks.

427.    In addition, Arnold was personally impacted by the California WARN Act violations identified above.

428.    Each of Killian and Arnold therefore have standing to prosecute a PAGA claim in a representative capacity.

429.    As alleged above, Twitter has violated each of Sections 201, 202, and 203 of the California Labor Code by failing to provide timely final paychecks that included all wages owed, including severance and 401K "true-up" payments due under Twitter's agreements with its employees.

430.    Twitter also violated Section 227.3 of the California Labor Code by failing to provide eligible employees with their accrued vacation pay at termination.

431.    Though Twitter purported to provide employees with "unlimited" time off, and some employees actually received unlimited time off, vacations required manager approval and many employees were subject to manager-imposed caps on theoretically unlimited vacation time.

432.    Some managers instructed the employees they supervised to limit their vacations to one week per quarter.

433.    Other managers refused to approve more than four weeks per year.

434.    Other managers instructed employees to target six-to-eight weeks per year.

435.    Other employees did not have specific vacation time targets communicated to them, but as a practical matter were assigned too much work to take more than four weeks per year.

436.    Under California law, and for employees whose vacation time was subject to such informal caps, Twitter's vacation policy is treated as a limited-and-vesting vacation policy, with each employee accruing vacation under the informal caps applicable to them.

437.    As such, and for those employees, Twitter violated Section 227.3 when it did not include payment for any accrued but unused vacation time in final paychecks.

438.    Twitter also violated Section 226 of the California Labor Code by providing inaccurate paystubs to at least the employees discharged on January 4, 2023, whose final paystubs did not accurately reflect their hours worked or for which they were paid.

439.    As alleged above, Twitter has repeatedly violated the California WARN Act.

440.    As such, Plaintiffs are entitled to an award of civil penalties, costs, and attorneys' fees as set out in Section 2699 of the California Labor Code.

## COUNT XII

**FAMILY AND MEDICAL LEAVE ACT INTERFERENCE (29 U.S.C. § 2615(a)(1))**
(Plaintiffs Arnold and Schlaikjer, Against X Corp. and Musk)

441.    Plaintiffs repeat and reallege paragraphs 1-440 above as though more fully stated herein.

442.    Plaintiffs Arnold and Schlaikjer were eligible for the protections of the Family and Medical Leave Act ("FMLA").

443.    Twitter is an employer covered under the FMLA.

444.    Arnold and Schlaikjer were entitled to leave under the FMLA; one had a new child and the other needed to take leave to care for a family member.

445.    Arnold and Schlaikjer each provided Twitter with sufficient notice of their intent to take leave.

446.    Twitter laid Arnold off shortly after Arnold returned from FMLA leave.

447.     Twitter laid Schlaikjer off while he was on FMLA leave.

448.     Twitter has thus denied Arnold and Schlaikjer their right to reinstatement in their positions or in equivalent positions at the end of their leave.

449.     Twitter has thus interfered with Arnold and Schlaikjer's rights under the FMLA.

450.     As such, Arnold and Schlaikjer are entitled to an award of damages in an amount to be calculated at trial, plus pre-and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

## COUNT XIII

### CALIFORNIA FAMILY RIGHTS ACT INTERFERENCE (Cal. Code Regs. tit. 2, § 11094(b))
(Plaintiffs Arnold and Schlaikjer, Against X Corp. and Musk)

451.     Plaintiffs repeat and reallege paragraphs 1-450 above as though more fully stated herein.

452.     On information and belief, one of the factors managers and executives were instructed to consider when constructing the termination lists was how dedicated to "new Twitter" the given employees were expected to be.

453.     On information and belief, perceived lesser availability or dedication was a factor in placing many of the people who were chosen for layoff on the termination list.

454.     For example, on information and belief, some people were chosen for layoff in part because they had children or other dependent care responsibilities.

455.     On information and belief, others were chosen in part because they were perceived as less dedicated to Twitter due to their intentions to take leave or their recent returns from leave.

456.     Defendants have shown other signs of being hostile to employees who take leave.

457.     For example, in late April of 2023, Twitter quietly altered its paid parental leave program, slashing the benefit from 20 weeks of paid time off for Tweeps who were welcoming a new family member to just two.

458.     The policy change was effective immediately – even for people who were scheduled to begin leave in weeks or days.

459.     In the wake of public outcry, Twitter attempted to walk this change back on May 7, 2023, "clarifying" (without explanation) that the actual change was to *twelve* weeks of leave, not two.

460.     On information and belief, Twitter changed the policy yet again in mid-May, telling employees that birthing parents would be eligible for 16 weeks of leave and non-birthing parents would be eligible for 7 weeks of leave.

461.     Plaintiffs Arnold and Schlaikjer were eligible for the protections of the California Family Rights Act ("CFRA").

462.     Twitter is an employer covered under the CFRA.

463.     Arnold and Schlaikjer were entitled to leave under the CFRA.

464.     Arnold and Schlaikjer each provided Twitter with sufficient notice of their intent to take leave.

465.     Twitter laid Arnold off shortly after Arnold returned from CFRA leave.

466.     Twitter laid Schlaikjer off while he was on CFRA leave.

467.     Twitter has thus denied Arnold and Schlaikjer their right to reinstatement in their positions or in equivalent positions at the end of their leave.

468.     Twitter has thus interfered with Arnold and Schlaikjer's rights under the CFRA.

469.    As such, Arnold and Schlaikjer are entitled to an award of damages in an amount to be calculated at trial, plus pre-and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

## COUNT XIV

### DISCRIMINATION UNDER CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, GOVERNMENT CODE § 12940, ET SEQ.
(Pytlarz and Arnold, Against all Defendants)

470.    Plaintiffs repeat and reallege paragraphs 1-469 above as though more fully stated herein.

471.    On information and belief, these determinations were made very quickly.

472.    On information and belief, managers and executives within Twitter were pressured to generate lists of employees to be fired within days or even hours.

473.    On information and belief, no effort was made to ensure that the layoffs were done in an unbiased and non-discriminatory fashion.

474.    On information and belief, pregnancy and remote work were discussed among the Twitter leadership making termination decisions as 'complicating factors' that would make it harder for employees to be fully involved.

475.    Twitter specifically refused to do a disparate impact analysis prior to implementing the layoffs.

476.    That choice was consistent with Musk's public disdain for anti-discrimination, equitable access, and policies he considers "leftist."

477.    For example, Musk has repeatedly tweeted about the "woke mind virus" he believes stands as impediment to human progress and success.



478.    Musk is no more circumspect when it comes to displaying his contempt for efforts to fight race and ethnicity-based prejudice.

479.    On May 17th, 2023, Musk tweeted a screenshot purporting to be of a poll indicating that Terry Crews, a Black man, should be hired to play Snow White.



480.

481.    On information and belief, Musk's tweet was intended to communicate his objection to race-neutral casting, such as casting Halle Bailey as Ariel in *The Little Mermaid*, and to antiracist hiring practices in general.

482.    Musk also agrees with and amplifies posts that display racist tropes.

483.    On May 15, 2023, Musk tweeted "Accurate" in response to a tweet from Luke Rudkowski[3] implying that concern about racist, institutionalized violence was the result of media elites deliberately highlighting racist violence to the public in order to create racial division.



---

[3] https://www.splcenter.org/fighting-hate/intelligence-report/2010/meet-patriots

484.    On information and belief, Musk's personal attitudes disregarding the effects of institutionalized bias and discrimination were reflected in his decisions and communications about who would remain employed at Twitter after the merger was complete.

485.    A disproportionate number of laid-off employees were members of disadvantaged minority groups that Musk had criticized or expressed animus towards, including LGBTQ people and women.

486.    A disproportionate number of laid-off employees were members of demographic groups most associated with the political ideologies Musk had inveighed against.

487.    On information and belief, that disproportionality was a result of Twitter's new management using factors such as race, gender, and sexual orientation as a proxy for identifying which employees suggested for potential termination would be least likely to "fit" with the new atmosphere Musk wished to create at Twitter.

488.    One highly publicized example of that atmosphere – and the hostile work environment Musk intended to and did create at Twitter – was the alteration of the "Twitter" sign at Twitter's San Francisco offices into a sexualized joke.

489.    Musk is certainly no stranger to corporate environments that tolerate and participate in discriminatory practices.

490.    Musk is the CEO of Tesla.

491.    Musk exercises a great deal of influence and control over Tesla's corporate culture and direction.

492.    In response to a Securities and Exchange Commission's investigation of Musk's tweets and their influence on Tesla and its market position, Karl Brauer, the executive publisher at Kelley Blue Book, commented that "Elon is Tesla and Tesla is Elon."

60

493.    In 2019, Brian Johnson, senior equity analyst following the U.S. Automotive sector for Barclays, said that "Tesla is Elon. And Elon is Tesla."

494.    Dan Ives, an analyst at Wedbush Securities, said in December of 2022 that "Tesla is Musk, and Musk is Tesla" in an article in the New York Times about the company's struggles.

495.    Musk is also the CEO of SpaceX.

496.    SpaceX Vice President Jon Edwards has told employees that "SpaceX is Elon and Elon is SpaceX."

497.    Both Tesla and SpaceX have been at the center of numerous allegations of persistent sexual harassment and discrimination on the basis of race and sex.

498.    For example, in *Diaz v. Tesla, Inc.*, N.D. Cal. Case No. 3:17-cv-06748-WHO, a jury found that Tesla had subjected employees to a racially hostile work environment.

499.    In addition, the California Department of Fair Employment and Housing ("DFEH") filed a complaint against Tesla in Alameda County Superior Court (Case No. 22CV006830) in February of 2022, based on its findings following a three-year investigation.

500.    Those findings included evidence that Tesla subjected its Black and/or African American workers to racial harassment and discriminated against them in the terms and conditions of employment, including assignment, discipline, promotion, termination, and constructive discharge.

501.    The investigation also concluded that Tesla retaliated against its Black and/or African American workers when they complained or reported the harassment or discrimination.

502.    DFEH's investigation also found that Defendants paid Black and/or African American workers less than workers of another race or ethnicity for substantially similar work.

61

503.     These lawsuits are not the only time Tesla has found itself in court over discriminatory mistreatment of its employees.

504.     More than a dozen sexual harassment lawsuits have been filed against Tesla in recent years.

505.     Many of the plaintiffs in these complaints cite the strong influence Musk has on the corporate environment and the degree to which his public and informal statements contributed to the harassment and discrimination they suffered.

506.     For example, Eden Mederos, in her complaint *Mederos v. Tesla,* Alameda County Superior Court No. 21CV004036 at ¶ 32, stated "Tesla's CEO Elon Musk would regularly tweet jokes about 4:20 and make jokes about '69s.' When Mr. Musk did this, everyone at the service center would read the tweets. The managers and technicians would bring up the tweets, laugh about them, and make their own jokes, riffing on the sexual themes."

507.     In addition, Jennifer Barazza, plaintiff in *Barazza v. Tesl*a, Alameda County Superior Court No. 21cv002714, said in an interview with the Washington Post that Musk's social media content "doesn't set a good example for the factory — it almost gives it like an … 'he's tweeting about it, it has to be okay[.]' "[4]

508.     Nor is Tesla the only Musk company that has faced discrimination allegations.

509.     Seven female SpaceX engineers publicly disclosed their experiences with pervasive sexual harassment at the company in December 2021.

510.     In the wake of these disclosures, more than 400 SpaceX employees signed an open letter in June 2022 which described Musk's behavior as "a frequent source of distraction and embarrassment for us, particularly in recent weeks," stated that "many employees continue

---

[4] https://www.washingtonpost.com/technology/2021/11/19/tesla-sexual-harassment/

to experience unequal enforcement of our oft-repeated 'No Asshole' and 'Zero Tolerance' policies" and asked the company to "publicly address and condemn Elon's harmful Twitter behavior."

511.    In response, SpaceX fired many of the employees who drafted and/or signed the letter.

512.    In a meeting discussing SpaceX's decision to fire the letter-writers, SpaceX Vice President Jon Edwards characterized the letter as an extremist act and declared that the writers had been fired for distracting the company and taking on Musk."

513.    It was in this meeting that Edwards explained that "SpaceX is Elon and Elon is SpaceX."

514.    This letter came just weeks after Musk had angrily discussed a previous sexual harassment allegation against him on Twitter, in which Musk had allegedly offered to buy a SpaceX flight attendant a horse in exchange for an erotic massage.

515.    On information and belief, Tesla paid the flight attendant $250,000 in exchange for her execution of a non-disclosure agreement on the topic of these allegations.

516.   On May 20, 2022, Musk responded to a tweet urging him to close on the Twitter deal with an off-color joke making light of the allegations.



517.   On information and belief, this was one of the tweets the SpaceX letter was describing as "harmful Twitter behavior."

518.   According to Tesla's 2020 Diversity, Equity, and Inclusion report, fewer than 25% of Tesla employees are female.

519.   According to Tesla's 2020 Diversity, Equity, and Impact report, fewer than 10% of Tesla's employees in leadership positions are Black or Hispanic/Latino.

520.   On information and belief, fewer than 15% of SpaceX employees are female.

521.   On information and belief, these were the values Musk imported to Twitter after his takeover when he gave his hand-picked Transition Team

522.   On information and belief, Twitter's express and deliberate refusal to conduct a disparate impact analysis in connection with its layoffs was the product of its knowledge that, because of the factors that went into the termination decisions, any such analysis would inevitably reveal that the layoff was in fact discriminatory.

523.    California laws bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds. [5]

524.    Pytlarz is an Asian woman.

525.    Arnold is bisexual, and over the age of 40.

526.    Twitter was specifically aware that Arnold was LGBTQ.

527.    Indeed, Twitter actively noted employees' LGBTQ status in their employment files, including Arnold's.

528.    The actions that Twitter took to lay off or fire its employees were discriminatory.

529.    As discussed above, Twitter manufactured pretextual reasons to terminate employees in large numbers.

530.    On information and belief, Twitter did not fire all of the employees who did not "click the button" in response to the mid-November 2022 ultimatum.

531.    On information and belief, Twitter's actual decision-making as to whom to include in the mass terminations, including which employees to terminate after the mid-November ultimatum, targeted women, older employees, minorities, and employees who had taken or scheduled family leave.

532.    Twitter retained employees who were not members of protected groups who had lower performance or seniority, or were less qualified, than Pytlarz.

533.    Twitter retained employees who were not members of protected groups who had lower performance or seniority, or were less qualified, than Arnold.

---

[5] Plaintiffs intend to amend the instant complaint when plaintiffs have exhausted other administrative remedies required by discrimination statutes, including but not limited to the exhaustion requirements under Title VII, 42 U.S.C. §2000e, *et seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*

534.    Twitter's conduct in the mass terminations was oppressive, fraudulent, or malicious.

535.    On information and belief, Twitter's officers, directors, or managing agents, including Defendant Musk, authorized or ratified this conduct, and engaged in such oppressive, fraudulent, or malicious conduct themselves.

536.    The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

537.    Pytlarz's sex (female) was a substantial factor motivating Twitter's decision to terminate Pytlarz.

538.    Arnold's sexual orientation (bisexual) was a substantial factor motivating Twitter's decision to terminate Arnold.

539.    Arnold's age (over 40) was a substantial factor motivating Twitter's decision to terminate Arnold.

540.    At the time she was terminated, Pytlarz reported to and was assigned to Twitter's San Francisco office.

541.    Pytlarz's work involved dealing on a regular basis with California business entities and individuals, and contracts created in the state of California.

542.    Pytlarz received a Notice of Right to Sue from the California Civil Rights Department on May 16, 2023.

543.    Arnold received a Notice of Right to Sue from the California Civil Rights Department on May 16, 2023.

544.    As a result of the foregoing, Twitter has violated California antidiscrimination laws, and Arnold and Pytlarz are entitled to an award of compensatory and punitive damages,

pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief against Defendants as follows:

1.      For judgment in favor of Plaintiffs and against Defendants with respect to each of the Counts set forth above;

2.      For compensatory and punitive damages according to proof in an amount in excess of the jurisdictional requirements;

3.      For prejudgment and post-judgment interest at the maximum legal rate;

4.      For costs of suit; and

5.      For any other and further relief that the Court may deem just and proper.

Dated: June 16, 2023        Respectfully submitted,

*/s/ Joseph L. Christensen*

Joseph L. Christensen (#5146)
CHRISTENSEN & DOUGHERTY LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Tel: (302) 212-4330
joe@christensendougherty.com

Of Counsel:

Akiva Cohen (admitted *pro hac vice*)
Dylan M. Schmeyer (admitted *pro hac vice*)
Michael D. Dunford (admitted *pro hac vice*)
Lane A. Haygood (admitted *pro hac vice*)
KAMERMAN, UNCYK, SONIKER & KLEIN P.C.
1700 Broadway, 16th Floor
New York, NY 10019
Tel: (212) 400-4930
acohen@kusklaw.com
dschmeyer@kusklaw.com
mdunford@kusklaw.com
lhaygood@kusklaw.com

*Attorneys for Plaintiffs*