# EXHIBIT 1

EX-2.1 2 d310843dex21.htm EX-2.1

**Exhibit 2.1**

**EXECUTION VERSION**

AGREEMENT AND PLAN OF MERGER

by and among

X HOLDINGS I, INC.,

X HOLDINGS II, INC.

and

TWITTER, INC.

Dated as of April 25, 2022

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS                                                          2

ARTICLE II THE MERGER                                                          13

Section 2.1      The Merger                                                    13
Section 2.2      The Closing                                                   13
Section 2.3      Effective Time                                                13
Section 2.4      Certificate of Incorporation and Bylaws                       13
Section 2.5      Board of Directors                                            14
Section 2.6      Officers                                                      14

ARTICLE III EFFECT OF THE MERGER ON CAPITAL STOCK                              14

Section 3.1      Effect on Securities                                          14
Section 3.2      Payment for Securities; Exchange of Certificates              15
Section 3.3      Lost Certificates                                            17
Section 3.4      Transfers; No Further Ownership Rights                        17
Section 3.5      Dissenting Shares                                             17
Section 3.6      Company Equity Awards                                         18
Section 3.7      Company ESPP                                                  20

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY                       21

Section 4.1      Organization and Qualification; Subsidiaries                  21
Section 4.2      Capitalization                                                21
Section 4.3      Authority Relative to Agreement                               23
Section 4.4      No Conflict; Required Filings and Consents                    23
Section 4.5      Permits; Compliance With Laws                                 24
Section 4.6      Company SEC Documents; Financial Statements                   25
Section 4.7      Information Supplied                                          25
Section 4.8      Disclosure Controls and Procedures                           25
Section 4.9      Absence of Certain Changes or Events                         26
Section 4.10     No Undisclosed Liabilities                                    26
Section 4.11     Litigation                                                    26
Section 4.12     Employee Benefit Plans                                        26
Section 4.13     Labor Matters                                                 28
Section 4.14     Intellectual Property                                         28
Section 4.15     Taxes                                                         29
Section 4.16     Material Contracts                                            30
Section 4.17     RESERVED                                                      30
Section 4.18     RESERVED                                                      30
Section 4.19     Takeover Statutes                                            30
Section 4.20     Vote Required                                                 30
Section 4.21     Brokers                                                       30
Section 4.22     Opinions of Financial Advisors                               31
Section 4.23     Rights Agreement                                             31
Section 4.24     RESERVED                                                      31

ii

Section 4.25        No Other Representations or Warranties                                                      31

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PARENT AND ACQUISITION SUB                                       31

Section 5.1         Organization and Qualification                                                            31
Section 5.2         Authority Relative to Agreement                                                           32
Section 5.3         No Conflict; Required Filings and Consents                                                33
Section 5.4         Financing                                                                                 33
Section 5.5         Information Supplied                                                                      35
Section 5.6         Brokers                                                                                   35
Section 5.7         Compliance With Laws                                                                      36
Section 5.8         Ownership of Company                                                                      36
Section 5.9         Solvency                                                                                  36
Section 5.10        Parent Guarantee                                                                          36
Section 5.11        Acknowledgment of Disclaimer of Other Representations and Warranties                      37

ARTICLE VI COVENANTS AND AGREEMENTS                                                                          37

Section 6.1         Conduct of Business by the Company Pending the Merger                                     37
Section 6.2         Preparation of the Proxy Statement; Company Stockholders' Meeting                         40
Section 6.3         Efforts to Close; Regulatory Filings                                                      41
Section 6.4         Access to Information; Confidentiality                                                    43
Section 6.5         Non-Solicitation; Competing Proposals                                                     44
Section 6.6         Directors' and Officers' Indemnification and Insurance                                    48
Section 6.7         Notification of Certain Matters                                                           50
Section 6.8         Public Announcements                                                                      50
Section 6.9         Employee Benefits                                                                         51
Section 6.10        Financing                                                                                 52
Section 6.11        Financing Cooperation                                                                     56
Section 6.12        Acquisition Sub                                                                           59
Section 6.13        Rule 16b-3 Matters                                                                        59
Section 6.14        Delisting of Company Common Stock                                                         59

ARTICLE VII CONDITIONS TO THE MERGER                                                                         59

Section 7.1         Conditions to the Obligations of Each Party                                               59
Section 7.2         Conditions to the Obligations of Parent and Acquisition Sub                               60
Section 7.3         Conditions to the Obligation of the Company to Effect the Merger                          60

ARTICLE VIII TERMINATION, AMENDMENT AND WAIVER                                                               61

Section 8.1         Termination                                                                               61
Section 8.2         Effect of Termination                                                                     62
Section 8.3         Termination Fee                                                                           63
Section 8.4         Amendment                                                                                 65
Section 8.5         Extension; Waiver                                                                         65
Section 8.6         Expenses; Transfer Taxes                                                                  66

ARTICLE IX GENERAL PROVISIONS ............................................................................... 66

Section 9.1      Non-Survival of Representations, Warranties and Agreements ........... 66
Section 9.2      Notices ............................................................................................... 66
Section 9.3      Interpretation; Certain Definitions ..................................................... 68
Section 9.4      Severability ........................................................................................ 69
Section 9.5      Assignment ......................................................................................... 69
Section 9.6      Entire Agreement ............................................................................... 69
Section 9.7      No Third-Party Beneficiaries ............................................................. 69
Section 9.8      Governing Law ................................................................................... 69
Section 9.9      Specific Performance ......................................................................... 70
Section 9.10     Consent to Jurisdiction ...................................................................... 71
Section 9.11     Counterparts ...................................................................................... 71
Section 9.12     WAIVER OF JURY TRIAL ............................................................... 71
Section 9.13     Debt Financing Source Related Part .................................................. 71

iv

## Index of Defined Terms

| | |
|---|---|
| Acceptable Confidentiality Agreement | Section 6.5(c) |
| Acquisition Sub | Article I, Preamble |
| Acquisition Sub Board | Article I, Recitals |
| Adverse Board Recommendation Change | Section 6.5(d), Article I |
| Affiliate | Article I |
| Aggregate Merger Consideration | Article I |
| Agreement | Article I, Preamble |
| Alternative Financing | Section 6.10(c), Article I |
| Alternative Financing Debt Commitment Letter | Section 6.10(c), Article I |
| Antitrust Laws | Section 4.4(b), Article I |
| Bank Debt Commitment Letter | Section 5.4, Article I |
| Bank Debt Financing | Section 5.4, Article I |
| Blue Sky Laws | Article I |
| Book-Entry Shares | Section 3.1(c), Article I |
| Business Day | Article I |
| Canceled Shares | Section 3.1(b) |
| CCC | Article I |
| Certificate of Merger | Section 2.3(a), Article I |
| Certificates | Section 3.1(c), Article I |
| Closing | Section 2.2, Article I |
| Closing Date | Section 2.2, Article I |
| Code | Article I |
| Company | Article I, Preamble |
| Company ASR Confirmations | Article I |
| Company Benefit Plan | Article I |
| Company Board | Article I, Recitals |
| Company Board Recommendation | Recitals |
| Company Bond Hedge Documentation | Article I |
| Company Bond Hedge Transactions | Article I |
| Company Bylaws | Section 4.1, Article I |
| Company Certificate of Incorporation | Section 4.1, Article I |
| Company Common Stock | Section 3.1(b), Article I |
| Company Disclosure Letter | Article I |
| Company Equity Awards | Article I |
| Company ESPP | Article I |
| Company Intellectual Property | Section 4.14(a), Article I |
| Company Material Adverse Effect | Article I |
| Company Material Contract | Section 4.16(a), Article I |
| Company Option | Article I |
| Company Permits | Section 4.5(a), Article I |
| Company PSU | Article I |
| Company Related Parties | Section 8.3(c), Article I |
| Company RSA | Article I |
| Company RSU | Article I |
| Company SEC Documents | Section 4.6(a), Article I |

Company Service Provider .......................................................................... Article I
Company Stockholder Advisory Vote .................................... Section 4.3(a), Article I
Company Stockholder Approval ................................................ Section 4.20, Article I
Company Stockholders' Meeting ........................................... Section 6.2(c), Article I
Company Warrant Confirmations .............................................................. Article I
Competing Proposal ............................................................ Section 6.5(g)(i), Article I
Consent ................................................................................... Section 4.4(b), Article I
Continuation Period ............................................................... Section 6.9(a), Article I
Continuing Employees ........................................................... Section 6.9(a), Article I
Contract .................................................................................................... Article I
COVID-19 ................................................................................................. Article I
COVID-19 Measures .................................................................................. Article I
D&O Indemnified Parties ....................................................... Section 6.6(a), Article I
Debt Commitment Letters .......................................................... Section 5.4, Article I
Debt Financing .......................................................................... Section 5.4, Article I
Debt Financing Source ............................................................................... Article I
Debt Financing Source Related Party ......................................................... Article I
DGCL ...................................................................................... Article I, Recitals
Dissenting Shares ...................................................................... Section 3.5, Article I
DTC .......................................................................................................... Article I
Effective Time ........................................................................... Section 2.3(a), Article I
Enforceability Exceptions ........................................................ Section 4.3(a), Article I
Equity Commitment Letter ......................................................... Section 5.4, Article I
Equity Financing ......................................................................................... Section 5.4
Equity Investor ......................................................................................... Preamble
ERISA ....................................................................................................... Article I
ERISA Affiliate .......................................................................................... Article I
Exchange Act ............................................................................................. Article I
Exchange Fund ......................................................................... Section 3.2(a), Article I
Existing 2027 Senior Notes ......................................................................... Article I
Existing 2030 Senior Notes ......................................................................... Article I
Existing Convertible Notes .......................................................................... Article I
Existing Credit Agreement .......................................................................... Article I
Existing D&O Insurance Policies .............................................. Section 6.6(c), Article I
Existing Senior Notes ................................................................................. Article I
Expenses ................................................................................................... Article I
Final Offering Period ................................................................. Section 3.7, Article I
Financing ................................................................................... Section 5.4, Article I
Financing Agreements .............................................................. Section 6.10(a)(i), Article I
Financing Commitments ............................................................ Section 5.4, Article I
Financing Sources ...................................................................................... Article I
Foreign Investment Laws ............................................................................. Article I
Foreign Plan .............................................................................................. Article I
Funding Obligations .................................................................. Section 5.4, Article I
GAAP ....................................................................................................... Article I
Goldman Sachs ......................................................................... Section 4.21, Article I

| | |
|---|---|
| Governmental Authority | Article I |
| Guarantor | Recitals |
| Hazardous Materials | Article I |
| HSR Act | Article I |
| Intellectual Property Rights | Section 4.14(a), Article I |
| Intervening Event | Section 6.5(d) |
| IRS | Article I |
| J.P. Morgan | Section 4.21 |
| Knowledge | Article I |
| Law | Article I |
| Lien | Article I |
| Margin Loan Borrower | Section 5.4, Article I |
| Margin Loan Commitment Letter | Section 5.4, Article I |
| Margin Loan Financing | Section 5.4, Article I |
| Merger | Article I, Recitals |
| Merger Consideration | Section 3.1(c), Article I |
| Notice of Adverse Board Recommendation Change | Section 6.5(d), Article I |
| Notice of Superior Proposal | Section 6.5(d), Article I |
| Order | Article I |
| Parent | Article I, Preamble |
| Parent Board | Article I, Recitals |
| Parent Disclosure Letter | Article I |
| Parent Guarantee | Recitals |
| Parent Material Adverse Effect | Article I |
| Parent Owned Shares | Section 5.8 |
| Parent Related Parties | Section 8.3(c), Article I |
| Parent Termination Fee | Article I |
| Paying Agent | Section 3.2(a), Article I |
| Paying Agent Agreement | Section 3.2(a), Article I |
| Permitted Lien | Article I |
| Person | Article I |
| Personal Information | Section 4.14 |
| Post-Closing Plans | Section 6.9(b), Article I |
| Post-Closing Welfare Plans | Section 6.9(c), Article I |
| Proxy Statement | Section 4.7, Article I |
| Representatives | Section 6.4, Article I |
| SEC | Article I |
| Secretary of State | Section 2.3(a), Article I |
| Securities Act | Article I |
| Silver Lake Investment Agreement | Article I |
| Solvent | Section 5.9, Article I |
| Specified Provisions | Article I, Preamble |
| Stockholder Rights | Article I |
| Stockholder Rights Agreement | Article I |
| Stockholder Rights Plan | Article I |
| Subsidiary | Article I |

| | |
|---|---|
| Superior Proposal | Section 6.5(g)(iii), Article I |
| Surviving Corporation | Section 2.1, Article I |
| Tax | Article I |
| Tax Returns | Article I |
| Taxes | Article I |
| Termination Date | Section 8.1(b)(i), Article I |
| Termination Fee | Article I |
| Tesla Shares | Article I |
| Third Party | Article I |
| U.S. | Article I |
| Unvested Company Option | Section 3.6(a)(ii) |
| Unvested Company PSU | Section 3.6(b)(ii) |
| Unvested Company RSU | Section 3.6(d)(ii) |
| Unvested Option Consideration | Section 3.6(a)(ii) |
| Unvested PSU Consideration | Section 3.6(b)(ii) |
| Unvested RSA Consideration | Section 3.6(c) |
| Unvested RSU Consideration | Section 3.6(d)(ii) |
| Vested Company Option | Section 3.6(a)(i) |
| Vested Company PSU | Section 3.6(b)(i) |
| Vested Company RSU | Section 3.6(d)(i) |
| Vested Option Consideration | Section 3.6(a)(i) |
| Vested PSU Consideration | Section 3.6(b)(i) |
| Vested RSU Consideration | Section 3.6(d)(i) |

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER, dated as of April 25, 2022 (this "**Agreement**"), is made by and among Twitter, Inc., a Delaware corporation (the "**Company**"), X Holdings I, Inc., a Delaware corporation ("**Parent**"), X Holdings II, Inc., a Delaware corporation and a direct wholly owned Subsidiary of Parent ("**Acquisition Sub**"), and, solely for purposes of Sections 5.4, 6.2(d), 6.3, 6.8, 6.10, 6.11, 6.12 and 9.9 (the "**Specified Provisions**"), Elon R. Musk (the "**Equity Investor**").

W I T N E S S E T H:

WHEREAS, the parties desire for Parent to acquire the Company by way of a merger (the "**Merger**") of Acquisition Sub with and into the Company pursuant to the General Corporation Law of the State of Delaware (the "**DGCL**") upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the board of directors of Acquisition Sub (the "**Acquisition Sub Board**") has determined that it is advisable to, fair to and in the best interests of Acquisition Sub and its stockholders to effect the Merger of Acquisition Sub with and into the Company pursuant to the DGCL upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the Company's board of directors (the "**Company Board**") has, by resolutions duly adopted by the unanimous vote of the directors at a duly held meeting (i) determined that the terms and conditions of this Agreement, the Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Company and the Company's stockholders, (ii) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (iii) directed that this Agreement be submitted for consideration at a meeting of the Company's stockholders and (iv) subject to the terms of this Agreement, recommended that the Company's stockholders adopt this Agreement and approve the transactions contemplated by this Agreement, including the Merger (the "**Company Board Recommendation**");

WHEREAS, the Acquisition Sub Board has, by resolutions duly adopted, (i) determined that the terms and conditions of this Agreement, the Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Acquisition Sub and Parent, as the sole stockholder of Acquisition Sub; (ii) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (iii) directed that this Agreement be submitted for consideration by Parent, as the sole stockholder of Acquisition Sub and (iv) recommended that Parent, as the sole stockholder of Acquisition Sub approve the Merger, and Parent, as the sole stockholder of Acquisition Sub, has approved this Agreement and the consummation of the transactions contemplated by this Agreement, including the Merger;

WHEREAS, the board of directors of Parent (the "**Parent Board**") has, by resolutions duly adopted by the unanimous vote of the directors, (i) adopted this Agreement and approved the consummation of the transactions contemplated by this Agreement, including the Merger and (ii) determined that this Agreement and the transactions contemplated by this Agreement are advisable and in the best interests of Parent and Elon Musk, as the sole stockholder of Parent;

WHEREAS, as a material inducement to, and as a condition to, the Company entering into this Agreement, concurrently with the execution of this Agreement, Elon Musk (the "**Guarantor**") has entered into a limited guarantee, dated as of the date hereof, guaranteeing certain of Parent's and Acquisition Sub's obligations under this Agreement (the "**Parent Guarantee**"); and

WHEREAS, each of Parent, Acquisition Sub and the Company desires to make certain representations, warranties, covenants and agreements in connection with the Merger and also to prescribe various conditions to the Merger.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties and covenants and subject to the conditions herein contained, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

As used in this Agreement, the following terms shall have the respective meanings set forth or referenced below:

"**Acquisition Sub**" shall have the meaning set forth in the Preamble.

"**Acquisition Sub Board**" shall have the meaning set forth in the Recitals.

"**Adverse Board Recommendation Change**" shall have the meaning set forth in Section 6.5(d).

"**Affiliate**" has the meaning set forth in Rule 12b-2 of the Exchange Act.

"**Aggregate Merger Consideration**" shall mean the product of (x) the number of shares of Company Common Stock issued and outstanding (other than those shares canceled or retired pursuant to Section 3.1(b)) immediately prior to the Effective Time *multiplied by* (y) the Merger Consideration.

"**Agreement**" shall have the meaning set forth in the Preamble.

"**Alternative Financing**" shall have the meaning set forth in Section 6.10(c).

"**Alternative Financing Debt Commitment Letter**" shall have the meaning set forth in Section 6.10(c).

"**Antitrust Laws**" shall have the meaning set forth in Section 4.4(b).

"**Bank Debt Commitment Letter**" shall have the meaning set forth in Section 5.4.

"**Bank Debt Financing**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Blue Sky Laws**" shall mean state securities or "blue sky" laws.

"**Book-Entry Shares**" shall have the meaning set forth in <u>Section 3.1(c)</u>.

"**Business Day**" shall mean any day other than a Saturday, Sunday or a day on which all banking institutions in San Francisco, California or New York, New York are authorized or obligated by Law or executive order to close.

"**CCC**" means the California Corporations Code.

"**Certificate of Merger**" shall have the meaning set forth in <u>Section 2.3(a)</u>.

"**Certificates**" shall have the meaning set forth in <u>Section 3.1(c)</u>.

"**Closing**" shall have the meaning set forth in <u>Section 2.2</u>.

"**Closing Date**" shall have the meaning set forth in <u>Section 2.2</u>.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Company**" shall have the meaning set forth in the Preamble.

"**Company ASR Confirmations**" means (i) the Master Confirmation re Accelerated Stock Repurchases, dated February 10, 2022, between the Company and Morgan Stanley & Co. LLC and (ii) the Master Confirmation re Accelerated Stock Repurchases, dated February 10, 2022, between the Company and Wells Fargo Bank, National Association, in each case, as amended through the date hereof.

"**Company Benefit Plan**" shall mean (i) "employee benefit plan" (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA), and (ii) each other employment agreement, bonus, stock option, stock purchase or other equity-based, benefit, incentive compensation, profit sharing, savings, retirement (including early retirement and supplemental retirement), disability, insurance, vacation, incentive, deferred compensation, supplemental retirement (including termination indemnities and seniority payments), severance, termination, retention, change of control and other similar fringe, welfare or other employee benefit plans, benefit programs, benefit agreements, benefit contracts, benefit policies or benefit arrangements (whether or not in writing), in each case, (x) which is sponsored, maintained or contributed to for the benefit of or relating to any current or former director, officer or employee of the Company or its Subsidiaries and (y) with respect to which the Company or any of its Subsidiaries has or may have any liability.

"**Company Board**" shall have the meaning set forth in the Recitals.

3

"**Company Bond Hedge Documentation**" means (a)(i) the call option transaction confirmation, dated June 6, 2018, between the Company and Barclays Bank PLC, (ii) the call option transaction confirmation, dated June 6, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (iii) the call option transaction confirmation, dated June 6, 2018, between the Company and Wells Fargo Bank, National Association, (iv) the additional call option transaction confirmation, dated June 7, 2018, between the Company and Barclays Bank PLC, (v) the additional call option transaction confirmation, dated June 7, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (vi) the additional call option transaction confirmation, dated June 7, 2018, between the Company and Wells Fargo Bank, National Association, and (b)(i) the call option transaction confirmation, dated March 1, 2021, between the Company and Bank of America, N.A., (ii) the call option transaction confirmation, dated March 1, 2021, between the Company and Barclays Bank PLC, (iii) the call option transaction confirmation, dated March 1, 2021, between the Company and Goldman Sachs & Co. LLC, (iv) the call option transaction confirmation, dated March 1, 2021, between the Company and Wells Fargo Bank, National Association, (v) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Bank of America, N.A., (vi) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Barclays Bank PLC, (vii) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Goldman Sachs & Co. LLC, (viii) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Wells Fargo Bank, National Association, (ix) the letter agreement, dated March 1, 2021, between the Company and Bank of America, N.A., (x) the letter agreement, dated March 1, 2021, between the Company and Barclays Bank PLC, (xi) the letter agreement, dated March 1, 2021, between the Company and Goldman Sachs & Co. LLC, (xii) the letter agreement, dated March 1, 2021, between the Company and Wells Fargo Bank, National Association, (xiii) the additional letter agreement, dated March 12, 2021, between the Company and Bank of America, N.A., (xiv) the additional letter agreement, dated March 12, 2021, between the Company and Barclays Bank PLC, (xv) the additional letter agreement, dated March 12, 2021, between the Company and Goldman Sachs & Co. LLC, and (xvi) the additional letter agreement, dated March 12, 2021, between the Company and Wells Fargo Bank, National Association.

"**Company Bond Hedge Transactions**" means each of the call option transactions evidenced by the Company Bond Hedge Documentation.

"**Company Bylaws**" shall have the meaning set forth in <u>Section 4.1</u>.

"**Company Certificate of Incorporation**" shall have the meaning set forth in <u>Section 4.1</u>.

"**Company Common Stock**" shall have the meaning set forth in <u>Section 3.1(a)</u>.

"**Company Disclosure Letter**" shall mean the disclosure letter delivered by the Company to Parent simultaneously with the execution of this Agreement.

"**Company Equity Awards**" shall mean, collectively, (i) Company Options, (ii) Company PSUs, (iii) Company RSAs, and (iv) Company RSUs.

"**Company ESPP**" shall mean the Company 2013 Employee Stock Purchase Plan.

"**Company Intellectual Property**" shall have the meaning set forth in <u>Section 4.14(a)</u>.

"**Company Material Adverse Effect**" means any change, event, effect or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a material adverse effect on the business, financial condition or results of operations of the Company and its Subsidiaries, taken as a whole; provided, however, that changes, events, effects or circumstances which, directly or indirectly, to the extent they relate to or result from the following shall be excluded from, and not taken into account in, the determination of Company Material Adverse Effect: (i) any condition, change, effect or circumstance generally affecting any of the industries or markets in which the Company or its Subsidiaries operate; (ii) any change in any Law or GAAP (or changes in interpretations of any Law or GAAP); (iii) general economic, regulatory or political conditions (or changes therein) or conditions (or changes therein) in the financial, credit or securities markets (including changes in interest or currency exchange rates) in the United States or any other country or region in the world; (iv) any acts of God, force majeure events, natural disasters, terrorism, cyberattack, data breach, armed hostilities, sabotage, war or any escalation or worsening of any of the foregoing; (v) any epidemics, pandemics or contagious disease outbreaks (including COVID-19) and any political or social conditions, including civil unrest, protests and public demonstrations or any other COVID-19 Measures that relate to, or arise out of, an epidemic, pandemic or disease outbreak (including COVID-19) or any change in such COVID-19 Measures, directive, pronouncement or guideline or interpretation thereof, or any continuation or of any of the foregoing, in the United States or any other country or region in the world; (vi) the negotiation, execution, announcement, performance, consummation or existence of this Agreement or the transactions contemplated by this Agreement, including (A) by reason of the identity of Elon Musk, Parent or any of their Affiliates or their respective financing sources, or any communication by Parent or any of its Affiliates or their respective financing sources, including regarding their plans or intentions with respect to the conduct of the business of the Company or any of its Subsidiaries and (B) any litigation, claim or legal proceeding threatened or initiated against Parent, Acquisition Sub, the Company or any of their respective Affiliates, officers or directors, in each case, arising out of or relating to the this Agreement or the transactions contemplated by this Agreement, and including the impact of any of the foregoing on any relationships with customers, suppliers, vendors, collaboration partners, employees, unions or regulators; (vii) any action taken pursuant to the terms of this Agreement or with the consent or at the direction of Parent or Acquisition Sub (or any action not taken as a result of the failure of Parent to consent to any action requiring Parent's consent pursuant to Section 6.1); (viii) any changes in the market price or trading volume of the Company Common Stock, any failure by the Company or its Subsidiaries to meet internal, analysts' or other earnings estimates or financial projections or forecasts for any period, any changes in credit ratings and any changes in any analysts' recommendations or ratings with respect to the Company or any of its Subsidiaries (provided that the facts or occurrences giving rise to or contributing to such changes or failure that are not otherwise excluded from the definition of "Company Material Adverse Effect" may be taken into account in determining whether there has been a Company Material Adverse Effect); and (ix) any matter disclosed in the Company SEC Documents filed by the Company prior to the date of this Agreement (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements").

"**Company Material Contract**" shall have the meaning set forth in Section 4.16(a).

"**Company Option**" shall mean each outstanding option to purchase shares of Company Common Stock granted to any employee or director of, or other Company Service Provider.

"**Company Permits**" shall have the meaning set forth in Section 4.5(a).

"**Company PSU**" shall mean each performance-based restricted stock unit that vests on the basis of time and the achievement of performance metrics and was granted to any Company Service Provider.

"**Company Related Parties**" shall have the meaning set forth in Section 8.3(d).

"**Company RSA**" shall mean each share of Company Common Stock granted to any Company Service Provider that remains subject to vesting, lapse or forfeiture provisions.

"**Company RSU**" shall mean each time-based restricted stock unit that vests on the basis of time and was granted to any Company Service Provider.

"**Company SEC Documents**" shall have the meaning set forth in Section 4.6(a).

"**Company Service Provider**" shall mean each current or former director, employee, consultant or independent contractor of the Company or any of its Subsidiaries

"**Company Stockholder Advisory Vote**" shall have the meaning set forth in Section 4.3(a).

"**Company Stockholder Approval**" shall have the meaning set forth in Section 4.20.

"**Company Stockholders' Meeting**" shall have the meaning set forth in Section 6.2(c).

"**Company Warrant Confirmations**" means (a)(i) the warrant confirmation, dated June 6, 2018, between the Company and Barclays Bank PLC, (ii) the warrant confirmation, dated June 6, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (iii) the warrant confirmation, dated June 6, 2018, between the Company and Wells Fargo Bank, National Association, (iv) the additional warrant confirmation, dated June 7, 2018, between the Company and Barclays Bank PLC, (v) the additional warrant confirmation, dated June 7, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (vi) the additional warrant confirmation, dated June 7, 2018, between the Company and Wells Fargo Bank, National Association, and (b)(i) the warrant confirmation, dated March 1, 2021, between the Company and Bank of America, N.A., (ii) the warrant confirmation, dated March 1, 2021, between the Company and Barclays Bank PLC, (iii) the warrant confirmation, dated March 1, 2021, between the Company and Goldman Sachs & Co. LLC, (iv) the warrant confirmation, dated March 1, 2021, between the Company and Wells Fargo Bank, National Association, (v) the additional warrant confirmation, dated March 12, 2021, between the Company and Bank of America, N.A., (vi) the additional warrant confirmation, dated March 12, 2021, between the Company and Barclays Bank PLC, (vii) the additional warrant confirmation, dated March 12, 2021, between the Company and Goldman Sachs & Co. LLC, and (viii) the additional warrant confirmation, dated March 12, 2021, between the Company and Wells Fargo Bank, National Association.

"**Competing Proposal**" shall have the meaning set forth in Section 6.5(g)(i).

"**Consent**" shall have the meaning set forth in Section 4.4(b).

"**Continuation Period**" shall have the meaning set forth in Section 6.9(a).

"**Continuing Employees**" shall have the meaning set forth in Section 6.9(a).

"**Contract**" means any written contract, subcontract, lease, sublease, conditional sales contract, purchase order, sales order, task order, delivery order, license, indenture, note, bond, loan, instrument, understanding, permit, concession, franchise, commitment or other agreement.

"**COVID-19**" means SARS-Co V-2 or COVID-19 or any evolutions, variants or mutations thereof.

"**COVID-19 Measures**" means quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, safety or similar laws, directives, restrictions, guidelines, responses or recommendations of or promulgated by any Governmental Authority, including the Centers for Disease Control and Prevention and the World Health Organization, or other reasonable actions taken in response to the foregoing or otherwise, in each case, in connection with or in response to COVID-19 and any evolutions, variants or mutations thereof or related or associated epidemics, pandemics or disease outbreaks.

"**D&O Indemnified Parties**" shall have the meaning set forth in Section 6.6(a).

"**Debt Commitment Letters**" shall have the meaning set forth in Section 5.4.

"**Debt Financing**" shall have the meaning set forth in Section 5.4.

"**Debt Financing Source**" shall mean (i) the commitment parties party, as of the date hereof, to the Debt Commitment Letters that have been delivered to the Company in accordance with Section 5.4, and (ii) the Persons, in their respective capacities as such, that have committed to arrange or provide or have otherwise entered into agreements (including the Debt Commitment Letters or any Financing Agreements), in each case, in connection with all or any portion of the Debt Financing or Alternative Financing in connection with the transactions contemplated hereby, and any joinder agreements, indentures or credit agreements entered into pursuant thereto, together with their Affiliates, and any of their or their Affiliates' respective, direct or indirect, former, current or future stockholders, managers, members, directors, officers, employees, agents, advisors, other representatives or any successors or assignees of any of the foregoing (it being understood that Parent, Acquisition Sub and any of their respective Affiliates shall not constitute "Debt Financing Sources" for any purposes hereunder).

"**Debt Financing Source Related Party**" means any Debt Financing Source, together with their respective Affiliates and their and their respective Affiliates' former, current and future officers, directors, employees, agents and representatives and their respective successors and assigns.

"**DGCL**" shall have the meaning set forth in the Recitals.

"**Dissenting Shares**" shall have the meaning set forth in Section 3.5.

"**DTC**" shall have the meaning set forth in Section 3.2(b)(ii).

7

"**Effective Time**" shall have the meaning set forth in <u>Section 2.3(a)</u>.

"**Enforceability Exceptions**" shall have the meaning set forth in <u>Section 4.3(a)</u>.

"**Equity Commitment Letter**" shall have the meaning set forth in <u>Section 5.4</u>.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" shall mean, for any Person, each trade or business, whether or not incorporated, that, together with such Person, would be deemed a "single employer" within the meaning set forth in Section 414 of the Code.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Exchange Fund**" shall have the meaning set forth in <u>Section 3.2(a)</u>.

"**Existing Credit Agreement**" shall mean that certain Revolving Credit Agreement, dated as of August 17, 2018, among the Company, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A. as administrative agent, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing D&O Insurance Policies**" shall have the meaning set forth in <u>Section 6.6(c)</u>.

"**Existing 2027 Senior Notes**" shall mean the 3.875% Senior Notes due 2027 issued pursuant to that certain Indenture, dated December 9, 2019, among the Company, as issuer, and U.S. Bank National Association, as trustee, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing 2030 Senior Notes**" shall mean the 5.000% Senior Notes due 2030 issued pursuant to that certain Indenture, dated February 25, 2022, among the Company, as issuer, and U.S. Bank National Association, as trustee, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing Convertible Notes**" shall mean the (i) 0.25% Convertible Senior Notes due 2024 issued pursuant to that certain Indenture, dated June 11, 2018, among the Company, as issuer, and U.S. Bank National Association, as trustee, (ii) 0.375% Convertible Senior Notes due 2025 issued pursuant to that certain Indenture, dated March 12, 2020, among the Company, as issuer, and U.S. Bank National Association, as trustee, and (iii) 0% Convertible Senior Notes due 2026 issued pursuant to that certain Indenture, dated March 4, 2021, among the Company, as issuer, and U.S. Bank National Association, as trustee, in each case as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing Senior Notes**" shall mean the (i) the Existing 2027 Senior Notes and (ii) the Existing 2030 Senior Notes.

8

"**Expenses**" shall mean all out-of-pocket expenses (including all fees and expenses of counsel, accountants, investment bankers, experts and consultants to a party hereto and its Affiliates) incurred by a party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution and performance of this Agreement, the preparation, printing, filing and mailing of the Proxy Statement and all SEC and other regulatory filing fees incurred in connection with the Proxy Statement, the solicitation of stockholder approvals, any filing with, and obtaining of any necessary action or non-action, Consent or approval from any Governmental Authority pursuant to any Antitrust Laws or Foreign Investment Laws, engaging the services of the Paying Agent, any other filings with the SEC, and all other matters related to the Closing and the other transactions contemplated by this Agreement.

"**Final Offering Period**" shall have the meaning set forth in <u>Section 3.7</u>.

"**Financing**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Financing Agreements**" shall have the meaning set forth in <u>Section 6.10(a)</u>.

"**Financing Commitments**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Financing Sources**" means the Debt Financing Sources and Elon Musk.

"**Foreign Investment Laws**" shall mean any Laws designed or intended to prohibit, restrict or regulate actions (i) by foreigners to acquire interests in or control over domestic equities, securities, entities, assets, land or interests, or (ii) to acquire interests in or control over equities, securities, entities, assets, land or interests that might harm domestic national security or public interest, other than Antitrust Laws.

"**Foreign Plan**" shall mean each Company Benefit Plan that primarily covers current or former employees, directors or individual service providers of the Company or any of its subsidiaries based outside of the U.S. and/or that is subject to any Law other than U.S., federal, state or local law (other than any plan or program that is required by statute or maintained by a Governmental Authority to which the Company or any of its subsidiaries contributes pursuant to applicable Law).

"**Funding Obligations**" shall have the meaning set forth in <u>Section 5.4</u>.

"**GAAP**" shall mean the U.S. generally accepted accounting principles.

"**Goldman Sachs**" shall have the meaning set forth in <u>Section 4.21</u>.

"**Governmental Authority**" shall mean any U.S. (federal, state or local) or foreign government, or any governmental, regulatory, judicial or administrative authority, agency or commission.

"**Hazardous Materials**" means all substances (i) defined as hazardous substances, oils, pollutants or contaminants in the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.5, or (ii) defined as hazardous substances, hazardous materials, pollutants, contaminants, toxic substances (or words of similar import) by or regulated as such under any Environmental Law.

"**HSR Act**" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

"**Intellectual Property Rights**" shall have the meaning set forth in <u>Section 4.14(a)</u>.

"**IRS**" shall mean the Internal Revenue Service.

"**Knowledge**" means the actual knowledge of the directors and officers of the relevant party, following due inquiry of their direct reports and others who would be reasonably expected to have knowledge of the subject matter in question.

"**Law**" shall mean any and all domestic (federal, state or local) or foreign laws (including common law), rules, regulations, orders, judgments or decrees promulgated by any Governmental Authority.

"**Lien**" shall mean liens, claims, mortgages, encumbrances, pledges, security interests or charges of any kind.

"**Margin Loan Borrower**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Margin Loan Commitment Letter**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Margin Loan Financing**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Merger**" shall have the meaning set forth in the Recitals.

"**Merger Consideration**" shall have the meaning set forth in <u>Section 3.1(c)</u>.

"**Notice of Adverse Board Recommendation Change**" shall have the meaning set forth in <u>Section 6.5(d)</u>.

"**Notice of Superior Proposal**" shall have the meaning set forth in <u>Section 6.5(d)</u>.

"**Order**" shall mean any decree, order, judgment, injunction, temporary restraining order or other order in any suit or proceeding by or with any Governmental Authority.

"**Parent**" shall have the meaning set forth in the Preamble.

"**Parent Board**" shall have the meaning set forth in the Recitals.

"**Parent Disclosure Letter**" shall mean the disclosure letter delivered by Parent to the Company simultaneously with the execution of this Agreement.

"**Parent Material Adverse Effect**" shall mean any change, effect or circumstance which, individually or in the aggregate, has prevented or materially delayed or materially impaired, or would reasonably be expected to prevent or materially delay or materially impair, the ability of Parent or Acquisition Sub to consummate the Merger and the other transactions contemplated by this Agreement.

10

"**Parent Related Parties**" shall have the meaning set forth in <u>Section 8.3(c)</u>.

"**Parent Termination Fee**" shall mean an amount equal to $1,000,000,000.

"**Paying Agent**" shall have the meaning set forth in <u>Section 3.2(a)</u>.

"**Paying Agent Agreement**" shall have the meaning set forth in <u>Section 3.2(a)</u>.

"**Permitted Lien**" shall mean (i) any Lien for Taxes not yet delinquent or that are being contested in good faith by any appropriate proceedings and for which adequate accruals or reserves have been established in accordance with GAAP, (ii) Liens securing indebtedness or liabilities that are reflected in the Company SEC Documents or incurred in the ordinary course of business since the end of the most recent fiscal year for which an Annual Report on Form 10-K has been filed by the Company with the SEC and Liens securing indebtedness or liabilities that have otherwise been disclosed to Parent in writing, (iii) such Liens or other imperfections of title, if any, that do not have a Company Material Adverse Effect, including (A) easements or claims of easements whether or not shown by the public records, boundary line disputes, overlaps, encroachments and any matters not of record which would be disclosed by an accurate survey or a personal inspection of the property, (B) rights of parties in possession, (C) any supplemental Taxes or assessments not shown by the public records and (D) title to any portion of the premises lying within the right of way or boundary of any public road or private road, (iv) Liens imposed or promulgated by Laws with respect to real property and improvements, including zoning regulations, (v) Liens disclosed on existing title reports or existing surveys, (vi) mechanics', carriers', workmen's, repairmen's and similar Liens incurred in the ordinary course of business, (vii) Liens securing acquisition financing with respect to the applicable asset, including refinancings thereof and (viii) licenses of Intellectual Property Rights.

"**Person**" shall mean an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a Governmental Authority.

"**Post-Closing Plans**" shall have the meaning set forth in <u>Section 6.9(b)</u>.

"**Post-Closing Welfare Plans**" shall have the meaning set forth in <u>Section 6.9(c)</u>.

"**Proxy Statement**" shall have the meaning set forth in <u>Section 4.7</u>.

"**Representatives**" shall have the meaning set forth in <u>Section 6.4</u>.

"**SEC**" shall mean the Securities and Exchange Commission.

"**Secretary of State**" shall have the meaning set forth in <u>Section 2.3(a)</u>.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Silver Lake Investment Agreement**" means the Investment Agreement, dated as of March 9, 2020, among Twitter, Inc. and Silver Lake Partners V DE (AIV), L.P., as amended, restated, supplemented or otherwise modified from time to time.

"**Solvent**" shall have the meaning set forth in Section 5.12.

"**Specified Provisions**" shall have the meaning set forth in the Preamble.

"**Stockholder Rights**" means the rights distributed to the Stockholders pursuant to Company Stockholder Rights Agreement.

"**Stockholder Rights Plan**" means the Company Stockholder Rights and the Company Stockholder Rights Agreement.

"**Stockholder Rights Agreement**" means the Preferred Stock Rights Agreement, dated as of April 15, 2022, between the Company and Computershare Trust Company, N.A., as rights agent, as amended, restated, supplemented or otherwise modified from time to time

"**Subsidiary**" of any Person shall mean any corporation, partnership, joint venture or other legal entity of which such Person (either above or through or together with any other subsidiary) owns, directly or indirectly, more than 50% of the stock or other equity interests, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity.

"**Superior Proposal**" shall have the meaning set forth in Section 6.5(g)(iii).

"**Surviving Corporation**" shall have the meaning set forth in Section 2.1.

"**Tax**" or "**Taxes**" shall mean all federal, state, local and foreign income, profits, franchise, gross receipts, customs duty, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, license, production, value added, occupancy and other taxes of any kind whatsoever, together with all interest, penalties and additions imposed with respect thereto.

"**Tax Returns**" shall mean all returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns) filed or required to be filed with a Tax authority.

"**Termination Date**" shall have the meaning set forth in Section 8.1(b)(i).

"**Termination Fee**" shall mean an amount equal to $1,000,000,000.

"**Tesla Shares**" means shares of common stock of Tesla, Inc., $0.001 par value.

"**Third Party**" shall mean any Person or group other than Parent, Acquisition Sub and their respective Affiliates.

"**U.S.**" means the United States of America and its territories, commonwealths and possessions.

12

## ARTICLE II

## THE MERGER

Section 2.1 The Merger. Upon the terms and subject to the conditions of this Agreement, and in accordance with the DGCL, at the Effective Time, Acquisition Sub shall be merged with and into the Company, whereupon the separate existence of Acquisition Sub shall cease, and the Company shall continue under the name "Twitter, Inc." as the surviving corporation (the "**Surviving Corporation**") and shall continue to be governed by the laws of the State of Delaware.

Section 2.2 The Closing. Subject to the provisions of Article VII, the closing of the Merger (the "**Closing**") shall take place at 9:00 a.m. (Pacific Time) on a date to be specified by the parties hereto, but no later than the second (2nd) Business Day after the satisfaction or waiver of all of the conditions set forth in Article VII (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing). The Closing shall take place virtually by the electronic exchange of documents, unless another time, date or place is agreed to in writing by the parties hereto (such date, the "**Closing Date**").

Section 2.3 Effective Time.

(a) Concurrently with the Closing, the Company, Parent and Acquisition Sub shall cause a certificate of merger with respect to the Merger (the "**Certificate of Merger**") to be executed and filed with the Secretary of State of the State of Delaware (the "**Secretary of State**") in accordance with the relevant provisions of the DGCL and any other applicable Law of the State of Delaware. The Merger shall become effective on the date and time at which the Certificate of Merger has been duly filed with the Secretary of State or such other date and time as may be agreed to by Parent and the Company and as set forth in the Certificate of Merger in accordance with the DGCL (such date and time hereinafter referred to as the "**Effective Time**").

(b) The Merger shall have the effects set forth in this Agreement and in the applicable provisions of the DGCL. Without limiting the generality of the foregoing, from and after the Effective Time, (i) the Company shall be the surviving corporation in the Merger, (ii) all the property, rights, privileges, immunities, powers, franchises and liabilities of the Company and Acquisition Sub are vested in the Surviving Corporation, (iii) the separate existence of Acquisition Sub shall cease and (iv) the Company shall continue to be governed by the laws of the State of Delaware.

Section 2.4 Certificate of Incorporation and Bylaws. The parties will take all necessary actions so that at the Effective Time, the certificate of incorporation and the bylaws of Acquisition Sub, each as in effect immediately prior to the Effective Time, will be the certificate of incorporation and the bylaws, respectively, of the Surviving Corporation (except that the titles thereof shall read "Certificate of Incorporation of Twitter, Inc." and "Bylaws of Twitter, Inc.", respectively) until, subject to Section 6.6, thereafter amended in accordance with the applicable provisions of the DGCL and the certificate of incorporation and bylaws of the Surviving Corporation.

13

Section 2.5 Board of Directors. The board of directors of the Surviving Corporation effective as of, and immediately following, the Effective Time shall consist of the members of the Acquisition Sub Board immediately prior to the Effective Time, each to serve in accordance with the certificate of incorporation and bylaws of the Surviving Corporation until their respective successors shall have been duly elected and qualified, or until their earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of the Surviving Corporation.

Section 2.6 Officers. From and after the Effective Time, the officers of the Company at the Effective Time shall be the officers of the Surviving Corporation, until their respective successors are duly elected or appointed and qualified in accordance with applicable Law.

## ARTICLE III

## EFFECT OF THE MERGER ON CAPITAL STOCK

Section 3.1 Effect on Securities. At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Parent, Acquisition Sub or the holders of any securities of the Company or Acquisition Sub:

(a) Conversion of Acquisition Sub Capital Stock. At the Effective Time, by virtue of the Merger and without any action on the part of the holder thereof, each share of common stock, $0.01 par value per share, of Acquisition Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become one (1) fully paid share of common stock, $0.01 par value per share, of the Surviving Corporation and constitute the only issued or outstanding shares of capital stock of the Surviving Corporation.

(b) Cancellation of Certain Company Securities. Each share of common stock, par value $0.000005 per share, of the Company (the "**Company Common Stock**") held by the Company or any of its Subsidiaries or held, directly or indirectly, by the Equity Investor, Parent or Acquisition Sub immediately prior to the Effective Time (collectively, the "**Canceled Shares**") shall automatically be canceled and retired and shall cease to exist as issued or outstanding shares, and no consideration or payment shall be delivered in exchange therefor or in respect thereof.

(c) Conversion of Company Securities. Except as otherwise provided in this Agreement, each share of Company Common Stock issued and outstanding immediately prior to the Effective Time (other than any Canceled Shares or Dissenting Shares) shall be converted into the right to receive $54.20 per share of Company Common Stock in cash, without interest (the "**Merger Consideration**"). Each share of Company Common Stock to be converted into the right to receive the Merger Consideration as provided in this Section 3.1(c) shall no longer be issued or outstanding and shall be automatically canceled and shall cease to exist, and the holders of certificates (the "**Certificates**") or book-entry shares ("**Book-Entry Shares**") which immediately prior to the Effective Time represented such shares of Company Common Stock shall cease to have any rights with respect to such Company Common Stock other than the right to receive, upon surrender of such Certificates or Book-Entry Shares in accordance with Section 3.2(b), the Merger Consideration, without interest thereon.

14

(d) <u>Adjustments</u>. Without limiting the other provisions of this Agreement, if at any time during the period between the date of this Agreement and the Effective Time, any change in the number of outstanding shares of Company Common Stock shall occur as a result of a reclassification, recapitalization, stock split (including a reverse stock split) or similar event, or combination or exchange of shares, or any stock dividend or stock distribution with a record date during such period (in each case, other than with respect to the initial distribution of Stockholder Rights under the Stockholder Rights Plan or such Stockholder Rights becoming exercisable as a result of Parent or any of its Affiliates or Representatives becoming an "Acquiring Person" (as defined in the Stockholder Rights Agreement)), the Merger Consideration shall be equitably adjusted to provide the same economic effect as contemplated by this Agreement prior to such event. Nothing in this <u>Section 3.1(d)</u> shall be construed to permit any party to take any action that is otherwise prohibited or restricted by any other provision of this Agreement.

Section 3.2 Payment for Securities; Exchange of Certificates.

(a) <u>Designation of Paying Agent; Deposit of Exchange Fund</u>. Prior to the Closing, Parent shall designate a reputable bank or trust company (the "**Paying Agent**") that is organized and doing business under the laws of the U.S., the identity and the terms of appointment of which to be reasonably acceptable to the Company, to act as Paying Agent for the payment of the Merger Consideration as provided in <u>Section 3.1(b)</u>, and shall enter into an agreement (the "**Paying Agent Agreement**") relating to the Paying Agent's responsibilities with respect thereto, in form and substance reasonably acceptable to the Company. At or prior to the Effective Time, Parent shall deposit, or cause to be deposited with the Paying Agent, cash constituting an amount equal to the Aggregate Merger Consideration (such Aggregate Merger Consideration as deposited with the Paying Agent, the "**Exchange Fund**"). In the event the Exchange Fund shall be insufficient to make the payments contemplated by <u>Section 3.1(b)</u>, Parent shall promptly deposit, or cause to be deposited, additional funds with the Paying Agent in an amount which is equal to the deficiency in the amount required to make such payments in full. Parent shall cause the Exchange Fund to be (A) held for the benefit of the holders of Company Common Stock and (B) applied promptly to make payments pursuant to <u>Section 3.1(b)</u>. The Exchange Fund shall not be used for any purpose other than to fund payments pursuant to <u>Section 3.1</u>, except as expressly provided for in this Agreement.

(b) <u>Procedures for Exchange</u>. As promptly as reasonably practicable following the Effective Time and in any event not later than two (2) Business Days thereafter, the Surviving Corporation shall cause the Paying Agent to mail to each holder of record a Certificate that immediately prior to the Effective Time represented outstanding shares of Company Common Stock (A) a letter of transmittal, which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon proper delivery of the Certificates (or affidavits of loss in lieu thereof) to the Paying Agent and which shall be in the form and have such other provisions as Parent and the Company may reasonably specify and (B) instructions for use in effecting the surrender of the Certificates in exchange for the Merger Consideration into which the number of shares of Company Common Stock previously represented by such Certificate shall have been converted pursuant to this Agreement (which instructions shall be in the form and have such other provisions as Parent and the Company may reasonably specify). Any holder of Book-Entry Shares shall not be required to deliver a Certificate or an executed letter of transmittal to receive the Merger Consideration with respect to such Book-Entry Shares.

15

(c) <u>Timing of Exchange</u>. Upon surrender of a Certificate (or affidavit of loss in lieu thereof) or Book-Entry Share for cancellation to the Paying Agent, together with, in the case of Certificates, a letter of transmittal duly completed and validly executed in accordance with the instructions thereto, or, in the case of Book-Entry Shares, receipt of an "agent's message" by the Paying Agent (it being understood that holders of Book-Entry Shares will be deemed to have surrendered such Book-Entry Shares upon receipt of an "agent's message" with respect to such Book-Entry Shares), and such other customary evidence of surrender as the Paying Agent may reasonably require, the holder of such Certificate or Book-Entry Share shall be entitled to receive in exchange therefor (and Parent shall cause the Paying Agent to promptly deliver in exchange therefor) the Merger Consideration for each share of Company Common Stock formerly represented by such Certificate or Book-Entry Share upon the later to occur of (i) the Effective Time or (ii) the Paying Agent's receipt of such Certificate (or affidavit of loss in lieu thereof) or Book-Entry Share, in accordance with <u>Section 3.2(b)</u>, as applicable, and the Certificate (or affidavit of loss in lieu thereof) or Book-Entry Share so surrendered shall be forthwith canceled. The Paying Agent Agreement shall provide that the Paying Agent shall accept such Certificates (or affidavits of loss in lieu thereof) or Book-Entry Shares upon compliance with such reasonable terms and conditions as the Paying Agent may impose to effect an orderly exchange thereof in accordance with customary exchange practices. No interest shall be paid or accrued for the benefit of holders of the Certificates or Book-Entry Shares on the Merger Consideration payable upon the surrender of the Certificates or Book-Entry Shares.

(d) <u>Termination of Exchange Fund</u>. Any portion of the Exchange Fund which remains undistributed to the holders of the Certificates or Book-Entry Shares for one (1) year after the Effective Time shall be delivered to the Surviving Corporation, upon written demand, and any such holders prior to the Merger who have not theretofore complied with this <u>Article III</u> shall thereafter look only to the Surviving Corporation as a general creditor thereof for payment of their claims for the Merger Consideration in respect thereof.

(e) <u>No Liability</u>. None of Parent, Acquisition Sub, the Company, the Surviving Corporation or the Paying Agent shall be liable to any Person in respect of any cash held in the Exchange Fund delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law. If any Certificates or Book-Entry Shares shall not have been surrendered immediately prior to the date on which any cash in respect of such Certificate or Book-Entry Share would otherwise escheat to or become the property of any Governmental Authority, any such cash in respect of such Certificate or Book-Entry Share shall, to the extent permitted by applicable Law, become the property of the Surviving Corporation, free and clear of all claims or interest of any Person previously entitled thereto.

(f) <u>Investment of Exchange Fund</u>. The Paying Agent Agreement shall provide that the Paying Agent shall invest any cash included in the Exchange Fund as directed by Parent or, after the Effective Time, the Surviving Corporation; <u>provided</u> that (i) no such investment shall relieve Parent or the Paying Agent from making the payments required by this <u>Article III</u>, and following any losses Parent shall promptly provide additional funds to the Paying Agent for the benefit of the holders of Company Common Stock in the amount of such losses, (ii) no such investment shall have maturities that could prevent or delay payments to be made pursuant to this Agreement and (iii) all such investments shall be in short-term obligations of the U.S. with maturities of no more than thirty (30) days or guaranteed by the U.S. and backed by the full faith and credit of the U.S. Any interest or income produced by such investments will be payable to the Surviving Corporation or Parent, as directed by Parent.

(g) <u>Withholding</u>. Each of Parent, the Surviving Corporation and the Paying Agent shall be entitled to deduct and withhold from the Merger Consideration and any amounts otherwise payable pursuant to this Agreement to any Person such amounts as are required to be deducted and withheld with respect to the making of such payment under any applicable Law. To the extent that amounts are so deducted and withheld, such amounts (i) shall be promptly remitted by Parent, the Surviving Corporation or the Paying Agent, as applicable, to the applicable Governmental Authority, and (ii) shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

<u>Section 3.3 Lost Certificates</u>. If any Certificate shall have been lost, stolen or destroyed, then upon the making of an affidavit, in form and substance reasonably acceptable to Parent, of that fact by the Person claiming such Certificate to be lost, stolen or destroyed, the Paying Agent shall issue, in exchange for such lost, stolen or destroyed Certificate, the Merger Consideration to which the holder thereof is entitled pursuant to this <u>Article III</u>.

<u>Section 3.4 Transfers; No Further Ownership Rights</u>. After the Effective Time, there shall be no registration of transfers on the stock transfer books of the Company of shares of Company Common Stock that were outstanding immediately prior to the Effective Time. If Certificates or Book-Entry Shares are presented to the Surviving Corporation, Parent or Paying Agent for transfer following the Effective Time, they shall be canceled against delivery of the applicable Merger Consideration, as provided for in <u>Section 3.1(b)</u>, for each share of Company Common Stock formerly represented by such Certificates or Book-Entry Shares. Payment of the Merger Consideration in accordance with the terms of this <u>Article III</u>, and, if applicable, any unclaimed dividends upon the surrender of Certificates, shall be deemed to have been paid in full satisfaction of all rights pertaining to the shares of Company Common Stock formerly represented by such Certificates or Book-Entry Shares.

<u>Section 3.5 Dissenting Shares</u>. Notwithstanding any other provision of this Agreement to the contrary, to the extent that holders thereof are entitled to appraisal rights under Section 262 of the DGCL or similar appraisal or dissenters' rights under any other applicable Law, shares of Company Common Stock issued and outstanding immediately prior to the Effective Time and held by a holder who has properly exercised and perfected his or her demand for appraisal or dissenters' rights under Section 262 of the DGCL or such other applicable Law (the "**Dissenting Shares**"), shall not be converted into the right to receive the Merger Consideration. At the Effective Time, the Dissenting Shares shall no longer be outstanding and shall automatically be canceled and shall cease to exist, as provided for in <u>Section 3.1(b)</u>, for shall cease to have any rights with respect thereto, but the holders of such Dissenting Shares shall be entitled to receive such consideration as shall be determined pursuant to Section 262 of the DGCL or such other applicable Law; <u>provided</u>, <u>however</u>, that if any such holder shall have failed to perfect or shall have effectively withdrawn or lost his or her right to appraisal or dissenters' rights and payment under the DGCL or such other applicable Law, as applicable (whether occurring before, at or after the Effective Time), such holder's shares of Company Common Stock shall thereupon be deemed to have been converted as of the Effective Time into the right to receive the Merger Consideration, without any interest thereon, and such shares shall not be deemed to be Dissenting Shares. Any payments

17

required to be made with respect to the Dissenting Shares shall be made by Parent (and not the Company or Acquisition Sub), and the Aggregate Merger Consideration shall be reduced, on a dollar-for-dollar basis, as if the holder of such Dissenting Shares had not been a stockholder on the Closing Date. The Company shall give prompt written notice to Parent of any demands for appraisal of or dissenters' rights respecting any shares of Company Common Stock, withdrawals of such demands and any other instruments served pursuant to the DGCL or such other applicable Law received by the Company relating to appraisal or dissenters' demands, and Parent shall have the right to participate in all negotiations and proceedings with respect to such demands. Prior to the Effective Time, the Company shall not, without the prior written consent of Parent (which consent shall not be unreasonably withheld or delayed), voluntarily make any payment with respect to, or settle or offer to settle, any such demands, or agree to do or commit to do any of the foregoing.

Section 3.6 Company Equity Awards.

(a) Company Options.

(i) As of the Effective Time, each Company Option that is vested in accordance with its terms and outstanding as of immediately prior to the Effective Time (each, a "**Vested Company Option**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Vested Company Option and (ii) the excess, if any, of the Merger Consideration, over the exercise price per share of Company Common Stock underlying such Vested Company Option (the "**Vested Option Consideration**"); provided, that if the exercise price per share of Company Common Stock underlying such Vested Company Option is equal to or greater than the Merger Consideration, such Vested Company Option shall be canceled without any cash payment or other consideration being made in respect thereof.

(ii) As of the Effective Time, each Company Option that is outstanding and is not a Vested Company Option (each, an "**Unvested Company Option**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company Option and (ii) the excess, if any, of the Merger Consideration, over the exercise price per share of Company Common Stock underlying such Unvested Company Option (the "**Unvested Option Consideration**"); provided that, if the exercise price per share of Company Common Stock underlying such Unvested Company Option is equal to or greater than the Merger Consideration, such Unvested Company Option shall be canceled without any cash payment or other consideration being made in respect thereof. Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested Option Consideration will vest and become payable at the same time as the Unvested Company Option from which such Unvested Option Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company Option immediately prior to the Effective Time.

18

(b) Company PSUs.

(i) As of the Effective Time, each Company PSU that is vested in accordance with its terms and outstanding as of immediately prior to the Effective Time (each, a "**Vested Company PSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Vested Company PSU based on the achievement of the applicable performance metrics at the level of performance for which such Vested Company PSU vested in accordance with its terms and (ii) the Merger Consideration (the "**Vested PSU Consideration**").

(ii) As of the Effective Time, each Company PSU that is outstanding immediately prior thereto and that is not a Vested Company PSU (each, an "**Unvested Company PSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company PSU based on the achievement of the applicable performance metrics at the target level of performance and (ii) the Merger Consideration (the "**Unvested PSU Consideration**"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested PSU Consideration will vest and become payable at the same time as the Unvested Company PSU from which such Unvested PSU Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company PSU immediately prior to the Effective Time (except that performance-based vesting metrics and criteria shall not apply from and after the Effective Time).

(c) Company RSAs. At the Effective Time, each Company RSA that is outstanding immediately prior to the Effective Time shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Company RSA and (ii) the Merger Consideration (the "**Unvested RSA Consideration**"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested RSA Consideration will vest and become payable at the same time as the Company RSA from which such Unvested RSA Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Company RSA immediately prior to the Effective Time; provided that the Company shall be permitted to accelerate the vesting of any unvested Company RSA if the holder thereof would be subject to Taxes in connection with the Closing as a result of the treatment contemplated by this Section 3.3(c).

(d) Company RSUs.

(i) As of the Effective Time, each Company RSU that is vested in accordance with its terms as of immediately prior to the Effective Time and each Company RSU held by a non-employee member of the Company Board, in either case, that is outstanding immediately prior to the Effective Time, (each, a "**Vested Company RSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Vested Company RSU and (ii) the Merger Consideration (the "**Vested RSU Consideration**").

(ii) As of the Effective Time, each Company RSU that is outstanding immediately prior thereto and that is not a Vested Company RSU (each, an "**Unvested Company RSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company RSU and (ii) the Merger Consideration (the "**Unvested RSU Consideration**"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested RSU Consideration will vest and become payable at the same time as the Unvested Company RSU from which such Unvested RSU Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company RSU immediately prior to the Effective Time.

(e) <u>Delivery of Company Equity Award Payments</u>. Parent shall cause the Surviving Corporation to pay through the payroll system of the Surviving Corporation (to the extent applicable) the Vested Option Consideration, the Vested PSU Consideration, and the Vested RSU Consideration to each holder of a Vested Company Option, Vested Company PSU and Vested Company RSU, as applicable, less any required withholding Taxes and without interest, within five (5) Business Days following the Effective Time.

<u>Section 3.7 Company ESPP</u>. As soon as practicable following the date of this Agreement, the Company Board or a committee thereof shall adopt resolutions or take other actions as may be required to provide that (A) the Offering Period (as defined in the Company ESPP) in effect as of the date hereof shall be the final Offering Period (such period, the "**Final Offering Period**") and no further Offering Period shall commence pursuant to the Company ESPP after the date hereof, and (B) each individual participating in the Final Offering Period on the date of this Agreement shall not be permitted to (x) increase his or her payroll contribution rate pursuant to the Company ESPP from the rate in effect when the Final Offering Period commenced or (y) make separate non-payroll contributions to the Company ESPP on or following the date of this Agreement, except as may be required by applicable Law. Prior to the Effective Time, the Company shall take all action that may be necessary to, effective upon the consummation of the Merger, (A) cause the Final Offering Period, to the extent that it would otherwise be outstanding at the Effective Time, to be terminated no later than ten (10) Business Days prior to the date on which the Effective Time occurs; (B) make any pro rata adjustments that may be necessary to reflect the Final Offering Period, but otherwise treat the Final Offering Period as a fully effective and completed Offering Period for all purposes pursuant to the Company ESPP; and (C) cause the exercise (as of no later than ten (10) Business Days prior to the date on which the Effective Time occurs) of each outstanding purchase right pursuant to the Company ESPP. On such exercise date, the Company shall apply the funds credited as of such date pursuant to the Company ESPP within each participant's payroll withholding account to the purchase of whole shares of Company Common Stock in accordance with the terms of the Company ESPP, and such Common Shares shall be entitled to the Merger Consideration in accordance with Section 3.1(b). Immediately prior to and effective as of the Effective Time (but subject to the consummation of the Merger), the Company shall terminate the Company ESPP.

20

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as disclosed in the Company Disclosure Letter or in the Company SEC Documents filed by the Company prior to the date of this Agreement (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements" and any other disclosures included therein to the extent they are forward-looking in nature), the Company hereby represents and warrants to Parent and Acquisition Sub as follows:

Section 4.1 Organization and Qualification; Subsidiaries. Each of the Company and its Subsidiaries is a corporation, partnership or other entity duly organized, validly existing and (to the extent applicable) in good standing under the laws of the jurisdiction of its incorporation or organization and has the requisite entity power and authority to conduct its business as it is now being conducted, except where the failure to be duly organized, validly existing or in good standing or to have such power and authority would not have a Company Material Adverse Effect. Each of the Company and its Subsidiaries is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing would not have a Company Material Adverse Effect. The Company's Amended and Restated Certificate of Incorporation (as may be further amended from time to time, the "**Company Certificate of Incorporation**") and the Company's Amended and Restated Bylaws (as may be further amended from time to time, the "**Company Bylaws**"), in each case, as currently in effect, are included in the Company SEC Documents.

Section 4.2 Capitalization.

(a) As of March 31, 2022, the authorized capital stock of the Company consists of (i) 5,000,000,000 shares of Company Common Stock, 763,577,530 of which were issued and outstanding (including 1,386,850 Company RSAs), and none of which were held in treasury, and (ii) 200,000,000 shares of preferred stock, par value $0.000005 per share, of the Company, none of which were issued and outstanding. As of March 31, 2022, there were (i) 953,365 Company Options outstanding, (ii) 2,900,689 Company PSUs outstanding (assuming attainment of the applicable performance metrics at the target level of performance), (iii) 67,575,223 Company RSUs outstanding, and (iv) shares of Company Common Stock subject to outstanding purchase rights under the Company ESPP. Except as described above and other than the Stockholder Rights, the Existing Convertible Notes, the Company Warrant Confirmations and any issuances or grants (or promises or offers to issue or grant) Company Equity Awards since March 31, 2022 in connection with employee hiring, retention or promotions in the ordinary course of business in an amount less than 5,000,000 Company Equity Awards (assuming attainment of the applicable performance metrics at the target level of performance) in the aggregate, as of the date of this Agreement, there are no additional existing and outstanding (i) options, warrants, calls, subscriptions or other rights, convertible securities, agreements or commitments of any character to which the Company or any of its Subsidiaries is a party obligating the Company or any of its

21

Subsidiaries to issue, transfer or sell any shares of capital stock or other equity interests in the Company or any of its Subsidiaries or securities convertible into or exchangeable for such shares or equity interests, (ii) contractual obligations of the Company or any of its Subsidiaries to repurchase, redeem or otherwise acquire any capital stock of the Company or any of its Subsidiaries, except pursuant to the other than the Company ASR Confirmations and the Company Bond Hedging Transactions or (iii) voting trusts or similar agreements to which the Company is a party with respect to the voting of the capital stock of the Company, other than the Silver Lake Investment Agreement.

(b) Except as would not be material to the Company and its Subsidiaries, taken as a whole, all of the outstanding shares of capital stock or equivalent equity interests of each of the Company's Subsidiaries are owned of record and beneficially, directly or indirectly, by the Company or the relevant wholly owned Subsidiary (except for de minimis equity interests held by a Third Party for local regulatory reasons) and free and clear of all Liens except for restrictions imposed by applicable securities laws and Permitted Liens.

(c) Prior to the Closing, the Company will provide Parent with a correct and complete list, as of such date, of all outstanding Company Equity Awards, including the holder (by employee identification number), type of Company Equity Award, date of grant, number of shares of Company Common Stock underlying such award (and, if applicable, assuming achievement of the applicable performance metrics at the target level of performance), whether such Company Equity Award is intended to qualify as an "incentive stock option" under Section 422 of the Code, the equity plan pursuant to which the Company Equity Award was granted, and, where applicable, the exercise price per share and expiration date.

22

Section 4.3 Authority Relative to Agreement.

(a) The Company has all necessary corporate power and authority to execute and deliver this Agreement and, assuming the accuracy of the representations and warranties set forth in the second sentence of Section 5.8 and subject to obtaining the Company Stockholder Approval and the occurrence of the stockholder advisory vote contemplated by Rule 14a-21(c) under the Exchange Act, regardless of the outcome of such advisory vote (the "**Company Stockholder Advisory Vote**"), to consummate the transactions contemplated by this Agreement, including the Merger. The execution, delivery and performance of this Agreement by the Company, and the consummation by the Company of the transactions contemplated by this Agreement, including the Merger, have been duly and validly authorized by all necessary corporate action by the Company, and assuming the accuracy of the representations and warranties set forth in the second sentence of Section 5.8 and except for the Company Stockholder Approval, the occurrence of the Company Stockholder Advisory Vote, no other corporate action or proceeding on the part of the Company is necessary to authorize the execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated by this Agreement, including the Merger. This Agreement has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery of this Agreement by the other parties hereto, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except that such enforceability may be subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar Laws, now or hereafter in effect, affecting creditors' rights and remedies generally (the "**Enforceability Exceptions**").

(b) The Company Board has, by resolutions duly adopted by the unanimous vote of the directors at a duly held meeting (i) determined that the terms and conditions of this Agreement, the Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Company and the Company's stockholders, (ii) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (iii) directed that this Agreement be submitted for consideration at a meeting of the Company's stockholders and (iv) subject to the terms of this Agreement, resolved to recommend that the Company's stockholders adopt this Agreement and approve the transactions contemplated hereby, including the Merger.

Section 4.4 No Conflict; Required Filings and Consents.

(a) Neither the execution and delivery of this Agreement by the Company nor the consummation by the Company of the transactions contemplated by this Agreement will (i) violate any provision of the Company Certificate of Incorporation or the Company Bylaws or (ii) assuming the accuracy of the representations and warranties set forth in the second sentence of Section 5.8 and that the Consents, registrations, declarations, filings and notices referred to in Section 4.4(b) have been obtained or made, any applicable waiting periods referred to therein have expired and any condition precedent to any such Consent has been satisfied, conflict with or violate any Law applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected or (iii) except with respect to the Existing Credit Agreement and the Existing Notes, result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give rise to any right of termination, acceleration or cancellation of, any Company Material Contract (other than any Company Benefit Plan) , other than, in the case of clauses (ii) and (iii) any such conflict, violation, breach, default, termination, acceleration or cancellation that would not have a Company Material Adverse Effect.

23

(b) No consent, approval, clearance, license, permit, order or authorization (each of the foregoing, a "**Consent**") of, or registration, declaration or filing with, or notice to, any Governmental Authority is required to be obtained or made by or with respect to the Company or any of its Subsidiaries under applicable Law in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated by this Agreement, other than (i) the applicable reporting or other requirements of and filings with the SEC under the Exchange Act (including the filing of the Proxy Statement), (ii) the filing of the Certificate of Merger with the Secretary of State in accordance with the DGCL and appropriate documents with the relevant authorities of the other jurisdictions in which the Company or any of its Subsidiaries is qualified to do business, (iii) the applicable requirements under corporation or Blue Sky Laws of various states, (iv) such filings as may be required in connection with the Taxes described in Section 8.6, (v) filings with the New York Stock Exchange, (vi) such other items required solely by reason of the participation of Parent or Acquisition Sub or any of their Affiliates in the transactions contemplated by this Agreement, (vii) compliance with and filings or notifications under the HSR Act and any other applicable U.S. or foreign competition, antitrust or merger control Laws (together with the HSR Act, "**Antitrust Laws**"), (viii) compliance with and filings or notifications under any applicable Foreign Investment Laws, and (ix) such other Consents, registrations, declarations, filings or notices the failure of which to be obtained or made would not have a Company Material Adverse Effect.

Section 4.5 Permits; Compliance With Laws.

(a) As of the date of this Agreement, the Company and its Subsidiaries are in possession of all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals and orders necessary for the Company and its Subsidiaries to carry on their respective business as it is now being conducted (the "**Company Permits**") and all Company Permits are in full force and effect and no suspension or cancellation of any of the Company Permits is pending or, to the Knowledge of the Company, threatened, except where the failure to be in possession of or be in full force and effect, or the suspension or cancellation of, any of the Company Permits would not have a Company Material Adverse Effect.

(b) Neither the Company nor any of its Subsidiaries is in default or violation of any Law applicable to the Company, any of its Subsidiaries or by which any of their respective properties or assets are bound, except for any such defaults or violations that would not have a Company Material Adverse Effect. Notwithstanding the foregoing, no representation or warranty in Section 4.5(a) or this Section 4.5(b) is made with respect to Company SEC Documents or financial statements, "disclosure controls and procedures" or "internal control over financial reporting," employee benefits matters, Intellectual Property Rights matters, Tax matters, which are addressed exclusively in Section 4.6 (Company SEC Documents; Financial Statements), Section 4.8 (Disclosure Controls and Procedures), Section 4.12 (Employee Benefit Plans), Section 4.14 (Intellectual Property Rights), Section 4.15 (Taxes), respectively.

24

<u>Section 4.6 Company SEC Documents; Financial Statements</u>.

(a) Since January 1, 2022, the Company has filed or furnished with the SEC all material forms, documents and reports required to be filed or furnished prior to the date of this Agreement by it with the SEC (such forms, documents and reports filed with the SEC, including any amendments or supplements thereto and any exhibits or other documents attached to or incorporated by reference therein, the "**Company SEC Documents**"). As of their respective dates, or, if amended or supplemented, as of the date of the last such amendment or supplement, the Company SEC Documents complied in all material respects with the requirements of the Securities Act and the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder, and none of the Company SEC Documents at the time it was filed (or, if amended or supplemented, as of the date of the last amendment or supplement) contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, or are to be made, not misleading.

(b) The consolidated financial statements (including all related notes) of the Company included in the Company SEC Documents fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as at the respective dates thereof and its consolidated statements of operations and consolidated statements of cash flows for the respective periods then ended (subject, in the case of unaudited interim statements, to normal year-end audit adjustments, none of which would have a Company Material Adverse Effect, to the absence of notes and to any other adjustments described therein, including in any notes thereto) in conformity with GAAP (except, in the case of unaudited statements, as permitted by Form 10-Q, Form 8-K or any successor form or other rules under the Exchange Act).

<u>Section 4.7 Information Supplied</u>. None of the information supplied or to be supplied by or on behalf of the Company or any of its Subsidiaries expressly for inclusion or incorporation by reference in the proxy statement relating to the matters to be submitted to the Company's stockholders at the Company Stockholders' Meeting (such proxy statement and any amendments or supplements thereto, the "**Proxy Statement**") shall, at the time the Proxy Statement is first mailed to the Company's stockholders and at the time of the Company Stockholders' Meeting to be held in connection with the Merger, contain any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading at such applicable time, except that no representation or warranty is made by the Company with respect to statements made therein based on information supplied, or required to be supplied, by Parent or its Representatives in writing expressly for inclusion therein. The Proxy Statement will comply as to form in all material respects with the provisions of the Securities Act and the Exchange Act, and the rules and regulations promulgated thereunder.

<u>Section 4.8 Disclosure Controls and Procedures</u>. The Company has established and maintains "disclosure controls and procedures" and "internal control over financial reporting" (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 promulgated under the Exchange Act) as required by Rule 13a-15 promulgated under the Exchange Act. The Company has disclosed, based on its most recent evaluation of the Company's internal control over financial reporting prior to the date of this Agreement, to the Company's auditors and the

25

audit committee of the Company Board (i) any significant deficiencies and material weaknesses in the design or operation of its internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and (ii) any fraud to the Knowledge of the Company, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Section 4.9 Absence of Certain Changes or Events. Since January 1, 2022 and until the date of this Agreement, (a) the businesses of the Company and its Subsidiaries have been conducted in the ordinary course of business (other than as a result of COVID-19 and COVID-19 Measures or with respect to the Existing 2030 Notes or the transactions contemplated hereby) and (b) there has not been any adverse change, event, development or state of circumstances that has had a Company Material Adverse Effect.

Section 4.10 No Undisclosed Liabilities. Except (a) as reflected, disclosed or reserved against in the Company's financial statements (as amended or restated, as applicable) or the notes thereto included in the Company SEC Documents, (b) for liabilities or obligations incurred in the ordinary course of business since December 31, 2021, (c) the Existing 2030 Notes, (d) for liabilities or obligations incurred in connection with the transactions contemplated by this Agreement, including the Merger, or (e) for liabilities or obligations that would not have a Company Material Adverse Effect, as of the date of this Agreement, the Company and its Subsidiaries do not have any liabilities of any nature, whether or not accrued, contingent or otherwise, that would be required by GAAP to be reflected on a consolidated balance sheet (or in the notes thereto) of the Company.

Section 4.11 Litigation. As of the date of this Agreement, there is no suit, action or proceeding pending or, to the Knowledge of the Company, threatened in writing against the Company or any of its Subsidiaries, that would have a Company Material Adverse Effect, nor is there any judgment of any Governmental Authority outstanding against, or, to the Knowledge of the Company, investigation by any Governmental Authority involving the Company or any of its Subsidiaries that would have a Company Material Adverse Effect. As of the date of this Agreement, there is no suit, action or proceeding pending or, to the Knowledge of the Company, threatened in writing seeking to prevent, hinder, modify, delay or challenge the Merger or any of the other transactions contemplated by this Agreement.

Section 4.12 Employee Benefit Plans.

(a) Prior to the Closing, the Company will provide a true and complete list, as of the date of this Agreement, of each material Company Benefit Plan (which list may reference a form of such Company Benefit Plan). Prior to the Closing, the Company will make available to Parent a true and complete copy of each material Company Benefit Plan and all amendments thereto and a true and complete copy of the following items (in each case, only if applicable): (i) each trust or other funding arrangement; (ii) each current summary plan description and current summary of material modifications; (iii) the most recently filed annual report on IRS Form 5500; and (iv) the most recently received IRS determination letter or IRS opinion letter.

26

(b) Except as would not have a Company Material Adverse Effect:

(i) each of the Company Benefit Plans has been maintained, operated, administered and funded in accordance with its terms and in compliance with applicable Laws;

(ii) there are no claims pending, or, to the Knowledge of the Company, threatened actions, suits, disputes or claims (other than routine claims for benefits) against or affecting any Company Benefit Plan, by any employee or beneficiary covered under such Company Benefit Plan, as applicable, or otherwise involving such Company Benefit Plan;

(iii) neither the Company nor its Subsidiaries has any material obligations for post-termination health or life insurance benefits under any Company Benefit Plan (other than for continuation coverage required to be provided pursuant to Section 4980B of the Code); and

(iv) each Foreign Plan (A) if required to be registered or approved by a non-U.S. Governmental Authority, has been registered or approved and has been maintained in good standing with applicable regulatory authorities, and, to the Knowledge of the Company, no event has occurred since the date of the most recent approval or application therefor relating to any such Foreign Plan that would reasonably be expected to adversely affect any such approval or good standing, (B) that is intended to qualify for special Tax treatment meets all requirements for such treatment, and (C) if required to be fully funded or fully insured, is fully funded or fully insured on an ongoing and termination or solvency basis (determined using reasonable actuarial assumptions) in compliance with applicable Laws.

(e) If, and to the extent, the execution or delivery of this Agreement or the consummation of the Merger (either alone or in combination with another event) will: (i) entitle any Company Service Provider to any material payment; (ii) materially increase the amount or value of any benefit or compensation or other obligation payable or required to be provided to any Company Service Provider; (iii) accelerate the time of payment or vesting of amounts due to any Company Service Provider or accelerate the time of any funding (whether to a trust or otherwise) of compensation or benefits in respect of any of the Company Benefit Plans; (iv) give rise to the payment of any amount by the Company or any of its Subsidiaries that would be non-deductible by reason of Section 280G of the Code, then, prior to the Closing, the Company will provide a true and complete list of each Company Benefit Plan that would trigger any of (i) through (iv) above. There is no contract, agreement, plan or arrangement to which the Company or any of its Subsidiaries is a party by which it is required by its terms to compensate, gross-up, indemnify, or otherwise reimburse any Person for excise Taxes imposed pursuant to Section 4999 or Section 409A of the Code.

(f) Except as would not have a Company Material Adverse Effect, there are no claims pending, or, to the Knowledge of the Company, threatened actions, suits, disputes or claims (other than routine claims for benefits) against or affecting any Company Benefit Plan, by any employee or beneficiary covered under such Company Benefit Plan, as applicable, or otherwise involving such Company Benefit Plan.

27

(g) Except as would not have a Company Material Adverse Effect, neither the Company nor its Subsidiaries has any material obligations for post-termination health or life insurance benefits under any Company Benefit Plan (other than for continuation coverage required to be provided pursuant to Section 4980B of the Code).

(h) Except as would not have a Company Material Adverse Effect, each Foreign Plan (i) has been maintained, operated and administered in compliance with its terms and in compliance with applicable Laws; (ii) if required to be registered or approved by a non-U.S. Governmental Authority, has been registered or approved and has been maintained in good standing with applicable regulatory authorities, and, to the Knowledge of the Company, no event has occurred since the date of the most recent approval or application therefor relating to any such Foreign Plan that would reasonably be expected to adversely affect any such approval or good standing; (iii) that is intended to qualify for special Tax treatment meets all requirements for such treatment; (iv) if required to be fully funded or fully insured, is fully funded or fully insured on an ongoing and termination or solvency basis (determined using reasonable actuarial assumptions) in compliance with applicable Laws; and (v) is not subject to any pending or, to the Knowledge of the Company, threatened claims by or on behalf of any participant in any Foreign Plan, or otherwise involving any such Foreign Plan or the assets of any Foreign Plan, other than routine claims for benefits.

Section 4.13 Labor Matters. If, and to the extent that, the Company or any of its Subsidiaries is a party to or bound by any works council or collective bargaining agreement and no employees of the Company or any of its Subsidiaries are represented by a labor organization with respect to their employment with the Company or any of its Subsidiaries, then, prior to the Closing, the Company will provide a true and complete list of each such works council or collective bargaining agreement, or labor organization, as applicable. There are no labor related strikes, walkouts or work stoppages pending or, to the Knowledge of the Company, threatened in writing.

Section 4.14 Intellectual Property.

(a) Except as would not have a Company Material Adverse Effect, the Company and its Subsidiaries solely and exclusively own all patents, trademarks, trade names, copyrights, Internet domain names, service marks, trade secrets and other intellectual property rights (the "**Intellectual Property Rights**") purported to be owned by the Company and its Subsidiaries (the "**Company Intellectual Property**"), free and clear of all Liens, except Permitted Liens.

(b) To the Knowledge of the Company, the conduct of the business of the Company and its Subsidiaries as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property Rights of any other Person, except for any such infringement, misappropriation or other violation that would not have a Company Material Adverse Effect. To the Knowledge of the Company, no other Person is infringing, misappropriating or otherwise violating any Company Intellectual Property, except for any such infringement, misappropriation or other violation as would not have a Company Material Adverse Effect.

28

The Company and its Subsidiaries are in compliance with all applicable Laws, Contracts to which the Company or its Subsidiaries are bound, and internal- and external-facing policies of the Company or its Subsidiaries, in each case, relating to privacy, data protection, and the collection and use of information that constitutes "personal information" under applicable Laws ("**Personal Information**") collected, used or held for use by the Company or its Subsidiaries, except where the failure to be in compliance would not have a Company Material Adverse Effect.

(e) Neither the Company nor any of its Subsidiaries has experienced any unauthorized access to the information technology systems owned or used by the Company or its Subsidiaries or Personal Information collected, used, held for use or otherwise processed by the Company or its Subsidiaries, except as would not have a Company Material Adverse Effect.

Section 4.15 Taxes.

(a) Except as would not have a Company Material Adverse Effect, (i) the Company and its Subsidiaries have timely filed all Tax Returns (taking into account any extensions) required to be filed, and such Tax Returns (taking into account all amendments thereto) are complete and accurate, and (ii) all Taxes required to be paid by the Company and its Subsidiaries have been paid.

(b) Except as would not have a Company Material Adverse Effect, (i) neither the Company nor any of its Subsidiaries has received written notice of any audit, examination, investigation or other proceeding from any Governmental Authority in respect of liabilities for Taxes of the Company or any of its Subsidiaries, which have not been fully paid or settled; (ii) there are no Liens for Taxes on any of the assets of the Company or any of its Subsidiaries other than Permitted Liens; (iii) with respect to any tax years open for audit as of the date of this Agreement, neither the Company nor any of its Subsidiaries has granted any waiver of any statute of limitations with respect to, or any extension of a period for the assessment of, any Tax; and (iv) neither the Company nor any of its Subsidiaries has any liability for the Taxes of any Person (other than the Company and its Subsidiaries) pursuant to Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law) as a transferee or successor, by contract (other than contracts entered into in the ordinary course of business the primary purpose of which does not relate to Tax) or otherwise by operation of law.

(c) Neither the Company nor any of its Subsidiaries has engaged in any "listed transaction" as defined in Treasury Regulation Section 1.6011-4(b)(2) in any tax year for which the statute of limitations has not expired.

(d) The Company is not nor has been during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

(e) Except with respect to Section 4.12, the representations in this Section 4.15 are the sole and exclusive representations and warranties concerning Tax matters.

29

Section 4.16 Material Contracts.

(a) For purposes of this Agreement, "**Company Material Contract**" means any Contract (other than any Company Benefit Plan) to which the Company or any of its Subsidiaries is a party or by which their respective properties or assets are bound, except for this Agreement, that constitutes a "material contract" (as such term is defined in item 601(b)(10) of Regulation S-K of the Securities Act).

(b) Neither the Company nor any of its Subsidiaries is in breach of or default under the terms of any Company Material Contract where such breach or default would have a Company Material Adverse Effect. To the Knowledge of the Company, no other party to any Company Material Contract is in breach of or default under the terms of any Company Material Contract where such breach or default would have a Company Material Adverse Effect. Each Company Material Contract is a valid and binding obligation of the Company or its Subsidiary and, to the Knowledge of the Company, the other parties thereto, except such as would not have a Company Material Adverse Effect; <u>provided</u> that (i) such enforcement may be subject to the Enforceability Exceptions and (ii) the remedies of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

Section 4.17 RESERVED.

Section 4.18 RESERVED.

Section 4.19 Takeover Statutes. Assuming the accuracy of the representation contained in <u>Section 5.8</u>, the Company Board has taken such actions and votes as are necessary to render the provisions of any "fair price," "moratorium," "control share acquisition" or any other takeover or anti-takeover statute or similar federal or state Law inapplicable to this Agreement, the Merger or any other transactions contemplated by this Agreement.

Section 4.20 Vote Required. Assuming the accuracy of the representation contained in <u>Section 5.8</u>, the adoption of this Agreement by the affirmative vote of a majority of the outstanding shares of Company Common Stock entitled to vote to adopt this Agreement (the "**Company Stockholder Approval**") are the only votes of holders of securities of the Company that are required to consummate the Merger.

Section 4.21 Brokers. Except for Goldman Sachs & Co. LLC ("**Goldman Sachs**"), J.P. Morgan Securities LLC ("**J.P. Morgan**") and Allen & Company LLC, each of whose fees and expenses shall be borne solely by the Company, no broker, finder, investment banker, consultant or intermediary is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with the Merger or any of the other transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company or any of its Subsidiaries.

Section 4.22 Opinions of Financial Advisors. The Company Board has received the oral opinion of Goldman Sachs (to be followed by delivery of a written opinion as of the date hereof), to the effect that, as of such date, and based upon and subject to the limitations, qualifications and assumptions set forth in the written opinion of Goldman Sachs, the Merger Consideration to be paid to the holders of Company Common Stock (other than the Equity Investor, Parent and their respective Affiliates) pursuant to this Agreement is fair from a financial point of view to such holders. On or prior to the date of this Agreement, the Company Board has received the opinion of J.P. Morgan to the effect that, as of the date of such opinion and subject to the assumptions, limitations, qualifications and other factors set forth therein, the Merger Consideration to be paid to holders of Company Common Stock pursuant to this Agreement is fair, from a financial point of view, to such holders.

Section 4.23 Rights Agreement. The Company has taken all action necessary to render the Stockholder Rights Plan, inapplicable to the Merger and this Agreement and the transactions contemplated hereby.

Section 4.24 RESERVED.

Section 4.25 No Other Representations or Warranties. Except for the representations and warranties expressly set forth in this Article IV, neither the Company nor any other Person makes or has made any representation or warranty of any kind whatsoever, express or implied, at Law or in equity, with respect to the Company or any of its Subsidiaries or their respective business, operations, assets, liabilities, conditions (financial or otherwise), notwithstanding the delivery or disclosure to Parent and the Acquisition Sub or any of their Affiliates or Representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing. Without limiting the generality of the foregoing, neither the Company nor any other Person makes or has made any express or implied representation or warranty to Parent, Acquisition Sub or any of their respective Representatives with respect to (a) any financial projection, forecast, estimate or budget relating to the Company, any of its Subsidiaries or their respective businesses or, (b) except for the representations and warranties made by the Company in this Article IV, any oral or written information presented to Parent, Acquisition Sub or any of their respective Representatives in the course of their due diligence investigation of the Company, the negotiation of this Agreement or the course of the Merger, or the accuracy or completeness thereof.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF PARENT AND ACQUISITION SUB

Except as disclosed in the Parent Disclosure Letter, Parent and Acquisition Sub hereby jointly and severally represent and warrant to the Company as follows:

Section 5.1 Organization and Qualification.

(a) Each of Parent and Acquisition Sub is a corporation duly organized, validly existing and (to the extent applicable) in good standing under the laws of the jurisdiction of its incorporation and has the requisite corporate entity power and authority to conduct its business as it is now being conducted, except where the failure to be duly organized, validly existing or in good standing or to have such power and authority would not have a Parent Material Adverse Effect. Each of Parent and Acquisition Sub is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing would not have a Parent Material Adverse Effect.

31

(b) As of the date of this Agreement, the authorized share capital of Acquisition Sub consists of 1,000 shares, $0.01 par value per share, all of which are validly issued and outstanding. All of the issued and outstanding share capital of Acquisition Sub is, and at the Effective Time will be, owned by Parent. Acquisition Sub was formed solely for the purpose of acquiring the Company, and it has not conducted any business prior to the date of this Agreement and has no, and prior to the Effective Time will have no, assets, liabilities or obligations of any nature other than those incident to its formation and pursuant to this Agreement and the Merger and other transactions contemplated by this Agreement.

(c) As of the date of this Agreement, all of the issued and outstanding share capital of Parent is owned by the Equity Investor.

<u>Section 5.2 Authority Relative to Agreement</u>.

(a) Parent and Acquisition Sub have all necessary corporate power and authority to (a) execute and deliver this Agreement, (b) perform its covenants and obligations hereunder and (c) consummate the transactions contemplated by this Agreement, including the Merger. The execution, delivery and performance of this Agreement by Parent and Acquisition Sub, and the consummation by Parent and Acquisition Sub of the transactions contemplated by this Agreement, including the Merger, have been duly and validly authorized by all necessary corporate action by Parent and Acquisition Sub, and no other corporate action or proceeding on the part of Parent and Acquisition Sub is necessary to authorize the execution, delivery and performance of this Agreement by Parent and Acquisition Sub and the consummation by Parent and Acquisition Sub of the transactions contemplated by this Agreement, including the Merger. This Agreement has been duly executed and delivered by Parent and Acquisition Sub and, assuming the due authorization, execution and delivery of this Agreement by the other party hereto, constitutes a legal, valid and binding obligation of Parent and Acquisition Sub, enforceable against Parent and Acquisition Sub in accordance with its terms, except that such enforceability may be subject to the Enforceability Exceptions.

(b) The Parent Board has, by resolutions duly adopted by the unanimous vote of the directors, (i) adopted this Agreement and approved the consummation of the transactions contemplated by this Agreement, including the Merger, and (ii) determined that this Agreement and the transactions contemplated by this Agreement are advisable and in the best interests of Parent and its stockholders, as applicable. No vote of, or consent by, the holders of any class or series of capital stock of Parent is necessary to authorize the execution, delivery and performance by Parent of this Agreement and the consummation of the transactions contemplated by this Agreement or otherwise required by the certificate of incorporation or bylaws of Parent, applicable Law (including any stockholder approval provisions under the rules of any applicable securities exchange) or any Governmental Authority.

(c) The Acquisition Sub Board has, by resolutions duly adopted by the unanimous vote of the directors, (i) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (ii) directed that this Agreement be submitted for consideration by Acquisition Sub's sole stockholder and (iii) recommended that the sole stockholder of Acquisition Sub approve the Merger. Parent, acting in its capacity as the sole stockholder of Acquisition Sub, has approved this Agreement and the consummation of the transactions contemplated by this Agreement, including the Merger, and no further vote is required.

Section 5.3 No Conflict; Required Filings and Consents.

(a) Neither the execution and delivery of this Agreement by Parent and Acquisition Sub nor the consummation by Parent and Acquisition Sub of the transactions contemplated by this Agreement will (i) violate any provision of Parent's or its Subsidiaries' certificates of incorporation or bylaws, (ii) assuming that the Consents, registrations, declarations, filings and notices referred to in Section 5.3(b) have been obtained or made, any applicable waiting periods referred to therein have expired and any condition precedent to any such Consent has been satisfied, conflict with or violate any Law applicable to Parent or any of its Subsidiaries or by which any property or asset of Parent or any of its Subsidiaries is bound or affected or (iii) result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give rise to any right of termination, acceleration or cancellation of any Contract to which Parent or any of its Subsidiaries is a party, or by which any of their respective properties or assets is bound, other than, in the case of clauses (ii) and (iii), any such conflict, violation, breach, default, termination, acceleration or cancellation that would not have a Parent Material Adverse Effect.

(b) No Consent of, or registration, declaration or filing with, or notice to, any Governmental Authority is required to be obtained or made by or with respect to Parent or any of its Subsidiaries under applicable Law in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated by this Agreement, other than (i) the applicable reporting or other requirements of and filings with the SEC under the Exchange Act (including the filing of the Proxy Statement), (ii) the filing of the Certificate of Merger with the Secretary of State in accordance with the DGCL and appropriate documents with the relevant authorities of the other jurisdictions in which Parent or any of its Subsidiaries is qualified to do business, (iii) such filings as may be required in connection with the Taxes described in Section 8.6, (iv) such other items required solely by reason of the participation of the Company in the transactions contemplated by this Agreement, (v) compliance with and filings or notifications under the HSR Act, other Antitrust Laws (vi) compliance with and filings or notifications under any Foreign Investment Laws, and (vii) such other Consents, registrations, declarations, filings or notices the failure of which to be obtained or made would not have a Parent Material Adverse Effect.

Section 5.4 Financing. Parent has delivered to the Company true, correct and complete copies of the duly executed (i) debt commitment letter, dated as of April 25, 2022, among Morgan Stanley Senior Funding, Inc., the other financial institutions party thereto, Parent and Acquisition Sub, together with true, correct and complete copies of the executed fee letter related thereto (collectively, including all exhibits, schedules and annexes thereto, the "**Bank Debt Commitment Letter**"), pursuant to which, and subject to the terms and conditions therein, the Debt Financing Sources party thereto have committed to lend the amounts set forth therein to Acquisition Sub for the purpose of funding a portion of the amounts required to fund the transactions contemplated by this Agreement (the "**Bank Debt Financing**"), (ii) debt commitment letter, dated as of April 25,

2022, among Morgan Stanley Senior Funding, Inc., the other financial institutions party thereto and X Holdings III, LLC, a Delaware limited liability company (the "**Margin Loan Borrower**"), together with true, correct and complete copies of the executed fee letter related thereto (collectively, including all exhibits, schedules and annexes thereto, the "**Margin Loan Commitment Letter**" and, together with the Bank Debt Commitment Letter, the "**Debt Commitment Letters**"), pursuant to which, and subject to the terms and conditions therein, the Debt Financing Sources party thereto have committed to lend the amounts set forth therein to the Margin Loan Borrower for the purpose of funding a portion of the amounts required to fund the transactions contemplated by this Agreement (the "**Margin Loan Financing**" and, together with the Bank Debt Financing, the "**Debt Financing**") and (iii) an equity commitment letter from the Equity Investor, dated as of the date hereof (including all exhibits, schedules, annexes and amendments thereto as of the date of this Agreement, the "**Equity Commitment Letter**" and, together with the Debt Commitment Letters, the "**Financing Commitments**") pursuant to which the Equity Investor has committed to invest the amounts set forth therein (the "**Equity Financing**" and, together with the Debt Financing, the "**Financing**"); provided that the fee and other economic provisions (including "flex" provisions) of fee letters may be redacted in a customary manner so long as none of the redacted terms would (i) reduce the amount of the Debt Financing below the amount that is required to pay the Funded Obligations, (ii) impose any new condition or otherwise adversely amend, modify or expand any conditions precedent to the Debt Financing or (iii) affect the enforceability or impair the validity of, or prevent, impede or delay the consummation of, the Debt Financing at the Closing. As of the date hereof, each of Parent and Acquisition Sub has accepted and is a party to the Bank Debt Commitment Letter, the Margin Loan Borrower has accepted and is a party to the Margin Loan Commitment Letter, and the Financing Commitments are in full force and effect and, are legal, valid and binding obligations of the Equity Investor, Parent and Acquisition Sub or the Margin Loan Borrower, as applicable, and, to the knowledge of the Equity Investor, Parent, Acquisition Sub and the Margin Loan Borrower, each of the other parties thereto, enforceable in accordance with their respective terms against the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower, as applicable, and, to the knowledge of Parent and Acquisition Sub, against each of the other parties thereto. As of the date hereof, the Financing Commitments, and the respective commitments or obligations thereunder, have not been withdrawn, terminated, reduced, repudiated, rescinded, amended, supplemented or modified, in any respect, and no such withdrawal, termination, reduction, repudiation, rescission, amendment, supplement or modification is contemplated by the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower or, to the knowledge of Parent and Acquisition Sub, any other party thereto. None of the Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower nor any of their respective Affiliates has, nor has, to the knowledge of the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower, any other party to the Financing Commitments, committed any breach or threatened breach of the performance, observance or fulfillment of any covenants, conditions or other obligations set forth in, or is in default under, any of the Financing Commitments. No event has occurred which, with or without notice, lapse of time or both, would or would reasonably be expected to (i) constitute or result in a breach or default on the part of Parent, Acquisition Sub, Margin Loan Borrower or any of the other parties thereto (including the Financing Sources) under the Financing Commitments, (ii) constitute or result in a failure to satisfy a condition or other contingency set forth in the Financing Commitments, or (iii) otherwise result in any portion of the Debt Financing or the Equity Financing not being available on the Closing Date. None of the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower, nor any

of their respective Affiliates has any reason to believe (both before and after giving effect to any "flex" provisions contained in the Debt Commitment Letters) that it will be unable to satisfy, on a timely basis (and in any event, not later than the Closing), any condition to be satisfied by it (or otherwise within the Equity Investor's, Parent's, Acquisition Sub's or the Margin Loan Borrower's any of their respective Representatives' or Affiliates' control) contained in the applicable Financing Commitments or that the full amounts committed pursuant to the applicable Financing Commitments will not be available as of the Closing. There are no conditions precedent or other contingencies or conditions related to the Financing other than those conditions expressly set forth in the unredacted provisions of the Financing Commitments, and there are no side letters, understandings or other agreements, Contracts or arrangements of any kind relating to the Financing Commitments or the Financing that could adversely affect the availability, conditionality, enforceability or amount of the Financing contemplated by the Financing Commitments. As of the date of this Agreement, Parent, Acquisition Sub, the Margin Loan Borrower and/or their respective Affiliates have fully paid any and all commitment fees or other fees or deposits required by the applicable Financing Commitments to be paid on or before the date of this Agreement. The aggregate proceeds from the Financing are sufficient in amount to provide Parent and Acquisition Sub with the funds necessary to consummate the transactions contemplated hereby and to satisfy their obligations under this Agreement, including for Parent to pay (or cause to be paid) the aggregate amounts payable pursuant to Article II and the payment of all fees, costs and expenses to be paid by Parent related to the transactions contemplated by this Agreement, including such fees, costs and expenses relating to the Financing, and payment of all amounts in connection with the refinancing or repayment of any outstanding indebtedness of the Company required by this Agreement or the Financing Commitments (collectively, the "**Funding Obligations**"). Notwithstanding anything contained in this Agreement to the contrary, the Equity Investor, Parent and Acquisition Sub each acknowledge and affirm that it is not a condition to the Closing or to any of its obligations under this Agreement that the Equity Investor, Parent, Acquisition Sub and/or any of their respective Affiliates obtain any financing (including the Debt Financing) for any of the transactions contemplated by this Agreement. As of the date of this Agreement, the Equity Investor owns, directly or indirectly, all the issued and outstanding capital stock and other equity interests of the Margin Loan Borrower.

Section 5.5 Information Supplied. None of the information supplied or required to be supplied by or on behalf of Parent or any of its Representatives expressly for inclusion or incorporation by reference in the Proxy Statement shall, at the time it is first mailed to the Company's stockholders and at the time of the Company Stockholders' Meeting to be held in connection with the Merger, contain any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

Section 5.6 Brokers. Except for Morgan Stanley & Co. LLC, Bank of America Merrill Lynch and Barclays, each of whose fees and expenses shall be borne solely by Parent, no broker, finder, investment banker, consultant or intermediary is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with the Merger or any of the other transactions contemplated by this Agreement based upon arrangements made by or on behalf of Parent, Acquisition Sub, or any of their respective Subsidiaries.

35

Section 5.7 Compliance With Laws.

(a) Neither the Parent, Acquisition Sub nor any of their Affiliates is in default or violation of any applicable Law, except for any such defaults or violations that would not have a Parent Material Adverse Effect.

(b) As of the date of this Agreement, there is no suit, action or proceeding pending or, to the knowledge of Parent, threatened in writing against Parent, Acquisition Sub or any of their Affiliates, that would have a Parent Material Adverse Effect, nor is there any judgment of any Governmental Authority outstanding against, or, to the knowledge of Parent, investigation by any Governmental Authority involving Parent, Acquisition Sub or any of their Affiliates or any of the transactions contemplated hereby that would have a Parent Material Adverse Effect.

Section 5.8 Ownership of Company. As of the date hereof, the Equity Investor, Parent and Acquisition Sub beneficially own, in the aggregate, 73,115,038 shares of Company Common Stock (the "**Parent Owned Shares**"). None of Parent, Acquisition Sub or any of their respective directors, officers, general partners or Affiliates has been an "interested stockholder" (as defined in Section 203 of the DGCL) of the Company, in each case during the three years prior to the date of this Agreement.

Section 5.9 Solvency. Neither Parent nor Acquisition Sub is entering into this Agreement with the actual intent to hinder, delay or defraud either present or future creditors of the Company or any of its Subsidiaries. Parent is Solvent as of the date of this Agreement, and each of Parent and the Company and its Subsidiaries (on a consolidated basis) will, after giving effect to the Merger or any other transaction contemplated by this Agreement, including the funding of the Financing, payment of the Funding Obligations, and payment of all other amounts required to be paid in connection with the consummation of the Merger or any other transaction contemplated by this Agreement and the payment of all related fees and expenses, be Solvent at and immediately after the Closing. As used in this Section 5.8, the term "**Solvent**" shall mean, with respect to a particular date, that on such date, (a) the sum of the assets, at a fair valuation, of Parent and, after the Closing, Parent and the Surviving Corporation and its Subsidiaries (on a consolidated basis) and each of them (on a stand-alone basis) will exceed their debts, (b) Parent and, after the Closing, Parent and the Surviving Corporation and its Subsidiaries (on a consolidated basis) and each of them (on a stand-alone basis) has not incurred and does not intend to incur, and does not believe that it will incur, debts beyond its ability to pay such debts as such debts mature, and (c) Parent has and, after the Closing, the Surviving Corporation and its Subsidiaries (on a consolidated basis) and of each of them (on a stand-alone basis) will have, sufficient capital and liquidity with which to conduct its business. For purposes of this Section 5.8, "debt" means any liability on a claim, and "claim" means any (i) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and (ii) any right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

Section 5.10 Parent Guarantee. Parent has furnished the Company with a true, complete and correct copy of the Parent Guarantee. The Parent Guarantee is in full force and effect and has not been amended, modified or terminated. The Parent Guarantee is a (i) legal, valid and binding obligation of the Guarantor and of each of the parties thereto and (ii) enforceable in accordance with its respective terms against the Guarantor and each of the other parties thereto. There is no default under the Parent Guarantee by the Guarantor, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a default thereunder by the Guarantor.

36

Section 5.11 Acknowledgment of Disclaimer of Other Representations and Warranties. Except for the representations and warranties expressly set forth in this Article V, in the Equity Commitment Letter and in the Guarantee none of Parent, Acquisition Sub or any other Person makes or has made any representation or warranty of any kind whatsoever, express or implied, at Law or in equity, with respect to Parent or Acquisition Sub or their Affiliates or their respective business, operations, assets, liabilities, conditions (financial or otherwise), notwithstanding the delivery or disclosure to the Company or any of its Affiliates or Representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing. Each of Parent and Acquisition Sub has conducted, to its satisfaction, its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company and its Subsidiaries. In making its determination to proceed with the transactions contemplated by this Agreement, including the Merger, each of Parent and Acquisition Sub has relied solely on the results of its own independent review and analysis and the covenants, representations and warranties of the Company contained in this Agreement. Parent and Acquisition Sub hereby acknowledge that, notwithstanding anything contained in this Agreement to the contrary, (i) neither the Company nor any of its Subsidiaries, nor any other Person, makes or has made or is making any express or implied representation or warranty with respect to the Company or any of its Subsidiaries or their respective business or operations, in each case, other than those expressly given solely by the Company in Article IV; and (ii) neither Parent nor Acquisition Sub is relying on any express or implied representation or warranty, or the accuracy or the completeness of the representations and warranties set forth in Article IV, with respect to the Company or any of its Subsidiaries or their respective business or operations, in each case, other than those expressly given solely by the Company in Article IV.

**ARTICLE VI**

**COVENANTS AND AGREEMENTS**

Section 6.1 Conduct of Business by the Company Pending the Merger. The Company covenants and agrees that, between the date of this Agreement and the earlier of the Effective Time and the date, if any, on which this Agreement is terminated pursuant to Section 8.1, except (a) as may be required by Law, (b) as may be agreed to in writing by Parent (which consent shall not be unreasonably withheld, delayed or conditioned), (c) as may be expressly required or permitted pursuant to this Agreement, or (d) as set forth in Section 6.1 of the Company Disclosure Letter, (x) the Company shall use its commercially reasonable efforts to conduct the business of the Company and its Subsidiaries in the ordinary course of business (except with respect to actions or omissions that constitute COVID-19 Measures), and to the extent consistent therewith, the Company shall use its commercially reasonable efforts to preserve substantially intact the material components of its current business organization, and to preserve in all material respects its present relationships with key customers, suppliers and other Persons with which it has material business relations; provided that no action by the Company or its Subsidiaries with respect to the matters specifically addressed by any provision of this Section 6.1 shall be deemed a breach of this sentence, unless such action would constitute a breach of such relevant provision; and (y) the Company shall not, and shall not permit any of its Subsidiaries to (except for actions or omissions that constitute COVID-19 Measures, following reasonable prior consultation with Parent):

37

(a) amend or otherwise change, in any material respect, the Company Certificate of Incorporation or the Company Bylaws (or, except in the ordinary course of business, such equivalent organizational or governing documents of any of its Subsidiaries);

(b) split, combine, reclassify, redeem, repurchase or otherwise acquire or amend the terms of any capital stock or other equity interests or rights (except in connection with (i) the acceptance of shares of Company Common Stock as payment for the per share exercise price of the Company Options or as payment for Taxes incurred in connection with the exercise, vesting and/or settlement of Company Equity Awards, in each case, in accordance with the applicable Company Benefit Plan, (ii) the forfeiture of Company Equity Awards), (iii) pursuant to the exercise of purchase rights under the Company ESPP or (iv) pursuant to other than the Company ASR Confirmations and the Company Bond Hedge Transactions;

(c) except as permitted pursuant to Section 6.1(f), issue, sell, pledge, dispose, encumber or grant any shares of its or its Subsidiaries' capital stock or other equity interests, or any options, warrants, convertible securities or other rights of any kind to acquire any shares of its or its Subsidiaries' capital stock or equity interests except for transactions among the Company and its direct or indirect wholly owned Subsidiaries or among the Company's direct or indirect wholly owned Subsidiaries; provided, however, that the Company may issue shares of Company Common Stock upon the exercise of any Vested Company Option or payment of any other Company Equity Award that becomes vested, pursuant to the exercise of purchase rights under the Company ESPP or to satisfy any obligations under the Existing Convertible Notes;

(d) other than any shares of the Company Common Stock issuable upon conversion of any series of Existing Convertible Notes in accordance with their terms, authorize, declare, pay or make any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to the Company's or any of its Subsidiaries' capital stock or other equity interests, other than dividends paid by any Subsidiary of the Company to the Company or any wholly owned Subsidiary of the Company;

(e) except as required pursuant to existing Company Benefit Plans, (i) increase the compensation payable or to become payable or benefits provided or to be provided to any Company Service Provider except for increases in cash compensation or benefits to Company Service Providers in the ordinary course of business consistent with past practice, (ii) grant or provide any severance or termination payments or benefits to any Company Service Provider other than the payment of severance amounts or benefits in the ordinary course of business consistent with past practice and subject to the execution and non-revocation of a release of claims in favor of the Company and its Subsidiaries, (iii) provide any obligation to gross-up, indemnify or otherwise reimburse any Company Service Provider for any Tax incurred by any such individual, including under Section 409A or 4999 of the Code, (iv) accelerate the time of payment or vesting of, or the lapsing of restrictions related to, or fund or otherwise secure the payment of, any compensation or benefits (including any equity or equity-based awards) to any Company Service Provider, or (v) establish, amend or terminate any Company Benefit Plan (or any plan, program, arrangement or agreement that would be a Company Benefit Plan if it were in existence on the

38

date hereof) other than (x) entry into, amendment or termination of any Company Benefit Plan in a manner that would not materially increase costs to the Company, Parent or the Surviving Corporation or any of their affiliates, or materially increase the benefits provided under any Company Benefit Plan or (y) new hire offer letters entered into in the ordinary course and consistent with past practices;

(f) except in the ordinary course of business and consistent with past practice (including with regard to aggregate grant date value, terms and allocation) or as may be required by the terms of a Company Benefit Plan in effect as of the date hereof, grant, confer or award any Company Equity Awards or other equity-based awards, convertible securities or any other rights to acquire any of its or its Subsidiaries' capital stock, whether settled in cash or shares of Company Common Stock;

(g) unless required by Law or pursuant to existing written Company Benefit Plans, (i) enter into or materially amend any collective bargaining or other labor agreement with any labor organization or (ii) recognize or certify any labor organization or group of employees as the bargaining representative for any employees of the Company or any of its Subsidiaries;

(i) (i) acquire (including by merger, consolidation, or acquisition of stock or assets), except in respect of any merger, consolidation, business combination among the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries, any corporation, partnership, limited liability company, other business organization or any division or material amount of assets thereof, or (ii) sell, lease, license, abandon or otherwise subject to a Lien other than a Permitted Lien or otherwise dispose of any material properties, rights or assets of the Company or its Subsidiaries other than (A) sales of inventory in the ordinary course of business, (B) licenses of Company Intellectual Property in the ordinary course of business, or (C) pursuant to agreements existing as of the date of this Agreement or entered into after the date of this Agreement in accordance with the terms of this Agreement;

(j) incur, or amend in any material respect the terms of, any indebtedness for borrowed money for any of its Subsidiaries, or assume or guarantee any such indebtedness for any Person (other than a Subsidiary), except for indebtedness incurred (i) under the Company's existing credit facilities or incurred to replace, renew, extend, refinance or refund any existing indebtedness of the Company or its Subsidiaries on terms and conditions not materially less favorable to the Company and its Subsidiaries than, taken as a whole, the terms or conditions of the replaced, renewed, extended, refinanced or refunded debt or otherwise are not inconsistent with prevailing market conditions for substantially similar indebtedness at such time, as determined by the Company in good faith, (ii) pursuant to other agreements in effect prior to the execution of this Agreement, (iii) under capital leases, purchase money financing, equipment financing and letters of credit in the ordinary course of business, (iv) between or among the Company and/or any of its Subsidiaries or (v) otherwise in the ordinary course of business;

(k) enter into, or amend in any material respect, any Company Material Contract with a term longer than one (1) year which cannot be terminated without material penalty upon notice of ninety (90) days or less other than (x) in the ordinary course of business or (y) which would not have a Company Material Adverse Effect;

39

(l) make any material change to its methods of accounting in effect at December 31, 2021, except (i) as required by GAAP (or any interpretation thereof), Regulation S-X or a Governmental Authority or quasi-Governmental Authority (including the Financial Accounting Standards Board or any similar organization), (ii) to permit the audit of the Company's financial statements in compliance with GAAP, (iii) as required by a change in applicable Law, (iv) as disclosed in the Company SEC Documents or (v) to the extent that such change would not have a Company Material Adverse Effect;

(m) make or change any Tax election or accounting method, settle or compromise any Tax claim or assessment, file any amended Tax Return, or consent to any extension or waiver of any limitation period with respect to any Tax claim or assessment, except, in each case, that would not have a Company Material Adverse Effect;

(n) solely with respect to the Company, adopt or enter into a plan of complete or partial liquidation or dissolution;

(o) settle or compromise any litigation other than (i) in the ordinary course of business or (ii) settlements or compromises of litigation where the amount paid (less the amount reserved for such matters by the Company or otherwise covered by insurance) in settlement or compromise, in each case, does not exceed $25 million;

(p) adopt a stockholder rights plan (or other similar agreement, plan or arrangement having a similar intent, purpose or effect) that would be triggered (or whose rights would be affected in any way) by the consummation of the transactions contemplated hereby, including the Merger; or

(q) except as otherwise permitted by clauses (a) through (p) above, enter into any agreement to do any of the foregoing.

Section 6.2 Preparation of the Proxy Statement; Company Stockholders' Meeting.

(a) As promptly as reasonably practicable after the date of this Agreement, (i) the Company shall prepare the Proxy Statement, (ii) Parent and Acquisition Sub shall furnish to the Company all information concerning themselves and their Affiliates that is required to be included in the Proxy Statement and shall promptly provide such other assistance in the preparation of the Proxy Statement as may be reasonably requested by the Company from time to time, and (iii) subject to the receipt from Parent and Acquisition Sub of the information described in clause (ii) above, the Company shall file the Proxy Statement with the SEC. The Company shall, as promptly as practicable after receipt thereof, provide Parent with copies of any written comments, and advise Parent of any oral comments, with respect to the Proxy Statement received from the SEC. The Company shall use its reasonable best efforts (with the assistance of, and after consultation with, Parent as provided by this Section 6.2(a)) to respond as promptly as reasonably practicable to any comments from the SEC with respect to the Proxy Statement. No filing or mailing of, or amendment or supplement to, the Proxy Statement will be made by the Company without providing Parent a reasonable opportunity to review and comment thereon (which comments shall be considered by the Company in good faith) (except as required by applicable Law or in connection with and an Adverse Board Recommendation Change.

40

(b) If, at any time prior to the Company Stockholders' Meeting, any information relating to Parent, Acquisition Sub or the Company, or any of their respective Affiliates, officers or directors, is discovered by Parent, Acquisition Sub or the Company that should be set forth in an amendment or supplement to the Proxy Statement so that the Proxy Statement shall not contain an untrue statement or omit to state any material fact required to be stated therein or necessary to make the statements therein (in light of the circumstances under which they were made) not misleading, the party that discovers such information shall promptly notify the other parties hereto, and, to the extent required by Law, an appropriate amendment or supplement describing such information shall be promptly filed with the SEC and disseminated to the Company's stockholders in accordance with applicable Law.

(c) The Company shall, as promptly as practicable following the date on which the SEC confirms that it has no further comments on the Proxy Statement, (i) establish a record date, for and give notice of a meeting of its stockholders, for the purpose of voting upon the approval of the Merger, holding the Company Stockholder Advisory Vote and voting on customary matters of procedure (together with any postponement, adjournment or other delay thereof, the "**Company Stockholders' Meeting**"), (ii) cause the Proxy Statement to be mailed to the Company's stockholders as of the record date established for the Company Stockholders' Meeting and (iii) duly call, convene and hold the Company Stockholders' Meeting; provided that the Company may postpone or adjourn the Company Stockholders' Meeting (on one or more occasions) (A) with the consent of Parent and Acquisition Sub, (B) for the absence of a quorum, (C) to allow reasonable additional time for any supplemental or amended disclosure that the Company has determined in good faith is necessary under applicable Law and for such supplemental or amended disclosure to be disseminated and reviewed by the Company's stockholders prior to the Company Stockholders' Meeting, (D) to allow additional solicitation of votes in order to obtain the Company Stockholder Approval or (E) if required by applicable Law. Subject to the right of the Company Board to make an Adverse Board Recommendation Change pursuant to Section 6.5, Company Board Recommendation include the Company Board Recommendation in the Proxy Statement, and, unless there has been an Adverse Board Recommendation Change pursuant to Section 6.5, the Company shall use commercially reasonable efforts to solicit proxies in favor of the Company Stockholder Approval at the Company Stockholders' Meeting.

(d) The Equity Investor, Parent and Acquisition Sub shall not sell or dispose any shares of Company Common Stock while this Agreement is in effect, and shall cause their controlled Affiliates to, cause Parent Owned Shares and all other shares of Company Common Stock beneficially as of the record date for the Company Stockholder Meeting owned by them to be (A) present at the Company Stockholder Meeting for quorum purposes; and (B) voted at the Company Stockholder Meeting in favor of the adoption of this Agreement.

Section 6.3 Efforts to Close; Regulatory Filings.

(a) Subject to the terms and conditions of this Agreement (including the limitations set forth in Section 6.5), the parties hereto will use their respective reasonable best efforts to consummate and make effective the transactions contemplated by this Agreement and to cause the conditions to the Merger set forth in Article VII to be satisfied, including using reasonable best efforts to accomplish the following: (i) the obtaining of all necessary actions or

41

non-actions, Consents and approvals from Governmental Authorities necessary in connection with the consummation of the transactions contemplated by this Agreement, including the Merger, and the making of all necessary registrations and filings (including filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to obtain an approval from, or to avoid an action or proceeding by, any Governmental Authority necessary in connection with the consummation of the transactions contemplated by this Agreement, including the Merger; (ii) the obtaining of all other necessary Consents, approvals or waivers from Third Parties; (iii) the defending of any lawsuits or other legal proceedings through the Termination Date, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated by this Agreement, including the Merger, performed or consummated by such party in accordance with the terms of this Agreement, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed; and (iv) the execution and delivery of any additional instruments reasonably necessary to consummate the Merger and any other transactions to be performed or consummated by such party in accordance with the terms of this Agreement and to carry out fully the purposes of this Agreement. Each of the parties hereto shall (x) promptly (and in no event later than ten (10) Business Days following the date that this Agreement is executed) make its respective filings under the HSR Act, and (y) as promptly as reasonably practicable, make any other applications and filings as are mutually agreed by Parent and the Company, acting reasonably, to be (i) material and (ii) required or advisable under any Antitrust Laws or Foreign Investment Laws with respect to the transactions contemplated by this Agreement, including the Merger. Notwithstanding anything in this Agreement to the contrary, except as expressly provided in Section 7.1(b) or Section 7.1(c), obtaining any Consent of any Third Party, approvals or waivers referenced in this Section 6.3(a) above or otherwise shall not be considered a condition to the obligations of Parent and Acquisition Sub to consummate the Merger.

(b) The Equity Investor, Parent and Acquisition Sub agree to take promptly any and all steps necessary to avoid or eliminate each and every impediment and obtain all Consents, actions, non-actions, approvals or waivers (or, as applicable, expiration or termination of the waiting periods with respect thereto) under any Antitrust Laws, Foreign Investment Laws (or, as applicable, expiration or termination of the waiting periods with respect thereto) or other Law that may be required by any foreign or U.S. federal, state or local Governmental Authority, in each case, with competent jurisdiction, so as to enable the parties to consummate the transactions contemplated by this Agreement, including the Merger, as promptly as practicable, but prior to the Termination Date, including committing to or effecting, by consent decree, hold separate orders, trust, or otherwise, (i) the sale or other disposition of such assets or businesses as are required to be divested or (ii) the acceptance of restrictions on freedom of action, conduct, or operations with respect to the business of Company, in the case of the foregoing clauses (i) or (ii) in order to avoid the entry of, or to effect the dissolution of or vacate or lift, any Order, that would otherwise have the effect of preventing or materially delaying the consummation of the Merger and the other transactions contemplated by this Agreement as promptly as practicable. Further, the Equity Investor, Parent and Acquisition Sub will take such actions as are necessary in order to ensure that (x) no requirement for any non-action by, or Consent or approval of, any foreign or U.S. federal, state or local Governmental Authority, (y) no decree, judgment, injunction, temporary restraining order or any other Order in any suit or proceeding and (z) no other matter relating to any Antitrust Laws or Foreign Investment Laws, would preclude consummation of the Merger by the Termination Date. Notwithstanding the foregoing, nothing in Section 6.3(a), Section 6.3(b)

42

(including with respect to the foregoing clauses (i) and (ii)), or any other part of this Agreement shall require or obligate Parent, Acquisition Sub, or any of their respective Affiliates to (xx) propose, take, or agree to take any actions that would individually or in the aggregate have a material adverse effect on the business, assets, or financial condition of the Company and its Subsidiaries, taken as a whole or (yy) propose, negotiate, effect or agree to, the sale, divestiture, lease, license, hold separate, transfer, or disposition of, or any restriction on the freedom of action with respect to, any assets, business, or equity holdings of, or held or controlled directly or indirectly by, Equity Investor or any Affiliate of Parent (other than Parent, Acquisition Sub or Company after giving effect to the Merger and subject to the restrictions in subpart (xx) of this paragraph).

(c) Each of the parties hereto will furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with the preparation of any required governmental filings or submissions and will cooperate in responding to any inquiry from a Governmental Authority, including (i) promptly informing the other party of such inquiry, (ii) consulting in advance before making any presentations or submissions to a Governmental Authority, (iii) cooperating in the filing of any analyses, presentations, memoranda, briefs, arguments, opinions or other written communications explaining or defending the Merger, articulating any regulatory or competitive argument or responding to requests or objections made by any Governmental Authority, (iv) providing each other with a reasonable advance opportunity to review and comment upon, and consider in good faith the views of the other with respect to, all material written communications (including applications, analyses, presentations, memoranda, briefs, arguments and opinions) with a Governmental Authority regarding the Merger or any other transactions, (v) giving the other party the opportunity to attend and participate in any substantive meetings or discussions with any Governmental Authority, to the extent reasonably practical and not prohibited by such Governmental Authority, and (vi) supplying each other with copies of all material correspondence, or communications between any party and any Governmental Authority with respect to this Agreement (provided that such materials may be limited to counsel as required or advisable under applicable Law and may be redacted to remove valuation material). The parties agree that Parent shall control the strategy for all filings, notifications, submissions, and communications, proposals and litigation in connection with any filing, notice, petition, statement, registration, submission of information, application or similar filing under the Antitrust Laws after consulting with, and considering in good faith the view of the Company relating to such strategy.

Section 6.4 <u>Access to Information; Confidentiality</u>. Upon reasonable notice, the Company shall (and shall cause each of its Subsidiaries to) afford to the representatives, officers, directors, employees, agents, attorneys, accountants and financial advisors ("**Representatives**") of Parent reasonable access (at Parent's sole cost and expense), in a manner not disruptive in any material respect to the operations of the business of the Company and its Subsidiaries, during normal business hours and upon reasonable written notice throughout the period commencing on the date of this Agreement until the earlier of the Effective Time and the termination of this Agreement pursuant to <u>Article VIII</u>, to the properties, books and records of the Company and its Subsidiaries and, during such period, shall (and shall cause each of its Subsidiaries to) furnish promptly to such Representatives all information concerning the business, properties and personnel of the Company and its Subsidiaries as may reasonably be requested in writing, in each case, for any reasonable business purpose related to the consummation of the transactions contemplated by this Agreement; <u>provided</u>, <u>however</u>, that nothing herein shall require the

Company or any of its Subsidiaries to disclose any information to Parent or Acquisition Sub if such disclosure would, in the reasonable judgment of the Company, (i) cause significant competitive harm to the Company or its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (ii) violate applicable Law or the provisions of any agreement to which the Company or any of its Subsidiaries is a party, or (iii) jeopardize any attorney-client or other legal privilege. No investigation or access permitted pursuant to this Section 6.4 shall affect or be deemed to modify any representation or warranty made by the Company hereunder. Each of Parent and Acquisition Sub agrees that it will not, and will cause its Representatives not to, use any information obtained pursuant to this Section 6.4 (or otherwise pursuant to this Agreement) for any competitive or other purpose unrelated to the consummation of the transactions contemplated by this Agreement. Parent will use its reasonable best efforts to minimize any disruption to the respective business of the Company and its Subsidiaries that may result from requests for access under this Section 6.4 and, notwithstanding anything to the contrary herein, the Company may satisfy its obligations set forth above by electronic means if physical access is not reasonably feasible or would not be permitted under applicable Law as a result of COVID-19 or any COVID-19 Measures. Prior to any disclosure, the Company and Parent shall enter into a customary confidentiality agreement with respect to any information obtained pursuant to this Section 6.4 (or otherwise pursuant to this Agreement).

Section 6.5 Non-Solicitation; Competing Proposals.

(a) From the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, the Company shall, and shall cause each of its directors, executive officers and Subsidiaries to, and shall instruct its other Representatives to, immediately cease and cause to be terminated any existing solicitation of, or discussions or negotiations with, any Third Party relating to any Competing Proposal, and the Company further agrees that it shall promptly request that all non-public information previously provided in the past twelve (12) months by or on behalf of the Company or any of its Subsidiaries to any Persons that might reasonably be expected to consider making a Competing Proposal be promptly returned or destroyed in accordance with the terms of the applicable confidentiality agreement. Except as otherwise provided in this Section 6.5, from the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, the Company shall not, shall cause each of its directors, executive officers and Subsidiaries not to, and shall instruct its other Representatives not to, (i) solicit, initiate, knowingly encourage or knowingly facilitate, whether publicly or otherwise, any substantive discussion, offer or request that constitutes, or would reasonably be expected to lead to, a Competing Proposal and (ii) engage in negotiations or substantive discussions with (it being understood that the Company may inform Persons of the provisions contained in this Section 6.5), or furnish any material non-public information to, any Person relating to a Competing Proposal or any inquiry or proposal that would reasonably be expected to lead to a Competing Proposal; provided that, notwithstanding the foregoing, the Company shall be permitted to grant a waiver of or terminate any "standstill" or similar obligation of any Person with respect to the Company or any of its Subsidiaries to allow such Person to submit a Competing Proposal.

44

(b) From the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, as promptly as reasonably practicable, and in any event within one (1) Business Day of receipt by the Company or any of its directors, executive officers or Subsidiaries of any Competing Proposal or any request that would reasonably be expected to lead to the making of a Competing Proposal, the Company shall deliver to Parent a written notice setting forth: (i) the identity of the Person making such Competing Proposal or request; and (ii) the material terms and conditions of any such Competing Proposal. The Company shall keep Parent reasonably informed of any material amendment or other modification of any such Competing Proposal or request on a prompt basis, and in any event within two (2) Business Days following the Company's receipt in writing of such an amendment or modification.

(c) Notwithstanding anything to the contrary in this Agreement, at any time prior to obtaining the Company Stockholder Approval, in the event that the Company receives a Competing Proposal from any Person or group of Persons, (i) the Company and its Representatives may contact such Person to clarify the terms and conditions thereof and (ii) the Company, the Company Board and their respective Representatives may engage in negotiations or discussions with, or furnish any information and other access to, any Person or group of Persons making such Competing Proposal and any of its Representatives or potential sources of financing if the Company Board determines in good faith (after consultation with its legal counsel and financial advisors) that such Competing Proposal either constitutes a Superior Proposal or would reasonably be expected to result in a Superior Proposal; provided that (x) prior to furnishing any material non-public information concerning the Company or its Subsidiaries, the Company receives from such Person or group, to the extent that such Person or group is not already subject to a confidentiality agreement with the Company, an executed confidentiality agreement containing customary confidentiality terms, it being understood that such confidentiality agreement need not contain a standstill provision or otherwise restrict the making, or amendment, of a Competing Proposal (and related communications) to the Company or the Company Board (such confidentiality agreement, an "**Acceptable Confidentiality Agreement**") and (y) any such material non-public information so furnished in writing shall be promptly made available to Parent to the extent that it was not previously made available to Parent or its Representatives. For the avoidance of doubt, none of (A) the determination, in itself with no further action, by the Company Board that a Competing Proposal either constitutes a Superior Proposal or would reasonably be expected to result in a Superior Proposal or (B) the public disclosure, in itself, of such determination will constitute an Adverse Board Recommendation Change or violate this Section 6.5.

(d) Except as otherwise provided in this Agreement, the Company Board shall not (i) (A) publicly recommend that the Company's stockholders vote against the adoption of this Agreement and the approval of the transactions contemplated by this Agreement, including the Merger, or make any public statement or knowingly take any action with a similar intent, purpose or effect, or (B) approve or recommend, or propose publicly to approve or recommend, to the Company's stockholders any Competing Proposal (any action described in this clause (i) being referred to as an "**Adverse Board Recommendation Change**"), or (ii) approve or recommend, or allow the Company or any of its Subsidiaries to execute or enter into, any letter of intent, memorandum of understanding or definitive merger or similar agreement with respect to any Competing Proposal (other than an Acceptable Confidentiality Agreement). Notwithstanding anything in this Agreement to the contrary, at any time prior to receipt of the Company Stockholder Approval, the Company Board may (i) make an Adverse Board Recommendation Change in response to an event, occurrence, change, effect, condition, development or state of facts or circumstances (other than related to a Competing Proposal or Superior Proposal, or any proposal

45

that constitutes or would reasonably be expected to lead to a Competing Proposal or Superior Proposal) that was neither known to, nor reasonably foreseeable by, the Company Board as of the date of this Agreement (or, if known, the consequences of which were not known or reasonably foreseeable to the Company Board as of the date of this Agreement) (an "**Intervening Event**") (where, for the avoidance of doubt, (x) the fact, in itself, that the Company meets or exceeds projections, forecasts or estimates (it being understood that the underlying causes of (or contributors to) such performance that are not otherwise excluded from the definition of Intervening Event may be taken into account) and (y) changes, in themselves, in the price of the Company Common Stock or the trading volume thereof shall be considered known and reasonably foreseeable occurrences (it being understood that the underlying causes of (or contributors to) such changes in price or trading volume that are not otherwise excluded from the definition of Intervening Event may be taken into account) if the Company Board has determined in good faith (after consultation with its legal counsel and financial advisors) that the failure to take such action would reasonably be expected to be inconsistent with the Company's directors' fiduciary duties under applicable Law; or (ii) (x) make an Adverse Board Recommendation Change if the Company has received a Competing Proposal that the Company Board has determined in good faith (after consultation with its legal counsel and financial advisors) constitutes a Superior Proposal, and (y) authorize, adopt or approve such Superior Proposal and cause or permit the Company to enter into a definitive agreement with respect to such Superior Proposal substantially concurrently with the termination of this Agreement pursuant to Section 8.1(c)(ii); provided, however, that (1) no Adverse Board Recommendation Change may be made and no termination of this Agreement pursuant to this Section 6.5(d) and Section 8.1(c)(ii) may be effected, in each case, until the end of the fourth (4th) full Business Day following Parent's receipt of a written notice from the Company advising Parent that the Company Board intends to make an Adverse Board Recommendation Change (a "**Notice of Adverse Board Recommendation Change**") or terminate this Agreement pursuant to this Section 6.5(d) and Section 8.1(c)(ii) (a "**Notice of Superior Proposal**"); and (2) during such period, if requested by Parent, the Company and its Representatives shall negotiate with Parent and its Representatives in good faith (to the extent Parent so desires to negotiate) to make adjustments to the terms and conditions of this Agreement so that either the failure to make an Adverse Board Recommendation Change in response to such Intervening Event would no longer reasonably be expected to be inconsistent with the Company's directors' fiduciary duties under applicable Law or such Competing Proposal would cease to constitute a Superior Proposal, as appropriate, and (3) in determining whether to make such Adverse Board Recommendation Change or terminate this Agreement pursuant to this Section 6.5(d) and Section 8.1(c)(ii), the Company Board shall take into account any changes to the terms of this Agreement timely proposed by Parent in response to a Notice of Adverse Recommendation or a Notice of Superior Proposal (as may be extended). Any material amendment to the financial terms or any other material amendment of such Superior Proposal shall require a new Notice of Superior Proposal and the Company shall be required to comply again with the requirements of this Section 6.5(d) with respect to such new Superior Proposal; provided that the new notice period shall be three (3) Business Days. For the avoidance of doubt, none of (A) the delivery, in itself, of a Notice of Adverse Board Recommendation or a Notice of Superior Proposal or (B) the public disclosure, in itself, of such delivery will constitute an Adverse Board Recommendation Change or violate this Section 6.5.

(f) Nothing in this Agreement shall restrict the Company or the Company Board from taking or disclosing a position contemplated by Rule 14d-9 or Rule 14e-2(a) under the Exchange Act, or otherwise making disclosure to comply with applicable Law (it being agreed that a "stop, look and listen" communication by the Company Board to the Company's stockholders pursuant to Rule 14d-9(f) under the Exchange Act or a factually accurate public statement by the Company that describes the Company's receipt of a Competing Proposal and the operation of this Agreement with respect thereto shall not be deemed to be an Adverse Board Recommendation Change or give rise to a Parent termination right pursuant to Section 8.1(d)(ii)). For the avoidance of doubt, a factually accurate public statement by the Company or the Company Board (or a committee thereof) that (A) describes the Company's receipt of a Competing Proposal; (B) identifies the Person or group of Persons making such Competing Proposal; (C) provides the material terms of such Competing Proposal; or (D) describes the operation of this Agreement with respect thereto will not, in any case, be deemed to be (1) an adoption, approval or recommendation with respect to such Competing Proposal; or (2) an Adverse Board Recommendation Change.

(g) For purposes of this Agreement:

(i) "**Competing Proposal**" shall mean any proposal or offer made by any Person (other than Parent, Acquisition Sub or any Affiliate thereof) or group (as defined in Section 13(d)(3) of the Exchange Act) of Persons (i) to purchase or otherwise acquire, directly or indirectly, in one transaction or a series of transactions, (A) beneficial ownership (as defined under Section 13(d) of the Exchange Act) of fifteen percent (15%) or more of any class of equity securities of the Company pursuant to a merger, consolidation or other business combination, sale of shares of capital stock, tender offer, exchange offer or similar transaction; or (B) any one or more assets or businesses of the Company and its Subsidiaries that constitute fifteen percent (15%) or more of the revenues or assets of the Company and its Subsidiaries, taken as a whole; (ii) with respect to the issuance, sale or other disposition, directly or indirectly, to any Person (other than Parent, Acquisition Sub or any Affiliate thereof) or group (as defined in Section 13(d)(3) of the Exchange Act) of Persons of securities (or options, rights, or warrants to purchase, or securities convertible into or exchangeable for, such securities) representing fifteen percent (15%) or more of the voting power of the Company; or (z) with respect to any merger, consolidation, business combination, recapitalization, reorganization or other transaction involving the Company or its Subsidiaries pursuant to which any Person (as defined in Section 13(d)(3) of the Exchange Act) or group of Persons would have beneficial ownership (as defined pursuant to Section 13(d)(3) of the Exchange Act) of securities representing fifteen percent (15%) or more of the total outstanding equity securities of the Company after giving effect to the consummation of such transaction.

(iii) "**Superior Proposal**" shall mean a Competing Proposal (with all percentages in the definition of Competing Proposal increased to ninety percent (90%)) made by a Third Party on terms that the Company Board determines in good faith (after consultation with its legal counsel and financial advisors) and considering such factors as the Company Board considers to be appropriate, are more favorable to the Company's stockholders than the transactions contemplated by this Agreement (including any changes to the terms of this Agreement committed to by Parent to the Company in writing in response to such Competing Proposal under the provisions of Section 6.5(d)).

47

Section 6.6 Directors' and Officers' Indemnification and Insurance.

(a) Parent and Acquisition Sub agree that all rights to exculpation and indemnification for acts or omissions occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time (including any matters arising in connection with the transactions contemplated by this Agreement), now existing in favor of the current or former directors, officers and employees, if any (the foregoing persons, the "**D&O Indemnified Parties**"), as the case may be, of the Company or its Subsidiaries as provided in their respective organizational documents as in effect on the date of this Agreement or in any Contract shall survive the Merger and shall continue in full force and effect. The Surviving Corporation shall (and Parent shall cause the Surviving Corporation to) indemnify, defend and hold harmless, and advance expenses to D&O Indemnified Parties with respect to all acts or omissions by them in their capacities as such at any time prior to the Effective Time (including any matters arising in connection with this Agreement or the transactions contemplated by this Agreement), to the fullest extent that the Company or its Subsidiaries would be permitted by applicable Law and to the fullest extent required by the organizational documents of the Company or its Subsidiaries as in effect on the date of this Agreement. Parent shall cause the certificate of incorporation, bylaws or other organizational documents of the Surviving Corporation and its Subsidiaries to contain provisions with respect to exculpation, indemnification, advancement of expenses and limitation of director, officer and employee liability that are no less favorable to the D&O Indemnified Parties than those set forth in the Company's and its Subsidiaries' organizational documents as of the date of this Agreement, which provisions thereafter shall not, for a period of six (6) years from the Effective Time, be amended, repealed or otherwise modified in any manner that would adversely affect the rights thereunder of the D&O Indemnified Parties.

(b) Without limiting the provisions of Section 6.6(a), to the fullest extent that the Company would be permitted by applicable Law to do so, Parent shall or shall cause the Surviving Corporation to: (i) indemnify and hold harmless each D&O Indemnified Party against and from any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, to the extent such claim, action, suit, proceeding or investigation arises out of or pertains to: (A) any alleged action or omission in such D&O Indemnified Party's capacity as a director, officer or employee of the Company or any of its Subsidiaries prior to the Effective Time; or (B) this Agreement or the transactions contemplated by this Agreement and (ii) pay in advance of the final disposition of any such claim, action, suit, proceeding or investigation the expenses (including reasonable attorneys' fees) of any D&O Indemnified Party upon confirmation by the D&O Indemnified Party of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification applicable to him or her and a customary written undertaking by him or her or on his or her behalf to repay the amount paid or reimbursed if it is ultimately determined that the standard of conduct for indemnification was not met. Any determination required to be made with respect to whether the conduct of any D&O Indemnified Party complies or complied with any applicable standard shall be made by independent legal counsel selected by the D&O Indemnified Party, which counsel shall be reasonably acceptable to the Surviving Corporation, and the fees of such counsel shall be paid by the Surviving Corporation. Notwithstanding anything to the contrary contained in this Section 6.6(b) or elsewhere in this Agreement, Parent shall not (and Parent shall cause the Surviving Corporation not to) settle or compromise or consent to the entry of any judgment or otherwise seek termination with respect to any claim, action, suit, proceeding or investigation, unless such settlement, compromise, consent or termination includes an unconditional release of all of the D&O Indemnified Parties covered by the claim, action, suit, proceeding or investigation from all liability arising out of such claim, action, suit, proceeding or investigation.

48

(c) Unless the Company shall have purchased a "tail" policy prior to the Effective Time as provided below, for at least six (6) years after the Effective Time, (i) Parent shall cause the Surviving Corporation and its other Subsidiaries to maintain in full force and effect the coverage provided by the existing directors' and officers' liability insurance and fiduciary insurance in effect as of the date of this Agreement and maintained by the Company or any of its Subsidiaries, as applicable (the "**Existing D&O Insurance Policies**"), or provide substitute policies for the Company and its current and former directors and officers who are currently covered by such Existing D&O Insurance Policies, in either case, on terms and conditions no less advantageous to the D&O Indemnified Parties, or any other Person entitled to the benefit of this Section 6.6, as applicable, than the Existing D&O Insurance Policies, covering claims arising from facts, events, acts or omissions that occurred at or prior to the Effective Time, including the transactions contemplated by this Agreement (provided that Parent or the Surviving Corporation, as applicable, shall not be required to pay an annual premium for such insurance in excess of three hundred percent (300%) of the aggregate annual premiums currently paid by the Company or any of its Subsidiaries, as applicable, on an annualized basis, but in such case shall purchase as much of such coverage as possible for such amount) and (ii) Parent shall not, and shall not permit the Surviving Corporation or its other Subsidiaries to, take any action that would prejudice the rights of, or otherwise impede recovery by, the beneficiaries of any such insurance, whether in respect of claims arising before or after the Effective Time. In lieu of such insurance, prior to the Effective Time, the Company may purchase a six (6) year "tail" prepaid policy on such terms and conditions (provided that the premium for such insurance shall not exceed three hundred percent (300%) of the aggregate annual premiums currently paid by the Company or any of its Subsidiaries, as applicable, on an annualized basis), in which event Parent shall cease to have any obligations under the first sentence of this Section 6.6(c).

(d) In the event that Parent, the Surviving Corporation, any of the Company's Subsidiaries or any of their successors or assigns shall (i) consolidate with or merge into any other Person and shall not be the continuing or surviving company or entity of such consolidation or merger or (ii) transfer all or substantially all its properties and assets to any Person, then, and in each such case, Parent shall cause proper provision to be made so that the successor and assign of Parent, the Surviving Corporation or any such Subsidiary assumes the obligations set forth in this Section 6.6.

(e) The D&O Indemnified Parties to whom this Section 6.6 applies shall be third-party beneficiaries of this Section 6.6. The provisions of this Section 6.6 are intended to be for the benefit of each D&O Indemnified Party and his or her successors, heirs or representatives. The Surviving Corporation shall pay all reasonable expenses, including reasonable attorneys' fees, that may be incurred by any D&O Indemnified Party in enforcing its indemnity and other rights under this Section 6.6. The rights of each D&O Indemnified Party hereunder shall be in addition to, and not in limitation of, any other applicable rights such D&O Indemnified Party may have under the respective organizational documents of the Company or any of its Subsidiaries or the Surviving Corporation, any other indemnification arrangement, the DGCL or otherwise. Notwithstanding any other provision of this Agreement, this Section 6.6 shall survive the consummation of the Merger indefinitely (or any earlier period actually specified in this Section 6.6) and shall be binding, jointly and severally, on all successors and assigns of Parent and the Surviving Corporation, and shall be enforceable by the D&O Indemnified Parties and their successors, heirs or representatives.

(f) Nothing in this Agreement is intended to, or will be construed to, release, waive or impair any rights to directors' and officers' insurance claims pursuant to any applicable insurance policy or indemnification agreement that is or has been in existence with respect to the Company or any of its Subsidiaries for any of their respective directors, officers or other employees, it being understood and agreed that the indemnification provided for in this Section 6.6 is not prior to or in substitution for any such claims pursuant to such policies or agreements. Following the Effective Time, the obligations of Parent and the Surviving Corporation under this Section 6.6 shall not be terminated or modified in any manner adverse to the rights of any D&O Indemnified Party without the consent of such affected D&O Indemnified Party.

Section 6.7 Notification of Certain Matters. From and after the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, the Company shall give prompt notice to Parent, and Parent shall give prompt notice to the Company, of (a) any notice or other communication received by such party from any Governmental Authority in connection with this Agreement, the Merger or the other transactions contemplated by this Agreement, or from any Person alleging that the consent of such Person is or may be required in connection with the Merger or the other transactions contemplated by this Agreement, if the subject matter of such communication or the failure of such party to obtain such consent could be material to the Company, the Surviving Corporation or Parent, and (b) any actions, suits, claims, investigations or proceedings commenced or, to such party's Knowledge, threatened against, relating to or involving or otherwise affecting such party or any of its Subsidiaries which relate to this Agreement, the Merger or the other transactions contemplated by this Agreement. The parties agree and acknowledge the Company's, on the one hand, and Parent's, on the other hand, compliance or failure of compliance with this Section 6.7 shall not be taken into account for purposes of determining whether the condition referred to in Section 7.2(a) or Section 7.3(a), respectively, shall have been satisfied with respect to performance in all material respects with this Section 6.7.

Section 6.8 Public Announcements. Except as otherwise contemplated by Section 6.5, so long as this Agreement is in effect, the Company, Parent and Acquisition Sub shall consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated by this Agreement, and none of the parties hereto or their Affiliates shall issue any such press release or make any public statement prior to obtaining the other parties' consent (which consent shall not be unreasonably withheld or delayed), except that no such consent shall be necessary to the extent disclosure may be required by Law, Order or applicable stock exchange rule or any listing agreement to which any party hereto is subject, in which case the party required to make such disclosure shall use its reasonable best efforts to allow, to the extent legally permitted, each other party reasonable time to comment on such disclosure in advance of its issuance, or is consistent with prior communications previously consented to by the other parties. In addition, the Company may, without Parent or Acquisition Sub's consent, communicate to its employees, customers, suppliers and consultants; provided that such communication is consistent with prior communications of the Company or any

50

communications plan previously agreed to by Parent and the Company, in which case such communications may be made consistent with such plan. Notwithstanding the foregoing, the restrictions set forth in this <u>Section 6.8</u> shall not apply in connection with any Adverse Board Recommendation Change or dispute between the parties regarding this Agreement or the transactions contemplated hereby. Notwithstanding the foregoing, the Equity Investor shall be permitted to issue Tweets about the Merger or the transactions contemplated hereby so long as such Tweets do not disparage the Company or any of its Representatives.

Section 6.9 <u>Employee Benefits</u>.

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time who remain employees of Parent, the Surviving Corporation or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.

(b) Parent agrees that the Surviving Corporation shall cause the Surviving Corporation's employee benefit plans established following the Closing Date (if any) and any other employee benefit plans covering the Continuing Employees following the Effective Time (collectively, the "**Post-Closing Plans**"), to recognize the service of each Continuing Employee (to the extent such service was recognized by the Company) for purposes of eligibility, vesting and determination of the level of benefits (but not for benefit accrual purposes under a defined benefit pension plan) under the Post-Closing Plans, to the extent such recognition does not result in the duplication of any benefits.

(c) For the calendar year including the Effective Time, the Continuing Employees shall not be required to satisfy any deductible, co-payment, out-of-pocket maximum or similar requirements under the Post-Closing Plans that provide medical, dental and other welfare benefits (collectively, the "**Post-Closing Welfare Plans**") to the extent amounts were previously credited for such purposes under comparable Company Benefit Plans that provide medical, dental and other welfare benefits.

(d) As of the Effective Time, any waiting periods, pre-existing condition exclusions and requirements to show evidence of good health contained in such Post-Closing Welfare Plans shall be waived with respect to the Continuing Employees (except to the extent any such waiting period, pre-existing condition exclusion or requirement to show evidence of good health was already in effect with respect to such employees and has not been satisfied under the applicable Company Benefit Plan in which the participant then participates or is otherwise eligible to participate as of immediately prior to the Effective Time).

(e) Nothing contained in this Section 6.9, expressed or implied, shall (i) be treated as the establishment, amendment or modification of any Company Benefit Plan, Post-Closing Plan or other employee benefit plan or constitute a limitation on rights to amend, modify, merge or terminate after the Effective Time any Company Benefit Plan, Post-Closing Plan or other employee benefit plan, (ii) give any Company Service Provider (including any beneficiary or dependent thereof) or other Person any third-party beneficiary or other rights or (iii) obligate Parent or any of its Affiliates to (A) maintain any particular Company Benefit Plan, Post-Closing Plan or (B) retain the employment or services of any Company Service Provider.

Section 6.10  Financing.

(a) Each of the Equity Investor, Parent and Acquisition Sub shall take or cause to be taken, and shall cause their respective Affiliates and its and their respective Representatives to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to arrange, obtain and consummate the Financing at or prior to the Closing on the terms and subject to the conditions set forth in the Financing Commitments (including any "flex" provisions), including executing and delivering all such documents and instruments as may be reasonably required thereunder and:

(i) complying with and maintaining in full force and effect the Financing and the Financing Commitments (and, once entered into, the Financing Agreements) in accordance with the terms and conditions thereof and negotiating and entering into definitive financing agreements with respect to the Debt Financing on the terms and conditions set forth in the Debt Commitment Letters (including any "flex" provisions) and containing no (I) conditions to the consummation of all or any portion of the Debt Financing other than the conditions set forth in Exhibit E to the Bank Debt Commitment Letter or Exhibit B to the Margin Loan Commitment Letter, as the case may be, in each case, as in effect on the date hereof, or (II) provisions that could reasonably be expected to prevent, impede, delay or adversely affect the availability of any of the Debt Financing or the consummation of the Merger and the other transactions contemplated by this Agreement (such definitive agreements, the "**Financing Agreements**") so that the Financing Agreements are in full force and effect no later than the Closing;

(ii) satisfying, or obtaining the waiver of, as promptly as practicable and on a timely basis (and in any event, no later than the Closing) all conditions to the Debt Financing contemplated by the Debt Commitment Letters and Financing Agreements that are within its or their control, including, without limitation:

(A) on or prior to the Closing Date, transferring Tesla Shares to the Margin Loan Borrower and causing the Margin Loan Borrower to credit to collateral accounts pledged to the applicable Debt Financing Sources in respect of the Margin Loan Financing and held through the facilities of DTC, in each case, sufficient Tesla Shares, which shall be free from all transfer restrictions and restrictive conditions (other than permitted restrictions contemplated under the Financing Documents in respect of the Margin Loan Financing), to cause the LTV Ratio (as defined in the Margin Loan Commitment Letter) not to exceed 20% as of the Closing Date;

52

(B) ensuring the absence of (1) any default or event of default (or any equivalent term) under the Financing Agreements in respect of the Margin Loan Financing, or (2) any Potential Adjustment Event or Mandatory Prepayment Event (in each case, under and as defined in the Margin Loan Commitment Letter);

(C) (x) maintaining the Margin Loan Borrower as a wholly owned subsidiary of Parent and Elon Musk, and (y) causing the organizational documents of the Margin Loan Borrower not to contain, and causing the Margin Loan Borrower not to enter into any Contract, that would (1) impede or prevent the Margin Loan Borrower or any of its Affiliates from enforcing or the Margin Loan Borrower's rights in respect of the Debt Financing Sources under the Margin Loan Commitment Letter or any Financing Agreement in respect thereof or (2) impede or prevent the Margin Loan Borrower or any of its Affiliates from applying the proceeds of the loans to pay any Funding Obligations; and

(D) causing Elon Musk to (1) fully and unconditionally guarantee all obligations of the Margin Loan Borrower under the Margin Loan Financing to the extent required to consummate the Margin Loan Financing and (2) at all times through and including the Closing Date to own (beneficially and of record), directly or indirectly, all of the outstanding equity interests of, and Control, the Margin Loan Borrower;

(iii) accepting (and complying with) to the fullest extent all "flex" provisions contemplated by the Debt Commitment Letters;

(iv) causing the Financing Sources to fund the Financing no later than the Closing (including by enforcing its rights under the Debt Commitment Letters and/or Financing Agreements, as applicable).

(b) None of the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower or any of their respective Affiliates shall agree to or permit any amendment, supplement, modification or replacement of, or grant any waiver of, any condition, remedy or other provision under any Financing Commitment or Financing Agreement, or permit any Financing Agreement to contain any provision, without the prior written consent of the Company, if such amendment, supplement, modification, replacement, waiver or provision would or would reasonably be expected to (i) reduce (or would reasonably be expected to have the effect of reducing) the aggregate amount of the Financing (or the cash proceeds available therefrom) from that contemplated by the Financing Commitments delivered as of the date hereof, (ii) impose new or additional conditions or contingencies to the Financing or otherwise expand, amend or modify any of the existing conditions to the receipt of the Financing, or otherwise add, expand, amend or modify any other provision of, or remedies under, the Financing Commitments as in effect on the date hereof, in a manner that would reasonably be expected to delay, impede or prevent the consummation

53

or funding of the Financing (or satisfaction of the conditions to obtaining any portion of the Financing) at the Closing or impair the ability or likelihood of the Closing or impair the ability of Parent and/or Acquisition Sub to timely consummate the Merger and the other transactions contemplated by this Agreement, (iii) make it less likely that any portion of the Financing would be funded (including by making the satisfaction of the conditions to obtaining any portion of the Financing less likely to occur) or otherwise prevent, impede or delay or impair the availability of any of the Financing or impair the ability or likelihood of the Closing or Parent and/or Acquisition Sub to timely consummate the transactions contemplated by this Agreement (including by requiring any additional filings, consents or approvals of any Governmental Authority) or (iv) adversely impact the ability of Parent, Acquisition Sub or the Margin Loan Borrower, or any of their respective Affiliates, to enforce their respective rights against the other parties to the Financing Commitments or the Financing Agreements; provided, however, subject to compliance with the other provisions of this Section 6.10, Parent, Acquisition Sub or their respective Affiliates may amend, modify, supplement or waive any provision of any Debt Commitment Letter (A) to add lenders, lead arrangers, bookrunners, syndication agents or similar entities that have not executed such Debt Commitment Letter as of the date hereof or (B) amend any Debt Commitment Letters to implement any "market flex" provisions applicable thereto. The Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower and their respective Affiliates shall not agree to the withdrawal, termination, repudiation or rescission of any Financing Commitment without the prior written consent of the Company, and shall not release or consent to the termination of the commitments or obligations of any Debt Financing Source under any Debt Commitment Letter, in each case, unless such Financing Commitment is contemporaneously replaced with a new Financing Commitment that complies with the first sentence of this Section 6.10(b). Upon any permitted amendment, supplement, modification or replacement of, or waiver of, any Financing Commitment in accordance with this Section 6.10(b), Parent shall promptly deliver to the Company a true, correct and complete copy of each Financing Agreement and each amendment, supplement, modification, replacement or waiver to any Financing Commitment or any Financing Agreement referenced herein to "Financing Commitments", "Bank Debt Commitment Letter", "Margin Loan Commitment Letter", "Debt Commitment Letters", "Equity Commitment Letter" and "Financing Agreements" shall include and mean such documents as amended, supplemented, modified, replaced or waived in compliance with this Section 6.10(b), as applicable, and references to "Financing", "Bank Debt Financing", "Margin Loan Financing" and "Equity Financing" shall include and mean the financing contemplated by the Financing Commitments or Financing Agreements as amended, supplemented, modified, replaced or waived in compliance with this Section 6.10(b), as applicable.

(c) In the event that (x) all or any portion of the Debt Financing expires, terminates, becomes or could reasonably be expected to become unavailable on the terms and conditions (including any "flex" provisions) or from the sources contemplated in the applicable Debt Commitment Letters or (y) any of the Debt Commitment Letters or the Financing Agreements shall be withdrawn, terminated, repudiated or rescinded, in whole or in part, for any reason, (i) Parent shall promptly so notify the Company in writing and (ii) Parent and/or its Affiliates shall use their respective reasonable best efforts to arrange and obtain, as promptly as practicable following the occurrence of such event (and in any event no later than the Closing),

54

and to negotiate and enter into definitive agreements with respect to, alternative financing from the same or alternative sources with terms and conditions (including market flex provisions) not less favorable taken as a whole to Parent than the terms and conditions set forth in the applicable Debt Commitment Letter and which shall not include any conditions or contingencies to the Financing not otherwise included in the Debt Commitment Letters as of the date hereof or include any provision that would reasonably be expected to materially delay or prevent the consummation or funding of the Financing (or satisfaction of the conditions to obtaining any portion of the Financing) at the Closing or materially impair the ability or likelihood of the Closing or Parent and/or Acquisition Sub to timely consummate the Merger and the other transactions contemplated by this Agreement (the "**Alternative Financing**") in an amount sufficient to consummate the transactions contemplated by this Agreement (or replace any unavailable portion of the Debt Financing). In the event any Alternative Financing is obtained and any new debt commitment letters are entered into in accordance with this Section 6.10(c) (each such letter, an "**Alternative Financing Debt Commitment Letter**"), Parent shall promptly deliver a copy thereof to the Company (it being understood that any fee letters related thereto may be redacted in the same manner as the fee letters delivered on or prior to the date of this Agreement) and references herein to (A) "Financing Commitments" and "Debt Commitment Letters" shall be deemed to include any Alternative Financing Debt Commitment Letter to the extent then in effect, and (B) "Financing", "Bank Debt Financing", "Margin Loan Financing" or "Debt Financing" shall include the debt financing contemplated by such Alternative Financing Debt Commitment Letter. Parent, Acquisition Sub and Elon Musk shall be subject to the same obligations with respect to any Alternative Financing as set forth in this Agreement with respect to the Debt Financing.

(d) The Equity Investor, Parent, Acquisition Sub and/or the Margin Loan Borrower shall (i) give the Company prompt written notice of any default, breach or threatened default or breach (or any event or circumstance that, with or without notice, lapse of time or both, would reasonably be expected to give rise to any default or breach) by any party to any of the Financing Commitments or the Financing Agreements of which Parent or any of its Affiliates or their respective Representatives becomes aware or any withdrawal, termination, repudiation or rescission or threatened withdrawal, termination, repudiation or rescission thereof, (ii) give the Company prompt notice of any dispute or disagreement between or among any parties to the Debt Commitment Letters, (iii) notify the Company promptly if for any reason Parent, Acquisition Sub or their respective Affiliates no longer believes in good faith that it will be able to obtain all or any portion of the Financing contemplated by the Financing Commitments, (iv) promptly provide and respond to any updates reasonably requested by the Company with respect to the status of Parent's efforts to arrange and finalize the Financing (or any Alternative Financing) and (v) otherwise keep the Company reasonably informed on a current basis of the status of its efforts to arrange and finalize the Financing (or any Alternative Financing). In no event shall Parent or any of its Affiliates be required to provide access to or disclose information that Parent or any of its Affiliates reasonably determines could jeopardize any attorney-client privilege of, or conflict with any confidentiality requirements applicable to, Parent or any of its Affiliates.

55

(e) Each of Parent and the Equity Investor acknowledges and agrees that it shall be fully responsible for the Equity Financing and each shall take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable to obtain the Equity Financing, including taking all actions necessary to (i) comply with the terms of and maintain in effect the Equity Commitment Letter, (ii) satisfy on a timely basis all conditions and obligations in such Equity Commitment Letter and (iii) consummate and fund the Equity Financing at or prior to the Closing. Parent further agrees that it shall take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable to fully enforce its rights (including through litigation) under the Equity Commitment Letter.

(f) Parent acknowledges and agrees that neither the obtaining of the Financing or any alternative financing, nor the completion of any issuance of securities contemplated by the Financing or any alternative financing (including the Alternative Financing), is a condition to the Closing, and reaffirms its obligation to consummate the transactions contemplated by this Agreement irrespective and independently of the availability of the Financing or any alternative financing (including the Alternative Financing), or the completion of any such issuance, subject to the applicable conditions set forth in <u>Article VII</u>.

(g) Each of the Equity Investor, Parent and the Acquisition Sub shall on or prior to the Closing Date cause the Margin Loan Borrower to apply the cash proceeds of the Margin Loan Financing to payment of the Funding Obligations under this Agreement.

<u>Section 6.11</u> <u>Financing Cooperation</u>.

(a) The Company shall and shall cause its Subsidiaries to, and shall use its commercially reasonable best efforts to cause each of its Representatives to, at Parent's sole expense, provide any reasonable cooperation reasonably requested by Parent in writing in connection with (i) the arrangement of the Bank Debt Financing and any other debt financing expressly contemplated by the Bank Debt Commitment Letter, including senior unsecured notes and senior secured notes, and (ii) subject to the requirements of <u>Section 6.11(b)</u>, the payoff, redemption, defeasance, discharge or other satisfaction of the Existing Credit Agreement and the Existing Senior Notes on or subsequent to the Closing Date, in each case as is necessary, customary and reasonably requested in writing by Parent; <u>provided</u> that any notice of, or documentation with respect to, any such payoff, redemption or other satisfaction of existing indebtedness of the Company pursuant to this Section 6.11(a)(ii) shall provide that the obligation to repay, redeem or satisfy such indebtedness shall, as applicable, be subject to and is conditioned upon the occurrence of the Closing; provided, further, that such requested cooperation with respect to clauses (i) and (ii) of this Section 6.11(a) does not unreasonably or materially interfere with the ongoing operations of the Company and its Subsidiaries. Notwithstanding anything in this Agreement to the contrary, (A) neither the Company nor any of its Subsidiaries shall be required to pay any commitment or other similar fee, incur or reimburse any costs or expenses, enter into any binding agreement or commitment or incur any other liability, indemnity or obligation in connection with the Bank Debt Financing or the cooperation required by this Section 6.11(a) that would be effective prior to the Closing, (B) no director, manager, officer or employee or other Representative or equityholder of the Company or any of its Subsidiaries shall be required to execute, deliver, enter into, approve or perform any agreement, commitment, document, instrument or certificate or take any other action pursuant to this <u>Section 6.11(a)</u> to the extent any such action could reasonably be expected to result in personal liability to such Representative or equityholder, (C) neither the Company nor any of its Subsidiaries (nor any of their respective boards of directors (or similar governing bodies)) shall be required to adopt any resolutions, execute any consents or otherwise take any corporate or similar action or deliver any certificate, document, instrument or agreement in connection to the Bank Debt Financing or the incurrence of

indebtedness thereby or any cooperation required by this Section 6.11(a) and (D) no cooperation under this <u>Section 6.11(a)</u> shall (I) require the Company or any of its Subsidiaries to provide, or cause to be provided, any information the disclosure of which is prohibited or restricted under applicable Law or any binding agreement with a third party or is legally privileged or consists of attorney work product or could reasonably be expected to result in the loss of any applicable legal privilege, (II) require the Company or any of its Subsidiaries to take any action that would reasonably be expected to conflict with or violate its organizational documents or any Laws or would reasonably be expected to result in (with or without notice, lapse of time, or both) a violation or breach of, or default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of such Person or to a loss of any benefit or privilege to which such Person is entitled under, any agreement to which the Company or any of its Subsidiaries is a party or result in the creation or imposition of any Lien on any asset of the Company or any of its Subsidiaries, except any Lien that becomes effective only upon the Closing, (III) cause (or require the taking of any action that would cause) any representation or warranty in this Agreement to be breached or cause any condition to Closing to fail to be satisfied or otherwise cause any breach of this Agreement or require the Company to waive or amend any terms of this Agreement, (IV) require the Company to disclose any material, non-public information other than to recipients of such information that agree to confidentiality arrangements as contemplated under Section 6.11(b) and Section 6.4 or any adjustments or assumptions used in connection therewith, (V) require the Company to prepare or provide any financial statements or other financial information (other than those financial statements (and any other financial information) from time to time filed by the Company with the SEC (and nothing in this Section 6.11(a) shall create or be implied to create any obligation to make any such filings or other readily available financial information), (VI) waive or amend any terms of this Agreement, (VII) require the Company or its Subsidiaries to take any action that, in the good faith determination of the Company or such Subsidiary would create a risk of damage or destruction to any property or assets of the Company or such Subsidiary, (VIII) require the Company or any of its Subsidiaries or any of their Representatives to deliver any legal opinions or reliance letters, (IX) file or furnish any reports or information with the SEC or change any fiscal period or accelerate the Company's preparation of its SEC reports or financial statements, or (X) prepare or provide any (1) information regarding officers or directors prior to consummation of the Merger, executive compensation and related party disclosure or any Compensation Discussion and Analysis or information required by Item 302 (to the extent not so provided in SEC filings) or 402 of Regulation S-K under the Securities Act and any other information that would be required by Part III of Form 10-K (except to the extent previously filed with the SEC), (2) any description of all or any component of the Bank Debt Financing or other information customarily provided by the Financing Sources or their counsel, (3) risk factors relating to all or any component of the Bank Debt Financing, (4) information regarding affiliate transactions that may exist following consummation of the Merger, or (5) other information that is not available to the Company without undue effort or expense. The parties hereto agree that any information with respect to the prospects, projections and plans for the business and operations of the Company and its Subsidiaries in connection with the Financing will be the sole responsibility of Parent, and none of the Company, any of its Subsidiaries or any of their respective Representatives shall be required to provide any information or make any presentations with respect to capital structure, the incurrence of the Financing, other pro forma information relating thereto or the manner in which Parent intends to operate, or cause to be operated, the business of the Company or its Subsidiaries after the Closing. Nothing contained in this Section 6.11 or

57

otherwise shall require the Company or any of its Subsidiaries, prior to the Closing, to be a borrower, an issuer, a guarantor or other obligor with respect to the Debt Financing. For the avoidance of doubt, the parties hereto acknowledge and agree that the provisions contained in this Section 6.11, represent the sole obligation of the Company, its Subsidiaries and their respective Representatives with respect to cooperation in connection with the arrangement of any financing (including the Financing) to be obtained by the Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower or any of their respective Affiliates with respect to the transactions contemplated by this Agreement and no other provision of this Agreement (including the Exhibits and Schedules hereto) shall be deemed to expand or modify such obligations. In no event shall the receipt or availability of any funds or financing (including, for the avoidance of doubt, the Financing) by the Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower or any of their respective Affiliates or any other financing or other transactions be a condition to any of the Equity Investor's, Parent's, Acquisition Sub's or the Margin Loan Borrower's obligations under this Agreement. Notwithstanding anything to the contrary contained in this Agreement, the Company will be deemed to be in compliance with this Section 6.11(a), and neither Parent nor any of its Affiliates shall allege that the Company is or has not been in compliance with this Section 6.11(a), unless Parent's failure to obtain the Bank Debt Financing was due solely to a deliberate action or omission taken or omitted to be taken by the Company in material breach of its obligations under this Section 6.11(a).

(b) On or prior to any applicable date of the Company's payoff, redemption or other satisfaction of the Existing Credit Agreement and/or Existing Senior Notes contemplated by Section 6.11(a), or if applicable, date of satisfaction and discharge, Parent shall deposit or cause to be deposited funds with the applicable paying agent sufficient to effect such payoff, redemption and/or satisfaction, as applicable, as required pursuant to the terms of the agreements governing such indebtedness (and in the event of any delay of the anticipated Effective Time, Parent shall deposit additional funds with the applicable paying agents sufficient to satisfy such payoff, redemption or other satisfaction of the Existing Credit Agreement and/or Existing Senior Notes, as required pursuant to the terms of the agreements governing such indebtedness); provided that the release of any such funds shall be subject to the occurrence of the Effective Time. Parent shall, promptly upon request by the Company, reimburse the Company for all reasonable and documented out-of-pocket costs and expenses (including outside attorneys' fees and disbursements) incurred by the Company, its Affiliates and their respective Representatives in connection with the cooperation contemplated by Section 6.11(a). Parent acknowledges and agrees that the Company, its Affiliates and their respective Representatives shall not have any responsibility for, or incur any liability to any Person under, any financing that Parent may raise in connection with the transactions contemplated by this Agreement or any cooperation provided pursuant to Section 6.11(a), and shall indemnify and hold harmless the Company, its Affiliates and their respective Representatives, from and against any and all losses suffered or incurred by any of them in connection with the Debt Financing, any cooperation provided pursuant to Section 6.11(a) or any alternative financing and any information utilized in connection therewith, except to the extent any such cost or expense, judgment, fine, loss, claim, or damage results directly from the bad faith, willful misconduct or gross negligence of the Company or its Representatives or controlled Affiliates as determined by a court of competent jurisdiction in a final and non-appealable judgment. All non-public or other confidential information provided by or behalf of the Company to Parent or its Affiliates or any of their respective Representatives pursuant to this Section 6.11 shall be kept confidential in accordance with the terms of Section 6.4; provided that

58

Parent and its Affiliates may share any confidential information with respect to the Company and its Subsidiaries with any Debt Financing Sources, and that Parent, such Debt Financing Sources and their respective Affiliates may share such information with potential Debt Financing Sources in connection with any marketing efforts with respect to the Debt Financing; provided, however, that the recipients of such confidential information contemplated to be provided by the preceding proviso shall agree to be bound by confidentiality obligations no less restrictive than those set forth in Section 6.4.

Section 6.12 Acquisition Sub. Parent and the Equity Investor shall take all actions necessary to (a) cause Acquisition Sub to perform its obligations under this Agreement and to consummate the Merger on the terms and conditions set forth in this Agreement and (b) ensure that, prior to the Effective Time, Acquisition Sub shall not conduct any business, or incur or guarantee any indebtedness or make any investments, other than as specifically contemplated by this Agreement. Parent hereby (a) guarantees the due, prompt and faithful payment performance and discharge by Acquisition Sub of, and compliance by Acquisition Sub with, all of the covenants and agreements of Acquisition Sub under this Agreement and (b) agrees to take all actions necessary, proper or advisable to ensure such payment, performance and discharge by Acquisition Sub under this Agreement. Parent agrees that any breach by Acquisition Sub of a representation, warranty, covenant or agreement in this Agreement shall also be a breach of such representation, warranty, covenant or agreement by Parent.

Section 6.13 Rule 16b-3 Matters. Prior to the Effective Time, the Company may take such further actions, if any, as may be reasonably necessary or appropriate to ensure that the dispositions of equity securities of the Company (including any derivative securities) pursuant to the transactions contemplated by this Agreement by any officer or director of the Company who is subject to Section 16 of the Exchange Act are exempt under Rule 16b-3 promulgated under the Exchange Act.

Section 6.14 Delisting of Company Common Stock. Parent shall, with the reasonable cooperation of the Company, take, or cause to be taken, all actions reasonably necessary to cause the Company's securities to be delisted from the New York Stock Exchange and deregistered under the Exchange Act as soon as reasonably practicable following the Effective Time.

## ARTICLE VII

## CONDITIONS TO THE MERGER

Section 7.1 Conditions to the Obligations of Each Party. The respective obligations of each party hereto to consummate the Merger, are subject to the satisfaction or waiver by the Company and Parent at or prior to the Effective Time of the following conditions:

(a) the Company Stockholder Approval shall have been obtained;

(b) any waiting period (or any extension thereof) applicable to the consummation of the Merger under the HSR Act shall have expired or early termination thereof shall have been granted; and each Consent or approval that is required under any Antitrust Laws or Foreign Investment Laws of the jurisdictions set forth on Schedule A with respect to the transactions contemplated by this Agreement, including the Merger shall have been made, obtained or received (or, as applicable, the waiting periods with respect thereto shall have expired or been terminated); and

(c) no Governmental Authority of the jurisdictions set forth on <u>Schedule A</u> shall have enacted, issued, promulgated, enforced or entered any Law or Order which is then in effect and has the effect of restraining, enjoining, rendering illegal or otherwise prohibiting consummation of the Merger, or causing the Merger to be rescinded following the completion thereof.

<u>Section 7.2 Conditions to the Obligations of Parent and Acquisition Sub</u>. The obligations of Parent and Acquisition Sub to consummate the Merger, are, in addition to the conditions set forth in <u>Section 7.1</u>, further subject to the satisfaction or waiver by Parent at or prior to the Effective Time of the following conditions:

(a) the Company shall have performed or complied, in all material respects, with its obligations required under this Agreement to be performed or complied with by the Company on or prior to the Closing Date;

(b) (i) each of the representations and warranties of the Company contained in this Agreement (except for the representations and warranties contained in <u>Section 4.2(a)</u> and <u>Section 4.2(b)</u>), without giving effect to any materiality or "Company Material Adverse Effect" qualifications therein, shall be true and correct as of the Closing Date (except to the extent such representations and warranties are expressly made as of a specific date, in which case such representations and warranties shall be so true and correct as of such specific date only), except for such failures to be true and correct as would not have a Company Material Adverse Effect; and (ii) each of the representations and warranties contained in <u>Section 4.2(a)</u> and <u>Section 4.2(b)</u> shall be shall be true and correct in all material respects as of the Closing Date (except to the extent such representations and warranties are expressly made as of a specific date, in which case such representations and warranties shall be so true and correct in all material respects as of such specific date only); and

(c) no Company Material Adverse Effect shall have occurred and be continuing.

<u>Section 7.3 Conditions to the Obligation of the Company to Effect the Merger</u>. The obligation of the Company to consummate the Merger, is, in addition to the conditions set forth in <u>Section 7.1</u>, further subject to the satisfaction or waiver by the Company at or prior to the Effective Time of the following conditions:

(a) Parent and Acquisition Sub shall have performed or complied, in all material respects, with its obligations required under this Agreement to be performed or complied with by Parent or Acquisition Sub, as the case may be, on or prior to the Closing Date; and

(b) each of the representations and warranties of Parent and Acquisition Sub contained in this Agreement, without giving effect to any materiality or "Parent Material Adverse Effect" qualifications therein, shall be true and correct as of the Closing Date, except for such failures to be true and correct as would not have a Parent Material Adverse Effect (except to the extent such representations and warranties are expressly made as of a specific date, in which case such representations and warranties shall be so true and correct as of such specific date only).

60

## ARTICLE VIII

## TERMINATION, AMENDMENT AND WAIVER

<u>Section 8.1 Termination</u>. Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Effective Time, whether before or after the Company Stockholder Approval is obtained (except as otherwise expressly noted), as follows:

(a) by mutual written agreement of each of Parent and the Company;

(b) by either Parent or the Company:

(i) if the Merger shall not have been consummated on or before 5:00 p.m. (Pacific Time) on October 24, 2022 (as such date may be extended pursuant to the terms hereof, the "**Termination Date**"); <u>provided</u>, <u>however</u>, that (x) the right to terminate this Agreement pursuant to this <u>Section 8.1(b)(i)</u> shall not be available to any party if the failure of such party to perform or comply with any of its obligations under this Agreement has been the principal cause of or resulted in the failure of the Closing to have occurred on or before such date and (y) the Termination Date shall be extended for an additional six (6) months if, as at the Termination Date, the condition set forth in <u>Section 7.1(b)</u> or <u>Section 7.1(c)</u> shall not have been satisfied;

(ii) if, prior to the Effective Time, any Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order or taken any other action permanently restraining, enjoining, rendering illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and such Law or Order or other action shall have become final and non-appealable; <u>provided</u>, <u>however</u>, that the party seeking to terminate this Agreement pursuant to this <u>Section 8.1(b)(ii)</u> shall have used the efforts required by this Agreement to remove such Law, Order or other action; <u>provided</u>, <u>further</u>, that the right to terminate this Agreement under this <u>Section 8.1(b)(ii)</u> shall not be available to a party if the issuance of such Law or Order or taking of such action was primarily due to the failure of such party, and, in the case of Parent, the failure of Acquisition Sub or the Equity Investor, to perform any of their obligations under this Agreement; or

(iii) if the Company Stockholder Approval shall not have been obtained at the Company Stockholders' Meeting duly convened therefor or at any adjournment or postponement thereof at which this Agreement and the transactions contemplated by this Agreement have been voted upon; or

61

(c) by the Company:

(i) if Parent, Acquisition Sub or the Equity Investor shall have breached or failed to perform any of their respective representations, warranties, covenants or other agreements set forth in this Agreement, which breach or failure to perform (A) would give rise to the failure of any condition set forth in Section 7.3(a) or Section 7.3(b) and (B) is not capable of being cured, or is not cured, by Parent, Acquisition Sub or the Equity Investor on or before the earlier of (x) the Termination Date and (y) the date that is thirty (30) calendar days following the Company's delivery of written notice to Parent, Acquisition Sub or the Equity Investor, as applicable, of such breach; provided, however, that the Company shall not have the right to terminate this Agreement pursuant to this Section 8.1(c)(i) if the Company is then in material breach of any of its representations, warranties, covenants or agreements hereunder;

(ii) if the Company Board shall have authorized the Company to enter into a definitive agreement with respect to a Superior Proposal; provided that, substantially concurrently with such termination, the Company enters into such definitive agreement and pays (or causes to be paid) at the direction of Parent the Termination Fee as specified in Section 8.3(a); or

(iii) if (A) the conditions set forth in Section 7.1 and Section 7.2 (other than those conditions that by their nature are to be satisfied at the Closing, which conditions are capable of being satisfied if the Closing were to occur at such time) have been satisfied or waived in accordance with this Agreement and Parent and Acquisition Sub shall have been notified in writing of the same, (B) Parent and Acquisition Sub fail to consummate the Merger within three (3) Business Days following the date on which the Closing should have occurred pursuant to Section 2.2 and (C) during such three (3)-Business Days period described in clause (B), the Company stood ready, willing and able to consummate the Merger and the other transactions contemplated hereby;

(d) by Parent:

(i) if the Company shall have breached or failed to perform any of its representations, warranties, covenants or other agreements set forth in this Agreement, which breach or failure to perform (A) would give rise to the failure of any condition set forth in Section 7.2(a) or Section 7.2(b), and (B) is not capable of being cured, or is not cured, by the Company on or before the earlier of (x) the Termination Date and (y) the date that is thirty (30) calendar days following Parent's delivery of written notice to the Company of such breach; provided, however, that Parent shall not have the right to terminate this Agreement pursuant to this Section 8.1(d)(i) if Parent, Acquisition Sub or the Equity Investor is then in material breach of any of its representations, warranties, covenants or agreements hereunder; or

(ii) prior to the receipt of the Company Stockholder Approval, if the Company Board shall have made an Adverse Board Recommendation Change.

Section 8.2 Effect of Termination. In the event that this Agreement is terminated and the Merger abandoned pursuant to Section 8.1, written notice thereof shall be given to the other party or parties, specifying the provisions of this Agreement pursuant to which such termination is made, and this Agreement shall forthwith become null and void and of no effect without liability on the part of any party hereto (or any of its Representatives), and all rights and obligations of any

62

party hereto shall cease; provided, however, that, except as otherwise provided in Section 8.3 or in any other provision of this Agreement, no such termination shall relieve any party hereto of any liability or damages (which the parties acknowledge and agree shall not be limited to reimbursement of Expenses or out-of-pocket costs, and, in the case of liabilities or damages payable by Parent and Acquisition Sub, would include the benefits of the transactions contemplated by this Agreement lost by the Company's stockholders) (taking into consideration all relevant matters, including lost stockholder premium, other combination opportunities and the time value of money), which shall be deemed in such event to be damages of such party, resulting from any knowing and intentional breach of this Agreement prior to such termination, in which case, except as otherwise provided in Section 8.3, the aggrieved party shall be entitled to all rights and remedies available at law or in equity; and provided, further, that the expense reimbursement and indemnification obligations contained in Section 6.11 and Section 6.12, and the provisions of this Section 8.2, Section 8.3, Section 8.6 and Article IX shall survive any termination of this Agreement pursuant to Section 8.1 in accordance with their respective terms.

Section 8.3 Termination Fee.

(a) In the event that:

(i) (A) a Third Party shall have made a Competing Proposal after the date of this Agreement, (B) this Agreement is subsequently terminated by (x) the Company or Parent pursuant to Section 8.1(b)(iii) or (y) Parent pursuant to Section 8.1(d)(i), and at the time of such Company Stockholders' Meeting in the case of clause (x) or at the time of such breach in the case of clause (y), a Competing Proposal has been publicly announced and has not been withdrawn, and (C) within twelve (12) months of such termination of this Agreement, the Company consummates a transaction involving a Competing Proposal or enters into a definitive agreement providing for the consummation of a Competing Proposal and such Competing Proposal is subsequently consummated; provided, however, that for purposes of this Section 8.3(a)(i), the references to "fifteen percent (15%)" in the definition of Competing Proposal shall be deemed to be references to "fifty percent (50%)";

(ii) this Agreement is terminated by the Company pursuant to Section 8.1(c)(ii); or

(iii) this Agreement is terminated by Parent pursuant to Section 8.1(d)(ii), then

the Company shall (A) in the case of clause (i) above, no later than two (2) Business Days following the date of the consummation of such transaction involving a Competing Proposal, (B) in the case of clause (ii) above, prior to or substantially concurrently with such termination, and (C) in the case of this clause (iii), no later than two (2) Business Days after the date of such termination, pay, or cause to be paid, by wire transfer of immediately available funds, at the direction of Parent, the Termination Fee; it being understood that in no event shall the Company be required to pay the Termination Fee on more than one occasion.

(b) In the event that:

(i) the Agreement is terminated by the Company pursuant to <u>Section 8.1(c)(i)</u>;

(ii) the Agreement is terminated by the Company pursuant to <u>Section 8.1(c)(iii)</u>, then

Parent shall no later than two (2) Business Days after the date of such termination, pay, or cause to be paid, by wire transfer of immediately available funds, at the direction of the Company, the Parent Termination Fee; it being understood that in no event shall Parent be required to pay the Parent Termination Fee on more than one occasion.

(c) Notwithstanding anything to the contrary set forth in this Agreement, but subject to <u>Section 9.9</u>, (i) except in the case of a knowing and intentional breach of this Agreement by the Company (in which case Parent shall be entitled to seek monetary damages, recovery or award from the Company in an amount not to exceed the amount of the Termination Fee in the aggregate), Parent's right to receive payment from the Company of the Termination Fee pursuant to <u>Section 8.3(a)</u>, shall constitute the sole and exclusive monetary remedy of Parent and Acquisition Sub against the Company and its Subsidiaries and any of their respective former, current or future general or limited partners, stockholders, members, managers, directors, officers, employees, agents, Affiliates or assignees of any of the foregoing (collectively, the "**Company Related Parties**") for all losses and damages suffered as a result of the failure of the transactions contemplated by this Agreement to be consummated or for a breach or failure to perform hereunder, and upon payment of such amount, none of the Company Related Parties shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated by this Agreement (except that the Company shall also be obligated with respect to <u>Section 8.6</u>); <u>provided</u>, that, in no event shall the Company be subject to an aggregate amount for monetary damages (including any payment of the Termination Fee) in excess of an aggregate amount equal to the Termination Fee (except in all cases that the Company shall also be obligated with respect to its applicable obligations under <u>Section 8.3(d)</u> and <u>Section 8.6</u>), and (ii) except in the case of a knowing and intentional breach of this Agreement by the Equity Investor, Parent or Acquisition Sub (in which case the Company shall be entitled to seek monetary damages, recovery or award from the Equity Investor, Parent or Acquisition Sub in an amount not to exceed the amount of the Parent Termination Fee, in the aggregate), the Company's right to receive payment from Parent of the Parent Termination Fee pursuant to <u>Section 8.3(b)</u>, shall constitute the sole and exclusive monetary remedy of the Company against the Parent, Acquisition Sub and the Equity Investor and any of their respective former, current or future general or limited partners, stockholders, members, managers, directors, officers, employees, agents, Affiliates or assignees of any of the foregoing (collectively, the "**Parent Related Parties**") for all losses and damages suffered as a result of the failure of the transactions contemplated by this Agreement, the Equity Commitment Letter or the Parent Guarantee to be consummated or for a breach or failure to perform the applicable provisions hereunder, and upon payment of such amount, none of the Parent Related Parties shall have any further liability or obligation relating to or arising out of this Agreement, the Equity Commitment Letter or the Parent Guarantee or the transactions contemplated thereby (except in all cases that Parent shall also be obligated with respect to its expense reimbursement and indemnification obligations contained in <u>Section 6.11</u> and its

64

applicable obligations under <u>Section 8.3(d)(iii)</u> and <u>Section 6.6(b)</u>); <u>provided</u>, that, in no event shall Equity Investor, Parent or Acquisition Sub collectively be subject to an aggregate amount for monetary damages (including any payment of the Parent Termination Fee) in excess of an aggregate amount equal to the Parent Termination Fee (except in all cases that Parent shall also be obligated with respect to its expense reimbursement and indemnification obligations contained in <u>Section 6.11</u> and its applicable obligations under <u>Section 8.3(d)(iii)</u> and <u>Section 6.6(b)</u>). For the avoidance of doubt, any liability or obligation of the Parent, Acquisition Sub or Equity Investor hereunder shall be subject to the terms of the Equity Commitment Letter and the Parent Guarantee.

(d) Each of the parties hereto acknowledges that (i) the agreement contained in this <u>Section 8.3</u> is an integral part of the transactions contemplated by this Agreement, (ii) the Termination Fee is not a penalty, but is liquidated damages, in a reasonable amount that will compensate Parent and its Affiliates in the circumstances in which such fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated by this Agreement, which amount would otherwise be impossible to calculate with precision, and (iii) without the agreement contained in this <u>Section 8.3</u>, the parties would not enter into this Agreement, accordingly, if the Company or Parent, as the case may be, fails to timely pay any amount due pursuant to this <u>Section 8.3</u> and, in order to obtain such payment, either Parent or the Company, as the case may be, commences a suit that results in a judgment against the other party for the payment of any amount set forth in this <u>Section 8.3</u>, such paying party shall pay the other party its costs and Expenses in connection with such suit, together with interest on such amount at the annual rate of five percent (5%) plus the prime rate as published in *The Wall Street Journal* in effect on the date such payment was required to be made through the date such payment was actually received, or such lesser rate as is the maximum permitted by applicable law.

<u>Section 8.4 Amendment</u>. This Agreement may be amended by mutual agreement of the parties hereto by action taken by or on behalf of their respective boards of directors at any time before or after receipt of the Company Stockholder Approval; <u>provided</u>, <u>however</u>, that (i) after the Company Stockholder Approval has been obtained, there shall not be any amendment that by Law or in accordance with the rules of any stock exchange requires further approval by the Company's stockholders without such further approval of such stockholders nor any amendment or change not permitted under applicable Law and (ii) any amendment of this <u>Section 8.4</u>, <u>Section 8.3(b)</u>, <u>Section 8.3(c)</u>, <u>Section 9.4</u>, <u>Section 9.7</u>, <u>Section 9.8</u>, <u>Section 9.10</u>, <u>Section 9.12 or Section 9.13</u>, in each case, to the extent such amendment would adversely affect the rights of a Debt Financing Source party to the Debt Commitment Letter under such Section, shall also be approved by such Debt Financing Source. This Agreement may not be amended except by an instrument in writing signed by each of the parties hereto.

<u>Section 8.5 Extension; Waiver</u>. At any time prior to the Effective Time, subject to applicable Law, the Company may (a) extend the time for the performance of any obligation or other act of Parent or Acquisition Sub, (b) waive any inaccuracy in the representations and warranties of Parent or Acquisition Sub contained herein or in any document delivered pursuant hereto and (c) waive compliance with any agreement or condition by Parent or Acquisition Sub contained herein. Any such extension or waiver shall only be valid if set forth in an instrument in writing signed by the party or parties to be bound thereby. Notwithstanding the foregoing, no failure or delay by the Company, Parent or Acquisition Sub in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

65

Section 8.6 Expenses; Transfer Taxes.

(a) Except as expressly set forth herein, all Expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the party incurring such Expenses.

(b) Parent shall timely and duly pay all (i) transfer, stamp and documentary Taxes or fees, (ii) sales, use, gains, real property transfer and other similar Taxes or fees arising out of or in connection with entering into and carrying out this Agreement and (iii) filing fees incurred in connection with any applications and filings under any Antitrust Laws or Foreign Investment Laws.

## ARTICLE IX

### GENERAL PROVISIONS

Section 9.1 Non-Survival of Representations, Warranties and Agreements. The representations, warranties, covenants and agreements in this Agreement and any certificate delivered pursuant hereto by any Person shall terminate at the Effective Time or, except as provided in Section 8.2, upon the termination of this Agreement pursuant to Section 8.1, as the case may be, except that this Section 9.1 shall not limit any covenant or agreement of the parties which by its terms contemplates performance after the Effective Time or after termination of this Agreement, including those contained in Section 6.6 and Section 6.9.

Section 9.2 Notices. All notices, consents and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by hand delivery, by prepaid overnight courier (providing written proof of delivery) or by confirmed electronic mail, addressed as follows:

if to Parent or Acquisition Sub:

    ***

    Attn: Elon Musk

with a copy (which shall not constitute notice) to:

    Skadden, Arps, Slate, Meagher & Flom LLP
    525 University Ave, Suite 1400
    Palo Alto, California 94301
    Attn:    Mike Ringler
              Sonia K. Nijjar
              Dohyun Kim

66

Email: ***
    ***
    ***

<u>if to the Company</u>:

Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, California 94103
Attn: General Counsel
Email: ***

with a copy (which shall not constitute notice) to:

Wilson Sonsini Goodrich & Rosati
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Attn:    Katharine A. Martin
    Martin W. Korman
    Douglas K. Schnell
    Remi P. Korenblit
Email:   ***
    ***
    ***
    ***

and

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attn: Alan Klein
    Anthony F. Vernace
    Katherine M. Krause
Email:   ***
    ***
    ***

or to such other address or electronic mail address for a party as shall be specified in a notice given in accordance with this <u>Section 9.2</u>; <u>provided</u> that any notice received by electronic mail or otherwise at the addressee's location on any Business Day after 5:00 p.m. (addressee's local time) or on any day that is not a Business Day shall be deemed to have been received at 9:00 a.m. (addressee's local time) on the next Business Day; <u>provided</u>, <u>further</u>, that notice of any change to the address or any of the other details specified in or pursuant to this <u>Section 9.2</u> shall not be deemed to have been received until, and shall be deemed to have been received upon, the later of the date specified in such notice or the date that is five (5) Business Days after such notice would otherwise be deemed to have been received pursuant to this <u>Section 9.2</u>.

Section 9.3 Interpretation; Certain Definitions.

(a) The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

(b) Disclosure of any fact, circumstance or information in any Section of the Company Disclosure Letter or Parent Disclosure Letter shall be deemed to be disclosure of such fact, circumstance or information with respect to any other Section of the Company Disclosure Letter or Parent Disclosure Letter, respectively, only if it is reasonably apparent that such disclosure relates to any such other Section. The inclusion of any item in the Company Disclosure Letter or Parent Disclosure Letter shall not be deemed to be an admission or evidence of materiality of such item, nor shall it establish any standard of materiality for any purpose whatsoever.

(c) The words "hereof," "herein," "hereby," "hereunder" and "herewith" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement. References to articles, sections, paragraphs, exhibits, annexes and schedules are to the articles, sections and paragraphs of, and exhibits, annexes and schedules to, this Agreement, unless otherwise specified, and the table of contents and headings in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the phrase "without limitation." Words describing the singular number shall be deemed to include the plural and vice versa, words denoting any gender shall be deemed to include all genders, words denoting natural persons shall be deemed to include business entities and vice versa, and references to a Person are also to its permitted successors and assigns. The phrases "the date of this Agreement" and "the date of this Agreement" and terms or phrases of similar import shall be deemed to refer to April 25, 2022, unless the context requires otherwise. When used in reference to the Company or its Subsidiaries, the term "material" shall be measured against the Company and its Subsidiaries, taken as a whole. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder (provided that for purposes of any representations and warranties contained in this Agreement that are made as of a specific date or dates, references to any statute shall be deemed to refer to such statute, as amended, and to any rules or regulations promulgated thereunder, in each case, as of such date). Terms defined in the text of this Agreement have such meaning throughout this Agreement, unless otherwise indicated in this Agreement, and all terms defined in this Agreement shall have the meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. Any Law defined or referred to herein or in any agreement or instrument that is referred to herein means such Law as from time to time amended, modified or supplemented, including (in the case of statutes) by succession of comparable successor Laws (provided that for purposes of any representations and warranties contained in this Agreement that are made as of a specific date or dates, references to any statute shall be deemed to refer to such statute, as amended, and to any rules or regulations promulgated thereunder, in each case, as of such date). All references to "dollars" or "$" refer to currency of the U.S. Nothing contained in Article IV or Article V may be construed as a covenant under the terms of this Agreement, other than the acknowledgments and agreements set forth in Section 4.25 and Section 5.10 to the extent necessary to give full effect to the acknowledgments and agreements set forth therein.

68

Section 9.4 <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, illegal, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Upon such determination that any term or other provision is invalid, void, illegal, unenforceable or against its regulatory policy, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement, including the Merger, be consummated as originally contemplated to the fullest extent possible.

Section 9.5 <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective permitted successors and assigns. Any attempted assignment in violation of this <u>Section 9.5</u> shall be null and void.

Section 9.6 <u>Entire Agreement</u>. This Agreement (including the exhibits, annexes and appendices hereto) constitutes, together with the Company Disclosure Letter and the Parent Disclosure Letter, the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof.

Section 9.7 <u>No Third-Party Beneficiaries</u>. Subject to <u>Section 9.13</u>, this Agreement is not intended to and shall not confer upon any Person other than the parties hereto any rights or remedies hereunder; <u>provided</u>, <u>however</u>, that it is specifically intended that (A) the D&O Indemnified Parties (with respect to <u>Section 6.6</u> from and after the Effective Time), (B) the Company Related Parties (with respect to <u>Section 8.3</u>) are third-party beneficiaries and (C) the Parent Related Parties (with respect to <u>Section 8.3</u>) are third-party beneficiaries.

Section 9.8 <u>Governing Law</u>. This Agreement and all actions, proceedings or counterclaims (whether based on contract, tort or otherwise) arising out of or relating to this Agreement, or the actions of Parent, Acquisition Sub or the Company in the negotiation, administration, performance and enforcement thereof, shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice or conflict of laws provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

Section 9.9 Specific Performance.

(a) The parties hereto agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the parties hereto do not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate this Agreement) in accordance with its specified terms or otherwise breach such provisions. Accordingly, the parties hereto acknowledge and agree that the parties hereto shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity. Each of the parties hereto agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. Any party seeking an injunction or injunctions or any other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to show proof of actual damages or provide any bond or other security in connection with any such order or injunction.

(b) Notwithstanding anything herein to the contrary, including the availability of the Parent Termination Fee or other monetary damages, remedy or award, it is hereby acknowledged and agreed that the Company shall be entitled to specific performance or other equitable remedy to enforce Parent and Acquisition Sub's obligations to cause the Equity Investor to fund the Equity Financing, or to enforce the Equity Investor's obligation to fund the Equity Financing directly, and to consummate the Closing if and for so long as, (i) all of the conditions set forth in Section 7.1 and Section 7.2 (other than those conditions that are to be satisfied at the Closing; provided, that such conditions are capable of being satisfied if the Closing were to occur at such time) have been satisfied or waived and Parent has failed to consummate the Closing on the date required pursuant to the terms of Section 2.2, (ii) the Debt Financing (or, as applicable, the Alternative Financing) has been funded or will be funded at the Closing if the Equity Financing is funded at the Closing, and (iii) the Company has confirmed that, if specific performance or other equity remedy is granted and the Equity Financing and Debt Financing are funded, then the Closing will occur. For the avoidance of doubt, (A) while the Company may concurrently seek (x) specific performance or other equitable relief, subject to the terms of this Section 9.9, and (y) payment of the Parent Termination Fee or other monetary damages, remedy or award if, as and when required pursuant to this Agreement), under no circumstances shall the Company be permitted or entitled to receive both a grant of specific performance to cause the Equity Financing to be funded, on the one hand, and payment of the Parent Termination Fee or other monetary damages, remedy or award, on the other hand; provided, however, that in no event shall the Company be permitted or entitled to receive aggregate monetary damages in excess of the Parent Termination Fee (except in all cases that Parent shall also be obligated with respect to its expense reimbursement and indemnification obligations contained in Section 6.11 and its applicable obligations under Section 8.3(d)(iii) and Section 8.6(b)).

(c) To the extent any party hereto brings an action, suit or proceeding to specifically enforce the performance of the terms and provisions of this Agreement (other than an action to enforce specifically any provision that expressly survives the termination of this Agreement), the Termination Date shall automatically be extended to (i) the twentieth (20th) Business Day following the resolution of such action, suit or proceeding or (ii) such other time period established by the court presiding over such action, suit or proceeding.

Section 9.10 <u>Consent to Jurisdiction</u>.

(a) Each of the parties hereto hereby (i) expressly and irrevocably submits to the exclusive personal jurisdiction of the Delaware Court of Chancery, any other court of the State of Delaware or any federal court sitting in the State of Delaware in the event any dispute arises out of this Agreement or the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (iii) agrees that it will not bring any action relating to this Agreement or the transactions contemplated by this Agreement in any court other than the Delaware Court of Chancery, any other court of the State of Delaware or any federal court sitting in the State of Delaware, (iv) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement and (v) agrees that each of the other parties shall have the right to bring any action or proceeding for enforcement of a judgment entered by the state courts of the Delaware Court of Chancery, any other court of the State of Delaware or any federal court sitting in the State of Delaware. Each of the Equity Investor, Parent, Acquisition Sub and the Company agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b) Each party hereto irrevocably consents to the service of process outside the territorial jurisdiction of the courts referred to in <u>Section 9.10(a)</u> in any such action or proceeding by mailing copies thereof by registered or certified U.S. mail, postage prepaid, return receipt requested, to its address as specified in or pursuant to <u>Section 9.2</u>. However, the foregoing shall not limit the right of a party to effect service of process on the other party by any other legally available method.

Section 9.11 <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, all of which shall together be considered one and the same agreement. Delivery of an executed signature page to this Agreement by electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 9.12 <u>WAIVER OF JURY TRIAL</u>. EACH OF THE EQUITY INVESTOR, PARENT, ACQUISITION SUB AND THE COMPANY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF PARENT, ACQUISITION SUB OR THE COMPANY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT THEREOF (INCLUDING THE DEBT FINANCING).

Section 9.13 <u>Debt Financing Source Related Party</u>. Notwithstanding anything in this Agreement to the contrary, but in all cases subject to and without in any way limiting the rights and claims of Parent or any of its Affiliates under and pursuant to any debt commitment letter or other applicable definitive document relating to the Debt Financing, the Company hereby:

(a) agrees that any claim, action, suit, investigation or other proceeding, whether in law or in equity, whether in contract or in tort or otherwise, involving the Debt Financing Sources, arising out of or relating to, this Agreement and/or the Debt Financing or any of the agreements entered into in connection therewith or any of the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of the Supreme Court of the State of New York, County of New York, or, if under applicable law exclusive jurisdiction is vested in the Federal courts, the United States District Court for the Southern District of New York sitting in New York County (and appellate courts thereof) and each party hereto irrevocably submits itself and its property with respect to any such claim, action, suit, investigation or other proceeding to the exclusive jurisdiction of such court;

(b) agrees that any such claim, action, suit, investigation or other proceeding shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in any debt commitment letter or other applicable definitive document relating to the Debt Financing;

(c) agrees not to bring or support or permit any of its respective Affiliates to bring or support any claim, action, suit, investigation or other proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way arising out of or relating to, this Agreement or the Debt Financing or any of the transactions contemplated hereby or the performance of any services thereunder in any forum other than the Supreme Court of the State of New York, County of New York, or, if under applicable law exclusive jurisdiction is vested in the Federal courts, the United States District Court for the Southern District of New York sitting in New York County (and appellate courts thereof);

(d) irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such claim, action, suit, investigation or other proceeding in any such court;

(e) **KNOWINGLY, INTENTIONALLY AND VOLUNTARILY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW TRIAL BY JURY IN ANY CLAIM, ACTION, SUIT, INVESTIGATION OR OTHER PROCEEDING BROUGHT AGAINST ANY DEBT FINANCING SOURCE RELATED PARTY IN ANY WAY ARISING OUT OF OR RELATING TO, THIS AGREEMENT OR THE DEBT FINANCING OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR THE PERFORMANCE OF ANY SERVICES THEREUNDER;**

(f) agrees that no Debt Financing Source Related Party will have any liability to the Company or any its Affiliates or Representatives relating to or arising out of this Agreement or the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise; and

72

(g) agrees that the Debt Financing Sources are express third party beneficiaries of, and may enforce, any of the provisions of this Section 9.13 and that such provisions and the definitions of "Debt Financing Sources" and "Debt Financing Source Related Party" shall not be amended or waived in any way adverse to the rights of any Debt Financing Source without the prior written consent of such Debt Financing Source.

[Remainder of page intentionally left blank.]

73

IN WITNESS WHEREOF, each of Parent, Acquisition Sub, the Company and, solely with respect to the Specified Provisions, the undersigned individual, have caused this Agreement to be executed as of the date first written above in their individual capacity or by their respective officers thereunto duly authorized, as applicable.

X HOLDINGS I, INC.

By: /s/ Elon R. Musk
Name: Elon R. Musk
Title: President, Secretary and Treasurer

X HOLDINGS II, INC.

By: /s/ Elon R. Musk
Name: Elon R. Musk
Title: President, Secretary and Treasurer

[Signature Page to Agreement and Plan of Merger]

TWITTER, INC.

By: /s/ Bret Taylor
Name: Bret Taylor
Title: Chair of the Board of Directors

[Signature Page to Agreement and Plan of Merger]

SOLELY WITH RESPECT TO THE SPECIFIED
PROVISIONS:

ELON R. MUSK

/s/ Elon R. Musk
_____

[Signature Page to Agreement and Plan of Merger]

**SCHEDULE A**
**Specified Jurisdictions**

With respect to <u>Section 7.1(b)</u>:

Any Consent or approval that is required under any Antitrust Laws or Foreign Investment Laws of the following jurisdictions, including as a result of any interventions by a Governmental Authority or voluntary filings under any Antitrust Laws or Foreign Investment Laws that Parent determines to make (for the avoidance of doubt, an approval shall be deemed to be required once the Parent determines it will make a voluntary filing in that jurisdiction, but only if an approval is typically granted for a filing of such a type in such a jurisdiction, whether through a decision or deemed by expiry of any applicable waiting periods):

1.    The federal government of the United States

2.    The State of Delaware

3.    Japan

4.    The United Kingdom

5.    The European Commission (but not any member states)

With respect to <u>Section 7.1(c)</u>:

1.    The federal government of the United States

2.    The State of Delaware

3.    Japan

4.    The United Kingdom

5.    The European Commission (but not any member states)

# EXHIBIT 2

EX 2 1 2 dex21 htm MERGER AGREEMENT DATED SEPTEMBER 14, 2006

**Table of Contents**

**Exhibit 2 1**

**AGREEMENT AND PLAN OF MERGER**

**by and between**

**INTERCONTINENTALEXCHANGE INC.,**

**BOARD OF TRADE OF THE CITY OF NEW YORK, INC.**

**and**

**CFC ACQUISITION CO.**

**Dated as of September 14, 2006**

## TABLE OF CONTENTS

### ARTICLE I

**Formation of Surviving Corporation**

| | | |
|---|---|---|
| 1 1 | Organization of the Surviving Corporation | 1 |
| 1 2 | Directors of the Surviving Corporation | 2 |
| 1 3 | Officers of the Surviving Corporation | 2 |

### ARTICLE II

**The Merger**

| | | |
|---|---|---|
| 2 1 | The Merger | 2 |
| 2 2 | Closing | 2 |
| 2 3 | Effective Time | 3 |

### ARTICLE III

**Certificate of Incorporation and Bylaws of the Surviving Corporation**

| | | |
|---|---|---|
| 3 1 | Certificate of Incorporation | 3 |
| 3 2 | Bylaws | 3 |
| 3 3 | Rules | 3 |

### ARTICLE IV

**Effect of the Merger on Membership Interests and Capital Stock**

| | | |
|---|---|---|
| 4 1 | Effect on Membership Interests | 3 |
| 4 2 | Effect on Surviving Corporation Common Stock | 4 |
| 4 3 | Election Procedures | 4 |
| 4 4 | Exchange of Certificates | 6 |
| 4 5 | Adjustments | 7 |
| 4 6 | Bonus Pool | 8 |
| 4 7 | Closing Cash Amount | 8 |

### ARTICLE V

**Representations and Warranties**

| | | |
|---|---|---|
| 5 1 | Representations and Warranties of NYBOT | 9 |
| 5 2 | Representations and Warranties of ICE and Merger Sub | 20 |

### ARTICLE VI

**Covenants**

| | | |
|---|---|---|
| 6 1 | Interim Operations | 23 |
| 6 2 | Acquisition Proposals | 25 |
| 6 3 | Preparation of Proxy Statements; Information Supplied | 27 |
| 6 4 | Members' Meeting | 28 |
| 6 5 | Reasonable Best Efforts; Regulatory Filings and Other Actions | 29 |
| 6 6 | Access | 29 |
| 6 7 | Affiliates | 30 |
| 6 8 | Exchange Listing | 30 |
| 6 9 | Publicity | 30 |

-i-

**Table of Contents**

| | | | |
|---|---|---|---:|
| 6.10. | Employment and Benefit Levels. | | 30 |
| 6.11. | Taxes | | 31 |
| 6.12. | Expenses | | 31 |
| 6.13. | Indemnification | | 31 |
| 6.14. | Other Actions by ICE and NYBOT. | | 32 |
| 6.15. | ICE Board of Directors | | 32 |
| 6.16. | Clearing Organization. | | 32 |

**ARTICLE VII**

**Conditions**

| | | | |
|---|---|---|---:|
| 7.1. | Conditions to Each Party's Obligation to Effect the Merger | | 33 |
| 7.2. | Conditions to Obligations of NYBOT | | 34 |
| 7.3. | Conditions to Obligation of ICE | | 34 |

**ARTICLE VIII**

**Termination**

| | | | |
|---|---|---|---:|
| 8.1. | Termination by Mutual Consent | | 35 |
| 8.2. | Termination by Either NYBOT or ICE | | 35 |
| 8.3. | Termination by ICE | | 36 |
| 8.4. | Termination by NYBOT | | 36 |
| 8.5. | Effect of Termination and Abandonment; Termination Fee and Expense Reimbursement. | | 36 |

**ARTICLE IX**

**Miscellaneous and General**

| | | | |
|---|---|---|---:|
| 9.1. | Survival | | 38 |
| 9.2. | Modification or Amendment | | 38 |
| 9.3. | Waiver of Conditions | | 38 |
| 9.4. | Counterparts | | 38 |
| 9.5. | GOVERNING LAW AND VENUE; WAIVER OF JURY TRIAL. | | 38 |
| 9.6. | Notices | | 39 |
| 9.7. | Entire Agreement | | 39 |
| 9.8. | No Third-Party Beneficiaries | | 39 |
| 9.9. | Transfer Taxes | | 40 |
| 9.10. | Definitions | | 40 |
| 9.11. | Severability | | 40 |
| 9.12. | Interpretation; Construction. | | 40 |
| 9.13. | Assignment | | 40 |

Exhibit A – Certificate of Incorporation of Surviving Corporation
Exhibit B – Bylaws of Surviving Corporation
Exhibit C – Knowledge of ICE
Exhibit D – Knowledge of NYBOT
Annex 1.2(b)(x) – Members of the Board of Directors of Surviving Corporation
Annex 1.2(b)(y) – NYBOT Designees & Public Directors
Annex 4.6 – Bonus Pool Caps

ii

Table of Contents

## AGREEMENT AND PLAN OF MERGER

This AGREEMENT AND PLAN OF MERGER (this "Agreement"), dated as of September 14, 2006, is by and among IntercontinentalExchange, Inc., a Delaware corporation ("ICE"), CFC Acquisition Co., a Delaware corporation ("Merger Sub") and Board of Trade of the City of New York, Inc., a New York not-for-profit corporation ("NYBOT").

# RECITALS

WHEREAS, in accordance with and subject to the New York Not-For-Profit Corporation Law (the "N-PCL") and the bylaws of NYBOT, all record owners of regular memberships in NYBOT other than NYBOT and its Subsidiaries (the "Members") own (i) Equity Memberships (as defined under the bylaws and rules of NYBOT) (the "Membership Interests") and (ii) Trading Rights (as hereinafter defined) associated with such Membership Interests;

WHEREAS, ICE desires to acquire all of the Membership Interests on the terms and subject to the conditions set forth in this Agreement and to leave certain Trading Rights outstanding and exercisable from and after the Effective Time through the Surviving Corporation (as hereinafter defined) on the terms and subject to the conditions set forth in the Bylaws and the Rules (as hereinafter defined);

WHEREAS, the Boards of Directors of ICE, Merger Sub and NYBOT have each determined that it is advisable and in the best interests of their respective members (in the case of NYBOT) and stockholders (in the case of ICE and Merger Sub) to consummate, and have approved, the business combination transaction provided for herein in which NYBOT would merge with and into Merger Sub and Merger Sub would continue to be a wholly owned subsidiary of ICE (the "Merger");

WHEREAS, it is intended that, for United States federal income tax purposes, the Merger shall qualify as a "reorganization" under the provisions of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code"); and

WHEREAS, each of ICE and NYBOT desires to make certain representations, warranties, covenants and agreements in connection with this Agreement.

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I

### Formation of Surviving Corporation

1.1. Organization of the Surviving Corporation. The certificate of incorporation (the "Charter") of Merger Sub (the "Surviving Corporation") and the bylaws of the Surviving Corporation (the "Bylaws") shall be substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively. Promptly after the date hereof, and in any event prior to the mailing of the Proxy Statement/Prospectus to the Members, ICE and NYBOT shall cooperate to prepare a draft of the rules of the Surviving Corporation (the "Rules"); provided, however, that such draft Rules shall be identical to the rules of NYBOT as in effect as of the date of this Agreement with only such changes as are reasonably necessary to conform such Rules to the Bylaws and this Agreement and such other changes as the parties mutually agree. Notwithstanding the foregoing, ICE may (but shall not be required to) modify or amend the Charter, Bylaws and/or the Rules, subject to the restrictions contained in Article XVI of the Bylaws, in response to requirements imposed by, or comments received from, the Commodities Futures Trading Commission ("CFTC") or its staff or any other governmental authority with lawful jurisdiction without the consent of

Table of Contents

NYBOT after giving NYBOT notice of such proposed modification or amendment, unless, within five business days of receiving such notice, NYBOT notifies ICE that it has determined in good faith that the modifications or amendments are reasonably likely to have a material adverse effect on the Surviving Corporation.

1.2. Directors of the Surviving Corporation.

(a) From and after the Effective Time, each of the members of the Board of Directors of the Surviving Corporation shall be appointed by ICE, subject to compliance by ICE with all applicable legal, regulatory and listing requirements relating to the composition of the Surviving Corporation's Board of Directors and subject to Section 1.2(b). Each such director shall remain in office until his or her successors are duly elected or appointed, as the case may be, and qualified in accordance with the Charter, the Bylaws and applicable Law or until his or her earlier death, resignation or removal in accordance with the Charter and the Bylaws.

(b) As of the Effective Time, ICE shall elect, as members of the Board of Directors of the Surviving Corporation, the individuals identified in Annex 1.2(b)(x). ICE shall take all requisite action to ensure that two of the individuals (determined in ICE's discretion) identified in Annex 1.2(b)(y) (the "NYBOT Designees") shall serve as members of the Board of Directors of the Surviving Corporation for one two-year term from and after the Effective Time.

(c) As of the Effective Time, ICE shall take all requisite action to ensure that four of the individuals (determined in ICE's discretion) identified in Annex 1.2(b)(y) (the "*Public Directors*") shall serve as members of the Board of Directors of the Surviving Corporation for four one-year terms from and after the Effective Time.

1.3. Officers of the Surviving Corporation. At the Effective Time, ICE shall cause the officers and directors of NYBOT immediately prior to the Effective Time (other than the Chief Executive Officer of NYBOT) to be the executive officers of the Surviving Corporation. The Chief Executive Officer of Merger Sub prior to the Effective Time shall become the Chief Executive Officer of the Surviving Corporation. Each officer of the Surviving Corporation shall remain in office until his or her successor is duly appointed in accordance with the Bylaws and applicable Law or until his or her earlier death, resignation or removal in accordance with the Charter and the Bylaws.

ARTICLE II

The Merger

2.1. The Merger. Upon the terms and subject to the conditions set forth in this Agreement, at the Effective Time, NYBOT shall be merged with and into the Surviving Corporation, and the separate corporate existence of NYBOT shall thereupon cease. The Surviving Corporation shall be the surviving entity in the Merger and shall continue its existence under the laws of the State of Delaware, with all its rights, privileges, immunities, powers and franchises. After the Merger, the Surviving Corporation shall continue to be a wholly owned Subsidiary of ICE. The Merger shall have the effects specified in the Delaware General Corporation Law, as amended (the "DGCL") and the N-PCL.

2.2. Closing. Unless otherwise mutually agreed in writing between ICE and NYBOT, the closing for the Merger (the "Closing") shall take place at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004, at 10:00 a.m. on the last business day (the "Closing Date") of the week in which the last to be fulfilled or waived of the conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions) shall be satisfied or waived in accordance with this Agreement, unless another time, date or place is agreed to in writing.

-2-

Table of Contents

2.3. <u>Effective Time</u>.

(a) As soon as practicable following the satisfaction or waiver (subject to applicable Law) of the conditions set forth in Article VII, on the Closing Date, the parties shall file or deliver, as appropriate, the Certificates of Merger with or to the Secretary of State of Delaware and with the Department of State of New York in such form as is required by and executed and acknowledged in accordance with the relevant provisions of the N-PCL and DGCL, as appropriate, and make all other filings or recordings required under the N-PCL and DGCL, as appropriate.

(b) The Merger shall become effective at (i) the date and time on which a certificate of merger relating to the Merger (the "<u>Delaware Certificate of Merger</u>") is duly filed with the Secretary of State of Delaware as required to effect such merger and a certificate of merger relating to the Merger (the "<u>New York Certificate of Merger</u>" and, together with the Delaware Certificate of Merger, the "<u>Certificates of Merger</u>") is duly filed by the Department of State of New York as required to effect such merger, or (ii) such subsequent time as ICE and NYBOT shall agree and as shall be specified in the Certificates of Merger (such time that the Merger shall become effective being the "<u>Effective Time</u>").

ARTICLE III

Certificate of Incorporation and Bylaws of the Surviving Corporation

3.1. <u>Certificate of Incorporation</u>. The Charter as in effect immediately prior to the Effective Time shall be the certificate of incorporation of the Surviving Corporation, until duly amended as provided therein or by applicable Law.

3.2. <u>Bylaws</u>. The parties hereto shall take all actions necessary so that the Bylaws in effect immediately prior to the Effective Time shall be the bylaws of the Surviving Corporation (subject to any mutually agreeable changes to conform the terminology in the Bylaws and the Rules) until thereafter amended as provided therein or by applicable Law.

3.3. <u>Rules</u>. The parties hereto shall take all actions necessary so that the draft Rules as mutually agreed pursuant to Section 1.1 shall be the Rules until thereafter amended as provided in the Bylaws or by applicable Law.

ARTICLE IV

Effect of the Merger on Membership Interests and Capital Stock

4.1. <u>Effect on Membership Interests</u>. As a result of the Merger and without any action on the part of the holder of any Membership Interest:

(a) At the Effective Time, each Membership Interest issued and outstanding immediately prior to the Effective Time shall automatically be converted into and constitute the right to receive, at the election of the Member that is the holder of such Membership Interest as provided in and subject to the provisions of Section 4.3, <u>either</u>:

(i) (A) 17,025 shares of newly issued, fully paid and nonassessable shares of common stock, par value $.01 per share, of ICE ("<u>ICE Common Stock</u>"), <i>plus</i> (B) at the time and in the manner set forth in Section 4.7, the right to receive the Per Interest Excess Consideration (as hereinafter defined), if any, <i>plus</i> (C) the Per Interest Additional Stock Consideration (as hereinafter defined), if any (collectively, the "<u>Stock Consideration</u>"); <i>or</i>

(ii) (A) the right to receive an amount of cash equal to $1,074,719, <i>plus</i> (B) at the time and in the manner set forth in Section 4.7, the right to receive the Per Interest Excess Consideration (as hereinafter

-3-

**Table of Contents**

defined), if any, *plus* (C) the Per Interest Additional Cash Consideration (as hereinafter defined), if any (collectively, the "Cash Consideration" and, together with the Stock Consideration, the "Merger Consideration").

(b) From and after the Effective Time, no Membership Interests shall remain outstanding, in treasury or authorized but unissued, and all Membership Interests shall be cancelled and retired and shall cease to exist. Each entry in the Member records of NYBOT formerly representing an issued and outstanding Membership Interest (a "Book Entry Interest") shall thereafter represent only (i) the right to receive the Merger Consideration, (ii) the right, if any, to receive pursuant to Section 4.4(e) cash in lieu of fractional shares and (iii) the right to receive any distribution or dividend pursuant to Section 4.4(c), if any.

(c) Each right to execute trades in Commodity Contracts (as defined in NYBOT's rules as of the date of this Agreement) on the Exchange (as defined in NYBOT's rules as of the date of this Agreement), whether granted as a Trading Permit (as defined in NYBOT's rules as of the date of this Agreement), belonging to a Membership Interest, a Lessee Member (as hereinafter defined), or as otherwise shall have been in existence (a "Trading Right") shall be and become, automatically at the Effective Time, solely the right and privilege to trade futures, futures option contracts and similar instruments on the Exchange (as defined in the Rules) to the extent expressly provided for in, and subject to, the Bylaws and the Rules.

4.2. Effect on Surviving Corporation Common Stock. At the Effective Time, each share of Surviving Corporation common stock issued and outstanding immediately prior to the Effective Time (the "Surviving Corporation Common Stock") shall remain outstanding and each certificate therefor shall continue to evidence one share of Surviving Corporation Common Stock.

4.3. Election Procedures.

(a) An election form and other appropriate and customary transmittal materials in such form as ICE and NYBOT shall mutually agree (the "Election Form") shall be mailed on the same date as the Proxy Statement/Prospectus is mailed to the Members or on such other date as ICE and NYBOT shall mutually agree (the "Mailing Date") to each Member as of the close of business on the fifth business day prior to the Mailing Date (the "Election Form Record Date"). Prior to the Mailing Date, ICE shall appoint, with the reasonable consent of NYBOT, a commercial bank or trust company, or a Subsidiary thereof, to act as paying and exchange agent under this Agreement (the "Exchange Agent").

(b) Each Election Form shall (A) permit the Member to specify (i) the number of Membership Interests, or the percentage of any one or more Membership Interests, held by such Member with respect to which such Member elects to receive the Stock Consideration ("Stock Election Shares"), (ii) the number of Membership Interests, or the percentage of any one or more Membership Interests, held by such Member with respect to which such Member elects to receive the Cash Consideration ("Cash Election Shares") and/or (iii) the number of Membership Interests, or the percentage of any one or more Membership Interests, held by such Member with respect to which such Member makes no election referred to in clause (i) or (ii) of this Section 4.3(b) ("No Election Shares") and (B) indicate that a Member making an election under clause (A) of this paragraph (b) may do so only with respect to a whole Membership Interest or a percentage of a Membership Interest representing at least 10%, or any whole multiple of 10%, of any Membership Interest). Any Membership Interests with respect to which the Exchange Agent has not received an effective, properly completed Election Form on or before 5:00 p.m. on the fifth day before the NYBOT Members Meeting (or such other time and date as ICE and NYBOT may mutually agree) (the "Election Deadline") shall also be deemed to be No Election Shares.

(c) ICE shall make available one or more Election Forms as may reasonably be requested from time to time by any person who becomes a Member between the Election Form Record Date and the close of business on the business day prior to the Election Deadline, and NYBOT shall provide to the Exchange Agent all information reasonably necessary for it to perform as specified herein.

(d) Any such election shall have been properly made only if the Exchange Agent shall have actually received a properly completed Election Form by the Election Deadline. An Election Form shall be deemed

4

Table of Contents

properly completed only if duly executed and delivered in accordance with the instructions thereto. Any Election Form may be revoked or changed by the person submitting such Election Form only by written notice received by the Exchange Agent prior to the Election Deadline. In the event an Election Form is revoked prior to the Election Deadline, unless a subsequent properly completed Election Form is submitted and actually received by the Exchange Agent by the Election Deadline, the Membership Interests represented by such Election Form shall become No Election Shares. Subject to the terms of this Agreement and of the Election Form, the Exchange Agent shall have reasonable discretion to determine whether any election, revocation or change has been properly or timely made and to disregard immaterial defects in the Election Forms, and any good faith decisions of the Exchange Agent regarding such matters shall be binding and conclusive. Neither ICE nor the Exchange Agent shall be under any obligation to notify any person of any defect in an Election Form.

(e) Within ten business days after the Effective Time, ICE shall cause the Exchange Agent to effect the allocation among the Members of rights to receive ICE Common Stock and/or cash in the Merger in accordance with the Election Forms as follows:

(i) <u>Cash Oversubscribed</u>. If the aggregate Cash Consideration that would otherwise be paid upon the conversion in the Merger of the Cash Election Shares (not taking into account any cash payable pursuant to Section 4.7 in connection with the Closing Cash Amount) *plus* any cash to be paid in lieu of fractional shares (the "<u>Cash Outlay</u>") is greater than (A) $400 million *minus* (B) the Awarded Cash Consideration (the "<u>Closing Aggregate Cash Consideration</u>"), then:

(A) all Stock Election Shares and No Election Shares shall be converted into the right to receive the Stock Consideration,

(B) the Exchange Agent shall then determine, pro rata from among the Cash Election Shares, a sufficient percentage of Cash Election Shares to receive the Stock Consideration ("<u>Stock Designated Shares</u>") such that the aggregate cash amount that will be paid in the Merger equals as closely as practicable the Closing Aggregate Cash Consideration, and all Stock Designated Shares shall be converted into the right to receive the Stock Consideration, and

(C) the Cash Election Shares that are not Stock Designated Shares will be converted into the right to receive the Cash Consideration.

(ii) <u>Cash Undersubscribed</u>. If the Cash Outlay is less than the Closing Aggregate Cash Consideration, then:

(A) all Cash Election Shares shall be converted into the right to receive the Cash Consideration,

(B) the Exchange Agent shall then determine first, pro rata from among the No Election Shares, and then (if necessary), pro rata from among the Stock Election Shares, a sufficient percentage of Stock Election Shares to receive the Cash Consideration ("<u>Cash Designated Shares</u>") such that the aggregate cash amount that will be paid in the Merger equals as closely as practicable the Closing Aggregate Cash Consideration, and all Cash Designated Shares shall be converted into the right to receive the Cash Consideration, and

(C) the Stock Election Shares that are not Cash Designated Shares and the No Election Shares that are not Cash Designated Shares shall be converted into the right to receive the Stock Consideration.

(iii) <u>Cash Subscriptions Sufficient</u>. If the Cash Outlay is equal or nearly equal (as determined by the Exchange Agent) to the Closing Aggregate Cash Consideration, then subparagraphs (A) and (B) above shall not apply and all Cash Election Shares shall be converted into the right to receive the Cash Consideration and all Stock Election Shares and No Election Shares shall be converted into the right to receive the Stock Consideration.

(f) The pro ration process to be used by the Exchange Agent shall consist of such equitable pro ration processes as determined by ICE in accordance with this Agreement.

-5-

Table of Contents

(g) Notwithstanding any other provision of this Agreement to the contrary, a sufficient number of Cash Election Shares may be converted into the right to receive Stock Consideration (including in connection with the Closing Cash Amount), but only to the extent necessary to secure the tax ruling required by Sections 7.2(c) and 7.3(c).

4.4. Exchange of Certificates.

(a) Exchange Agent. On or prior to the Effective Time, ICE shall deposit, or cause to be deposited, with the Exchange Agent, for the benefit of holders of record of Membership Interests as of immediately prior to the Effective Time, (i) an amount of cash sufficient to pay the Closing Aggregate Cash Consideration, and (ii) an amount of cash sufficient to be paid pursuant to Section 4.4(e) in respect of any cash in lieu of fractional shares of ICE Common Stock, in each case in exchange for outstanding Membership Interests upon delivery to the Exchange Agent of instructions regarding the transfer and cancellation of Book Entry Interests (the "Instructions") (such cash being hereinafter referred to as the "Exchange Fund").

(b) Exchange Procedures. ICE shall cause appropriate transmittal materials, in such form as reasonably agreed upon by ICE and NYBOT, to be provided by the Exchange Agent to holders of record of Membership Interests as soon as practicable after the Effective Time advising such holders of the effectiveness of the Merger and the procedure for providing the Instructions to the Exchange Agent. Upon the delivery to the Exchange Agent of the Instructions, the holder of such Book Entry Interests shall be entitled to receive in exchange therefor (i) evidence in book entry form of the issuance of that number of whole shares of ICE Common Stock in respect of the aggregate Stock Consideration that such holder is entitled to receive pursuant to Section 4.1(a) and Section 4.3 (after taking into account all Membership Interests then held by such holder) and (ii) a check in the amount (after giving effect to any required Tax withholdings) equal to the sum of (x) any cash in lieu of fractional shares and (y) any cash in respect of the Cash Consideration (after taking into account all Membership Interests then held by such holder), and the Book Entry Interests which are the subject of such Instructions shall forthwith be cancelled. No interest will be paid or accrued on any amount payable upon such transfer and cancellation of any Book Entry Interests. In the event of a transfer of ownership of Membership Interests that is not registered in the transfer records of NYBOT, evidence in book entry form of the issuance of the proper number of shares of ICE Common Stock, together with a check for any cash to be paid upon the delivery to the Exchange Agent of the Instructions, may be issued and/or paid to such a transferee if written instructions authorizing the transfer of any Book Entry Interests are presented to the Exchange Agent, accompanied by all documents required to evidence and effect such transfer and to evidence that any applicable stock transfer Taxes have been paid. If any shares of ICE Common Stock are to be issued in a name other than that in which any Book Entry Interest is registered, it shall be a condition of such exchange that the Person requesting such exchange shall pay any transfer or other Taxes required by reason of the issuance of shares of ICE Common Stock in a name other than that of the registered holder of such Book Entry Interests, or shall establish to the satisfaction of ICE or the Exchange Agent that such Tax has been paid or is not applicable.

For the purposes of this Agreement, the term "Person" shall mean any individual, corporation (including not-for-profit), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, Governmental Entity or Self-Regulatory Organization or other entity of any kind or nature.

As used in this Agreement, (i) the term "Tax" (including the plural form "Taxes" and, with correlative meaning, the terms "Taxable" and "Taxation") includes all U.S. federal, state, local and foreign income, profits, windfall profits, franchise, gross receipts, environmental, customs duty, capital stock, severances, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy and other taxes, duties or assessments of any nature whatsoever, together with all interest, penalties and additions imposed with respect to such amounts and any interest in respect of such penalties and additions, (ii) the term "Tax Return" includes all returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns) required to be filed with a Tax Authority relating to Taxes, and (iii) the term "Tax Authority" includes any Governmental Entity responsible for the assessment, collection or enforcement of Laws relating to Taxes (including the IRS and any similar state or local revenue agency).

-6-

Table of Contents

(c) <u>Distributions with Respect to Unexchanged Shares; Voting</u>.

(i) All shares of ICE Common Stock to be issued pursuant to the Merger shall be deemed issued and outstanding as of the Effective Time and whenever a dividend or other distribution is declared by ICE in respect of ICE Common Stock, the record date for which is at or after the Effective Time, that declaration shall include dividends or other distributions in respect of all shares issuable pursuant to this Agreement. No dividends or other distributions in respect of the ICE Common Stock shall be paid to any holder of any Book Entry Interests until the Instructions have been delivered to the Exchange Agent. Subject to the effect of applicable Laws, following delivery to the Exchange Agent of such Instructions, there shall be issued and/or paid to the holder of shares of ICE Common Stock issued in exchange for Membership Interests, without interest, (A) promptly after the time of such delivery of such Instructions, the dividends or other distributions with a record date after the Effective Time theretofore payable with respect to such whole shares of ICE Common Stock and not paid and (B) at the appropriate payment date, the dividends or other distributions payable with respect to such whole shares of ICE Common Stock with a record date after the Effective Time but with a payment date subsequent to such delivery.

(ii) Holders of Book Entry Interests in respect of which such Instructions have not been delivered shall be entitled to vote after the Effective Time at any meeting of ICE stockholders the number of whole shares of ICE Common Stock represented by such Book Entry Interests, regardless of whether such holders have delivered such Instructions to the Exchange Agent.

(d) <u>Transfers</u>. At or after the Effective Time, there shall be no transfers on the Member records of the Surviving Corporation of the Membership Interests that were outstanding immediately prior to the Effective Time.

(e) <u>Fractional Shares</u>. Notwithstanding any other provision of this Agreement, no fractional shares of ICE Common Stock will be issued and any holder of Membership Interests entitled to receive a fractional share of ICE Common Stock but for this Section 4.4(e) shall be entitled to receive a cash payment in lieu thereof, which payment shall be calculated by the Exchange Agent and shall represent such holder's proportionate interest in net proceeds from the sale by the Exchange Agent on behalf of all holders of the aggregate fractional shares of ICE Common Stock that such holders otherwise would be entitled to receive. Any such sale shall be made by the Exchange Agent within five business days after the date upon which the issuance of such fractional shares of ICE Common Stock would have otherwise occurred pursuant to the Instructions received by the Exchange Agent.

(f) <u>Termination of Exchange Fund</u>. Any portion of the Exchange Fund (including the proceeds of any investments thereof) that remains unclaimed by the former Members of NYBOT for 180 days after the Effective Time shall be delivered to ICE. Any former Members of NYBOT who have not theretofore complied with this Article IV shall thereafter look only to ICE for delivery of evidence in book entry form of the issuance of shares of ICE Common Stock to such stockholders and payment of cash and any dividends and other distributions in respect of ICE Common Stock of such stockholders payable and/or issuable pursuant to Sections 4.1(a), 4.4(e) and 4.6 upon delivery to the Exchange Agent of the Instructions, without any interest thereon. Notwithstanding the foregoing, none of ICE, NYBOT, the Surviving Corporation, the Exchange Agent or any other Person shall be liable to any former holder of Membership Interests for any amount properly delivered to a public official pursuant to applicable abandoned property, escheat or similar Laws.

(g) <u>Affiliates</u>. Notwithstanding anything herein to the contrary, Book Entry Interests in respect of which instructions for transfer and cancellation have been delivered to the Exchange Agent for exchange for the Merger Consideration by any Member that may be deemed to be an "affiliate" (as determined pursuant to Section 6.7 of this Agreement) of NYBOT shall not be exchanged until ICE has received an Affiliates Letter from such Person as provided in Section 6.7 of this Agreement.

4.5. <u>Adjustments</u>. Notwithstanding anything in this Agreement to the contrary, if, between the date of this Agreement and the Effective Time, the issued and outstanding shares of ICE Common Stock or

-7-

Table of Contents

securities convertible or exchangeable into or exercisable for ICE Common Stock shall have been changed into a different number of shares or a different class by reason of any reclassification, stock split (including a reverse stock split), stock dividend or distribution, recapitalization, redenomination, issuer tender or exchange offer, or other similar transaction, then the Merger Consideration shall be equitably adjusted and as so adjusted shall, from and after the date of such event, be the Merger Consideration.

4.6. Bonus Pool.

(a) Prior to the Mailing Date, NYBOT shall deliver to ICE and the Exchange Agent, in writing, a schedule (the "Allocation Schedule") setting forth an allocation of up to an aggregate amount in cash and up to an aggregate number of shares of ICE Common Stock, in each case as set forth on Annex 4.6, to certain directors and employees of NYBOT and its Subsidiaries (in the aggregate, the "Bonus Pool"). With respect to the Bonus Pool, the Allocation Schedule shall identify the full name and such other identifying information as ICE may reasonably request with respect to each of the directors and employees of NYBOT and its Subsidiaries that NYBOT desires to receive a portion of the Bonus Pool, together with details of the amount of cash (in the aggregate, the "Awarded Cash Consideration") and number of shares of ICE Common Stock (in the aggregate, the "Awarded Share Number") in the Bonus Pool to be provided to each such director and employee. If any of the Bonus Pool has not been allocated to such directors and employees of NYBOT, the amount of (i) any unallocated cash plus (ii) any unallocated shares of ICE Common Stock shall be allocated to the Members (the "Members' Allocation").

(b) ICE shall cause the Exchange Agent to include in the transmittal materials to be provided to Members pursuant to Section 4.4(b) a notice of the amount of the aggregate Members' Allocation divided by the number of Membership Interests then issued and outstanding (the "Per Interest Additional Consideration"). The Per Interest Additional Consideration shall be payable to the Members in the relative proportions of cash and shares of ICE Common Stock in which such Member is entitled to receive the other Merger Consideration pursuant to Section 4.3, taking into account the Exchange Agent's pro ration process pursuant to Section 4.3. The "Per Interest Additional Cash Consideration" means the cash portion of such Per Interest Additional Consideration. The "Per Interest Additional Stock Consideration" means the ICE Common Stock portion of such Per Interest Additional Consideration.

(c) Promptly after the Effective Time, ICE shall cause the Surviving Corporation to distribute the Awarded Cash Consideration and the Awarded Share Number to the directors and employees of NYBOT who are employed in such positions as of the Effective Time and who (other than those listed on Section 4.6(c) of the NYBOT Disclosure Letter) have executed a non-competition agreement in a form reasonably acceptable to ICE, substantially similar to ICE's standard non-competition agreements and having the limits set forth on Section 4.6(c) of the NYBOT Disclosure Letter in accordance with the Allocation Schedule; provided, however, that in no event shall ICE be required to distribute the Awarded Cash Consideration or the Awarded Share Number to the extent such distribution would not be fully deductible by ICE, NYBOT or the Surviving Corporation under Section 162(m) or Section 280G of the Code and any such Awarded Cash Consideration or Awarded Share Number not so distributed shall be treated as Members' Allocation and promptly paid to Members using the procedures set forth in Section 4.6(b) hereof.

4.7. Closing Cash Amount.

(a) Within 30 days after the Closing Date, ICE shall prepare a calculation (the "Calculation") of the Closing Cash Amount. "Closing Cash Amount" means the aggregate working capital of NYBOT and its Subsidiaries, on a consolidated basis, as of the Closing Date, as determined applying the same principles, practices, methodologies and policies used in the preparation of the sample calculation set forth on Section 4.7(a) of the NYBOT Disclosure Letter.

(b) The Closing Cash Amount divided by the number of Membership Interests issued and outstanding as of the Effective Time shall be the "Per Interest Excess Consideration".

(c) Promptly after ICE prepares the Calculation (and in any event within 30 days after the Closing Date), ICE shall pay, or cause to be paid, to the former Members of NYBOT, with respect to each

8

Table of Contents

Membership Interest formerly held by each such Member, the Per Interest Excess Consideration in cash. Any amount payable pursuant to this Section 4.7(c) shall give effect to any required Tax withholdings. To the extent ICE elects to engage the Exchange Agent, or any other representative, in connection with the payments and issuances pursuant to this Section 4.7(c), Section 4.4 will apply *mutatis mutandi* to the extent reasonably applicable.

(d) Notwithstanding any other provision of this Agreement to the contrary, the Closing Cash Amount shall be payable in shares of ICE Common Stock (based on a price per share of ICE Common Stock determined based on the average closing price for the ten trading days ending on the business day immediately prior to the actual Closing Cash Amount payment date), but only to the extent necessary to cause the Merger to be treated for United States federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Code.

(e) In the event that the Surviving Corporation, or its successors, assigns or Affiliates, receives any payment pursuant to Article 35 of the lease set forth on Section 4.7(e) of the NYBOT Disclosure Letter (the "Lease Payment"), ICE shall pay, or cause to be paid, to each holder of a NYBOT Membership (as defined in the Bylaws) existing as of the date of any such Lease Payment, an amount equal to 60% of such Lease Payment divided by the total number of such NYBOT Memberships. Any amount payable pursuant to this Section 4.7(e) shall give effect to any required Tax withholdings. To the extent ICE elects to engage any representative in connection with payments pursuant to this Section 4.7(e), Section 4.4 will apply *mutatis mutandi* to the extent reasonably applicable.

ARTICLE V

Representations and Warranties

5.1. Representations and Warranties of NYBOT. Except as set forth in the corresponding sections or subsections of the disclosure letter dated as of the date hereof, delivered to ICE by NYBOT on or prior to entering into this Agreement (the "NYBOT Disclosure Letter"), or in such other section or subsection of the NYBOT Disclosure Letter where the applicability of such exception is reasonably apparent, NYBOT hereby represents and warrants to ICE as set forth in this Section 5.1. The mere inclusion of any item in the NYBOT Disclosure Letter as an exception to a representation or warranty of NYBOT in this Agreement shall not be deemed to be an admission that such item is a material exception, fact, event or circumstance, or that such item, individually or in the aggregate, has had or is reasonably expected to have, a NYBOT Material Adverse Effect or trigger any other materiality qualification.

(a) Organization, Good Standing and Qualification. NYBOT is a Type A not-for-profit corporation duly organized, validly existing and in good standing under the N-PCL. Each of NYBOT's Subsidiaries is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of its respective jurisdiction of organization. Each of NYBOT and its Subsidiaries has all requisite corporate or similar power and authority to own and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, existing and in good standing or to have such power or authority when taken together with all other such failures, individually or in the aggregate, has not had and is not reasonably expected to have a NYBOT Material Adverse Effect. NYBOT has made available to ICE a complete and correct copy of the NYBOT Organizational Documents and NYBOT Subsidiary Organizational Documents, in effect as of the date hereof. The NYBOT Organizational Documents and the NYBOT Subsidiary Organizational Documents so delivered are in full force and effect.

"NYBOT Organizational Documents" means the articles of incorporation, bylaws and rules of NYBOT.

"NYBOT Subsidiary Organizational Documents" means the certificates of incorporation, bylaws, rules and similar organizational documents of all Subsidiaries of NYBOT.

9

Table of Contents

"NYBOT Material Adverse Effect" means a material adverse effect on (a) the business, results of operations or financial condition of (x) NYBOT and its Subsidiaries, taken as a whole, or (y) NYBOT Clearing Corporation, or (b) the ability of NYBOT to consummate the Merger in accordance with the terms of this Agreement prior to the Termination Date; provided, however, that the following shall not be considered in determining whether a NYBOT Material Adverse Effect has occurred: (A) any change or development in economic, business or commodities exchange conditions generally to the extent that such change or development does not affect NYBOT and its Subsidiaries, taken as a whole, or NYBOT Clearing Corporation, separately, in a materially disproportionate manner relative to other commodities exchanges; (B) any change or development to the extent resulting from the execution or announcement of this Agreement or the transactions contemplated hereby; (C) any change or development to the extent proximately resulting from any action or omission by NYBOT or any of its Subsidiaries that is required by this Agreement; (D) the announcement, commencement or continuation of any war or armed hostilities or the occurrence of any act or acts of terrorism; or (E) any effect arising from or relating to any change in United States generally accepted accounting principles ("GAAP") or any change in applicable laws, rules or regulations or the interpretation thereof.

"Subsidiary" means, with respect to any party, a Person of which at least a majority of the securities or ownership interests thereof having by their terms voting power to elect a majority of the board of directors or other persons performing similar functions is directly or indirectly owned or controlled by such party or by one or more of its respective Subsidiaries.

(b) Memberships and Trading Rights.

(i) As of September 12, 2006, there are 967 issued and outstanding Membership Interests, all of which are held by Members. As of September 12, 2006, 292 of the Membership Interests have been leased by a "Lessor" (as such term is defined in NYBOT's rules) (such lessor, a "Lessor Member") to a "Lessee" (as such term is defined in NYBOT's rules) (such lessee, a "Lessee Member") pursuant to a lease agreement (each, a "Membership Lease"). As of September 12, 2006, there are issued and outstanding 123 option trading permits, 483 FINEX trading permits and 125 FINEX European trading permits (the holders thereof, the "Trading Permit Holders"). Section 5.1(b)(i) of the NYBOT Disclosure Letter sets forth true and complete lists, as of September 12, 2006, of each of the following: all Members, Lessor Members, Lessee Members, Member Firms as defined in NYBOT's rules in effect as of the date of this Agreement, Clearing Members (as hereinafter defined) and Trading Permit Holders (collectively, the "Members/Holders"). Except as set forth in the NYBOT Organizational Documents or the NYBOT Subsidiary Organizational Documents, NYBOT and its Subsidiaries are not parties to any agreements with, and have not granted any rights to, waived any rights for the benefit of or taken any similar action with respect to, any Members/Holders. The only rights or entitlements of any Member/Holder with respect to NYBOT and its Subsidiaries are those rights and entitlements provided for in the NYBOT Organizational Documents or the NYBOT Subsidiary Organizational Documents, respectively.

(ii) All of the outstanding Membership Interests in NYBOT have been duly authorized and are validly issued, fully paid and non-assessable. Section 5.1(b)(ii) of the NYBOT Disclosure Letter contains a correct and complete list of all Subsidiaries of NYBOT, and each jurisdiction where NYBOT and each of its Subsidiaries is organized and qualified to do business. Each of the outstanding shares of capital stock or other securities of each of the NYBOT's Subsidiaries is duly authorized, validly issued, fully paid and nonassessable and owned by NYBOT or by a direct or indirect wholly owned Subsidiary of NYBOT, free and clear of any lien, pledge, security interest, claim or other encumbrance.

(iii) Except as set forth above, there are no preemptive or other outstanding rights, options, phantom equity, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights of any kind that obligate NYBOT or any of its Subsidiaries to issue or sell any Membership Interests or Trading Rights, shares of capital stock or other securities of NYBOT or any of its Subsidiaries or any securities or obligations convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for or acquire, any Membership Interests or other securities of NYBOT or any of its Subsidiaries, or Trading Rights, and no securities or obligations

10

Table of Contents

evidencing such rights are authorized, issued or outstanding. NYBOT does not have outstanding any bonds, debentures, notes or other obligations the holders of which have the right to vote (or convertible into or exercisable for securities having the right to vote) with the Members or holders of any other equity interests in NYBOT on any matter. Except as set forth above, (i) there are no Trading Rights, similar permits or trading rights that will permit any Person to trade on NYBOT, the Surviving Corporation or any Affiliate of the Surviving Corporation outstanding and (ii) no Person, other than each Member, is entitled to any Merger Consideration. Except as set forth in the NYBOT Subsidiary Organizational Documents of NYBOT Clearing Corporation, no Person has any right to clear through NYBOT Clearing Corporation.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with that Person. As used in this definition, "control" (including, with correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

(c) Corporate Authority.

(i) NYBOT has all requisite corporate power and authority and has taken all corporate action necessary in order to authorize, execute, deliver and perform its obligations under this Agreement, and to consummate the Merger and the other transactions contemplated hereby (including all actions by the Board of Directors of NYBOT set forth in clause (ii)(A) and (B) below), subject only to the adoption and approval of this Agreement by two-thirds of the votes cast by the Members entitled to vote thereon at a meeting at which a quorum is present (the "NYBOT Requisite Vote"). This Agreement is a valid and binding agreement of NYBOT, enforceable against NYBOT in accordance with its terms, subject, as to enforcement, to the Bankruptcy and Equity Exception (as hereinafter defined).

(ii) The Board of Directors of NYBOT: (A) has approved, adopted and declared advisable this Agreement and the other transactions contemplated hereby and (B) has received the opinion of its financial advisor, Houlihan Lokey Howard & Zukin, to the effect that the Merger Consideration is fair from a financial point of view, as of the date of such opinion, to the Members, a copy of which opinion has been delivered to NYBOT.

(d) No Conflicts.

(i) (A) Neither the execution and delivery by NYBOT of this Agreement, the compliance by it with all of the provisions of and the performance by it of its obligations under this Agreement, nor the consummation of the Merger and the other transactions herein contemplated by this Agreement will conflict with, or result in a breach or violation of, or result in any acceleration of any rights or obligations or the payment of any penalty under or the creation of a lien, pledge, security interest or other encumbrance on assets (with or without the giving of notice or the lapse of time) pursuant to, or permit any other party any improvement in rights with respect to or permit it to exercise, or otherwise constitute a default under, any provision of any Contract in effect as of the date hereof, or result in any change in the rights or obligations of any party under any Contract in effect as of the date hereof, to which NYBOT or any of its Subsidiaries is a party or by which NYBOT or any of its Subsidiaries or any of their respective assets are bound, (B) nor, subject to any required approval of the Merger by the CFTC, will such execution and delivery, compliance, performance or consummation (x) result in any breach or violation of, or a default under, the provisions of (i) the NYBOT Organizational Documents or the NYBOT Subsidiary Organizational Documents, or (ii) any U.S. federal, state, local or foreign law, statute, ordinance, rule, regulation, judgment, order, injunction, decree, arbitration award, agency requirement, writ, franchise, variance, exemption, approval, license or permit (each, a "Law" and collectively "Laws") or Permit applicable to it, or (y) to the knowledge of NYBOT, subject NYBOT or any Subsidiaries of NYBOT, ICE or any Subsidiaries of ICE, or any of their respective Affiliates, to any claim of, or any liability or obligation with respect to, any Member, any Lessee Member, any Trading Permit Holder or any Person having the right to clear through NYBOT Clearing

-11-

**Table of Contents**

Corporation, other than as set forth in this Agreement, or to any penalty or sanction, in the case of clauses (A) and (B) above, except for such conflicts, breaches, violations, defaults, payments, accelerations, creations or changes that (other than with respect to clause (B)(x)(i) above), individually or in the aggregate, have not had and are not reasonably expected to have, a NYBOT Material Adverse Effect.

(ii) (A) Neither the implementation by the Surviving Corporation or any of its Affiliates of electronic trading after the Closing in accordance with the Bylaws nor the clearing by NYBOT Clearing Corporation of products of ICE and its Affiliates that are not currently cleared through NYBOT Clearing Corporation will conflict with, or result in a breach or violation of, or result in any acceleration of any rights or obligations or the payment of any penalty under or the creation of a lien, pledge, security interest or other encumbrance on assets (with or without the giving of notice or the lapse of time) pursuant to, or permit any other party any improvement in rights with respect to or permit it to exercise, or otherwise constitute a default under, any provision of any Contract in effect as of the date hereof, or result in any change in the rights or obligations of any party under any Contract in effect as of the date hereof, to which NYBOT or any of its Subsidiaries is a party or by which NYBOT or any of its Subsidiaries or any of their respective assets is bound, and (B) nor, to the knowledge of NYBOT, will such implementation or clearing subject NYBOT or any Subsidiaries of NYBOT, ICE or any Subsidiaries of ICE, or any of their respective Affiliates, to any claim of, or any liability or obligation with respect to, any Member, any Lessee Member, any Trading Permit Holder or any Person having the right to clear through NYBOT Clearing Corporation, or to any penalty or sanction.

"Contract" means, with respect to any Person, any agreement, indenture, loan agreement, undertaking, note or other debt instrument, contract, lease, mortgage, deed of trust, permit, license, understanding, arrangement, commitment or other obligation to which such Person or any of its subsidiaries is a party or by which any of them may be bound or to which any of their properties may be subject.

(e) Governmental Approvals and Consents. Other than (i) the filings and/or notices under the HSR Act (as hereinafter defined), (ii) the filings, notices, approvals and/or consents to be obtained from the CFTC and under the Commodity Exchange Act, as amended, and (iii) other foreign approvals, state securities, takeover and "blue sky" laws, no authorizations, consents, approvals, orders, permits, notices, reports, filings, registrations, qualifications and exemptions of, with or from, or other actions are required to be made by NYBOT or any of its Subsidiaries with, or obtained by NYBOT or any of its Subsidiaries from, any Governmental Entity (as hereinafter defined) or Self-Regulatory Organization in connection with the execution and delivery by NYBOT of this Agreement, the performance by NYBOT of its obligations hereunder, and the consummation of the transactions contemplated hereby.

For purposes of this Agreement, "Self-Regulatory Organization" shall mean any U.S. or foreign commission, board, agency or body that is not a Governmental Entity but is charged with the supervision or regulation of brokers, dealers, securities underwriting or trading, stock exchanges, commodities exchanges, ECNs, insurance companies or agents, investment companies or investment advisers.

(f) NYBOT Reports; Financial Statements. NYBOT has made available to ICE its annual reports and proxy statements delivered to its Members since December 31, 2004 (collectively, the "NYBOT Reports"). Neither NYBOT nor any of its Subsidiaries files with any Governmental Entity or Self-Regulatory Organization any NYBOT Report. As of their respective dates (or if amended, as of the date of such amendment), the NYBOT Reports did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading. NYBOT has delivered to ICE true and complete copies of the audited consolidated financial statements of NYBOT for the fiscal year ended December 31, 2005 (the "NYBOT Audited Financial Statements") and the unaudited consolidated financial statements of NYBOT for the six months ended June 30, 2006 (the "NYBOT Interim Financial Statements" and, together with the NYBOT Audited Financial Statements, the "NYBOT Financial Statements"). NYBOT has delivered to ICE a true and complete copy of the unaudited management report of NYBOT for the month ended July 31, 2006 (the "Management Report"). Each of the consolidated balance sheets included in the NYBOT

-12-

Table of Contents

Financial Statements and the Management Report (including the related notes and schedules) fairly presents the consolidated financial position of NYBOT and its Subsidiaries as of its date and each of the consolidated statements of revenues, expenses, changes in members' equity and cash flows included in the NYBOT Financial Statements and the Management Report (including any related notes and schedules) fairly presents the results of operations, members' equity and cash flows, as the case may be, of NYBOT and its Subsidiaries for the periods set forth therein, in each case in conformity with GAAP consistently applied during the periods involved, except as may be noted therein. Except for liabilities and obligations incurred in the ordinary course of business since December 31, 2005, neither NYBOT nor any of its Subsidiaries has any liabilities or obligations of any nature required by GAAP to be set forth on a consolidated balance sheet of NYBOT or any of its Subsidiaries or in the notes thereto which, individually or in the aggregate, could reasonably be expected to have a NYBOT Material Adverse Effect. The NYBOT Financial Statements and the Management Report have been compiled from, and were prepared in accordance with, the books and records of NYBOT and its Affiliates. The books and records of NYBOT and its Affiliates are true, complete and correct in all material respects and have been maintained in accordance with sound business practices. NYBOT has designed and maintained a system of internal accounting controls sufficient to provide reasonable assurances regarding the reliability of financial reports and the preparation of annual financial statements for external purposes in accordance with GAAP.

(g) <u>Absence of Certain Changes</u>. Since December 31, 2005, NYBOT and its Subsidiaries have conducted their respective businesses only in, and have not engaged in any material transaction other than according to, the ordinary and usual course of such businesses and there has not been (i) any change or development that, individually or in the aggregate, has had or is reasonably expected to have, a NYBOT Material Adverse Effect; (ii) any material damage, destruction or other casualty loss with respect to any material asset or property owned, leased or otherwise used by NYBOT or any of its Subsidiaries, whether or not covered by insurance; or (iii) any change by NYBOT in financial accounting principles, practices or methods that is not required by GAAP. Since December 31, 2005, except as provided for herein, there has not been any increase in the compensation payable or that could become payable by NYBOT or any of its Subsidiaries to officers or key employees or any amendment of or other modification to any of the NYBOT Benefit Plans other than increases or amendments in the ordinary and usual course consistent with past practice.

(h) <u>Compliance</u>  The businesses of NYBOT and each of its Subsidiaries have been conducted in compliance in all material respects with all Laws and the applicable rules of any Self-Regulatory Organization. Neither NYBOT nor any of its Subsidiaries is in conflict with, or in default or violation of, any Contract to which NYBOT or any of its Subsidiaries is a party or by which NYBOT or any of its Subsidiaries or its or any of their respective properties is bound or affected, except for any such conflicts, defaults or violations that, individually or in the aggregate, have not had and are not reasonably expected to have a NYBOT Material Adverse Effect. No investigation, review, audit or similar procedure by any Governmental Entity or any Self-Regulatory Organization with respect to NYBOT or any of its Subsidiaries is pending or, to the knowledge of NYBOT, threatened, nor has any Governmental Entity or any Self-Regulatory Organization indicated an intention to conduct the same, except, in each case, for those the outcome of which, individually or in the aggregate, have not had and are not reasonably expected to have a NYBOT Material Adverse Effect. Except as, individually or in the aggregate, is not reasonably expected to have a NYBOT Material Adverse Effect, (x) no material change is required in NYBOT's or any of its Subsidiaries' processes, properties or procedures to comply with any Laws in effect on the date hereof or enacted as of the date hereof and scheduled to be effective after the date hereof, and (y) NYBOT has not received any written notice or written communication of any noncompliance with any Laws and no Governmental Entity has otherwise identified any instance in which NYBOT or any of its Subsidiaries is or may be in violation of applicable Laws. Each of NYBOT and its Subsidiaries has all permits, licenses, franchises, variances, exemptions, orders and other authorizations, consents and approvals (together, "<u>Permits</u>") of all Governmental Entities and Self-Regulatory Organizations necessary to conduct its business as presently conducted, except where the failure to have such Permits, individually or in the aggregate, has not had and is not reasonably expected to have a NYBOT Material Adverse Effect.

13

Table of Contents

(i) <u>Litigation and Liabilities</u>. There are no (i) civil, criminal or administrative actions, suits, claims, hearings, investigations or proceedings pending or, to the knowledge of NYBOT, threatened against NYBOT, any of its Subsidiaries or any of their respective directors or officers, or (ii) obligations or liabilities, whether or not accrued, contingent or otherwise and whether or not required to be disclosed, including those relating to, or any other facts or circumstances of which, to the knowledge of NYBOT, could result in any claims against, or obligations or liabilities of, NYBOT or any of its Affiliates, except, in both cases, for those that, individually or in the aggregate, have not had and are not reasonably expected to have a NYBOT Material Adverse Effect.

(j) <u>Employee Benefits</u>.

(i) All benefit and compensation plans, contracts, policies or arrangements covering current or former employees of NYBOT and its Subsidiaries (the "<u>NYBOT Employees</u>") and current or former directors of NYBOT, in each case sponsored, maintained or contributed to by NYBOT or its Subsidiaries or with respect to which NYBOT or its Subsidiaries may have any liability, including, but not limited to, "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), and deferred compensation, severance, stock option, stock purchase, stock appreciation rights, stock based, incentive and bonus plans (the "<u>NYBOT Benefit Plans</u>") are listed in Section 5.1(j) of the NYBOT Disclosure Letter, and each NYBOT Benefit Plan which has received a favorable opinion letter or favorable determination letter from the Internal Revenue Service National Office, including any master or prototype plan, has been separately identified. True and complete copies of all NYBOT Benefit Plans, including, but not limited to, any trust instruments, insurance contracts and, with respect to any employee stock ownership plan, loan agreements forming a part of any NYBOT Benefit Plans, and all amendments thereto, have been provided or made available to ICE.

(ii) All NYBOT Benefit Plans, other than "multiemployer plans" within the meaning of Section 3(37) of ERISA (each, an "<u>NYBOT Multiemployer Plan</u>") are in substantial compliance with ERISA and the Code and other applicable Laws. Each NYBOT Benefit Plan which is subject to ERISA (an "<u>NYBOT ERISA Plan</u>") that is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA (an "<u>NYBOT Pension Plan</u>") intended to be qualified under Section 401(a) of the Code, either (A) has received a favorable determination letter from the IRS covering all Tax law changes prior to the Economic Growth and Tax Relief Reconciliation Act of 2001 or has applied to the IRS for such favorable determination letter within the applicable remedial amendment period under Section 401(b) of the Code, and NYBOT is not aware of any circumstances likely to result in the loss of the qualification of any such NYBOT Pension Plan under Section 401(a) of the Code, or (B) is entitled to rely upon an opinion letter issued to the sponsor of a prototype plan. Neither NYBOT nor any of its Subsidiaries has engaged in a transaction with respect to any NYBOT ERISA Plan that, assuming the Taxable period of such transaction expired as of the date hereof, could subject NYBOT or any Subsidiary to a material Tax or penalty imposed by either Section 4975 of the Code or Section 502(i) of ERISA in an amount which would be material. Neither NYBOT nor any of its Subsidiaries has incurred or reasonably expects to incur a Tax or penalty imposed by Section 4980 of the Code or Section 502 of ERISA or any material liability under Section 4071 of ERISA.

(iii) No liability under Subtitle C or D of Title IV of ERISA has been or is expected to be incurred by NYBOT or any of its Subsidiaries with respect to any ongoing, frozen or terminated "single-employer plan", within the meaning of Section 4001(a)(15) of ERISA, currently or formerly maintained by any of them, or the single-employer plan of any entity which is considered one employer with NYBOT under Section 4001 of ERISA or Section 414 of the Code (a "NYBOT ERISA Affiliate"). NYBOT and its Subsidiaries have not incurred and do not expect to incur any withdrawal liability with respect to a NYBOT Multiemployer Plan under Subtitle E of Title IV of ERISA (regardless of whether based on contributions of a NYBOT ERISA Affiliate). No notice of a "reportable event", within the meaning of Section 4043 of ERISA for which the reporting requirement has not been waived or extended, other than pursuant to Pension Benefit Guaranty Corporation ("PBGC") Reg. Section 4043.33 or 4043.66, has been required to be filed for any NYBOT Pension Plan or by any NYBOT ERISA Affiliate within the 12-month period ending on the date hereof or will be required to be filed in connection with the transaction contemplated by this Agreement. No notices

14

**Table of Contents**

have been required to be sent to participants and beneficiaries or the PBGC under Section 302 or 4011 of ERISA or Section 412 of the Code, including Section 412(m).

(iv) All contributions required to be made under each NYBOT Benefit Plan, as of the date hereof, have been timely made and all obligations in respect of each NYBOT Benefit Plan have been properly accrued and reflected in the NYBOT Financial Statements except for contributions that individually or in the aggregate would not be material. Neither any NYBOT Pension Plan nor any single-employer plan of a NYBOT ERISA Affiliate has an "accumulated funding deficiency" (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA and no NYBOT ERISA Affiliate has an outstanding funding waiver. Neither any NYBOT Pension Plan nor any single-employer plan of a NYBOT ERISA Affiliate has been required to file information pursuant to Section 4010 of ERISA for the current or most recently completed plan year. It is not reasonably anticipated that required minimum contributions to any NYBOT Pension Plan under Section 412 of the Code will be increased by application of Section 412(l) of the Code. Neither NYBOT nor any of its Subsidiaries has provided, or is required to provide, security to any NYBOT Pension Plan or to any single-employer plan of a NYBOT ERISA Affiliate pursuant to Section 401(a)(29) of the Code.

(v) Under each NYBOT Pension Plan which is a single-employer plan, as of the date hereof, the actuarially determined present value of all "benefit liabilities", within the meaning of Section 4001(a)(16) of ERISA (as determined on the basis of the actuarial assumptions contained in such NYBOT Pension Plan's most recent actuarial valuation), did not exceed the then current value of the assets of such NYBOT Pension Plan, and there has been no change in the financial condition, whether or not as a result of a change in the funding method, of such NYBOT Pension Plan since the last day of the most recent plan year that would reasonably be expected to have a NYBOT Material Adverse Effect.

(vi) As of the date hereof, there is no material pending or, to the knowledge of NYBOT threatened, litigation relating to NYBOT Benefit Plans. Neither NYBOT nor any of its Subsidiaries has any obligations for retiree health and life benefits under any NYBOT ERISA Plan or collective bargaining agreement (other than COBRA continuation coverage pursuant to applicable Law). NYBOT or its Subsidiaries may amend or terminate any such plan at any time without incurring any liability thereunder other than in respect of claims incurred prior to such amendment or termination.

(vii) There has been no amendment to, announcement by NYBOT or any of its Subsidiaries relating to, or change in employee participation or coverage under, any NYBOT Benefit Plan which would increase materially the expense of maintaining such plan above the level of the expense incurred therefor for the most recent fiscal year. Neither the execution of this Agreement, Member approval of this Agreement nor the consummation of the transactions contemplated hereby will (A) entitle any NYBOT Employees to severance pay or any increase in severance pay upon any termination of employment after the date hereof, (B) accelerate the time of payment or vesting or result in any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or result in any other material obligation pursuant to, any of the NYBOT Benefit Plans, (C) limit or restrict the right of NYBOT or, after the consummation of the Merger or any other transactions contemplated hereby, ICE or any of its Subsidiaries to merge, amend or terminate any of the NYBOT Benefit Plans or (D) result in payments under any of NYBOT Benefit Plans which would not be deductible under Section 280G of the Code.

(k) Tax Matters. Neither NYBOT nor any of its Affiliates has taken or agreed to take any action, nor, to the knowledge of NYBOT, does there exist any fact or circumstance, that would prevent or impede, or would be reasonably likely to prevent or impede, the Merger from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code.

(l) Taxes.

(i) Except as would not, individually or in the aggregate, reasonably be expected to have a NYBOT Material Adverse Effect: (A) all Tax Returns that are required to be filed by NYBOT or any of its Subsidiaries have been timely filed (taking into account any extension of time within which to file), and all

-15-

Table of Contents

such Tax Returns are true and complete; (B) all Taxes that are shown as due on such filed Tax Returns or that NYBOT or any of its Subsidiaries are obligated to withhold from amounts owing to any NYBOT Employee, creditor or third party have been timely paid, except with respect to matters for which adequate reserves have been established; (C) neither NYBOT nor any of its Subsidiaries have waived any statute of limitations with respect to Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency; (D) all Taxes due and payable by NYBOT or any of its Subsidiaries have been adequately provided for in the financial statements of NYBOT and its Subsidiaries for all periods ending through the date hereof (including the NYBOT Financial Statements) and, as of the date hereof, no material deficiency with respect to any Tax has been proposed, asserted or assessed against NYBOT or any of its Subsidiaries; (E) neither NYBOT nor any of its Subsidiaries has constituted a "distributing corporation" or a "controlled corporation" (within the meaning of Section 355(a)(1)(A) of the Code) in a distribution of stock intended to qualify for tax-free treatment under Section 355 of the Code in the three years prior to the date of this Agreement; and (F) none of NYBOT or any of its Subsidiaries has any liability for Taxes of any Person (other than NYBOT or any of its Subsidiaries) under Treasury Regulation §1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract, or otherwise.

(ii) No claim has been made by a Taxing Authority in a jurisdiction where NYBOT or any of its Subsidiaries does not file Tax Returns that NYBOT or any of its Subsidiaries is or may be subject to Taxation in that jurisdiction.

(iii) No private letter rulings, technical advice memoranda or similar agreements or rulings have been entered into or issued by any Taxing Authority with respect to NYBOT or any of its Subsidiaries for any taxable year for which the statute of limitations has not yet expired.

(iv) None of NYBOT or any of its Subsidiaries will be required, as a result of (A) a change in accounting method for a Tax period beginning on or before the Closing, to include any material adjustment under Section 481(c) of the Code (or any similar provision of state, local or foreign Law) in Taxable income for any Tax period beginning on or after the Closing Date, or (B) any "closing agreement" as described in Section 7121 of the Code (or similar provision of state, local or foreign Law), to include any material item of income in or exclude any material item of deduction from any Tax period beginning on or after the Closing Date;

(v) None of NYBOT or any Subsidiary has engaged in any transactions that is a "reportable transaction" for purposes of § 1.6011-4(b).

(vi) Neither the execution of this Agreement nor the consummation of the Merger or any other transactions contemplated by this Agreement, either alone or in conjunction with any other event, will result in any payment under any compensation plans or otherwise which alone or together with all other payments would constitute a "parachute payment" to any "disqualified individual" as those terms are defined in Section 280G of the Code (whether or not such payment is considered to be reasonable compensation for services rendered).

(m) Labor Matters.

(i) There are no collective bargaining agreements binding on NYBOT or any of its Subsidiaries.

(ii) None of the NYBOT Employees is represented by a labor union, and, to the knowledge of NYBOT, no petition has been filed, nor has any proceeding been instituted by any NYBOT Employee or group of NYBOT Employees with any labor relations board or commission seeking recognition of a collective bargaining representative.

(iii) To the knowledge of NYBOT, (a) there is no organizational effort currently being made or threatened by or on behalf of any labor organization or trade union to organize any NYBOT Employees, and (b) no demand for recognition of any NYBOT Employees has been made by or on behalf of any labor organization or trade union in the past five (5) years.

(iv) There has been no pending or, to the knowledge of NYBOT, threatened employee strike, work stoppage, slowdown, picketing or material labor dispute with respect to any NYBOT Employees in the past five (5) years.

16

**Table of Contents**

(v) NYBOT and its Subsidiaries, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) are and for the past five years have been in compliance in all material respects with (i) all federal and state laws respecting employment and employment practices, terms and conditions of employment, collective bargaining, immigration, wages, hours and benefits, non-discrimination in employment, workers' compensation and the collection and payment of withholding and/or payroll taxes and similar taxes, including but not limited to the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the Equal Employment Opportunity Act of 1972, the Employee Retirement Income Security Act of 1974, the Equal Pay Act, the National Labor Relations Act, the Americans with Disabilities Act of 1990, the Vietnam Era Veterans Reemployment Act, and any and all similar applicable state and local laws; and (ii) all material applicable requirements of the Occupational Safety and Health Act of 1970 within the United States and comparable regulations and orders thereunder; and (b) are not, and for the past five years have not been, engaged in any unfair labor practice.

(vi) There is no charge pending or, to the knowledge of NYBOT, threatened before any court or agency alleging unlawful discrimination in employment practices or any unfair labor practice by NYBOT or any of its Subsidiaries.

(vii) During the preceding two years, (i) neither NYBOT nor any of its Subsidiaries has effectuated a "plant closing" (as defined in the Worker Adjustment and Retraining Notification Act (the "WARN Act") affecting any site of employment or one or more facilities or operating units within any site of employment or facility, (ii) there has not occurred a "mass layoff" (as defined in the WARN Act) in connection with NYBOT or any of its Subsidiaries affecting any site of employment or one or more facilities or operating units within any site of employment or facility, and (iii) neither NYBOT nor any of its Subsidiaries has been affected by any transaction or engaged in layoffs or employment terminations sufficient in number to trigger application of any similar state, local or foreign law.

(n) Insurance. All insurance policies maintained by NYBOT and its Subsidiaries provide coverage for those risks reasonably foreseeable with respect to the business of NYBOT and its Subsidiaries, and their respective properties and assets as is customary for companies conducting the business conducted by NYBOT and its Subsidiaries during such time period, are in character and amount at least equivalent to industry standards for similar businesses, of a similar size, and subject to the same or similar perils or hazards, and are sufficient for compliance with all Laws currently applicable to NYBOT and its Subsidiaries. None of NYBOT or any of its Subsidiaries has received any notice of cancellation or termination with respect to any insurance policy of NYBOT or its Subsidiaries. The insurance policies of NYBOT and its Subsidiaries are valid and enforceable policies in all respects. No claims have been made under NYBOT's directors' and officers' liability insurance policies since December 31, 2002, and, as of the date of this Agreement, no such claims are pending.

(o) Intellectual Property.

(i) For the purposes of this Agreement, (i) "Intellectual Property" means all inventions (whether patentable or not), discoveries, patents, patent applications, registered and unregistered trademarks and service marks and all goodwill associated therewith and symbolized thereby, trademark applications and service mark applications, Internet domain names, registered and unregistered copyrights (including without limitation databases and other compilations of information), confidential information, trade secrets and know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists, computer software programs, and all other intellectual property and proprietary rights; and (ii) "IT Assets" means computers, computer software, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements, and all associated documentation, used in the businesses of NYBOT or any of its Subsidiaries as currently conducted.

(ii) Except as has not had or is not reasonably expected to have a NYBOT Material Adverse Effect, (A) NYBOT or at least one of its Subsidiaries is sole and exclusive owner of, is licensed under or otherwise

17

Table of Contents

possesses sufficient and legally enforceable rights to practice or otherwise use all Intellectual Property which is necessary to the operation of the business of NYBOT as currently conducted (the "NYBOT Intellectual Property"), (B) all such licenses and legally enforceable rights relating to the NYBOT Intellectual Property are freely transferable by NYBOT and its Subsidiaries without restriction; and (C) the consummation of the transactions contemplated by this Agreement will not alter or impair such rights. Set forth on Section 5.1(o)(x) of the NYBOT Disclosure Letter is a true and correct list of all NYBOT Intellectual Property that is owned by NYBOT or any of its Subsidiaries. Set forth on Section 5.1(o)(y) of the NYBOT Disclosure Letter is a true and correct list of all NYBOT Intellectual Property that is not owned by, but is used by, NYBOT or any of its Subsidiaries under license, other than with respect to commercially available software products under standard end-user object code license agreements. Set forth on Section 5.1(o)(z) of the NYBOT Disclosure Letter is a true and correct list of all license agreements relating to the NYBOT Intellectual Property listed in Section 5.1(o)(y) of the NYBOT Disclosure Letter. Except as has not had or is not reasonably expected to have a NYBOT Material Adverse Effect: (A) the NYBOT Intellectual Property owned by NYBOT and/or its Subsidiaries is valid, subsisting and enforceable, (B) NYBOT's and/or its Subsidiaries' ownership of and right to practice or otherwise use the NYBOT Intellectual Property is free and clear of any lien, pledge, security interest or other encumbrance and (C) no other Person has the right to practice or otherwise use any of the owned NYBOT Intellectual Property owned by NYBOT or its Subsidiaries, except pursuant to non-exclusive license grants made in writing by NYBOT. All material Contracts under which NYBOT or any of its Subsidiaries licenses or otherwise permits another Person, or is licensed or otherwise permitted by another Person, to practice or otherwise use any NYBOT Intellectual Property (the "NYBOT Intellectual Property Contracts") are legal, valid, binding and enforceable against the other party, and are in full force and effect, subject to the Bankruptcy and Equity Exception. Except as has not had or is not reasonably expected to have a NYBOT Material Adverse Effect, (A) no claim has been made that NYBOT or any of its Subsidiaries, or to the knowledge of NYBOT, another person, has breached or is otherwise in violation of any NYBOT Intellectual Property Contract and (B) NYBOT does not have knowledge of any unasserted claims that may be made that NYBOT or any of its Subsidiaries or another Person has breached or is otherwise in violation of any NYBOT Intellectual Property Contract.

(iii) There are no pending or, to the knowledge of NYBOT, threatened or unasserted claims by any Person alleging infringement, misappropriation or violation of any of such Person's Intellectual Property, as a result of the use of any NYBOT Intellectual Property by NYBOT or its Subsidiaries, that are reasonably expected to have a NYBOT Material Adverse Effect. Except as has not had or is not reasonably expected to have a NYBOT Material Adverse Effect, to the knowledge of NYBOT, the conduct of the business of NYBOT and its Subsidiaries as currently conducted and the NYBOT Intellectual Property do not infringe upon, misappropriate or violate any Intellectual Property rights or any other proprietary right of any Person. To the knowledge of NYBOT, the implementation of electronic trading on the Exchange and the clearing, from and after the Effective Time, of additional products by NYBOT Clearing Corporation that are not currently cleared by NYBOT Clearing Corporation would not infringe upon, misappropriate or violate any Intellectual Property rights or any other proprietary right of any Person to the extent such Intellectual Property right or other proprietary right is currently used by NYBOT or any of its Subsidiaries. To the knowledge of NYBOT, there is no unauthorized use, infringement, misappropriation or other violation of NYBOT Intellectual Property by any Person, including any Employee of NYBOT or any of its Subsidiaries, except as would not reasonably be likely to have a NYBOT Material Adverse Effect. NYBOT and its Subsidiaries have taken commercially reasonable steps to maintain the confidentiality of the trade secrets, know-how and other non-public information owned by NYBOT or its Subsidiaries, or received from third Persons which NYBOT or its Subsidiaries is obligated to treat as confidential, except for such steps the failure of which to have taken has not, individually or in the aggregate, had or reasonably be expected to have a NYBOT Material Adverse Effect.

(iv) To the knowledge of NYBOT and except as has not had or is not reasonably expected to have a NYBOT Material Adverse Effect, the IT Assets operate and perform in all material respects in accordance with their documentation and functional specifications, to the extent available, or as otherwise required by

18

**Table of Contents**

NYBOT and its Subsidiaries in connection with the business of NYBOT as currently conducted. Each of NYBOT and its Subsidiaries has implemented reasonable backup and disaster recovery measures consistent with industry standards.

(p) NYBOT Clearing Corporation. No clearing member of NYBOT Clearing Corporation (each, a "Clearing Member") is currently in default under and, to NYBOT's knowledge, there are no circumstances that would reasonably be expected to lead a Clearing Member of NYBOT Clearing Corporation to default on or otherwise fail to make any required payment to NYBOT Clearing Corporation under, any contract or obligation to NYBOT Clearing Corporation.

(q) Material Contracts.

(i) As of the date of this Agreement, neither NYBOT nor any of its Subsidiaries is a party to or bound by:

(A) any lease of real or personal property providing for annual rentals of $250,000 or more;

(B) any Contract that is reasonably likely to require either (x) annual payments to or from NYBOT and its Subsidiaries of more than $250,000 or (y) aggregate payments to or from NYBOT and its Subsidiaries of more than $250,000;

(C) other than with respect to any entity that is wholly-owned by NYBOT or any wholly-owned Subsidiary of NYBOT, any partnership, joint venture or other similar agreement or arrangement relating to the formation, creation, operation, management or control of any partnership or joint venture material to NYBOT or any of its Subsidiaries or in which NYBOT owns any interest;

(D) any Contract (other than among direct or indirect wholly-owned Subsidiaries of NYBOT) relating to indebtedness for borrowed money or the deferred purchase price of property (in either case, whether incurred, assumed, guaranteed or secured by any asset) (i) in excess of $100,000 or (ii) that would not be included in the calculation of the Closing Cash Amount pursuant to Section 4.7;

(E) any non-competition Contract or other Contract that (I) purports to limit in any material respect either the type of business in which NYBOT or its Subsidiaries (or, after the Effective Time, ICE or its Subsidiaries) may engage or the manner or locations in which any of them may so engage in any business (including, without limitation, any Contract that purports to limit in any material respect NYBOT's or its Subsidiaries' ability to employ an electronic trading platform); (II) could require the disposition of any material assets or line of business of NYBOT or its Subsidiaries or, after the Effective Time, ICE or its Subsidiaries, (III) grants "most favored nation" status that, following the Merger, would apply to ICE and its Subsidiaries, including NYBOT and its Subsidiaries or (IV) prohibits or limits the right of NYBOT or any of its Subsidiaries to make, sell or distribute any products or services or use, transfer, license, distribute or enforce any of their respective Intellectual Property rights;

(F) any Contract to which NYBOT or any of its Subsidiaries is a party containing a standstill or similar agreement pursuant to which one party has agreed not to acquire assets or securities of the other party or any of its Affiliates;

(G) any Contract providing for indemnification by NYBOT or any of its Subsidiaries of any Person, except for any such Contract that is (x) not material to NYBOT or any of its Subsidiaries and (y) entered into in the ordinary course of business;

(H) any Contract that contains a put, call or similar right pursuant to which NYBOT or any of its Subsidiaries could be required to purchase or sell, as applicable, any equity interests of any Person or assets that have a fair market value or purchase price of more than $100,000; and

(I) any other (i) Contract or (ii) group of related Contracts with the same counterparty (or affiliates of the such counterparty) or entered into pursuant to a master agreement that, in each case, if

19

Table of Contents

terminated or subject to a default by any party thereto, would, individually or in the aggregate, reasonably be expected to result in a NYBOT Material Adverse Effect (the Contracts described in clauses (A) – (I), together with all exhibits and schedules to such Contracts, being the "Material Contracts").

(ii) A copy of each Material Contract has previously been delivered to ICE and each such Contract is a valid and binding agreement of NYBOT or one of its Subsidiaries, as the case may be, and is in full force and effect, and neither NYBOT nor any of its Subsidiaries nor, to the knowledge of NYBOT, any other party thereto is in default or breach in any respect under the terms of any such agreement, contract, plan, lease, arrangement or commitment.

(r) Brokers and Finders. None of NYBOT, its Subsidiaries nor any of their respective officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders fees in connection with the Merger or the other transactions contemplated by this Agreement, except that NYBOT has employed Brown Brothers Harriman, Houlihan Lokey Howard & Zukin and Parthenon Group as its financial advisor, the arrangements with which have been disclosed in writing to ICE prior to the date hereof.

5.2. Representations and Warranties of ICE and Merger Sub. Except as disclosed in the ICE Reports or as set forth in the corresponding sections or subsections of the disclosure letter dated as of the date hereof, delivered to NYBOT by ICE on or prior to entering into this Agreement (the "ICE Disclosure Letter"), or in such other section or subsection of the ICE Disclosure Letter where the applicability of such exception is reasonably apparent, ICE and Merger Sub hereby represent and warrant to NYBOT as set forth in this Section 5.2. The mere inclusion of any item in the ICE Disclosure Letter as an exception to a representation or warranty of ICE in this Agreement shall not be deemed to be an admission that such item is a material exception, fact, event or circumstance, or that such item, individually or in the aggregate, has had or is reasonably expected to have, a ICE Material Adverse Effect or trigger any other materiality qualification.

(a) Organization, Good Standing and Qualification. Each of ICE and Merger Sub is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Each of ICE and Merger Sub has all requisite corporate or similar power and authority to own and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, existing and in good standing or to have such power or authority when taken together with all other such failures, individually or in the aggregate, has not had and is not reasonably expected to have a ICE Material Adverse Effect. Merger Sub was formed solely for the purpose of engaging in the transactions contemplated by this Agreement, has engaged in no other business activities and has conducted its operations only as contemplated hereby.

"ICE Material Adverse Effect" means a material adverse effect on (a) the business, results of operations or financial condition of ICE and its Subsidiaries, taken as a whole, or (b) the ability of ICE to consummate the Merger in accordance with the terms of this Agreement prior to the Termination Date; provided, however, that the following shall not be considered in determining whether a ICE Material Adverse Effect has occurred: (A) any change or development in economic, business or commodities markets conditions generally to the extent that such change or development does not affect ICE and its Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other commodities exchanges or trading markets; (B) any change or development to the extent resulting from the execution or announcement of this Agreement or the transactions contemplated hereby; (C) any change or development to the extent proximately resulting from any action or omission by ICE or any of its Subsidiaries that is required by this Agreement; (D) the announcement, commencement or continuation of any war or armed hostilities or the occurrence of any act or acts of terrorism; or (E) any effect arising from or relating to any change in GAAP or any change in applicable laws, rules or regulations or the interpretation thereof.

20

Table of Contents

(b) <u>Capital Structure of ICE</u>.

(i) The authorized capital stock of ICE consists of (i) 194,275,000 shares of ICE Common Stock, of which 57,005,020 shares are outstanding as of September 1, 2006, (ii) 80,725,000 shares of Class A common stock, par value $.01 per share ("<u>ICE Class A Common Shares</u>"), of which 3,211 shares are outstanding as of September 1, 2006, and (iii) 25,000,000 shares of Preferred Stock par value $.01 per share (the "<u>ICE Preferred Shares</u>"), of which no shares are outstanding as of the date hereof. All of the outstanding shares of ICE Common Stock have been duly authorized and are validly issued, fully paid and nonassessable. ICE has no shares of ICE Common Stock, ICE Class A Common Shares or ICE Preferred Shares reserved for issuance, except that, as of June 30, 2006, there were 4,211,631 shares of ICE Common Stock reserved for issuance pursuant to the 2000 Stock Option Plan, there were 2,125,000 shares of ICE Common Stock reserved for issuance pursuant to the 2005 Equity Incentive Plan, there were 250,000 shares of ICE Common Stock reserved for issuance pursuant to the 2003 Restricted Stock Deferral Plan for Outside Directors and there were 1,475,000 shares of ICE Common Stock reserved for issuance pursuant to the 2004 Restricted Stock Plan. Each of the outstanding shares of capital stock or other equity interests of each of ICE's Subsidiaries is duly authorized, validly issued, fully paid and nonassessable and owned by ICE or by a direct or indirect wholly owned Subsidiary of ICE, free and clear of any lien, pledge, security interest, claim or other encumbrance. Except as set forth above, there are no preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights of any kind that obligate ICE or any of its Subsidiaries to issue or sell any shares of capital stock or other securities of ICE or any of its Subsidiaries or any securities or obligations convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for or acquire, any shares of ICE Common Stock or other securities of ICE or any of its Subsidiaries, and no securities or obligations evidencing such rights are authorized, issued or outstanding. ICE does not have outstanding any bonds, debentures, notes or other obligations the holders of which have the right to vote (or convertible into or exercisable for securities having the right to vote) with the stockholders of ICE on any matter.

(ii) All shares of ICE Common Stock to be issued in connection with the Merger, when issued as contemplated herein, will be duly authorized, validly issued, fully paid and nonassessable and will not be in violation of any preemptive rights.

(iii) The authorized capital stock of Merger Sub consists of 100 shares of common stock, par value $.01 per share, all of which shares are issued and outstanding. ICE is the legal and beneficial owner of all of the issued and outstanding shares of Merger Sub. All of the outstanding shares of capital stock of Merger Sub have been duly authorized and validly issued, and are fully paid and nonassessable and not subject to any preemptive rights.

(c) <u>Corporate Authority</u>. Each of ICE and Merger Sub has all requisite corporate power and authority and has taken all corporate action necessary in order to authorize, execute, deliver and perform its obligations under this Agreement and to consummate the Merger and the other transactions contemplated hereby. The execution, delivery and performance of this Agreement by each of ICE and Merger Sub and the consummation by each of ICE and Merger Sub of the transactions contemplated hereby have been duly and validly approved by its Board of Directors and by ICE in its capacity as the sole stockholder of Merger Sub. This Agreement is a valid and binding agreement of each of ICE and Merger Sub enforceable against ICE in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (the "<u>Bankruptcy and Equity Exception</u>").

(d) <u>No Conflicts</u>. Neither the execution and delivery by each of ICE and Merger Sub of this Agreement, the compliance by each of ICE and Merger Sub with all of the provisions of and the performance by each of ICE and Merger Sub of its obligations under this Agreement, nor the consummation of the Merger and the other transactions herein contemplated will conflict with, or result in a breach or violation of, or result in any acceleration of any rights or obligations or the payment of any penalty under or

-21-

Table of Contents

the creation of a lien, pledge, security interest or other encumbrance on assets (with or without the giving of notice or the lapse of time) pursuant to, or permit any other party any improvement in rights with respect to or permit it to exercise, or otherwise constitute a default under, any provision of any Contract in effect as of the date hereof, or result in any change in the rights or obligations of any party under any Contract in effect as of the date hereof, to which ICE or any of its Subsidiaries is a party or by which ICE or any of its Subsidiaries or any of their respective assets is bound, nor, subject to any required approval of the Merger by the CFTC, will such execution and delivery, compliance, performance or consummation result in any breach or violation of, or a default under, the provisions of the articles of incorporation or bylaws of ICE, or any Law applicable to it, except in each case for such conflicts, breaches, violations, defaults, payments, accelerations, creations or changes that, individually or in the aggregate, have not had and are not reasonably expected to have, a ICE Material Adverse Effect.

(e) Governmental Approvals and Consents. Other than (i) the filings and/or notices under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended (the "HSR Act"), the Exchange Act and the Securities Act, (ii) the filings, notices, approvals and/or consents to be obtained from the CFTC and under the Commodity Exchange Act, as amended, and (iii) other foreign approvals, state securities, takeover and "blue sky" laws, no authorizations, consents, approvals, orders, permits, notices, reports, filings, registrations, qualifications and exemptions of, with or from, or other actions are required to be made by ICE or any of its Subsidiaries with, or obtained by ICE or any of its Subsidiaries from, any governmental or regulatory authority, agency, commission, body or other governmental or regulatory entity, domestic or foreign, other than ICE or any of its Subsidiaries ("Governmental Entity"), in connection with the execution and delivery by ICE of this Agreement, the performance by ICE of its obligations hereunder, and the consummation of the transactions contemplated hereby.

(f) ICE Reports; Financial Statements. ICE has filed or furnished, as applicable, on a timely basis all forms, statements, certifications, reports and documents required to be filed or furnished by it with the SEC under the Exchange Act or the Securities Act of 1933, as amended (the "Securities Act") since December 31, 2005 (collectively, the "ICE Reports"). Each of the ICE Reports, at the time of its filing or being furnished complied, or if not yet filed or furnished, will comply in all material respects with the applicable requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act of 2002 (as amended, the "Sarbanes-Oxley Act"), and any rules and regulations promulgated thereunder applicable to the ICE Reports. As of their respective dates (or, if amended prior to the date hereof, as of the date of such amendment) the ICE Reports did not, and any ICE Reports filed or furnished with the SEC subsequent to the date hereof will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading. Each of the consolidated balance sheets included in the financial statements included in the ICE Reports (including the related notes and schedules) fairly presents the consolidated financial position of ICE and its Subsidiaries as of its date and each of the consolidated statements of income, retained earnings, and cash flows and of changes in financial position included in the financial statements included in the ICE Reports (including any related notes and schedules) fairly presents the results of operations, retained earnings, members' equity, cash flows and changes in financial position, as the case may be, of ICE and its Subsidiaries for the periods set forth therein, in each case in conformity with GAAP consistently applied during the periods involved, except as may be noted therein. Except for liabilities and obligations incurred in the ordinary course of business since December 31, 2005, neither ICE nor any of its Subsidiaries has any liabilities or obligations of any nature required by GAAP to be set forth on a consolidated balance sheet of ICE or any of its Subsidiaries or in the notes thereto which, individually or in the aggregate, could reasonably be expected to have a ICE Material Adverse Effect.

(g) Absence of Certain Changes. Since December 31, 2005, ICE and its Subsidiaries have conducted their respective businesses only in, and have not engaged in any material transaction other than according to, the ordinary and usual course of such businesses and there has not been (i) any change or development that, individually or in the aggregate, has had or is reasonably expected to have, a ICE Material Adverse Effect; or (ii) any change by ICE in financial accounting principles, practices or methods that is not required by GAAP.

-22-

Table of Contents

(h) <u>Compliance</u>  The businesses of ICE and each of its Subsidiaries have been conducted in compliance in all material respects with all Laws and the applicable rules of any Self-Regulatory Organization. Neither ICE nor any of its Subsidiaries is in conflict with, or in default or violation of, any Contract to which ICE or any of its Subsidiaries is a party or by which ICE or any of its Subsidiaries or its or any of their respective properties is bound or affected, except for any such conflicts, defaults or violations that, individually or in the aggregate, would not reasonably be expected to prevent or materially impair or delay the consummation of the Merger. ICE is in compliance in all material respects with the applicable listing and corporate governance rules and regulations of the NYSE.

(i) <u>Litigation and Liabilities</u>. There are no (i) civil, criminal or administrative actions, suits, claims, hearings, investigations or proceedings pending or, to the knowledge of ICE, threatened against ICE, any of its Subsidiaries or any of their respective directors or officers or (ii) obligations or liabilities, whether or not accrued, contingent or otherwise and whether or not required to be disclosed, including those relating to, or any other facts or circumstances of which, to the knowledge of ICE, could result in any claims against, or obligations or liabilities of, ICE or any of its Affiliates, except, in both cases, for those that, individually or in the aggregate, have not had and are not reasonably expected to have a ICE Material Adverse Effect or would not reasonably be expected to prevent or materially impair or delay the consummation of the Merger.

(j) <u>Tax Matters</u>. Neither ICE nor any of its Affiliates has taken or agreed to take any action, nor, to the knowledge of ICE, does there exist any fact or circumstance, that would prevent or impede, or would be reasonably likely to prevent or impede, the Merger from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code.

(k) <u>Brokers and Finders</u>. None of ICE, its Subsidiaries nor any of their respective officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders fees in connection with the Merger or the other transactions contemplated by this Agreement, except that ICE has employed Evercore Partners as its financial advisor.

ARTICLE VI

Covenants

6.1. <u>Interim Operations</u>. ICE and NYBOT each covenants and agrees as to itself and its Subsidiaries that, after the date hereof and until the earlier of the Effective Time or the termination of this Agreement in accordance with its terms (unless ICE (in the case of NYBOT) or NYBOT (in the case of ICE) shall otherwise approve in writing, and except as otherwise expressly contemplated by this Agreement or, in the case of NYBOT, except as otherwise set forth in Section 6.1 of the NYBOT Disclosure Letter or, in the case of ICE, except as otherwise set forth in Section 6.1 of the ICE Disclosure Letter):

(a) the business of it and its Subsidiaries shall be conducted in the ordinary and usual course consistent with past practice and, to the extent consistent therewith, it and its Subsidiaries shall use their respective reasonable best efforts to preserve its business organization intact and maintain its existing relations and goodwill with all Governmental Entities, Self-Regulatory Organizations, providers of order flow, customers, suppliers, distributors, creditors, lessors, Employees, business associates, Members and stockholders, as appropriate;

(b) it shall not declare, set aside or pay any type of dividend, whether payable in cash, stock or property, in respect of any Membership Interests or capital stock, as appropriate, other than, in the case of ICE, dividends payable by direct or indirect wholly owned Subsidiaries of ICE to ICE or other direct or indirect wholly owned Subsidiaries of ICE and, in the case of NYBOT, dividends payable by direct or indirect wholly owned Subsidiaries of NYBOT to NYBOT or other direct or indirect wholly owned Subsidiaries of NYBOT;

23

Table of Contents

(c) in the case of NYBOT, neither it nor its Subsidiaries shall:

(i) issue any new Membership Interests, other membership interests, capital stock or any securities convertible into or exchangeable or exercisable for any membership interests or shares of capital stock, Trading Rights, other trading permits or trading rights, or any lease rights;

(ii) sell, pledge, dispose of or encumber, split, combine or reclassify, or repurchase, redeem or acquire any outstanding Membership Interests, other membership interests, capital stock or any securities convertible into or exchangeable or exercisable for any membership interests or shares of capital stock, Permits, Trading Rights, other trading permits or trading rights, or any lease rights;

(iii) make any structural changes to NYBOT Clearing Corporation, agree to (other than in the ordinary course of business) list or clear any additional products or markets, change its risk policies or reduce its guaranty fund, liquidity or credit resources;

(iv) except as required by applicable Law or as set forth on Section 6.1(c)(iv) of the NYBOT Disclosure Letter, (A) terminate, establish, adopt, enter into, make any new grants or awards under, amend or otherwise modify, any NYBOT Benefit Plan, as the case may be, or any other arrangement that would be a NYBOT Benefit Plan if in effect on the date hereof, or (B) increase the salary, wage, bonus, pension, welfare, severance or other compensation of any employees or fringe benefits of any director, officer or employee or enter into any contract, agreement, commitment or arrangement to do any of the foregoing, except increases occurring in the ordinary and usual course of business consistent with past practice, or (C) provide for the grant of any stock option, restricted stock, restricted stock unit or other equity-related award, or (D) pay any change of control or severance benefits to any NYBOT director or Employee in connection with the Merger, or grant or provide for any severance, change in control or termination payments or benefits to any director, officer or employee of NYBOT or any of its Subsidiaries, or (E) take any action to accelerate the vesting or payment, or fund or in any way secure the payment, of compensation or benefits under any NYBOT Benefit Plan, to the extent not already provided in the any such NYBOT Benefit Plan, or (F) change any actuarial or other assumptions used to calculate funding obligations with respect to the manner in which contributions to such plans are made or the basis on which contributions are determined, except as may be required by GAAP, or (G) establish, adopt, enter into or amend any collective bargaining agreement or (H) terminate any officer, other than for cause, in which case NYBOT shall promptly notify ICE of such termination;

(v) except in the ordinary and usual course of business consistent with past practice, settle or compromise any material claims or litigation or modify, amend or terminate any of its material Contracts or waive, release or assign any material rights or claims;

(vi) other than in the ordinary and usual course of business, transfer, lease, license, guarantee, sell, mortgage, pledge, dispose of or encumber any other material property or assets (including membership interests or capital stock of any of its Subsidiaries);

(vii) incur additional material indebtedness or other liability or modify any material indebtedness or other liability or modify any material indebtedness or other liability other than in the ordinary course of business;

(viii) make or authorize or commit to any capital expenditures (other than under its current business plan as disclosed to ICE prior to the date of this Agreement), acquisitions or other types of non-ordinary-course transactions;

(ix) except for a platform license and service agreement with ICE, which shall provide that ICE shall license ICE's electronic trading platform to NYBOT for a minimum period of 18 months from and after the date of this Agreement and that the costs of operation shall not exceed $3 million per year, and which shall contain such other commercially reasonable terms as mutually agreed by ICE and NYBOT as soon as reasonably practicable after the date of this Agreement (and in any event within 45 days after the date of this Agreement) (the "Platform License Agreement"), enter into any agreement to trade any products on an

-24-

Table of Contents

electronic trading platform or that would restrict NYBOT's or its Subsidiaries' ability to trade any product on an electronic trading platform; provided, however, if ICE and NYBOT are not able to reach agreement on the terms of the Platform License Agreement in accordance with the foregoing, NYBOT may, at its own expense, license an electronic trading platform from an alternate system vendor, provided that (A) such license agreement is terminable by NYBOT as of the Closing and (B) all costs associated with such license agreement from and after the Closing shall be deducted from the calculation of the Closing Cash Amount;

(x) change any material Tax election, change any material method of Tax accounting, file any materially amended Tax Return, or settle or compromise any material audit or proceeding relating to Taxes or permit any insurance policy naming it as a beneficiary or loss-payable payee to be cancelled or terminated except in the ordinary and usual course of business;

(xi) permit any change in its credit practices or accounting principles, policies or practice (including any of its practices with respect to accounts receivable or accounts payable), except to the extent that any such changes in accounting principles, policies or practices shall be required by changes in GAAP;

(xii) enter into any "non-compete" or similar Contract that would restrict the business of the Surviving Corporation or any of its Affiliates following the Effective Time;

(xiii) except as permitted pursuant to Section 6.1(c)(iv) of the NYBOT Disclosure Letter, enter into any Contract between itself, on the one hand, or any of its Affiliates, employees, officers or directors, on the other hand;

(xiv) (A) amend or modify any of the NYBOT Organizational Documents or the NYBOT Subsidiary Organizational Documents, except for rule amendments or modifications that are consistent with past practice, that are not material and that would not become Core Rights (as defined in the Bylaws) or (B) file with the CFTC any notice of such amendment or modification unless it shall simultaneously provide a written copy of such application to ICE; and

(xv) neither NYBOT nor any of its Subsidiaries will authorize or enter into an agreement to do any of the foregoing set forth in Sections 6.1(c)(i) – (xiv) if NYBOT would be prohibited by the terms of Sections 6.1(c)(i) – (xiv) from doing the foregoing. Notwithstanding anything to the contrary in this Agreement, ICE shall have the right to agree to and to consummate any acquisitions of another Person, including by agreeing to issue equity interests in ICE to such Person.

(d) In the case of NYBOT, it shall, and shall cause its Subsidiaries to, preserve their respective existing regulatory status in all jurisdictions, and shall not make any material change to their respective regulatory status in any jurisdiction.

(e) Prior to making any written or oral communications to the directors, officers or employees of NYBOT or any of its Subsidiaries pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Agreement, NYBOT shall provide ICE with a copy of the intended communication, ICE shall have a reasonable period of time to review and comment on the communication, and ICE and NYBOT shall cooperate in providing any such mutually agreeable communication

6.2. Acquisition Proposals.

(a) Without limitation on any of NYBOT's other obligations under this Agreement, NYBOT agrees that, from and after the date hereof until the earlier of the Closing and the termination of this Agreement in accordance with its terms, neither it nor any of its Subsidiaries nor any of the officers and directors of it or its Subsidiaries shall, and that it shall direct and use its reasonable best efforts to cause its and its Subsidiaries' employees, agents and representatives (including any investment banker, attorney or accountant retained by it or any of its Subsidiaries) not to, directly or indirectly, (i) initiate, solicit, knowingly encourage (including by way of furnishing information), facilitate, or induce any inquiries or the making, submission or announcement of, any proposal or offer that constitutes, or could reasonably be expected to result in, an Acquisition Proposal, (ii) have any discussion with or provide any confidential information or data to any Person relating to an Acquisition Proposal, or engage in any negotiations

25

concerning an Acquisition Proposal, or knowingly facilitate any effort or attempt to make or implement an Acquisition Proposal, (iii) approve or recommend, or propose publicly to approve or recommend, any Acquisition Proposal or (iv) approve or recommend, or propose to approve or recommend, or execute or enter into, any letter of intent, agreement in principle, merger agreement, acquisition agreement, option agreement or other similar agreement or propose publicly or agree to do any of the foregoing related to any Acquisition Proposal.

An "Acquisition Proposal" means any offer or proposal for, or any indication of interest in, (i) any direct or indirect acquisition or purchase of NYBOT, NYBOT Clearing Corporation or any NYBOT Subsidiary that constitutes 10% or more of the consolidated gross revenue or consolidated gross assets of NYBOT and its Subsidiaries, taken as a whole (NYBOT Clearing Corporation and each such Subsidiary, a "Major Subsidiary"); (ii) any direct or indirect acquisition or purchase of (A) 10% or more of any class of equity securities or voting power or 10% or more of the consolidated gross assets of NYBOT, or (B) 50% or more of any class of equity securities or voting power of any of its Major Subsidiaries; (iii) any tender offer that, if consummated, would result in any Person beneficially owning 10% or more of any class of equity securities or voting power of NYBOT; (iv) any merger, reorganization, share exchange, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving NYBOT or any Major Subsidiary of NYBOT, in each case other than the transactions contemplated by this Agreement.

(b) Within two business days after receipt of an Acquisition Proposal or any request for nonpublic information or inquiry that NYBOT reasonably believes could lead to an Acquisition Proposal for NYBOT, NYBOT shall provide the other party hereto with oral and written notice of the material terms and conditions of such Acquisition Proposal, request or inquiry, and the identity of the Person making any such Acquisition Proposal, request or inquiry. Thereafter, NYBOT shall provide ICE, as promptly as practicable, with oral and written notice setting forth all such information as is reasonably necessary to keep ICE informed in all material respects of the status and details (including material amendments or proposed material amendments) of any such Acquisition Proposal, request or inquiry.

(c) Notwithstanding anything in this Agreement to the contrary, NYBOT or its Board of Directors shall be permitted to (A) to the extent applicable, comply with Rule 14d-9 and Rule 14e-2 promulgated under the Exchange Act with regard to an Acquisition Proposal, (B) effect a Change in NYBOT Recommendation prior to the receipt of the NYBOT Requisite Vote to the extent permitted to do so by Section 6.4(b), or (C) prior to the receipt of the NYBOT Requisite Vote, engage in any discussions or negotiations with, or provide any information to, any Person in response to an unsolicited bona fide written Acquisition Proposal by any such Person, if and only to the extent that, (i) in the case of clause (B) above, it has received an unsolicited bona fide written Acquisition Proposal from a third party and its Board of Directors concludes in good faith (after consultation with its outside legal counsel and financial advisors) that such Acquisition Proposal constitutes a Superior Proposal, (ii) in the case of clause (C) above, its Board of Directors concludes in good faith (after consultation with its outside legal counsel and financial advisors) that there is a reasonable likelihood that such Acquisition Proposal would result in a Superior Proposal, (iii) in the case of clause (B) or (C) above, its Board of Directors, after consultation with its outside legal counsel, determines in good faith that the failure to take such action would be inconsistent with its fiduciary duties under applicable Law, (iv) in the case of clause (C) above, prior to providing any information or data to any Person in connection with an Acquisition Proposal by any such Person, its Board of Directors receives from such Person an executed confidentiality agreement with terms no less restrictive, in the aggregate, than those contained in the Confidentiality Agreement, and (v) in the case of clause (C) above, NYBOT is not then in material breach of its obligations under this Section 6.2. NYBOT shall, and shall cause its senior officers, directors and representatives to, immediately cease and cause to be terminated any activities, discussions or negotiations existing as of the date of this Agreement with any parties conducted heretofore with respect to any Acquisition Proposal. NYBOT shall use reasonable best efforts to promptly inform its directors, officers, agents and representatives of the obligations undertaken in this Section 6.2. Nothing in this Section 6.2 shall (x) permit NYBOT to terminate this Agreement (except as specifically provided in Article VIII hereof) or (y) affect any other obligation of NYBOT under this Agreement, except as otherwise

26

**Table of Contents**

expressly set forth in this Agreement. Prior to any termination of this Agreement, NYBOT shall not submit to the vote of its Members any Acquisition Proposal.

"Superior Proposal" means, with respect to NYBOT, a bona fide written Acquisition Proposal obtained not in breach of this Section 6.2 for or in respect of all of the outstanding voting power of and economic interest in the Membership Interests or any other capital stock of NYBOT or all of the assets of NYBOT and its Subsidiaries, on a consolidated basis, on terms that the Board of Directors of NYBOT in good faith concludes (following receipt of the advice of its financial advisors and outside legal counsel), taking into account, among other things, all legal, financial, regulatory, structural and other aspects of the Acquisition Proposal and this Agreement, and taking into account any improved terms that ICE has offered pursuant to Section 8.3 deemed relevant by such Board of Directors, including conditions to and expected timing and risks of consummation and the ability of the party making such proposal to obtain financing for such Acquisition Proposal) are more favorable from a financial point of view to the Members of NYBOT than the Merger and the other transactions contemplated by this Agreement (after taking into account any such improved terms).

6.3. Preparation of Proxy Statements; Information Supplied.

(a) As promptly as reasonably practicable following the date hereof, ICE and NYBOT shall cooperate in preparing mutually acceptable proxy materials of NYBOT which shall constitute the proxy statement/prospectus relating to the matters to be submitted to the NYBOT Members at the NYBOT Members Meeting (such proxy statement/prospectus, and any amendments or supplements thereto, the "Proxy Statement/Prospectus"), and ICE shall prepare and file with the SEC a registration statement on Form S-4 with respect to the issuance of ICE Common Stock in the Merger (such Form S-4, and any amendments or supplements thereto, the "S-4 Registration Statement"). The Proxy Statement/Prospectus will be included as a prospectus in and will constitute a part of the S-4 Registration Statement as ICE's prospectus.

(b) Each of ICE and NYBOT shall use reasonable best efforts to have the S-4 Registration Statement declared effective by the SEC and to keep the S-4 Registration Statement effective as long as is necessary to consummate the Merger and the transactions contemplated thereby. ICE shall, as promptly as practicable after receipt thereof, provide NYBOT copies of any written comments and advise NYBOT of any oral comments received from the SEC with respect to the S-4 Registration Statement. The parties shall cooperate and provide the other with a reasonable opportunity to review and comment on any amendment or supplement to the Proxy Statement/Prospectus and the S-4 Registration Statement prior to filing such with the SEC or providing such to the Members and will provide each other with a copy of all such filings made with the SEC or provided to the Members.

(c) Notwithstanding any other provision herein to the contrary, no amendment or supplement (including by incorporation by reference) to the Proxy Statement/Prospectus or the S-4 Registration Statement shall be made without the approval of both parties, which approval shall not be unreasonably withheld or delayed; provided that NYBOT, in connection with a Change in the NYBOT Recommendation, may amend or supplement the Proxy Statement/Prospectus pursuant to a Qualifying Amendment to effect such a Change, and in such event, this right of approval shall apply only with respect to information relating to the other party or its business, financial condition or results of operations, and shall be subject to the right of each party to have its Board of Directors' deliberations and conclusions to be accurately described. A "Qualifying Amendment" means an amendment or supplement to the Proxy Statement/Prospectus (including by incorporation by reference) to the extent that it contains (i) a Change in the NYBOT Recommendation, (ii) a statement of the reasons of the Board of Directors of NYBOT for making such Change in the NYBOT Recommendation and (iii) additional information reasonably related to the foregoing.

(d) NYBOT will use reasonable best efforts to cause the Proxy Statement/Prospectus to be mailed to NYBOT's Members as promptly as practicable after the S-4 Registration Statement is declared effective under the Securities Act.

(e) Each party will advise the other party, promptly after it receives notice thereof, of the time when the S-4 Registration Statement has become effective, the issuance of any stop order, the suspension of the

27

qualification of the ICE Common Stock issuable in connection with the Merger for offering or sale in any jurisdiction, or any request by the SEC for amendment of the S-4 Registration Statement.

(f) ICE and NYBOT each agrees, as to itself and its Subsidiaries, that none of the information, supplied or to be supplied by it or its Subsidiaries and solely to the extent that such information pertains to it, its Subsidiaries, Affiliates, directors, officers, stockholders or Members, for inclusion or incorporation by reference in (i) the S-4 Registration Statement will, at the time the S-4 Registration Statement becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, and (ii) the Proxy Statement/Prospectus and any amendment or supplement thereto will, at the date of mailing and at the time of the NYBOT Members Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. ICE will cause the S-4 Registration Statement to comply as to form in all material respects with the applicable provisions of the Securities Act and the rules and regulations thereunder. If at any time prior to the Effective Time any information relating to ICE or NYBOT, or any of their respective Affiliates, officers or directors, should be discovered by ICE or NYBOT which should be set forth in an amendment or supplement to any of the S-4 Registration Statement or the Proxy Statement/Prospectus so that any of such documents would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the party which discovers such information shall promptly notify the other party hereto and, to the extent required by law, rules or regulations, an appropriate amendment or supplement describing such information shall be promptly filed with the SEC and disseminated to the Members of NYBOT.

(g) ICE and NYBOT each shall use its reasonable best efforts to cause to be delivered to the other party and its directors a letter of its independent auditors, dated (i) the date on which the S-4 Registration Statement shall become effective and (ii) the Closing Date, and addressed to the other party and its directors, in form and substance customary for "comfort" letters delivered by independent public accountants in connection with registration statements similar to the S-4 Registration Statement.

6.4. Members' Meeting. NYBOT will take, in accordance with applicable Law and its certificate of incorporation and bylaws, all action necessary to convene a meeting of its Members (the "NYBOT Members Meeting") on a date determined in accordance with the mutual agreement of ICE and NYBOT (the "Meeting Date"), which date shall be as promptly as practicable (but in no event more than 35 calendar days) after the S-4 Registration Statement is declared effective, to consider and vote upon the adoption and approval of this Agreement. Subject to fiduciary obligations under applicable Law, the Board of Directors of NYBOT shall recommend such adoption or approval, as the case may be, and shall take all lawful action to solicit such adoption and approval. Prior to the NYBOT Members Meeting, the Board of Directors of NYBOT may withhold, withdraw, qualify or modify its recommendation of the adoption or approval of this Agreement and the Merger if the Board of Directors of NYBOT determines in good faith, after consultation with outside counsel, that failure to do so would be inconsistent with its fiduciary obligations under applicable Law (a "Change in NYBOT Recommendation"); provided, however, that no Change in NYBOT Recommendation may be made until after at least 48 hours following ICE's receipt of notice from NYBOT advising that management of NYBOT intends to recommend to the Board of Directors of NYBOT that it take such action and the basis therefor. In determining whether to make a NYBOT Change in Recommendation in response to a Superior Proposal or otherwise, the Board of Directors of NYBOT shall take into account any changes to the terms of this Agreement proposed by ICE and any other information provided by ICE in response to such notice. Any material amendment to any Acquisition Proposal will be deemed to be a new Acquisition Proposal for purposes of this Section 6.4, including with respect to the notice period referred to in this Section 6.4. In the event of a Change in NYBOT Recommendation, NYBOT shall nevertheless submit this Agreement to its Members for adoption at the NYBOT Members Meeting unless this Agreement shall have been terminated in accordance with its terms prior to the NYBOT Members Meeting.

-28-

Table of Contents

6.5. <u>Reasonable Best Efforts; Regulatory Filings and Other Actions</u>.

(a) <u>Reasonable Best Efforts; Regulatory Filings</u>. ICE and NYBOT shall cooperate with each other and use (and shall cause their respective Subsidiaries to use) their respective reasonable best efforts to take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable on its part under this Agreement and applicable Laws to consummate and make effective the Merger and the other transactions contemplated by this Agreement as soon as practicable, including preparing and filing as promptly as practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, registrations, approvals, authorizations and other Permits (including all approvals and consents to be obtained from the CFTC) (collectively, "<u>Consents</u>") necessary or advisable to be obtained from any third party and/or any Governmental Entity or Self-Regulatory Organization (if any) in order to consummate the transactions contemplated by this Agreement; <u>provided</u>, <u>however</u>, that nothing in this Section 6.5 shall require, or be construed to require, ICE to proffer to, or agree to, sell or hold separate and agree to sell, before or after the Effective Time, any assets, businesses, or interests in any assets or businesses of ICE or any of its Affiliates (or to consent to any sale, or agreement to sell, by NYBOT or any of its Subsidiaries, of any of its assets or businesses), if such action would, individually or in the aggregate, reasonably be expected to result in a ICE Substantial Detriment. Subject to applicable Law and the instructions of any Governmental Entity, ICE and NYBOT shall keep each other apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement, including promptly furnishing the other with copies of notices or other communications received by ICE or NYBOT, as the case may be, or any of their respective Subsidiaries, from any third party and/or any Governmental Entity with respect to such transactions.

"<u>ICE Substantial Detriment</u>" means a material adverse effect on the business, results of operations or financial condition of ICE and its Subsidiaries, taken as a whole, or on the Surviving Corporation and its Subsidiaries, taken as a whole.

(b) <u>Prior Review of Certain Information</u>. Subject to applicable Laws relating to the sharing of information, ICE and NYBOT shall have the right to review in advance, and to the extent practicable, each will consult the other on any filing made with, or written materials submitted to, any third party and/or any Governmental Entity and Self-Regulatory Organization in connection with the Merger and the other transactions contemplated by this Agreement (including the Proxy Statement/Prospectus). ICE and NYBOT shall provide the other party with the opportunity to participate in any meeting with any Governmental Entity or any Self-Regulatory Organization in respect of any filings, investigation or other inquiry in connection with the transactions contemplated hereby.

(c) <u>Furnishing of Information</u>. ICE and NYBOT each shall, upon request by the other, furnish the other with all information concerning itself, its Subsidiaries, Affiliates, directors, officers and stockholders and such other matters as may be reasonably necessary or advisable in connection with the Proxy Statement/Prospectus, the S-4 Registration Statement or any other statement, filing, notice or application made by or on behalf of ICE, NYBOT or any of their respective Subsidiaries to any third party and/or any Governmental Entity in connection with the Merger and the other transactions contemplated by this Agreement.

(d) <u>Status Updates and Notice</u>. Subject to applicable Law and the instructions of any Governmental Entity or any Self-Regulatory Organization, ICE and NYBOT each shall keep the other apprised of the status of matters relating to completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by ICE or NYBOT, as the case may be, or any of its Subsidiaries, from any third party and/or any Governmental Entity and/or any Self-Regulatory Organization, with respect to such transactions and copies of any written claim or threatened claim by any Member or Trading Permit Holder with respect to such transactions.

6.6. <u>Access</u>. Subject to applicable Law relating to the sharing of information, upon reasonable notice, and except as may otherwise be required by applicable Law, ICE and NYBOT each shall (and shall cause its

-29-

Table of Contents

Subsidiaries to) afford the other's officers, employees, counsel, accountants, consultants and other authorized representatives ("Representatives") reasonable access, during normal business hours throughout the period prior to the Effective Time, to its properties, books, contracts and records and, during such period, each shall (and shall cause its Subsidiaries to) furnish promptly to the other all information concerning its business, properties and personnel as may reasonably be requested; provided that no investigation pursuant to this Section 6.6 shall affect or be deemed to modify any representation or warranty made by ICE or NYBOT; provided, further, that the foregoing shall not require ICE or NYBOT (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of ICE or NYBOT, as the case may be, would result in the disclosure of any trade secrets of third parties or violate any of its obligations with respect to confidentiality if ICE or NYBOT, as the case may be, shall have used reasonable best efforts to obtain the consent of such third party to such inspection or disclosure, (ii) to disclose any privileged information of ICE or NYBOT, as the case may be, or any of its Subsidiaries, or (iii) in the case of ICE, to permit any inspection, or to disclose any information relating to any regulatory enforcement, investigations or inquiries conducted by ICE or any other regulatory activities that the Chief Regulatory Officer of ICE determines, in his or her sole discretion, is confidential and inappropriate to disclose to NYBOT. All requests for information made pursuant to this Section 6.6 shall be directed to an executive officer of ICE or NYBOT, as the case may be, or such Person as may be designated by either of their executive officers, as the case may be, with a copy to the General Counsel of such party. All such information shall be governed by the terms of the Confidentiality Agreement.

6.7. Affiliates. Section 6.7 of the NYBOT Disclosure Letter contains a list of those Persons who, as of the date of this Agreement, may be deemed to be "affiliates" of NYBOT for purposes of Rule 145 under the Securities Act. Not less than 45 days prior to the Meeting Date, NYBOT shall update Section 6.7 of the NYBOT Disclosure Letter to add to such list the names of any other Person subsequently identified by NYBOT as a Person who may be deemed to be such an affiliate of NYBOT. NYBOT shall keep such list updated as necessary to reflect changes from the Meeting Date and shall use reasonable best efforts to cause each person identified on such list to deliver to ICE, not less than 30 days prior to the Effective Time, a customary "affiliates" letter, dated as of the Closing Date, in form and substance satisfactory to ICE and NYBOT (the "Affiliates Letter").

6.8. Exchange Listing. ICE shall use its reasonable best efforts to cause the shares of ICE Common Stock to be issued in the Merger pursuant to Article IV of this Agreement to be approved for listing on the NYSE, subject to official notice of issuance, prior to the Closing Date.

6.9. Publicity. The initial press release regarding the Merger shall be a joint press release and thereafter ICE and NYBOT shall use reasonable best efforts to develop a joint communications plan and each party shall use reasonable best efforts to ensure that all press releases and other public statements with respect to the transactions contemplated hereby shall be consistent with such joint communications plan. Notwithstanding the foregoing, without ICE's prior written consent, unless otherwise required by applicable Law, NYBOT shall not, and shall not permit its Affiliates, agents or Representatives to, issue any press release or other written statement or, to the extent practical, otherwise make any public statement with respect to this Agreement or the transactions contemplated hereby. In addition to the foregoing, except to the extent disclosed in or consistent with the Proxy Statement/Prospectus in accordance with the provisions of Section 6.3, neither ICE nor NYBOT shall issue any press release or otherwise make any public statement or disclosure concerning the other party or the other party's business, financial condition or results of operations without the consent of the other party, which consent shall not be unreasonably withheld or delayed.

6.10. Employment and Benefit Levels.

(a) During the period commencing as of the Effective Time and ending on the second anniversary thereof, ICE shall provide, or cause to be provided, (i) to each Employee (as hereinafter defined), pension and welfare benefits under employee benefit plans that are no less favorable in the aggregate than those currently provided by NYBOT and its Subsidiaries to such Employee, and (ii) to each Employee, salary and

-30-

**Table of Contents**

the year end incentive payment corresponding to such Employee and listed on Schedule 6.10(a), that is no less favorable that that currently paid by NYBOT and its Subsidiaries to such Employee. ICE shall cause any of its and its Subsidiaries' employee benefit plans in which the Employees are eligible to participate from and after the Effective Time pursuant to the foregoing sentence to take into account (i) for purposes of eligibility and vesting thereunder (but not for purposes of benefit accrual or to the extent it would result in a duplication of benefits), service by Employees as if such service were with ICE or its Subsidiaries, to the same extent such service was credited under a comparable plan of NYBOT or its Subsidiaries and (ii) any eligible expenses incurred by such Employee and his or her covered dependents during the portion of the plan year of any employee benefit plan provided by NYBOT or its Subsidiaries that ends on the date such Employee's participation in any corresponding plan provided by ICE begins to be taken into account under such corresponding ICE plan for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Employee and his or her covered dependents for the applicable plan year as if such amounts had been paid in accordance with such corresponding plan provided by ICE. Notwithstanding the foregoing, nothing contained herein shall (1) be treated as an amendment of any particular NYBOT Benefit Plan, (2) obligate ICE, the Surviving Corporation or any of their Affiliates to (i) maintain any particular NYBOT Benefit Plan or (ii) retain the employment of any particular Employee or (3) give any third party any right to enforce the provisions of this Agreement.

(b) Prior to the Effective Time, if requested by ICE in writing, to the extent permitted by applicable Law and the terms of the applicable plan or arrangement of NYBOT and/or its Subsidiaries, NYBOT shall (i) cause to be amended the employee benefit plans and arrangements of it and its Subsidiaries to the extent necessary to provide that no employees of ICE and its Subsidiaries shall commence participation therein following the Effective Time unless ICE or such Subsidiary explicitly authorizes such participation, (ii) cause to be amended the employee benefit plans and arrangements of it and its Subsidiaries to the extent necessary to provide that no persons who are not Employees may participate in such employee benefit plans and arrangements, and (iii) cause the NYBOT 401(k) Plan to be terminated effective immediately prior to the Effective Time.

(c) For purposes of this Section 6.10, "Employee" shall mean (i) any person who is employed by NYBOT and its Subsidiaries as of the Effective Time who is not a Member of NYBOT and (ii) those persons listed on Schedule 6.10(c).

6.11. Taxes. Subject to Section 6.2, neither NYBOT nor ICE shall take or cause to be taken any action, whether before or after the Effective Time, that would prevent or impede, or would be reasonably likely to prevent or impede, the Merger from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code.

6.12. Expenses. Subject to Sections 6.2 and 8.5, whether or not the Merger is consummated, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such Expenses, except (a) if the Merger is consummated, the Surviving Corporation shall pay, or cause to be paid, any and all property or transfer taxes imposed in connection with the Merger and (b) Expenses incurred in connection with the filing, printing and mailing of the Proxy Statement/Prospectus and the S-4 Registration Statement shall be shared equally by ICE and NYBOT. As used in this Agreement, "Expenses" includes all out-of-pocket expenses (including all fees and expenses of counsel, accountants, investment bankers, experts and consultants to a party hereto and its Affiliates) incurred by a party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution and performance of this Agreement and the transaction contemplated hereby, including the preparation, printing, filing and mailing of the Proxy Statement/Prospectus and the S-4 Registration Statement and the solicitation of stockholder approvals and all other matters related to the transactions contemplated hereby and thereby.

6.13. Indemnification. From and after the Effective Time, ICE shall (i) indemnify and hold harmless, and provide advancement of expenses to, all past and present directors, officers and employees of NYBOT and its Subsidiaries (in all of their capacities) (A) to the same extent such persons are indemnified or have

-31-

Table of Contents

the right to advancement of expenses as of the date of this Agreement by NYBOT pursuant to NYBOT's certificate of incorporation and indemnification agreements, if any, in existence on the date hereof with any directors, officers and employees of NYBOT and its Subsidiaries and (B) without limitation to clause (A), to the fullest extent permitted by law, in each case for acts or omissions occurring at or prior to the Effective Time (including for acts or omissions occurring in connection with the approval of this Agreement and the consummation of the transactions contemplated hereby), and (ii) include and cause to be maintained in effect the Surviving Corporation's (or any successor's) certificate of incorporation and bylaws after the Effective Time, provisions regarding elimination of liability of directors, indemnification of officers, directors and employees and advancement of expenses which are, in the aggregate, no less advantageous to the intended beneficiaries than the corresponding provisions contained in the current certificate of incorporation and bylaws of NYBOT. Prior to the Effective Time, ICE shall purchase or permit NYBOT to purchase a six-year "tail" prepaid policy on terms and conditions no less advantageous to the insured than the current directors' and officers' liability insurance and fiduciary liability insurance maintained by NYBOT; provided, however, that in no event shall ICE or NYBOT expend for such "tail" policy a premium amount in excess of $1,500,000. The obligations of ICE under this Section 6.13 shall not be terminated or modified in such a manner as to adversely affect any indemnitee to whom this Section 6.13 applies without the consent of such affected indemnitee (it being expressly agreed that the indemnities to whom this Section 6.13 applies shall be third party beneficiaries of this Section 6.13).

6.14. Other Actions by ICE and NYBOT.

(a) Takeover Statutes. If any takeover statute is or may become applicable to the Merger or the other transactions contemplated by this Agreement, each of ICE and NYBOT and their respective Boards of Directors shall grant such approvals and take such actions as are necessary so that such transactions may be consummated as promptly as practicable on the terms contemplated by this Agreement or by the Merger, and otherwise act to eliminate or minimize the effects of such statute or regulation on such transactions.

(b) Section 16 Matters. Prior to the Effective Time, ICE and NYBOT shall take all such steps as may be required to cause any dispositions of Membership Interests or acquisitions of ICE Common Stock resulting from the Merger by each individual who is subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to ICE and NYBOT to be exempt under Rule 16b-3 promulgated under the Exchange Act.

(c) Advice of Changes. Until the earlier of the Effective Time and the termination of this Agreement in accordance with its terms, (i) ICE shall promptly advise NYBOT of any change or event that it believes would or would reasonably be likely to cause or constitute a ICE Material Adverse Effect or a material breach of any of its representations, warranties or covenants contained herein such that the condition contained in Section 8.2(a) or 8.2(b) shall no longer be capable of satisfaction; and (ii) NYBOT shall promptly advise ICE of any change or event that it believes would or would reasonably be likely to cause or constitute a NYBOT Material Adverse Effect or a material breach of any of its representations, warranties or covenants contained herein such that the condition contained in Section 8.3(a) or 8.3(b) shall no longer be capable of satisfaction.

6.15. ICE Board of Directors. ICE shall, subject to applicable Law, use its best efforts to cause to be appointed to the Board of Directors of ICE immediately after the Effective Time two current members of the Board of Directors of NYBOT who are designated by NYBOT by notice in writing to ICE at least 10 business days prior to the Closing Date and who are reasonably acceptable to ICE; provided, that at least one such individual shall be "independent" within the meaning of the NYSE Listed Company Manual.

6.16. Clearing Organization.

(a) Effective as of the Closing Date, ICE shall cause to be amended the provisions of the bylaws of NYBOT Clearing Corporation with respect to the use of guaranty fund deposits and the issuance of assessments to the Clearing Members in the event of a "Monetary Default" (as such term is defined in such bylaws), to limit the application of such bylaw provisions, in the case of "Self Clearing Members" (as such

-32-

term is defined in such bylaws) and Clearing Members that are only entitled to clear cotton contracts on the date this Agreement is executed by NYBOT, each of which Clearing Members, as of the date hereof, is identified in Section 6.16 of the NYBOT Disclosure Letter (the "Cotton Clearing Members"), to Monetary Defaults that involve a commodity contract that the applicable Clearing Member is entitled to clear with NYBOT Clearing Corporation, and to exclude Self Clearing Members and the Cotton Clearing Members from the application of such bylaw provisions in the case of Monetary Defaults that involve a commodity contract that the applicable Clearing Member is not entitled to clear with NYBOT Clearing Corporation.

(b) From and after the Closing, ICE shall not amend, or cause to be amended, the NYBOT Subsidiary Organizational Documents of NYBOT Clearing Corporation in effect as of the Closing in a manner that would be inconsistent with the Core Rights (as defined in the Bylaws) without the approvals that would be required pursuant to Article XVI of the Bylaws if the Surviving Corporation were the entity seeking to take such action, only to the extent such approvals would be required.

ARTICLE VII

Conditions

7.1. Conditions to Each Party's Obligation to Effect the Merger. The respective obligation of each party to effect the Merger is subject to the satisfaction or waiver at or prior to the Effective Time of each of the following conditions:

(a) Member Approval. This Agreement shall have been duly adopted and approved by Members constituting the NYBOT Requisite Vote in accordance with applicable Law and the certificate of incorporation and bylaws of NYBOT.

(b) Exchange Listing. The shares of ICE Common Stock shall have been authorized for listing on the New York Stock Exchange (or if such listing is not approved or permitted, another national securities exchange), upon official notice of issuance.

(c) HSR Waiting Period. The waiting period applicable to the consummation of the Merger under the HSR Act shall have expired or been terminated.

(d) Requisite Approvals. Subject to the proviso set forth in Section 6.5(a), all Consents required to be obtained prior to the Effective Time by ICE, NYBOT or any of their respective Subsidiaries from any Governmental Entity in connection with the execution and delivery of this Agreement and the consummation of the Merger and the other transactions contemplated hereby by ICE and NYBOT shall have been obtained (all such required Consents being referred herein as the "Requisite Regulatory Approvals").

(e) Litigation. No court or other Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, law, ordinance, rule, regulation, judgment, determination, decree, injunction or other order (whether temporary, preliminary or permanent) that is in effect and restrains, enjoins or otherwise prohibits consummation of the Merger or the other transactions contemplated by this Agreement (collectively, an "Order"), and no Governmental Entity shall have instituted any proceeding seeking any such Order, in each case if such Order would result in, or would be reasonably likely to result in, a ICE Substantial Detriment.

(f) S-4. The S-4 Registration Statement shall have become effective under the Securities Act. No stop order suspending the effectiveness of the S-4 Registration Statement shall have been issued, and no proceedings for that purpose shall have been initiated or be threatened by the SEC.

(g) Blue Sky Approvals. ICE shall have received all state securities and "blue sky" permits and approvals necessary to consummate the transactions contemplated hereby.

33

Table of Contents

7.2. <u>Conditions to Obligations of NYBOT</u>. The obligation of NYBOT to effect the Merger is also subject to the satisfaction or waiver by NYBOT at or prior to the Effective Time of the following conditions:

(a) <u>Representations and Warranties</u>. (i) Each of the representations and warranties of ICE set forth in this Agreement that is qualified as to ICE Material Adverse Effect shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on and as of such date and time (except to the extent that any such representation and warranty speaks of a specified date, in which case such representation and warranty shall be true and correct as of such specified date), (ii) each of the representations and warranties of ICE set forth in this Agreement that is not qualified as to ICE Material Adverse Effect (reading such representations and warranties without regard to any materiality qualifications contained therein) shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on and as of such date and time (except to the extent that any such representation and warranty speaks of a specified date, in which case such representation and warranty shall be true and correct as of such specified date), except where the failure to be so true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have an ICE Material Adverse Effect, (iii) each of the representations and warranties of ICE set forth in Sections 5.2(b) and 5.2(c) shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of such date and time (except to the extent that any such representation and warranty speaks of a specified date, in which case such representation and warranty shall be true and correct as of such specified date), and (iv) NYBOT shall have received at the Closing a certificate signed on behalf of ICE by the Chief Executive Officer of ICE certifying the matters set forth in clauses (i), (ii) and (iii) of this Section 7.2(a).

(b) <u>Performance of Obligations of ICE</u>. ICE shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and NYBOT shall have received a certificate signed on behalf of ICE by the Chief Executive Officer of ICE to such effect.

(c) <u>Tax Ruling</u>. NYBOT shall have received a private letter ruling from the Internal Revenue Service to the effect that (i) the Merger will be treated for United States federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Code and (ii) the Members and holders of NYBOT Permits will not recognize gain in connection with the Merger other than with respect to any Cash Consideration they receive.

7.3. <u>Conditions to Obligation of ICE</u>. The obligation of ICE to effect the Merger is also subject to the satisfaction or waiver by ICE at or prior to the Effective Time of the following conditions:

(a) <u>Representations and Warranties</u>. (i) Each of the representations and warranties of NYBOT set forth in this Agreement that is qualified as to NYBOT Material Adverse Effect shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on and as of such date and time (except to the extent that any such representation and warranty speaks of a specified date, in which case such representation and warranty shall be true and correct as of such specified date), (ii) each of the representations and warranties of NYBOT set forth in this Agreement that is not qualified as to NYBOT Material Adverse Effect (reading such representations and warranties without regard to any materiality qualifications contained therein) shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on and as of such date and time (except to the extent that any such representation and warranty speaks of a specified date, in which case such representation and warranty shall be true and correct as of such specified date), except where the failure to be so true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a NYBOT Material Adverse Effect, (iii) each of the representations and warranties of NYBOT set forth in Sections 5.1(b), 5.1(c), 5.1(d), 5.1(e) and 5.1(f) shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as though made on and as of such date and time (except to the extent that any such representation and warranty speaks of a specified date, in which case such representation and warranty shall be true and correct as of such specified date), and (iv) ICE shall have received at the Closing a certificate signed on behalf of NYBOT by the Chief Executive Officer of NYBOT certifying the matters set forth in clauses (i), (ii) and (iii) of this Section 7.3(a).

-34-

[Table of Contents](#)

(b) <u>Performance of Obligations of NYBOT</u>. NYBOT shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and ICE shall have received a certificate signed on behalf of NYBOT by the Chief Executive Officer of NYBOT to such effect.

(c) <u>Requisite Regulatory Approvals</u>. All of the Requisite Regulatory Approvals that have been obtained shall have been obtained without the imposition of any term, condition or consequence the acceptance of which would be reasonably expected to result in a ICE Substantial Detriment.

(d) <u>Tax Ruling</u>. ICE shall have received a private letter ruling from the Internal Revenue Service (or a copy of a private letter ruling issued by the Internal Revenue Service to NYBOT and reasonably acceptable to ICE) to the effect that the Merger will be treated for United States federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Code.

ARTICLE VIII

Termination

8.1. <u>Termination by Mutual Consent</u>. This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, whether before or after the approval by the Members of NYBOT, referred to in Section 7.1(a), by mutual written consent of ICE and NYBOT by action of their respective Boards of Directors.

8.2. <u>Termination by Either NYBOT or ICE</u>. This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time by action of the Board of Directors of either NYBOT or ICE if:

(a) the Merger shall not have been consummated by June 14, 2007 (such date, as it may be extended under the proviso below, the "<u>Termination Date</u>"), whether such date is before or after the date of the receipt of the NYBOT Requisite Vote; <u>provided</u>, <u>however</u>, that each of ICE and NYBOT shall have the right, in their respective sole discretion, to extend the Termination Date to September 14, 2007 if the only conditions set forth in Article VII that have not been satisfied (other than those conditions that by their nature are to be satisfied at the Closing) are the conditions set forth in Section 7.1 or the conditions set forth in Sections 7.2(c) and 7.3(d); <u>provided</u>, <u>further</u>, that no such right to extend the Termination Date may be exercised by either party if such party's failure to perform any material covenant or obligation under this Agreement has been the cause of, or resulted in, the failure of such condition to be satisfied;

(b) the NYBOT Requisite Vote required by Section 7.1(a) shall not have been obtained after a vote of the Members has been taken and completed at the NYBOT Members Meeting or at any adjournment or postponement thereof; or

(c) (i) any Governmental Entity which must grant a Requisite Regulatory Approval has denied such grant, whether orally or in writing, and such denial has become final, binding and non-appealable, (ii) any Order permanently restraining, enjoining or otherwise prohibiting consummation of the Merger shall become final and non-appealable (whether before or after the approval by ICE stockholders or NYBOT Members) or (iii) any Governmental Entity which must grant a Requisite Regulatory Approval has conditioned such grant, whether orally or in writing, in a manner that ICE reasonably determines would be reasonably likely to result in a ICE Substantial Detriment, and such condition has become final, binding and non-appealable;

<u>provided</u> that (i) the right to terminate this Agreement pursuant to clause (a) above shall not be available to any party that has breached in any material respect its obligations under this Agreement in any manner that shall have proximately contributed to the occurrence of the failure of the Merger to be consummated; and (ii) the right to terminate this Agreement pursuant to clause (b) above shall not be available to NYBOT, if NYBOT has breached

-35-

Table of Contents

in any material respect its obligations under Section 6.4 of this Agreement in any manner that shall have proximately contributed to the NYBOT Members Meeting not having been held, or the vote of the Members contemplated by Section 6.4 not having been taken, by the Termination Date.

8.3. <u>Termination by ICE</u>. This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, whether before or after the approval by NYBOT Members referred to in Section 7.1(a), and, in either case, by action of the Board of Directors of ICE:

(a) if the Board of Directors of NYBOT shall have effected a Change in NYBOT Recommendation or failed to reconfirm its recommendation of this Agreement within seven business days after a written request by ICE to do so;

(b) if NYBOT shall have breached in any material respect any of its representations or warranties contained in this Agreement or failed to perform in any material respect any of its covenants or agreements contained in this Agreement, which breach or failure to perform would render unsatisfied any condition in Section 7.3(a) or 7.3(b) and (i) is not curable or (ii) if curable, is not cured prior to the earlier of (A) the business day prior to the Termination Date or (B) the date that is 30 days after the date that written notice thereof is given by ICE to NYBOT; or

(c) if NYBOT or any of the other Persons described in Section 6.2 as Affiliates, agents or Representatives of NYBOT shall breach Section 6.2 in any material respect.

8.4. <u>Termination by NYBOT</u>. This Agreement may be terminated and the Merger may be abandoned at any time prior to (x) in the case of clause (a) below, the approval by NYBOT Members referred to in Section 7.1(a), and (y) in the case of clause (b) below, the Effective Time, whether, in the case of such clause (b), before or after the approval by NYBOT Members referred to in Section 7.1(a), and, in either case, by action of the Board of Directors of NYBOT:

(a) if (i) NYBOT is not in breach in any material respect of Section 6.2 or in breach in any material respect of any other terms of this Agreement, (ii) the Board of Directors of NYBOT authorizes NYBOT, subject to complying with the terms of this Agreement, to enter into a binding written agreement providing for a transaction that constitutes a Superior Proposal and NYBOT notifies ICE in writing that it intends to enter into such an agreement, attaching the most current version of such agreement to such notice, which agreement shall include all of the material terms and conditions of such Superior Proposal, (iii) ICE does not make, within five business days of receipt of NYBOT's written notification pursuant to clause (ii), an offer that the Board of Directors of NYBOT determines, in good faith after consultation with its financial advisors and outside legal counsel, would cause the transaction that is the subject of NYBOT's written notification pursuant to clause (ii) above, in light of such offer, to no longer be a Superior Proposal and (iv) NYBOT shall have paid to ICE, in immediately available funds any fees required to be paid pursuant to Section 8.5; provided, however, that NYBOT agrees (x) that it will not enter into a binding agreement referred to in clause (ii) above until at least the sixth business day after it has provided the notice to ICE required under clause (ii) above; and (y) to notify ICE promptly if its intention to enter into a written agreement referred to in its notification shall change at any time after giving such notification;

(b) if ICE shall have breached in any material respect any of its representations or warranties contained in this Agreement or failed to perform in any material respect any of its covenants or agreements contained in this Agreement, which breach or failure to perform would render unsatisfied any condition in Section 7.2(a) or 7.2(b) and (i) is not curable or (ii) if curable, is not cured prior to the earlier of (A) the business day prior to the Termination Date or (B) the date that is 30 days after written notice thereof is given by NYBOT to ICE.

8.5. <u>Effect of Termination and Abandonment; Termination Fee and Expense Reimbursement</u>.

(a) <u>Effect of Termination and Abandonment</u>. In the event of termination of this Agreement and the abandonment of the Merger pursuant to this Article VIII, this Agreement (other than as set forth in Section 9.1) shall become void and of no effect with no liability on the part of any party hereto (or of any of its directors, officers, employees, agents, legal and financial advisors or other representatives); provided,

-36-

Table of Contents

however, except as otherwise provided herein, that no such termination shall relieve any party hereto of any liability or damages resulting from any willful or intentional breach of this Agreement.

(b) Termination Fee and Expense Reimbursement by NYBOT.

(i) In the event that this Agreement is terminated by NYBOT, pursuant to (A) Section 8.2(a) (Drop-Dead Date) and, at such time, ICE would have been permitted to terminate this Agreement pursuant to Section 8.3(a) (NYBOT Change in Recommendation), or (B) Section 8.4(a) (Superior Proposal Out), then NYBOT shall, prior to such termination, pay ICE a termination fee of $39 million (the "Termination Fee") and shall reimburse ICE for its out-of-pocket expenses up to $5 million (the "Expense Reimbursement" and, together with the Termination Fee, the "Aggregate Break-Up Amount"), in each case by wire transfer of same day funds.

(ii) In the event that this Agreement is terminated by ICE pursuant to Section 8.3(a) (NYBOT Change in Recommendation), then NYBOT shall promptly, but in no event later than two days after the date of such termination, pay ICE the Aggregate Break-Up Amount by wire transfer of same day funds.

(iii) In the event that an Acquisition Proposal shall have been made (and not subsequently withdrawn) to NYBOT or any of its Subsidiaries or any Person shall have publicly announced (and not subsequently withdrawn) a bona fide intention (whether or not conditional) to make an Acquisition Proposal with respect to NYBOT or any of its Subsidiaries and thereafter this Agreement is terminated:

(A) by either ICE or NYBOT pursuant to (x) Section 8.2(b) (NYBOT Requisite Vote) or (y) Section 8.2(a) (Drop Dead Date) and, at such time, the vote of the NYBOT Members to approve this Agreement has not been taken and the only condition set forth in Article VII that has not been satisfied (other than those conditions by their nature are to be satisfied at Closing) is the failure to have received the NYBOT Requisite Vote; or

(B) by ICE pursuant to Section 8.3(b) (NYBOT Breach of Covenant) or Section 8.3(c) (NYBOT Breach of Non-Solicit);

then, in each of cases (A) and (B), NYBOT shall promptly, but in no event later than two days after the date of such termination, pay the Expense Reimbursement to ICE and, if within 9 months of such termination (x) any Person (other than ICE) has acquired (or has entered into any Contract with NYBOT or any of its Subsidiaries providing for such acquisition), by purchase, merger, consolidation, sale, assignment, lease, transfer or otherwise, in one transaction or any related series of transactions, a majority of the voting power of or economic interest in the outstanding Membership Interests or other equity securities of NYBOT or a majority of the consolidated assets of NYBOT and its Subsidiaries, taken as a whole, or (y) there has been consummated a merger, consolidation or similar business combination between NYBOT and any Person (other than ICE) after which the NYBOT Members do not hold a majority of the voting power or economic interest in the surviving or successor company, then NYBOT shall, prior to the completion of such acquisition or transaction (or, if earlier, the entry into such Contract), pay the Termination Fee to ICE, by wire transfer of same day funds.

(c) Interest. NYBOT acknowledges that the agreements contained in this Section 8.5 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, ICE would not enter into this Agreement; accordingly, if NYBOT fails to promptly pay the amount due pursuant to this Section 8.5, and, in order to obtain such payment, ICE commences a suit that results in a judgment against NYBOT for the fee set forth in this Section 8.5 or any portion of such fee, NYBOT shall pay the other party its costs and expenses (including attorneys' fees) in connection with such suit, together with interest on the amount of the fee at the prime rate plus 200 basis points in effect on the date such payment was required to be paid, from the date such payment was required through the date of payment.

-37-

Table of Contents

ARTICLE IX

Miscellaneous and General

9.1. Survival. This Article IX and the agreements of ICE and NYBOT contained in Section 6.8 (Exchange Listing) and Section 6.13 (Indemnification; Directors' and Officers' Insurance) shall survive the consummation of the Merger. This Article IX, the agreements of ICE and NYBOT contained in Section 6.12 (Expenses), Section 8.5 (Effect of Termination and Abandonment; Termination Fee and Expense Reimbursement) and the Confidentiality Agreement shall survive the termination of this Agreement. No other representations, warranties, covenants and agreements in this Agreement shall survive the consummation of the Merger or the termination of this Agreement.

9.2. Modification or Amendment. Subject to the provisions of applicable Law, at any time prior to the Effective Time, this Agreement may be amended, modified or supplemented (a) only by a written instrument executed and delivered by all of the parties hereto, (b) by action taken or authorized by their respective Boards of Directors, and (c) before or after approval of the matters presented in connection with the Merger by NYBOT Members, but, after any such approval, no amendment shall be made which by Law or in accordance with the rules of any relevant stock exchange requires further approval by such Members or stockholders without such further approval.

9.3. Waiver of Conditions. The conditions to each of the parties' obligations to consummate the Merger are for the sole benefit of such party and may be waived by such party in whole or in part to the extent permitted by applicable Law.

9.4. Counterparts. This Agreement may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

9.5. GOVERNING LAW AND VENUE; WAIVER OF JURY TRIAL.

(a) THIS AGREEMENT SHALL BE DEEMED TO BE MADE IN, AND IN ALL RESPECTS SHALL BE INTERPRETED, CONSTRUED AND GOVERNED BY AND IN ACCORDANCE WITH THE LAW OF, THE STATE OF DELAWARE WITHOUT REGARD TO THE CONFLICT OF LAW PRINCIPLES THEREOF. The parties hereby irrevocably submit to the exclusive jurisdiction of the courts of the State of Delaware and the Federal Courts of the United States of America located in the State of Delaware in respect of the interpretation and enforcement of the provisions of this Agreement and of the documents referred to in this Agreement, and in respect of the transactions contemplated hereby, and hereby waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof or of any such document, that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that the venue thereof may not be appropriate or that this Agreement or any such document may not be enforced in or by such courts, and the parties hereto irrevocably agree that all claims with respect to such action or proceeding shall be heard and determined in such a Delaware State or Federal Court. The parties hereby consent to and grant any such court jurisdiction over the person of such parties and, to the extent permitted by Law, over the subject matter of such dispute and agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 9.6 or in such other manner as may be permitted by Law shall be valid and sufficient service thereof.

(b) EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR

-38-

Table of Contents

ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.5.

9.6. <u>Notices</u>. Any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, or by facsimile:

(a) If to ICE, to:

> IntercontinentalExchange, Inc.
> 2100 RiverEdge Parkway, Suite 500
> Atlanta, GA 30328
> Tel: (770) 857-4700
> Fax: (770) 951-5481
> Attention: General Counsel

> with a copy to:

> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, NY 10004
> Tel: (212) 558-4000
> Fax: (212) 558-3588
> Attention: John Evangelakos, Esq.

(b) If to NYBOT, to:

> Board of Trade of the City of New York, Inc.
> One North End Avenue
> World Financial Center
> New York, NY 10282-1101
> Tel: (212) 748-4000
> Fax: (212) 748-4089
> Attention: General Counsel

> with a copy to:

> Milbank, Tweed, Hadley & McCloy LLP
> 1 Chase Manhattan Plaza
> New York, NY 10005
> Tel: (212) 530-5735
> Fax: (212) 822-5735
> Attention: Roland Hlawaty, Esq.

or to such other persons or addresses as may be designated in writing by the party to receive such notice as provided above.

9.7. <u>Entire Agreement</u>. This Agreement (including any exhibits hereto), the ICE Disclosure Letter, the NYBOT Disclosure Letter and the Confidentiality Agreement, dated March 31, 2006, between ICE and NYBOT (the "Confidentiality Agreement") constitute the entire agreement, and supersede all other prior agreements, understandings, representations and warranties both written and oral, among the parties, with respect to the subject matter hereof.

9.8. <u>No Third-Party Beneficiaries</u>. Except as provided in Section 6.13 (Indemnification; Directors' and Officers' Insurance), this Agreement is not intended to, and does not, confer upon any Person other than the

-39-

Table of Contents

parties who are signatories hereto any rights or remedies hereunder. The parties hereto further agree that the rights of third party beneficiaries under Section 6.13 shall not arise unless and until the Effective Time occurs.

9.9. Transfer Taxes. Except as otherwise provided in Section 6.12, all transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including penalties and interest) incurred in connection with the Merger shall be paid by the party upon which such Taxes are imposed.

9.10. Definitions. Each of the terms set forth in Annex A is defined on the page of this Agreement set forth opposite such term.

9.11. Severability. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability or the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

9.12. Interpretation; Construction.

(a) The table of contents and headings herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof. Where a reference in this Agreement is made to a Section or Exhibit, such reference shall be to a Section of or Exhibit to this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The term "knowledge of ICE" shall be deemed to mean the actual knowledge of the individuals set forth on Exhibit C. The term "knowledge of NYBOT" shall be deemed to mean the actual knowledge of the individuals set forth on Exhibit D. The term "NYBOT" includes any entity that is treated as a predecessor of NYBOT or any of its Subsidiaries.

(b) The parties have participated jointly in negotiating and drafting this Agreement. In the event that an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

9.13. Assignment. This Agreement shall not be assignable by operation of Law or otherwise. Any purported assignment in violation of this Agreement shall be void.

[The next page is the signature page]

-40-

Table of Contents

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto as of the date first written above.

INTERCONTINENTALEXCHANGE, INC

By        /S/   JEFFREY C  SPRECHER
Name:        Jeffrey C. Sprecher
Title:        Chief Executive Officer

CFC ACQUISITION CO.

By        /S/   JEFFREY C. SPRECHER
Name        Jeffrey C  Sprecher
Title:        Chief Executive Officer and President

BOARD OF TRADE OF THE CITY OF NEW YORK, INC

By        /S/   C  HARRY FALK
Name:        C. Harry Falk
Title:        President and Chief Executive Officer

*Signature Page for Merger Agreement*

Table of Contents

Exhibit A

**AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**
**OF**
**CFC ACQUISITION CO.**

FIRST. The name of the corporation is CFC Acquisition Co.

SECOND. The address of the corporation's registered office in the State of Delaware, County of New Castle, is 1209 Orange Street, Wilmington, Delaware 19801. The name of its registered agent at such address is The Corporation Trust Company.

THIRD. The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

FOURTH. The total number of shares which the corporation shall have authority to issue is 100 shares of Common Stock, and the par value of each of such shares is $0.01.

FIFTH. The name and mailing address of the incorporator is Andrew J. Surdykowski, 2100 River Edge Parkway, Suite 500, Atlanta, Georgia 30328.

SIXTH. The board of directors of the corporation is expressly authorized to adopt, amend or repeal bylaws of the corporation in accordance with the terms of such bylaws.

SEVENTH. Elections of directors need not be by written ballot except and to the extent provided in the bylaws of the corporation.

EIGHTH. The number of directors of the corporation shall be fixed by, or in the manner provided in, the bylaws of the corporation.

NINTH. Any action required by law to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

TENTH. A director of the corporation shall not be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent that such exemption from liability or limitation thereof is not permitted under the Delaware General Corporation Law as currently in effect or as the same may hereafter be amended. No amendment, modification or repeal of this Article TENTH shall adversely affect any right or protection of a director that exists at the time of such amendment, modification or repeal.

ELEVENTH. The corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that such person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a

Table of Contents

presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful. The corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that such person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection with the defense or settlement of such action or suit if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the corporation and except that the corporation shall not make any indemnification in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnification for such expenses which the Court of Chancery or such other court shall deem proper. To the extent that a present or former director or officer of the corporation has been successful on the merits or otherwise in the defense of any action, suit or proceeding referred to in this Article ELEVENTH, or in defense of any claim, issue or matter therein, the corporation shall indemnify such person against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith. Any indemnification under this Article ELEVENTH (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that indemnification of the present or former director, officer, employee or agent is proper in the circumstances because such person has met the applicable standard of conduct set forth in this Article ELEVENTH. Such determination shall be made, with respect to a person who is a director or officer at the time of such determination, (1) by a majority vote of the directors who are not parties to such action, suit or proceeding, even though less than a quorum, or (2) by a committee of such directors designated by majority vote of such directors, even though less than a quorum, or (3) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion, or (4) by the stockholders. Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this Article ELEVENTH. Such expenses (including attorneys' fees) incurred by former directors and officers or other employees and agents shall be paid upon such terms and conditions, if any, as the corporation deems appropriate. The indemnification and advancement of expenses provided by, or granted pursuant to, this Article ELEVENTH shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any by-law, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office. The rights provided to any person by this Article ELEVENTH shall be enforceable against the corporation by such person who shall be presumed to have relied upon it in serving or continuing to serve as a director, officer, employee or agent as provided above. No amendment of this Article ELEVENTH shall impair the rights of any person arising at any time with respect to events occurring prior to such amendment. For purposes of this Article ELEVENTH, references to "the Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees and agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this Article ELEVENTH with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued; reference to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan; references to "serving at the request of the corporation" shall include any service as a

2

Table of Contents

director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; references to "agents" shall include any member of any Trade Committee or Exchange Committee; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this Article ELEVENTH. The indemnification and advancement of expenses provided by, or granted pursuant to, this Article ELEVENTH shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

3

Table of Contents

IN WITNESS WHEREOF, I have signed this certificate of incorporation this [•] day of [•].

By: _____
Name:
Title:

*Signature Page for Certificate of Incorporation*

Table of Contents

Exhibit B

**FORM OF**
**BYLAWS**
**OF**
**BOARD OF TRADE OF THE CITY OF NEW YORK, INC.**
**ADOPTED EFFECTIVE [●], 2006**

**ARTICLE I**
**DEFINITIONS; INTERPRETATION; ANNEXES AND SCHEDULES**

Section 1.1 Capitalized terms used but not defined herein shall have their respective meanings set forth in <u>Annex D.</u>

Section 1.2 Any reference in these Bylaws to the Delaware General Corporation Law shall be to the Delaware General Corporation Law as it now exists or as it may hereafter be amended.

Section 1.3 The Annexes hereto (and any Schedules thereto) are hereby incorporated by reference into, and shall be deemed to be part of, these Bylaws.

Section 1.4 To the extent that there is any conflict or inconsistency between the Bylaws and the Rules, the Bylaws shall control.

**ARTICLE II**
**OFFICES**

Section 2.1 The registered office of Board of Trade of the City of New York, Inc. (the "<u>Corporation</u>" or "<u>NYBOT</u>") shall be in the City of Wilmington, County of New Castle, State of Delaware. The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors of the Corporation (the "<u>Board of Directors</u>") may from time to time determine or the business of the Corporation may require.

**ARTICLE III**
**MEETINGS OF STOCKHOLDERS**

Section 3.1 <u>Annual Meetings</u>.

(a) Annual meetings of stockholders shall be held at such date and time as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting, at which they shall elect the Board of Directors and transact such other business as may properly be brought before the meeting

(b) Notice of the annual meeting stating the place, if any, date and hour of the meeting, and the means of remote communications, if any, by which stockholders may be deemed to be present in person and vote at such meeting, shall be given to each stockholder entitled to vote at such meeting not fewer than ten (10) nor more than sixty (60) days before the date of the meeting. If mailed, such notice shall be deemed to be given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the Corporation.

Section 3.2 <u>Special Meetings</u>.

(a) Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute or by the certificate of incorporation of the Corporation (the "<u>Certificate of Incorporation</u>"), may be called at any time by the Board of Directors, the Chairman of the Board, if any, or the Chief Executive

Table of Contents

Officer, or by the Secretary upon the written request of holders of common stock representing in the aggregate at least 50% of the shares of common stock outstanding at such time. Such request shall state the purpose or purposes of the proposed meeting. At any special meeting, only such business may be transacted which is related to the purpose or purposes set forth in the notice of such special meeting given pursuant to Section 3.2(b) of these Bylaws.

(b) Notice of a special meeting stating the place, if any, date and hour of the meeting and the purpose or purposes for which the meeting is called, and the means of remote communications, if any, by which stockholders may be deemed to be present in person and vote at such meeting, shall be given not fewer than ten (10) nor more than sixty (60) days before the date of the meeting, to each stockholder entitled to vote at such meeting. If mailed, such notice shall be deemed to be given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the Corporation.

Section 3.3 Stockholder List. At the written request of any stockholder, the Secretary shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof and may be inspected by any stockholder who is present.

Section 3.4 Quorum. The holders of a majority of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute or by the Certificate of Incorporation or these Bylaws. When a quorum is once present to organize a meeting, it is not broken by the subsequent withdrawal of any stockholders. The stockholders present in person or by proxy and entitled to vote may, by a majority of the votes cast, adjourn the meeting despite the absence of a quorum.

Section 3.5 Adjournment. Any meeting of stockholders, annual or special, may be adjourned from time to time in accordance with Section 3.6 hereof, to reconvene at the same or some other place, if any, and notice need not be given of any such adjourned meeting if the time and place thereof, and the means of remote communications, if any, by which stockholders may be deemed to be present in person and vote at such meeting, are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting in conformity with the requirements of these Bylaws.

Section 3.6 Organization. Meetings of stockholders shall be presided over by the Chairman of the Board, if any, or in the absence of the Chairman of the Board by the Vice Chairman of the Board, if any, or in the absence of the Vice Chairman of the Board by the Chief Executive Officer, or in the absence of the Chief Executive Officer by a Vice President, or in the absence of the foregoing persons by a Chairman designated by the Board of Directors, or in the absence of such designation by a Chairman chosen at the meeting. The Secretary, or in the absence of the Secretary an Assistant Secretary, shall act as Secretary of the meeting, but in the absence of the Secretary and any Assistant Secretary the Chairman of the meeting may appoint any person to act as Secretary of the meeting. The order of business at each such meeting shall be as determined by the Chairman of the meeting. The Chairman of the meeting shall have the right, power and authority to adjourn a meeting of stockholders for a reasonable period of time to another place, if any, date and time, and to prescribe such rules, regulations and procedures and to do all such acts and things as are necessary or desirable for the proper conduct of the meeting and are not inconsistent with any rules, regulations or procedures adopted by the Board of Directors pursuant to

2

Table of Contents

the provisions of the Certificate of Incorporation, including, without limitation, the establishment of procedures for the maintenance of order and safety, limitations on the time allotted to questions or comments on the affairs of the Corporation, restrictions on entry to such meeting after the time prescribed for the commencement thereof and the opening and closing of the voting polls for each item upon which a vote is to be taken.

Section 3.7 <u>Vote; Proxies</u>. Unless otherwise provided in the Certificate of Incorporation, each stockholder entitled to vote at any meeting of stockholders shall be entitled to one (1) vote for each share of stock held by such stockholder which has voting power upon the matter in question. Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another Person or Persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power, regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by filing an instrument in writing revoking the proxy or another duly executed proxy bearing a later date with the Secretary of the Corporation. Voting at meetings of stockholders need not be by written ballot and need not be conducted by inspectors unless the holders of a majority of the outstanding shares of all classes of stock entitled to vote thereon present in person or represented by proxy at such meeting shall so determine. Directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors. In all other matters, unless otherwise provided by law or by the Certificate of Incorporation or these Bylaws, the affirmative vote of the holders of a majority of the shares present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders. Where a separate vote by class or classes is required, the affirmative vote of the holders of a majority of the shares of such class or classes present in person or represented by proxy at the meeting shall be the act of such class or classes, except as otherwise provided by law or by the Certificate of Incorporation or these Bylaws.

Section 3.8 <u>Record Dates</u>.

(a) In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, or delegate the task of fixing a record date to a committee consisting of one or more directors of the Corporation, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; <u>provided</u>, <u>however</u>, that the Board of Directors may fix a new record date for the adjourned meeting.

(b) In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered

3

Table of Contents

mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c) In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of shares of capital stock of the Corporation ("*Shares*"), or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 3.9 <u>Action by Written Consent</u>. Unless otherwise provided in the Certificate of Incorporation or by law, whenever stockholders are required or permitted to take any action by vote, such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding Shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Shares entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of stockholders to take the action were delivered to the Corporation as provided in this Section 3.9.

## ARTICLE IV
## DIRECTORS

Section 4.1 <u>Number; Election; Qualifications</u>.

(a) Until [●] (the "<u>Two-Year Anniversary</u>"), the number of directors constituting the entire Board of Directors shall be nine, consisting of the Chief Executive Officer of IntercontinentalExchange, Inc. or any successor to, or successor owner of, IntercontinentalExchange, Inc. ("<u>ICE</u>"), the Chief Financial Officer of ICE, the Chief Executive Officer or the President of the Corporation, the two NYBOT Designees (as hereinafter defined) and four representatives who are not Trading Members of the Exchange and qualify as Public Directors, and acting by a majority vote of the total number of directors.[1] After the Two-Year Anniversary, the number of directors shall be the number, not less than three, fixed from time to time by the Board of Directors, acting by a majority vote of the total number of directors which the Corporation would have, prior to any increase or decrease, determined as if there were no vacancies, <u>provided</u>, that no decrease shall shorten the term of any incumbent director; and <u>provided</u>, <u>further</u>, that until [●] (the "<u>Four-Year Anniversary</u>"), the Board of Directors shall consist of at least four Public Directors.

(b) Each director shall be elected by the stockholders at their annual meeting; <u>provided</u>, <u>however</u>, that the NYBOT Designees shall not be required to be elected at any such annual meeting until after the Two-Year Anniversary. Each initial Public Director shall hold office for four (4) consecutive one (1) year terms from the Effective Date and shall be reelected by ICE at each annual meeting called for such purpose

---

[1]   The initial composition of the board is being set forth in the Merger Agreement. The initial board will be comprised of Jeff Sprecher, Richard Spencer, a CEO or President appointed by ICE, two NYBOT Designees (one of whom shall be the Chairman) and four representatives who are not Members of the Exchange and who meet the definition of "Public Directors" under present CFTC proposals. Such NYBOT Designees and representatives will be selected in accordance with the terms of the Merger Agreement.

4

**Table of Contents**

if such Public Director is nominated by a majority of the other Public Directors; provided, that if ICE fails to elect any such Public Director for any reason, such Public Director shall continue in office as provided in the immediately succeeding sentence. Each director shall hold office until the next election, and until his or her successor is elected and qualified or until his or her earlier death, resignation or removal. Any director may resign at any time upon written notice or by electronic transmission given to the Board of Directors or to the Chief Executive Officer or the Secretary of the Corporation. Such resignation shall take effect at the time specified therein, and unless otherwise specified therein, no acceptance of such resignation shall be necessary to make it effective.

(c) Directors need not be stockholders.

(d) Notwithstanding anything to the contrary set forth herein, no director who is a NYBOT Designee may be removed solely because he or she fails to qualify as a Public Director. In the event applicable CFTC rules or other requirements require that additional directors of the Corporation qualify as Public Directors, the Board of Directors, after consultation with the Public Directors, shall cause the Corporation to take all necessary actions to increase the size of the Board of Directors by such number of Public Directors as is necessary to satisfy then applicable laws or CFTC rules or requirements relating to the independence of directors.

Section 4.2 Vacancies. Any vacancies resulting from death, resignation, disqualification, removal or other cause, and newly created directorships resulting from any increase in the authorized number of directors or from any other cause, shall be filled by, and only by, directors then in office, even if less than a quorum, or by the sole remaining director; provided, however, that until the Four-Year Anniversary (with respect to the Public Directors) and the Two-Year Anniversary (with respect to the NYBOT Designees), (i) any vacancy in a directorship most recently held by either of [        ] or [        ] (each, a "NYBOT Designee") shall be filled by, and only by, an individual nominated by the remaining NYBOT Designee, if then holding office (and in the event there is no remaining NYBOT Designee, the directors then in office shall fill each such vacancy by selecting an individual from Annex E) and (ii) any vacancy in a directorship most recently held by one of the four Public Directors shall be filled by, and only by, an individual appointed by the remaining Public Directors then holding office and approved by ICE (such approval not to be unreasonably withheld); provided, further, however, that if the directorship then vacated was held by a NYBOT Designee that qualified as a Public Director, his or her successor must qualify as a Public Director. In the event that there is a vacancy in a directorship required to be held by one of the two NYBOT Designees, the remaining NYBOT Designee or, in the event there is no remaining NYBOT Designee, the directors then in office, shall act to ensure that such vacancy is filled promptly (and in any event within two weeks of the occurrence of such vacancy). In the event there is a vacancy in a directorship most recently held by one of the Public Directors, the Public Directors then holding office and ICE shall act to ensure that such vacancy is filled promptly (and in any event within two weeks of the occurrence of such vacancy). If any such vacancy is not filled within such two week period, the stockholders may fill such seat with a Person who would qualify as a NYBOT Designee or a Public Director, as the case may be. Prior to the Two-Year Anniversary, the stockholders shall not remove any NYBOT Designee from the Board of Directors without cause. Prior to the Four-Year Anniversary, the stockholders shall not remove any Public Director from the Board of Directors without cause. If the Board of Directors fails to adopt and approve fees or charges for a Commodity Contract proposed by ICE (provided that such proposed fees or charges do not violate Section 4(b) of Annex A or Section 4 of Annex B) or fails to approve any bona fide market maker programs that are consistent with standard industry practices, the stockholders shall have the right to remove for cause any director who has not voted to adopt and approve such proposed fees or charges, or market maker programs (including, in any such case, any director who abstains from a vote to adopt and approve such proposed fees and charges, or market maker programs). Any director elected or appointed to fill a vacancy or a newly created directorship shall hold office until the next annual election and until his or her successor is duly elected and shall qualify, or until his or her earlier resignation or removal.

Section 4.3 Authority. The business of the Corporation shall be managed by or under the direction of its Board of Directors.

5

Table of Contents

Section 4.4 <u>Meetings</u>. The Board of Directors may hold meetings, both regular and special, either within or without the State of Delaware.

(a) Regular meetings of the Board of Directors may be held at such time and at such place as shall from time to time be determined by the Board of Directors and publicized among all directors, and if so determined and publicized, notice thereof need not be given.

(b) Special meetings of the Board of Directors may be called by the Chairman of the Board, if any, by the Vice Chairman of the Board, if any, by the Chief Executive Officer or by any two directors on reasonable notice to each director either personally or by mail, e-mail or facsimile, which notice, with respect to each director, may be waived in writing by such director.

Section 4.5 <u>Quorum</u>. At each meeting of the Board of Directors, a majority of the total number of directors fixed hereby (including any vacancies) shall constitute a quorum. The vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors unless the Certificate of Incorporation or these Bylaws shall require a vote of a greater number. In case at any meeting of the Board of Directors a quorum shall not be present, the members of the Board of Directors present may adjourn the meeting from time to time until a quorum shall be present.

Section 4.6 <u>Organization</u>. Meetings of the Board of Directors shall be presided over by the Chairman of the Board, if any, or in the absence of the Chairman of the Board by the Vice Chairman of the Board, if any, or in the absence of the Vice Chairman of the Board by the Chief Executive Officer, or in their absence by a Chairman chosen at the meeting. The Secretary, or in the absence of the Secretary an Assistant Secretary, shall act as Secretary of the meeting, but in the absence of the Secretary and any Assistant Secretary the Chairman of the meeting may appoint any person to act as Secretary of the meeting.

Section 4.7 <u>Action by Written Consent</u>. Any action required or permitted to be taken at any meeting of the Board of Directors or any committee thereof may be taken without a meeting if all of the members of the Board of Directors or of such committee, as the case may be, consent thereto in writing or by electronic transmission and the writing or writings or transmission or transmissions are filed with the minutes of the Corporation. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 4.8 <u>Participation in Meetings by Means of Remote Communication</u>. Members of the Board of Directors, or of any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors or of such committee, as the case may be, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

## ARTICLE V
## COMMITTEES OF DIRECTORS

Section 5.1 <u>Composition</u>. The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

Section 5.2 <u>Scope of Authority</u>. Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management

6

of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that require it; but no such committee shall have such power or authority in reference to the following matters: (a) approving or adopting, or recommending to the stockholders, any action or matter expressly required by the Delaware General Corporation Law to be submitted to stockholders for approval; and (b) adopting, amending or repealing any provision of these Bylaws.

Section 5.3 <u>Organization</u>. Unless the Board of Directors otherwise provides, each committee designated by the Board of Directors may adopt, amend and repeal rules for the conduct of its business. In the absence of a provision by the Board of Directors or a provision in the rules of such committee to the contrary, a majority of the entire authorized number of members of such committee shall constitute a quorum for the transaction of business, the vote of a majority of the members present at a meeting at the time of such vote if a quorum is then present shall be the act of such committee, and in other respects each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to Article IV of these Bylaws.

## ARTICLE VI
## COMPENSATION OF DIRECTORS

Section 6.1 Any action taken by the Board of Directors or any committee thereof with respect to the compensation and benefits of directors of the Corporation shall be approved by the stockholders.

## ARTICLE VII
## TRADING RIGHTS; ELECTRONIC TRADING; TRADE COMMITTEES;
## EXCHANGE COMMITTEES

Section 7.1 In connection with issuing rights with respect to certain matters regarding the trading of Commodity Contracts on the Exchange, the Corporation shall comply with the requirements set forth in <u>Annex A</u>.

Section 7.2 In connection with conducting, or arranging for the conduct, of electronic trading on the Exchange, the Corporation shall comply with the requirements of <u>Annex B</u>.

Section 7.3 The Corporation shall have certain Trade Committees (as defined in <u>Annex C</u>), the authority of, procedures governing and duration of which shall be as set forth in <u>Annex C</u>. No Trade Committee, or member thereof, in his or her capacity as such, shall have the authority to bind the Corporation. Each Trade Committee shall have only such authority as is expressly granted to such Trade Committee by these Bylaws or by the Board of Directors. The Trade Committees shall not be deemed to be committees of the Board of Directors. No term or condition of any Commodity Contract involving a Core Product may be adopted, altered, repealed or amended without the approval of a majority of the members of the applicable Trade Committee.

Section 7.4 The Exchange shall have such committees ("<u>Exchange Committees</u>") as are provided for in the Rules or as the Board of Directors shall appoint from time to time. Subject to the limitations provided in these Bylaws, including the Annexes hereto, on the authority and power of Trade Committees, Exchange Committees shall have such powers as may be delegated to them from time to time by the Board of Directors; <u>provided</u>, <u>however</u>, that such powers shall in no case exceed such powers as the Board of Directors might delegate lawfully to an officer of the Exchange. Unless otherwise specifically provided in the Rules, Exchange Committees shall have such number and composition as the Board of Directors may from time to time determine. The Chairman of the Board of Directors shall appoint a chairman of every committee and may appoint such vice chairmen as he may deem desirable. The Exchange Committees shall not be deemed to be committees of the Board of Directors.

7

[Table of Contents](#)

## ARTICLE VIII
## NOTICES

Section 8.1 Whenever any notice is required by law, the Certificate of Incorporation or these Bylaws to be given, a waiver thereof in writing, signed by the person or persons entitled to said notice, or a waiver thereof by electronic transmission by such person, whether given before or after the time stated therein, shall be deemed equivalent thereto. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders, directors or members of a committee of directors need be specified in any written waiver of notice unless so required by the Certificate of Incorporation or these Bylaws. If mailed, notice to stockholders shall be deemed given when deposited in the mail, postage prepaid, directed to the stockholder at the stockholder's address as it appears on the records of the Corporation. Without limiting the manner by which notices otherwise may be given effectively to stockholders, any notice to stockholders may be given by electronic transmission in the manner provided in Section 232 of the Delaware General Corporation Law.

## ARTICLE IX
## OFFICERS

Section 9.1 The Board of Directors may elect from among its members a Chairman of the Board and a Vice Chairman of the Board; provided, however, that for any term expiring prior to the Two-Year Anniversary and so long as a NYBOT Designee is a director, a NYBOT Designee shall be the Chairman of the Board. The Board of Directors may also choose officers of the Corporation, which may include a Chief Executive Officer, a President, one or more Senior Vice Presidents, a Chief Financial Officer and a Secretary (collectively, the "Senior Officers") and may also choose one or more Vice Presidents, Assistant Secretaries, Treasurers and Assistant Treasurers and such other officers as the Board of Directors may deem desirable or appropriate and may give any of them such further designations or alternate titles as it considers desirable.[2] In addition, the Board of Directors at any time and from time to time may authorize any officer of the Corporation to appoint one or more officers of the kind described in the immediately preceding sentence (other than any Senior Officers). Any number of offices may be held by the same person and directors may hold any office, unless the Certificate of Incorporation or these Bylaws otherwise provide.

Section 9.2 Unless otherwise provided in the resolution of the Board of Directors electing or authorizing the appointment of any officer, each officer of the Corporation shall hold office until his or her successor is chosen and qualifies or until his or her earlier resignation or removal. Any officer may resign at any time upon written notice to the Board of Directors or to the Chief Executive Officer or the Secretary of the Corporation. Such resignation shall take effect at the time specified therein or, if no time is so specified, immediately upon delivery, and unless otherwise specified therein no acceptance of such resignation shall be necessary to make it effective. Any officer may be removed with or without cause at any time by the affirmative vote of a majority of the Board of Directors. Any officer authorized by the Board of Directors to appoint a person to hold an office of the Corporation may also remove such person from such office with or without cause at any time, unless otherwise provided in the resolution of the Board of Directors providing such authorization. Any such removal shall be without prejudice to the contractual rights of such officer, if any, with the Corporation, but the election of an officer shall not of itself create contractual rights. Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors.

Section 9.3 Any action taken by the Board of Directors or any committee thereof with respect to the compensation and benefits of officers of the Corporation shall be approved by the stockholders.

---

[2]    The appointment of the NYBOT executives as the initial executive officers will be handled by board resolution and employment agreements.

8

Table of Contents

## ARTICLE X
## CERTIFICATES OF STOCK

Section 10.1 The shares of stock in the Corporation shall be uncertificated shares except, to the extent, if any, required by applicable law, every holder of stock in the Corporation shall be entitled to have a certificate, signed by, or in the name of the Corporation by the Chief Executive Officer or a Vice President and the Chief Financial Officer or an Assistant Treasurer, the Secretary or an Assistant Secretary of the Corporation, certifying the number of shares of stock registered in certificate form owned by him or her in the Corporation. Any of or all the signatures on any such certificate may be facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer, transfer agent or registrar at the date of issue.

## ARTICLE XI
## REGISTERED STOCKHOLDERS

Section 11.1 The Corporation shall be entitled to recognize the exclusive right of a Person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other Person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

## ARTICLE XII
## FISCAL YEAR

Section 12.1 The fiscal year of the Corporation shall be the calendar year or such other period as may be fixed by the Board of Directors.

## ARTICLE XIII
## INDEMNIFICATION, EXCULPATION AND INSURANCE

Section 13.1

(a) A director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent that such exemption from liability or limitation thereof is not permitted under the Delaware General Corporation Law as currently in effect or as the same may hereafter be amended. No amendment, modification or repeal of this Section 13.1(a) shall adversely affect any right or protection of a director that exists at the time of such amendment, modification or repeal.

(b) The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that such person is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in

9

[Table of Contents](#)

good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful. The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that such person is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection with the defense or settlement of such action or suit if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation and except that the Corporation shall not make any indemnification in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnification for such expenses which the Court of Chancery or such other court shall deem proper. To the extent that a present or former director or officer of the Corporation has been successful on the merits or otherwise in the defense of any action, suit or proceeding referred to in this Section 13.1(b), or in defense of any claim, issue or matter therein, the Corporation shall indemnify such person against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith. Any indemnification under this Section 13.1(b) (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the present or former director, officer, employee or agent is proper in the circumstances because such person has met the applicable standard of conduct set forth in this Section 13.1(b). Such determination shall be made, with respect to a person who is a director or officer at the time of such determination, (1) by a majority vote of the directors who are not parties to such action, suit or proceeding, even though less than a quorum, or (2) by a committee of such directors designated by majority vote of such directors, even though less than a quorum, or (3) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion, or (4) by the stockholders. Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation as authorized in this Section 13.1(b). Such expenses (including attorneys' fees) incurred by former directors and officers or other employees and agents shall be paid upon such terms and conditions, if any, as the Corporation deems appropriate. The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 13.1(b) shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office. The rights provided to any person by this Section 13.1(b) shall be enforceable against the Corporation by such person who shall be presumed to have relied upon it in serving or continuing to serve as a director, officer, employee or agent as provided above. No amendment of this Section 13.1(b) shall impair the rights of any person arising at any time with respect to events occurring prior to such amendment. For purposes of this Section 13.1(b), references to "the Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees and agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this Section 13.1(b) with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued; reference to "other enterprises" shall include employee benefit plans; references to "fines" shall include any

10

Table of Contents

excise taxes assessed on a person with respect to any employee benefit plan; references to "serving at the request of the Corporation" shall include any service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; references to "agents" shall include any member of any Trade Committee or Exchange Committee; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in this Section 13.1(b). The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 13.1(b) shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

(c) Any actions, suits or proceedings against the Corporation or any of its officers, directors or employees must be brought within two (2) years from the time that a cause of action has accrued. Any party bringing any such action, suit or proceeding consents to jurisdiction in the courts of the State of Delaware and the Federal Courts of the United States of America located in the State of Delaware, and waives any objection to venue therein. This provision shall in no way create a cause of action and shall not authorize an action that would otherwise be prohibited by the Rules.

## ARTICLE XIV
## SEAL

Section 14.1 The Board of Directors may adopt a corporate seal having inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware." The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

## ARTICLE XV
## TIME PERIODS

Section 15.1 In applying any provision of these Bylaws that requires that an act be done or not be done a specified number of days prior to any event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE XVI
## AMENDMENTS

Section 16.1 The Board of Directors and the stockholders may adopt additional Bylaws, and may amend or repeal any Bylaws, whether or not adopted by them, at any time; provided, however, that:

Notwithstanding anything herein to the contrary, until July 1, 2013, the provisions described on Annex F and this Section 16.1 (the "Core Rights") shall not be amended or repealed, and no Bylaw that violates the Core Rights shall be adopted (a "Core Rights Amendment") unless (i) the Public Directors, by a Required Public Director Vote, determine that a Core Rights Amendment should be adopted and recommend the same to the Board of Directors and (ii) the Core Rights Amendment is approved by a vote of at least two-thirds of the entire Board of Directors, determined as if there were no vacancies; provided, however, that the size of the entire Board of Directors for purposes of calculating the two-thirds vote required by (ii) shall exclude the number of Public Directors, if any, that are barred from voting on such matter due to that fact that such Public Director or a member of such Public Director's immediate family, directly or indirectly, has a financial interest in such matter; provided, further, however, that for this purpose compensation paid by ICE to such Public Director for serving as a director of NYBOT shall not be deemed to be a financial interest. For the avoidance of doubt, notwithstanding

11

Table of Contents

any provision of these Bylaws or the Annexes to these Bylaws, any action permitted to be taken under these Bylaws and taken in accordance with these Bylaws shall not be deemed to be a Core Right Amendment. The Board of Directors shall not adopt, alter or amend these Bylaws in a manner that violates this Article XVI.

Section 16.2 The Board of Directors shall not adopt any Rules or make any amendment to the Rules that would be inconsistent with these Bylaws.

**ARTICLE XVII**
**MISCELLANEOUS**

Section 17.1 Unless otherwise provided in the Rules, any alteration of the Rules relating to Commodity Contracts, may, if the Board of Directors so decides, be binding on Commodity Contracts entered into before as well as after its adoption, provided such alteration does not affect the amount of money to be paid, or the quality of the merchandise to be received, under such Commodity Contracts, in which case such alteration may only apply with respect to the first delivery or expiration month following the last delivery or expiration month in which there is an open position at the time such alteration becomes effective;

Section 17.2 All Rules shall be binding and effective and in force, and shall govern all cases to which they may be applicable, at such time as the Board of Directors prescribes or, if the Board of Directors does not so prescribe, on such date as the President may prescribe following the date on which such Rule may become effective under the Commodity Exchange Act and the regulations promulgated thereunder; and

Section 17.3 The correct interpretation or meaning of any Rule may, in the discretion of the Board of Directors, be determined by a two-thirds vote of the Board of Directors present at any regular meeting or any special meeting called for that purpose, and such interpretation shall continue in force until the ambiguity of such Rule is removed by proper amendment as herein provided, but no such determination of the Board of Directors shall in any way affect any rights accrued under any final decision theretofore rendered by any committee from which no appeal is pending or may be taken.

Section 17.4 The Board of Directors shall not adopt or amend any Rule to, or interpret the meaning of any Rule so as to, violate the rights of the stockholders under these Bylaws (including the Annexes hereto).

12

Table of Contents

**ANNEX A**
**TRADING MEMBERSHIPS AND TRADING PERMITS**

Section 1 <u>Issuance of Trading Memberships and Trading Permits</u>.

(a) *Trading Memberships*.

(i) The Corporation shall issue to each Former Member (and to no other Person) a NYBOT Membership upon receiving from such Former Member properly completed, executed copies of such NYBOT Membership application documentation as the Corporation shall have requested and delivered to such Former Member prior to the Effective Time. A NYBOT Member shall own, at all times, three thousand one hundred sixty two (3,162) shares of common stock, par value $0.01 per share, of ICE ("<u>ICE Common Stock</u>") (as adjusted for reclassifications, stock splits (including reverse stock splits), stock dividends or distributions, recapitalizations or similar transaction) for each NYBOT Membership held by such NYBOT Member. Any NYBOT Member that fails to hold such requisite number of shares of ICE Common Stock shall have such NYBOT Membership revoked and permanently cancelled. Each NYBOT Member shall grant to the Exchange a security interest in all of such shares of ICE Common Stock as provided in the Rules in a manner, and pursuant to arrangements, required by the Corporation. Each NYBOT Member shall have the right to execute trades in all Existing Products, to the extent that such Existing Products are then traded by the Exchange.

(ii) The Corporation may issue other Trading Memberships in such numbers and for such consideration as the Board of Directors may from time to time determine, subject to these Bylaws and the Rules, <u>provided</u>, <u>however</u>, that any Trading Membership issued other than pursuant to paragraph (a)(i), above, shall not include the right to execute Transactions on the Exchange trading floor.

(b) *Trading Permits*.

(i) The Corporation shall issue NYBOT Trading Permits to each Former Permit Holder (and to no other Person), upon receiving from such Former Permit Holder properly completed, executed copies of such Trading Permit application documentation as the Corporation shall have requested and delivered to such Former Permit Holder. Each such NYBOT Trading Permit shall be limited to the specific Commodity Contracts for which such Former Permit Holder had trading rights immediately prior to the Effective Time.

(ii) The Corporation may issue other Trading Permits in such numbers and for such consideration as the Board of Directors may from time to time determine, subject to these Bylaws and the Rules, <u>provided</u>, <u>however</u>, that any Trading Permits issued other than pursuant to paragraph (b)(i), above, shall not include the right to execute Transactions on the Exchange trading floor.

(c) Trading Members, Permit Holders, Member Firms and Lessees shall have only such rights and privileges as are set forth in these Bylaws, the Rules or as prescribed by the Board of Directors, which rights will exist as a matter of contract only. Trading Members, Permit Holders, Member Firms and Lessees shall not constitute stockholders within the meaning of the Delaware General Corporation Law, the Certificate of Incorporation, these Bylaws or the Rules, shall not have any of the rights and privileges of stockholders and shall have only such rights and privileges as are set forth in the Rules or as prescribed by the Board of Directors, which rights will exist as a matter of contract only. No director or officer of NYBOT shall have any fiduciary duty, obligation or responsibility of any nature to Trading Members, Permit Holders, Member Firms or Lessees by virtue of such contractual rights. Without limiting the generality of the foregoing, Trading Members, Permit Holders, Member Firms and Lessees will not have any voting rights in the Corporation or any rights to receive any distributions of cash, securities or other property, whether on dissolution, liquidation, merger, consolidation or otherwise.

Section 2 <u>Eligibility Criteria and Procedures</u>. The Board of Directors may from time to time adopt such eligibility criteria and application procedures for becoming a Trading Member, Permit Holder, Member Firm or

A-1

Table of Contents

Lessee and such requirements and procedures for acquisition, transfer, lease, sale or other disposition of a Trading Membership or a Trading Permit as the Board of Directors shall determine, subject to the provisions of Section 8(a) of this Annex A.

Section 3 Financial Standards and Reporting Requirements.

(a) The Board of Directors may from time to time adopt minimum financial standards and related reporting requirements to be complied with by Trading Members, Permit Holders, Member Firms and Lessees as a continuing condition to exercising or maintaining such status as a Trading Member, Permit Holder, Member Firm or Lessee, and, for purposes of imposing such standards and requirements, the Board of Directors may create such categories as it deems necessary or appropriate.

(b) Each Member Firm that is registered with the CFTC as a Futures Commission Merchant shall comply with Sections 1.10(a) (3), 1.10(b), 1.10(c), (d), (e) and (f) and 1.17 of the Regulations promulgated under the Commodity Exchange Act, provided that (i) any requirement specified in said Sections 1.10 or 1.17 concerning filing with or reporting to the Commission or the approval of the Commission shall not be considered a requirement of the Corporation; and (ii) any reference to a "designated self-regulatory organization" or "self-regulatory organization of which an FCM is a member" shall mean the Corporation unless the Corporation has notified any such Member Firm that this term shall mean another "self-regulatory organization".

Section 4 Transaction Fees.

(a) The Board of Directors may from time to time adopt resolutions that impose fees or charges for each Commodity Contract purchased or sold on the Exchange or subject to the Rules. In fixing the amount of any such fees or charges, the Board of Directors may, in its discretion, establish different rates for Transactions in different Commodity Contracts, or for different types of Transactions involving the same Commodity Contract, or may omit any such fees or charges with respect to any type of Transaction or may establish different rates based on such other factors as the Board of Directors may determine are appropriate. Such fees and charges shall be paid or collected by Persons in accordance with such terms and conditions as the Board of Directors may prescribe. If any Person fails to pay any fee or charge required pursuant to this Section, the Corporation may, in addition to any other rights or remedies it may have, order that any trading in Commodity Contracts for such Person's account be for liquidation only until such fees or charges are paid.

(b) Fees charged to any Person for electronic trading of "physical delivery" Core Products that were listed for trading as of September 14, 2006 shall be at least $1.00 more than the fees charged to such Person for open-outcry trading of such Core Products. In the case of NYBOT Members and NYBOT Member Firms, such fees shall be set after taking into account the discount provided in Section 4(a) of Annex B. The restriction provided in the first sentence of this subsection (b) shall not apply to fees related to bona fide market maker programs.

(c) In the event either (i) the Chicago Mercantile Exchange, Inc., the Board of Trade of the City of Chicago, Inc., the New York Mercantile Exchange, Inc., Eurex Frankfurt AG / Eurex Zurich AG, or Euronext.LIFFE, or in any such case one of their affiliates or successors, introduces a "physical delivery" contract after September 14, 2006 (and if such contract has been introduced prior to the Effective Time, such contract was not terminated or withdrawn prior to the Effective Time) that (x) has the same contract terms as a Core Product (other than immaterially different terms) or (y) has the same contract terms as a Core Product except that it is cash-settled (other than any immaterially different terms) or (ii) the Board of Directors of ICE requests that the Public Directors determine whether the introduction of a "physical delivery" contract by another exchange is a Competitive Contract (as defined in Annex B to the Bylaws) with respect to a Core Product and the Public Directors, by a Required Public Director Vote, determine that such contract is a Competitive Contract, at the request of ICE, the Corporation will eliminate the $1.00 amount specified in the preceding paragraph with respect to such Core Product and adjust the electronic

A-2

Table of Contents

trading fee; provided, however, that in no event shall the electronic trading fee for such Core Product be lower than the open-outcry trading fee for such product, except in connection with bona fide market making programs.

(d) Subject to the other provisions of the Bylaws, the Exchange will trade any derivative of a contract for a Core Product (such as a Mini or Maxi Contract) proposed by ICE, unless the trading or clearance of such new contract would violate applicable laws or regulations, and no such new contract shall be subject to the $1.00 amount specified in paragraph (b) above. ICE may determine that any such Mini or Maxi Contracts are to be fungible and treated equivalently with Core Products. NYBOT shall make all rule changes necessary to permit such new contracts to be traded and cleared, and shall cause NYBOT Clearing Company to clear such derivative contracts in accordance with customary risk practices.

(e) Subject to the other provisions of the Bylaws, the Exchange will trade any new contract proposed by ICE that is not a derivative contract for a Core Product, unless the trading or clearance of such new contract would violate applicable laws or regulations or the Board of Directors determines that trading or clearing such new contract would materially and adversely affect the long-term business of the Corporation, without regard to how it may affect any other contract. NYBOT shall make all rule changes necessary to permit such new contracts to be traded and cleared, and shall cause NYBOT Clearing Company to clear such new contracts in accordance with customary risk practices.

(f) Upon the request of ICE, the Exchange will trade all contracts traded by ICE or ICE Futures as of September 14, 2006 and all contracts for energy products traded by ICE or ICE Futures thereafter, unless the trading or clearance of such contracts would violate applicable laws or regulations, or violate any contract that the Exchange was a party to as of September 14, 2006, and which the Exchange remains subject to at the time such products are to be traded. NYBOT shall make all rule changes necessary to permit such contracts to be traded and cleared, and shall cause NYBOT Clearing Corporation to clear such new contracts in accordance with customary risk practices.

Section 5 Failure to Pay Fees and Other Amounts.

(a) If any Trading Member, Permit Holder, Member Firm or Lessee shall fail to pay any fees, charges or other amounts owing, directly or indirectly, to the Corporation, including, but not limited to, floor fines, booth fees and telecommunication and work station fees, when and as provided in the Rules or in any agreement to which such Person is a party, and such failure shall not be corrected within thirty (30) days following written notice by the Corporation that such fees or other amounts are in arrears, such Person shall be suspended automatically, and shall remain suspended until such arrearage, together with any other amounts which accrued and remain unpaid since the date of the suspension, is paid, and such Person is reinstated as provided in this Section. Any such Person that makes full payment in good funds within thirty (30) days of the suspension shall be automatically reinstated effective the day following receipt by the Corporation. Any such suspended Person that makes full payment in good funds after thirty (30) days from the date of the suspension but prior to ninety (90) days thereafter may be reinstated as provided in the Rules.

(b) If a Person suspended pursuant to paragraph (a) of this Section 5 shall fail to pay the arrearage upon which such suspension was based within ninety (90) days following the effective date of any such suspension:

(i) such Person shall automatically have all Exchange rights and privileges terminated; and

(ii) The Corporation may sell any Trading Membership or Trading Permit held by such Person and any ICE Common Stock as to which a security interest was granted to the Corporation, and pay and apply the proceeds as provided in the Rules; provided, however, that on written application received prior to the expiration of such ninety (90) day period, the Corporation, in its sole discretion, may extend such period.

A-3

Table of Contents

Section 6 <u>Notice</u>. Notice of all fees, charges and other amounts shall be mailed by the Corporation to each Person owing any such amount at his address on file with the Corporation; <u>provided</u>, <u>however</u>, that non-receipt shall not operate to release any such Person from the obligation to make payment, extend time for payment, or relieve any such Person from any penalties for non-payment.

Section 7 <u>Effect of Suspension or Termination</u>.

(a) A Trading Member, Permit Holder, Member Firm or Lessee whose rights and privileges have been suspended shall remain and continue to be:

(i) subject to all of the Rules;

(ii) liable for fees, charges and other amounts imposed by the Corporation; and

(iii) obligated to the Corporation for all Commodity Contracts, obligations and liabilities entered into or incurred before, during and after suspension.

(b) A Trading Member, Permit Holder, Member Firm or Lessee whose rights and privileges have been terminated shall remain and continue to be:

(i) liable for all fees, charges and other amounts imposed by the Corporation prior to termination of such rights and privileges;

(ii) obligated to the Corporation for all Commodity Contracts, obligations and liabilities entered into or incurred prior to such termination; and

(iii) liable for all fines and other penalties imposed subsequent to the termination of rights and privileges which are based upon Rule violations committed prior to said termination if an investigation into said violations shall have been commenced within six (6) months of the effective date of such termination.

(c) In connection with the investigation and prosecution of Rule violations referred to in paragraph (b)(iii), former Trading Members, Permit Holders, Member Firms and Lessees remain subject to the Corporation's Disciplinary Rules, and retain all rights and protections granted by all Rules relating to Corporation disciplinary procedures.

Section 8 <u>Transferability of Trading Memberships and Trading Permits</u>.

(a) The acquisition, lease, transfer, sale or other disposition of Trading Memberships and Trading Permits shall be effected according to <u>Annex B</u> to the Bylaws, the Rules, Sections 1 and 2 hereof and this Section 8; <u>provided</u>, <u>however</u>, that (i) no Person may transfer his Trading Membership or Trading Permit where an arbitration proceeding is pending against such Person or where the Compliance Department has commenced an investigation into possible violations of the Rules by such Person, until such arbitration, investigation and any resulting disciplinary actions have been completed, (ii) no NYBOT Permit Holder may lease an electronic trading right and (iii) no Person may exercise, receive or confer any Member Firm rights, privileges or benefits through the lease of a Trading Membership (including, for the avoidance of doubt, a NYBOT Membership).

(b) Notwithstanding the provisions of paragraph (a) of this Section 8, the Chief Executive Officer may permit the transfer of a Trading Membership or Trading Permit if the transferor deposits with the Corporation an Official Teller's Check in an amount equal to the sum of (i) the price of the last sale or the last bid for such Trading Membership or Trading Permit, whichever is higher, plus (ii) the market value of the shares of ICE Common Stock required pursuant to Section 1(a)(i) of this Annex A, in the case of a

A-4

Table of Contents

Trading Membership and the Corporation shall retain such deposit in its custody until such time as the investigation and any disciplinary actions have been completed, after which said deposit shall be disposed of as provided in the Rules.

(c) Each transferee of a Trading Membership or Trading Permit shall enter into such documentation as the Corporation may require from time to time, including without limitation a written acknowledgement that such transferee agrees to be bound by and subject to these Bylaws and the Rules.

(d) To the extent any attempted acquisition, lease, transfer, sale or other disposition of a Trading Membership or Trading Permit would be in violation of these Bylaws or the Rules, it shall be null and void *ab initio*.

Section 9 Clearing.

(a) The NYBOT Clearing Corporation is hereby designated as the Clearing Organization authorized to clear Transactions. The Board of Directors may from time to time designate one (1) or more additional clearing organizations as being authorized to clear any or all Transactions.

(b) In order to be eligible to be a member of NYBOT Clearing Corporation (a "Clearing Member") after the Effective Time, a firm shall hold at least 21,078 shares of ICE Common Stock (as adjusted for reclassifications, stock splits (including reverse stock splits), stock dividends or distributions, recapitalizations or similar transaction) and satisfy the requirements for Clearing Members set forth in the Rules. Any Clearing Member that fails to hold such requisite number of shares of ICE Common Stock shall not be permitted to clear Transactions at NYBOT Clearing Corporation. Each Clearing Member shall grant to the Exchange a security interest in all of such shares of ICE Common Stock as provided in the Rules in a manner, and pursuant to arrangements, required by the Corporation.

(c) Subject to applicable law and CFTC requirements, the Corporation shall take such actions as are reasonably necessary to cause the organizational documents of NYBOT Clearing Corporation not to be inconsistent with these Bylaws.

(d) Subject to the other provisions of these Bylaws, the Corporation shall take such actions as are reasonably necessary to cause NYBOT Clearing Corporation to clear any derivative of a contract for a Core Product (such as a Mini or Maxi Contract) proposed by ICE, unless the trading or clearance of such new contract would violate applicable laws or regulations. ICE may determine that any such Mini or Maxi Contract is to be fungible and treated equivalently with Core Products. NYBOT shall make, and shall cause NYBOT Clearing Corporation to make, all rule changes necessary to permit such derivative contracts to be cleared by NYBOT Clearing Corporation in accordance with customary risk practices.

(e) Subject to the other provisions of the Bylaws, the Corporation shall take such actions as are reasonably necessary to cause NYBOT Clearing Corporation to clear any new contract proposed by ICE that is not a derivative contract for a Core Product, unless the clearance of such new contract would violate applicable laws or regulations or the Board of Directors determines that clearing such new contract would materially and adversely affect the long-term business of the Corporation, without regard to how it may affect any other contract. The Corporation shall make, and shall cause NYBOT Clearing Corporation to make, all rule changes necessary to permit such new contracts to be cleared by NYBOT Clearing Corporation in accordance with customary risk practices and to admit as Clearing Members all entities that then clear any such contracts.

(f) The Corporation shall take such actions as are reasonably necessary to cause NYBOT Clearing Corporation to clear all contracts traded by ICE or ICE Futures as of September 14, 2006 and all contracts for energy products traded by ICE or ICE Futures thereafter, unless the trading or clearance of such contracts would violate applicable laws or regulations. The Corporation shall make, and shall cause NYBOT Clearing Corporation to make, all rule changes necessary to permit such contracts to be cleared by NYBOT Clearing Corporation in accordance with customary risk practices and to admit as Clearing Members all entities that then clear any such contracts.

A 5

Table of Contents

## ANNEX B
## ELECTRONIC TRADING; DISCOUNTS

The Corporation may conduct, or arrange for the conduct, of electronic trading on the Exchange as set forth in this Annex B, subject to the express limitations set forth herein.

Section 1 Side-by-Side and After-Hours Trading of Commodity Contracts. At any time, the Chief Executive Officer of the Corporation shall have the authority to cause the Corporation to implement side-by-side electronic trading (including after-hours electronic trading) with respect to any Commodity Contracts (other than any Commodity Contracts that have the same contract terms as Core Products except that they are cash-settled). In the event that the Corporation lists one of its Core Products for side-by-side electronic and open-outcry trading, the Corporation shall take all steps reasonably necessary to ensure that its settlement prices take full account of trades executed electronically with respect to such Core Product during relevant settlement periods. In the event that either (i) the Chicago Mercantile Exchange, Inc., the Board of Trade of the City of Chicago, Inc., the New York Mercantile Exchange, Inc., Eurex Frankfurt AG/Eurex Zurich AG or Euronext.LIFFE, or in any such case one of their affiliates or successors, introduces a "cash-settled" contract after September 14, 2006 (and if such contract has been introduced prior to the Effective Time, such contract was not terminated or withdrawn prior to the Effective Time) that has the same contract terms as a Core Product except that it is cash-settled (other than immaterially different terms) or (ii) the Board of Directors of ICE requests that the Public Directors determine whether the introduction of a "cash-settled" contract by another exchange is a Competitive Contract (as defined in this Annex B) with respect to a Core Product and the Public Directors, by a Required Public Director Vote, determine that such contract is a Competitive Contract, at the request of ICE, the Corporation will (a) implement side-by-side electronic trading (including after-hours electronic trading) with respect to such cash-settled version of a Core Product and/or (b) if such cash-settled contract is settled using NYBOT Exchange prices, eliminate the $1.00 amount specified in Section 4(b) of Annex A to the Bylaws with respect to the "physically-settled" contract for such Core Product and adjust the electronic trading fee; provided, however, with respect to clause (i) only, the Public Directors may reinstate such $1.00 amount with respect to the physically-settled contract for such Core Product if they determine, by a Required Public Director Vote, that reinstating such $1.00 amount would not reasonably be expected to give rise to a bona fide risk of loss of market share of the Corporation for such Core Product; and provided further that in no event shall the electronic trading fee for such physically settled Core Product be lower than the open outcry trading fee for such product, except in accordance with bona fide market making programs.

Section 2 Open-Outcry Trading of Futures Contracts on Core Products. The Corporation shall not terminate open-outcry trading of Futures Contracts that are Core Products until one of the following circumstances shall have occurred: (a) a Liquidity Event (as defined in Section 5 hereof) has occurred; (b) the Corporation's lease, existing as of the Effective Time, with respect to the Corporation's trading floor located at the World Financial Center, One North End Ave., New York, NY 10282, has expired or been terminated (other than as a result of a breach thereof by the Corporation or a voluntary termination thereof by the Corporation); or (c) (i) the Public Directors, by a Required Public Director Vote, recommend to the Board of Directors that such action be taken and (ii) such action is approved by a vote of at least two-thirds of the entire Board of Directors, determined as if there were no vacancies; provided, however, that the size of the entire Board of Directors for purposes of calculating the two-thirds vote required by (ii) shall exclude the number of Public Directors, if any, that are barred from voting on such matter due to that fact that such Public Director or a member of such Public Director's immediate family, directly or indirectly, has a financial interest in such matter; provided, further, however, that for this purpose, compensation paid by ICE to such Public Director for serving as a director of NYBOT shall not be deemed to be a financial interest. If any of the circumstances described in clause (ii) of the definition of "Liquidity Event" or clause (b) of this Section 2 shall have occurred, then all trading of Futures Contracts that are Core Products may be transitioned to fully electronic trading and all open-outcry trading of such Futures Contracts may be terminated. If any of the circumstances described in clause (i) of the definition of "Liquidity Event" shall have occurred, then all trading of Futures Contracts that are Core Products of the type triggering such clause may be transitioned to fully electronic trading and all open-outcry trading of such Futures

B 1

Table of Contents

Contracts may be terminated, but open-outcry trading of other Futures Contracts that are Core Products shall not be terminated on this basis  For so long as open-outcry trading of Futures Contracts that are Core Products has not been terminated pursuant to this Section 2, the Corporation shall (a) maintain an appropriate disaster recovery site, which is at least comparable to the Corporation's recovery site as of the Effective Time, to sustain open-outcry trading in the event the Corporation's trading floor is not available for such trading and (b) dedicate sufficient financial and technological resources appropriate to support and maintain trading on an open-outcry trading floor consistent with prevailing industry practices. Notwithstanding any other term of the Bylaws or any Annex thereto, the Corporation may terminate open-outcry trading of any Futures Contracts that are not Core Products by majority vote of the Board of Directors.

Section 3 <u>Trading of Options on Core Products</u>. The Corporation may terminate open-outcry trading of Options on Core Products if and when the Corporation may terminate open-outcry trading of the corresponding Futures Contract on the Core Product under Section 2 hereof.

Section 4 <u>Discounts</u>.

(a) *Discount for Certain Trading*. Notwithstanding anything to the contrary set forth herein, NYBOT Members and NYBOT Member Firms shall be entitled to a fee reduction of no less than 20% off the lowest fees established by the Corporation and NYBOT Clearing Corporation, and charged to Persons who are not NYBOT Members or NYBOT Member Firms (other than with respect to prices charged in connection with bona fide market making programs). Such fee reduction shall apply with respect to Transactions constituting proprietary trading conducted by the Person entitled to the discount, for his, her or its own account, whether executed by open-outcry trading or electronic trading (but shall not include Transactions for customer or other accounts) with respect to any Existing Products;

(b) *Duration of Discount for Certain Electronic Trading*. Upon the transfer by a NYBOT Member of a NYBOT Membership, the discount for Transactions made via electronic trading shall terminate, <u>provided</u>, <u>however</u>, that (i) a transfer to an individual who confers NYBOT Membership privileges to a NYBOT Member Firm shall not be deemed a transfer for this purpose and (ii) the leasing of a NYBOT Membership to an individual shall not be deemed a transfer with respect to such NYBOT Member's rights under Section 4(a) of Annex B.

(c) *MFN for Electronic Trading*. From and after the Effective Time, all NYBOT Members, NYBOT Permit Holders, Lessees and NYBOT Member Firms shall be entitled to pay the lowest Exchange fee and NYBOT Clearing Corporation fee per Commodity Contract for electronic Transactions in any Existing Product on the Exchange (a "<u>MFN Discount</u>"), but excluding for such purpose (a) any discount pursuant to Section 4(a) above and (b) fees charged in connection with bona fide market making programs. The entitlement to such MFN Discount expires upon the first transfer of a NYBOT Trading Permit or a NYBOT Membership, <u>provided</u>, <u>however</u>, that (i) a transfer to an individual who confers NYBOT Membership privileges to a NYBOT Member Firm and (ii) the leasing of a NYBOT Membership to an individual shall not be deemed a transfer for this purpose.

Section 5 <u>Definitions</u>.

(a) A "<u>Liquidity Event</u>" shall mean, (i) with respect to a contract in a Core Product, the failure of the average daily open-outcry volume in futures (excluding EFPs, block trades or any other off-Exchange trade submitted to the Exchange) ("*ADV*"), as publicly reported by the Exchange pursuant to the Commodity Exchange Act and CFTC regulations and measured on a rolling 90-day basis, to equal at least 50% of the ADV in such contract for the comparable 90-day period in calendar year 2005; and (ii) with respect to all Core Products, in the aggregate, the failure to maintain open-outcry ADV, measured on the foregoing basis, equal to 50% of the aggregate ADV for all Core Products in calendar year 2005.

(b) A "<u>Competitive Contract</u>" shall mean any contract listed by a competing exchange, after September 14, 2006, which the Public Directors, by a Required Public Director Vote, determine (i) has the same contract terms as a Core Product (other than any immaterially different terms) or (ii) has the same

B-2

Table of Contents

contract terms as a Core Product except that it is cash-settled (other than any immaterially different terms); and that, in either case, the failure of the Corporation to address and compete with such contract may be expected to give rise to a bona fide risk of a loss of market share (other than a temporary or immaterial loss) by the Exchange for such Core Product (for purposes of determining such market share, both physically-settled and cash-settled versions of such Core Product shall be considered together). For the avoidance of doubt and without limitation, none of the following shall be considered immaterial terms of a contract wherever such term is referred to in the Bylaws and the Annexes thereto: grade of commodity, size of the contract, or delivery point for physical delivery of the contract.

B 3

**Table of Contents**

**ANNEX C**
**TRADE COMMITTEES**

The Corporation shall have one trade committee with respect to each of the Core Products (each, a "Trade Committee").

Section 1 Composition of the Trade Committees.

(a) Until the Two-Year Anniversary, each Trade Committee shall consist of the individuals identified on Schedule III attached hereto or their successors who have been designated in accordance with Section 1(d). Each of such designated individuals shall serve for an initial two-year term.

(b) Until the Two-Year Anniversary, the composition of any Trade Committee shall be as follows: (i) nine members, to be selected by ICE, who are actively engaged, or employed by a firm that is actively engaged, in the Core Product industry for the relevant Trade Committee; (ii) three Floor Brokers in the Core Product for the relevant Trade Committee; (iii) two members who are Affiliated Persons of FCMs; and (iv) one member representing an asset management firm advising investment funds or separate accounts that trade in the relevant Core Product or a proprietary trading desk of an investment bank. All Trade Committees shall be composed of at least two-thirds of NYBOT Members or individuals associated with NYBOT Member Firms; provided, that, the orange juice committee shall be composed of at least 50% of NYBOT Members or individuals associated with NYBOT Member Firms.

(c) Unless the Board of Directors otherwise determines, each member of a Trade Committee filling one of the memberships designated in clause (ii) or (iii) of Section 1(b) shall be a NYBOT Member or an Affiliated Person of a NYBOT Member Firm. Any member of a Trade Committee designated in clause (ii) or (iii) of Section 1(b) who fails to remain a NYBOT Member or an Affiliated Person of a NYBOT Member Firm shall be disqualified from serving on, and shall promptly resign from, such Trade Committee.

(d) Except for the two-year term provided in Section 1(a) hereof, each member of a Trade Committee shall serve for a one-year term, subject to reappointment in accordance with this Annex C. The Board of Directors may fix the end of directors' terms to be coterminous.

(e) Until the Two-Year Anniversary, any vacancies on a Trade Committee shall be filled with an individual from the category in which the vacancy exists, only by a vote of the remaining members of such Trade Committee. After the Two-Year Anniversary, any vacancies on a Trade Committee shall be filled by the Board of Directors, after consultation with the remaining members of such Trade Committee.

(f) The stockholder(s) of the Corporation may appoint one or more non-voting observers (each, a "Trade Committee Observer") to any of the Trade Committees. Each Trade Committee Observer shall be entitled to (i) receive written notice of each meeting of the Trade Committee and (ii) attend and observe all meetings of the Trade Committee. All Trade Committee Observers will be entitled to receive any and all written materials delivered to the members of relevant Trade Committee in connection with any meeting of the Trade Committee at the same time and in the same manner as such materials are delivered to the members of such Trade Committee.

(g) Each Trade Committee shall elect, by majority vote, a Chairman and a Secretary.

Section 2 Meetings of the Trade Committees.

(a) Unless otherwise specifically provided in the Rules, regular meetings of Trade Committees shall be held on such date and at such time as the Trade Committee shall determine.

(b) The Chairman of any Trade Committee shall have the authority to call a special meeting of such Trade Committee to be held on such date and at such time as the Chairman shall determine.

(c) Notice of all meetings of Trade Committees may be in writing, by telephone, or by other means of communication. With the consent of the Chief Executive Officer of the Corporation, the Chairman of the

C 1

Table of Contents

Board may call a meeting on twenty-four (24) hour's notice. The Chairman of the Board may call any other meeting on not less than two Business Days' notice before such meeting, which notice may be in writing served at the offices of the members of the Trade Committee, by telephone, by facsimile, by email or any other reasonable means of communication.

(d) Any action required or permitted to be taken by a Trade Committee may be taken without a meeting if the number of members of the Trade Committee necessary to take such action consent in writing to the taking of such action.

(e) Any one (1) or more members of a Trade Committee may participate in a meeting by means of a conference telephone or similar communications device allowing all Persons participating in the meeting to hear each other at the same time. Participation by such means shall constitute presence in person at a meeting.

Section 3 Quorum; Vote.

(a) Unless otherwise specifically provided in the Rules, a majority of the entire Trade Committee shall constitute a quorum for the transaction of business by such Trade Committee.

(b) Unless otherwise specifically provided in the Rules, any action taken by a vote of a majority of the Trade Committee members present at a meeting at which a quorum is present shall be deemed to be a valid action of such Trade Committee.

Section 4 Scope of Authority. Each Trade Committee shall have and may exercise only the power or authority of approving or rejecting any modifications to the contractual terms and conditions of any Core Product over which such Trade Committee has authority (and no such changes may be made without the Trade Committee's approval). For the avoidance of doubt, except as expressly set forth in this Section 4, *Annex B* to the Bylaws, and Section 16 of the Bylaws, no Trade Committee shall have the power or authority to prevent the implementation of a decision by the Board of Directors with respect to, or make or reject, any proposed changes with respect to the trading of Core Products by open-outcry versus electronic trading, or with respect to any other Commodity Contract or other operations of the Exchange. In the event that the Exchange is trading a Core Product both by open-outcry and electronically, the relevant Trade Committee for such Core Product shall take all action reasonably necessary to ensure the terms of both the open-outcry and electronically-traded versions of such Core Product are consistent with each other and fungible.

C 2

**Table of Contents**

**ANNEX D**
**CERTAIN DEFINITIONS**

(The following definitions shall apply to the Bylaws and Annexes)

**Affiliated Person**

The term "Affiliated Person" shall mean with respect to a Member Firm, an individual who is a general partner, director, officer, member (in the case of a limited liability company), executive employee or manager of such firm.

**Business Days**

The term "Business Day" shall mean any day other than Saturday, Sunday, or any day which the Board of Directors may designate as an Exchange holiday and on which the Exchange shall be closed; provided, however, that, whenever the Exchange's Dublin facility is open for trading on a day when the Exchange is closed for trading in New York or *vice versa*, such day shall constitute a "Business Day" within the meaning of the Rules only for the Commodity Contracts that are listed for trading on the facility that is open for trading on such day.

**CFTC**

The term "CFTC" shall mean the Commodity Futures Trading Commission.

**Commodity**

The term "Commodity" shall mean any and all goods, articles, services, rights and interests in which contracts for future delivery are presently or in the future dealt in, on or subject to the Rules.

**Commodity Contract**

The term "Commodity Contract" shall include Futures Contracts, Options on Commodities or on Futures Contracts, and any other interests or instruments traded on or subject to the Rules.

**Core Products**

The term "Core Product" shall mean the following existing Commodity Contracts traded by the Exchange, as hereafter amended from time to time: *Coffee "C", Cocoa, Cotton No. 2, Sugar No. 11, Frozen Concentrated Orange Juice, NFC Orange Juice, and Sugar No. 14*.

**Disciplinary Rules**

The term "Disciplinary Rules" shall mean the rules and procedures governing the investigation of rule violations and the disciplining of any Person in connection with such violations, as set forth in the Corporation's Rules.

**Effective Time**

The term "Effective Time" shall mean the time that the Merger becomes effective.

**Exchange**

The term "Exchange" shall mean the Corporation.

D-1

**Table of Contents**

**Existing Product**

The term "Existing Product" shall mean Commodity Contracts that are listed in Schedule II attached hereto.

**Floor Broker**

The term "Floor Broker" shall mean any Person who has been granted floor trading privileges pursuant to the Rules.

**Former Member**

The term "Former Member" means a holder of an equity membership in NYBOT immediately prior to the Effective Time.

**Former Permit Holder**

The term "Former Permit Holder" means the holder of any right (other than the right held by a Former Member) to execute trades in specified Commodity Contracts on the Exchange immediately prior to the Effective Time pursuant to the rules or bylaws of NYBOT in effect immediately prior to the Effective Time.

**Futures Commission Merchant or FCM**

The term "Futures Commission Merchant" or "FCM" shall have the same meaning as defined in the Commodity Exchange Act.

**Futures Contracts**

The term "Futures Contract" shall mean any contract for the purchase or sale of a Commodity for future delivery that is traded on or subject to the rules of any exchange.

**Lessee**

The term "Lessee" shall mean an individual who leases a NYBOT Membership from the owner thereof pursuant to the Bylaws and the Rules.

**Lessor**

The term "Lessor" shall mean an individual who leases a NYBOT Membership of which he is the owner to another individual who thereby becomes the Lessee of such NYBOT Membership pursuant to the Bylaws and the Rules.

**Member Firm**

The term "Member Firm" means any partnership, corporation, limited liability company, sole proprietorship or other entity to which Exchange privileges have been conferred by a Trading Member who is an Affiliated Person of such firm in accordance with the Rules.

**Merger**

The term "Merger" shall mean the business combination transaction in which Board of Trade of the City of New York, Inc. shall merge with and into the Corporation.

D-2

[Table of Contents](#)

**Mini or Maxi Contract**

The term "Mini or Maxi Contract" shall mean with respect to a Futures Contract any other contract having the same terms as such Futures Contract except that it has a standard size that is (i) in the case of a Mini Contract, one-half or less of the standard size of such Futures Contract as of September 14, 2006, provided that if the standard size of such Futures Contract is increased after September 14, 2006, the size of such Mini Contract shall be one-half or less of the standard size of such larger Futures Contract; and (ii) in the case of a Maxi Contract, two times or more (or, in the case of Sugar No. 11 and Sugar No. 14, three times or more) of the standard size of such Futures Contract as of September 14, 2006; provided that if the standard size of such Futures Contract is reduced after September 14, 2006, the size of such Maxi Contract shall be two times or more (or, in the case of Sugar No. 11 and Sugar No. 14, three times or more) of the standard size of such smaller Futures Contract.

**NYBOT Clearing Corporation**

The term "NYBOT Clearing Corporation" shall mean New York Clearing Corporation, a business corporation organized under the laws of New York.

**NYBOT Member**

The term "NYBOT Member" shall mean an individual who has been granted one or more NYBOT Memberships pursuant to Section 1(a)(i) of Annex A to the Bylaws.

**NYBOT Member Firm**

The term "NYBOT Member Firm" shall mean any partnership, corporation, limited liability company, sole proprietorship or other entity to which Exchange privileges have been conferred by a Trading Member who is an Affiliated Person of such firm in accordance with the Rules, provided that such firm was a Member Firm on September 14, 2006.

**NYBOT Membership**

The term "NYBOT Membership" shall mean one of the Trading Memberships authorized to be issued pursuant to Section 1(a)(i) of Annex A to the Bylaws.

**NYBOT Permit Holder**

The term "NYBOT Permit Holder" shall mean an individual who has been granted one or more NYBOT Trading Permits pursuant to Section 1(b)(i) of Annex A to the Bylaws.

**NYBOT Trading Permit**

The term "NYBOT Trading Permit" shall mean the right to execute trades in specific Commodity Contracts granted pursuant to Section 1(b)(i) of Annex A to the Bylaws.

**Option**

The term "Option" shall mean a contract or Transaction whereby one party grants to another the right, but not the obligation, to buy or sell a Commodity, or to buy, sell or enter into a Futures Contract.

**Permit Holder**

The term "Permit Holder" means any holder of a Trading Permit.

D-3

Table of Contents

**Person**

The term "Person" shall mean an individual, corporation, partnership, limited liability company, sole proprietorship or other entity.

**Public Director**

The term "Public Director" shall mean any person who (i) qualifies as a "public" director within the meaning of the rules proposed by the CFTC as of September 14, 2006 for determining qualifications of public directors or, if the CFTC adopts any such rules, within the meaning of such rules in effect from time to time and (ii) the independence requirements of the New York Stock Exchange for directors serving on the boards of listed companies, as amended from time to time.

**Required Public Director Vote**

The term "Required Public Director Vote" shall mean an affirmative vote of at least the number of Public Directors that is one less than the total number of Public Directors, determined as if there were no vacancies, eligible to vote on a matter but, in all cases, at least one Public Director; provided, that, no Public Director shall be eligible to vote on any such matter if such Public Director or a member of such Public Director's immediate family, directly or indirectly, has a financial interest in such matter; provided, further, however, that for this purpose, compensation paid by ICE to such Public Director for serving as a director of NYBOT shall not be deemed to be a financial interest.

**Rules**

The term "Rule" or "Rules" shall mean the rules of the Exchange, as in effect from time to time.

**Trade Committee**

The term "Trade Committee" shall mean a Trade Committee that is organized in accordance with Section 1(b) of Annex C.

**Trading Member**

The term "Trading Member" means a holder of a Trading Membership.

**Trading Membership**

The term "Trading Membership" means the right, as expressly provided for in Section 1(a) of Annex A to these Bylaws, to buy and sell all or any one or more of the categories of Commodity Contracts authorized for trading on the Exchange (as may be determined by the Board of Directors of the Corporation in the case of Trading Memberships authorized pursuant to Section 1(a)(ii) of Annex A to these Bylaws), together with and subject in all respects to such other rights and obligations as are expressly provided in these Bylaws and the Rules, and shall include a NYBOT Trading Membership.

**Trading Permit**

The term "Trading Permit" means any right (other than a Trading Membership), as expressly provided for in these Bylaws and the Rules, to buy and sell one or more specified Commodity Contracts on the Exchange, together with and subject in all respects to such other rights and obligations as are expressly provided in these Bylaws and the Rules.

**Transaction**

The term "Transaction" shall mean any purchase or sale of any Commodity Contract made in accordance with the Rules.

D-4

[Table of Contents](#)

**ANNEX E**
**AUTHORIZED NYBOT DESIGNEES**

1.   Robert Ahrens
2.   Sebastian Angelico
3.   Michael C  Belmont
4.   Patrick C. Bennett
5.   James A  Calcagnini
6.   Maxine C. Champion
7.   Roger Corrado
8.   Paul Dapolito, III
9.   Christopher A  Dunn
10.  Charles H. Falk
11.  Randal G  Freeman
12.  Martin Greenberg
13.  W C  Hay
14.  Herman S. Kohlmeyer, Jr.
15.  Hugh R  Lamle
16.  Paul Liubicich
17.  Terrence F  Martell
18.  John Marchisotto
19.  Alfred J  Mascia
20.  Gerald McTague
21.  Joseph T  Nicosia
22.  Michael J. Nugent
23.  John C  Santos, Jr
24.  Frederick W. Schoenhut
25.  William J  Shaughnessy

E-1

**Table of Contents**

ANNEX F
CORE RIGHTS

The amendment or repeal of the following shall constitute "Core Rights" as such term is used in the Bylaws of the Corporation:

I. <u>NYBOT Rules</u>

   a. The eligibility standards and criteria for becoming a NYBOT Member, NYBOT Permit Holder, or Lessee;

   b. The financial requirements applicable to a NYBOT Member, NYBOT Permit Holder, Lessee, and NYBOT Member Firm;

   c. The trading privileges authorized to each category of NYBOT Permit Holder and to NYBOT Members;

   d. The sale, leasing and transferability of rights applicable to NYBOT Memberships and NYBOT Trading Permits;

   e. The requirements applicable to obtaining Exchange floor trading privileges by NYBOT Members and NYBOT Permit Holders;

   f. Provisions of Chapter 4 of the Rules governing the mode of executing transactions by open-outcry on the trading floor;

   g. The eligibility requirements applicable to remaining a Clearing Member, to the extent that such Person was a Clearing Member prior to the Effective Time; and

   h. The rights and obligations of Clearing Members that act as guarantors of Floor Brokers, to the extent that Clearing Member so acted prior to the Effective Time.

Any of the Rules in (a)-(h) above shall be considered a Core Right and an amendment or repeal of any such Rules shall be considered a Core Right Amendment only to the extent such Rule is applicable to Core Products and only to the extent that any such amendment or repeal of such Rule (i) with respect to open-outcry trading of a Core Product, would materially and adversely affect the rights of NYBOT Members, NYBOT Permit Holders, NYBOT Member Firms, Lessees or the Clearing Members referenced in (g) and (h) above or (ii) otherwise would materially and adversely affect the rights referenced in Part II of this *Annex F* of NYBOT Members, NYBOT Permit Holders, Lessees, NYBOT Member Firms or the Clearing Members referenced in (g) and (h) above.

II. <u>Bylaws and Annexes</u>

The provisions of the Bylaws and Annexes to the Bylaws pertaining to the composition of the Board of Directors, the NYBOT Designees, NYBOT Memberships, NYBOT Member Firms, and NYBOT Trading Permits, the limitations on electronic trading of Core Products, for so long as open-outcry trading is required under the Bylaws, maintaining a disaster recovery site for open-outcry trading under Annex B and dedicating financial and technical resources to support and maintain open-outcry trading as set forth in Annex B, the Transaction fees and discounts set out in paragraphs (b) and (c) of Section 4 of Annex A to the Bylaws and in Section 4 of Annex B to the Bylaws, eligibility to be a Clearing Member, Trade Committee composition and Trade Committee control over the terms and conditions of the Core Products within their jurisdiction.

F 1

**Table of Contents**

**Schedule II**

| NYBOT Products | Futures/Options (Including serial options) |
|---|---|
| Mini Coffee "C" | Future |
| Coffee "C" | Future/Option |
| Sugar No  11 | Future/Option |
| Sugar No  14 | Future |
| Cotton No  2 | Future/Option |
| Cocoa | Future/Option |
| FCOJ A | Future/Option |
| FCOJ B | Future |
| FCOJ Differential OJ | Future |
| Not From Concentrate OJ | Future/Option |
| FINEX Euro Index | Future/Option |
| U S  Dollar Index | Future/Option |
| (REVISED) NYSE Composite Index   Regular | Future/Option |
| (REVISED) NYSE Composite Index   Mini | Future |
| Russell 1000 Index   Regular | Future/Option |
| Russell 1000 Index   Mini | Future |
| Russell 1000 Value Index   Regular | Future/Option |
| Russell 1000 Growth Index   Regular | Future/Option |
| Russell 2000 Index   Regular | Future/Option |
| Russell 2000 Growth Index | Future |
| Russell 2000 Value Index | Future |
| Russell 3000 Index   Regular | Future/Option |
| Reuters/Jefferies CRB Index | Future/Option |
| Ethanol | Future/Option |
| Pulp | Future/Option |
| Continuous Commodity Index | Future/Option |
| AR   Aussie Dollar/New Zealand | Future/Option |
| AS   Aussie Dollar/Canadian Dollar | Future/Option |
| AU   Aussie Dollar/US | Future/Option |
| DX   US Dollar Index | Future/Option |
| EJ   Euro/Yen | Future/Option |
| EO   Euro US$ | Future |
| EP   Euro/Canadian Dollar | Future/Option |
| EU   Euro | Future/Option |
| EZ   Euro Czech koruna | Future/Option |
| GB   Euro/Pound | Future/Option |
| GN   Pound/NZ Dollar | Future/Option |
| HR   Euro Hungarian forint | Future/Option |
| HY   Canadian Dollar/Japanese Yen | Future/Option |
| KJ   Swedish/Yen | Future/Option |
| KU   US Dollar/Swedish | Future/Option |
| KY   Norwegian krone/Yen | Future/Option |
| MF   Small U S $/Swiss Franc | Future |
| MP   Small British Pound/U S  $ | Future |
| NJ   Norwegian Krone/Swedish Koruna | Future/Option |
| NS   US Dollar/Norwegian Krone | Future/Option |
| OL   Euro/Norwegian | Future/Option |
| PC   Pound/Canadian Dollar | Future/Option |
| PK   Pound/Norwegian krone | Future/Option |
| PS   Pound/Swedish | Future/Option |
| PZ   Pound/Rand | Future/Option |
| QA   Pound/Aussie | Future/Option |

RA—Euro/Australian Dollar                                                                                                                      Future/Option

Table of Contents

| NYBOT Products | Futures/Options (Including serial options) |
|---|---|
| RK—Euro/Krona | Future/Option |
| RZ—Euro/Swiss | Future/Option |
| SN—Small U.S.$/Jap. Yen | Future |
| SS—Pound/Swiss Franc | Future |
| SV—Small U.S. $/ Canadian Dollar | Future |
| SY—Pound/Yen | Future/Option |
| UF—US Dollar—Hungarian forint | Future/Option |
| UZ—US Dollar—Czech koruna | Future/Option |
| YA—Aussie Dollar/Japanese Yen | Future/Option |
| YD—US Dollar/Canadian | Future/Option |
| YF—US Dollar/Swiss | Future/Option |
| YP—US Dollar/ Pound | Future/Option |
| YY—US Dollar/Yen | Future/Option |
| YZ—Euro/Rand | Future/Option |
| ZJ—NZ Dollar/Yen | Future/Option |
| ZR—US Dollar/Rand | Future/Option |
| ZX—NZ Dollar/US Dollar | Future/Option |
| ZY—Swiss/Yen | Future/Option |

Table of Contents

Schedule III

## BOARD OF CITRUS ADVISORS

Randal G  Freeman, Chairman

Thomas P  Abrahamson
R  William Becker
Robert M  Behr
Paul A  Burkhardt
Dan K  Casper
Roger Corrado
John A  Cox
Nicholas A  Emanuel
Edward P  Gregory

Robert A  Katz
Chris W  Layton
John J  Murphy
Sandra G  Pappas
Wayne Peterson
John S  Ruffino
Christopher W  Scheid
Warren Seeley
B  Courtney Turner
George H  Wilson, III
James Zellner

## COCOA

William J. Shaunessy, Chairman

Scott Amoye
David Bagley
Frank G. Day
Daniel V. Diez
Marcelo Dorea
James Emanuel
Pablo Esteve

John Gibbons
Jeffrey B. Lelliott
Joseph P. Mallaney
Lee McConnell
Michael Nugent
Robert Redman
Kristen Seaver
Pam Thornton

## COFFEE

W.C. Hay, Chairman

Paul Akroyd
Ernesto Alvarez
Joseph Apuzzo, Jr.
John W. Bunker
Henry Dunlop
Daniel Dwyer
Ricahrd Emanuele

Andreas Enderlin
Paul J. Fisher
Carlo Frigerio
Michael Hoch
Ernesto Leon-Gahbetta
Joseph LoCandro
John T. Meyer
Michael J. Nugent
Thomas Westfeldt

## COTTON

Donald B. Conlin, Chairman

Robert G. Ahrens
David C. Brandon, Jr.
Thomas A. Butler, Jr.
W.B. Dunavant, Jr.
Nick Earlam
Woods E. Eastland
Edurado Esteve
Stuart H. Frazer, III
Victor M. Gallo
Riobert D.Grounds
Edward D. Jernigan

Jordan Lea
Joseph T. Nicosia
Robert T. Norris
Leonardo C. Pappalardo
Charles Parker
James H. Phillips
Stephen J. Place
Thomas Reardon
Ernst D. Schroeder, Sr.
Gary Taylor
Robert S. Weil, II
Lonnie D. Winters
Marvin A. Woolen, Jr.

Herman S. Kohlmeyer, Jr.

**Table of Contents**

**DOMESTIC SUGAR**

Joseph Goehring, Chairman

John E  Barkenbush
Antonio Contreras, Jr
Charles H  Falk
John H  Gebhard

Michael Gelchie
Patrick Henneberry
Kenneth F  Lorenze
Francois D  Nehama
Peter O'Hara
Stephen Potash

**WORLD SUGAR**

Paul H. Gardner, Chairman

Jeffrey Bauml
Patrick Bennett
Darryl Berry
John Bird
Jean Luc Bohbot
Eduardo Carvalho
Sean Diffley
Charles H. Falk
Daniel Gutman
Michael Levantin
Gerald McTague

Desmond Monteith
Jon Payne
Daniel Rosenblum
Alexander J. Trakimowicz
Stephen J. Ward

Alternates

Manoel Garcia
Darwin Lee
Alberto Peixoto
Fernando A. Ribeiro
Bernardo Rodrigues

# EXHIBIT 3

**EFiled: Jul 29 2022 02:57PM EDT**
**Transaction ID 67859708**
**Case No. 2022-0666-**

# IN THE COURT OF CHANCERY IN THE STATE OF DELAWARE

| | |
|---|---|
| LUIGI CRISPO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. _____ |
| | ) |
| ELON R. MUSK, X HOLDINGS I, | ) |
| INC. AND X HOLDINGS II, INC. | ) |
| | ) |
| Defendants. | ) |

## VERIFIED SHAREHOLDER CLASS ACTION COMPLAINT

Luigi Crispo ("Plaintiff") brings this Verified Shareholder Class Action Complaint (the "Complaint") individually on behalf of himself as a stockholder of Twitter, Inc. ("Twitter" or the "Company"), and as a class action on behalf of Twitter stockholders as of April 25, 2022 (excluding Defendants) and their successors and assignees (the "Class"). Plaintiff asserts individual and class claims for specific performance of the obligation of Elon R. Musk ("Musk") and Musk's acquisition vehicles, X Holdings I, Inc., ("Parent") and X Holdings II, Inc. ("Acquisition Sub") under the April 25, 2022 Agreement and Plan of Merger by and among Twitter, Musk (as to certain provisions), Parent and Acquisition Sub (the "Merger Agreement") to purchase their Twitter shares. Plaintiff also asserts individual and class claims that Defendants' self-interested refusal to purchase the Twitter shares and related conduct is a breach of the fiduciary duty Defendants owe to Twitter's public stockholders as a result of their ownership and control of the Company. The

allegations of the Complaint are based on Plaintiff's knowledge as to himself and as to all other matters on information and belief, including from the public filings of Twitter and Musk with the United States Securities and Exchange Commission (the "SEC") and the investigation of counsel.

## **INTRODUCTION**

1.     Plaintiff holds 5,500 shares of Twitter, Inc. ("Twitter" or the "Company") stock.   Under the Agreement and Plan of Merger (the "Merger Agreement"), defendants agreed to purchase Plaintiff's Twitter shares for $54.20 per share (the "Merger"), which entitles him to a cash payment of $298,100 when the Merger closes.

2.     The Merger Agreement is a binding contract with Defendants signed for Twitter by Brett Taylor, Chair of Twitter's board of directors (the "Board"), for the benefit of Plaintiff and other Twitter stockholders.  Because the purpose of the Merger Agreement is for Defendants to purchase the Twitter shares of Plaintiff and the Class, they are third-party beneficiaries of the Merger Agreement and have individual and class rights to enforce Defendants' obligation under that agreement to purchase those shares.

3.     Through their ownership of 9.6% of Twitter's stock, their beneficial ownership as a result of the Merger Agreement, and their continued rights under the Merger Agreement, and actions taken by Defendants and Twitter based on the

2

Merger Agreement, Defendants have obtained majority ownership and a controlling interest over Twitter.

4.     Elon R. Musk and his corporate acquisition entities planned to finance their purchase of Twitter stock from Plaintiff and the Class through a combination of bank debt, a margin loan and equity financing.  Merger Agreement § 5.4.  The sale and pledge of Musk's personal Tesla, Inc. ("Tesla") stock holdings would provide the majority of the margin and equity funding.  After the signing of the Merger Agreement, Musk's sources of financing dwindled and the value of his Tesla stock declined significantly.  The $54.20 per-share cash consideration for Twitter stock under the Merger Agreement remained unchanged.  Musk developed cold feet and decided to walk away from the deal.  But, having agreed to take on the foreseeable risk of a market decline (including a drop in the price of Tesla's shares), Musk is contractually prohibited from reneging on the Merger Agreement.

5.     In an effort to circumvent his clear contractual obligation under Section 5.4 of the Merger Agreement to finance the Merger Consideration, Musk has fabricated several excuses which he claims let him back out of the deal.  His lame rationales for reneging on his contract are without merit.  On July 12, 2022, Twitter sued Musk and his acquisition entities for specific performance of their obligations to Twitter under the Merger Agreement.

3

6.     In the Merger Agreement, Defendants agreed to purchase Plaintiff's Twitter stock, but they are refusing to do so.  Therefore, Plaintiff and the Class seek specific performance of Defendants' obligation to purchase their stock for $54.20 per share. They also assert that Defendants have breached their fiduciary duty of loyalty as controlling stockholders by pursuing their financial self-interest through reneging on their contractual promise to buy the Twitter shares of Plaintiff and the Class.  In addition, Plaintiff and the Class seek damages against Defendants for the harm their breaches of contract and fiduciary duty has caused and will cause the Twitter stockholders.

## PARTIES

7.     Plaintiff Luigi Crispo is a Twitter stockholder and has continuously held shares since the time the Merger was first publicly disclosed to Twitter stockholders.

8.     Defendant Elon R. Musk ("Musk") is the direct owner of 9.6% of Twitter's stock.  Musk is referred to in the Merger Agreement as "Equity Investor." He is the President, Secretary, Treasurer and sole shareholder of both Parent and Acquisition Sub, and agreed to be a party to the Merger Agreement in his individual capacity as Equity Investor with respect to his unqualified obligation to fund the Merger, among other provisions.

4

9.      Defendant X Holdings, I, Inc. is a Delaware corporation formed on April 19, 2022, for the sole purpose of engaging in, and arranging financing for, the transactions contemplated by the Merger Agreement.  Parent will provide the funding for the purchase of the Twitter stock in the Merger, but Musk must provide that funding to Parent.

10.     Defendant X Holdings II, Inc. is a Delaware corporation and a wholly owned subsidiary of Parent.  Acquisition Sub was formed on April 19, 2022 solely for the purpose of engaging in, and arranging financing for, the transactions contemplated by the Merger Agreement.

11.     Musk, Parent and Acquisition Sub are collectively referred to herein as "Defendants" and because of Musk's ownership and control of Parent and Acquisition Sub, they are sometimes referred together herein as simply "Musk."

## JURISDICTION

12.     This Court has subject matter jurisdiction under 10 *Del. C.* § 341, 8 *Del. C.* § 111(a), and 6 *Del. C.* § 2708.

13.     Personal jurisdiction over Parent and Acquisition Sub is proper because both are incorporated under the laws of Delaware and have consented to jurisdiction by agreeing to "expressly and irrevocably submit[] to the exclusive personal jurisdiction of the Delaware Court of Chancery . . . in the event any dispute arises

out of [the merger agreement] or the transactions contemplated by [the merger agreement]."  Merger Agreement § 9.10(a).

14.     Personal jurisdiction over Musk is proper pursuant to 10 *Del. C.* § 3104(c)(1), because, among other reasons: (a) Musk wholly owns and formed two Delaware corporations, Parent and Acquisition Sub, and which he created for the sole purpose of acquiring Twitter, a Delaware corporation; (b) Musk agreed to undertake "reasonable best efforts" to complete the Merger, which includes the delivery of a Certificate of Merger to the Delaware Secretary of State by Parent and Acquisition Sub.  Merger Agreement §§ 2.3(a), 6.3(a).  In addition, through his shareholdings and power under the Merger Agreement and actions pursuant to the Merger Agreement, Musk is a majority beneficial owner and controlling stockholder of Twitter.

## <u>SUBSTANTIVE ALLEGATIONS</u>

### A.     **Musk's Pursuit of Twitter**

15.      Musk has been a Twitter user since 2010.  Since then, he has tweeted approximately 18,700 times and has accrued over 100 million followers, making him one of Twitter's most prolific, and most followed, users.

16.     In January 2022, Musk began secretly purchasing Twitter stock.  In March 2022, Musk issued a series of tweets soliciting his followers' support for

fundamental changes in how Twitter conducted its operations.  His comments made his negative view of Twitter and its content modification policies clear.

17.     Also in March 20222, Musk began publicly and privately communicating with Twitter directors and officers, musing about joining Twitter's Board, purchasing the Company, or starting a competitor. On April 4, 2022, Musk filed a Schedule 13G indicating he owned 9.2% of Twitter's outstanding stock.  Also on April 4, 2022, Musk and Twitter entered into a letter agreement for Musk to become a director of the Company.  Musk agreed that while he served as a director and for 90 days thereafter, he would not become the beneficial owner of more than 14.9% of Twitter's outstanding stock.   Twitter and Musk announced the letter agreement providing that Musk was joining Twitter's board of directors.  On April 9, 2022, Musk notified Twitter that he would not be joining Twitter's board, but would instead make an offer to take Twitter private.

18.     On April 13, 2022, Musk delivered a "best and final" offer "to buy 100% of Twitter stock $54.20 per share in cash" proclaiming he would "unlock" Twitter's "extraordinary potential" as a platform for free speech.  Musk's initial offer was conditioned on regulatory approval, confirmatory diligence, execution of a definitive agreement and completion of financing.   On April 14, 2022, Musk publicly announced his offer.  In response, Twitter's Board approved a so-called poison pill (or shareholders' rights) plan.  In a Schedule 13D filed April 21, 2022,

7

Musk announced a debt commitment letter for $13 billion, a separate margin loan commitment letter for $12.5 billion and an equity commitment letter from Musk for $21 billion, all dated April 20, 2022.  Musk also publicly proclaimed that his $54.20 offer was no longer conditioned on financing or diligence.  He publicly tweeted about the possibility of launching a hostile tender offer, if his offer was not accepted.

19.     On April 24, 2022, Musk indicated to Twitter that his $54.20 per share offer was "binary – my offer will either be accepted or I will exit my position." Musk recognized his $54.20 offer was for the benefit of Twitter's stockholders and even said he would explore a rollover transaction "to provide further value and choice to shareholders."   On April 25, 2022, the parties signed the Merger Agreement.  In the joint press release issued by Twitter and Musk, Musk stated:

> Under the terms of the agreement, Twitter stockholders will receive $54.20 in cash for each share of Twitter common stock that they own upon closing of the proposed transaction.

Twitter Board Chair Bret Taylor said the Merger Agreement was "the best path forward for Twitter's stockholders."  Musk described his plans for Twitter, including "defeating the spam bots."  In further materials filed with the SEC and shared with Twitter employees, the Twitter Board stated that the Merger Agreement "delivers a substantial cash premium to stockholders [and] is the best path forward for Twitter's stockholders."

8

20.     On April 26, 2022, Musk filed Amendment No. 5 to his Schedule 13D statement of beneficial ownership, stating that under the Merger Agreement Twitter would become wholly owned by Parent, which is wholly owned by Musk.

### B.     The Merger Agreement

21.     Musk (as to certain provisions), Parent, Merger Sub and Twitter are parties to the Merger Agreement.  At the time the Merger becomes effective (the "Effective Time"), Twitter will merge with Acquisition Sub, with Twitter surviving the Merger, keeping its name and remaining a Delaware corporation.  Merger Agreement § 2.1.  Under Sections 2.4 and 2.5, the parties agreed that the certificate of incorporation and bylaws of Acquisition Sub would become the certificate and bylaws of Twitter and Acquisition Sub's board of directors would become Twitter's board.  The Twitter shares of Plaintiff and the Class "shall be converted into the right to receive $54.20 per share of Company common stock in cash" (the "Merger Consideration").  Merger Agreement § 3.1(c).  Each share of Acquisition Sub shall be converted into one share of Twitter.  Merger Agreement § 3.1(a).

22.     Twitter will not receive any of the Merger Consideration.  Parent will deposit the Merger Consideration with a paying agent "for the benefit of the holders of Company Common Stock" to be applied promptly to payment of the Merger Consideration to those Twitter stockholders.  Merger Agreement § 3.2(a).  If there is any investment loss on the fund containing the Merger Consideration, Parent is

required to deposit additional funds "for the benefit of the holders of Company Common Stock." Merger Agreement § 3.2(f). The paying agent will pay Plaintiff and the Class the Merger Consideration. Merger Agreement §§ 3.2(b)-(c).

23.    Musk is a party to Sections 5.4, 6.2(d), 6.3, 6.8, 6.10, 6.11, 6.12 and 9.9 of the Merger Agreement. Section 5.4 of the Merger Agreement provides for the Bank Debt Financing, Margin Loan Financing and Equity Financing and further provides that these Financing Commitments "are legal, valid and binding obligations of the Equity Investor, Parent and Acquisition Sub" and are enforceable against them. Section 6.10 reinforces the obligation of Musk, Parent and Acquisition Sub to finance the purchase of the Twitter shares of Plaintiff and the Class. The Merger Agreement requires Musk to transfer Tesla shares to support the Margin Loan at an LTY Ratio not to exceed 20%. Merger Agreement § 6.10(a)(ii)(A). He is also bound by Section 6.3, which requires reasonable best efforts to consummate the transactions contemplated by the Merger Agreement and cause the conditions to the Merger to be satisfied. Under Section 6.8, Musk is not permitted to issue Tweets about the Merger which disparage Twitter or its representatives. Section 6.12 requires Musk and Parent to cause Acquisition Sub to consummate the Merger.

24.    The Merger Agreement contains several provisions to ensure Defendants cannot walk away from the deal. Section 5.2(a) provides that the Merger Agreement "constitutes a legal, valid and binding obligation of Parent and

10

Acquisition Sub, enforceable against Parent and Acquisition Sub." There is no financing condition and few conditions to closing. *See, e.g.,* Merger Agreement §§ 7.1; 7.2. Section 6.10(e) imposes a hell-or-highwater obligation for Defendants, including Musk personally, to "take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable to obtain the Equity Financing." Most importantly, Musk, Parent and Acquisition Sub agreed in Section 9.9 that the Merger Agreement would be specifically enforceable against them.

25.     Section 8.2 of the Merger Agreement, which concerning as the effect of termination of the Merger Agreement provides in pertinent part:

> . . . except as otherwise provided in <u>Section 8.3</u> or in any other provision of this Agreement, no such termination shall relieve any party hereto of any liability or damages (which the parties acknowledge and agree shall not be limited to reimbursement of Expenses or out-of-pocket costs, and, in the case of liabilities or damages payable by Parent and Acquisition Sub, would include the benefits of the transactions contemplated by this Agreement lost by the Company's stockholder) (taking into consideration all relevant matters, including lost stockholder premium, other combination opportunities and the time value of money), which shall be deemed in such event to be damages of such party, resulting from any knowing and intentional breach of this Agreement prior to such termination, in which case, except as otherwise provided in <u>Section 8.3</u>, the aggrieved party shall be entitled to all rights and remedies available at law or in equity.

Thus, the Merger Agreement specifically recognizes that the Twitter stockholders are intended recipients of "the benefits of the transactions contemplated by this Agreement" and are "entitled to all rights and remedies available at law or in equity" for "any knowing and intentional breech" of the Merger Agreement, including the

11

loss of benefits to them contemplated by the Merger Agreement, such as the "lost stockholder premium."

### C.    The Merger Agreement Benefits Twitter Stockholders

26.    The Merger Agreement does not provide any financial benefit directly to Twitter.  Twitter itself survives the merger and continues to operate.  Merger Agreement § 2.1.   Instead, the Merger Agreement provides for Twitter's stockholders to sell their shares to Musk, Parent and Acquisition Sub.  Indeed, Twitter's July 12, 2022 Complaint[1] against Defendants notes the Merger Agreement's assurances that the "agreement would stick" were included "for the benefit of stockholders."  Twitter Complaint ¶ 38.  That Complaint acknowledges that "Musk refuses to honor his obligations to Twitter <u>and its stockholders</u>."  *Id.* ¶ 1 (emphasis added).   Twitter further recognizes that Defendants' conduct creates "uncertainty and delay that harm Twitter <u>and its stockholders</u> and <u>deprive them of their bargained-for rights</u>."  *Id.* ¶146 (emphasis added).

27.    The Merger Agreement includes numerous provisions described above that are for the benefit of the Twitter stockholders, including Sections 3.1, 3.2, 5.4, 6.3, 6.10, 6.12, 8.2 and 9.9.

28.    Twitter filed preliminary proxy materials concerning the Merger on May 17, June 21 and July 15, 2022.  Under Section 6.2 of the Merger Agreement,

---

[1] Trans. ID 67812653.

Parent has the right to review and comment on the proxy statement. Thus, Musk and his affiliates and counsel presumably reviewed the contents of the preliminary proxy materials.

29.     In the July 15, 2022 Preliminary Proxy Statement ("PPS"), Twitter and its Board repeatedly recognize that Musk's acquisition of Twitter was "for the benefit of our stockholders." PPS at 54, 56. The Twitter Board acknowledged "the financial benefit of the transaction to our stockholders." PPS at 57. In a June 20, 2022 letter from Twitter's counsel to Musk's counsel, Twitter brought up Musk's April 24, 2022 threat to make his $54.20 offer directly to the Twitter stockholders "without giving them the benefit of the definitive merger agreement to protect their interest." PPS at 68.

**D.     Musk Is the Majority Owner and Controller of Twitter**

30.     Before and after the signing of the Merger Agreement, Musk directly owned 9.6% of Twitter's outstanding shares. The only larger Twitter stockholder is The Vanguard Group, a passive investor.

31.     Through the signing of the Merger Agreement, Musk gained significant additional beneficial ownership and influence over Twitter. The Merger Agreement gave Musk the right to acquire the 90.4% of Twitter's stock he does not already own. The Merger Agreement is an agreement for the purpose of acquiring the Twitter

stock owned by the other Twitter stockholders.  As a result of the Merger Agreement, Musk became the owner of a majority of Twitter's stock.

32.     Through the Merger Agreement, Musk obtained veto power over numerous matters ordinarily reserved for the Board and Twitter's stockholders under Twitters' certificate of incorporation (the "Certificate"), bylaws (the "Bylaws") and Delaware law.

33.     Pursuant to 8 *Del. C.* § 242(b), the Board and Twitter's stockholders can amend the Certificate.  Under the Merger Agreement, the Certificate cannot be amended in any material respect without Defendants' consent (§ 6.1(a)).

34.      Per Article VI.A. of the Certificate, the Board can amend the Bylaws. Under the Merger Agreement, the Board cannot amend the Bylaws in any material respect without Defendants' consent (§ 6.1(a)).

35.     Per Article XI of the Bylaws, Twitter's stockholders can repeal, adopt and amend bylaws.  Under the Merger Agreement, the stockholders cannot amend the Bylaws in any material respect without Defendants' consent (§ 6.1(a)).

36.     Under the Delaware General Corporation Law Twitter may issue, split, combine, reclassify, repurchase or amend the terms of its stock.  Pursuant to the Merger Agreement, Twitter cannot take such actions without Defendants' consent (§§ 6.1(b)-(c)).

4882-5036-1644, v. 1

37.    Under 8 *Del. C.* §170, the Board can cause Twitter to issue dividends. Under the Merger Agreement, dividends cannot be issued without Defendants' consent (§ 6.1(d)).

38.    Under Article V.A. of the Certificate, Section 3.1 of the Bylaws, and 8 *Del. C.* § 141(a), the Board manages Twitter.  Under the Merger Agreement, without Defendants' consent, the Board cannot:

    a.    increase employee salaries unless "consistent with past practice" (§ 6.1(e));

    b.    acquire any companies (§ 6.1(i));

    c.    incur material debt (§ 6.1(j)); or

    d.    communicate with its employees, customers, suppliers and consultants unless "consistent with prior communications" (§ 6.8)).

39.    Notably, Twitter, which had adopted a stockholders' rights plan on April 15, 2022, to protect stockholders from Musk's takeover, now cannot do so without his consent.  Merger Agreement § 6.1(p).

## E.    Musk Walks Away from the Merger Agreement

40.    Musk himself is largely required to finance the Merger, through a margin loan secured with his Tesla stock, a huge equity commitment, and loans made directly to Twitter.  Since Musk is using Tesla shares to help finance the Merger, the more Tesla's stock price declines, the more Tesla shares Musk has to

sell or pledge to fund the Merger.  Musk is well-known for his reluctance to sell Tesla shares because he wants to continue to maintain control of that company.

41.     On April 23, 2022, the last trading day before the Merger Agreement was signed on April 25, 2022, the closing trading price for a share of Tesla stock was $1,005.05.  After the signing of the Merger Agreement, as Musk started to sell his holdings to finance the Merger, the price of Tesla stock began to fall.  By the end of the week, April 29, 2022, Tesla stock was trading at $870.76 per share.  In other words, the portion of the Merger that Musk was financing through Tesla stock got 13% more expensive for Musk by the week's end.

42.     On May 4, 2022, the Margin Loan Commitment was cut from $13.5 billion to $6.25 billion and Musk's Equity Funding Commitment was increased by $6.25 billion to $27.25 billion.  In Amendment No. 6 to his 13D, Musk announced Co-Investor Equity Commitment Letters for approximately $7.139 billion in cash from investors on Twitter shares (valued at $54.20 per share) to provide part of the equity financing for the purchase of the Twitter stock of Plaintiff and the Class. Thus, Musk was attempting to reduce his obligation to use his Tesla stock to support the margin debt and reduce his obligation to provide equity financing which would require sale of Tesla stock.

43.     Tesla's stock price kept falling, closing at $728.00 per share on May 12, 2022.

4882-5036-1644, v. 1

44.    Musk wanted an out.  But Defendants' ability to terminate the Merger Agreement was (and is) highly restricted by the terms of the Merger Agreement. One of Defendants' few possible grounds for terminating the Merger Agreement is showing that Twitter's representations in the Merger Agreement are not true and correct, causing a Material Advise Effect (an "MAE").  Merger Agreement §§ 7.2(b), 8.1(d)(i).  One of Twitter's representations in the Merger Agreement, contained in Section 4.6(a), is that Twitter's filings with the SEC are materially accurate.

45.    On May 13, 2022, Musk tweeted "Twitter deal temporarily on hold," and linked to a story about Twitter's May 2, 2022 disclosure in a Form 10-Q that it estimated fewer than 5% of its monetizable daily active users were "fake or spam accounts."  Under the Merger Agreement, Musk had no right or authority to put the merger "on hold."  This tweet violated Musk's agreement in Section 6.3 of the Merger Agreement to use reasonable best efforts to consummate the purchase of the Twitter shares.

46.    To lay the groundwork for an exit from the Merger Agreement, Musk publicly claimed that the 10-Q disclosure was an admission that Twitter's SEC filings were false and misleading.  On May 13, 2022, Musk made more tweets about fake accounts, misleadingly contending Twitter's estimates are based upon a

17

sampling of only 100 accounts.  In reality, the estimates are made through review of thousands of accounts.

47.     Musk continued to try to derail the Merger.  On May 15, 2022, in response to another Twitter user's tweet about fake accounts, Musk tweeted that fake accounts may comprise "over 90% of daily active users."  Musk repeated this statement the next day at an industry conference, hosted by the *All-In* podcast.

48.     When Musk appeared at the *All-In* podcast's May 16, 2022 conference, he stated he believes the number of fake Twitter accounts is "four to five times" the 5% figure contained in Twitter's SEC disclosures.  He further stated: "I am still waiting for some sort of logical explanation for the number of sort of fake or spam accounts on Twitter, and Twitter is refusing to tell us.  So you know, this just seems like a strange thing. . . .they claim that they do know. And they claim they have this complex methodology that only they can understand. . . . This is a material public statement, is a Material Adverse Misstatement."

49.     On May 17, 2022, Musk claimed in a tweet that at least 20% of Twitter accounts are fake and the deal could not move forward until Twitter's Chief Executive Officer publicly proved that less than 5% of accounts were fake.  But the most egregious tweet came later that day when Musk, in a reply to his own post about fake accounts, tweeted "Hello @SECGov, anyone home?"

18

50.     Tesla's share price continued to decline.  On May 24, 2022, Musk scrapped entirely the margin loan secured by his Tesla stock, and increased his equity commitment to $33.5 billion.  Tesla stock continued to decline, closing at $628.16 per share that day.  On May 25, 2022, Musk's lawyers claimed Musk was surprised by what he considered Twitter's "tax methodologies" for determining fake or spam accounts and demanded "rigorous computer-aided and third-party testing." The letter did not explain why Musk has not conducted analysis of Twitter's methodologies and requested testing <u>before</u> he signed the Merger Agreement.

51.     It was Musk and his tweets, not Twitter, that attracted the SEC's scrutiny.  On May 18, 2022 the SEC issued comments to Musk's legal counsel concerning his 13D filings.  When Musk did not respond, the SEC issued a June 2, 2022 letter reiterating those comments in writing.  The SEC observed that Musk's May 17, 2022 tweet that "[t]his deal cannot move forward" suggested Musk was "exercising a legal right under the terms of the merger agreement to suspend completion of the acquisition of Twitter or otherwise do not intent to complete the acquisition."  Thus, the SEC recognized that Musk was trying to back out of the Merger Agreement and demanded that he amend his 13D.

52.     On June 6, 2022, Musk filed a 13D amendment attaching a letter from his counsel to Twitter, which repeated Musk's demands for information on spam and fake accounts and asserted he had a right to such information under Section 6.4 and

19

6.11 of the Merger Agreement.  The letter asserted that Musk had the right "not to consummate the transaction" and the "right to terminate the merger agreement." Thus, Musk confirmed what was increasingly clear since mid-May: he had no intention of honoring his contractual commitment and fiduciary obligation to buy the Twitter stock of Plaintiff and the Class.

53.     From late May, 2022 through early July, 2022, Musk's lawyers and Twitter's lawyers exchanged letter volleys arguing over who had breached the Merger Agreement.  Not surprisingly, Twitter's efforts to provide information could not satisfy Musk, who was merely trying to fabricate an excuse for defaulting on his agreement to buy Twitter's stock.

54.     Despite his clear obligation under the Merger Agreement to fund the purchase of Twitter's stock and the lack of any financing condition, during June 2022 Musk raised doubts about the Bank Debt Financing being available to allow the Merger to be consummated, including stating on June 21, 2022 that the Bank Debt Financing "need[ed] to be resolved before the transaction can complete."

55.     On July 8, 2022, with Tesla stock opening at only $727.00 per share, Musk purported to terminate the Merger Agreement in a letter from his counsel to Twitter.  Musk's grounds for doing so were a pretext.

56.     Musk claimed Twitter violated Section 6.4 of the Merger Agreement by failing to provide Musk with information he needed to consummate the Merger,

but, as described at length in Twitter's Complaint against Defendant, Musk's information requests related to fake users were reasonably satisfied and, in any event, were for the purpose of *not* consummating the Merger. Musk's letter admitted that he chose not to seek data and information on fake users before entering into the Merger Agreement.

57.    Musk also contended Twitter's disclosures about fake accounts contained in SEC filings "may have also caused, or is reasonably likely to result in," an MAE and be untrue, because, Musk believes, more than 5% of Twitter accounts may be spam of fake. Musk Termination Letter. But even if Musk is correct (and Musk provides no reason to believe he is), this does not contradict Twitter's SEC filings about spam and fake accounts, which merely disclose that Twitter's own estimate is that less than 5% of accounts are spam or fake, and Musk does not contend that is not Twitter's true estimate. Indeed, Twitter's disclosures of "false or spam accounts" being less than 5% of Twitter's mDAU have been consistently qualified by statements that the mDAU calculation "may not accurately reflect the actual number of people or organizations using our platform" and that the calculation of spam or false accounts involves "significant judgement" and "may not accurately represent the actual number . . . ."

58.    Finally, Musk contends Twitter violated Section 6.1 of the Merger Agreement since some employees have resigned and Twitter implemented layoffs,

fired two employees, and implemented a hiring freeze, all without Musk's consent. But, as detailed in Twitter's Complaint, Twitter tried to engage with Musk on these issues, without any cooperation or substantive response, even though his consent cannot be "unreasonably withheld, delayed or conditioned."  Merger Agreement § 6.1.  Musk cannot create a breach of Section 6.1 by breaching it himself.   Twitter's Complaint details the factual and legal reasons that Twitter has not breached the Merger Agreement.

59.    Later that day, Bret Taylor, Twitter's Board Chair tweeted: "The Twitter Board is committed to closing the transaction on the price and terms agreed upon with Mr. Musk and plans to pursue legal action to enforce the merger agreement. We are confident we will prevail in the Delaware Court of Chancery."

60.    On July 10, 2022, Twitter's counsel advised Musk's counsel that Musk's purported termination of the Merger Agreement "is invalid and wrongful, and it constitutes a repudiation of their obligation under the Agreement."  Twitter asserted that Musk "knowingly, intentionally, willingly, and materially breached" Sections 6.3, 6.8 and 6.10 of the Merger Agreement.

61.    Apparently aware that his termination letter would not be effective, Musk continued to try to create an MAE.  On July 11, 2022, Musk tweeted images of himself with the text "THEY SAID I COULDN'T BUY TWITTER; THEN THEY WOULDN'T DISCLOSE THE BOT INFO; NOW THEY WANT TO

FORCE ME TO BUY TWITTER IN COURT; NOW THEY HAVE TO DISCLOSE
BOT INFO IN COURT."  This was followed by a picture of Chuck Norris and the
text "Chuckmate."



62.     That same day, Musk once again encouraged the SEC to investigate
Twitter's disclosures, responding to a tweet suggesting that more than 5% of
Twitter's users were fake by writing "Hello???@SECGov."

63.     Also on July 11, 2022, Musk tweeted "Problematic" in response to a
tweet about Twitter's May 2, 2022 Form 10-Q's explanation that Twitter identified,
and corrected, a technical error in calculating its mDAU figures.  None of the

23

adjustments to historical mDAU figures exceeded 0.88% of the previously reported mDAU figures.

64.     Only after exhausting its options, on July 12, 2022, Twitter filed its action against Musk and his acquisition entities, seeking to enforce the Company's rights under the Merger Agreement.  Twitter's Complaint acknowledges that the Twitter stockholders also have rights under the Merger Agreement.

<u>**CLASS ACTION ALLEGATIONS**</u>

65.     Plaintiff brings this Action pursuant to Rule 23 of the Rules of the Court of Chancery, individually and on behalf of all other holders of Twitter common stock on or after April 25, 2022 (except Defendants and any person, firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) (previously defined as the "Class").

66.     This Action is properly maintainable as a class action.  The Class is so numerous that joinder of all members is impracticable.  According to Section 4.2 of the Merger Agreement, as of March 31, 2022, there were 763,577,530 shares of Twitter common stock issued and outstanding.  Thus, upon information and belief, there are at least thousands of Twitter stockholders scattered throughout the United States.

67.     There are questions of law and fact common to the Class, including, *inter alia*, whether:

24

a.     Plaintiff and the Class are intended beneficiaries of the Merger Agreement and, therefore, have standing to sue for specific performance and breach of the Merger Agreement;

b.     Defendants breached the Merger Agreement;

c.     Musk breached his individual and personal obligation to fund the Merger;

d.     Musk violated the Section 6.8 of the Merger Agreement and his fiduciary duties though his tweets and public statements, including those on May 13, 14, 15 and 17, and July 11, 2022;

e.     Musk's control of Twitter through his large stock holding, his influence over investors (including through his tweets), his ownership and rights under the Merger Agreement and his actions since the signing of the Merger Agreement, impose fiduciary duties to Twitter stockholders on him;

f.     Plaintiff and the Class are entitled to specific performance of the Merger Agreement; and

g.     Plaintiff and the other members of the Class were injured by the wrongful conduct alleged herein, and, if so, what is the proper measure of damages.

68.     Plaintiff is committed to prosecuting this Action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are

typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the class. Plaintiff is an adequate representative of the Class.

69.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class. Such inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants and/or with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not party to the adjudication and/or would substantially impair or impede their ability to protect their interests.

70.     In purporting to terminate the Merger Agreement and refusing to consummate the purchase of Twitter shares in the Merger, Defendants have acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief, misleading an order of specific performance, and related declaration relief with respect to the Class as a whole.

71.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

4882-5036-1644, v. 1

## COUNT I

### Direct Claim for Specific Performance and Breach of Contract
(Against All Defendants)

72.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

*Plaintiff and the Class Are Third-Party*
*Beneficiaries of the Merger Agreement*

73.     Twitter and Musk intended for the Merger Agreement to confer a material benefit on the Plaintiff and the Class.  Therefore, Plaintiff and the Class are intended beneficiaries of that agreement and have enforceable rights thereunder. The Merger Agreement manifests an unambiguous intent to benefit Twitter stockholders because it provides compensation for their stock, which is to be converted into $54.20 in cash in the Merger.  Furthermore, stockholder approval of the Merger Agreement was required.   The specific benefits to the stockholders override the Merger Agreement's disclaimer of third-party beneficiary rights.

74.     Plaintiff and the Class seek to enforce a right specifically and explicitly granted in the Merger Agreement: the right to sell their stock to Musk for cash.  That right is not incidental—the overriding purpose of the Merger Agreement is for Musk to purchase the stockholders' shares through the Merger.

27

75.     As detailed above, the terms of the Merger Agreement, the Preliminary Proxy Statement and other public statements by Twitter and Musk admit that the Merger Agreement is for the benefit of Twitter's stockholders.

76.     Twitter's Complaint against Musk confirms that the Twitter stockholders are intended beneficiaries of the Merger Agreement who will be harmed by Musk's breach. *E.g.*, Twitter Complaint ¶ 1 (recognizing Musk's obligations to the Twitter stockholders and that Musk's breach is destroying stockholder value); *id.* ¶ 6 (Musk's breach seeks to shift the cost of the market downturn to the Twitter stockholders); *id.* ¶ 11 (the Twitter stockholders are entitled to "the benefit of Musk's bargain"); *id.* ¶ 36 (Musk agreed to specific performance requiring him to buy the shares of the Twitter stockholders); ¶ 38 (the Twitter Board obtained assurances in the Merger Agreement "[f]or the benefit of stockholders" in order that "the agreement would stick"); *id.* ¶ 40 ("Under the [Merger Agreement] . . . Twitter stockholders will receive $54.20 per share in cash").

77.     The Merger Agreement affects the rights of the Twitter stockholders and gives them rights. Section 3.1(c) provides that their stock can be taken from them but as a substitute creates the right for them to receive $54.20 in cash as compensation. Under Section 3.5, even dissenting shares will no longer be outstanding and the right to appraisal will be substituted for the shares. Section 6.1 restricts *inter alia* the stockholders' rights to (a) amend the certificate or bylaws; (b)

have their shares repurchased; (c) receive dividends; (d) participate in a stockholder rights plan. Section 6.2(c) and Section 6.5 impinges on rights relating to notice, voting and alienability.  Section 8.3 further limits the remedies available to Plaintiff and the Class if Defendants violate the Merger Agreement.  The right of Twitter stockholders to have their shares purchased in the Merger is in substitution for these pre-existing rights, which are restricted by the terms of the Merger Agreement.

*Plaintiff and the Class Have a Right to Specific Performance of the Obligation of Defendants to Purchase Their Twitter Shares*

78.    The Merger Agreement is a valid contract and Plaintiff and the Class are intended beneficiaries of that contract for the sale of their Twitter shares to the Defendants for $54.20 per share in cash.  Plaintiff and the Class are ready, willing and able to sell their shares to Defendants for $54.20 per share in cash pursuant to the Merger Agreement.  The balance of equites tips in favor of Plaintiff and the Class.  They are victims of Musk's machinations and efforts to avoid his contractual obligation.   Based on changed market circumstances, Musk suffered buyer's remorse, sought to trash Twitter, knowingly and intentionally breached the Merger Agreement and reneged on his obligation under the Merger Agreement to purchase the Twitter shares.  Defendants have knowingly and intentionally breached Sections 3.1(c), 3.2, 5.4, 6.3(a), 6.10 and 6.12 of the Merger Agreement.

79.    In Section 9.9 of the Merger Agreement, Defendants agreed that their failure to perform the Merger Agreement, including consummating the Merger by

buying the shares of Plaintiff and the Class, would cause irreparable harm for which monetary damages would not be an adequate remedy and that an injunction, specific performance and other equitable relief would be warranted.  Defendants are sophisticated parties represented by sophisticated counsel and have agreed that specific performance is an appropriate remedy for their failure to consummate the purchase of the Twitter shares of Plaintiff and the Class pursuant to the Merger Agreement.

80.    Plaintiff and the Class have suffered and will continue to suffer irreparable harm as a result of Defendants knowing and intentional breaches of the Merger Agreement and refusal to complete the purchase of their Twitter shares.

81.    Plaintiff and the Class also seek damages resulting from Defendants' breaches of the Merger Agreement, including the time value of money.  If specific performance of Defendants' obligation to purchase the Twitter share of Plaintiff and the Class is not ordered and accomplished, then in the alternative Plaintiff and the Class seek damages, including the lost stockholder premium, resulting from Defendants' knowing and intentional breaches of the Merger Agreement.

4882-5036-1644, v. 1

## COUNT II

## Direct Claim for Breach of Fiduciary Duty

### (Against All Defendants)

82.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

### *Musk Owes Fiduciary Duties to the Twitter Stockholders*

83.     Because of his direct share ownership, his right to acquire shares under the Merger Agreement, his contract rights under the Merger Agreement and his actions after the signing of the Merger Agreement, Musk and his acquisition entities are the majority /controlling stockholder of Twitter and owe fiduciary duties to the Twitter stockholders.

84.     Musk acknowledges he is the owner of 9.6% of Twitter's outstanding shares. The Merger Agreement gives him the contractual right to acquire the remaining shares of Twitter.  Under Delaware law, Musk is the beneficial owner of a majority of Twitter's outstanding stock.  *See, e.g.*, 8 *Del. C.* § 203 (definition of beneficial ownership).  The Merger Agreement contains few conditions.  Twitter has acknowledged that: "As of July 13, 2022, stockholder approval of the Merger Agreement [was] the only remaining approval or regulatory condition to consummating the closing of the Merger under the Merger Agreement." As Twitter

31

has acknowledged at paragraph 37 of its Complaint, there is a "high level of closing certainty."

85.    The Merger Agreement gives Musk substantial control of Twitter's operations and activities.  Section 6.1 requires Musk's approval for a wide array of corporate actions and permits him to require Twitter to operate its business only in the ordinary course.  Section 6.2 gives Musk contractual rights as to a stockholder meeting, proxy statement and proxy solicitation.  Section 6.5 gives Musk contractual rights as to a sale of Twitter and recommendations of the Twitter Board.  Musk thus holds veto power over stockholders' votes on certain matters, and the ability of Twitter's stockholder-elected Board to exercise its powers.

*Defendants Have Breached Their Fiduciary Duty of Loyalty*

86.    In reneging on the Merger Agreement, acting to undermine the transaction and seeking to shift the market risk to Twitter stockholders, Defendants have pursued their own self-interest at the expense of Plaintiff and the Class.  This violates Defendants' duty of loyalty.

87.    Defendants' breach of loyalty will result in irreparable harm to Plaintiff and the Class and entitles them to injunctive and other equitable relief and damages.  Defendants' duty of loyalty requires that they fulfill their commitment to purchase the Twitter shares or be liable for damages, including the lost stockholder premium.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and relief in his favor and in favor of the Class, and against the Defendants as follows:

A.   Declaring that this Action is properly maintainable as a class action and certifying the proposed Class;

B.   Finding Plaintiff and the Class to be intended beneficiaries of the Merger Agreement;

C.   Issuing an order of specific performance, requiring Defendants to comply with the Merger Agreement and effectuate the Merger;

D.   Finding that Defendants violated the Merger Agreement;

E.   Finding Defendant Elon Musk liable for breaches his fiduciary duties owed to Plaintiff and the Class;

F.   Awarding damages to Plaintiff and the Class against all Defendants for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein, in an amount to be determined at trial; together with interest thereon;

G.   Awarding the Class members damages together with pre- and post-judgment interest;

H.   Awarding Plaintiff the costs, expenses, and disbursements of this Action, including all reasonable attorneys' and experts' fees; and

33

I.      Awarding Plaintiff and the Class such other relief as this Court deems just and equitable.

PRICKETT, JONES & ELLIOTT, P.A.

OF COUNSEL:

*/s/ Michael Hanrahan*
Michael Hanrahan (Bar No. 941)

SCOTT+SCOTT
ATTORNEYS AT LAW LLP
Max Huffman
Joseph A. Pettigrew
600 W. Broadway, Suite 3300
San Diego, CA 92101
(619) 233-4565

Samuel L. Closic (Bar No. 5468)
John G. Day (Bar No. 6023)
Robert B. Lackey (Bar No. 6843)
1310 N. King Street
Wilmington, Delaware 19801
(302) 888-6500

SCOTT+SCOTT
ATTORNEYS AT LAW LLP
Scott R. Jacobsen
Jing-Li Yu (Bar No. 6483)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
(212) 223-6444

*Counsel for Plaintiff*

Dated: July 29, 2022

34

# EXHIBIT 4



**Table of contents**

Updated as of October 27, 2022
Updates as of October 24, 2022
Updates as of October 21, 2022
Updates as of October 20, 2022
Updates as of October 17, 2022
Updates as of October 6, 2022
Updates as of October 4, 2022
Updates as of September 13, 2022
Updates as of August 30, 2022
Updates as of August 4, 2022
Updates as of July 26, 2022
Updates as of July 13, 2022
FAQs previously provided on May 19, 2022
What's happening? (Overview)
Process and timeline
The Board
Leadership
Compensation
Customers/Advertisers/Business Partners
Company culture and benefits
Future of Twitter

**Updates as of October 27, 2022**

Please see Elon Musk's Tweet on October 27, 2022 titled, "Dear Twitter Advertisers."

"I wanted to reach out personally to share my motivation in acquiring Twitter. There has been much speculation about why I bought Twitter and what I think about advertising. Most of it has been wrong.

The reason I acquired Twitter is because it is important to the future of civilization to have a common digital town square, where a wide range of beliefs can be debated in a healthy manner, without resorting to violence. There is currently great danger that social media will splinter into far right wing and far left wing echo chambers that generate more hate and divide our society.

In the relentless pursuit of clicks, much of traditional media has fueled and catered to those polarized extremes, as they believe that is what brings in the money, but, in doing so, the opportunity for dialogue is lost.

That is why I bought Twitter. I didn't do it because it would be easy. I didn't do it to make more. I did it to try to help humanity, whom I love. And I do so with humility, recognizing that failure in pursuing this goal, despite our best efforts, is a very real possibility.

That said, Twitter obviously cannot become a free-for-all hellscape, where anything can be said with no consequences! In addition to adhering to the laws of the land, our platform must be warm and welcoming to all, where you can choose your desired experience according to your preferences, just as you can choose, for example, to see movies or play video games ranging from all ages to mature.

I also very much believe that advertising, when done right, can delight, entertain and inform you; it can show you a service or product or medical treatment that you never knew existed, but is right for you. For this to be true, it is essential to show Twitter users advertising that is as relevant as possible to their needs. Low relevancy ads are spam, but highly relevant ads are actually content!

Fundamentally, Twitter aspires to be the most respected advertising platform in the world that strengthens your brand and grows your enterprise. To everyone who has partnered with us, I thank you. Let us build something extraordinary together."

**Updates as of October 24, 2022**

*Reposting this information that was published in a [companywide FAQ](#) from a team@ email on May 13, 2022.*

What is our general severance package if a position is eliminated?

> Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:
>
>> Two months base salary or On Target Earnings for employees on the Sales Incentive Plan
>>
>> Pro-rated Performance Bonus Plan compensation at target
>>
>> Cash value of equity that would have vested within three months from the separation date
>>
>> A cash contribution for health care continuation.
>
> For Tweeps who are on a work-related visa, we also consider an extended notice period to enable additional time to transfer their visa to a new employer.
>
> Of course, we also comply with local employment laws and apply any additional statutory severance for redundancies that may occur outside of the United States.

**Updates as of October 21, 2022**

> All vested TWTR shares and cash held in EAC accounts have been transferred to your connected Charles Schwab brokerage accounts. Please note that the trading window will remain closed for current employees.

**Updates as of October 20, 2022**

> With the anticipated closing of the merger agreement, there are a lot of teams working in the background to prepare for the transition. We will continue to update [go/AcquisitionFAQ](#) on a rolling basis and also send proactive updates and answers to overarching questions.

Please know, as we get closer to deal close, there will continue to be tons of public rumors and speculation. Two things to clarify.

First, we do not have any confirmation of the buyer's plans following close and recommend not following rumors or leaked documents but rather wait for facts from us and the buyer directly.

Second, earlier in the year and as we have shared in public proxy filings, there were targeted cost savings discussions and planning. Those discussions stopped once the merger agreement was signed. As we've shared at #OneTeam meetings, since the merger agreement has been in place, there have been no plans for any company-wide layoffs.

We will continue to keep you all updated with relevant information and updates as we approach closing.

**Updates as of October 17, 2022**

***From the Twitter Equity Award Center (posted October 17, 2022):***

We are writing to let you know of an update related to our Equity Award Center. There is no immediate action for you to take.

In anticipation of the closing of the pending acquisition of Twitter by an entity controlled by Elon Musk (the "Acquisition"), it will be necessary to freeze all activity in the Equity Award Center (EAC) beginning at close of the market today, October 17, 2022. This freeze allows Schwab to perform final reconciliation of employee accounts prior to close of the Acquisition. You will not be able to access balances or transact in the EAC any longer. All vested TWTR shares and cash held in EAC accounts will be transferred to your connected Charles Schwab brokerage accounts and available to you by end of day on Monday, October 24, 2022; however the trading window will remain closed for current employees.

When the Acquisition closes your vested TWTR shares will be automatically converted into the right to receive $54.20 per share in cash in accordance with the terms of the Merger Agreement for the Acquisition. More information about this can be found in go/AcquisitionFAQ. Participants may also wish to download any personal documents including a copy of their grant agreement PDFs for future reference (watch the tutorial for instructions starting at 1:03). We expect that access to the EAC will cease upon the closing of the Acquisition as Twitter will no longer be a public company and the related equity plans will be terminated. Please note that participants will still have access to their Charles Schwab brokerage accounts after the Acquisition is completed.

***From "ESPP Supplemental Update" (sent October 12, 2022):***

In connection with the execution of the agreement involving the pending acquisition by an entity owned by Elon Musk (the "Acquisition"), participants in Twitter's Employee Stock Purchase Plan (ESPP) previously received an ESPP Update that summarized the treatment of the ESPP leading up to the closing of the Acquisition. The ESPP Update described, in part, that due to the Acquisition, the ESPP offering period that began on November 15, 2021, may have a final purchase date that occurs earlier than its normally scheduled purchase date of November 15, 2022, and that a follow-up notice about any final purchase date would be provided at a later date. Additional information regarding the Acquisition is included in Twitter's definitive proxy statement dated July 26, 2022, filed with the Securities and Exchange Commission (the "SEC")

in connection with the solicitation of proxies to approve the Acquisition and in other relevant documents filed by Twitter with the SEC.

**In anticipation of the possible closing of the Acquisition, the final purchase date under the ESPP for the offering period that began November 15, 2021, has been set to be October 14, 2022.**

Any Tweep who is enrolled in this offering period and remains an ESPP participant through this date will have his or her accumulated ESPP contributions applied to the purchase of shares on October 14, 2022, and then cease participating after such final purchase. No additional ESPP contributions will be deducted after this date, and any accumulated ESPP deductions remaining in any ESPP accounts after the purchase of shares on the final purchase date will be returned to the appropriate participants, in cash, promptly after the final purchase occurs.

The purchase price on the final purchase date will be 85% of the <u>lower of</u> the closing price of a share of Twitter's common stock on (i) November 15, 2021, or (ii) the final purchase date.

More details regarding treatment of the ESPP in connection with the Acquisition can be found in the previous ESPP Update. You also can review the FAQs at go/AcquisitionFAQ if you have any more questions.

**Updates as of October 6, 2022**

> The Chancellor has ordered a stay on our trial, meaning that we will no longer be going to court on October 17. We will work with our buyer to close the acquisition by October 28, per the order.
>
> If the buyer is unable or unwilling to close by then, we will reconvene with the Chancellor to reschedule the trial for November.
>
> Our intention remains the same: to close the acquisition at the price and terms in the original merger agreement.

**Updates as of October 4, 2022**

> We received the letter from the Musk parties which they have filed with the SEC. Our intention is to close the transaction at $54.20 per share.
>
> We are still continuing to litigate this matter in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition. As a reminder, our five-day trial is scheduled to begin October 17, 2022.

**Updates as of September 13, 2022**

What was the result of the stockholder vote?

> Our stockholders approved the adoption of the Merger Agreement between Twitter and affiliates of Elon Musk for $54.20 per share in cash. You can see our press release here.
>
> Based on a preliminary tabulation following the Special Meeting of Stockholders, approximately 98.6% of the votes cast at the Special Meeting approved the proposal. The approval of our stockholders satisfies the final condition precedent to the closing of the merger (other than those conditions that by their nature are to be satisfied at closing). After certification by the Special Meeting's inspector of

elections, the final voting results will be filed with the SEC. We do not expect that the voting outcome will change after certification.

Obtaining stockholder approval is an important step forward in this process, however we are still continuing to litigate this matter in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition. As a reminder, our five-day trial is scheduled to begin October 17, 2022.

What is happening with Elon Musk's purported termination of the merger agreement?

As previously announced, affiliates of Mr. Musk have delivered notices purporting to terminate the merger agreement. Twitter continues to believe that Mr. Musk's purported termination of the merger agreement is invalid and without merit, and that the Musk parties continue to be bound by the merger agreement and obligated to complete the merger on the agreed terms and conditions. Twitter has filed a lawsuit in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition, and Twitter remains committed to doing so on the price and terms agreed upon with Mr. Musk.

**Updates as of August, 30, 2022**

What is our response to the buyer's second termination letter?

The buyer sent a second termination letter, and we responded, which you can read in full here. As was the case with the buyer's previous termination letter, his second termination letter is invalid and wrongful. Twitter has breached none of its representations or obligations under the Agreement, and Twitter has not suffered and is not likely to suffer a Company Material Adverse Effect. We remain committed to closing the transaction on the price and terms agreed upon with Mr. Musk.

**Updates as of August 4, 2022**

What is mDAU?

Twitter defines monetizable daily active usage or users (mDAU) as people, organizations, or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day through twitter.com, Twitter applications that *are able to* show ads, or paid Twitter products, including subscriptions. Monetizable means they could see ads or pay Twitter through a subscription, not that they will see ads on any given day. As our filings state, they are on a monetizable client or application.

How does Twitter determine mDAU?

When an account logs in or is otherwise authenticated on Twitter on any given day through twitter.com, Twitter applications that are able to show ads, or paid Twitter products, including subscriptions.

Average mDAU for a period represents the number of mDAU on each day of such period divided by the number of days for such period. Changes in mDAU are a measure of changes in the size of our daily "logged in" or otherwise authenticated active total accounts.

Why do we measure mDAU?

Audience metrics are seldom one size fits all but some form of daily active usage is a typical metric in our industry. Different products have different definitions they employ tailored to their specific service.

mDAU (monetizable daily active user) is designed to be our baseline to gauge broad usage and growth on the Twitter platform.

Monetizable means they *could* see ads or pay for a subscription, not that they *will* see ads. They are on a monetizable client or application.

We are committed to providing something valuable to people on Twitter every day.

As stated in our SEC filings, "We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement."

Our goal is not to disclose the largest user number we can but rather one that has more relevance. mDAU is designed to provide relevance and context to external stakeholders that reflects our goal of delivering value to people on Twitter every day and monetizing that usage.

Why do advertisers trust Twitter?

Twitter has historically built integrity through transparency and consistent operating principles. This approach is unwavering and something that differentiates us.

Twitter has never been more important to our customers around the world. We are working closely with our clients and partners, who can continue to expect our best-in-class customer service, client solutions and commitment to brand safety. We remain focused on delivering priority solutions in areas such as performance marketing, measurement, shopping, brand strategy and more.

We stand by our reporting methods and are transparent with the process for estimating our mDAU, accounts that are spam within mDAU and when updates are made.

As stated in our SEC filings, "We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement."

How do advertisers measure success on Twitter?

The results and metrics associated with campaign objectives are what best determines advertiser ROI.

Campaign objectives could focus on areas such as reach, video views, website traffic, app installs, followers, engagements, etc.

Targeting can focus on: followers, custom audiences, geography, language, interests, device type, etc.

Success metrics may include: Video views, impressions, Site visits, number of app downloads, various cost per data points (i.e. CPI, CPM, CPC, CPE), conversions, brand sentiment, etc.

We work with a variety of first and third party measurement companies to help validate.

Twitter has solutions that help advertisers measure the success of a campaign, maintain privacy, and brand safety:

Twitter First-Party Measurement Solutions

Advertisers can leverage Twitter's suite of first-party measurement solutions to garner learnings such as brand lift, media metrics, viewability, conversions, and more.

Third-Party Measurement Solutions

Advertisers know their ads are being seen using third-party accredited viewability reporting partners

See more here for information on our partners who help advertisers with measurement, Ad analytics, targeting, creative and more.

Twitter + Third-Party Brand Lift Surveys

We help advertisers measure the impact of campaigns on key brand metrics such as awareness, association, favorability, and consideration, using our first-party and third-party Brand Lift Surveys.

Third-Party Viewability — Moat, IAS, DV Direct Integration

We help brands measure the quality of impressions and video views of their media buys with our third-party partners such as MOAT, IAS, and DV.

Advertiser audience targeting:

Via a suite of intuitive, performant, and privacy-compliant tools, we enable advertisers to refine campaign delivery and reach the people that are most likely to be receptive to a brand's message. Advertisers on Twitter can:

Reach people based on who they are with Demographic targeting.

Reach people based on how they access Twitter with Device targeting.

Reach people based on how they engage on Twitter with Audience Features.

Leverage off-platform data to build Custom Audiences on Twitter.

Let Twitter find the people most likely to drive results with Automated Targeting.

Extend reach to people similar to core audience with Audience Expansion.

Enriched Twitter Audiences and Account Based Marketing

Twitter can help advertisers drive even more results with powerful ways to reach our audiences.

Enriched Twitter Audiences are hyper-targeted custom audiences that expand reach, increase engagement, and improve overall

performance. These custom audiences are created by trusted partners using Twitter's data.

For B2B advertisers, Account Based Marketing campaigns identify business decision makers and their influential communities on Twitter.

Across many verticals including gaming, fashion, and pharma, these solutions are making it easier for customers to drive results.

Campaign Planner: New as of June 2022

The tool enables customers to forecast reach, impressions, average frequency, and CPM against a specific audience, campaign duration, frequency setting, placement, and budget for auction-based campaigns.

We've also made it easier than ever to execute reach campaigns by allowing advertisers to start and save a draft campaign directly from the tool.

Campaign Planner is available to advertisers in the United States, United Kingdom, and Japan.

Partners can also tap into tools such as Audience Estimate.

See more here for examples of successful advertising campaigns that include key campaign metrics.

How does Twitter calculate spam?

We shared a comprehensive blog post and Tweet thread about how we define and calculate spam/bots here and here, respectively.

Customers org: If clients have questions, you can use this client-facing language reactively.

Does Twitter use AI and ML to identify spam and bots on the platform?

We do! Specifically, Twitter deploys spam detection capabilities that have resulted, and continue to result, in the suspension of typically more than one million spam accounts every day, including both automated and manual reviews of accounts and activity on the Twitter platform during and after sign-up. Twitter also locks millions of accounts each week that cannot pass human-verification challenges, such as CAPTCHAs or phone verifications.

Our processes encompass a mix of human engagement and automation to identify malicious spam and bots.

We are always testing and exploring ways to further advance our systems for detection and remediation.

Separate from these automated and manual spam-detection processes, Twitter estimates the prevalence of false and spam accounts within mDAU through multiple human reviews (in replicate) of thousands of randomly selected accounts each quarter using both public and private data.

Did Twitter cooperate by providing the Buyer's team the information they were requesting?

Yes. Twitter has continuously shared information with the buyer to consummate the transaction in accordance with the terms of the merger agreement.

Throughout this process we have and will continue to protect proprietary and confidential information of Twitter advertisers and our customers' private user data.

Why didn't Twitter choose to redact any information from the acquirer's countersuit?

We fully stand by our SEC filings, the methodologies we use to calculate mDAU, and our statements about the percentage of spam accounts on our platform.

What is our public response to the countersuit?

The counterclaims are factually inaccurate, legally insufficient, and commercially irrelevant.

Why did Twitter recast its mDAU values three days after signing the agreement?

The updated values for mDAU reflected a change of less than 1% for each impacted period.

Twitter has historically built integrity through transparency and consistent operating principles. We reported this out of an abundance of transparency. Twitter disclosed this recast when we announced Q1 2022 Earnings in April.

Why did Twitter move from disclosing MAU to mDAU in 2019?

We want to provide something valuable to people on Twitter every day, and we believe that mDAU, and its related growth, are the best ways to measure the success of our objectives and to show the size of our audience and engagement.

**Updates as of July 26, 2022**

What's the schedule for our case?

The judge set a schedule for our case in the Delaware Court of Chancery for a five-day trial in October.

Does our Board of Directors recommend how stockholders should vote?

Yes, the Twitter Board of Directors recommends that stockholders vote in favor of the transaction ("FOR").

When is the Special Meeting of Stockholders?

The meeting is scheduled for September 13, 2022 at 10am PT. Anyone who owns TWTR stock (including Tweeps) as of July 22, 2022 is entitled to vote prior to or during the meeting.

What should stockholders expect?

Each stockholder will receive voting materials in the very near future. The materials describe easy ways to vote electronically, over the phone, or by mail. If you received your voting materials by email, you can simply click the "Vote Now" button in the email. Otherwise, the easiest way to vote your shares is to go to proxyvote.com and enter the Control Number(s) provided to you in the materials. Please note that if you hold Twitter shares in more than one account (e.g., in our employee share purchase plan (ESPP), in registered name, or through a personal bank or brokerage account), you'll receive separate emails or hard copies of voting materials for each account. To make sure that all your shares are represented, you must submit a vote for each account in which you hold Twitter shares. You will receive a separate Control Number for each account in which you own shares.

What communications will stockholders receive from Innisfree, our proxy solicitor?

We asked Innisfree to work with us to ensure our shareholders are educated about this important proposal, so you will likely receive more communications from them over the coming weeks via email, phone call and traditional mail. If you have any questions, please call Innisfree at +1 (877) 750-8338 (US/Canada) or +1 (412) 232-3651 (all other countries).

**Updates as of July 13, 2022**

What does Mr. Musk's notice mean? Is the deal now officially off?

No. Mr. Musk's purported termination is invalid and wrongful.
As we noted in our press release and commentary from the Chairperson of our Board, the Twitter Board is committed to closing the merger on the $54.20 price and terms agreed upon with Mr. Musk and plans to pursue legal action to specifically enforce the merger agreement.
Please understand that the Twitter Board and executive management team are continuing to actively manage the process related to the acquisition. We will share information with you as we can, but this is an evolving situation and we may not have, or be able to share, answers to all of your questions.

What is Mr. Musk's goal?

We are not in a position to speculate about Mr. Musk's objectives.

Given that we plan to pursue legal action to enforce the merger agreement, how long will it take to resolve that?

As with many legal matters, it is difficult to predict the duration of this process. We have a group of internal team members and external advisers who are dedicated to this workstream. It is important to remember that during this process, it is business as usual for all of us at Twitter. That means we should continue the important and meaningful work of driving Twitter forward and continuing to deliver value to our users and customers.

Have we shared bot information with Mr. Musk as requested?

We have met our obligations under the merger agreement.

Has Twitter breached the merger agreement?

As stated in the letter attached to our 8-K filing from July 11, 2022, "Twitter has breached none of its obligations under the Agreement," and "As it has done, Twitter will continue to provide information reasonably requested by Mr. Musk under the Agreement and to diligently take all measures required to close the transaction.

Anything more you can share with us about the complaint that we filed on July 12, 2022?

The complaint is public and details why Twitter believes that Mr. Musk's purported termination is invalid and wrongful.

Given this is active litigation, we are limited in what we can say beyond our public filings.

We have a group of internal team members and external advisers who are dedicated to this workstream. It is important to remember that during this process, it is business as usual for all of us at Twitter. That means we should continue the important and meaningful work of driving Twitter forward and continuing to deliver value to our users and customers.

**What is the likelihood of a settlement? What is our desired outcome?**

The Twitter Board is committed to closing the merger on the $54.20 price and terms agreed upon with Mr. Musk.

**Why haven't we implemented retention packages or similar for Tweeps?**

Tweeps are the heart of Twitter and will always be essential to our success. On June 20, 2022, we sent Mr. Musk a formal request for consent to two tailored employee retention programs that had been vetted by the board and the compensation committee with the assistance of an outside compensation consultant.  Mr. Musk has not provided his consent to implement these programs.

**How do we plan to retain talent?**

Our attrition is slightly higher than best practice for normal macroeconomic times, but remains inline with current industry trends. We will continue to monitor it to ensure that we can quickly identify any areas of concern and help mitigate where possible.

**What's the plan to support the transition of our current projects and work?**
Until the transaction closes, we'll be focused on continuing to drive the business forward. We are confident plans for transition will be properly created.

**Is there a possibility for layoffs, now or post-close?**

We're not looking at company-wide layoffs. However, teams from across the company are reprioritizing and making changes to ensure we are operating responsibly and efficiently in the current operating environment. We may continue to see restructuring and org changes as we continue to align with our revised business needs (as we always have in the past).

**What regulatory agencies will need to approve the transaction?**

As of July 13, 2022, stockholder approval of the Merger Agreement is the only remaining approval or regulatory condition to consummating the closing of the Merger under the Merger Agreement.

**FAQs previously provided on May 19, 2022**

**What's happening?**

Twitter has entered into a definitive agreement to be acquired by a private entity affiliated with Elon Musk. The purchase price is $54.20 per share. We expect the transaction to close in 2022, subject to the satisfaction of customary closing conditions. Upon completion of the transaction (or the "closing"), Twitter will become a privately held company.

Twitter's board of directors (the "Board") undertook a thoughtful, comprehensive, and deliberate process to review the proposal and unanimously determined the transaction was in the best interests of our stockholders.

There are still several steps to close. Completion of the transaction is subject to the approval of Twitter stockholders, the receipt of applicable regulatory approvals, and the satisfaction of other customary closing conditions.

Upon the closing, Twitter equity awards will be canceled and converted into the right to receive a cash amount of $54.20 (less any applicable exercise price) for each underlying share. The cash amount payable for unvested Twitter equity awards will be payable over the same pre-transaction vesting schedule as the award that was canceled.

The terms of the agreement specifically provide for Tweep annual base salary, bonus opportunities (short/long term incentive (excluding equity) opportunities) and employee benefits so that, in each case, they are no less favorable in the aggregate than the comparable opportunities or benefits, as applicable for at least one year from the closing date.

Between now and closing, we generally will operate Twitter in normal course - just like we always have. In general, we do not expect any changes to Tweep compensation programs and benefits. Twitter RSUs and other equity awards will vest as they normally have. Business decisions will continue to be made by Twitter's leadership.

**Process and timeline**

Why did Twitter enter into this transaction and why do we feel it is still best for stockholders?

The Twitter Board undertook a thoughtful and comprehensive process to review Elon Musk's proposal, with a deliberate focus on value, certainty, and financing. The Twitter Board considered, among other things, Twitter's go-forward prospects in the current market as well as other potential value-creating opportunities.

The Board still believes this transaction, which delivers a substantial cash premium to stockholders, is the best path forward for Twitter's stockholders.

Why did we announce the transaction when we did?

> We announced the deal to employees and the public at the same time as we had a legal and fiduciary responsibility as a public company to do so.

How long will it take for this deal to close?

> We expect the transaction to close in 2022 subject to the satisfaction of customary closing conditions.

Why did we implement a Shareholder Rights Plan ("poison pill")?

> The Board adopted the Shareholder Rights Agreement on April 15, which has been referred to as a "poison pill" in the press. The Board adopted the rights plan to enable all stockholders to realize the full value of their investment in Twitter by reducing the likelihood that any entity, person or group gains control of Twitter through open market accumulation without paying all stockholders an appropriate control premium or without providing the Board sufficient time to make informed judgments and take actions that are in the best interests of shareholders.

Is there a go-shop provision?

> No. All of these details are laid out in the merger agreement that has been filed with the SEC.

What does it mean to become a privately held company? What are the benefits?

> Generally, private companies' shares are not publicly traded or held by a broad group of shareholders.
> Private companies typically do not have to incur costs related to public reporting and may have more flexibility to operate.
> Until the transaction closes, it remains business as usual, and we are continuing to operate normally as an independent, publicly traded company.

Once the deal closes, is there a test for the debt coverage capabilities?
> In an acquisition like this one, it is common for the party acquiring a target company to add debt to the target's balance sheet. In assessing the deal, prospective lenders have considered the leverage ratio, which is one of the credit metrics used to measure the ability of the target company to use its cash flows to repay all its debt obligations, including principal and interest payments.

What does the acquisition mean for our debt?
> The debt balance on our balance sheet will be higher. If you are reading news externally, you have probably seen that Mr. Musk's affiliates received $13B of commitments from banks for loans to partially finance the deal. Twitter will ultimately incur such loans after the transaction closes. A portion of Twitter's existing debt balance, which is $5.2B today, is expected to be repaid in

connection with the closing, and new debt securities are expected to be issued by Twitter.

What are the upcoming major milestones of the deal and when will Tweeps find out?

We expect the transaction to close in 2022, subject to satisfaction of customary closing conditions, including required regulatory and stockholder approvals. In terms of next milestones, we expect to file a preliminary proxy statement in the near future relating to the special meeting of stockholders to vote to approve the merger agreement. Once that document clears SEC review, we will file a definitive proxy statement and then hold the special meeting on the timeline specified in the proxy statement. We will aim to keep you informed of major updates.

Where are we in the acquisition cycle? Do the changes to hiring and cost savings have any implications on this?

We're still on track and working to close the transaction in a timely manner. We expect the transaction to close in 2022, subject to satisfaction of customary closing conditions, including required regulatory and stockholder approval.

**The Board**

What factors did the Board use to evaluate whether this would be in the best interest of stockholders?

As mentioned above, the Board undertook a thoughtful and comprehensive process to review the proposal, with a deliberate focus on value, certainty and financing. The Board's vote to approve the transaction was unanimous.
The Board considered the proposal in light of the company's go-forward prospects and the current market environment, among numerous other considerations.
Additional details of the Board's process will be made available in our future SEC filings.

Did the Board get a fairness opinion? From whom?

Yes, Goldman Sachs and JP Morgan each provided a fairness opinion.

Did the Board lose confidence in the business?

Absolutely not. The Twitter Board considered the proposal in light of Twitter's go-forward prospects and the current market environment, among numerous other considerations.
This transaction is a great outcome for stockholders and demonstrates the tremendous value of Twitter.

**Leadership**

What will Twitter's leadership team look like post-close?

It's too early to speculate on that right now.

For now, our team is focused on continuing to operate our business as we have and taking steps to secure the approvals we need to close the transaction and set Twitter up for continued success as a private company.

Will we have a board of directors post-close? Who will hold our new owner accountable?

Private companies are operated differently than public companies, but they are also subject to many of the same governance requirements and regulations as a public company. Twitter is incorporated in Delaware, which provides rules that dictate our governance.

Are the recent changes to Staff, cost savings, and hiring pause connected to the acquisition? These changes are ones that Twitter has been contemplating and is driving as part of our ordinary course operations and operational improvements. In order to responsibly manage the organization as we sharpen our roadmaps and our work, we need to continue to be intentional about our teams, hiring, and costs. We will continue to remain focused on strengthening our work through increased accountability and execution to make Twitter everything it can be.

**Compensation and Equity Awards**

Will this announcement impact promotion decisions and related compensation increases?

No. Until the deal closes, it is business as usual for Twitter, including with respect to promotion decisions or related comp changes.

What will our compensation program look like without RSUs? How will we stay competitive?

Tweeps are the heart of Twitter and will always be essential to our success. We expect our compensation program will reflect that.
It is too early to determine the future of our incentive programs as a private company, but we will share more information as soon as it becomes available. We currently expect to continue to offer competitive rewards (regardless of the underlying currency of those rewards) to attract and retain talent.

Will we grant new Twitter equity awards between now and deal close for promotions and role changes?

We will continue to grant Twitter equity awards until the transaction closes, as we normally would for promotions and role changes. After the transaction closes, we expect our compensation program will be reviewed and updated to account for the fact that we will operate as a privately-held company. We will share more information when it becomes available.

**Existing Twitter Shares and Equity Awards**

Will the trading window change as a result of this announcement?

No, the trading window will not change. We're still a public company and we will still report quarterly earnings on the same cadence that we did before, so we expect our calendars generally will be the same. We expect this to be the case until the deal closes.

Should I or can I sell Twitter stock that I own?

As long as you are not in possession of any material nonpublic information (MNPI) regarding Twitter, you are free to trade Twitter stock when trading windows are open. You are still bound by all black-out periods and the other terms of our insider trading policy.

What happens to my existing Twitter equity awards if the transaction closes?

Unless and until the transaction closes, the terms of your Twitter equity awards will remain the same.

Once the transaction closes, then your Twitter equity awards (whether granted under our 2013 Equity Incentive Plan or assumed in an acquisition of your prior employer) will be treated as described below:

**RSUs**

Each vested RSU will be converted into the right to receive the $54.20 purchase price in cash as described below. If RSUs were subject to performance-based vesting, the number of vested RSUs subject to that award will be based on actual achievement.

Each unvested RSU will be converted into the right to receive an amount in cash equal to $54.20. This cash amount will vest in installments on the same vesting schedule that applied to the canceled unvested RSUs it is replacing, subject to continued service through the applicable vesting date. If unvested RSUs were subject to performance-based vesting, the number of RSUs subject to that award will be deemed earned at the target level of achievement.

For example, if you have 100 RSUs that vest on November 1, 2022 (assuming the transaction closes before that date), then you will receive a cash amount equal to $5,420, less applicable tax withholding, on November 1, 2022 through payroll.

Under the terms of the deal, all unvested RSU awards are converted into the right to receive cash in an amount equal to the product of the total number of unvested RSUs and the per share purchase price ($54.20). The resulting cash amount then vests and will be paid to you according to the original vesting schedule subject to your continued service through the applicable vesting dates, which will remain in place.

**Options**

Each vested option will be converted into the right to receive an amount in cash equal to the difference between $54.20 and the option exercise price for each underlying share.

Each unvested option will be converted into the right to receive an amount in cash equal to the difference between $54.20 and the option exercise price for each underlying share. This cash amount will vest on the same vesting schedule that applied to those canceled unvested options it is replacing, subject to continued service through the applicable vesting date.

**<u>Restricted Stock Awards</u>**

Each restricted stock award will be converted into the right to receive $54.20 in cash. This cash amount will vest on the same vesting schedule that applied to the canceled award it is replacing, subject to continued service through the applicable vesting date.

When will the cash amounts for my Twitter equity awards described be paid?

Generally, amounts payable to you for your vested equity awards will be paid to you, less applicable tax withholding, within five business days after the closing of the transaction.

Generally, amounts payable to you for your unvested Twitter equity awards will be paid to you, less applicable tax withholding, through payroll on the same vesting schedule that applied to those equity awards before the transaction, subject to your continued service through the applicable vesting date.

Please consult with your tax advisor as to the tax consequences to you of these payments.

What happens to cash amounts payable for unvested Twitter equity awards if a Tweep departs before the cash amounts are vested?

The cash amounts payable in respect of your unvested Twitter equity awards will only vest and be paid to you if you remain in continuous service with Twitter through the applicable vesting date. If your service with Twitter (or a subsidiary) ends before a portion of such cash amount is vested, you will not receive that portion of the cash amount and it will be forfeited to Twitter.

Do Twitter RSUs have a "change in control" clause that will accelerate vesting if layoffs occur within one year?

Generally, no. Unless you are party to a separate agreement with Twitter, your Twitter equity awards (or the cash amounts payable for such equity awards) will not receive accelerated vesting if your employment is involuntarily terminated following the closing of the transaction (known colloquially as a "double trigger").

As is customary in our industry, only a few of our executives and other senior employees currently have a "double trigger" provision.

Do all Tweeps have the same vesting schedule?

Generally, Twitter equity awards are granted through the annual refresh process or promotion process vest on a quarterly vesting schedule (with vesting dates in February, May, August, and November); however, depending on when a Tweep was hired, their new hire grant may vest outside of those normal dates. The award agreement provided to you upon the grant of your Twitter equity award will contain your applicable vesting schedule.

Will the $54.20 purchase price change with the fluctuation of Twitter's current stock price or because of inflation?

No, the transaction price of $54.20 per share is fixed, including for purposes of future cash payouts for equity awards on the same vesting schedule.

For International Tweeps, as individual RSUs convert into the cash equivalent of $54.20 post-close, will international Tweeps receive this in U.S. dollars through their brokerage account (ex: Schwab) or will it be converted into local currency and deposited into their payroll?

Finance and Payroll are working on this now, however, the merger agreement provides that cash amounts paid in respect of unvested Twitter equity awards will be paid in U.S. dollars. We will share more information when it becomes available.

**New hires and offers**

Will new hires continue to receive RSUs?

Yes, we expect we will continue our current practices for new hire grants up until the close.

Are there any changes to the methodology for how new hire grants are converted to shares?

No, until the closing of the transaction, we expect we will continue our current equity granting practices.

How will this announcement affect new Tweeps who have signed an offer letter with RSUs, but have not yet joined the company? What should we tell candidates that have equity in their current offer letters?

New Tweeps will still be granted their RSUs subject to the terms of their offer letters, however depending on the timeline of closing and their vesting schedule, they may receive equivalent cash payments in respect of those RSUs.

What do we tell candidates if they ask us about this announcement during an interview?

Please point them to the press release (Parag Tweeted a link to it) for all of the specific details related to the announcement.

You may use this FAQ to answer questions for candidates and use the What's happening? section of this doc for key messages to third parties.

**ESPP**

If you are a current ESPP participant, your accumulated ESPP contributions will be used to purchase shares on May 16, 2022, unless you withdraw in advance of the purchase date. There will not be a new offering period beginning on May 16, 2022, and any current ESPP participant who is enrolled in the ESPP offering period that began on May 15, 2021 will cease participating in the ESPP after May 16, 2022.

If you are a current ESPP participant who is enrolled in the offering period that began on November 15, 2021, you may continue to participate in the ESPP following May 16, 2022. The final purchase date is scheduled to occur on November 15, 2022, or, if earlier, a date that is at least 10 business days prior to the date on which the transaction closes. Following the final purchase date, the ESPP will then terminate, subject to the closing of the transaction.

If you are a current ESPP participant, you may not make any increases to your ESPP contribution rate.

Shares received through the exercise of an ESPP purchase right will be converted at the closing of the transaction into the right to receive $54.20 per share in cash.

You may opt out of the ESPP at any time through Charles Schwab. If you opt out of the ESPP prior to a purchase date, you will be refunded the accumulated but unused contributions in your ESPP account.

**Customers/Advertisers/Business Partners**
*Tweeps: *Please see the email from Sarah Personette with an email template to send to clients and partners**
How will this transaction impact business partners? Customers?

The service has never been more important to our customers around the world, and the work of our teams is critical.

Partners can continue to expect our best-in-class customer service, client solutions, and commitment to brand safety.

We cannot speculate on changes Elon Musk may make post closing.

While Twitter has signed the deal, there are still more steps to take in order to close, which is expected to be in 2022.

For now, there will be no changes as a result of this announcement.

Any changes will be communicated as they always have.

Will there be changes to how advertisers potentially leverage Twitter?

> During the period until closing, Twitter will operate as it always has.
> Advertisers can continue to turn to Twitter to drive awareness and consideration for their products and services when they want to launch something new or connect with what's happening.
> We remain focused on delivering priority solutions in areas such as performance marketing, measurement, shopping, brand strategy, and more.
> Any changes will be communicated as they always have.

Will there be any changes to our advertising model?

> Until the transaction closes, it is business as usual for us.
> We remain committed to our product roadmap that helps businesses Launch something, connect with what's happening, and help people buy their products or services.
> We continue to support businesses - big and small - to be able to do this with both our native and paid solutions.
> Our commitment to our customers remains unchanged.

Will there be any changes to our commitment to brand safety in light of freedom of speech comments?

> Until the transaction closes, it is business as usual for us, including with respect to our terms of service.
> Everything we do centers around people.
> At the core of Twitter, we are an organization focused on how we create a space for all voices to have a chance to participate in the public conversation.
> For us, we seek to tackle it by focusing on our Policies, Products, and Partnerships.
> We have no planned changes to our commitment to brand safety and will continue to lead in products that protect, policies that lead, and partnerships that matter.

**Company culture and benefits**

How will our acquisition impact our IDEA goals, and how can we ensure that Twitter maintains its values and commitment to social responsibility?

> Twitter is an open service that's home to a world of diverse people, perspectives, ideas, and information, and our IDEA principles and commitment to social responsibility will continue to be an integral part of our company's core.
> Our Tweepforce representation goals remain in place, and we are committed to delivering on our IDEA roadmap during this period.

**Benefits/perks**

What does the future hold for reimbursements, allowances, and other perks?

> We do not expect any changes to these programs at the moment.

Are there any changes to parental leave benefits or medical, dental, and vision benefits?

> We do not expect any changes to these programs at the moment.
> The agreement provides for Tweep benefits, base salary, and bonus opportunities (short/long term incentives) to continue on a comparable basis for at least one year following the close of the transaction.

Are there any plans to adjust benefits for hourly employees prior to the closing?
> We do not expect any benefits to change for our hourly Tweeps at this time.

**Remote work**

Will our commitment to flexible/remote work change?

> We do not expect our policies around remote work to change at this time. A significant portion of our workforce is either fully or partially remote. That is how we have worked the last several years and that is how we currently expect to work going forward during this time.

**Contractors and Interns**

How will this announcement affect contractors? Will their contracts be cut short upon close?

> We do not expect any changes to our contingent workforce at this time.

Will contractor conversions to FTE be considered in 2022 while we wait for the deal to close?

> These decisions will be handled on a case-by-case basis. As always, please stay close to your S&O and FP&A partners, as well as your Staff lead for hiring and conversion decisions.

Are there any changes to our intern program?

> We have no current plans to change our intern program.

**Immigration/Visas**

What impact will there be for employees being sponsored through work visas?

> There is no impact to employer-sponsored visas at this time. When the deal closes, we anticipate that your employing entity will remain the same, and thus there will be no impact to your visa status. If you have questions about your individual immigration status, please contact talentmobility@twitter.com.

**Communications**

What are we doing to prevent leaks?

Employees are held to the standards laid out in our Playbook, which includes communications guidelines.
Leaks hurt the company's ability to communicate in the best way possible.
We do our part to investigate how information leaks and handle accordingly.

Why do Twitter employees find out big news like this at the same time as the public?

We do our best to share information with all of you as soon as we're able.
In this case, there are laws in place (such as Regulation FD) that require we disclose information to all members of the investment community at the same time. These laws help to ensure investors receive information at the same time. Given employees are also shareholders, we cannot selectively disclose information ahead of other audiences.

I'm being approached by the press, or people I don't know, for comments on Twitter. What should I do?

Please continue to handle any inquiries in accordance with Twitter's policies. Press or other inquiries should be directed to the appropriate parties within Twitter for response. Please raise any concern to CorpSec@, even if you're unsure about the intention of the question. If you are approached by the press, please forward any inquiries to press@twitter.com.

**Future of Twitter**

How will the product be impacted? Will there be any changes to the user experience?

Until the transaction closes, it is business as usual for us, including with respect to our products. We are always iterating to make Twitter the best it can be for people on the service. When there are changes, we will be sure to communicate as we always have.

Will our policies around content moderation change?

Until the transaction closes, it is business as usual for us, including with respect to our terms of service. As we always do, we will continue evolving and iterating to improve the product and the health of the public conversation during this time.

Should we be prepared to dial back our work over the next few months, and correspondingly our budgets?

Between now and close, we should continue operating Twitter in normal course as a public company.
We should always be mindful of our expenses and ensure we're seeing a corresponding return on investment.

Are our priorities changing as a company, or should we continue working on existing projects? Should we still focus on our current OKRs?

Until the transaction closes, it remains business as usual and we are continuing to operate normally as an independent, publicly-traded company.

While the deal is still pending, we must continue to execute and advance our existing strategy.

**Protections**

How will the closing of the transaction affect employee benefits and compensation?

The merger agreement provides special protection for Tweep compensation and benefits for one year following the closing of the transaction.

Specifically, the agreement specifically provides that, for one year following the closing of the transaction, the purchasing entity will:

- Maintain existing base salary and wage rates of continuing Tweeps
- Provide continuing Tweeps with short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those than existing compensation opportunities, although equity compensation may or may not be granted in the future
- Provide continuing Tweeps with employee benefits (excluding equity and equity-based awards) that are substantially comparable in the aggregate to existing benefits
- Provide continuing Tweeps whose employment are terminated during such period with severance payments and benefits that are no less favorable than those applicable to an applicable employee prior to the closing of the transaction
- Recognize continuing Tweeps' service to Twitter in determining eligibility, vesting and determination of the level of benefits applicable to such employees following the closing of the transaction
- Waive requirements for continuing Tweeps to satisfy any deductible, co-payment, out-of-pocket maximum or similar requirements under the acquiring entity's benefits plans to the extent the employee has made correlating previously credited payments under a Twitter benefit plan
- Waive waiting periods, preexisting condition exclusions and requirements to show evidence of good health for continuing Tweeps

What will happen to Twitter user data/IP after the deal closes? Will any of our policies regarding data protection, including with regard to employee specific information, be impacted by this announcement?

We will continue to treat information with the utmost protection and operate consistent with the laws.

If I'm on a company sponsored visa, are there any risks if I travel outside of the country during the closing period?

We recognize that there are a lot of questions about Tweeps working on a company sponsored visa. For specific questions about your individual status, please contact talentmobility@twitter.com.

**Compliance**

Do we expect any potential risks as a private social media company from a regulatory standpoint?

> As a private company, Twitter will still have to comply with any rules and regulations that govern the activities of social media companies. The same risks apply as they do now and if you have any questions, you should consult with the Compliance team.

**Additional Information and Where to Find It**

On May 17, 2022, Twitter Inc. ("Twitter") filed a preliminary proxy statement in connection with its Special Meeting of Stockholders (the "Special Meeting") related to the pending acquisition of Twitter (the "Transaction"). Prior to the Special Meeting, Twitter will furnish a definitive proxy statement to its stockholders, together with a proxy card. STOCKHOLDERS ARE URGED TO READ THE DEFINITIVE PROXY STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION. Detailed information regarding the names, affiliations and interests of individuals who are participants in the solicitation of proxies of Twitter's stockholders is available in Twitter's preliminary proxy statement.

Stockholders may obtain, free of charge, Twitter's proxy statement (in both preliminary and definitive form), any amendments or supplements thereto, and any other relevant documents filed by Twitter with the U.S. Securities and Exchange Commission (the "SEC") in connection with the Special Meeting at the SEC's website (http://www.sec.gov). Copies of Twitter's definitive proxy statement, any amendments or supplements thereto, and any other relevant documents filed by Twitter with the SEC in connection with the Special Meeting will also be available, free of charge, at Twitter's investor relations website (https://investor.twitterinc.com) or by writing to Twitter, Inc., Attention: Investor Relations, 1355 Market Street, Suite 900, San Francisco, California 94103.

**Forward-Looking Statements**

This communication contains forward-looking statements that involve risks and uncertainties, including statements regarding: the Transaction, including the expected timing of the closing of the Transaction; considerations taken into account by Twitter's Board of Directors in approving the Transaction; and expectations for Twitter following the closing of the Transaction. If any of these risks or uncertainties materialize, or if any of Twitter's assumptions prove incorrect, Twitter's actual results could differ materially from the results expressed or implied by these forward-looking statements. Additional risks and uncertainties include those associated with: the possibility that the conditions to the closing of the Transaction are not satisfied, including the risk that required approvals from Twitter's stockholders for the Transaction or required regulatory approvals to consummate the Transaction are not obtained; potential litigation relating to the Transaction; uncertainties as to the timing of the consummation of the Transaction; the ability of each party to consummate the Transaction; possible disruption related to the Transaction to Twitter's current plans and operations, including through the loss of customers and employees; and other risks and uncertainties detailed in the periodic reports that Twitter files with the SEC, including Twitter's Annual Report on Form 10-K filed with the SEC on February 16, 2022, and Quarterly Report on Form 10-Q filed with the SEC on May 2, 2022, which may be obtained on the investor relations section of Twitter's website (https://investor.twitterinc.com). All forward-looking statements in this communication are based on information available to Twitter as of the date of this communication, and Twitter does not assume any obligation to update the

forward-looking statements provided to reflect events that occur or circumstances that exist after the date on which they were made, except as required by law.