# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| WOLFRAM ARNOLD, ERIK FROESE, TRACY HAWKINS, JOSEPH KILLIAN, LAURA CHAN PYTLARZ, and ANDREW SCHLAIKJER,<br><br>                Plaintiffs,<br><br>      v.<br><br>X CORP. f/k/a TWITTER, INC., X HOLDINGS CORP. f/k/a X HOLDINGS I, INC. and ELON MUSK,<br><br>                Defendants. | C.A. No. 1:23-cv-00528-CFC |

## <u>NOTICE OF SERVICE OF SUBPOENA</u>

PLEASE TAKE NOTICE that, pursuant to Rules 30 and 45 of the Federal Rules of Civil Procedure, Plaintiffs Wolfram Arnold, Erik Froese, Tracy Hawkins, Joseph Killian, Laura Chan Pytlarz, and Andrew Schlaikjer (collectively, "Plaintiffs"), through their counsel, have caused to be issued the attached Subpoena to Produce Documents (Ex. 1), to be served on Quinn Emmanuel Urquhart and Sullivan, LLP.

Dated: August 30, 2023

Akiva Cohen (*pro hac vice*)
Dylan M. Schmeyer (*pro hac vice*)
Michael D. Dunford (*pro hac vice*)
Lane A. Haygood (*pro hac vice*)
KAMERMAN, UNCYK, SONIKER & KLEIN
P.C.
1700 Broadway, 16th Floor
New York, NY 10019
Tel: (212) 400-4930
acohen@kusklaw.com
dschmeyer@kusklaw.com
mdunford@kusklaw.com

/s/ Joseph L. Christensen
Joseph L. Christensen (#5146)
CHRISTENSEN & DOUGHERTY LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Tel: (302) 212-4330
joe@christensendougherty.com

*Attorneys for Wolfram Arnold, Erik Froese, Tracy Hawkins, Joseph Killian, Laura Chan Pytlarz, and Andrew Schlaikjer*

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | | | |
|---|---|---|---|
| WOLFRAM ARNOLD, ERIK FROESE, TRACY HAW | ) | | |
| *Plaintiff* | ) | | |
| v. | ) | Civil Action No. | C.A. No. 1: 23-cv-00528 CFC |
| X CORP. f/k/a TWITTER, INC., X HOLDINGS CORP. f/k/a X HOLDINGS I, INC. and ELON MUSK | ) ) | | |
| *Defendant* | ) | | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
Quinn Emmanuel Urquhart and Sullivan, LLP

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule A

| Place: Kamerman, Uncyk, Soniker & Klein, P.C., 1700 Broadway, 16th Floor New York, NY 10019 | Date and Time: 09/14/2023 9:00 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 08/31/2023

*CLERK OF COURT*

OR

_____      /s/ Akiva M. Cohen
*Signature of Clerk or Deputy Clerk*       *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

Akiva M. Cohen, Kamerman, Uncyk, Soniker & Klein, P.C., 1700 Broadway, 16th Floor, New York, NY 10019, acohen@kusklaw.com, 212.400.4930

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. C.A. No. 1: 23-cv-00528 CFC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c)  Place of Compliance.**

  **(1)  *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)  *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** inspection of premises at the premises to be inspected.

**(d)  Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)  *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)  *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)  *Quashing or Modifying a Subpoena.***
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e)  Duties in Responding to a Subpoena.**

  **(1)  *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)  *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g)  Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## <u>SCHEDULE A</u>

**I.     DEFINITIONS**

1.   The terms "and" and "or" shall be construed both conjunctively and disjunctively to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

2.   The term "any" means any and all.

3.   The term "each" means each and every.

4.   The term "including" means including but not limited to.

5.   Terms in the present tense include the past and future tenses. Terms in the past tense include the present and future tenses. Terms in the future tense include the present and past tenses.

6.   The singular form of terms includes the plural, and the plural form of terms includes the singular.

7.   Terms in the masculine, feminine or neuter form shall include each of the other genders.

8.   The term "THIS ACTION" means the civil action *Arnold et al. v. X Corp et al*. and bearing the case number 1:23-cv-00528. which was filed in the Federal District Court of Delaware on or about May 16, 2023.

9.   The term "MERGER AGREEMENT" means the Agreement and Plan of Merger By and Among X Holdings I, Inc., X Holdings II, Inc., and Twitter, Inc., dated April 25, 2022.

10. The term ACQUISITION FAQ means the document annexed hereto as Exhibit 1, including all prior versions thereof.

11. The term "TWEEP" means "Company Service Provider" as it is defined in the MERGER AGREEMENT.

12. The terms "YOU" and "YOUR" mean and refer individually and collectively to the law firm of Quinn Emmanuel Urquhart and Sullivan, LLP and any attorneys, paralegals, assistants, staff members, or any other persons acting at its direction or under its supervision, whether during their time as partners or employees of or when partners or employees of any other law firm. The terms "YOU" and "YOUR" further mean and refer to any present or former agents, representatives, employees, attorneys, investigators, and other persons acting under YOUR authorization, employment, direction, or control, whether employed or retained on a full-time, part-time, independent contractor, commission, or other basis.

13. The terms "PERSON" and "PERSONS," and the possessive forms of those terms, mean and include natural persons, corporations, partnerships, limited partnerships, associations, organizations, joint ventures, governmental units or entities, and any other kind of business or other entity whether or not employed by YOU; and the acts of a PERSON are defined to include the acts of a director, officer, owner, member, employee, agent, consultant or attorney acting on the PERSON's behalf.

14. The term "COMMUNICATION" means any recording of any transfer of information, ideas, opinions, or thoughts made by any means, at any time or place, under any circumstances, INCLUDING by a single person hearing or seeing by any means, personal meeting, telephone, letter, facsimile, and e-mail. COMMUNICATIONS are not limited to direct transfers between PERSONS, but include other transfers and memorializations, such as records, memoranda to file, electronic or magnetic transfer of computer files, facsimile transmissions, and teletype transmission. COMMUNICATIONS may be embodied in any means or media, including

2

writing, electronic or magnetic storage or computer files, electronic mail, voice mail, answering machine, digital recording, sound recording, and facsimile transmission.

15. The term "DOCUMENTS" means and refers to all "Documents and things" identified in, or within the scope of Federal Rule of Civil Procedure 34(a) and the 1970 Advisory Committee Note thereto, the Local Rules of the United States District Court for the District of Delaware, the District of Delaware Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI"), and any decision interpreting one or more of such rules, and all forms of "writings" and "recordings" as defined by Federal Rule of Evidence 1001(1) and includes, without limitation, all tangible record of intelligence or information, whether handwritten, typed, printed or otherwise visually or orally reproduced, including information stored on magnetic or optical media or in solid state storage devices, notes, drafts, reports, art-work, films, videotape, e-mails, drawings, graphs, photographs, agreements, letters, test data, circuit diagrams, software structure charts, software flow charts, software code, data flow diagrams, hardware schematic diagrams, hardware logic diagrams, field maintenance print sets, timing diagrams, technical summaries, product description documents, software description documents, laboratory or engineers' notebooks, project or progress reports, database information, whether for prototypes or production products, and the like. A draft or non-identical copy bearing on any sheet (front or back), margins, attachment, or enclosure thereof, any mark that is not a part of the original text or reproduction thereof, is a separate document within the meaning of this term.

16. When referring to a human person, "IDENTIFY" means to give, to the extent known, the person's full name, present or last known address, phone number and the present or last known place of employment, if known. Once a person has been identified in accordance with

this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person. When referring to a business or other entity, "IDENTIFY" means to state the entity's full name, present or last known address, and present or last known telephone number, and to describe the nature of its business or other operations. When referring to Documents, "IDENTIFY" means to give, to the extent known, the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s) and all recipient(s), including "cc"s and "bcc"s. When referring to electronically stored information "IDENTIFY" means to give (i) the type of electronically stored information; (ii) its format; (iii) its location; (iv) its date; (v) its author(s), addressee(s) and all recipient(s), including "cc"s and "bcc"s.

17. The term "RELATING TO" or any variants thereof, when used in conjunction with any DOCUMENT, shall be understood to apply if the DOCUMENT directly or indirectly evidences, mentions, discusses, constitutes, concerns, supports, contradicts, refers to, or in any way deals with the subject matter described in the Request in which the term appears.

## II. INSTRUCTIONS

1. If, in responding to this Request for Production, the responding party encounters any ambiguities when construing a request of definition, the response shall set forth the matter deemed ambiguous and the construction used in responding.

2. These Requests call for all DOCUMENTS, electronically stored information, and tangible things on the particular subject (a) in YOUR possession, custody or control, (b) in the possession, custody or control of anyone acting on YOUR behalf, irrespective of who generated, prepared, received, sent, or signed the DOCUMENTS or tangible things.

3. DOCUMENTS, electronically stored information, and tangible things responsive to these Requests shall be produced as they are kept in the usual course of business, or should be

4

organized and labeled to correspond to categories set forth in these Requests. When produced as

kept in the ordinary course of business or as organized and labeled to correspond with the

categories set forth in these Requests, the DOCUMENTS and tangible things shall be produced

with the folders (or copies thereof) kept by the Person who had the DOCUMENTS in his, her, or

its possession, custody or control so that Plaintiffs will know who had the DOCUMENTS or

things in his, her, or its possession, custody or control. Please produce DOCUMENTS in such a

manner as will facilitate their identification with the particular request or category of requests to

which they are responsive. File folders with table or labels identifying DOCUMENTS must be

produced intact with the DOCUMENTS. DOCUMENTS attached to each other should not be

separated. Selection of DOCUMENTS from files and other sources shall be performed in a

manner sufficient to ensure that the source of each Document may be determined, if necessary.

To the extent that YOU process hard copy documents for YOUR internal review, including by

OCR, such documents should be produced together with all associated electronic information.

With respect to electronically stored information, each document produced must be accompanied

with filepath information sufficient to identify the storage location and full folder tree

information associated with that document and available to YOU when and if the file is viewed

in the location in which it is maintained in the ordinary course of business.

    4.  Electronically stored documents should be produced in native format and

accompanied by a Concordance/Opticon load file that includes the following metadata

fields/information: (1) VOLUME/volume the data was produced on; (2) Custodian/Source of

data, indicated, for individuals, as follows: [Last name], [First name]; (3) BEGNO/Start Bates

(including prefixes), no spaces; (4) ENDNO/End Bates (including prefix); (5) DOCID/Identical

to BEGNO; (6) BEGATTACH/First Bates Number in attachment range; (6) ENDATTACH/Last

Bates Number in attachment range; (7) Record Type/File Type, e-mail, attachment; (8) Subject/As set forth in e-mail; (9) From Author/ [Last name], [First name]; (10) TO/ / [Last name], [First name]; (11) CC/ [Last name], [First name]; (12) BCC/ [Last name], [First name]; (13) Sent Date/E-mail sent date; (14) TITLE/ File name; (15) Date Created/From file header metadata; (16) Date last modified/From file header metadata; (17) File Size/in KB; (18) Application/Application used to create the file; (19) File Path/Original location of the file for loose files email folder location for email and attachments; (20) Doclink/Link to native file on production volume; (21) EXTRACTED TEXT/OCR/Filepath on production volume for extracted text/OCR; and (22) md5hash/Hash value.

5. <u>Partial Production</u>. Whenever a DOCUMENT is not produced in full please state with particularity the reason(s) it is not being produced in full and describe, to the best of YOUR knowledge, information and belief, and with as much particularity as possible, those portions of the DOCUMENT that are not produced and the reasons therefore. If a deposition transcript or other DOCUMENT cannot be produced because it is proprietary or believed to be proprietary, please produce an invoice thereof or otherwise provide information sufficient for Plaintiffs to obtain such transcript or other DOCUMENTS.

6. <u>Documents Withheld</u>. Whenever in these Requests YOU are asked to IDENTIFY or produce a DOCUMENT that is deemed by YOU to be properly withheld from production, Identify the portion of the request, *i.e.*, request number(s), to which the withheld DOCUMENT is responsive and:

      a.   If You are withholding the DOCUMENT under claim of privilege (including but not limited to the work product doctrine), please provide the information set forth in Federal Rule of Civil Procedure 26(b)(5), including:

i)      The type of DOCUMENT;

ii)     The general subject matter of the DOCUMENT;

iii)    The date of the DOCUMENT;

iv)    Such other information as is sufficient to IDENTIFY the DOCUMENT, including, where appropriate, the length of the DOCUMENT, as well as the author, addressees, custodian, and any other recipient of the DOCUMENT, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other, in a manner that, without revealing the information claimed to be protected, will enable this party to assess the applicability of the privilege or protection claimed by YOU;

v)     The nature and basis of the privilege claimed;

vi)    If the privilege claimed is the attorney-client privilege, an indication of which author(s) or addressee(s) is/are attorney(s); and

vii)   Any other information necessary to support the claim of privilege.

b.    If production of any requested DOCUMENT(s) is objected to on the ground the production is unduly burdensome, describe the burden or expense of the proposed discovery;

c.    If YOU are withholding the DOCUMENT for any reason other than an objection that it is beyond the scope of discovery or that a request is unduly burdensome, provide the reason for withholding the DOCUMENT, and the information requested in sections 6(i)(a)-(d) above. Regardless of whether a Protective Order is entered by the Court, in all instances in which YOU are withholding

DOCUMENTS or things on the ground of confidentiality, please so indicate in YOUR responses.

7. Whenever a DOCUMENT contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material. If a privilege is asserted with regard to part of the material contained in a DOCUMENT, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a DOCUMENT has been redacted or altered in any fashion, IDENTIFY as to each DOCUMENT the reason for the redaction or alteration, the date of the redaction or alteration, and the Person performing the redaction or alteration. Any redaction must be clearly visible on the redacted DOCUMENT.

8. To the extent information is maintained in both hard copy and magnetic or electronic form, produce both forms.

9. If a DOCUMENT is in a language other than English, produce both the original and any translation thereof.

10. Orderly Response. Please produce DOCUMENTS in such a manner as will facilitate their identification with the particular request or category of request to which they are responsive. File folders with tabs or labels identifying DOCUMENTS must be produced intact with the DOCUMENTS. DOCUMENTS attached to each other should not be separated. Selection of DOCUMENTS from files and other sources shall be performed in a manner sufficient to ensure that the source of each DOCUMENT may be determined, if necessary.

11. Duty to Produce Continues. Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these discovery requests are intended to be continuing in nature so as to require supplemental or amended responses or answers, or production of additional DOCUMENTS, if

any additional information or DOCUMENTS are obtained in the future. Such supplemental or amended responses or answers or such production of additional DOCUMENTS shall be furnished within ten (10) days of the date on which any additional information or document is obtained.

    12. <u>Inability to Produce</u>. If any or all of the DOCUMENTS IDENTIFIED herein are no longer in YOUR possession, custody, or control because of destruction, loss, or any other reason, then please provide the following information for each such Document:

        d.     A description of the content of that Document;

        e.     The location of all copies of the Document;

        f.     A description of the reason why that Document no longer remains in YOUR possession, custody or control; and

        g.     The date of, and the identity of the Person responsible for, its destruction, loss, transfer, or other action by which the Document left YOUR possession, custody or control.

## III.    REQUESTS

### <u>REQUEST NO. 1.</u>

    All DOCUMENTS and COMMUNICATIONS RELATING TO Section 6.9 of the MERGER AGREEMENT, including but not limited to DOCUMENTS and COMMUNICATIONS RELATING TO its meaning, intent, purpose, and enforceability, and specifically including any work product, drafts, client communications, comments, or discussions related thereto.

### <u>REQUEST NO. 2.</u>

    All DOCUMENTS and COMMUNICATIONS RELATING TO Section 9.7 of the MERGER AGREEMENT, including but not limited to DOCUMENTS and

COMMUNICATIONS RELATING TO its meaning, intent, purpose, and enforceability, and specifically including any work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 3.**

All DOCUMENTS and COMMUNICATIONS RELATING TO the ACQUISITION FAQ, including any work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 4.**

All DOCUMENTS and COMMUNICATIONS RELATING TO communications with TWEEPS regarding the MERGER AGREEMENT, specifically including work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 5.**

To the extent not produced in response to prior requests, all DOCUMENTS and COMMUNICATIONS pertaining to communications with TWEEPS regarding severance or other benefits, from March 1, 2022 through the present, including any work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 6.**

To the extent not produced in response to prior requests, all DOCUMENTS and COMMUNICATIONS pertaining to TWEEP severance or other benefits, from March 1, 2022 through the present, including work product, drafts, client communications, comments, or discussions.

# EXHIBIT 1



**Table of contents**

Updated as of October 27, 2022

Updates as of October 24, 2022

Updates as of October 21, 2022

Updates as of October 20, 2022

Updates as of October 17, 2022

Updates as of October 6, 2022

Updates as of October 4, 2022

Updates as of September 13, 2022

Updates as of August 30, 2022

Updates as of August 4, 2022

Updates as of July 26, 2022

Updates as of July 13, 2022

FAQs previously provided on May 19, 2022

What's happening? (Overview)

Process and timeline

The Board

Leadership

Compensation

Customers/Advertisers/Business Partners

Company culture and benefits

Future of Twitter

**Updates as of October 27, 2022**

Please see Elon Musk's Tweet on October 27, 2022 titled, "Dear Twitter Advertisers."

"I wanted to reach out personally to share my motivation in acquiring Twitter. There has been much speculation about why I bought Twitter and what I think about advertising. Most of it has been wrong.

The reason I acquired Twitter is because it is important to the future of civilization to have a common digital town square, where a wide range of beliefs can be debated in a healthy manner, without resorting to violence. There is currently great danger that social media will splinter into far right wing and far left wing echo chambers that generate more hate and divide our society.

In the relentless pursuit of clicks, much of traditional media has fueled and catered to those polarized extremes, as they believe that is what brings in the money, but, in doing so, the opportunity for dialogue is lost.

That is why I bought Twitter. I didn't do it because it would be easy. I didn't do it to make more. I did it to try to help humanity, whom I love. And I do so with humility, recognizing that failure in pursuing this goal, despite our best efforts, is a very real possibility.

That said, Twitter obviously cannot become a free-for-all hellscape, where anything can be said with no consequences! In addition to adhering to the laws of the land, our platform must be warm and welcoming to all, where you can choose your desired experience according to your preferences, just as you can choose, for example, to see movies or play video games ranging from all ages to mature.

I also very much believe that advertising, when done right, can delight, entertain and inform you; it can show you a service or product or medical treatment that you never knew existed, but is right for you. For this to be true, it is essential to show Twitter users advertising that is as relevant as possible to their needs. Low relevancy ads are spam, but highly relevant ads are actually content!

Fundamentally, Twitter aspires to be the most respected advertising platform in the world that strengthens your brand and grows your enterprise. To everyone who has partnered with us, I thank you. Let us build something extraordinary together."

**Updates as of October 24, 2022**

*Reposting this information that was published in a [companywide FAQ](#) from a team@ email on May 13, 2022.*

What is our general severance package if a position is eliminated?

> Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:
>
> > Two months base salary or On Target Earnings for employees on the Sales Incentive Plan
> >
> > Pro-rated Performance Bonus Plan compensation at target
> >
> > Cash value of equity that would have vested within three months from the separation date
> >
> > A cash contribution for health care continuation.
>
> For Tweeps who are on a work-related visa, we also consider an extended notice period to enable additional time to transfer their visa to a new employer.
>
> Of course, we also comply with local employment laws and apply any additional statutory severance for redundancies that may occur outside of the United States.

**Updates as of October 21, 2022**

> All vested TWTR shares and cash held in EAC accounts have been transferred to your connected Charles Schwab brokerage accounts. Please note that the trading window will remain closed for current employees.

**Updates as of October 20, 2022**

> With the anticipated closing of the merger agreement, there are a lot of teams working in the background to prepare for the transition. We will continue to update [go/AcquisitionFAQ](#) on a rolling basis and also send proactive updates and answers to overarching questions.

Please know, as we get closer to deal close, there will continue to be tons of public rumors and speculation. Two things to clarify.

First, we do not have any confirmation of the buyer's plans following close and recommend not following rumors or leaked documents but rather wait for facts from us and the buyer directly.

Second, earlier in the year and as we have shared in public proxy filings, there were targeted cost savings discussions and planning. Those discussions stopped once the merger agreement was signed. As we've shared at #OneTeam meetings, since the merger agreement has been in place, there have been no plans for any company-wide layoffs.

We will continue to keep you all updated with relevant information and updates as we approach closing.

**Updates as of October 17, 2022**

***From the Twitter Equity Award Center (posted October 17, 2022):***

We are writing to let you know of an update related to our Equity Award Center. There is no immediate action for you to take.

In anticipation of the closing of the pending acquisition of Twitter by an entity controlled by Elon Musk (the "Acquisition"), it will be necessary to freeze all activity in the Equity Award Center (EAC) beginning at close of the market today, October 17, 2022. This freeze allows Schwab to perform final reconciliation of employee accounts prior to close of the Acquisition. You will not be able to access balances or transact in the EAC any longer. All vested TWTR shares and cash held in EAC accounts will be transferred to your connected Charles Schwab brokerage accounts and available to you by end of day on Monday, October 24, 2022; however the trading window will remain closed for current employees.

When the Acquisition closes your vested TWTR shares will be automatically converted into the right to receive $54.20 per share in cash in accordance with the terms of the Merger Agreement for the Acquisition. More information about this can be found in go/AcquisitionFAQ.

Participants may also wish to download any personal documents including a copy of their grant agreement PDFs for future reference (watch the tutorial for instructions starting at 1:03). We expect that access to the EAC will cease upon the closing of the Acquisition as Twitter will no longer be a public company and the related equity plans will be terminated. Please note that participants will still have access to their Charles Schwab brokerage accounts after the Acquisition is completed.

***From "ESPP Supplemental Update" (sent October 12, 2022):***

In connection with the execution of the agreement involving the pending acquisition by an entity owned by Elon Musk (the "Acquisition"), participants in Twitter's Employee Stock Purchase Plan (ESPP) previously received an ESPP Update that summarized the treatment of the ESPP leading up to the closing of the Acquisition. The ESPP Update described, in part, that due to the Acquisition, the ESPP offering period that began on November 15, 2021, may have a final purchase date that occurs earlier than its normally scheduled purchase date of November 15, 2022, and that a follow-up notice about any final purchase date would be provided at a later date. Additional information regarding the Acquisition is included in Twitter's definitive proxy statement dated July 26, 2022, filed with the Securities and Exchange Commission (the "SEC")

in connection with the solicitation of proxies to approve the Acquisition and in other relevant documents filed by Twitter with the SEC.

**In anticipation of the possible closing of the Acquisition, the final purchase date under the ESPP for the offering period that began November 15, 2021, has been set to be <u>October 14, 2022</u>.**

Any Tweep who is enrolled in this offering period and remains an ESPP participant through this date will have his or her accumulated ESPP contributions applied to the purchase of shares on October 14, 2022, and then cease participating after such final purchase. No additional ESPP contributions will be deducted after this date, and any accumulated ESPP deductions remaining in any ESPP accounts after the purchase of shares on the final purchase date will be returned to the appropriate participants, in cash, promptly after the final purchase occurs.

The purchase price on the final purchase date will be 85% of the <u>lower of</u> the closing price of a share of Twitter's common stock on (i) November 15, 2021, or (ii) the final purchase date.

More details regarding treatment of the ESPP in connection with the Acquisition can be found in the previous ESPP Update. You also can review the FAQs at go/AcquisitionFAQ if you have any more questions.

<u>**Updates as of October 6, 2022**</u>

The Chancellor has ordered a stay on our trial, meaning that we will no longer be going to court on October 17. We will work with our buyer to close the acquisition by October 28, per the order.

If the buyer is unable or unwilling to close by then, we will reconvene with the Chancellor to reschedule the trial for November.

Our intention remains the same: to close the acquisition at the price and terms in the original merger agreement.

<u>**Updates as of October 4, 2022**</u>

We received the letter from the Musk parties which they have filed with the SEC. Our intention is to close the transaction at $54.20 per share.

We are still continuing to litigate this matter in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition. As a reminder, our five-day trial is scheduled to begin October 17, 2022.

<u>**Updates as of September 13, 2022**</u>

What was the result of the stockholder vote?

Our stockholders approved the adoption of the Merger Agreement between Twitter and affiliates of Elon Musk for $54.20 per share in cash. You can see our press release here.

Based on a preliminary tabulation following the Special Meeting of Stockholders, approximately 98.6% of the votes cast at the Special Meeting approved the proposal. The approval of our stockholders satisfies the final condition precedent to the closing of the merger (other than those conditions that by their nature are to be satisfied at closing). After certification by the Special Meeting's inspector of

elections, the final voting results will be filed with the SEC. We do not expect that the voting outcome will change after certification.

Obtaining stockholder approval is an important step forward in this process, however we are still continuing to litigate this matter in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition. As a reminder, our five-day trial is scheduled to begin October 17, 2022.

What is happening with Elon Musk's purported termination of the merger agreement?

As previously announced, affiliates of Mr. Musk have delivered notices purporting to terminate the merger agreement. Twitter continues to believe that Mr. Musk's purported termination of the merger agreement is invalid and without merit, and that the Musk parties continue to be bound by the merger agreement and obligated to complete the merger on the agreed terms and conditions. Twitter has filed a lawsuit in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition, and Twitter remains committed to doing so on the price and terms agreed upon with Mr. Musk.

**Updates as of August, 30, 2022**

What is our response to the buyer's second termination letter?

The buyer sent a second termination letter, and we responded, which you can read in full here. As was the case with the buyer's previous termination letter, his second termination letter is invalid and wrongful. Twitter has breached none of its representations or obligations under the Agreement, and Twitter has not suffered and is not likely to suffer a Company Material Adverse Effect. We remain committed to closing the transaction on the price and terms agreed upon with Mr. Musk.

**Updates as of August 4, 2022**

What is mDAU?

Twitter defines monetizable daily active usage or users (mDAU) as people, organizations, or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day through twitter.com, Twitter applications that *are able to* show ads, or paid Twitter products, including subscriptions. Monetizable means they could see ads or pay Twitter through a subscription, not that they will see ads on any given day. As our filings state, they are on a monetizable client or application.

How does Twitter determine mDAU?

When an account logs in or is otherwise authenticated on Twitter on any given day through twitter.com, Twitter applications that are able to show ads, or paid Twitter products, including subscriptions.

Average mDAU for a period represents the number of mDAU on each day of such period divided by the number of days for such period. Changes in mDAU are a measure of changes in the size of our daily "logged in" or otherwise authenticated active total accounts.

Why do we measure mDAU?

Audience metrics are seldom one size fits all but some form of daily active usage is a typical metric in our industry. Different products have different definitions they employ tailored to their specific service.

mDAU (monetizable daily active user) is designed to be our baseline to gauge broad usage and growth on the Twitter platform.

Monetizable means they *could* see ads or pay for a subscription, not that they *will* see ads. They are on a monetizable client or application.

We are committed to providing something valuable to people on Twitter every day.

As stated in our SEC filings, "We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement."

Our goal is not to disclose the largest user number we can but rather one that has more relevance. mDAU is designed to provide relevance and context to external stakeholders that reflects our goal of delivering value to people on Twitter every day and monetizing that usage.

Why do advertisers trust Twitter?

Twitter has historically built integrity through transparency and consistent operating principles. This approach is unwavering and something that differentiates us.

Twitter has never been more important to our customers around the world. We are working closely with our clients and partners, who can continue to expect our best-in-class customer service, client solutions and commitment to brand safety. We remain focused on delivering priority solutions in areas such as performance marketing, measurement, shopping, brand strategy and more.

We stand by our reporting methods and are transparent with the process for estimating our mDAU, accounts that are spam within mDAU and when updates are made.

As stated in our SEC filings, "We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement."

How do advertisers measure success on Twitter?

The results and metrics associated with campaign objectives are what best determines advertiser ROI.

Campaign objectives could focus on areas such as reach, video views, website traffic, app installs, followers, engagements, etc.

Targeting can focus on: followers, custom audiences, geography, language, interests, device type, etc.

Success metrics may include: Video views, impressions, Site visits, number of app downloads, various cost per data points (i.e. CPI, CPM, CPC, CPE), conversions, brand sentiment, etc.

We work with a variety of first and third party measurement companies to help validate.

Twitter has solutions that help advertisers measure the success of a campaign, maintain privacy, and brand safety:

    Twitter First-Party Measurement Solutions

        Advertisers can leverage Twitter's suite of first-party measurement solutions to garner learnings such as brand lift, media metrics, viewability, conversions, and more.

    Third-Party Measurement Solutions

        Advertisers know their ads are being seen using third-party accredited viewability reporting partners

        See more here for information on our partners who help advertisers with measurement, Ad analytics, targeting, creative and more.

    Twitter + Third-Party Brand Lift Surveys

        We help advertisers measure the impact of campaigns on key brand metrics such as awareness, association, favorability, and consideration, using our first-party and third-party Brand Lift Surveys.

    Third-Party Viewability — Moat, IAS, DV Direct Integration

        We help brands measure the quality of impressions and video views of their media buys with our third-party partners such as MOAT, IAS, and DV.

    Advertiser audience targeting:

        Via a suite of intuitive, performant, and privacy-compliant tools, we enable advertisers to refine campaign delivery and reach the people that are most likely to be receptive to a brand's message. Advertisers on Twitter can:

            Reach people based on who they are with Demographic targeting.

            Reach people based on how they access Twitter with Device targeting.

            Reach people based on how they engage on Twitter with Audience Features.

            Leverage off-platform data to build Custom Audiences on Twitter.

            Let Twitter find the people most likely to drive results with Automated Targeting.

            Extend reach to people similar to core audience with Audience Expansion.

    Enriched Twitter Audiences and Account Based Marketing

        Twitter can help advertisers drive even more results with powerful ways to reach our audiences.

        Enriched Twitter Audiences are hyper-targeted custom audiences that expand reach, increase engagement, and improve overall

performance. These custom audiences are created by trusted partners using Twitter's data.

For B2B advertisers, Account Based Marketing campaigns identify business decision makers and their influential communities on Twitter.

Across many verticals including gaming, fashion, and pharma, these solutions are making it easier for customers to drive results.

Campaign Planner: New as of June 2022

The tool enables customers to forecast reach, impressions, average frequency, and CPM against a specific audience, campaign duration, frequency setting, placement, and budget for auction-based campaigns.

We've also made it easier than ever to execute reach campaigns by allowing advertisers to start and save a draft campaign directly from the tool.

Campaign Planner is available to advertisers in the United States, United Kingdom, and Japan.

Partners can also tap into tools such as Audience Estimate.

See more here for examples of successful advertising campaigns that include key campaign metrics.

How does Twitter calculate spam?

We shared a comprehensive blog post and Tweet thread about how we define and calculate spam/bots here and here, respectively.

Customers org: If clients have questions, you can use this client-facing language reactively.

Does Twitter use AI and ML to identify spam and bots on the platform?

We do! Specifically, Twitter deploys spam detection capabilities that have resulted, and continue to result, in the suspension of typically more than one million spam accounts every day, including both automated and manual reviews of accounts and activity on the Twitter platform during and after sign-up. Twitter also locks millions of accounts each week that cannot pass human-verification challenges, such as CAPTCHAs or phone verifications.

Our processes encompass a mix of human engagement and automation to identify malicious spam and bots.

We are always testing and exploring ways to further advance our systems for detection and remediation.

Separate from these automated and manual spam-detection processes, Twitter estimates the prevalence of false and spam accounts within mDAU through multiple human reviews (in replicate) of thousands of randomly selected accounts each quarter using both public and private data.

Did Twitter cooperate by providing the Buyer's team the information they were requesting?

Yes. Twitter has continuously shared information with the buyer to consummate the transaction in accordance with the terms of the merger agreement.

Throughout this process we have and will continue to protect proprietary and confidential information of Twitter advertisers and our customers' private user data.

Why didn't Twitter choose to redact any information from the acquirer's countersuit?

We fully stand by our SEC filings, the methodologies we use to calculate mDAU, and our statements about the percentage of spam accounts on our platform.

What is our public response to the countersuit?

The counterclaims are factually inaccurate, legally insufficient, and commercially irrelevant.

Why did Twitter recast its mDAU values three days after signing the agreement?

The updated values for mDAU reflected a change of less than 1% for each impacted period.

Twitter has historically built integrity through transparency and consistent operating principles. We reported this out of an abundance of transparency. Twitter disclosed this recast when we announced Q1 2022 Earnings in April.

Why did Twitter move from disclosing MAU to mDAU in 2019?

We want to provide something valuable to people on Twitter every day, and we believe that mDAU, and its related growth, are the best ways to measure the success of our objectives and to show the size of our audience and engagement.

**Updates as of July 26, 2022**

What's the schedule for our case?

The judge set a schedule for our case in the Delaware Court of Chancery for a five-day trial in October.

Does our Board of Directors recommend how stockholders should vote?

Yes, the Twitter Board of Directors recommends that stockholders vote in favor of the transaction ("FOR").

When is the Special Meeting of Stockholders?

The meeting is scheduled for September 13, 2022 at 10am PT. Anyone who owns TWTR stock (including Tweeps) as of July 22, 2022 is entitled to vote prior to or during the meeting.

What should stockholders expect?

Each stockholder will receive voting materials in the very near future. The materials describe easy ways to vote electronically, over the phone, or by mail. If you received your voting materials by email, you can simply click the "Vote Now" button in the email. Otherwise, the easiest way to vote your shares is to go to proxyvote.com and enter the Control Number(s) provided to you in the materials. Please note that if you hold Twitter shares in more than one account (e.g., in our employee share purchase plan (ESPP), in registered name, or through a personal bank or brokerage account), you'll receive separate emails or hard copies of voting materials for each account. To make sure that all your shares are represented, you must submit a vote for each account in which you hold Twitter shares. You will receive a separate Control Number for each account in which you own shares.

What communications will stockholders receive from Innisfree, our proxy solicitor?

We asked Innisfree to work with us to ensure our shareholders are educated about this important proposal, so you will likely receive more communications from them over the coming weeks via email, phone call and traditional mail. If you have any questions, please call Innisfree at +1 (877) 750-8338 (US/Canada) or +1 (412) 232-3651 (all other countries).

**Updates as of July 13, 2022**

What does Mr. Musk's notice mean? Is the deal now officially off?

No. Mr. Musk's purported termination is invalid and wrongful. As we noted in our press release and commentary from the Chairperson of our Board, the Twitter Board is committed to closing the merger on the $54.20 price and terms agreed upon with Mr. Musk and plans to pursue legal action to specifically enforce the merger agreement. Please understand that the Twitter Board and executive management team are continuing to actively manage the process related to the acquisition. We will share information with you as we can, but this is an evolving situation and we may not have, or be able to share, answers to all of your questions.

What is Mr. Musk's goal?

We are not in a position to speculate about Mr. Musk's objectives.

Given that we plan to pursue legal action to enforce the merger agreement, how long will it take to resolve that?

As with many legal matters, it is difficult to predict the duration of this process. We have a group of internal team members and external advisers who are dedicated to this workstream. It is important to remember that during this process, it is business as usual for all of us at Twitter. That means we should continue the important and meaningful work of driving Twitter forward and continuing to deliver value to our users and customers.

Have we shared bot information with Mr. Musk as requested?

We have met our obligations under the merger agreement.

Has Twitter breached the merger agreement?

As stated in the letter attached to our 8-K filing from July 11, 2022, "Twitter has breached none of its obligations under the Agreement," and "As it has done, Twitter will continue to provide information reasonably requested by Mr. Musk under the Agreement and to diligently take all measures required to close the transaction.

Anything more you can share with us about the complaint that we filed on July 12, 2022?

The complaint is public and details why Twitter believes that Mr. Musk's purported termination is invalid and wrongful.

Given this is active litigation, we are limited in what we can say beyond our public filings.

We have a group of internal team members and external advisers who are dedicated to this workstream. It is important to remember that during this process, it is business as usual for all of us at Twitter. That means we should continue the important and meaningful work of driving Twitter forward and continuing to deliver value to our users and customers.

**What is the likelihood of a settlement? What is our desired outcome?**

The Twitter Board is committed to closing the merger on the $54.20 price and terms agreed upon with Mr. Musk.

**Why haven't we implemented retention packages or similar for Tweeps?**

Tweeps are the heart of Twitter and will always be essential to our success. On June 20, 2022, we sent Mr. Musk a formal request for consent to two tailored employee retention programs that had been vetted by the board and the compensation committee with the assistance of an outside compensation consultant.  Mr. Musk has not provided his consent to implement these programs.

**How do we plan to retain talent?**

Our attrition is slightly higher than best practice for normal macroeconomic times, but remains inline with current industry trends. We will continue to monitor it to ensure that we can quickly identify any areas of concern and help mitigate where possible.

**What's the plan to support the transition of our current projects and work?**
Until the transaction closes, we'll be focused on continuing to drive the business forward. We are confident plans for transition will be properly created.

**Is there a possibility for layoffs, now or post-close?**

We're not looking at company-wide layoffs. However, teams from across the company are reprioritizing and making changes to ensure we are operating responsibly and efficiently in the current operating environment. We may continue to see restructuring and org changes as we continue to align with our revised business needs (as we always have in the past).

**What regulatory agencies will need to approve the transaction?**

As of July 13, 2022, stockholder approval of the Merger Agreement is the only remaining approval or regulatory condition to consummating the closing of the Merger under the Merger Agreement.

**FAQs previously provided on May 19, 2022**

**What's happening?**

Twitter has entered into a definitive agreement to be acquired by a private entity affiliated with Elon Musk. The purchase price is $54.20 per share. We expect the transaction to close in 2022, subject to the satisfaction of customary closing conditions. Upon completion of the transaction (or the "closing"), Twitter will become a privately held company.

Twitter's board of directors (the "Board") undertook a thoughtful, comprehensive, and deliberate process to review the proposal and unanimously determined the transaction was in the best interests of our stockholders.

There are still several steps to close. Completion of the transaction is subject to the approval of Twitter stockholders, the receipt of applicable regulatory approvals, and the satisfaction of other customary closing conditions.

Upon the closing, Twitter equity awards will be canceled and converted into the right to receive a cash amount of $54.20 (less any applicable exercise price) for each underlying share. The cash amount payable for unvested Twitter equity awards will be payable over the same pre-transaction vesting schedule as the award that was canceled.

The terms of the agreement specifically provide for Tweep annual base salary, bonus opportunities (short/long term incentive (excluding equity) opportunities) and employee benefits so that, in each case, they are no less favorable in the aggregate than the comparable opportunities or benefits, as applicable for at least one year from the closing date.

Between now and closing, we generally will operate Twitter in normal course - just like we always have. In general, we do not expect any changes to Tweep compensation programs and benefits. Twitter RSUs and other equity awards will vest as they normally have. Business decisions will continue to be made by Twitter's leadership.

**Process and timeline**

Why did Twitter enter into this transaction and why do we feel it is still best for stockholders?

The Twitter Board undertook a thoughtful and comprehensive process to review Elon Musk's proposal, with a deliberate focus on value, certainty, and financing. The Twitter Board considered, among other things, Twitter's go-forward prospects in the current market as well as other potential value-creating opportunities.

The Board still believes this transaction, which delivers a substantial cash premium to stockholders, is the best path forward for Twitter's stockholders.

Why did we announce the transaction when we did?

> We announced the deal to employees and the public at the same time as we had a legal and fiduciary responsibility as a public company to do so.

How long will it take for this deal to close?

> We expect the transaction to close in 2022 subject to the satisfaction of customary closing conditions.

Why did we implement a Shareholder Rights Plan ("poison pill")?

> The Board adopted the Shareholder Rights Agreement on April 15, which has been referred to as a "poison pill" in the press. The Board adopted the rights plan to enable all stockholders to realize the full value of their investment in Twitter by reducing the likelihood that any entity, person or group gains control of Twitter through open market accumulation without paying all stockholders an appropriate control premium or without providing the Board sufficient time to make informed judgments and take actions that are in the best interests of shareholders.

Is there a go-shop provision?

> No. All of these details are laid out in the merger agreement that has been filed with the SEC.

What does it mean to become a privately held company? What are the benefits?

> Generally, private companies' shares are not publicly traded or held by a broad group of shareholders.
> Private companies typically do not have to incur costs related to public reporting and may have more flexibility to operate.
> Until the transaction closes, it remains business as usual, and we are continuing to operate normally as an independent, publicly traded company.

Once the deal closes, is there a test for the debt coverage capabilities?

> In an acquisition like this one, it is common for the party acquiring a target company to add debt to the target's balance sheet. In assessing the deal, prospective lenders have considered the leverage ratio, which is one of the credit metrics used to measure the ability of the target company to use its cash flows to repay all its debt obligations, including principal and interest payments.

What does the acquisition mean for our debt?

> The debt balance on our balance sheet will be higher. If you are reading news externally, you have probably seen that Mr. Musk's affiliates received $13B of commitments from banks for loans to partially finance the deal. Twitter will ultimately incur such loans after the transaction closes. A portion of Twitter's existing debt balance, which is $5.2B today, is expected to be repaid in

connection with the closing, and new debt securities are expected to be issued by Twitter.

**What are the upcoming major milestones of the deal and when will Tweeps find out?**

We expect the transaction to close in 2022, subject to satisfaction of customary closing conditions, including required regulatory and stockholder approvals. In terms of next milestones, we expect to file a preliminary proxy statement in the near future relating to the special meeting of stockholders to vote to approve the merger agreement. Once that document clears SEC review, we will file a definitive proxy statement and then hold the special meeting on the timeline specified in the proxy statement. We will aim to keep you informed of major updates.

**Where are we in the acquisition cycle? Do the changes to hiring and cost savings have any implications on this?**

We're still on track and working to close the transaction in a timely manner. We expect the transaction to close in 2022, subject to satisfaction of customary closing conditions, including required regulatory and stockholder approval.

## The Board

**What factors did the Board use to evaluate whether this would be in the best interest of stockholders?**

As mentioned above, the Board undertook a thoughtful and comprehensive process to review the proposal, with a deliberate focus on value, certainty and financing. The Board's vote to approve the transaction was unanimous.

The Board considered the proposal in light of the company's go-forward prospects and the current market environment, among numerous other considerations.

Additional details of the Board's process will be made available in our future SEC filings.

**Did the Board get a fairness opinion? From whom?**

Yes, Goldman Sachs and JP Morgan each provided a fairness opinion.

**Did the Board lose confidence in the business?**

Absolutely not. The Twitter Board considered the proposal in light of Twitter's go-forward prospects and the current market environment, among numerous other considerations.

This transaction is a great outcome for stockholders and demonstrates the tremendous value of Twitter.

## Leadership

**What will Twitter's leadership team look like post-close?**

It's too early to speculate on that right now.

For now, our team is focused on continuing to operate our business as we have and taking steps to secure the approvals we need to close the transaction and set Twitter up for continued success as a private company.

Will we have a board of directors post-close? Who will hold our new owner accountable?

Private companies are operated differently than public companies, but they are also subject to many of the same governance requirements and regulations as a public company. Twitter is incorporated in Delaware, which provides rules that dictate our governance.

Are the recent changes to Staff, cost savings, and hiring pause connected to the acquisition?
These changes are ones that Twitter has been contemplating and is driving as part of our ordinary course operations and operational improvements. In order to responsibly manage the organization as we sharpen our roadmaps and our work, we need to continue to be intentional about our teams, hiring, and costs. We will continue to remain focused on strengthening our work through increased accountability and execution to make Twitter everything it can be.

**Compensation and Equity Awards**
Will this announcement impact promotion decisions and related compensation increases?

No. Until the deal closes, it is business as usual for Twitter, including with respect to promotion decisions or related comp changes.

What will our compensation program look like without RSUs? How will we stay competitive?

Tweeps are the heart of Twitter and will always be essential to our success. We expect our compensation program will reflect that.
It is too early to determine the future of our incentive programs as a private company, but we will share more information as soon as it becomes available. We currently expect to continue to offer competitive rewards (regardless of the underlying currency of those rewards) to attract and retain talent.

Will we grant new Twitter equity awards between now and deal close for promotions and role changes?

We will continue to grant Twitter equity awards until the transaction closes, as we normally would for promotions and role changes. After the transaction closes, we expect our compensation program will be reviewed and updated to account for the fact that we will operate as a privately-held company. We will share more information when it becomes available.

**Existing Twitter Shares and Equity Awards**
Will the trading window change as a result of this announcement?

No, the trading window will not change. We're still a public company and we will still report quarterly earnings on the same cadence that we did before, so we expect our calendars generally will be the same. We expect this to be the case until the deal closes.

Should I or can I sell Twitter stock that I own?

As long as you are not in possession of any material nonpublic information (MNPI) regarding Twitter, you are free to trade Twitter stock when trading windows are open. You are still bound by all black-out periods and the other terms of our insider trading policy.

What happens to my existing Twitter equity awards if the transaction closes?

Unless and until the transaction closes, the terms of your Twitter equity awards will remain the same.

Once the transaction closes, then your Twitter equity awards (whether granted under our 2013 Equity Incentive Plan or assumed in an acquisition of your prior employer) will be treated as described below:

**RSUs**

Each vested RSU will be converted into the right to receive the $54.20 purchase price in cash as described below. If RSUs were subject to performance-based vesting, the number of vested RSUs subject to that award will be based on actual achievement.

Each unvested RSU will be converted into the right to receive an amount in cash equal to $54.20. This cash amount will vest in installments on the same vesting schedule that applied to the canceled unvested RSUs it is replacing, subject to continued service through the applicable vesting date. If unvested RSUs were subject to performance-based vesting, the number of RSUs subject to that award will be deemed earned at the target level of achievement.

For example, if you have 100 RSUs that vest on November 1, 2022 (assuming the transaction closes before that date), then you will receive a cash amount equal to $5,420, less applicable tax withholding, on November 1, 2022 through payroll.

Under the terms of the deal, all unvested RSU awards are converted into the right to receive cash in an amount equal to the product of the total number of unvested RSUs and the per share purchase price ($54.20). The resulting cash amount then vests and will be paid to you according to the original vesting schedule subject to your continued service through the applicable vesting dates, which will remain in place.

**Options**

Each vested option will be converted into the right to receive an amount in cash equal to the difference between $54.20 and the option exercise price for each underlying share.

Each unvested option will be converted into the right to receive an amount in cash equal to the difference between $54.20 and the option exercise price for each underlying share. This cash amount will vest on the same vesting schedule that applied to those canceled unvested options it is replacing, subject to continued service through the applicable vesting date.

**Restricted Stock Awards**

Each restricted stock award will be converted into the right to receive $54.20 in cash. This cash amount will vest on the same vesting schedule that applied to the canceled award it is replacing, subject to continued service through the applicable vesting date.

When will the cash amounts for my Twitter equity awards described be paid?

Generally, amounts payable to you for your vested equity awards will be paid to you, less applicable tax withholding, within five business days after the closing of the transaction.

Generally, amounts payable to you for your unvested Twitter equity awards will be paid to you, less applicable tax withholding, through payroll on the same vesting schedule that applied to those equity awards before the transaction, subject to your continued service through the applicable vesting date.

Please consult with your tax advisor as to the tax consequences to you of these payments.

What happens to cash amounts payable for unvested Twitter equity awards if a Tweep departs before the cash amounts are vested?

The cash amounts payable in respect of your unvested Twitter equity awards will only vest and be paid to you if you remain in continuous service with Twitter through the applicable vesting date. If your service with Twitter (or a subsidiary) ends before a portion of such cash amount is vested, you will not receive that portion of the cash amount and it will be forfeited to Twitter.

Do Twitter RSUs have a "change in control" clause that will accelerate vesting if layoffs occur within one year?

Generally, no. Unless you are party to a separate agreement with Twitter, your Twitter equity awards (or the cash amounts payable for such equity awards) will not receive accelerated vesting if your employment is involuntarily terminated following the closing of the transaction (known colloquially as a "double trigger").

As is customary in our industry, only a few of our executives and other senior employees currently have a "double trigger" provision.

Do all Tweeps have the same vesting schedule?

Generally, Twitter equity awards are granted through the annual refresh process or promotion process vest on a quarterly vesting schedule (with vesting dates in February, May, August, and November); however, depending on when a Tweep was hired, their new hire grant may vest outside of those normal dates. The award agreement provided to you upon the grant of your Twitter equity award will contain your applicable vesting schedule.

Will the $54.20 purchase price change with the fluctuation of Twitter's current stock price or because of inflation?

No, the transaction price of $54.20 per share is fixed, including for purposes of future cash payouts for equity awards on the same vesting schedule.

For International Tweeps, as individual RSUs convert into the cash equivalent of $54.20 post-close, will international Tweeps receive this in U.S. dollars through their brokerage account (ex: Schwab) or will it be converted into local currency and deposited into their payroll?

Finance and Payroll are working on this now, however, the merger agreement provides that cash amounts paid in respect of unvested Twitter equity awards will be paid in U.S. dollars. We will share more information when it becomes available.

**New hires and offers**

Will new hires continue to receive RSUs?

Yes, we expect we will continue our current practices for new hire grants up until the close.

Are there any changes to the methodology for how new hire grants are converted to shares?

No, until the closing of the transaction, we expect we will continue our current equity granting practices.

How will this announcement affect new Tweeps who have signed an offer letter with RSUs, but have not yet joined the company? What should we tell candidates that have equity in their current offer letters?

New Tweeps will still be granted their RSUs subject to the terms of their offer letters, however depending on the timeline of closing and their vesting schedule, they may receive equivalent cash payments in respect of those RSUs.

What do we tell candidates if they ask us about this announcement during an interview?

> Please point them to the press release (Parag Tweeted a link to it) for all of the specific details related to the announcement.
>
> You may use this FAQ to answer questions for candidates and use the What's happening? section of this doc for key messages to third parties.

**ESPP**

> If you are a current ESPP participant, your accumulated ESPP contributions will be used to purchase shares on May 16, 2022, unless you withdraw in advance of the purchase date. There will not be a new offering period beginning on May 16, 2022, and any current ESPP participant who is enrolled in the ESPP offering period that began on May 15, 2021 will cease participating in the ESPP after May 16, 2022.
>
> If you are a current ESPP participant who is enrolled in the offering period that began on November 15, 2021, you may continue to participate in the ESPP following May 16, 2022. The final purchase date is scheduled to occur on November 15, 2022, or, if earlier, a date that is at least 10 business days prior to the date on which the transaction closes. Following the final purchase date, the ESPP will then terminate, subject to the closing of the transaction.
>
> If you are a current ESPP participant, you may not make any increases to your ESPP contribution rate.
>
> Shares received through the exercise of an ESPP purchase right will be converted at the closing of the transaction into the right to receive $54.20 per share in cash.
>
> You may opt out of the ESPP at any time through Charles Schwab. If you opt out of the ESPP prior to a purchase date, you will be refunded the accumulated but unused contributions in your ESPP account.

**Customers/Advertisers/Business Partners**

*Tweeps: \*Please see the email from Sarah Personette with an email template to send to clients and partners\**

How will this transaction impact business partners? Customers?

> The service has never been more important to our customers around the world, and the work of our teams is critical.
>
> Partners can continue to expect our best-in-class customer service, client solutions, and commitment to brand safety.
>
> We cannot speculate on changes Elon Musk may make post closing.
>
> While Twitter has signed the deal, there are still more steps to take in order to close, which is expected to be in 2022.
>
> For now, there will be no changes as a result of this announcement.
>
> Any changes will be communicated as they always have.

Will there be changes to how advertisers potentially leverage Twitter?

> During the period until closing, Twitter will operate as it always has.
> Advertisers can continue to turn to Twitter to drive awareness and consideration for their products and services when they want to launch something new or connect with what's happening.
> We remain focused on delivering priority solutions in areas such as performance marketing, measurement, shopping, brand strategy, and more.
> Any changes will be communicated as they always have.

Will there be any changes to our advertising model?

> Until the transaction closes, it is business as usual for us.
> We remain committed to our product roadmap that helps businesses Launch something, connect with what's happening, and help people buy their products or services.
> We continue to support businesses - big and small - to be able to do this with both our native and paid solutions.
> Our commitment to our customers remains unchanged.

Will there be any changes to our commitment to brand safety in light of freedom of speech comments?

> Until the transaction closes, it is business as usual for us, including with respect to our terms of service.
> Everything we do centers around people.
> At the core of Twitter, we are an organization focused on how we create a space for all voices to have a chance to participate in the public conversation.
> For us, we seek to tackle it by focusing on our Policies, Products, and Partnerships.
> We have no planned changes to our commitment to brand safety and will continue to lead in products that protect, policies that lead, and partnerships that matter.

**Company culture and benefits**

How will our acquisition impact our IDEA goals, and how can we ensure that Twitter maintains its values and commitment to social responsibility?

> Twitter is an open service that's home to a world of diverse people, perspectives, ideas, and information, and our IDEA principles and commitment to social responsibility will continue to be an integral part of our company's core.
> Our Tweepforce representation goals remain in place, and we are committed to delivering on our IDEA roadmap during this period.

**Benefits/perks**

What does the future hold for reimbursements, allowances, and other perks?

> We do not expect any changes to these programs at the moment.

Are there any changes to parental leave benefits or medical, dental, and vision benefits?

> We do not expect any changes to these programs at the moment.
> The agreement provides for Tweep benefits, base salary, and bonus opportunities (short/long term incentives) to continue on a comparable basis for at least one year following the close of the transaction.

Are there any plans to adjust benefits for hourly employees prior to the closing?
> We do not expect any benefits to change for our hourly Tweeps at this time.

## Remote work
Will our commitment to flexible/remote work change?

> We do not expect our policies around remote work to change at this time. A significant portion of our workforce is either fully or partially remote. That is how we have worked the last several years and that is how we currently expect to work going forward during this time.

## Contractors and Interns
How will this announcement affect contractors? Will their contracts be cut short upon close?

> We do not expect any changes to our contingent workforce at this time.

Will contractor conversions to FTE be considered in 2022 while we wait for the deal to close?

> These decisions will be handled on a case-by-case basis. As always, please stay close to your S&O and FP&A partners, as well as your Staff lead for hiring and conversion decisions.

Are there any changes to our intern program?

> We have no current plans to change our intern program.

## Immigration/Visas
What impact will there be for employees being sponsored through work visas?

> There is no impact to employer-sponsored visas at this time. When the deal closes, we anticipate that your employing entity will remain the same, and thus there will be no impact to your visa status. If you have questions about your individual immigration status, please contact talentmobility@twitter.com.

## Communications
What are we doing to prevent leaks?

Employees are held to the standards laid out in our Playbook, which includes communications guidelines.
Leaks hurt the company's ability to communicate in the best way possible.
We do our part to investigate how information leaks and handle accordingly.

Why do Twitter employees find out big news like this at the same time as the public?

We do our best to share information with all of you as soon as we're able.
In this case, there are laws in place (such as Regulation FD) that require we disclose information to all members of the investment community at the same time. These laws help to ensure investors receive information at the same time. Given employees are also shareholders, we cannot selectively disclose information ahead of other audiences.

I'm being approached by the press, or people I don't know, for comments on Twitter. What should I do?

Please continue to handle any inquiries in accordance with Twitter's policies. Press or other inquiries should be directed to the appropriate parties within Twitter for response. Please raise any concern to CorpSec@, even if you're unsure about the intention of the question. If you are approached by the press, please forward any inquiries to press@twitter.com.

## Future of Twitter
How will the product be impacted? Will there be any changes to the user experience?

Until the transaction closes, it is business as usual for us, including with respect to our products. We are always iterating to make Twitter the best it can be for people on the service. When there are changes, we will be sure to communicate as we always have.

Will our policies around content moderation change?

Until the transaction closes, it is business as usual for us, including with respect to our terms of service. As we always do, we will continue evolving and iterating to improve the product and the health of the public conversation during this time.

Should we be prepared to dial back our work over the next few months, and correspondingly our budgets?

Between now and close, we should continue operating Twitter in normal course as a public company.
We should always be mindful of our expenses and ensure we're seeing a corresponding return on investment.

Are our priorities changing as a company, or should we continue working on existing projects? Should we still focus on our current OKRs?

Until the transaction closes, it remains business as usual and we are continuing to operate normally as an independent, publicly-traded company.

While the deal is still pending, we must continue to execute and advance our existing strategy.

**Protections**

How will the closing of the transaction affect employee benefits and compensation?

The merger agreement provides special protection for Tweep compensation and benefits for one year following the closing of the transaction.

Specifically, the agreement specifically provides that, for one year following the closing of the transaction, the purchasing entity will:

- Maintain existing base salary and wage rates of continuing Tweeps
- Provide continuing Tweeps with short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those than existing compensation opportunities, although equity compensation may or may not be granted in the future
- Provide continuing Tweeps with employee benefits (excluding equity and equity-based awards) that are substantially comparable in the aggregate to existing benefits
- Provide continuing Tweeps whose employment are terminated during such period with severance payments and benefits that are no less favorable than those applicable to an applicable employee prior to the closing of the transaction
- Recognize continuing Tweeps' service to Twitter in determining eligibility, vesting and determination of the level of benefits applicable to such employees following the closing of the transaction
- Waive requirements for continuing Tweeps to satisfy any deductible, co-payment, out-of-pocket maximum or similar requirements under the acquiring entity's benefits plans to the extent the employee has made correlating previously credited payments under a Twitter benefit plan
- Waive waiting periods, preexisting condition exclusions and requirements to show evidence of good health for continuing Tweeps

What will happen to Twitter user data/IP after the deal closes? Will any of our policies regarding data protection, including with regard to employee specific information, be impacted by this announcement?

We will continue to treat information with the utmost protection and operate consistent with the laws.

If I'm on a company sponsored visa, are there any risks if I travel outside of the country during the closing period?

We recognize that there are a lot of questions about Tweeps working on a company sponsored visa. For specific questions about your individual status, please contact talentmobility@twitter.com.

**Compliance**

Do we expect any potential risks as a private social media company from a regulatory standpoint?

> As a private company, Twitter will still have to comply with any rules and regulations that govern the activities of social media companies. The same risks apply as they do now and if you have any questions, you should consult with the Compliance team.

**Additional Information and Where to Find It**

On May 17, 2022, Twitter Inc. ("Twitter") filed a preliminary proxy statement in connection with its Special Meeting of Stockholders (the "Special Meeting") related to the pending acquisition of Twitter (the "Transaction"). Prior to the Special Meeting, Twitter will furnish a definitive proxy statement to its stockholders, together with a proxy card. STOCKHOLDERS ARE URGED TO READ THE DEFINITIVE PROXY STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION. Detailed information regarding the names, affiliations and interests of individuals who are participants in the solicitation of proxies of Twitter's stockholders is available in Twitter's preliminary proxy statement.

Stockholders may obtain, free of charge, Twitter's proxy statement (in both preliminary and definitive form), any amendments or supplements thereto, and any other relevant documents filed by Twitter with the U.S. Securities and Exchange Commission (the "SEC") in connection with the Special Meeting at the SEC's website (http://www.sec.gov). Copies of Twitter's definitive proxy statement, any amendments or supplements thereto, and any other relevant documents filed by Twitter with the SEC in connection with the Special Meeting will also be available, free of charge, at Twitter's investor relations website (https://investor.twitterinc.com) or by writing to Twitter, Inc., Attention: Investor Relations, 1355 Market Street, Suite 900, San Francisco, California 94103.

**Forward-Looking Statements**

This communication contains forward-looking statements that involve risks and uncertainties, including statements regarding: the Transaction, including the expected timing of the closing of the Transaction; considerations taken into account by Twitter's Board of Directors in approving the Transaction; and expectations for Twitter following the closing of the Transaction. If any of these risks or uncertainties materialize, or if any of Twitter's assumptions prove incorrect, Twitter's actual results could differ materially from the results expressed or implied by these forward-looking statements. Additional risks and uncertainties include those associated with: the possibility that the conditions to the closing of the Transaction are not satisfied, including the risk that required approvals from Twitter's stockholders for the Transaction or required regulatory approvals to consummate the Transaction are not obtained; potential litigation relating to the Transaction; uncertainties as to the timing of the consummation of the Transaction; the ability of each party to consummate the Transaction; possible disruption related to the Transaction to Twitter's current plans and operations, including through the loss of customers and employees; and other risks and uncertainties detailed in the periodic reports that Twitter files with the SEC, including Twitter's Annual Report on Form 10-K filed with the SEC on February 16, 2022, and Quarterly Report on Form 10-Q filed with the SEC on May 2, 2022, which may be obtained on the investor relations section of Twitter's website (https://investor.twitterinc.com). All forward-looking statements in this communication are based on information available to Twitter as of the date of this communication, and Twitter does not assume any obligation to update the

forward-looking statements provided to reflect events that occur or circumstances that exist after the date on which they were made, except as required by law.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

WOLFRAM ARNOLD, ERIK
FROESE, TRACY HAWKINS,
JOSEPH KILLIAN, LAURA CHAN
PYTLARZ, and ANDREW
SCHLAIKJER,

                  Plaintiffs,

      v.

X CORP. f/k/a TWITTER, INC., X
HOLDINGS CORP. f/k/a X
HOLDINGS I, INC. and ELON MUSK,

                  Defendants.

C.A. No. 1:23-cv-00528-CFC

## <u>NOTICE OF SERVICE OF SUBPOENA</u>

PLEASE TAKE NOTICE that, pursuant to Rules 30 and 45 of the Federal

Rules of Civil Procedure, Plaintiffs Wolfram Arnold, Erik Froese, Tracy Hawkins,

Joseph Killian, Laura Chan Pytlarz, and Andrew Schlaikjer (collectively,

"Plaintiffs"), through their counsel, have caused to be issued the attached

Subpoena to Produce Documents (Ex. 1), to be served on Wachtell, Lipton, Rosen,

& Katz.

Dated: August 30, 2023

Akiva Cohen (*pro hac vice*)
Dylan M. Schmeyer (*pro hac vice*)
Michael D. Dunford (*pro hac vice*)
Lane A. Haygood (*pro hac vice*)
KAMERMAN, UNCYK, SONIKER & KLEIN
P.C.
1700 Broadway, 16th Floor
New York, NY 10019
Tel: (212) 400-4930
acohen@kusklaw.com
dschmeyer@kusklaw.com
mdunford@kusklaw.com

/s/ Joseph L. Christensen
Joseph L. Christensen (#5146)
CHRISTENSEN & DOUGHERTY LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Tel: (302) 212-4330
joe@christensendougherty.com

*Attorneys for Wolfram Arnold, Erik Froese, Tracy Hawkins, Joseph Killian, Laura Chan Pytlarz, and Andrew Schlaikjer*

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | | |
|---|---|---|
| WOLFRAM ARNOLD, ERIK FROESE, TRACY HAW | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   C.A. No. 1: 23-cv-00528 CFC |
| X CORP. f/k/a TWITTER, INC., X HOLDINGS | ) | |
| CORP. f/k/a X HOLDINGS I, INC. and ELON MUSK | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                              Wachtell, Lipton, Rosen, & Katz

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule A

| Place: Kamerman, Uncyk, Soniker & Klein, P.C., 1700 Broadway, 16th Floor New York, NY 10019 | Date and Time: 09/14/2023 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      08/31/2023

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | /s/ Akiva M. Cohen |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____ _____, who issues or requests this subpoena, are:

Akiva M. Cohen, Kamerman, Uncyk, Soniker & Klein, P.C., 1700 Broadway, 16th Floor, New York, NY 10019, acohen@kusklaw.com, 212.400.4930

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. C.A. No. 1: 23-cv-00528 CFC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____  on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
   **(i)** is a party or a party's officer; or
   **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
   **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
   **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
   **(i)** fails to allow a reasonable time to comply;
   **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
   **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
   **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
   **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
   **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
   **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
   **(i)** expressly make the claim; and
   **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

I.     **DEFINITIONS**

1.   The terms "and" and "or" shall be construed both conjunctively and disjunctively to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

2.   The term "any" means any and all.

3.   The term "each" means each and every.

4.   The term "including" means including but not limited to.

5.   Terms in the present tense include the past and future tenses. Terms in the past tense include the present and future tenses. Terms in the future tense include the present and past tenses.

6.   The singular form of terms includes the plural, and the plural form of terms includes the singular.

7.   Terms in the masculine, feminine or neuter form shall include each of the other genders.

8.   The term "THIS ACTION" means the civil action *Arnold et al. v. X Corp et al*. and bearing the case number 1:23-cv-00528. which was filed in the Federal District Court of Delaware on or about May 16, 2023.

9.   The term "MERGER AGREEMENT" means the Agreement and Plan of Merger By and Among X Holdings I, Inc., X Holdings II, Inc., and Twitter, Inc., dated April 25, 2022.

10. The term ACQUISITION FAQ means the document annexed hereto as Exhibit 1, including all prior versions thereof.

11. The term "TWEEP" means "Company Service Provider" as it is defined in the MERGER AGREEMENT.

12. The terms "YOU" and "YOUR" mean and refer individually and collectively to the law firm of Wachtell, Lipton, Rosen, & Katz and any attorneys, paralegals, assistants, staff members, or any other persons acting at its direction or under its supervision, whether during their time as partners or employees of or when partners or employees of any other law firm. The terms "YOU" and "YOUR" further mean and refer to any present or former agents, representatives, employees, attorneys, investigators, and other persons acting under YOUR authorization, employment, direction, or control, whether employed or retained on a full-time, part-time, independent contractor, commission, or other basis.

13. The terms "PERSON" and "PERSONS," and the possessive forms of those terms, mean and include natural persons, corporations, partnerships, limited partnerships, associations, organizations, joint ventures, governmental units or entities, and any other kind of business or other entity whether or not employed by YOU; and the acts of a PERSON are defined to include the acts of a director, officer, owner, member, employee, agent, consultant or attorney acting on the PERSON's behalf.

14. The term "COMMUNICATION" means any recording of any transfer of information, ideas, opinions, or thoughts made by any means, at any time or place, under any circumstances, INCLUDING by a single person hearing or seeing by any means, personal meeting, telephone, letter, facsimile, and e-mail. COMMUNICATIONS are not limited to direct transfers between PERSONS, but include other transfers and memorializations, such as records, memoranda to file, electronic or magnetic transfer of computer files, facsimile transmissions, and teletype transmission. COMMUNICATIONS may be embodied in any means or media, including

writing, electronic or magnetic storage or computer files, electronic mail, voice mail, answering machine, digital recording, sound recording, and facsimile transmission.

15. The term "DOCUMENTS" means and refers to all "Documents and things" identified in, or within the scope of Federal Rule of Civil Procedure 34(a) and the 1970 Advisory Committee Note thereto, the Local Rules of the United States District Court for the District of Delaware, the District of Delaware Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI"), and any decision interpreting one or more of such rules, and all forms of "writings" and "recordings" as defined by Federal Rule of Evidence 1001(1) and includes, without limitation, all tangible record of intelligence or information, whether handwritten, typed, printed or otherwise visually or orally reproduced, including information stored on magnetic or optical media or in solid state storage devices, notes, drafts, reports, art-work, films, videotape, e-mails, drawings, graphs, photographs, agreements, letters, test data, circuit diagrams, software structure charts, software flow charts, software code, data flow diagrams, hardware schematic diagrams, hardware logic diagrams, field maintenance print sets, timing diagrams, technical summaries, product description documents, software description documents, laboratory or engineers' notebooks, project or progress reports, database information, whether for prototypes or production products, and the like. A draft or non-identical copy bearing on any sheet (front or back), margins, attachment, or enclosure thereof, any mark that is not a part of the original text or reproduction thereof, is a separate document within the meaning of this term.

16. When referring to a human person, "IDENTIFY" means to give, to the extent known, the person's full name, present or last known address, phone number and the present or last known place of employment, if known. Once a person has been identified in accordance with

this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person. When referring to a business or other entity, "IDENTIFY" means to state the entity's full name, present or last known address, and present or last known telephone number, and to describe the nature of its business or other operations. When referring to Documents, "IDENTIFY" means to give, to the extent known, the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s) and all recipient(s), including "cc"s and "bcc"s. When referring to electronically stored information "IDENTIFY" means to give (i) the type of electronically stored information; (ii) its format; (iii) its location; (iv) its date; (v) its author(s), addressee(s) and all recipient(s), including "cc"s and "bcc"s.

17. The term "RELATING TO" or any variants thereof, when used in conjunction with any DOCUMENT, shall be understood to apply if the DOCUMENT directly or indirectly evidences, mentions, discusses, constitutes, concerns, supports, contradicts, refers to, or in any way deals with the subject matter described in the Request in which the term appears.

## II.  INSTRUCTIONS

1.  If, in responding to this Request for Production, the responding party encounters any ambiguities when construing a request of definition, the response shall set forth the matter deemed ambiguous and the construction used in responding.

2.  These Requests call for all DOCUMENTS, electronically stored information, and tangible things on the particular subject (a) in YOUR possession, custody or control, (b) in the possession, custody or control of anyone acting on YOUR behalf, irrespective of who generated, prepared, received, sent, or signed the DOCUMENTS or tangible things.

3.  DOCUMENTS, electronically stored information, and tangible things responsive to these Requests shall be produced as they are kept in the usual course of business, or should be

organized and labeled to correspond to categories set forth in these Requests. When produced as kept in the ordinary course of business or as organized and labeled to correspond with the categories set forth in these Requests, the DOCUMENTS and tangible things shall be produced with the folders (or copies thereof) kept by the Person who had the DOCUMENTS in his, her, or its possession, custody or control so that Plaintiffs will know who had the DOCUMENTS or things in his, her, or its possession, custody or control. Please produce DOCUMENTS in such a manner as will facilitate their identification with the particular request or category of requests to which they are responsive. File folders with table or labels identifying DOCUMENTS must be produced intact with the DOCUMENTS. DOCUMENTS attached to each other should not be separated. Selection of DOCUMENTS from files and other sources shall be performed in a manner sufficient to ensure that the source of each Document may be determined, if necessary. To the extent that YOU process hard copy documents for YOUR internal review, including by OCR, such documents should be produced together with all associated electronic information. With respect to electronically stored information, each document produced must be accompanied with filepath information sufficient to identify the storage location and full folder tree information associated with that document and available to YOU when and if the file is viewed in the location in which it is maintained in the ordinary course of business.

4.   Electronically stored documents should be produced in native format and accompanied by a Concordance/Opticon load file that includes the following metadata fields/information: (1) VOLUME/volume the data was produced on; (2) Custodian/Source of data, indicated, for individuals, as follows: [Last name], [First name]; (3) BEGNO/Start Bates (including prefixes), no spaces; (4) ENDNO/End Bates (including prefix); (5) DOCID/Identical to BEGNO; (6) BEGATTACH/First Bates Number in attachment range; (6) ENDATTACH/Last

5

Bates Number in attachment range; (7) Record Type/File Type, e-mail, attachment; (8) Subject/As set forth in e-mail; (9) From Author/ [Last name], [First name]; (10) TO/ / [Last name], [First name]; (11) CC/ [Last name], [First name]; (12) BCC/ [Last name], [First name]; (13) Sent Date/E-mail sent date; (14) TITLE/ File name; (15) Date Created/From file header metadata; (16) Date last modified/From file header metadata; (17) File Size/in KB; (18) Application/Application used to create the file; (19) File Path/Original location of the file for loose files email folder location for email and attachments; (20) Doclink/Link to native file on production volume; (21) EXTRACTED TEXT/OCR/Filepath on production volume for extracted text/OCR; and (22) md5hash/Hash value.

5. <u>Partial Production</u>. Whenever a DOCUMENT is not produced in full please state with particularity the reason(s) it is not being produced in full and describe, to the best of YOUR knowledge, information and belief, and with as much particularity as possible, those portions of the DOCUMENT that are not produced and the reasons therefore. If a deposition transcript or other DOCUMENT cannot be produced because it is proprietary or believed to be proprietary, please produce an invoice thereof or otherwise provide information sufficient for Plaintiffs to obtain such transcript or other DOCUMENTS.

6. <u>Documents Withheld</u>. Whenever in these Requests YOU are asked to IDENTIFY or produce a DOCUMENT that is deemed by YOU to be properly withheld from production, Identify the portion of the request, *i.e.*, request number(s), to which the withheld DOCUMENT is responsive and:

    a.    If You are withholding the DOCUMENT under claim of privilege (including but not limited to the work product doctrine), please provide the information set forth in Federal Rule of Civil Procedure 26(b)(5), including:

    i)     The type of DOCUMENT;

    ii)    The general subject matter of the DOCUMENT;

    iii)   The date of the DOCUMENT;

    iv)   Such other information as is sufficient to IDENTIFY the DOCUMENT, including, where appropriate, the length of the DOCUMENT, as well as the author, addressees, custodian, and any other recipient of the DOCUMENT, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other, in a manner that, without revealing the information claimed to be protected, will enable this party to assess the applicability of the privilege or protection claimed by YOU;

    v)    The nature and basis of the privilege claimed;

    vi)   If the privilege claimed is the attorney-client privilege, an indication of which author(s) or addressee(s) is/are attorney(s); and

    vii)  Any other information necessary to support the claim of privilege.

b.    If production of any requested DOCUMENT(s) is objected to on the ground the production is unduly burdensome, describe the burden or expense of the proposed discovery;

c.    If YOU are withholding the DOCUMENT for any reason other than an objection that it is beyond the scope of discovery or that a request is unduly burdensome, provide the reason for withholding the DOCUMENT, and the information requested in sections 6(i)(a)-(d) above. Regardless of whether a Protective Order is entered by the Court, in all instances in which YOU are withholding

DOCUMENTS or things on the ground of confidentiality, please so indicate in YOUR responses.

7. Whenever a DOCUMENT contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material. If a privilege is asserted with regard to part of the material contained in a DOCUMENT, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a DOCUMENT has been redacted or altered in any fashion, IDENTIFY as to each DOCUMENT the reason for the redaction or alteration, the date of the redaction or alteration, and the Person performing the redaction or alteration. Any redaction must be clearly visible on the redacted DOCUMENT.

8. To the extent information is maintained in both hard copy and magnetic or electronic form, produce both forms.

9. If a DOCUMENT is in a language other than English, produce both the original and any translation thereof.

10. Orderly Response. Please produce DOCUMENTS in such a manner as will facilitate their identification with the particular request or category of request to which they are responsive. File folders with tabs or labels identifying DOCUMENTS must be produced intact with the DOCUMENTS. DOCUMENTS attached to each other should not be separated. Selection of DOCUMENTS from files and other sources shall be performed in a manner sufficient to ensure that the source of each DOCUMENT may be determined, if necessary.

11. Duty to Produce Continues. Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these discovery requests are intended to be continuing in nature so as to require supplemental or amended responses or answers, or production of additional DOCUMENTS, if

any additional information or DOCUMENTS are obtained in the future. Such supplemental or amended responses or answers or such production of additional DOCUMENTS shall be furnished within ten (10) days of the date on which any additional information or document is obtained.

12. <u>Inability to Produce</u>. If any or all of the DOCUMENTS IDENTIFIED herein are no longer in YOUR possession, custody, or control because of destruction, loss, or any other reason, then please provide the following information for each such Document:

      d.    A description of the content of that Document;

      e.    The location of all copies of the Document;

      f.    A description of the reason why that Document no longer remains in YOUR possession, custody or control; and

      g.    The date of, and the identity of the Person responsible for, its destruction, loss, transfer, or other action by which the Document left YOUR possession, custody or control.

## III.    REQUESTS

### REQUEST NO. 1.

All DOCUMENTS and COMMUNICATIONS RELATING TO Section 6.9 of the MERGER AGREEMENT, including but not limited to DOCUMENTS and COMMUNICATIONS RELATING TO its meaning, intent, purpose, and enforceability, and specifically including any work product, drafts, client communications, comments, or discussions related thereto.

### REQUEST NO. 2.

All DOCUMENTS and COMMUNICATIONS RELATING TO Section 9.7 of the MERGER AGREEMENT, including but not limited to DOCUMENTS and

COMMUNICATIONS RELATING TO its meaning, intent, purpose, and enforceability, and specifically including any work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 3.**

All DOCUMENTS and COMMUNICATIONS RELATING TO the ACQUISITION FAQ, including any work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 4.**

All DOCUMENTS and COMMUNICATIONS RELATING TO communications with TWEEPS regarding the MERGER AGREEMENT, specifically including work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 5.**

To the extent not produced in response to prior requests, all DOCUMENTS and COMMUNICATIONS pertaining to communications with TWEEPS regarding severance or other benefits, from March 1, 2022 through the present, including any work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 6.**

To the extent not produced in response to prior requests, all DOCUMENTS and COMMUNICATIONS pertaining to TWEEP severance or other benefits, from March 1, 2022 through the present, including work product, drafts, client communications, comments, or discussions.

# EXHIBIT 1



**Table of contents**

Updated as of October 27, 2022
Updates as of October 24, 2022
Updates as of October 21, 2022
Updates as of October 20, 2022
Updates as of October 17, 2022
Updates as of October 6, 2022
Updates as of October 4, 2022
Updates as of September 13, 2022
Updates as of August 30, 2022
Updates as of August 4, 2022
Updates as of July 26, 2022
Updates as of July 13, 2022
FAQs previously provided on May 19, 2022

    What's happening? (Overview)
    Process and timeline
    The Board
    Leadership
    Compensation
    Customers/Advertisers/Business Partners
    Company culture and benefits
    Future of Twitter

**Updates as of October 27, 2022**

Please see Elon Musk's Tweet on October 27, 2022 titled, "Dear Twitter Advertisers."

"I wanted to reach out personally to share my motivation in acquiring Twitter. There has been much speculation about why I bought Twitter and what I think about advertising. Most of it has been wrong.

The reason I acquired Twitter is because it is important to the future of civilization to have a common digital town square, where a wide range of beliefs can be debated in a healthy manner, without resorting to violence. There is currently great danger that social media will splinter into far right wing and far left wing echo chambers that generate more hate and divide our society.

In the relentless pursuit of clicks, much of traditional media has fueled and catered to those polarized extremes, as they believe that is what brings in the money, but, in doing so, the opportunity for dialogue is lost.

That is why I bought Twitter. I didn't do it because it would be easy. I didn't do it to make more. I did it to try to help humanity, whom I love. And I do so with humility, recognizing that failure in pursuing this goal, despite our best efforts, is a very real possibility.

That said, Twitter obviously cannot become a free-for-all hellscape, where anything can be said with no consequences! In addition to adhering to the laws of the land, our platform must be warm and welcoming to all, where you can choose your desired experience according to your preferences, just as you can choose, for example, to see movies or play video games ranging from all ages to mature.

I also very much believe that advertising, when done right, can delight, entertain and inform you; it can show you a service or product or medical treatment that you never knew existed, but is right for you. For this to be true, it is essential to show Twitter users advertising that is as relevant as possible to their needs. Low relevancy ads are spam, but highly relevant ads are actually content!

Fundamentally, Twitter aspires to be the most respected advertising platform in the world that strengthens your brand and grows your enterprise. To everyone who has partnered with us, I thank you. Let us build something extraordinary together."

**Updates as of October 24, 2022**

*Reposting this information that was published in a [companywide FAQ](#) from a team@ email on May 13, 2022.*

What is our general severance package if a position is eliminated?

> Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:
>
> > Two months base salary or On Target Earnings for employees on the Sales Incentive Plan
> > Pro-rated Performance Bonus Plan compensation at target
> > Cash value of equity that would have vested within three months from the separation date
> > A cash contribution for health care continuation.
>
> For Tweeps who are on a work-related visa, we also consider an extended notice period to enable additional time to transfer their visa to a new employer.
>
> Of course, we also comply with local employment laws and apply any additional statutory severance for redundancies that may occur outside of the United States.

**Updates as of October 21, 2022**

> All vested TWTR shares and cash held in EAC accounts have been transferred to your connected Charles Schwab brokerage accounts. Please note that the trading window will remain closed for current employees.

**Updates as of October 20, 2022**

> With the anticipated closing of the merger agreement, there are a lot of teams working in the background to prepare for the transition. We will continue to update [go/AcquisitionFAQ](#) on a rolling basis and also send proactive updates and answers to overarching questions.

Please know, as we get closer to deal close, there will continue to be tons of public rumors and speculation. Two things to clarify.

First, we do not have any confirmation of the buyer's plans following close and recommend not following rumors or leaked documents but rather wait for facts from us and the buyer directly.

Second, earlier in the year and as we have shared in public proxy filings, there were targeted cost savings discussions and planning. Those discussions stopped once the merger agreement was signed. As we've shared at #OneTeam meetings, since the merger agreement has been in place, there have been no plans for any company-wide layoffs.

We will continue to keep you all updated with relevant information and updates as we approach closing.

**Updates as of October 17, 2022**

***From the Twitter Equity Award Center (posted October 17, 2022):***

We are writing to let you know of an update related to our Equity Award Center. There is no immediate action for you to take.

In anticipation of the closing of the pending acquisition of Twitter by an entity controlled by Elon Musk (the "Acquisition"), it will be necessary to freeze all activity in the Equity Award Center (EAC) beginning at close of the market today, October 17, 2022. This freeze allows Schwab to perform final reconciliation of employee accounts prior to close of the Acquisition. You will not be able to access balances or transact in the EAC any longer. All vested TWTR shares and cash held in EAC accounts will be transferred to your connected Charles Schwab brokerage accounts and available to you by end of day on Monday, October 24, 2022; however the trading window will remain closed for current employees.

When the Acquisition closes your vested TWTR shares will be automatically converted into the right to receive $54.20 per share in cash in accordance with the terms of the Merger Agreement for the Acquisition. More information about this can be found in go/AcquisitionFAQ.

Participants may also wish to download any personal documents including a copy of their grant agreement PDFs for future reference (watch the tutorial for instructions starting at 1:03). We expect that access to the EAC will cease upon the closing of the Acquisition as Twitter will no longer be a public company and the related equity plans will be terminated. Please note that participants will still have access to their Charles Schwab brokerage accounts after the Acquisition is completed.

***From "ESPP Supplemental Update" (sent October 12, 2022):***

In connection with the execution of the agreement involving the pending acquisition by an entity owned by Elon Musk (the "Acquisition"), participants in Twitter's Employee Stock Purchase Plan (ESPP) previously received an ESPP Update that summarized the treatment of the ESPP leading up to the closing of the Acquisition. The ESPP Update described, in part, that due to the Acquisition, the ESPP offering period that began on November 15, 2021, may have a final purchase date that occurs earlier than its normally scheduled purchase date of November 15, 2022, and that a follow-up notice about any final purchase date would be provided at a later date. Additional information regarding the Acquisition is included in Twitter's definitive proxy statement dated July 26, 2022, filed with the Securities and Exchange Commission (the "SEC")

in connection with the solicitation of proxies to approve the Acquisition and in other relevant documents filed by Twitter with the SEC.

**In anticipation of the possible closing of the Acquisition, the final purchase date under the ESPP for the offering period that began November 15, 2021, has been set to be <u>October 14, 2022</u>.**

Any Tweep who is enrolled in this offering period and remains an ESPP participant through this date will have his or her accumulated ESPP contributions applied to the purchase of shares on October 14, 2022, and then cease participating after such final purchase. No additional ESPP contributions will be deducted after this date, and any accumulated ESPP deductions remaining in any ESPP accounts after the purchase of shares on the final purchase date will be returned to the appropriate participants, in cash, promptly after the final purchase occurs.

The purchase price on the final purchase date will be 85% of the <u>lower of</u> the closing price of a share of Twitter's common stock on (i) November 15, 2021, or (ii) the final purchase date.

More details regarding treatment of the ESPP in connection with the Acquisition can be found in the previous ESPP Update. You also can review the FAQs at <u>go/AcquisitionFAQ</u> if you have any more questions.

**<u>Updates as of October 6, 2022</u>**
> The Chancellor has ordered a stay on our trial, meaning that we will no longer be going to court on October 17. We will work with our buyer to close the acquisition by October 28, per the order.
> If the buyer is unable or unwilling to close by then, we will reconvene with the Chancellor to reschedule the trial for November.
> Our intention remains the same: to close the acquisition at the price and terms in the original merger agreement.

**<u>Updates as of October 4, 2022</u>**
> We received the letter from the Musk parties which they have <u>filed</u> with the SEC. Our intention is to close the transaction at $54.20 per share.
> We are still continuing to litigate this matter in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition. As a reminder, our five-day trial is scheduled to begin October 17, 2022.

**<u>Updates as of September 13, 2022</u>**
What was the result of the stockholder vote?
> Our stockholders approved the adoption of the Merger Agreement between Twitter and affiliates of Elon Musk for $54.20 per share in cash. You can see our press release <u>here</u>.
> Based on a preliminary tabulation following the Special Meeting of Stockholders, approximately 98.6% of the votes cast at the Special Meeting approved the proposal. The approval of our stockholders satisfies the final condition precedent to the closing of the merger (other than those conditions that by their nature are to be satisfied at closing). After certification by the Special Meeting's inspector of

elections, the final voting results will be filed with the SEC. We do not expect that the voting outcome will change after certification.

Obtaining stockholder approval is an important step forward in this process, however we are still continuing to litigate this matter in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition. As a reminder, our five-day trial is scheduled to begin October 17, 2022.

What is happening with Elon Musk's purported termination of the merger agreement?

As previously announced, affiliates of Mr. Musk have delivered notices purporting to terminate the merger agreement. Twitter continues to believe that Mr. Musk's purported termination of the merger agreement is invalid and without merit, and that the Musk parties continue to be bound by the merger agreement and obligated to complete the merger on the agreed terms and conditions. Twitter has filed a lawsuit in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition, and Twitter remains committed to doing so on the price and terms agreed upon with Mr. Musk.

**Updates as of August, 30, 2022**

What is our response to the buyer's second termination letter?

The buyer sent a second termination letter, and we responded, which you can read in full here. As was the case with the buyer's previous termination letter, his second termination letter is invalid and wrongful. Twitter has breached none of its representations or obligations under the Agreement, and Twitter has not suffered and is not likely to suffer a Company Material Adverse Effect. We remain committed to closing the transaction on the price and terms agreed upon with Mr. Musk.

**Updates as of August 4, 2022**

What is mDAU?

Twitter defines monetizable daily active usage or users (mDAU) as people, organizations, or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day through twitter.com, Twitter applications that *are able to* show ads, or paid Twitter products, including subscriptions. Monetizable means they could see ads or pay Twitter through a subscription, not that they will see ads on any given day. As our filings state, they are on a monetizable client or application.

How does Twitter determine mDAU?

When an account logs in or is otherwise authenticated on Twitter on any given day through twitter.com, Twitter applications that are able to show ads, or paid Twitter products, including subscriptions.

Average mDAU for a period represents the number of mDAU on each day of such period divided by the number of days for such period. Changes in mDAU are a measure of changes in the size of our daily "logged in" or otherwise authenticated active total accounts.

Why do we measure mDAU?

Audience metrics are seldom one size fits all but some form of daily active usage is a typical metric in our industry. Different products have different definitions they employ tailored to their specific service.

mDAU (monetizable daily active user) is designed to be our baseline to gauge broad usage and growth on the Twitter platform.

Monetizable means they *could* see ads or pay for a subscription, not that they *will* see ads. They are on a monetizable client or application.

We are committed to providing something valuable to people on Twitter every day.

As stated in our SEC filings, "We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement."

Our goal is not to disclose the largest user number we can but rather one that has more relevance. mDAU is designed to provide relevance and context to external stakeholders that reflects our goal of delivering value to people on Twitter every day and monetizing that usage.

Why do advertisers trust Twitter?

Twitter has historically built integrity through transparency and consistent operating principles. This approach is unwavering and something that differentiates us.

Twitter has never been more important to our customers around the world. We are working closely with our clients and partners, who can continue to expect our best-in-class customer service, client solutions and commitment to brand safety. We remain focused on delivering priority solutions in areas such as performance marketing, measurement, shopping, brand strategy and more.

We stand by our reporting methods and are transparent with the process for estimating our mDAU, accounts that are spam within mDAU and when updates are made.

As stated in our SEC filings, "We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement."

How do advertisers measure success on Twitter?

The results and metrics associated with campaign objectives are what best determines advertiser ROI.

Campaign objectives could focus on areas such as reach, video views, website traffic, app installs, followers, engagements, etc.

Targeting can focus on: followers, custom audiences, geography, language, interests, device type, etc.

Success metrics may include: Video views, impressions, Site visits, number of app downloads, various cost per data points (i.e. CPI, CPM, CPC, CPE), conversions, brand sentiment, etc.

We work with a variety of first and third party measurement companies to help validate.

Twitter has solutions that help advertisers measure the success of a campaign, maintain privacy, and brand safety:

Twitter First-Party Measurement Solutions

Advertisers can leverage Twitter's suite of first-party measurement solutions to garner learnings such as brand lift, media metrics, viewability, conversions, and more.

Third-Party Measurement Solutions

Advertisers know their ads are being seen using third-party accredited viewability reporting partners

See more here for information on our partners who help advertisers with measurement, Ad analytics, targeting, creative and more.

Twitter + Third-Party Brand Lift Surveys

We help advertisers measure the impact of campaigns on key brand metrics such as awareness, association, favorability, and consideration, using our first-party and third-party Brand Lift Surveys.

Third-Party Viewability — Moat, IAS, DV Direct Integration

We help brands measure the quality of impressions and video views of their media buys with our third-party partners such as MOAT, IAS, and DV.

Advertiser audience targeting:

Via a suite of intuitive, performant, and privacy-compliant tools, we enable advertisers to refine campaign delivery and reach the people that are most likely to be receptive to a brand's message. Advertisers on Twitter can:

Reach people based on who they are with Demographic targeting.

Reach people based on how they access Twitter with Device targeting.

Reach people based on how they engage on Twitter with Audience Features.

Leverage off-platform data to build Custom Audiences on Twitter.

Let Twitter find the people most likely to drive results with Automated Targeting.

Extend reach to people similar to core audience with Audience Expansion.

Enriched Twitter Audiences and Account Based Marketing

Twitter can help advertisers drive even more results with powerful ways to reach our audiences.

Enriched Twitter Audiences are hyper-targeted custom audiences that expand reach, increase engagement, and improve overall

performance. These custom audiences are created by trusted partners using Twitter's data.

For B2B advertisers, Account Based Marketing campaigns identify business decision makers and their influential communities on Twitter.

Across many verticals including gaming, fashion, and pharma, these solutions are making it easier for customers to drive results.

Campaign Planner: New as of June 2022

The tool enables customers to forecast reach, impressions, average frequency, and CPM against a specific audience, campaign duration, frequency setting, placement, and budget for auction-based campaigns.

We've also made it easier than ever to execute reach campaigns by allowing advertisers to start and save a draft campaign directly from the tool.

Campaign Planner is available to advertisers in the United States, United Kingdom, and Japan.

Partners can also tap into tools such as Audience Estimate.

See more here for examples of successful advertising campaigns that include key campaign metrics.

How does Twitter calculate spam?

We shared a comprehensive blog post and Tweet thread about how we define and calculate spam/bots here and here, respectively.

Customers org: If clients have questions, you can use this client-facing language reactively.

Does Twitter use AI and ML to identify spam and bots on the platform?

We do! Specifically, Twitter deploys spam detection capabilities that have resulted, and continue to result, in the suspension of typically more than one million spam accounts every day, including both automated and manual reviews of accounts and activity on the Twitter platform during and after sign-up. Twitter also locks millions of accounts each week that cannot pass human-verification challenges, such as CAPTCHAs or phone verifications.

Our processes encompass a mix of human engagement and automation to identify malicious spam and bots.

We are always testing and exploring ways to further advance our systems for detection and remediation.

Separate from these automated and manual spam-detection processes, Twitter estimates the prevalence of false and spam accounts within mDAU through multiple human reviews (in replicate) of thousands of randomly selected accounts each quarter using both public and private data.

Did Twitter cooperate by providing the Buyer's team the information they were requesting?

Yes. Twitter has continuously shared information with the buyer to consummate the transaction in accordance with the terms of the merger agreement.

Throughout this process we have and will continue to protect proprietary and confidential information of Twitter advertisers and our customers' private user data.

Why didn't Twitter choose to redact any information from the acquirer's countersuit?

We fully stand by our SEC filings, the methodologies we use to calculate mDAU, and our statements about the percentage of spam accounts on our platform.

What is our public response to the countersuit?

The counterclaims are factually inaccurate, legally insufficient, and commercially irrelevant.

Why did Twitter recast its mDAU values three days after signing the agreement?

The updated values for mDAU reflected a change of less than 1% for each impacted period.

Twitter has historically built integrity through transparency and consistent operating principles. We reported this out of an abundance of transparency. Twitter disclosed this recast when we announced Q1 2022 Earnings in April.

Why did Twitter move from disclosing MAU to mDAU in 2019?

We want to provide something valuable to people on Twitter every day, and we believe that mDAU, and its related growth, are the best ways to measure the success of our objectives and to show the size of our audience and engagement.

**Updates as of July 26, 2022**

What's the schedule for our case?

The judge set a schedule for our case in the Delaware Court of Chancery for a five-day trial in October.

Does our Board of Directors recommend how stockholders should vote?

Yes, the Twitter Board of Directors recommends that stockholders vote in favor of the transaction ("FOR").

When is the Special Meeting of Stockholders?

The meeting is scheduled for September 13, 2022 at 10am PT. Anyone who owns TWTR stock (including Tweeps) as of July 22, 2022 is entitled to vote prior to or during the meeting.

What should stockholders expect?

Each stockholder will receive voting materials in the very near future. The materials describe easy ways to vote electronically, over the phone, or by mail. If you received your voting materials by email, you can simply click the "Vote Now" button in the email. Otherwise, the easiest way to vote your shares is to go to proxyvote.com and enter the Control Number(s) provided to you in the materials. Please note that if you hold Twitter shares in more than one account (e.g., in our employee share purchase plan (ESPP), in registered name, or through a personal bank or brokerage account), you'll receive separate emails or hard copies of voting materials for each account. To make sure that all your shares are represented, you must submit a vote for each account in which you hold Twitter shares. You will receive a separate Control Number for each account in which you own shares.

What communications will stockholders receive from Innisfree, our proxy solicitor?

We asked Innisfree to work with us to ensure our shareholders are educated about this important proposal, so you will likely receive more communications from them over the coming weeks via email, phone call and traditional mail. If you have any questions, please call Innisfree at +1 (877) 750-8338 (US/Canada) or +1 (412) 232-3651 (all other countries).

**Updates as of July 13, 2022**

What does Mr. Musk's notice mean? Is the deal now officially off?

No. Mr. Musk's purported termination is invalid and wrongful.
As we noted in our press release and commentary from the Chairperson of our Board, the Twitter Board is committed to closing the merger on the $54.20 price and terms agreed upon with Mr. Musk and plans to pursue legal action to specifically enforce the merger agreement.
Please understand that the Twitter Board and executive management team are continuing to actively manage the process related to the acquisition. We will share information with you as we can, but this is an evolving situation and we may not have, or be able to share, answers to all of your questions.

What is Mr. Musk's goal?

We are not in a position to speculate about Mr. Musk's objectives.

Given that we plan to pursue legal action to enforce the merger agreement, how long will it take to resolve that?

As with many legal matters, it is difficult to predict the duration of this process. We have a group of internal team members and external advisers who are dedicated to this workstream. It is important to remember that during this process, it is business as usual for all of us at Twitter. That means we should continue the important and meaningful work of driving Twitter forward and continuing to deliver value to our users and customers.

Have we shared bot information with Mr. Musk as requested?

We have met our obligations under the merger agreement.

Has Twitter breached the merger agreement?

As stated in the letter attached to our 8-K filing from July 11, 2022, "Twitter has breached none of its obligations under the Agreement," and "As it has done, Twitter will continue to provide information reasonably requested by Mr. Musk under the Agreement and to diligently take all measures required to close the transaction.

Anything more you can share with us about the complaint that we filed on July 12, 2022?

The complaint is public and details why Twitter believes that Mr. Musk's purported termination is invalid and wrongful.

Given this is active litigation, we are limited in what we can say beyond our public filings.

We have a group of internal team members and external advisers who are dedicated to this workstream. It is important to remember that during this process, it is business as usual for all of us at Twitter. That means we should continue the important and meaningful work of driving Twitter forward and continuing to deliver value to our users and customers.

What is the likelihood of a settlement? What is our desired outcome?

The Twitter Board is committed to closing the merger on the $54.20 price and terms agreed upon with Mr. Musk.

Why haven't we implemented retention packages or similar for Tweeps?

Tweeps are the heart of Twitter and will always be essential to our success. On June 20, 2022, we sent Mr. Musk a formal request for consent to two tailored employee retention programs that had been vetted by the board and the compensation committee with the assistance of an outside compensation consultant. Mr. Musk has not provided his consent to implement these programs.

How do we plan to retain talent?

Our attrition is slightly higher than best practice for normal macroeconomic times, but remains inline with current industry trends. We will continue to monitor it to ensure that we can quickly identify any areas of concern and help mitigate where possible.

What's the plan to support the transition of our current projects and work?

Until the transaction closes, we'll be focused on continuing to drive the business forward. We are confident plans for transition will be properly created.

Is there a possibility for layoffs, now or post-close?

We're not looking at company-wide layoffs. However, teams from across the company are reprioritizing and making changes to ensure we are operating responsibly and efficiently in the current operating environment. We may continue to see restructuring and org changes as we continue to align with our revised business needs (as we always have in the past).

What regulatory agencies will need to approve the transaction?

As of July 13, 2022, stockholder approval of the Merger Agreement is the only remaining approval or regulatory condition to consummating the closing of the Merger under the Merger Agreement.

**FAQs previously provided on May 19, 2022**

**What's happening?**

Twitter has entered into a definitive agreement to be acquired by a private entity affiliated with Elon Musk. The purchase price is $54.20 per share. We expect the transaction to close in 2022, subject to the satisfaction of customary closing conditions. Upon completion of the transaction (or the "closing"), Twitter will become a privately held company.

Twitter's board of directors (the "Board") undertook a thoughtful, comprehensive, and deliberate process to review the proposal and unanimously determined the transaction was in the best interests of our stockholders.

There are still several steps to close. Completion of the transaction is subject to the approval of Twitter stockholders, the receipt of applicable regulatory approvals, and the satisfaction of other customary closing conditions.

Upon the closing, Twitter equity awards will be canceled and converted into the right to receive a cash amount of $54.20 (less any applicable exercise price) for each underlying share. The cash amount payable for unvested Twitter equity awards will be payable over the same pre-transaction vesting schedule as the award that was canceled.

The terms of the agreement specifically provide for Tweep annual base salary, bonus opportunities (short/long term incentive (excluding equity) opportunities) and employee benefits so that, in each case, they are no less favorable in the aggregate than the comparable opportunities or benefits, as applicable for at least one year from the closing date.

Between now and closing, we generally will operate Twitter in normal course - just like we always have. In general, we do not expect any changes to Tweep compensation programs and benefits. Twitter RSUs and other equity awards will vest as they normally have. Business decisions will continue to be made by Twitter's leadership.

**Process and timeline**

Why did Twitter enter into this transaction and why do we feel it is still best for stockholders?

The Twitter Board undertook a thoughtful and comprehensive process to review Elon Musk's proposal, with a deliberate focus on value, certainty, and financing. The Twitter Board considered, among other things, Twitter's go-forward prospects in the current market as well as other potential value-creating opportunities.

The Board still believes this transaction, which delivers a substantial cash premium to stockholders, is the best path forward for Twitter's stockholders.

Why did we announce the transaction when we did?

> We announced the deal to employees and the public at the same time as we had a legal and fiduciary responsibility as a public company to do so.

How long will it take for this deal to close?

> We expect the transaction to close in 2022 subject to the satisfaction of customary closing conditions.

Why did we implement a Shareholder Rights Plan ("poison pill")?

> The Board adopted the Shareholder Rights Agreement on April 15, which has been referred to as a "poison pill" in the press. The Board adopted the rights plan to enable all stockholders to realize the full value of their investment in Twitter by reducing the likelihood that any entity, person or group gains control of Twitter through open market accumulation without paying all stockholders an appropriate control premium or without providing the Board sufficient time to make informed judgments and take actions that are in the best interests of shareholders.

Is there a go-shop provision?

> No. All of these details are laid out in the merger agreement that has been filed with the SEC.

What does it mean to become a privately held company? What are the benefits?

> Generally, private companies' shares are not publicly traded or held by a broad group of shareholders.
> Private companies typically do not have to incur costs related to public reporting and may have more flexibility to operate.
> Until the transaction closes, it remains business as usual, and we are continuing to operate normally as an independent, publicly traded company.

Once the deal closes, is there a test for the debt coverage capabilities?
> In an acquisition like this one, it is common for the party acquiring a target company to add debt to the target's balance sheet. In assessing the deal, prospective lenders have considered the leverage ratio, which is one of the credit metrics used to measure the ability of the target company to use its cash flows to repay all its debt obligations, including principal and interest payments.

What does the acquisition mean for our debt?
> The debt balance on our balance sheet will be higher. If you are reading news externally, you have probably seen that Mr. Musk's affiliates received $13B of commitments from banks for loans to partially finance the deal. Twitter will ultimately incur such loans after the transaction closes. A portion of Twitter's existing debt balance, which is $5.2B today, is expected to be repaid in

connection with the closing, and new debt securities are expected to be issued by Twitter.

What are the upcoming major milestones of the deal and when will Tweeps find out?

We expect the transaction to close in 2022, subject to satisfaction of customary closing conditions, including required regulatory and stockholder approvals. In terms of next milestones, we expect to file a preliminary proxy statement in the near future relating to the special meeting of stockholders to vote to approve the merger agreement. Once that document clears SEC review, we will file a definitive proxy statement and then hold the special meeting on the timeline specified in the proxy statement. We will aim to keep you informed of major updates.

Where are we in the acquisition cycle? Do the changes to hiring and cost savings have any implications on this?

We're still on track and working to close the transaction in a timely manner. We expect the transaction to close in 2022, subject to satisfaction of customary closing conditions, including required regulatory and stockholder approval.

## The Board

What factors did the Board use to evaluate whether this would be in the best interest of stockholders?

As mentioned above, the Board undertook a thoughtful and comprehensive process to review the proposal, with a deliberate focus on value, certainty and financing. The Board's vote to approve the transaction was unanimous.
The Board considered the proposal in light of the company's go-forward prospects and the current market environment, among numerous other considerations.
Additional details of the Board's process will be made available in our future SEC filings.

Did the Board get a fairness opinion? From whom?

Yes, Goldman Sachs and JP Morgan each provided a fairness opinion.

Did the Board lose confidence in the business?

Absolutely not. The Twitter Board considered the proposal in light of Twitter's go-forward prospects and the current market environment, among numerous other considerations.
This transaction is a great outcome for stockholders and demonstrates the tremendous value of Twitter.

## Leadership

What will Twitter's leadership team look like post-close?

It's too early to speculate on that right now.

For now, our team is focused on continuing to operate our business as we have and taking steps to secure the approvals we need to close the transaction and set Twitter up for continued success as a private company.

Will we have a board of directors post-close? Who will hold our new owner accountable?

Private companies are operated differently than public companies, but they are also subject to many of the same governance requirements and regulations as a public company. Twitter is incorporated in Delaware, which provides rules that dictate our governance.

Are the recent changes to Staff, cost savings, and hiring pause connected to the acquisition?
These changes are ones that Twitter has been contemplating and is driving as part of our ordinary course operations and operational improvements. In order to responsibly manage the organization as we sharpen our roadmaps and our work, we need to continue to be intentional about our teams, hiring, and costs. We will continue to remain focused on strengthening our work through increased accountability and execution to make Twitter everything it can be.

**Compensation and Equity Awards**
Will this announcement impact promotion decisions and related compensation increases?

No. Until the deal closes, it is business as usual for Twitter, including with respect to promotion decisions or related comp changes.

What will our compensation program look like without RSUs? How will we stay competitive?

Tweeps are the heart of Twitter and will always be essential to our success. We expect our compensation program will reflect that.
It is too early to determine the future of our incentive programs as a private company, but we will share more information as soon as it becomes available. We currently expect to continue to offer competitive rewards (regardless of the underlying currency of those rewards) to attract and retain talent.

Will we grant new Twitter equity awards between now and deal close for promotions and role changes?

We will continue to grant Twitter equity awards until the transaction closes, as we normally would for promotions and role changes. After the transaction closes, we expect our compensation program will be reviewed and updated to account for the fact that we will operate as a privately-held company. We will share more information when it becomes available.

**Existing Twitter Shares and Equity Awards**
Will the trading window change as a result of this announcement?

No, the trading window will not change. We're still a public company and we will still report quarterly earnings on the same cadence that we did before, so we expect our calendars generally will be the same. We expect this to be the case until the deal closes.

Should I or can I sell Twitter stock that I own?

As long as you are not in possession of any material nonpublic information (MNPI) regarding Twitter, you are free to trade Twitter stock when trading windows are open. You are still bound by all black-out periods and the other terms of our insider trading policy.

What happens to my existing Twitter equity awards if the transaction closes?

Unless and until the transaction closes, the terms of your Twitter equity awards will remain the same.

Once the transaction closes, then your Twitter equity awards (whether granted under our 2013 Equity Incentive Plan or assumed in an acquisition of your prior employer) will be treated as described below:

**RSUs**

Each vested RSU will be converted into the right to receive the $54.20 purchase price in cash as described below. If RSUs were subject to performance-based vesting, the number of vested RSUs subject to that award will be based on actual achievement.

Each unvested RSU will be converted into the right to receive an amount in cash equal to $54.20. This cash amount will vest in installments on the same vesting schedule that applied to the canceled unvested RSUs it is replacing, subject to continued service through the applicable vesting date. If unvested RSUs were subject to performance-based vesting, the number of RSUs subject to that award will be deemed earned at the target level of achievement.

For example, if you have 100 RSUs that vest on November 1, 2022 (assuming the transaction closes before that date), then you will receive a cash amount equal to $5,420, less applicable tax withholding, on November 1, 2022 through payroll.

Under the terms of the deal, all unvested RSU awards are converted into the right to receive cash in an amount equal to the product of the total number of unvested RSUs and the per share purchase price ($54.20). The resulting cash amount then vests and will be paid to you according to the original vesting schedule subject to your continued service through the applicable vesting dates, which will remain in place.

**Options**

Each vested option will be converted into the right to receive an amount in cash equal to the difference between $54.20 and the option exercise price for each underlying share.

Each unvested option will be converted into the right to receive an amount in cash equal to the difference between $54.20 and the option exercise price for each underlying share. This cash amount will vest on the same vesting schedule that applied to those canceled unvested options it is replacing, subject to continued service through the applicable vesting date.

**Restricted Stock Awards**

Each restricted stock award will be converted into the right to receive $54.20 in cash. This cash amount will vest on the same vesting schedule that applied to the canceled award it is replacing, subject to continued service through the applicable vesting date.

When will the cash amounts for my Twitter equity awards described be paid?

Generally, amounts payable to you for your vested equity awards will be paid to you, less applicable tax withholding, within five business days after the closing of the transaction.

Generally, amounts payable to you for your unvested Twitter equity awards will be paid to you, less applicable tax withholding, through payroll on the same vesting schedule that applied to those equity awards before the transaction, subject to your continued service through the applicable vesting date.

Please consult with your tax advisor as to the tax consequences to you of these payments.

What happens to cash amounts payable for unvested Twitter equity awards if a Tweep departs before the cash amounts are vested?

The cash amounts payable in respect of your unvested Twitter equity awards will only vest and be paid to you if you remain in continuous service with Twitter through the applicable vesting date. If your service with Twitter (or a subsidiary) ends before a portion of such cash amount is vested, you will not receive that portion of the cash amount and it will be forfeited to Twitter.

Do Twitter RSUs have a "change in control" clause that will accelerate vesting if layoffs occur within one year?

Generally, no. Unless you are party to a separate agreement with Twitter, your Twitter equity awards (or the cash amounts payable for such equity awards) will not receive accelerated vesting if your employment is involuntarily terminated following the closing of the transaction (known colloquially as a "double trigger").

As is customary in our industry, only a few of our executives and other senior employees currently have a "double trigger" provision.

Do all Tweeps have the same vesting schedule?

Generally, Twitter equity awards are granted through the annual refresh process or promotion process vest on a quarterly vesting schedule (with vesting dates in February, May, August, and November); however, depending on when a Tweep was hired, their new hire grant may vest outside of those normal dates. The award agreement provided to you upon the grant of your Twitter equity award will contain your applicable vesting schedule.

Will the $54.20 purchase price change with the fluctuation of Twitter's current stock price or because of inflation?

No, the transaction price of $54.20 per share is fixed, including for purposes of future cash payouts for equity awards on the same vesting schedule.

For International Tweeps, as individual RSUs convert into the cash equivalent of $54.20 post-close, will international Tweeps receive this in U.S. dollars through their brokerage account (ex: Schwab) or will it be converted into local currency and deposited into their payroll?

Finance and Payroll are working on this now, however, the merger agreement provides that cash amounts paid in respect of unvested Twitter equity awards will be paid in U.S. dollars. We will share more information when it becomes available.

**New hires and offers**

Will new hires continue to receive RSUs?

Yes, we expect we will continue our current practices for new hire grants up until the close.

Are there any changes to the methodology for how new hire grants are converted to shares?

No, until the closing of the transaction, we expect we will continue our current equity granting practices.

How will this announcement affect new Tweeps who have signed an offer letter with RSUs, but have not yet joined the company? What should we tell candidates that have equity in their current offer letters?

New Tweeps will still be granted their RSUs subject to the terms of their offer letters, however depending on the timeline of closing and their vesting schedule, they may receive equivalent cash payments in respect of those RSUs.

What do we tell candidates if they ask us about this announcement during an interview?

> Please point them to the press release (Parag Tweeted a link to it) for all of the specific details related to the announcement.
> You may use this FAQ to answer questions for candidates and use the What's happening? section of this doc for key messages to third parties.

**ESPP**

> If you are a current ESPP participant, your accumulated ESPP contributions will be used to purchase shares on May 16, 2022, unless you withdraw in advance of the purchase date. There will not be a new offering period beginning on May 16, 2022, and any current ESPP participant who is enrolled in the ESPP offering period that began on May 15, 2021 will cease participating in the ESPP after May 16, 2022.
> If you are a current ESPP participant who is enrolled in the offering period that began on November 15, 2021, you may continue to participate in the ESPP following May 16, 2022. The final purchase date is scheduled to occur on November 15, 2022, or, if earlier, a date that is at least 10 business days prior to the date on which the transaction closes. Following the final purchase date, the ESPP will then terminate, subject to the closing of the transaction.
> If you are a current ESPP participant, you may not make any increases to your ESPP contribution rate.
> Shares received through the exercise of an ESPP purchase right will be converted at the closing of the transaction into the right to receive $54.20 per share in cash.
> You may opt out of the ESPP at any time through Charles Schwab. If you opt out of the ESPP prior to a purchase date, you will be refunded the accumulated but unused contributions in your ESPP account.

**Customers/Advertisers/Business Partners**
*Tweeps: *Please see the email from Sarah Personette with an email template to send to clients and partners**
How will this transaction impact business partners? Customers?

> The service has never been more important to our customers around the world, and the work of our teams is critical.
> Partners can continue to expect our best-in-class customer service, client solutions, and commitment to brand safety.
> We cannot speculate on changes Elon Musk may make post closing.
> While Twitter has signed the deal, there are still more steps to take in order to close, which is expected to be in 2022.
> For now, there will be no changes as a result of this announcement.
> Any changes will be communicated as they always have.

Will there be changes to how advertisers potentially leverage Twitter?

> During the period until closing, Twitter will operate as it always has.
> Advertisers can continue to turn to Twitter to drive awareness and consideration for their products and services when they want to launch something new or connect with what's happening.
> We remain focused on delivering priority solutions in areas such as performance marketing, measurement, shopping, brand strategy, and more.
> Any changes will be communicated as they always have.

Will there be any changes to our advertising model?

> Until the transaction closes, it is business as usual for us.
> We remain committed to our product roadmap that helps businesses Launch something, connect with what's happening, and help people buy their products or services.
> We continue to support businesses - big and small - to be able to do this with both our native and paid solutions.
> Our commitment to our customers remains unchanged.

Will there be any changes to our commitment to brand safety in light of freedom of speech comments?

> Until the transaction closes, it is business as usual for us, including with respect to our terms of service.
> Everything we do centers around people.
> At the core of Twitter, we are an organization focused on how we create a space for all voices to have a chance to participate in the public conversation.
> For us, we seek to tackle it by focusing on our Policies, Products, and Partnerships.
> We have no planned changes to our commitment to brand safety and will continue to lead in products that protect, policies that lead, and partnerships that matter.

**Company culture and benefits**

How will our acquisition impact our IDEA goals, and how can we ensure that Twitter maintains its values and commitment to social responsibility?

> Twitter is an open service that's home to a world of diverse people, perspectives, ideas, and information, and our IDEA principles and commitment to social responsibility will continue to be an integral part of our company's core.
> Our Tweepforce representation goals remain in place, and we are committed to delivering on our IDEA roadmap during this period.

**Benefits/perks**

What does the future hold for reimbursements, allowances, and other perks?

> We do not expect any changes to these programs at the moment.

Are there any changes to parental leave benefits or medical, dental, and vision benefits?

> We do not expect any changes to these programs at the moment.
> The agreement provides for Tweep benefits, base salary, and bonus opportunities (short/long term incentives) to continue on a comparable basis for at least one year following the close of the transaction.

Are there any plans to adjust benefits for hourly employees prior to the closing?
> We do not expect any benefits to change for our hourly Tweeps at this time.

**Remote work**

Will our commitment to flexible/remote work change?

> We do not expect our policies around remote work to change at this time. A significant portion of our workforce is either fully or partially remote. That is how we have worked the last several years and that is how we currently expect to work going forward during this time.

**Contractors and Interns**

How will this announcement affect contractors? Will their contracts be cut short upon close?

> We do not expect any changes to our contingent workforce at this time.

Will contractor conversions to FTE be considered in 2022 while we wait for the deal to close?

> These decisions will be handled on a case-by-case basis. As always, please stay close to your S&O and FP&A partners, as well as your Staff lead for hiring and conversion decisions.

Are there any changes to our intern program?

> We have no current plans to change our intern program.

**Immigration/Visas**

What impact will there be for employees being sponsored through work visas?

> There is no impact to employer-sponsored visas at this time. When the deal closes, we anticipate that your employing entity will remain the same, and thus there will be no impact to your visa status. If you have questions about your individual immigration status, please contact talentmobility@twitter.com.

**Communications**

What are we doing to prevent leaks?

Employees are held to the standards laid out in our Playbook, which includes communications guidelines.

Leaks hurt the company's ability to communicate in the best way possible.

We do our part to investigate how information leaks and handle accordingly.

Why do Twitter employees find out big news like this at the same time as the public?

We do our best to share information with all of you as soon as we're able.

In this case, there are laws in place (such as Regulation FD) that require we disclose information to all members of the investment community at the same time. These laws help to ensure investors receive information at the same time. Given employees are also shareholders, we cannot selectively disclose information ahead of other audiences.

I'm being approached by the press, or people I don't know, for comments on Twitter. What should I do?

Please continue to handle any inquiries in accordance with Twitter's policies. Press or other inquiries should be directed to the appropriate parties within Twitter for response. Please raise any concern to CorpSec@, even if you're unsure about the intention of the question. If you are approached by the press, please forward any inquiries to press@twitter.com.

**Future of Twitter**

How will the product be impacted? Will there be any changes to the user experience?

Until the transaction closes, it is business as usual for us, including with respect to our products. We are always iterating to make Twitter the best it can be for people on the service. When there are changes, we will be sure to communicate as we always have.

Will our policies around content moderation change?

Until the transaction closes, it is business as usual for us, including with respect to our terms of service. As we always do, we will continue evolving and iterating to improve the product and the health of the public conversation during this time.

Should we be prepared to dial back our work over the next few months, and correspondingly our budgets?

Between now and close, we should continue operating Twitter in normal course as a public company.

We should always be mindful of our expenses and ensure we're seeing a corresponding return on investment.

Are our priorities changing as a company, or should we continue working on existing projects? Should we still focus on our current OKRs?

Until the transaction closes, it remains business as usual and we are continuing to operate normally as an independent, publicly-traded company.

While the deal is still pending, we must continue to execute and advance our existing strategy.

**Protections**

How will the closing of the transaction affect employee benefits and compensation?

The merger agreement provides special protection for Tweep compensation and benefits for one year following the closing of the transaction.

Specifically, the agreement specifically provides that, for one year following the closing of the transaction, the purchasing entity will:

> Maintain existing base salary and wage rates of continuing Tweeps
>
> Provide continuing Tweeps with short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those than existing compensation opportunities, although equity compensation may or may not be granted in the future
>
> Provide continuing Tweeps with employee benefits (excluding equity and equity-based awards) that are substantially comparable in the aggregate to existing benefits
>
> Provide continuing Tweeps whose employment are terminated during such period with severance payments and benefits that are no less favorable than those applicable to an applicable employee prior to the closing of the transaction
>
> Recognize continuing Tweeps' service to Twitter in determining eligibility, vesting and determination of the level of benefits applicable to such employees following the closing of the transaction
>
> Waive requirements for continuing Tweeps to satisfy any deductible, co-payment, out-of-pocket maximum or similar requirements under the acquiring entity's benefits plans to the extent the employee has made correlating previously credited payments under a Twitter benefit plan
>
> Waive waiting periods, preexisting condition exclusions and requirements to show evidence of good health for continuing Tweeps

What will happen to Twitter user data/IP after the deal closes? Will any of our policies regarding data protection, including with regard to employee specific information, be impacted by this announcement?

We will continue to treat information with the utmost protection and operate consistent with the laws.

If I'm on a company sponsored visa, are there any risks if I travel outside of the country during the closing period?

We recognize that there are a lot of questions about Tweeps working on a company sponsored visa. For specific questions about your individual status, please contact talentmobility@twitter.com.

**Compliance**

Do we expect any potential risks as a private social media company from a regulatory standpoint?

> As a private company, Twitter will still have to comply with any rules and regulations that govern the activities of social media companies. The same risks apply as they do now and if you have any questions, you should consult with the Compliance team.

**Additional Information and Where to Find It**

On May 17, 2022, Twitter Inc. ("Twitter") filed a preliminary proxy statement in connection with its Special Meeting of Stockholders (the "Special Meeting") related to the pending acquisition of Twitter (the "Transaction"). Prior to the Special Meeting, Twitter will furnish a definitive proxy statement to its stockholders, together with a proxy card. STOCKHOLDERS ARE URGED TO READ THE DEFINITIVE PROXY STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION. Detailed information regarding the names, affiliations and interests of individuals who are participants in the solicitation of proxies of Twitter's stockholders is available in Twitter's preliminary proxy statement.

Stockholders may obtain, free of charge, Twitter's proxy statement (in both preliminary and definitive form), any amendments or supplements thereto, and any other relevant documents filed by Twitter with the U.S. Securities and Exchange Commission (the "SEC") in connection with the Special Meeting at the SEC's website (http://www.sec.gov). Copies of Twitter's definitive proxy statement, any amendments or supplements thereto, and any other relevant documents filed by Twitter with the SEC in connection with the Special Meeting will also be available, free of charge, at Twitter's investor relations website (https://investor.twitterinc.com) or by writing to Twitter, Inc., Attention: Investor Relations, 1355 Market Street, Suite 900, San Francisco, California 94103.

**Forward-Looking Statements**

This communication contains forward-looking statements that involve risks and uncertainties, including statements regarding: the Transaction, including the expected timing of the closing of the Transaction; considerations taken into account by Twitter's Board of Directors in approving the Transaction; and expectations for Twitter following the closing of the Transaction. If any of these risks or uncertainties materialize, or if any of Twitter's assumptions prove incorrect, Twitter's actual results could differ materially from the results expressed or implied by these forward-looking statements. Additional risks and uncertainties include those associated with: the possibility that the conditions to the closing of the Transaction are not satisfied, including the risk that required approvals from Twitter's stockholders for the Transaction or required regulatory approvals to consummate the Transaction are not obtained; potential litigation relating to the Transaction; uncertainties as to the timing of the consummation of the Transaction; the ability of each party to consummate the Transaction; possible disruption related to the Transaction to Twitter's current plans and operations, including through the loss of customers and employees; and other risks and uncertainties detailed in the periodic reports that Twitter files with the SEC, including Twitter's Annual Report on Form 10-K filed with the SEC on February 16, 2022, and Quarterly Report on Form 10-Q filed with the SEC on May 2, 2022, which may be obtained on the investor relations section of Twitter's website (https://investor.twitterinc.com). All forward-looking statements in this communication are based on information available to Twitter as of the date of this communication, and Twitter does not assume any obligation to update the

forward-looking statements provided to reflect events that occur or circumstances that exist after the date on which they were made, except as required by law.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WOLFRAM ARNOLD, ERIK
FROESE, TRACY HAWKINS,
JOSEPH KILLIAN, LAURA CHAN
PYTLARZ, and ANDREW
SCHLAIKJER,

Plaintiffs,

v.

X CORP. f/k/a TWITTER, INC., X
HOLDINGS CORP. f/k/a X
HOLDINGS I, INC. and ELON MUSK,

Defendants.

C.A. No. 1:23-cv-00528-CFC

## NOTICE OF SERVICE OF SUBPOENA

PLEASE TAKE NOTICE that, pursuant to Rules 30 and 45 of the Federal

Rules of Civil Procedure, Plaintiffs Wolfram Arnold, Erik Froese, Tracy Hawkins,

Joseph Killian, Laura Chan Pytlarz, and Andrew Schlaikjer (collectively,

"Plaintiffs"), through their counsel, have caused to be issued the attached

Subpoena to Produce Documents (Ex. 1), to be served on Wilson Sonsini Goodrich

& Rosati.

Dated: August 30, 2023

Akiva Cohen (*pro hac vice*)
Dylan M. Schmeyer (*pro hac vice*)
Michael D. Dunford (*pro hac vice*)
Lane A. Haygood (*pro hac vice*)
KAMERMAN, UNCYK, SONIKER & KLEIN P.C.
1700 Broadway, 16th Floor
New York, NY 10019
Tel: (212) 400-4930
acohen@kusklaw.com
dschmeyer@kusklaw.com
mdunford@kusklaw.com

/s/ Joseph L. Christensen
Joseph L. Christensen (#5146)
CHRISTENSEN & DOUGHERTY LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Tel: (302) 212-4330
joe@christensendougherty.com

*Attorneys for Wolfram Arnold, Erik Froese, Tracy Hawkins, Joseph Killian, Laura Chan Pytlarz, and Andrew Schlaikjer*

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | |
|---|---|
| WOLFRAM ARNOLD, ERIK FROESE, TRACY HAW | ) |
| _Plaintiff_ | ) |
| v. | ) |
| X CORP. f/k/a TWITTER, INC., X HOLDINGS | ) |
| CORP. f/k/a X HOLDINGS I, INC. and ELON MUSK | ) |
| _Defendant_ | ) |

Civil Action No.   C.A. No. 1: 23-cv-00528 CFC

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                          Wilson Sonsini Goodrich & Rosati

_____

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule A

| Place: Kamerman, Uncyk, Soniker & Klein, P.C., 1700 Broadway, 16th Floor New York, NY 10019 | Date and Time: 09/14/2023 9:00 am |
|---|---|

❑ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      08/31/2023

           _CLERK OF COURT_

                                            OR

_____          /s/ Akiva M. Cohen
_Signature of Clerk or Deputy Clerk_          _____
                                            _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ _____
_____ , who issues or requests this subpoena, are:

Akiva M. Cohen, Kamerman, Uncyk, Soniker & Klein, P.C., 1700 Broadway, 16th Floor, New York, NY 10019, acohen@kusklaw.com, 212.400.4930

### Notice to the person who issues or requests this subpoena
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   C.A. No. 1: 23-cv-00528 CFC

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____          _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
  **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
  **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

### I. DEFINITIONS

1. The terms "and" and "or" shall be construed both conjunctively and disjunctively to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

2. The term "any" means any and all.

3. The term "each" means each and every.

4. The term "including" means including but not limited to.

5. Terms in the present tense include the past and future tenses. Terms in the past tense include the present and future tenses. Terms in the future tense include the present and past tenses.

6. The singular form of terms includes the plural, and the plural form of terms includes the singular.

7. Terms in the masculine, feminine or neuter form shall include each of the other genders.

8. The term "THIS ACTION" means the civil action *Arnold et al. v. X Corp et al*. and bearing the case number 1:23-cv-00528. which was filed in the Federal District Court of Delaware on or about May 16, 2023.

9. The term "MERGER AGREEMENT" means the Agreement and Plan of Merger By and Among X Holdings I, Inc., X Holdings II, Inc., and Twitter, Inc., dated April 25, 2022.

10. The term ACQUISITION FAQ means the document annexed hereto as Exhibit 1, including all prior versions thereof.

11. The term "TWEEP" means "Company Service Provider" as it is defined in the MERGER AGREEMENT.

12. The terms "YOU" and "YOUR" mean and refer individually and collectively to the law firm of Wilson Sonsini Goodrich & Rosati and any attorneys, paralegals, assistants, staff members, or any other persons acting at its direction or under its supervision, whether during their time as partners or employees of or when partners or employees of any other law firm. The terms "YOU" and "YOUR" further mean and refer to any present or former agents, representatives, employees, attorneys, investigators, and other persons acting under YOUR authorization, employment, direction, or control, whether employed or retained on a full-time, part-time, independent contractor, commission, or other basis.

13. The terms "PERSON" and "PERSONS," and the possessive forms of those terms, mean and include natural persons, corporations, partnerships, limited partnerships, associations, organizations, joint ventures, governmental units or entities, and any other kind of business or other entity whether or not employed by YOU; and the acts of a PERSON are defined to include the acts of a director, officer, owner, member, employee, agent, consultant or attorney acting on the PERSON's behalf.

14. The term "COMMUNICATION" means any recording of any transfer of information, ideas, opinions, or thoughts made by any means, at any time or place, under any circumstances, INCLUDING by a single person hearing or seeing by any means, personal meeting, telephone, letter, facsimile, and e-mail. COMMUNICATIONS are not limited to direct transfers between PERSONS, but include other transfers and memorializations, such as records, memoranda to file, electronic or magnetic transfer of computer files, facsimile transmissions, and teletype transmission. COMMUNICATIONS may be embodied in any means or media, including

writing, electronic or magnetic storage or computer files, electronic mail, voice mail, answering machine, digital recording, sound recording, and facsimile transmission.

15. The term "DOCUMENTS" means and refers to all "Documents and things" identified in, or within the scope of Federal Rule of Civil Procedure 34(a) and the 1970 Advisory Committee Note thereto, the Local Rules of the United States District Court for the District of Delaware, the District of Delaware Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI"), and any decision interpreting one or more of such rules, and all forms of "writings" and "recordings" as defined by Federal Rule of Evidence 1001(1) and includes, without limitation, all tangible record of intelligence or information, whether handwritten, typed, printed or otherwise visually or orally reproduced, including information stored on magnetic or optical media or in solid state storage devices, notes, drafts, reports, art-work, films, videotape, e-mails, drawings, graphs, photographs, agreements, letters, test data, circuit diagrams, software structure charts, software flow charts, software code, data flow diagrams, hardware schematic diagrams, hardware logic diagrams, field maintenance print sets, timing diagrams, technical summaries, product description documents, software description documents, laboratory or engineers' notebooks, project or progress reports, database information, whether for prototypes or production products, and the like. A draft or non-identical copy bearing on any sheet (front or back), margins, attachment, or enclosure thereof, any mark that is not a part of the original text or reproduction thereof, is a separate document within the meaning of this term.

16. When referring to a human person, "IDENTIFY" means to give, to the extent known, the person's full name, present or last known address, phone number and the present or last known place of employment, if known. Once a person has been identified in accordance with

this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person. When referring to a business or other entity, "IDENTIFY" means to state the entity's full name, present or last known address, and present or last known telephone number, and to describe the nature of its business or other operations. When referring to Documents, "IDENTIFY" means to give, to the extent known, the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s) and all recipient(s), including "cc"s and "bcc"s. When referring to electronically stored information "IDENTIFY" means to give (i) the type of electronically stored information; (ii) its format; (iii) its location; (iv) its date; (v) its author(s), addressee(s) and all recipient(s), including "cc"s and "bcc"s.

17. The term "RELATING TO" or any variants thereof, when used in conjunction with any DOCUMENT, shall be understood to apply if the DOCUMENT directly or indirectly evidences, mentions, discusses, constitutes, concerns, supports, contradicts, refers to, or in any way deals with the subject matter described in the Request in which the term appears.

## II. INSTRUCTIONS

1. If, in responding to this Request for Production, the responding party encounters any ambiguities when construing a request of definition, the response shall set forth the matter deemed ambiguous and the construction used in responding.

2. These Requests call for all DOCUMENTS, electronically stored information, and tangible things on the particular subject (a) in YOUR possession, custody or control, (b) in the possession, custody or control of anyone acting on YOUR behalf, irrespective of who generated, prepared, received, sent, or signed the DOCUMENTS or tangible things.

3. DOCUMENTS, electronically stored information, and tangible things responsive to these Requests shall be produced as they are kept in the usual course of business, or should be

organized and labeled to correspond to categories set forth in these Requests. When produced as

kept in the ordinary course of business or as organized and labeled to correspond with the

categories set forth in these Requests, the DOCUMENTS and tangible things shall be produced

with the folders (or copies thereof) kept by the Person who had the DOCUMENTS in his, her, or

its possession, custody or control so that Plaintiffs will know who had the DOCUMENTS or

things in his, her, or its possession, custody or control. Please produce DOCUMENTS in such a

manner as will facilitate their identification with the particular request or category of requests to

which they are responsive. File folders with table or labels identifying DOCUMENTS must be

produced intact with the DOCUMENTS. DOCUMENTS attached to each other should not be

separated. Selection of DOCUMENTS from files and other sources shall be performed in a

manner sufficient to ensure that the source of each Document may be determined, if necessary.

To the extent that YOU process hard copy documents for YOUR internal review, including by

OCR, such documents should be produced together with all associated electronic information.

With respect to electronically stored information, each document produced must be accompanied

with filepath information sufficient to identify the storage location and full folder tree

information associated with that document and available to YOU when and if the file is viewed

in the location in which it is maintained in the ordinary course of business.

    4.   Electronically stored documents should be produced in native format and

accompanied by a Concordance/Opticon load file that includes the following metadata

fields/information: (1) VOLUME/volume the data was produced on; (2) Custodian/Source of

data, indicated, for individuals, as follows: [Last name], [First name]; (3) BEGNO/Start Bates

(including prefixes), no spaces; (4) ENDNO/End Bates (including prefix); (5) DOCID/Identical

to BEGNO; (6) BEGATTACH/First Bates Number in attachment range; (6) ENDATTACH/Last

Bates Number in attachment range; (7) Record Type/File Type, e-mail, attachment; (8) Subject/As set forth in e-mail; (9) From Author/ [Last name], [First name]; (10) TO/ / [Last name], [First name]; (11) CC/ [Last name], [First name]; (12) BCC/ [Last name], [First name]; (13) Sent Date/E-mail sent date; (14) TITLE/ File name; (15) Date Created/From file header metadata; (16) Date last modified/From file header metadata; (17) File Size/in KB; (18) Application/Application used to create the file; (19) File Path/Original location of the file for loose files email folder location for email and attachments; (20) Doclink/Link to native file on production volume; (21) EXTRACTED TEXT/OCR/Filepath on production volume for extracted text/OCR; and (22) md5hash/Hash value.

     5.  <u>Partial Production</u>. Whenever a DOCUMENT is not produced in full please state with particularity the reason(s) it is not being produced in full and describe, to the best of YOUR knowledge, information and belief, and with as much particularity as possible, those portions of the DOCUMENT that are not produced and the reasons therefore. If a deposition transcript or other DOCUMENT cannot be produced because it is proprietary or believed to be proprietary, please produce an invoice thereof or otherwise provide information sufficient for Plaintiffs to obtain such transcript or other DOCUMENTS.

     6.  <u>Documents Withheld</u>. Whenever in these Requests YOU are asked to IDENTIFY or produce a DOCUMENT that is deemed by YOU to be properly withheld from production, Identify the portion of the request, *i.e.*, request number(s), to which the withheld DOCUMENT is responsive and:

          a.  If You are withholding the DOCUMENT under claim of privilege (including but not limited to the work product doctrine), please provide the information set forth in Federal Rule of Civil Procedure 26(b)(5), including:

     i)     The type of DOCUMENT;

     ii)    The general subject matter of the DOCUMENT;

     iii)   The date of the DOCUMENT;

     iv)   Such other information as is sufficient to IDENTIFY the DOCUMENT, including, where appropriate, the length of the DOCUMENT, as well as the author, addressees, custodian, and any other recipient of the DOCUMENT, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other, in a manner that, without revealing the information claimed to be protected, will enable this party to assess the applicability of the privilege or protection claimed by YOU;

     v)    The nature and basis of the privilege claimed;

     vi)   If the privilege claimed is the attorney-client privilege, an indication of which author(s) or addressee(s) is/are attorney(s); and

     vii)  Any other information necessary to support the claim of privilege.

b.    If production of any requested DOCUMENT(s) is objected to on the ground the production is unduly burdensome, describe the burden or expense of the proposed discovery;

c.    If YOU are withholding the DOCUMENT for any reason other than an objection that it is beyond the scope of discovery or that a request is unduly burdensome, provide the reason for withholding the DOCUMENT, and the information requested in sections 6(i)(a)-(d) above. Regardless of whether a Protective Order is entered by the Court, in all instances in which YOU are withholding

DOCUMENTS or things on the ground of confidentiality, please so indicate in YOUR responses.

7. Whenever a DOCUMENT contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material. If a privilege is asserted with regard to part of the material contained in a DOCUMENT, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a DOCUMENT has been redacted or altered in any fashion, IDENTIFY as to each DOCUMENT the reason for the redaction or alteration, the date of the redaction or alteration, and the Person performing the redaction or alteration. Any redaction must be clearly visible on the redacted DOCUMENT.

8. To the extent information is maintained in both hard copy and magnetic or electronic form, produce both forms.

9. If a DOCUMENT is in a language other than English, produce both the original and any translation thereof.

10. <u>Orderly Response</u>. Please produce DOCUMENTS in such a manner as will facilitate their identification with the particular request or category of request to which they are responsive. File folders with tabs or labels identifying DOCUMENTS must be produced intact with the DOCUMENTS. DOCUMENTS attached to each other should not be separated. Selection of DOCUMENTS from files and other sources shall be performed in a manner sufficient to ensure that the source of each DOCUMENT may be determined, if necessary.

11. <u>Duty to Produce Continues</u>. Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these discovery requests are intended to be continuing in nature so as to require supplemental or amended responses or answers, or production of additional DOCUMENTS, if

any additional information or DOCUMENTS are obtained in the future. Such supplemental or amended responses or answers or such production of additional DOCUMENTS shall be furnished within ten (10) days of the date on which any additional information or document is obtained.

12. <u>Inability to Produce</u>. If any or all of the DOCUMENTS IDENTIFIED herein are no longer in YOUR possession, custody, or control because of destruction, loss, or any other reason, then please provide the following information for each such Document:

     d.     A description of the content of that Document;

     e.     The location of all copies of the Document;

     f.     A description of the reason why that Document no longer remains in YOUR possession, custody or control; and

     g.     The date of, and the identity of the Person responsible for, its destruction, loss, transfer, or other action by which the Document left YOUR possession, custody or control.

## III.   REQUESTS

### REQUEST NO. 1.

All DOCUMENTS and COMMUNICATIONS RELATING TO Section 6.9 of the MERGER AGREEMENT, including but not limited to DOCUMENTS and COMMUNICATIONS RELATING TO its meaning, intent, purpose, and enforceability, and specifically including any work product, drafts, client communications, comments, or discussions related thereto.

### REQUEST NO. 2.

All DOCUMENTS and COMMUNICATIONS RELATING TO Section 9.7 of the MERGER AGREEMENT, including but not limited to DOCUMENTS and

COMMUNICATIONS RELATING TO its meaning, intent, purpose, and enforceability, and specifically including any work product, drafts, client communications, comments, or discussions related thereto.

### REQUEST NO. 3.

All DOCUMENTS and COMMUNICATIONS RELATING TO the ACQUISITION FAQ, including any work product, drafts, client communications, comments, or discussions related thereto.

### REQUEST NO. 4.

All DOCUMENTS and COMMUNICATIONS RELATING TO communications with TWEEPS regarding the MERGER AGREEMENT, specifically including work product, drafts, client communications, comments, or discussions related thereto.

### REQUEST NO. 5.

To the extent not produced in response to prior requests, all DOCUMENTS and COMMUNICATIONS pertaining to communications with TWEEPS regarding severance or other benefits, from March 1, 2022 through the present, including any work product, drafts, client communications, comments, or discussions related thereto.

### REQUEST NO. 6.

To the extent not produced in response to prior requests, all DOCUMENTS and COMMUNICATIONS pertaining to TWEEP severance or other benefits, from March 1, 2022 through the present, including work product, drafts, client communications, comments, or discussions.

# EXHIBIT 1



**Table of contents**

Updated as of October 27, 2022
Updates as of October 24, 2022
Updates as of October 21, 2022
Updates as of October 20, 2022
Updates as of October 17, 2022
Updates as of October 6, 2022
Updates as of October 4, 2022
Updates as of September 13, 2022
Updates as of August 30, 2022
Updates as of August 4, 2022
Updates as of July 26, 2022
Updates as of July 13, 2022
FAQs previously provided on May 19, 2022
    What's happening? (Overview)
    Process and timeline
    The Board
    Leadership
    Compensation
    Customers/Advertisers/Business Partners
    Company culture and benefits
    Future of Twitter

**Updates as of October 27, 2022**

Please see Elon Musk's Tweet on October 27, 2022 titled, "Dear Twitter Advertisers."

"I wanted to reach out personally to share my motivation in acquiring Twitter. There has been much speculation about why I bought Twitter and what I think about advertising. Most of it has been wrong.

The reason I acquired Twitter is because it is important to the future of civilization to have a common digital town square, where a wide range of beliefs can be debated in a healthy manner, without resorting to violence. There is currently great danger that social media will splinter into far right wing and far left wing echo chambers that generate more hate and divide our society.

In the relentless pursuit of clicks, much of traditional media has fueled and catered to those polarized extremes, as they believe that is what brings in the money, but, in doing so, the opportunity for dialogue is lost.

That is why I bought Twitter. I didn't do it because it would be easy. I didn't do it to make more. I did it to try to help humanity, whom I love. And I do so with humility, recognizing that failure in pursuing this goal, despite our best efforts, is a very real possibility.

That said, Twitter obviously cannot become a free-for-all hellscape, where anything can be said with no consequences! In addition to adhering to the laws of the land, our platform must be warm and welcoming to all, where you can choose your desired experience according to your preferences, just as you can choose, for example, to see movies or play video games ranging from all ages to mature.

I also very much believe that advertising, when done right, can delight, entertain and inform you; it can show you a service or product or medical treatment that you never knew existed, but is right for you. For this to be true, it is essential to show Twitter users advertising that is as relevant as possible to their needs. Low relevancy ads are spam, but highly relevant ads are actually content!

Fundamentally, Twitter aspires to be the most respected advertising platform in the world that strengthens your brand and grows your enterprise. To everyone who has partnered with us, I thank you. Let us build something extraordinary together."

**Updates as of October 24, 2022**

*Reposting this information that was published in a* [companywide FAQ](companywide FAQ) *from a team@ email on May 13, 2022.*

What is our general severance package if a position is eliminated?

> Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:
>
> > Two months base salary or On Target Earnings for employees on the Sales Incentive Plan
> > Pro-rated Performance Bonus Plan compensation at target
> > Cash value of equity that would have vested within three months from the separation date
> > A cash contribution for health care continuation.
>
> For Tweeps who are on a work-related visa, we also consider an extended notice period to enable additional time to transfer their visa to a new employer.
>
> Of course, we also comply with local employment laws and apply any additional statutory severance for redundancies that may occur outside of the United States.

**Updates as of October 21, 2022**

> All vested TWTR shares and cash held in EAC accounts have been transferred to your connected Charles Schwab brokerage accounts. Please note that the trading window will remain closed for current employees.

**Updates as of October 20, 2022**

> With the anticipated closing of the merger agreement, there are a lot of teams working in the background to prepare for the transition. We will continue to update [go/AcquisitionFAQ](go/AcquisitionFAQ) on a rolling basis and also send proactive updates and answers to overarching questions.

Please know, as we get closer to deal close, there will continue to be tons of public rumors and speculation. Two things to clarify.

First, we do not have any confirmation of the buyer's plans following close and recommend not following rumors or leaked documents but rather wait for facts from us and the buyer directly.

Second, earlier in the year and as we have shared in public proxy filings, there were targeted cost savings discussions and planning. Those discussions stopped once the merger agreement was signed. As we've shared at #OneTeam meetings, since the merger agreement has been in place, there have been no plans for any company-wide layoffs.

We will continue to keep you all updated with relevant information and updates as we approach closing.

**Updates as of October 17, 2022**

***From the Twitter Equity Award Center (posted October 17, 2022):***

We are writing to let you know of an update related to our Equity Award Center. There is no immediate action for you to take.

In anticipation of the closing of the pending acquisition of Twitter by an entity controlled by Elon Musk (the "Acquisition"), it will be necessary to freeze all activity in the Equity Award Center (EAC) beginning at close of the market today, October 17, 2022. This freeze allows Schwab to perform final reconciliation of employee accounts prior to close of the Acquisition. You will not be able to access balances or transact in the EAC any longer. All vested TWTR shares and cash held in EAC accounts will be transferred to your connected Charles Schwab brokerage accounts and available to you by end of day on Monday, October 24, 2022; however the trading window will remain closed for current employees.

When the Acquisition closes your vested TWTR shares will be automatically converted into the right to receive $54.20 per share in cash in accordance with the terms of the Merger Agreement for the Acquisition. More information about this can be found in go/AcquisitionFAQ.

Participants may also wish to download any personal documents including a copy of their grant agreement PDFs for future reference (watch the tutorial for instructions starting at 1:03). We expect that access to the EAC will cease upon the closing of the Acquisition as Twitter will no longer be a public company and the related equity plans will be terminated. Please note that participants will still have access to their Charles Schwab brokerage accounts after the Acquisition is completed.

***From "ESPP Supplemental Update" (sent October 12, 2022):***

In connection with the execution of the agreement involving the pending acquisition by an entity owned by Elon Musk (the "Acquisition"), participants in Twitter's Employee Stock Purchase Plan (ESPP) previously received an ESPP Update that summarized the treatment of the ESPP leading up to the closing of the Acquisition. The ESPP Update described, in part, that due to the Acquisition, the ESPP offering period that began on November 15, 2021, may have a final purchase date that occurs earlier than its normally scheduled purchase date of November 15, 2022, and that a follow-up notice about any final purchase date would be provided at a later date. Additional information regarding the Acquisition is included in Twitter's definitive proxy statement dated July 26, 2022, filed with the Securities and Exchange Commission (the "SEC")

in connection with the solicitation of proxies to approve the Acquisition and in other relevant documents filed by Twitter with the SEC.

**In anticipation of the possible closing of the Acquisition, the final purchase date under the ESPP for the offering period that began November 15, 2021, has been set to be <u>October 14, 2022</u>.**

Any Tweep who is enrolled in this offering period and remains an ESPP participant through this date will have his or her accumulated ESPP contributions applied to the purchase of shares on October 14, 2022, and then cease participating after such final purchase. No additional ESPP contributions will be deducted after this date, and any accumulated ESPP deductions remaining in any ESPP accounts after the purchase of shares on the final purchase date will be returned to the appropriate participants, in cash, promptly after the final purchase occurs.

The purchase price on the final purchase date will be 85% of the <u>lower of</u> the closing price of a share of Twitter's common stock on (i) November 15, 2021, or (ii) the final purchase date.

More details regarding treatment of the ESPP in connection with the Acquisition can be found in the previous ESPP Update. You also can review the FAQs at go/AcquisitionFAQ if you have any more questions.

**<u>Updates as of October 6, 2022</u>**

> The Chancellor has ordered a stay on our trial, meaning that we will no longer be going to court on October 17. We will work with our buyer to close the acquisition by October 28, per the order.
> If the buyer is unable or unwilling to close by then, we will reconvene with the Chancellor to reschedule the trial for November.
> Our intention remains the same: to close the acquisition at the price and terms in the original merger agreement.

**<u>Updates as of October 4, 2022</u>**

> We received the letter from the Musk parties which they have filed with the SEC. Our intention is to close the transaction at $54.20 per share.
> We are still continuing to litigate this matter in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition. As a reminder, our five-day trial is scheduled to begin October 17, 2022.

**<u>Updates as of September 13, 2022</u>**

What was the result of the stockholder vote?

> Our stockholders approved the adoption of the Merger Agreement between Twitter and affiliates of Elon Musk for $54.20 per share in cash. You can see our press release here.
> Based on a preliminary tabulation following the Special Meeting of Stockholders, approximately 98.6% of the votes cast at the Special Meeting approved the proposal. The approval of our stockholders satisfies the final condition precedent to the closing of the merger (other than those conditions that by their nature are to be satisfied at closing). After certification by the Special Meeting's inspector of

elections, the final voting results will be filed with the SEC. We do not expect that the voting outcome will change after certification.

Obtaining stockholder approval is an important step forward in this process, however we are still continuing to litigate this matter in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition. As a reminder, our five-day trial is scheduled to begin October 17, 2022.

What is happening with Elon Musk's purported termination of the merger agreement?

As previously announced, affiliates of Mr. Musk have delivered notices purporting to terminate the merger agreement. Twitter continues to believe that Mr. Musk's purported termination of the merger agreement is invalid and without merit, and that the Musk parties continue to be bound by the merger agreement and obligated to complete the merger on the agreed terms and conditions. Twitter has filed a lawsuit in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition, and Twitter remains committed to doing so on the price and terms agreed upon with Mr. Musk.

**Updates as of August, 30, 2022**

What is our response to the buyer's second termination letter?

The buyer sent a second termination letter, and we responded, which you can read in full here. As was the case with the buyer's previous termination letter, his second termination letter is invalid and wrongful. Twitter has breached none of its representations or obligations under the Agreement, and Twitter has not suffered and is not likely to suffer a Company Material Adverse Effect. We remain committed to closing the transaction on the price and terms agreed upon with Mr. Musk.

**Updates as of August 4, 2022**

What is mDAU?

Twitter defines monetizable daily active usage or users (mDAU) as people, organizations, or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day through twitter.com, Twitter applications that *are able to* show ads, or paid Twitter products, including subscriptions. Monetizable means they could see ads or pay Twitter through a subscription, not that they will see ads on any given day. As our filings state, they are on a monetizable client or application.

How does Twitter determine mDAU?

When an account logs in or is otherwise authenticated on Twitter on any given day through twitter.com, Twitter applications that are able to show ads, or paid Twitter products, including subscriptions.

Average mDAU for a period represents the number of mDAU on each day of such period divided by the number of days for such period. Changes in mDAU are a measure of changes in the size of our daily "logged in" or otherwise authenticated active total accounts.

Why do we measure mDAU?

Audience metrics are seldom one size fits all but some form of daily active usage is a typical metric in our industry. Different products have different definitions they employ tailored to their specific service.

mDAU (monetizable daily active user) is designed to be our baseline to gauge broad usage and growth on the Twitter platform.

Monetizable means they *could* see ads or pay for a subscription, not that they *will* see ads. They are on a monetizable client or application.

We are committed to providing something valuable to people on Twitter every day.

As stated in our SEC filings, "We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement."

Our goal is not to disclose the largest user number we can but rather one that has more relevance. mDAU is designed to provide relevance and context to external stakeholders that reflects our goal of delivering value to people on Twitter every day and monetizing that usage.

Why do advertisers trust Twitter?

Twitter has historically built integrity through transparency and consistent operating principles. This approach is unwavering and something that differentiates us.

Twitter has never been more important to our customers around the world. We are working closely with our clients and partners, who can continue to expect our best-in-class customer service, client solutions and commitment to brand safety. We remain focused on delivering priority solutions in areas such as performance marketing, measurement, shopping, brand strategy and more.

We stand by our reporting methods and are transparent with the process for estimating our mDAU, accounts that are spam within mDAU and when updates are made.

As stated in our SEC filings, "We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement."

How do advertisers measure success on Twitter?

The results and metrics associated with campaign objectives are what best determines advertiser ROI.

Campaign objectives could focus on areas such as reach, video views, website traffic, app installs, followers, engagements, etc.

Targeting can focus on: followers, custom audiences, geography, language, interests, device type, etc.

Success metrics may include: Video views, impressions, Site visits, number of app downloads, various cost per data points (i.e. CPI, CPM, CPC, CPE), conversions, brand sentiment, etc.

We work with a variety of first and third party measurement companies to help validate.

Twitter has solutions that help advertisers measure the success of a campaign, maintain privacy, and brand safety:

    Twitter First-Party Measurement Solutions

        Advertisers can leverage Twitter's suite of first-party measurement solutions to garner learnings such as brand lift, media metrics, viewability, conversions, and more.

    Third-Party Measurement Solutions

        Advertisers know their ads are being seen using third-party accredited viewability reporting partners

        See more here for information on our partners who help advertisers with measurement, Ad analytics, targeting, creative and more.

    Twitter + Third-Party Brand Lift Surveys

        We help advertisers measure the impact of campaigns on key brand metrics such as awareness, association, favorability, and consideration, using our first-party and third-party Brand Lift Surveys.

    Third-Party Viewability — Moat, IAS, DV Direct Integration

        We help brands measure the quality of impressions and video views of their media buys with our third-party partners such as MOAT, IAS, and DV.

    Advertiser audience targeting:

        Via a suite of intuitive, performant, and privacy-compliant tools, we enable advertisers to refine campaign delivery and reach the people that are most likely to be receptive to a brand's message. Advertisers on Twitter can:

            Reach people based on who they are with Demographic targeting.

            Reach people based on how they access Twitter with Device targeting.

            Reach people based on how they engage on Twitter with Audience Features.

            Leverage off-platform data to build Custom Audiences on Twitter.

            Let Twitter find the people most likely to drive results with Automated Targeting.

            Extend reach to people similar to core audience with Audience Expansion.

    Enriched Twitter Audiences and Account Based Marketing

        Twitter can help advertisers drive even more results with powerful ways to reach our audiences.

        Enriched Twitter Audiences are hyper-targeted custom audiences that expand reach, increase engagement, and improve overall

performance. These custom audiences are created by trusted partners using Twitter's data.

For B2B advertisers, Account Based Marketing campaigns identify business decision makers and their influential communities on Twitter.

Across many verticals including gaming, fashion, and pharma, these solutions are making it easier for customers to drive results.

Campaign Planner: New as of June 2022

The tool enables customers to forecast reach, impressions, average frequency, and CPM against a specific audience, campaign duration, frequency setting, placement, and budget for auction-based campaigns.

We've also made it easier than ever to execute reach campaigns by allowing advertisers to start and save a draft campaign directly from the tool.

Campaign Planner is available to advertisers in the United States, United Kingdom, and Japan.

Partners can also tap into tools such as Audience Estimate.

See more here for examples of successful advertising campaigns that include key campaign metrics.

How does Twitter calculate spam?

We shared a comprehensive blog post and Tweet thread about how we define and calculate spam/bots here and here, respectively.

Customers org: If clients have questions, you can use this client-facing language reactively.

Does Twitter use AI and ML to identify spam and bots on the platform?

We do! Specifically, Twitter deploys spam detection capabilities that have resulted, and continue to result, in the suspension of typically more than one million spam accounts every day, including both automated and manual reviews of accounts and activity on the Twitter platform during and after sign-up. Twitter also locks millions of accounts each week that cannot pass human-verification challenges, such as CAPTCHAs or phone verifications.

Our processes encompass a mix of human engagement and automation to identify malicious spam and bots.

We are always testing and exploring ways to further advance our systems for detection and remediation.

Separate from these automated and manual spam-detection processes, Twitter estimates the prevalence of false and spam accounts within mDAU through multiple human reviews (in replicate) of thousands of randomly selected accounts each quarter using both public and private data.

Did Twitter cooperate by providing the Buyer's team the information they were requesting?

Yes. Twitter has continuously shared information with the buyer to consummate the transaction in accordance with the terms of the merger agreement.

Throughout this process we have and will continue to protect proprietary and confidential information of Twitter advertisers and our customers' private user data.

Why didn't Twitter choose to redact any information from the acquirer's countersuit?

We fully stand by our SEC filings, the methodologies we use to calculate mDAU, and our statements about the percentage of spam accounts on our platform.

What is our public response to the countersuit?

The counterclaims are factually inaccurate, legally insufficient, and commercially irrelevant.

Why did Twitter recast its mDAU values three days after signing the agreement?

The updated values for mDAU reflected a change of less than 1% for each impacted period.

Twitter has historically built integrity through transparency and consistent operating principles. We reported this out of an abundance of transparency. Twitter disclosed this recast when we announced Q1 2022 Earnings in April.

Why did Twitter move from disclosing MAU to mDAU in 2019?

We want to provide something valuable to people on Twitter every day, and we believe that mDAU, and its related growth, are the best ways to measure the success of our objectives and to show the size of our audience and engagement.

**Updates as of July 26, 2022**

What's the schedule for our case?

The judge set a schedule for our case in the Delaware Court of Chancery for a five-day trial in October.

Does our Board of Directors recommend how stockholders should vote?

Yes, the Twitter Board of Directors recommends that stockholders vote in favor of the transaction ("FOR").

When is the Special Meeting of Stockholders?

The meeting is scheduled for September 13, 2022 at 10am PT. Anyone who owns TWTR stock (including Tweeps) as of July 22, 2022 is entitled to vote prior to or during the meeting.

What should stockholders expect?

Each stockholder will receive voting materials in the very near future. The materials describe easy ways to vote electronically, over the phone, or by mail. If you received your voting materials by email, you can simply click the "Vote Now" button in the email. Otherwise, the easiest way to vote your shares is to go to proxyvote.com and enter the Control Number(s) provided to you in the materials. Please note that if you hold Twitter shares in more than one account (e.g., in our employee share purchase plan (ESPP), in registered name, or through a personal bank or brokerage account), you'll receive separate emails or hard copies of voting materials for each account. To make sure that all your shares are represented, you must submit a vote for each account in which you hold Twitter shares. You will receive a separate Control Number for each account in which you own shares.

What communications will stockholders receive from Innisfree, our proxy solicitor?

We asked Innisfree to work with us to ensure our shareholders are educated about this important proposal, so you will likely receive more communications from them over the coming weeks via email, phone call and traditional mail. If you have any questions, please call Innisfree at +1 (877) 750-8338 (US/Canada) or +1 (412) 232-3651 (all other countries).

**Updates as of July 13, 2022**

What does Mr. Musk's notice mean? Is the deal now officially off?

No. Mr. Musk's purported termination is invalid and wrongful.
As we noted in our press release and commentary from the Chairperson of our Board, the Twitter Board is committed to closing the merger on the $54.20 price and terms agreed upon with Mr. Musk and plans to pursue legal action to specifically enforce the merger agreement.
Please understand that the Twitter Board and executive management team are continuing to actively manage the process related to the acquisition. We will share information with you as we can, but this is an evolving situation and we may not have, or be able to share, answers to all of your questions.

What is Mr. Musk's goal?

We are not in a position to speculate about Mr. Musk's objectives.

Given that we plan to pursue legal action to enforce the merger agreement, how long will it take to resolve that?

As with many legal matters, it is difficult to predict the duration of this process. We have a group of internal team members and external advisers who are dedicated to this workstream. It is important to remember that during this process, it is business as usual for all of us at Twitter. That means we should continue the important and meaningful work of driving Twitter forward and continuing to deliver value to our users and customers.

Have we shared bot information with Mr. Musk as requested?

We have met our obligations under the merger agreement.

Has Twitter breached the merger agreement?

As stated in the letter attached to our 8-K filing from July 11, 2022, "Twitter has breached none of its obligations under the Agreement," and "As it has done, Twitter will continue to provide information reasonably requested by Mr. Musk under the Agreement and to diligently take all measures required to close the transaction.

Anything more you can share with us about the complaint that we filed on July 12, 2022?

The complaint is public and details why Twitter believes that Mr. Musk's purported termination is invalid and wrongful.

Given this is active litigation, we are limited in what we can say beyond our public filings.

We have a group of internal team members and external advisers who are dedicated to this workstream. It is important to remember that during this process, it is business as usual for all of us at Twitter. That means we should continue the important and meaningful work of driving Twitter forward and continuing to deliver value to our users and customers.

What is the likelihood of a settlement? What is our desired outcome?

The Twitter Board is committed to closing the merger on the $54.20 price and terms agreed upon with Mr. Musk.

Why haven't we implemented retention packages or similar for Tweeps?

Tweeps are the heart of Twitter and will always be essential to our success. On June 20, 2022, we sent Mr. Musk a formal request for consent to two tailored employee retention programs that had been vetted by the board and the compensation committee with the assistance of an outside compensation consultant.  Mr. Musk has not provided his consent to implement these programs.

How do we plan to retain talent?

Our attrition is slightly higher than best practice for normal macroeconomic times, but remains inline with current industry trends. We will continue to monitor it to ensure that we can quickly identify any areas of concern and help mitigate where possible.

What's the plan to support the transition of our current projects and work?
Until the transaction closes, we'll be focused on continuing to drive the business forward. We are confident plans for transition will be properly created.

Is there a possibility for layoffs, now or post-close?

We're not looking at company-wide layoffs. However, teams from across the company are reprioritizing and making changes to ensure we are operating responsibly and efficiently in the current operating environment. We may continue to see restructuring and org changes as we continue to align with our revised business needs (as we always have in the past).

What regulatory agencies will need to approve the transaction?

As of July 13, 2022, stockholder approval of the Merger Agreement is the only remaining approval or regulatory condition to consummating the closing of the Merger under the Merger Agreement.

**FAQs previously provided on May 19, 2022**

**What's happening?**

Twitter has entered into a definitive agreement to be acquired by a private entity affiliated with Elon Musk. The purchase price is $54.20 per share. We expect the transaction to close in 2022, subject to the satisfaction of customary closing conditions. Upon completion of the transaction (or the "closing"), Twitter will become a privately held company.

Twitter's board of directors (the "Board") undertook a thoughtful, comprehensive, and deliberate process to review the proposal and unanimously determined the transaction was in the best interests of our stockholders.

There are still several steps to close. Completion of the transaction is subject to the approval of Twitter stockholders, the receipt of applicable regulatory approvals, and the satisfaction of other customary closing conditions.

Upon the closing, Twitter equity awards will be canceled and converted into the right to receive a cash amount of $54.20 (less any applicable exercise price) for each underlying share. The cash amount payable for unvested Twitter equity awards will be payable over the same pre-transaction vesting schedule as the award that was canceled.

The terms of the agreement specifically provide for Tweep annual base salary, bonus opportunities (short/long term incentive (excluding equity) opportunities) and employee benefits so that, in each case, they are no less favorable in the aggregate than the comparable opportunities or benefits, as applicable for at least one year from the closing date.

Between now and closing, we generally will operate Twitter in normal course - just like we always have. In general, we do not expect any changes to Tweep compensation programs and benefits. Twitter RSUs and other equity awards will vest as they normally have. Business decisions will continue to be made by Twitter's leadership.

**Process and timeline**

Why did Twitter enter into this transaction and why do we feel it is still best for stockholders?

The Twitter Board undertook a thoughtful and comprehensive process to review Elon Musk's proposal, with a deliberate focus on value, certainty, and financing. The Twitter Board considered, among other things, Twitter's go-forward prospects in the current market as well as other potential value-creating opportunities.

The Board still believes this transaction, which delivers a substantial cash premium to stockholders, is the best path forward for Twitter's stockholders.

Why did we announce the transaction when we did?

> We announced the deal to employees and the public at the same time as we had a legal and fiduciary responsibility as a public company to do so.

How long will it take for this deal to close?

> We expect the transaction to close in 2022 subject to the satisfaction of customary closing conditions.

Why did we implement a Shareholder Rights Plan ("poison pill")?

> The Board adopted the Shareholder Rights Agreement on April 15, which has been referred to as a "poison pill" in the press. The Board adopted the rights plan to enable all stockholders to realize the full value of their investment in Twitter by reducing the likelihood that any entity, person or group gains control of Twitter through open market accumulation without paying all stockholders an appropriate control premium or without providing the Board sufficient time to make informed judgments and take actions that are in the best interests of shareholders.

Is there a go-shop provision?

> No. All of these details are laid out in the merger agreement that has been filed with the SEC.

What does it mean to become a privately held company? What are the benefits?

> Generally, private companies' shares are not publicly traded or held by a broad group of shareholders.
> Private companies typically do not have to incur costs related to public reporting and may have more flexibility to operate.
> Until the transaction closes, it remains business as usual, and we are continuing to operate normally as an independent, publicly traded company.

Once the deal closes, is there a test for the debt coverage capabilities?
> In an acquisition like this one, it is common for the party acquiring a target company to add debt to the target's balance sheet. In assessing the deal, prospective lenders have considered the leverage ratio, which is one of the credit metrics used to measure the ability of the target company to use its cash flows to repay all its debt obligations, including principal and interest payments.

What does the acquisition mean for our debt?
> The debt balance on our balance sheet will be higher. If you are reading news externally, you have probably seen that Mr. Musk's affiliates received $13B of commitments from banks for loans to partially finance the deal. Twitter will ultimately incur such loans after the transaction closes. A portion of Twitter's existing debt balance, which is $5.2B today, is expected to be repaid in

connection with the closing, and new debt securities are expected to be issued by Twitter.

What are the upcoming major milestones of the deal and when will Tweeps find out?

We expect the transaction to close in 2022, subject to satisfaction of customary closing conditions, including required regulatory and stockholder approvals. In terms of next milestones, we expect to file a preliminary proxy statement in the near future relating to the special meeting of stockholders to vote to approve the merger agreement. Once that document clears SEC review, we will file a definitive proxy statement and then hold the special meeting on the timeline specified in the proxy statement. We will aim to keep you informed of major updates.

Where are we in the acquisition cycle? Do the changes to hiring and cost savings have any implications on this?

We're still on track and working to close the transaction in a timely manner. We expect the transaction to close in 2022, subject to satisfaction of customary closing conditions, including required regulatory and stockholder approval.

## The Board

What factors did the Board use to evaluate whether this would be in the best interest of stockholders?

As mentioned above, the Board undertook a thoughtful and comprehensive process to review the proposal, with a deliberate focus on value, certainty and financing. The Board's vote to approve the transaction was unanimous.

The Board considered the proposal in light of the company's go-forward prospects and the current market environment, among numerous other considerations.

Additional details of the Board's process will be made available in our future SEC filings.

Did the Board get a fairness opinion? From whom?

Yes, Goldman Sachs and JP Morgan each provided a fairness opinion.

Did the Board lose confidence in the business?

Absolutely not. The Twitter Board considered the proposal in light of Twitter's go-forward prospects and the current market environment, among numerous other considerations.

This transaction is a great outcome for stockholders and demonstrates the tremendous value of Twitter.

## Leadership

What will Twitter's leadership team look like post-close?

It's too early to speculate on that right now.

For now, our team is focused on continuing to operate our business as we have and taking steps to secure the approvals we need to close the transaction and set Twitter up for continued success as a private company.

Will we have a board of directors post-close? Who will hold our new owner accountable?

Private companies are operated differently than public companies, but they are also subject to many of the same governance requirements and regulations as a public company. Twitter is incorporated in Delaware, which provides rules that dictate our governance.

Are the recent changes to Staff, cost savings, and hiring pause connected to the acquisition?
These changes are ones that Twitter has been contemplating and is driving as part of our ordinary course operations and operational improvements. In order to responsibly manage the organization as we sharpen our roadmaps and our work, we need to continue to be intentional about our teams, hiring, and costs. We will continue to remain focused on strengthening our work through increased accountability and execution to make Twitter everything it can be.

## Compensation and Equity Awards
Will this announcement impact promotion decisions and related compensation increases?

No. Until the deal closes, it is business as usual for Twitter, including with respect to promotion decisions or related comp changes.

What will our compensation program look like without RSUs? How will we stay competitive?

Tweeps are the heart of Twitter and will always be essential to our success. We expect our compensation program will reflect that.
It is too early to determine the future of our incentive programs as a private company, but we will share more information as soon as it becomes available. We currently expect to continue to offer competitive rewards (regardless of the underlying currency of those rewards) to attract and retain talent.

Will we grant new Twitter equity awards between now and deal close for promotions and role changes?

We will continue to grant Twitter equity awards until the transaction closes, as we normally would for promotions and role changes. After the transaction closes, we expect our compensation program will be reviewed and updated to account for the fact that we will operate as a privately-held company. We will share more information when it becomes available.

## Existing Twitter Shares and Equity Awards
Will the trading window change as a result of this announcement?

No, the trading window will not change. We're still a public company and we will still report quarterly earnings on the same cadence that we did before, so we expect our calendars generally will be the same. We expect this to be the case until the deal closes.

Should I or can I sell Twitter stock that I own?

As long as you are not in possession of any material nonpublic information (MNPI) regarding Twitter, you are free to trade Twitter stock when trading windows are open. You are still bound by all black-out periods and the other terms of our insider trading policy.

What happens to my existing Twitter equity awards if the transaction closes?

Unless and until the transaction closes, the terms of your Twitter equity awards will remain the same.

Once the transaction closes, then your Twitter equity awards (whether granted under our 2013 Equity Incentive Plan or assumed in an acquisition of your prior employer) will be treated as described below:

**RSUs**

Each vested RSU will be converted into the right to receive the $54.20 purchase price in cash as described below. If RSUs were subject to performance-based vesting, the number of vested RSUs subject to that award will be based on actual achievement.

Each unvested RSU will be converted into the right to receive an amount in cash equal to $54.20. This cash amount will vest in installments on the same vesting schedule that applied to the canceled unvested RSUs it is replacing, subject to continued service through the applicable vesting date. If unvested RSUs were subject to performance-based vesting, the number of RSUs subject to that award will be deemed earned at the target level of achievement.

For example, if you have 100 RSUs that vest on November 1, 2022 (assuming the transaction closes before that date), then you will receive a cash amount equal to $5,420, less applicable tax withholding, on November 1, 2022 through payroll.

Under the terms of the deal, all unvested RSU awards are converted into the right to receive cash in an amount equal to the product of the total number of unvested RSUs and the per share purchase price ($54.20). The resulting cash amount then vests and will be paid to you according to the original vesting schedule subject to your continued service through the applicable vesting dates, which will remain in place.

**Options**

Each vested option will be converted into the right to receive an amount in cash equal to the difference between $54.20 and the option exercise price for each underlying share.

Each unvested option will be converted into the right to receive an amount in cash equal to the difference between $54.20 and the option exercise price for each underlying share. This cash amount will vest on the same vesting schedule that applied to those canceled unvested options it is replacing, subject to continued service through the applicable vesting date.

**<u>Restricted Stock Awards</u>**

Each restricted stock award will be converted into the right to receive $54.20 in cash. This cash amount will vest on the same vesting schedule that applied to the canceled award it is replacing, subject to continued service through the applicable vesting date.

When will the cash amounts for my Twitter equity awards described be paid?

Generally, amounts payable to you for your vested equity awards will be paid to you, less applicable tax withholding, within five business days after the closing of the transaction.

Generally, amounts payable to you for your unvested Twitter equity awards will be paid to you, less applicable tax withholding, through payroll on the same vesting schedule that applied to those equity awards before the transaction, subject to your continued service through the applicable vesting date.

Please consult with your tax advisor as to the tax consequences to you of these payments.

What happens to cash amounts payable for unvested Twitter equity awards if a Tweep departs before the cash amounts are vested?

The cash amounts payable in respect of your unvested Twitter equity awards will only vest and be paid to you if you remain in continuous service with Twitter through the applicable vesting date. If your service with Twitter (or a subsidiary) ends before a portion of such cash amount is vested, you will not receive that portion of the cash amount and it will be forfeited to Twitter.

Do Twitter RSUs have a "change in control" clause that will accelerate vesting if layoffs occur within one year?

Generally, no. Unless you are party to a separate agreement with Twitter, your Twitter equity awards (or the cash amounts payable for such equity awards) will not receive accelerated vesting if your employment is involuntarily terminated following the closing of the transaction (known colloquially as a "double trigger").

As is customary in our industry, only a few of our executives and other senior employees currently have a "double trigger" provision.

Do all Tweeps have the same vesting schedule?

Generally, Twitter equity awards are granted through the annual refresh process or promotion process vest on a quarterly vesting schedule (with vesting dates in February, May, August, and November); however, depending on when a Tweep was hired, their new hire grant may vest outside of those normal dates. The award agreement provided to you upon the grant of your Twitter equity award will contain your applicable vesting schedule.

Will the $54.20 purchase price change with the fluctuation of Twitter's current stock price or because of inflation?

No, the transaction price of $54.20 per share is fixed, including for purposes of future cash payouts for equity awards on the same vesting schedule.

For International Tweeps, as individual RSUs convert into the cash equivalent of $54.20 post-close, will international Tweeps receive this in U.S. dollars through their brokerage account (ex: Schwab) or will it be converted into local currency and deposited into their payroll?

Finance and Payroll are working on this now, however, the merger agreement provides that cash amounts paid in respect of unvested Twitter equity awards will be paid in U.S. dollars. We will share more information when it becomes available.

**New hires and offers**

Will new hires continue to receive RSUs?

Yes, we expect we will continue our current practices for new hire grants up until the close.

Are there any changes to the methodology for how new hire grants are converted to shares?

No, until the closing of the transaction, we expect we will continue our current equity granting practices.

How will this announcement affect new Tweeps who have signed an offer letter with RSUs, but have not yet joined the company? What should we tell candidates that have equity in their current offer letters?

New Tweeps will still be granted their RSUs subject to the terms of their offer letters, however depending on the timeline of closing and their vesting schedule, they may receive equivalent cash payments in respect of those RSUs.

What do we tell candidates if they ask us about this announcement during an interview?

>Please point them to the press release (Parag Tweeted a link to it) for all of the specific details related to the announcement.
>You may use this FAQ to answer questions for candidates and use the What's happening? section of this doc for key messages to third parties.

**ESPP**

>If you are a current ESPP participant, your accumulated ESPP contributions will be used to purchase shares on May 16, 2022, unless you withdraw in advance of the purchase date. There will not be a new offering period beginning on May 16, 2022, and any current ESPP participant who is enrolled in the ESPP offering period that began on May 15, 2021 will cease participating in the ESPP after May 16, 2022.
>If you are a current ESPP participant who is enrolled in the offering period that began on November 15, 2021, you may continue to participate in the ESPP following May 16, 2022. The final purchase date is scheduled to occur on November 15, 2022, or, if earlier, a date that is at least 10 business days prior to the date on which the transaction closes. Following the final purchase date, the ESPP will then terminate, subject to the closing of the transaction.
>If you are a current ESPP participant, you may not make any increases to your ESPP contribution rate.
>Shares received through the exercise of an ESPP purchase right will be converted at the closing of the transaction into the right to receive $54.20 per share in cash.
>You may opt out of the ESPP at any time through Charles Schwab. If you opt out of the ESPP prior to a purchase date, you will be refunded the accumulated but unused contributions in your ESPP account.

**Customers/Advertisers/Business Partners**
*Tweeps: *Please see the email from Sarah Personette with an email template to send to clients and partners**
How will this transaction impact business partners? Customers?

>The service has never been more important to our customers around the world, and the work of our teams is critical.
>Partners can continue to expect our best-in-class customer service, client solutions, and commitment to brand safety.
>We cannot speculate on changes Elon Musk may make post closing.
>While Twitter has signed the deal, there are still more steps to take in order to close, which is expected to be in 2022.
>For now, there will be no changes as a result of this announcement.
>Any changes will be communicated as they always have.

Will there be changes to how advertisers potentially leverage Twitter?

> During the period until closing, Twitter will operate as it always has.
> Advertisers can continue to turn to Twitter to drive awareness and consideration for their products and services when they want to launch something new or connect with what's happening.
> We remain focused on delivering priority solutions in areas such as performance marketing, measurement, shopping, brand strategy, and more.
> Any changes will be communicated as they always have.

Will there be any changes to our advertising model?

> Until the transaction closes, it is business as usual for us.
> We remain committed to our product roadmap that helps businesses Launch something, connect with what's happening, and help people buy their products or services.
> We continue to support businesses - big and small - to be able to do this with both our native and paid solutions.
> Our commitment to our customers remains unchanged.

Will there be any changes to our commitment to brand safety in light of freedom of speech comments?

> Until the transaction closes, it is business as usual for us, including with respect to our terms of service.
> Everything we do centers around people.
> At the core of Twitter, we are an organization focused on how we create a space for all voices to have a chance to participate in the public conversation.
> For us, we seek to tackle it by focusing on our Policies, Products, and Partnerships.
> We have no planned changes to our commitment to brand safety and will continue to lead in products that protect, policies that lead, and partnerships that matter.

### **Company culture and benefits**

How will our acquisition impact our IDEA goals, and how can we ensure that Twitter maintains its values and commitment to social responsibility?

> Twitter is an open service that's home to a world of diverse people, perspectives, ideas, and information, and our IDEA principles and commitment to social responsibility will continue to be an integral part of our company's core.
> Our Tweepforce representation goals remain in place, and we are committed to delivering on our IDEA roadmap during this period.

### **Benefits/perks**

What does the future hold for reimbursements, allowances, and other perks?

> We do not expect any changes to these programs at the moment.

Are there any changes to parental leave benefits or medical, dental, and vision benefits?

> We do not expect any changes to these programs at the moment.
> The agreement provides for Tweep benefits, base salary, and bonus opportunities (short/long term incentives) to continue on a comparable basis for at least one year following the close of the transaction.

Are there any plans to adjust benefits for hourly employees prior to the closing?
> We do not expect any benefits to change for our hourly Tweeps at this time.

## Remote work
Will our commitment to flexible/remote work change?

> We do not expect our policies around remote work to change at this time. A significant portion of our workforce is either fully or partially remote. That is how we have worked the last several years and that is how we currently expect to work going forward during this time.

## Contractors and Interns
How will this announcement affect contractors? Will their contracts be cut short upon close?

> We do not expect any changes to our contingent workforce at this time.

Will contractor conversions to FTE be considered in 2022 while we wait for the deal to close?

> These decisions will be handled on a case-by-case basis. As always, please stay close to your S&O and FP&A partners, as well as your Staff lead for hiring and conversion decisions.

Are there any changes to our intern program?

> We have no current plans to change our intern program.

## Immigration/Visas
What impact will there be for employees being sponsored through work visas?

> There is no impact to employer-sponsored visas at this time. When the deal closes, we anticipate that your employing entity will remain the same, and thus there will be no impact to your visa status. If you have questions about your individual immigration status, please contact talentmobility@twitter.com.

## Communications
What are we doing to prevent leaks?

Employees are held to the standards laid out in our Playbook, which includes communications guidelines.

Leaks hurt the company's ability to communicate in the best way possible.

We do our part to investigate how information leaks and handle accordingly.

Why do Twitter employees find out big news like this at the same time as the public?

We do our best to share information with all of you as soon as we're able. In this case, there are laws in place (such as Regulation FD) that require we disclose information to all members of the investment community at the same time. These laws help to ensure investors receive information at the same time. Given employees are also shareholders, we cannot selectively disclose information ahead of other audiences.

I'm being approached by the press, or people I don't know, for comments on Twitter. What should I do?

Please continue to handle any inquiries in accordance with Twitter's policies. Press or other inquiries should be directed to the appropriate parties within Twitter for response. Please raise any concern to CorpSec@, even if you're unsure about the intention of the question. If you are approached by the press, please forward any inquiries to press@twitter.com.

**Future of Twitter**

How will the product be impacted? Will there be any changes to the user experience?

Until the transaction closes, it is business as usual for us, including with respect to our products. We are always iterating to make Twitter the best it can be for people on the service. When there are changes, we will be sure to communicate as we always have.

Will our policies around content moderation change?

Until the transaction closes, it is business as usual for us, including with respect to our terms of service. As we always do, we will continue evolving and iterating to improve the product and the health of the public conversation during this time.

Should we be prepared to dial back our work over the next few months, and correspondingly our budgets?

Between now and close, we should continue operating Twitter in normal course as a public company.

We should always be mindful of our expenses and ensure we're seeing a corresponding return on investment.

Are our priorities changing as a company, or should we continue working on existing projects? Should we still focus on our current OKRs?

Until the transaction closes, it remains business as usual and we are continuing to operate normally as an independent, publicly-traded company.

While the deal is still pending, we must continue to execute and advance our existing strategy.

**Protections**

How will the closing of the transaction affect employee benefits and compensation?

The merger agreement provides special protection for Tweep compensation and benefits for one year following the closing of the transaction.

Specifically, the agreement specifically provides that, for one year following the closing of the transaction, the purchasing entity will:

- Maintain existing base salary and wage rates of continuing Tweeps
- Provide continuing Tweeps with short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those than existing compensation opportunities, although equity compensation may or may not be granted in the future
- Provide continuing Tweeps with employee benefits (excluding equity and equity-based awards) that are substantially comparable in the aggregate to existing benefits
- Provide continuing Tweeps whose employment are terminated during such period with severance payments and benefits that are no less favorable than those applicable to an applicable employee prior to the closing of the transaction
- Recognize continuing Tweeps' service to Twitter in determining eligibility, vesting and determination of the level of benefits applicable to such employees following the closing of the transaction
- Waive requirements for continuing Tweeps to satisfy any deductible, co-payment, out-of-pocket maximum or similar requirements under the acquiring entity's benefits plans to the extent the employee has made correlating previously credited payments under a Twitter benefit plan
- Waive waiting periods, preexisting condition exclusions and requirements to show evidence of good health for continuing Tweeps

What will happen to Twitter user data/IP after the deal closes? Will any of our policies regarding data protection, including with regard to employee specific information, be impacted by this announcement?

We will continue to treat information with the utmost protection and operate consistent with the laws.

If I'm on a company sponsored visa, are there any risks if I travel outside of the country during the closing period?

We recognize that there are a lot of questions about Tweeps working on a company sponsored visa. For specific questions about your individual status, please contact talentmobility@twitter.com.

**Compliance**

Do we expect any potential risks as a private social media company from a regulatory standpoint?

> As a private company, Twitter will still have to comply with any rules and regulations that govern the activities of social media companies. The same risks apply as they do now and if you have any questions, you should consult with the Compliance team.

**Additional Information and Where to Find It**

On May 17, 2022, Twitter Inc. ("Twitter") filed a preliminary proxy statement in connection with its Special Meeting of Stockholders (the "Special Meeting") related to the pending acquisition of Twitter (the "Transaction"). Prior to the Special Meeting, Twitter will furnish a definitive proxy statement to its stockholders, together with a proxy card. STOCKHOLDERS ARE URGED TO READ THE DEFINITIVE PROXY STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION. Detailed information regarding the names, affiliations and interests of individuals who are participants in the solicitation of proxies of Twitter's stockholders is available in Twitter's preliminary proxy statement.

Stockholders may obtain, free of charge, Twitter's proxy statement (in both preliminary and definitive form), any amendments or supplements thereto, and any other relevant documents filed by Twitter with the U.S. Securities and Exchange Commission (the "SEC") in connection with the Special Meeting at the SEC's website (http://www.sec.gov). Copies of Twitter's definitive proxy statement, any amendments or supplements thereto, and any other relevant documents filed by Twitter with the SEC in connection with the Special Meeting will also be available, free of charge, at Twitter's investor relations website (https://investor.twitterinc.com) or by writing to Twitter, Inc., Attention: Investor Relations, 1355 Market Street, Suite 900, San Francisco, California 94103.

**Forward-Looking Statements**

This communication contains forward-looking statements that involve risks and uncertainties, including statements regarding: the Transaction, including the expected timing of the closing of the Transaction; considerations taken into account by Twitter's Board of Directors in approving the Transaction; and expectations for Twitter following the closing of the Transaction. If any of these risks or uncertainties materialize, or if any of Twitter's assumptions prove incorrect, Twitter's actual results could differ materially from the results expressed or implied by these forward-looking statements. Additional risks and uncertainties include those associated with: the possibility that the conditions to the closing of the Transaction are not satisfied, including the risk that required approvals from Twitter's stockholders for the Transaction or required regulatory approvals to consummate the Transaction are not obtained; potential litigation relating to the Transaction; uncertainties as to the timing of the consummation of the Transaction; the ability of each party to consummate the Transaction; possible disruption related to the Transaction to Twitter's current plans and operations, including through the loss of customers and employees; and other risks and uncertainties detailed in the periodic reports that Twitter files with the SEC, including Twitter's Annual Report on Form 10-K filed with the SEC on February 16, 2022, and Quarterly Report on Form 10-Q filed with the SEC on May 2, 2022, which may be obtained on the investor relations section of Twitter's website (https://investor.twitterinc.com). All forward-looking statements in this communication are based on information available to Twitter as of the date of this communication, and Twitter does not assume any obligation to update the

forward-looking statements provided to reflect events that occur or circumstances that exist after the date on which they were made, except as required by law.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WOLFRAM ARNOLD, ERIK
FROESE, TRACY HAWKINS,
JOSEPH KILLIAN, LAURA CHAN
PYTLARZ, and ANDREW
SCHLAIKJER,

                     Plaintiffs,

       v.

X CORP. f/k/a TWITTER, INC., X
HOLDINGS CORP. f/k/a X
HOLDINGS I, INC. and ELON MUSK,

                Defendants.

C.A. No. 1:23-cv-00528-CFC

## NOTICE OF SERVICE OF SUBPOENA

PLEASE TAKE NOTICE that, pursuant to Rules 30 and 45 of the Federal

Rules of Civil Procedure, Plaintiffs Wolfram Arnold, Erik Froese, Tracy Hawkins,

Joseph Killian, Laura Chan Pytlarz, and Andrew Schlaikjer (collectively,

"Plaintiffs"), through their counsel, have caused to be issued the attached

Subpoena to Produce Documents (Ex. 1), to be served on Skadden, Arps, Slate,

Meagher & Flom LLP.

Dated: August 30, 2023

/s/ Joseph L. Christensen

Akiva Cohen (*pro hac vice*)
Dylan M. Schmeyer (*pro hac vice*)
Michael D. Dunford (*pro hac vice*)
Lane A. Haygood (*pro hac vice*)
KAMERMAN, UNCYK, SONIKER & KLEIN
P.C.
1700 Broadway, 16th Floor
New York, NY 10019
Tel: (212) 400-4930
acohen@kusklaw.com
dschmeyer@kusklaw.com
mdunford@kusklaw.com

Joseph L. Christensen (#5146)
CHRISTENSEN & DOUGHERTY LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Tel: (302) 212-4330
joe@christensendougherty.com

*Attorneys for Wolfram Arnold, Erik Froese, Tracy Hawkins, Joseph Killian, Laura Chan Pytlarz, and Andrew Schlaikjer*

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | | |
|---|---|---|
| WOLFRAM ARNOLD, ERIK FROESE, TRACY HAW | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   C.A. No. 1: 23-cv-00528 CFC |
| X CORP. f/k/a TWITTER, INC., X HOLDINGS CORP. f/k/a X HOLDINGS I, INC. and ELON MUSK | ) | |
| *Defendant* | ) | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                              Skadden, Arps, Slate, Meagher & Flom LLP

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule A

| Place: Kamerman, Uncyk, Soniker & Klein, P.C., 1700 Broadway, 16th Floor New York, NY 10019 | Date and Time: 09/14/2023 9:00 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:        08/31/2023

|                              *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | /s/ Akiva M. Cohen |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

 Akiva M. Cohen, Kamerman, Uncyk, Soniker & Klein, P.C., 1700 Broadway, 16th Floor, New York, NY 10019, acohen@kusklaw.com, 212.400.4930

### Notice to the person who issues or requests this subpoena
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

Civil Action No.  C.A. No. 1: 23-cv-00528 CFC

### PROOF OF SERVICE

#### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
 **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
 **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
 **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
 **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
 **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

### I.    DEFINITIONS

1.   The terms "and" and "or" shall be construed both conjunctively and disjunctively to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

2.   The term "any" means any and all.

3.   The term "each" means each and every.

4.   The term "including" means including but not limited to.

5.   Terms in the present tense include the past and future tenses. Terms in the past tense include the present and future tenses. Terms in the future tense include the present and past tenses.

6.   The singular form of terms includes the plural, and the plural form of terms includes the singular.

7.   Terms in the masculine, feminine or neuter form shall include each of the other genders.

8.   The term "THIS ACTION" means the civil action *Arnold et al. v. X Corp et al.* and bearing the case number 1:23-cv-00528. which was filed in the Federal District Court of Delaware on or about May 16, 2023.

9.   The term "MERGER AGREEMENT" means the Agreement and Plan of Merger By and Among X Holdings I, Inc., X Holdings II, Inc., and Twitter, Inc., dated April 25, 2022.

10. The term ACQUISITION FAQ means the document annexed hereto as Exhibit 1, including all prior versions thereof.

11. The term "TWEEP" means "Company Service Provider" as it is defined in the MERGER AGREEMENT.

12. The terms "YOU" and "YOUR" mean and refer individually and collectively to the law firm of Skadden, Arps, Slate, Meagher & Flom LLP and any attorneys, paralegals, assistants, staff members, or any other persons acting at its direction or under its supervision, whether during their time as partners or employees of or when partners or employees of any other law firm. The terms "YOU" and "YOUR" further mean and refer to any present or former agents, representatives, employees, attorneys, investigators, and other persons acting under YOUR authorization, employment, direction, or control, whether employed or retained on a full-time, part-time, independent contractor, commission, or other basis.

13. The terms "PERSON" and "PERSONS," and the possessive forms of those terms, mean and include natural persons, corporations, partnerships, limited partnerships, associations, organizations, joint ventures, governmental units or entities, and any other kind of business or other entity whether or not employed by YOU; and the acts of a PERSON are defined to include the acts of a director, officer, owner, member, employee, agent, consultant or attorney acting on the PERSON's behalf.

14. The term "COMMUNICATION" means any recording of any transfer of information, ideas, opinions, or thoughts made by any means, at any time or place, under any circumstances, INCLUDING by a single person hearing or seeing by any means, personal meeting, telephone, letter, facsimile, and e-mail. COMMUNICATIONS are not limited to direct transfers between PERSONS, but include other transfers and memorializations, such as records, memoranda to file, electronic or magnetic transfer of computer files, facsimile transmissions, and teletype transmission. COMMUNICATIONS may be embodied in any means or media, including

writing, electronic or magnetic storage or computer files, electronic mail, voice mail, answering machine, digital recording, sound recording, and facsimile transmission.

15. The term "DOCUMENTS" means and refers to all "Documents and things" identified in, or within the scope of Federal Rule of Civil Procedure 34(a) and the 1970 Advisory Committee Note thereto, the Local Rules of the United States District Court for the District of Delaware, the District of Delaware Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI"), and any decision interpreting one or more of such rules, and all forms of "writings" and "recordings" as defined by Federal Rule of Evidence 1001(1) and includes, without limitation, all tangible record of intelligence or information, whether handwritten, typed, printed or otherwise visually or orally reproduced, including information stored on magnetic or optical media or in solid state storage devices, notes, drafts, reports, art-work, films, videotape, e-mails, drawings, graphs, photographs, agreements, letters, test data, circuit diagrams, software structure charts, software flow charts, software code, data flow diagrams, hardware schematic diagrams, hardware logic diagrams, field maintenance print sets, timing diagrams, technical summaries, product description documents, software description documents, laboratory or engineers' notebooks, project or progress reports, database information, whether for prototypes or production products, and the like. A draft or non-identical copy bearing on any sheet (front or back), margins, attachment, or enclosure thereof, any mark that is not a part of the original text or reproduction thereof, is a separate document within the meaning of this term.

16. When referring to a human person, "IDENTIFY" means to give, to the extent known, the person's full name, present or last known address, phone number and the present or last known place of employment, if known. Once a person has been identified in accordance with

this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person. When referring to a business or other entity, "IDENTIFY" means to state the entity's full name, present or last known address, and present or last known telephone number, and to describe the nature of its business or other operations. When referring to Documents, "IDENTIFY" means to give, to the extent known, the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s) and all recipient(s), including "cc"s and "bcc"s. When referring to electronically stored information "IDENTIFY" means to give (i) the type of electronically stored information; (ii) its format; (iii) its location; (iv) its date; (v) its author(s), addressee(s) and all recipient(s), including "cc"s and "bcc"s.

17. The term "RELATING TO" or any variants thereof, when used in conjunction with any DOCUMENT, shall be understood to apply if the DOCUMENT directly or indirectly evidences, mentions, discusses, constitutes, concerns, supports, contradicts, refers to, or in any way deals with the subject matter described in the Request in which the term appears.

## II. INSTRUCTIONS

1. If, in responding to this Request for Production, the responding party encounters any ambiguities when construing a request of definition, the response shall set forth the matter deemed ambiguous and the construction used in responding.

2. These Requests call for all DOCUMENTS, electronically stored information, and tangible things on the particular subject (a) in YOUR possession, custody or control, (b) in the possession, custody or control of anyone acting on YOUR behalf, irrespective of who generated, prepared, received, sent, or signed the DOCUMENTS or tangible things.

3. DOCUMENTS, electronically stored information, and tangible things responsive to these Requests shall be produced as they are kept in the usual course of business, or should be

4

organized and labeled to correspond to categories set forth in these Requests. When produced as kept in the ordinary course of business or as organized and labeled to correspond with the categories set forth in these Requests, the DOCUMENTS and tangible things shall be produced with the folders (or copies thereof) kept by the Person who had the DOCUMENTS in his, her, or its possession, custody or control so that Plaintiffs will know who had the DOCUMENTS or things in his, her, or its possession, custody or control. Please produce DOCUMENTS in such a manner as will facilitate their identification with the particular request or category of requests to which they are responsive. File folders with table or labels identifying DOCUMENTS must be produced intact with the DOCUMENTS. DOCUMENTS attached to each other should not be separated. Selection of DOCUMENTS from files and other sources shall be performed in a manner sufficient to ensure that the source of each Document may be determined, if necessary. To the extent that YOU process hard copy documents for YOUR internal review, including by OCR, such documents should be produced together with all associated electronic information. With respect to electronically stored information, each document produced must be accompanied with filepath information sufficient to identify the storage location and full folder tree information associated with that document and available to YOU when and if the file is viewed in the location in which it is maintained in the ordinary course of business.

4. Electronically stored documents should be produced in native format and accompanied by a Concordance/Opticon load file that includes the following metadata fields/information: (1) VOLUME/volume the data was produced on; (2) Custodian/Source of data, indicated, for individuals, as follows: [Last name], [First name]; (3) BEGNO/Start Bates (including prefixes), no spaces; (4) ENDNO/End Bates (including prefix); (5) DOCID/Identical to BEGNO; (6) BEGATTACH/First Bates Number in attachment range; (6) ENDATTACH/Last

Bates Number in attachment range; (7) Record Type/File Type, e-mail, attachment; (8) Subject/As set forth in e-mail; (9) From Author/ [Last name], [First name]; (10) TO/ / [Last name], [First name]; (11) CC/ [Last name], [First name]; (12) BCC/ [Last name], [First name]; (13) Sent Date/E-mail sent date; (14) TITLE/ File name; (15) Date Created/From file header metadata; (16) Date last modified/From file header metadata; (17) File Size/in KB; (18) Application/Application used to create the file; (19) File Path/Original location of the file for loose files email folder location for email and attachments; (20) Doclink/Link to native file on production volume; (21) EXTRACTED TEXT/OCR/Filepath on production volume for extracted text/OCR; and (22) md5hash/Hash value.

5. <u>Partial Production</u>. Whenever a DOCUMENT is not produced in full please state with particularity the reason(s) it is not being produced in full and describe, to the best of YOUR knowledge, information and belief, and with as much particularity as possible, those portions of the DOCUMENT that are not produced and the reasons therefore. If a deposition transcript or other DOCUMENT cannot be produced because it is proprietary or believed to be proprietary, please produce an invoice thereof or otherwise provide information sufficient for Plaintiffs to obtain such transcript or other DOCUMENTS.

6. <u>Documents Withheld</u>. Whenever in these Requests YOU are asked to IDENTIFY or produce a DOCUMENT that is deemed by YOU to be properly withheld from production, Identify the portion of the request, *i.e.*, request number(s), to which the withheld DOCUMENT is responsive and:

    a. If You are withholding the DOCUMENT under claim of privilege (including but not limited to the work product doctrine), please provide the information set forth in Federal Rule of Civil Procedure 26(b)(5), including:

    i)      The type of DOCUMENT;

    ii)     The general subject matter of the DOCUMENT;

    iii)    The date of the DOCUMENT;

    iv)    Such other information as is sufficient to IDENTIFY the DOCUMENT, including, where appropriate, the length of the DOCUMENT, as well as the author, addressees, custodian, and any other recipient of the DOCUMENT, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other, in a manner that, without revealing the information claimed to be protected, will enable this party to assess the applicability of the privilege or protection claimed by YOU;

    v)     The nature and basis of the privilege claimed;

    vi)    If the privilege claimed is the attorney-client privilege, an indication of which author(s) or addressee(s) is/are attorney(s); and

    vii)   Any other information necessary to support the claim of privilege.

b.    If production of any requested DOCUMENT(s) is objected to on the ground the production is unduly burdensome, describe the burden or expense of the proposed discovery;

c.    If YOU are withholding the DOCUMENT for any reason other than an objection that it is beyond the scope of discovery or that a request is unduly burdensome, provide the reason for withholding the DOCUMENT, and the information requested in sections 6(i)(a)-(d) above. Regardless of whether a Protective Order is entered by the Court, in all instances in which YOU are withholding

DOCUMENTS or things on the ground of confidentiality, please so indicate in YOUR responses.

7.   Whenever a DOCUMENT contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material. If a privilege is asserted with regard to part of the material contained in a DOCUMENT, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a DOCUMENT has been redacted or altered in any fashion, IDENTIFY as to each DOCUMENT the reason for the redaction or alteration, the date of the redaction or alteration, and the Person performing the redaction or alteration. Any redaction must be clearly visible on the redacted DOCUMENT.

8.   To the extent information is maintained in both hard copy and magnetic or electronic form, produce both forms.

9.   If a DOCUMENT is in a language other than English, produce both the original and any translation thereof.

10. Orderly Response. Please produce DOCUMENTS in such a manner as will facilitate their identification with the particular request or category of request to which they are responsive. File folders with tabs or labels identifying DOCUMENTS must be produced intact with the DOCUMENTS. DOCUMENTS attached to each other should not be separated. Selection of DOCUMENTS from files and other sources shall be performed in a manner sufficient to ensure that the source of each DOCUMENT may be determined, if necessary.

11. Duty to Produce Continues. Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these discovery requests are intended to be continuing in nature so as to require supplemental or amended responses or answers, or production of additional DOCUMENTS, if

any additional information or DOCUMENTS are obtained in the future. Such supplemental or amended responses or answers or such production of additional DOCUMENTS shall be furnished within ten (10) days of the date on which any additional information or document is obtained.

12. Inability to Produce. If any or all of the DOCUMENTS IDENTIFIED herein are no longer in YOUR possession, custody, or control because of destruction, loss, or any other reason, then please provide the following information for each such Document:

     d.     A description of the content of that Document;

     e.     The location of all copies of the Document;

     f.     A description of the reason why that Document no longer remains in YOUR possession, custody or control; and

     g.     The date of, and the identity of the Person responsible for, its destruction, loss, transfer, or other action by which the Document left YOUR possession, custody or control.

## III.    REQUESTS

### REQUEST NO. 1.

All DOCUMENTS and COMMUNICATIONS RELATING TO Section 6.9 of the MERGER AGREEMENT, including but not limited to DOCUMENTS and COMMUNICATIONS RELATING TO its meaning, intent, purpose, and enforceability, and specifically including any work product, drafts, client communications, comments, or discussions related thereto.

### REQUEST NO. 2.

All DOCUMENTS and COMMUNICATIONS RELATING TO Section 9.7 of the MERGER AGREEMENT, including but not limited to DOCUMENTS and

9

COMMUNICATIONS RELATING TO its meaning, intent, purpose, and enforceability, and specifically including any work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 3.**

All DOCUMENTS and COMMUNICATIONS RELATING TO the ACQUISITION FAQ, including any work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 4.**

All DOCUMENTS and COMMUNICATIONS RELATING TO communications with TWEEPS regarding the MERGER AGREEMENT, specifically including work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 5.**

To the extent not produced in response to prior requests, all DOCUMENTS and COMMUNICATIONS pertaining to communications with TWEEPS regarding severance or other benefits, from March 1, 2022 through the present, including any work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 6.**

To the extent not produced in response to prior requests, all DOCUMENTS and COMMUNICATIONS pertaining to TWEEP severance or other benefits, from March 1, 2022 through the present, including work product, drafts, client communications, comments, or discussions.

# EXHIBIT 1



**Table of contents**

Updated as of October 27, 2022
Updates as of October 24, 2022
Updates as of October 21, 2022
Updates as of October 20, 2022
Updates as of October 17, 2022
Updates as of October 6, 2022
Updates as of October 4, 2022
Updates as of September 13, 2022
Updates as of August 30, 2022
Updates as of August 4, 2022
Updates as of July 26, 2022
Updates as of July 13, 2022
FAQs previously provided on May 19, 2022
    What's happening? (Overview)
    Process and timeline
    The Board
    Leadership
    Compensation
    Customers/Advertisers/Business Partners
    Company culture and benefits
    Future of Twitter

**Updates as of October 27, 2022**

Please see Elon Musk's Tweet on October 27, 2022 titled, "Dear Twitter Advertisers."

"I wanted to reach out personally to share my motivation in acquiring Twitter. There has been much speculation about why I bought Twitter and what I think about advertising. Most of it has been wrong.

The reason I acquired Twitter is because it is important to the future of civilization to have a common digital town square, where a wide range of beliefs can be debated in a healthy manner, without resorting to violence. There is currently great danger that social media will splinter into far right wing and far left wing echo chambers that generate more hate and divide our society.

In the relentless pursuit of clicks, much of traditional media has fueled and catered to those polarized extremes, as they believe that is what brings in the money, but, in doing so, the opportunity for dialogue is lost.

That is why I bought Twitter. I didn't do it because it would be easy. I didn't do it to make more. I did it to try to help humanity, whom I love. And I do so with humility, recognizing that failure in pursuing this goal, despite our best efforts, is a very real possibility.

That said, Twitter obviously cannot become a free-for-all hellscape, where anything can be said with no consequences! In addition to adhering to the laws of the land, our platform must be warm and welcoming to all, where you can choose your desired experience according to your preferences, just as you can choose, for example, to see movies or play video games ranging from all ages to mature.

I also very much believe that advertising, when done right, can delight, entertain and inform you; it can show you a service or product or medical treatment that you never knew existed, but is right for you. For this to be true, it is essential to show Twitter users advertising that is as relevant as possible to their needs. Low relevancy ads are spam, but highly relevant ads are actually content!

Fundamentally, Twitter aspires to be the most respected advertising platform in the world that strengthens your brand and grows your enterprise. To everyone who has partnered with us, I thank you. Let us build something extraordinary together."

**Updates as of October 24, 2022**

*Reposting this information that was published in a [companywide FAQ](#) from a team@ email on May 13, 2022.*

What is our general severance package if a position is eliminated?

> Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:
>
> > Two months base salary or On Target Earnings for employees on the Sales Incentive Plan
> >
> > Pro-rated Performance Bonus Plan compensation at target
> >
> > Cash value of equity that would have vested within three months from the separation date
> >
> > A cash contribution for health care continuation.
>
> For Tweeps who are on a work-related visa, we also consider an extended notice period to enable additional time to transfer their visa to a new employer.
>
> Of course, we also comply with local employment laws and apply any additional statutory severance for redundancies that may occur outside of the United States.

**Updates as of October 21, 2022**

> All vested TWTR shares and cash held in EAC accounts have been transferred to your connected Charles Schwab brokerage accounts. Please note that the trading window will remain closed for current employees.

**Updates as of October 20, 2022**

> With the anticipated closing of the merger agreement, there are a lot of teams working in the background to prepare for the transition. We will continue to update [go/AcquisitionFAQ](#) on a rolling basis and also send proactive updates and answers to overarching questions.

Please know, as we get closer to deal close, there will continue to be tons of public rumors and speculation. Two things to clarify.

First, we do not have any confirmation of the buyer's plans following close and recommend not following rumors or leaked documents but rather wait for facts from us and the buyer directly.

Second, earlier in the year and as we have shared in public proxy filings, there were targeted cost savings discussions and planning. Those discussions stopped once the merger agreement was signed. As we've shared at #OneTeam meetings, since the merger agreement has been in place, there have been no plans for any company-wide layoffs.

We will continue to keep you all updated with relevant information and updates as we approach closing.

**Updates as of October 17, 2022**

***From the Twitter Equity Award Center (posted October 17, 2022):***

We are writing to let you know of an update related to our Equity Award Center. There is no immediate action for you to take.

In anticipation of the closing of the pending acquisition of Twitter by an entity controlled by Elon Musk (the "Acquisition"), it will be necessary to freeze all activity in the Equity Award Center (EAC) beginning at close of the market today, October 17, 2022. This freeze allows Schwab to perform final reconciliation of employee accounts prior to close of the Acquisition. You will not be able to access balances or transact in the EAC any longer. All vested TWTR shares and cash held in EAC accounts will be transferred to your connected Charles Schwab brokerage accounts and available to you by end of day on Monday, October 24, 2022; however the trading window will remain closed for current employees.

When the Acquisition closes your vested TWTR shares will be automatically converted into the right to receive $54.20 per share in cash in accordance with the terms of the Merger Agreement for the Acquisition. More information about this can be found in go/AcquisitionFAQ.

Participants may also wish to download any personal documents including a copy of their grant agreement PDFs for future reference (watch the tutorial for instructions starting at 1:03). We expect that access to the EAC will cease upon the closing of the Acquisition as Twitter will no longer be a public company and the related equity plans will be terminated. Please note that participants will still have access to their Charles Schwab brokerage accounts after the Acquisition is completed.

***From "ESPP Supplemental Update" (sent October 12, 2022):***

In connection with the execution of the agreement involving the pending acquisition by an entity owned by Elon Musk (the "Acquisition"), participants in Twitter's Employee Stock Purchase Plan (ESPP) previously received an ESPP Update that summarized the treatment of the ESPP leading up to the closing of the Acquisition. The ESPP Update described, in part, that due to the Acquisition, the ESPP offering period that began on November 15, 2021, may have a final purchase date that occurs earlier than its normally scheduled purchase date of November 15, 2022, and that a follow-up notice about any final purchase date would be provided at a later date. Additional information regarding the Acquisition is included in Twitter's definitive proxy statement dated July 26, 2022, filed with the Securities and Exchange Commission (the "SEC")

in connection with the solicitation of proxies to approve the Acquisition and in other relevant documents filed by Twitter with the SEC.

**In anticipation of the possible closing of the Acquisition, the final purchase date under the ESPP for the offering period that began November 15, 2021, has been set to be <u>October 14, 2022</u>.**

Any Tweep who is enrolled in this offering period and remains an ESPP participant through this date will have his or her accumulated ESPP contributions applied to the purchase of shares on October 14, 2022, and then cease participating after such final purchase. No additional ESPP contributions will be deducted after this date, and any accumulated ESPP deductions remaining in any ESPP accounts after the purchase of shares on the final purchase date will be returned to the appropriate participants, in cash, promptly after the final purchase occurs.

The purchase price on the final purchase date will be 85% of the <u>lower of</u> the closing price of a share of Twitter's common stock on (i) November 15, 2021, or (ii) the final purchase date.

More details regarding treatment of the ESPP in connection with the Acquisition can be found in the previous ESPP Update. You also can review the FAQs at go/AcquisitionFAQ if you have any more questions.

**<u>Updates as of October 6, 2022</u>**

> The Chancellor has ordered a stay on our trial, meaning that we will no longer be going to court on October 17. We will work with our buyer to close the acquisition by October 28, per the order.
>
> If the buyer is unable or unwilling to close by then, we will reconvene with the Chancellor to reschedule the trial for November.
>
> Our intention remains the same: to close the acquisition at the price and terms in the original merger agreement.

**<u>Updates as of October 4, 2022</u>**

> We received the letter from the Musk parties which they have filed with the SEC. Our intention is to close the transaction at $54.20 per share.
>
> We are still continuing to litigate this matter in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition. As a reminder, our five-day trial is scheduled to begin October 17, 2022.

**<u>Updates as of September 13, 2022</u>**

What was the result of the stockholder vote?

> Our stockholders approved the adoption of the Merger Agreement between Twitter and affiliates of Elon Musk for $54.20 per share in cash. You can see our press release here.
>
> Based on a preliminary tabulation following the Special Meeting of Stockholders, approximately 98.6% of the votes cast at the Special Meeting approved the proposal. The approval of our stockholders satisfies the final condition precedent to the closing of the merger (other than those conditions that by their nature are to be satisfied at closing). After certification by the Special Meeting's inspector of

elections, the final voting results will be filed with the SEC. We do not expect that the voting outcome will change after certification.

Obtaining stockholder approval is an important step forward in this process, however we are still continuing to litigate this matter in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition. As a reminder, our five-day trial is scheduled to begin October 17, 2022.

What is happening with Elon Musk's purported termination of the merger agreement?

As previously announced, affiliates of Mr. Musk have delivered notices purporting to terminate the merger agreement. Twitter continues to believe that Mr. Musk's purported termination of the merger agreement is invalid and without merit, and that the Musk parties continue to be bound by the merger agreement and obligated to complete the merger on the agreed terms and conditions. Twitter has filed a lawsuit in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition, and Twitter remains committed to doing so on the price and terms agreed upon with Mr. Musk.

**Updates as of August, 30, 2022**

What is our response to the buyer's second termination letter?

The buyer sent a second termination letter, and we responded, which you can read in full here. As was the case with the buyer's previous termination letter, his second termination letter is invalid and wrongful. Twitter has breached none of its representations or obligations under the Agreement, and Twitter has not suffered and is not likely to suffer a Company Material Adverse Effect. We remain committed to closing the transaction on the price and terms agreed upon with Mr. Musk.

**Updates as of August 4, 2022**

What is mDAU?

Twitter defines monetizable daily active usage or users (mDAU) as people, organizations, or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day through twitter.com, Twitter applications that *are able to* show ads, or paid Twitter products, including subscriptions. Monetizable means they could see ads or pay Twitter through a subscription, not that they will see ads on any given day. As our filings state, they are on a monetizable client or application.

How does Twitter determine mDAU?

When an account logs in or is otherwise authenticated on Twitter on any given day through twitter.com, Twitter applications that are able to show ads, or paid Twitter products, including subscriptions.

Average mDAU for a period represents the number of mDAU on each day of such period divided by the number of days for such period. Changes in mDAU are a measure of changes in the size of our daily "logged in" or otherwise authenticated active total accounts.

Why do we measure mDAU?

Audience metrics are seldom one size fits all but some form of daily active usage is a typical metric in our industry. Different products have different definitions they employ tailored to their specific service.

mDAU (monetizable daily active user) is designed to be our baseline to gauge broad usage and growth on the Twitter platform.

Monetizable means they *could* see ads or pay for a subscription, not that they *will* see ads. They are on a monetizable client or application.

We are committed to providing something valuable to people on Twitter every day.

As stated in our SEC filings, "We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement."

Our goal is not to disclose the largest user number we can but rather one that has more relevance. mDAU is designed to provide relevance and context to external stakeholders that reflects our goal of delivering value to people on Twitter every day and monetizing that usage.

Why do advertisers trust Twitter?

Twitter has historically built integrity through transparency and consistent operating principles. This approach is unwavering and something that differentiates us.

Twitter has never been more important to our customers around the world. We are working closely with our clients and partners, who can continue to expect our best-in-class customer service, client solutions and commitment to brand safety. We remain focused on delivering priority solutions in areas such as performance marketing, measurement, shopping, brand strategy and more.

We stand by our reporting methods and are transparent with the process for estimating our mDAU, accounts that are spam within mDAU and when updates are made.

As stated in our SEC filings, "We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement."

How do advertisers measure success on Twitter?

The results and metrics associated with campaign objectives are what best determines advertiser ROI.

Campaign objectives could focus on areas such as reach, video views, website traffic, app installs, followers, engagements, etc.

Targeting can focus on: followers, custom audiences, geography, language, interests, device type, etc.

Success metrics may include: Video views, impressions, Site visits, number of app downloads, various cost per data points (i.e. CPI, CPM, CPC, CPE), conversions, brand sentiment, etc.

We work with a variety of first and third party measurement companies to help validate.

Twitter has solutions that help advertisers measure the success of a campaign, maintain privacy, and brand safety:

> Twitter First-Party Measurement Solutions
>
> > Advertisers can leverage Twitter's suite of first-party measurement solutions to garner learnings such as brand lift, media metrics, viewability, conversions, and more.
>
> Third-Party Measurement Solutions
>
> > Advertisers know their ads are being seen using third-party accredited viewability reporting partners
> >
> > See more here for information on our partners who help advertisers with measurement, Ad analytics, targeting, creative and more.
>
> Twitter + Third-Party Brand Lift Surveys
>
> > We help advertisers measure the impact of campaigns on key brand metrics such as awareness, association, favorability, and consideration, using our first-party and third-party Brand Lift Surveys.
>
> Third-Party Viewability — Moat, IAS, DV Direct Integration
>
> > We help brands measure the quality of impressions and video views of their media buys with our third-party partners such as MOAT, IAS, and DV.
>
> Advertiser audience targeting:
>
> > Via a suite of intuitive, performant, and privacy-compliant tools, we enable advertisers to refine campaign delivery and reach the people that are most likely to be receptive to a brand's message. Advertisers on Twitter can:
> >
> > > Reach people based on who they are with Demographic targeting.
> > >
> > > Reach people based on how they access Twitter with Device targeting.
> > >
> > > Reach people based on how they engage on Twitter with Audience Features.
> > >
> > > Leverage off-platform data to build Custom Audiences on Twitter.
> > >
> > > Let Twitter find the people most likely to drive results with Automated Targeting.
> > >
> > > Extend reach to people similar to core audience with Audience Expansion.
>
> Enriched Twitter Audiences and Account Based Marketing
>
> > Twitter can help advertisers drive even more results with powerful ways to reach our audiences.
> >
> > Enriched Twitter Audiences are hyper-targeted custom audiences that expand reach, increase engagement, and improve overall

performance. These custom audiences are created by trusted partners using Twitter's data.

For B2B advertisers, Account Based Marketing campaigns identify business decision makers and their influential communities on Twitter.

Across many verticals including gaming, fashion, and pharma, these solutions are making it easier for customers to drive results.

Campaign Planner: New as of June 2022

The tool enables customers to forecast reach, impressions, average frequency, and CPM against a specific audience, campaign duration, frequency setting, placement, and budget for auction-based campaigns.

We've also made it easier than ever to execute reach campaigns by allowing advertisers to start and save a draft campaign directly from the tool.

Campaign Planner is available to advertisers in the United States, United Kingdom, and Japan.

Partners can also tap into tools such as Audience Estimate.

See more here for examples of successful advertising campaigns that include key campaign metrics.

How does Twitter calculate spam?

We shared a comprehensive blog post and Tweet thread about how we define and calculate spam/bots here and here, respectively.

Customers org: If clients have questions, you can use this client-facing language reactively.

Does Twitter use AI and ML to identify spam and bots on the platform?

We do! Specifically, Twitter deploys spam detection capabilities that have resulted, and continue to result, in the suspension of typically more than one million spam accounts every day, including both automated and manual reviews of accounts and activity on the Twitter platform during and after sign-up. Twitter also locks millions of accounts each week that cannot pass human-verification challenges, such as CAPTCHAs or phone verifications.

Our processes encompass a mix of human engagement and automation to identify malicious spam and bots.

We are always testing and exploring ways to further advance our systems for detection and remediation.

Separate from these automated and manual spam-detection processes, Twitter estimates the prevalence of false and spam accounts within mDAU through multiple human reviews (in replicate) of thousands of randomly selected accounts each quarter using both public and private data.

Did Twitter cooperate by providing the Buyer's team the information they were requesting?

Yes. Twitter has continuously shared information with the buyer to consummate the transaction in accordance with the terms of the merger agreement.

Throughout this process we have and will continue to protect proprietary and confidential information of Twitter advertisers and our customers' private user data.

Why didn't Twitter choose to redact any information from the acquirer's countersuit?

We fully stand by our SEC filings, the methodologies we use to calculate mDAU, and our statements about the percentage of spam accounts on our platform.

What is our public response to the countersuit?

The counterclaims are factually inaccurate, legally insufficient, and commercially irrelevant.

Why did Twitter recast its mDAU values three days after signing the agreement?

The updated values for mDAU reflected a change of less than 1% for each impacted period.

Twitter has historically built integrity through transparency and consistent operating principles. We reported this out of an abundance of transparency. Twitter disclosed this recast when we announced Q1 2022 Earnings in April.

Why did Twitter move from disclosing MAU to mDAU in 2019?

We want to provide something valuable to people on Twitter every day, and we believe that mDAU, and its related growth, are the best ways to measure the success of our objectives and to show the size of our audience and engagement.

**Updates as of July 26, 2022**

What's the schedule for our case?

The judge set a schedule for our case in the Delaware Court of Chancery for a five-day trial in October.

Does our Board of Directors recommend how stockholders should vote?

Yes, the Twitter Board of Directors recommends that stockholders vote in favor of the transaction ("FOR").

When is the Special Meeting of Stockholders?

The meeting is scheduled for September 13, 2022 at 10am PT. Anyone who owns TWTR stock (including Tweeps) as of July 22, 2022 is entitled to vote prior to or during the meeting.

What should stockholders expect?

Each stockholder will receive voting materials in the very near future. The materials describe easy ways to vote electronically, over the phone, or by mail. If you received your voting materials by email, you can simply click the "Vote Now" button in the email. Otherwise, the easiest way to vote your shares is to go to proxyvote.com and enter the Control Number(s) provided to you in the materials. Please note that if you hold Twitter shares in more than one account (e.g., in our employee share purchase plan (ESPP), in registered name, or through a personal bank or brokerage account), you'll receive separate emails or hard copies of voting materials for each account. To make sure that all your shares are represented, you must submit a vote for each account in which you hold Twitter shares. You will receive a separate Control Number for each account in which you own shares.

What communications will stockholders receive from Innisfree, our proxy solicitor?

We asked Innisfree to work with us to ensure our shareholders are educated about this important proposal, so you will likely receive more communications from them over the coming weeks via email, phone call and traditional mail. If you have any questions, please call Innisfree at +1 (877) 750-8338 (US/Canada) or +1 (412) 232-3651 (all other countries).

**Updates as of July 13, 2022**

What does Mr. Musk's notice mean? Is the deal now officially off?

No. Mr. Musk's purported termination is invalid and wrongful.
As we noted in our press release and commentary from the Chairperson of our Board, the Twitter Board is committed to closing the merger on the $54.20 price and terms agreed upon with Mr. Musk and plans to pursue legal action to specifically enforce the merger agreement.
Please understand that the Twitter Board and executive management team are continuing to actively manage the process related to the acquisition. We will share information with you as we can, but this is an evolving situation and we may not have, or be able to share, answers to all of your questions.

What is Mr. Musk's goal?

We are not in a position to speculate about Mr. Musk's objectives.

Given that we plan to pursue legal action to enforce the merger agreement, how long will it take to resolve that?

As with many legal matters, it is difficult to predict the duration of this process. We have a group of internal team members and external advisers who are dedicated to this workstream. It is important to remember that during this process, it is business as usual for all of us at Twitter. That means we should continue the important and meaningful work of driving Twitter forward and continuing to deliver value to our users and customers.

Have we shared bot information with Mr. Musk as requested?

We have met our obligations under the merger agreement.

Has Twitter breached the merger agreement?

As stated in the letter attached to our 8-K filing from July 11, 2022, "Twitter has breached none of its obligations under the Agreement," and "As it has done, Twitter will continue to provide information reasonably requested by Mr. Musk under the Agreement and to diligently take all measures required to close the transaction.

Anything more you can share with us about the complaint that we filed on July 12, 2022?

The complaint is public and details why Twitter believes that Mr. Musk's purported termination is invalid and wrongful.

Given this is active litigation, we are limited in what we can say beyond our public filings.

We have a group of internal team members and external advisers who are dedicated to this workstream. It is important to remember that during this process, it is business as usual for all of us at Twitter. That means we should continue the important and meaningful work of driving Twitter forward and continuing to deliver value to our users and customers.

What is the likelihood of a settlement? What is our desired outcome?

The Twitter Board is committed to closing the merger on the $54.20 price and terms agreed upon with Mr. Musk.

Why haven't we implemented retention packages or similar for Tweeps?

Tweeps are the heart of Twitter and will always be essential to our success. On June 20, 2022, we sent Mr. Musk a formal request for consent to two tailored employee retention programs that had been vetted by the board and the compensation committee with the assistance of an outside compensation consultant. Mr. Musk has not provided his consent to implement these programs.

How do we plan to retain talent?

Our attrition is slightly higher than best practice for normal macroeconomic times, but remains inline with current industry trends. We will continue to monitor it to ensure that we can quickly identify any areas of concern and help mitigate where possible.

What's the plan to support the transition of our current projects and work?

Until the transaction closes, we'll be focused on continuing to drive the business forward. We are confident plans for transition will be properly created.

Is there a possibility for layoffs, now or post-close?

We're not looking at company-wide layoffs. However, teams from across the company are reprioritizing and making changes to ensure we are operating responsibly and efficiently in the current operating environment. We may continue to see restructuring and org changes as we continue to align with our revised business needs (as we always have in the past).

What regulatory agencies will need to approve the transaction?

As of July 13, 2022, stockholder approval of the Merger Agreement is the only remaining approval or regulatory condition to consummating the closing of the Merger under the Merger Agreement.

**FAQs previously provided on May 19, 2022**

**What's happening?**

Twitter has entered into a definitive agreement to be acquired by a private entity affiliated with Elon Musk. The purchase price is $54.20 per share. We expect the transaction to close in 2022, subject to the satisfaction of customary closing conditions. Upon completion of the transaction (or the "closing"), Twitter will become a privately held company.

Twitter's board of directors (the "Board") undertook a thoughtful, comprehensive, and deliberate process to review the proposal and unanimously determined the transaction was in the best interests of our stockholders.

There are still several steps to close. Completion of the transaction is subject to the approval of Twitter stockholders, the receipt of applicable regulatory approvals, and the satisfaction of other customary closing conditions.

Upon the closing, Twitter equity awards will be canceled and converted into the right to receive a cash amount of $54.20 (less any applicable exercise price) for each underlying share. The cash amount payable for unvested Twitter equity awards will be payable over the same pre-transaction vesting schedule as the award that was canceled.

The terms of the agreement specifically provide for Tweep annual base salary, bonus opportunities (short/long term incentive (excluding equity) opportunities) and employee benefits so that, in each case, they are no less favorable in the aggregate than the comparable opportunities or benefits, as applicable for at least one year from the closing date.

Between now and closing, we generally will operate Twitter in normal course - just like we always have. In general, we do not expect any changes to Tweep compensation programs and benefits. Twitter RSUs and other equity awards will vest as they normally have. Business decisions will continue to be made by Twitter's leadership.

**Process and timeline**

Why did Twitter enter into this transaction and why do we feel it is still best for stockholders?

The Twitter Board undertook a thoughtful and comprehensive process to review Elon Musk's proposal, with a deliberate focus on value, certainty, and financing. The Twitter Board considered, among other things, Twitter's go-forward prospects in the current market as well as other potential value-creating opportunities.

The Board still believes this transaction, which delivers a substantial cash premium to stockholders, is the best path forward for Twitter's stockholders.

Why did we announce the transaction when we did?

> We announced the deal to employees and the public at the same time as we had a legal and fiduciary responsibility as a public company to do so.

How long will it take for this deal to close?

> We expect the transaction to close in 2022 subject to the satisfaction of customary closing conditions.

Why did we implement a Shareholder Rights Plan ("poison pill")?

> The Board adopted the Shareholder Rights Agreement on April 15, which has been referred to as a "poison pill" in the press. The Board adopted the rights plan to enable all stockholders to realize the full value of their investment in Twitter by reducing the likelihood that any entity, person or group gains control of Twitter through open market accumulation without paying all stockholders an appropriate control premium or without providing the Board sufficient time to make informed judgments and take actions that are in the best interests of shareholders.

Is there a go-shop provision?

> No. All of these details are laid out in the merger agreement that has been filed with the SEC.

What does it mean to become a privately held company? What are the benefits?

> Generally, private companies' shares are not publicly traded or held by a broad group of shareholders.
> Private companies typically do not have to incur costs related to public reporting and may have more flexibility to operate.
> Until the transaction closes, it remains business as usual, and we are continuing to operate normally as an independent, publicly traded company.

Once the deal closes, is there a test for the debt coverage capabilities?
> In an acquisition like this one, it is common for the party acquiring a target company to add debt to the target's balance sheet. In assessing the deal, prospective lenders have considered the leverage ratio, which is one of the credit metrics used to measure the ability of the target company to use its cash flows to repay all its debt obligations, including principal and interest payments.

What does the acquisition mean for our debt?
> The debt balance on our balance sheet will be higher. If you are reading news externally, you have probably seen that Mr. Musk's affiliates received $13B of commitments from banks for loans to partially finance the deal. Twitter will ultimately incur such loans after the transaction closes. A portion of Twitter's existing debt balance, which is $5.2B today, is expected to be repaid in

connection with the closing, and new debt securities are expected to be issued by Twitter.

What are the upcoming major milestones of the deal and when will Tweeps find out?

We expect the transaction to close in 2022, subject to satisfaction of customary closing conditions, including required regulatory and stockholder approvals. In terms of next milestones, we expect to file a preliminary proxy statement in the near future relating to the special meeting of stockholders to vote to approve the merger agreement. Once that document clears SEC review, we will file a definitive proxy statement and then hold the special meeting on the timeline specified in the proxy statement. We will aim to keep you informed of major updates.

Where are we in the acquisition cycle? Do the changes to hiring and cost savings have any implications on this?

We're still on track and working to close the transaction in a timely manner. We expect the transaction to close in 2022, subject to satisfaction of customary closing conditions, including required regulatory and stockholder approval.

## The Board

What factors did the Board use to evaluate whether this would be in the best interest of stockholders?

As mentioned above, the Board undertook a thoughtful and comprehensive process to review the proposal, with a deliberate focus on value, certainty and financing. The Board's vote to approve the transaction was unanimous.
The Board considered the proposal in light of the company's go-forward prospects and the current market environment, among numerous other considerations.
Additional details of the Board's process will be made available in our future SEC filings.

Did the Board get a fairness opinion? From whom?

Yes, Goldman Sachs and JP Morgan each provided a fairness opinion.

Did the Board lose confidence in the business?

Absolutely not. The Twitter Board considered the proposal in light of Twitter's go-forward prospects and the current market environment, among numerous other considerations.
This transaction is a great outcome for stockholders and demonstrates the tremendous value of Twitter.

## Leadership

What will Twitter's leadership team look like post-close?

It's too early to speculate on that right now.

For now, our team is focused on continuing to operate our business as we have and taking steps to secure the approvals we need to close the transaction and set Twitter up for continued success as a private company.

Will we have a board of directors post-close? Who will hold our new owner accountable?

Private companies are operated differently than public companies, but they are also subject to many of the same governance requirements and regulations as a public company. Twitter is incorporated in Delaware, which provides rules that dictate our governance.

Are the recent changes to Staff, cost savings, and hiring pause connected to the acquisition? These changes are ones that Twitter has been contemplating and is driving as part of our ordinary course operations and operational improvements. In order to responsibly manage the organization as we sharpen our roadmaps and our work, we need to continue to be intentional about our teams, hiring, and costs. We will continue to remain focused on strengthening our work through increased accountability and execution to make Twitter everything it can be.

## Compensation and Equity Awards

Will this announcement impact promotion decisions and related compensation increases?

No. Until the deal closes, it is business as usual for Twitter, including with respect to promotion decisions or related comp changes.

What will our compensation program look like without RSUs? How will we stay competitive?

Tweeps are the heart of Twitter and will always be essential to our success. We expect our compensation program will reflect that.
It is too early to determine the future of our incentive programs as a private company, but we will share more information as soon as it becomes available. We currently expect to continue to offer competitive rewards (regardless of the underlying currency of those rewards) to attract and retain talent.

Will we grant new Twitter equity awards between now and deal close for promotions and role changes?

We will continue to grant Twitter equity awards until the transaction closes, as we normally would for promotions and role changes. After the transaction closes, we expect our compensation program will be reviewed and updated to account for the fact that we will operate as a privately-held company. We will share more information when it becomes available.

## Existing Twitter Shares and Equity Awards

Will the trading window change as a result of this announcement?

No, the trading window will not change. We're still a public company and we will still report quarterly earnings on the same cadence that we did before, so we expect our calendars generally will be the same. We expect this to be the case until the deal closes.

Should I or can I sell Twitter stock that I own?

As long as you are not in possession of any material nonpublic information (MNPI) regarding Twitter, you are free to trade Twitter stock when trading windows are open. You are still bound by all black-out periods and the other terms of our insider trading policy.

What happens to my existing Twitter equity awards if the transaction closes?

Unless and until the transaction closes, the terms of your Twitter equity awards will remain the same.

Once the transaction closes, then your Twitter equity awards (whether granted under our 2013 Equity Incentive Plan or assumed in an acquisition of your prior employer) will be treated as described below:

**RSUs**

Each vested RSU will be converted into the right to receive the $54.20 purchase price in cash as described below. If RSUs were subject to performance-based vesting, the number of vested RSUs subject to that award will be based on actual achievement.

Each unvested RSU will be converted into the right to receive an amount in cash equal to $54.20. This cash amount will vest in installments on the same vesting schedule that applied to the canceled unvested RSUs it is replacing, subject to continued service through the applicable vesting date. If unvested RSUs were subject to performance-based vesting, the number of RSUs subject to that award will be deemed earned at the target level of achievement.

For example, if you have 100 RSUs that vest on November 1, 2022 (assuming the transaction closes before that date), then you will receive a cash amount equal to $5,420, less applicable tax withholding, on November 1, 2022 through payroll.

Under the terms of the deal, all unvested RSU awards are converted into the right to receive cash in an amount equal to the product of the total number of unvested RSUs and the per share purchase price ($54.20). The resulting cash amount then vests and will be paid to you according to the original vesting schedule subject to your continued service through the applicable vesting dates, which will remain in place.

**Options**

Each vested option will be converted into the right to receive an amount in cash equal to the difference between $54.20 and the option exercise price for each underlying share.

Each unvested option will be converted into the right to receive an amount in cash equal to the difference between $54.20 and the option exercise price for each underlying share. This cash amount will vest on the same vesting schedule that applied to those canceled unvested options it is replacing, subject to continued service through the applicable vesting date.

**Restricted Stock Awards**

Each restricted stock award will be converted into the right to receive $54.20 in cash. This cash amount will vest on the same vesting schedule that applied to the canceled award it is replacing, subject to continued service through the applicable vesting date.

When will the cash amounts for my Twitter equity awards described be paid?

Generally, amounts payable to you for your vested equity awards will be paid to you, less applicable tax withholding, within five business days after the closing of the transaction.

Generally, amounts payable to you for your unvested Twitter equity awards will be paid to you, less applicable tax withholding, through payroll on the same vesting schedule that applied to those equity awards before the transaction, subject to your continued service through the applicable vesting date.

Please consult with your tax advisor as to the tax consequences to you of these payments.

What happens to cash amounts payable for unvested Twitter equity awards if a Tweep departs before the cash amounts are vested?

The cash amounts payable in respect of your unvested Twitter equity awards will only vest and be paid to you if you remain in continuous service with Twitter through the applicable vesting date. If your service with Twitter (or a subsidiary) ends before a portion of such cash amount is vested, you will not receive that portion of the cash amount and it will be forfeited to Twitter.

Do Twitter RSUs have a "change in control" clause that will accelerate vesting if layoffs occur within one year?

Generally, no. Unless you are party to a separate agreement with Twitter, your Twitter equity awards (or the cash amounts payable for such equity awards) will not receive accelerated vesting if your employment is involuntarily terminated following the closing of the transaction (known colloquially as a "double trigger").

As is customary in our industry, only a few of our executives and other senior employees currently have a "double trigger" provision.

Do all Tweeps have the same vesting schedule?

Generally, Twitter equity awards are granted through the annual refresh process or promotion process vest on a quarterly vesting schedule (with vesting dates in February, May, August, and November); however, depending on when a Tweep was hired, their new hire grant may vest outside of those normal dates. The award agreement provided to you upon the grant of your Twitter equity award will contain your applicable vesting schedule.

Will the $54.20 purchase price change with the fluctuation of Twitter's current stock price or because of inflation?

No, the transaction price of $54.20 per share is fixed, including for purposes of future cash payouts for equity awards on the same vesting schedule.

For International Tweeps, as individual RSUs convert into the cash equivalent of $54.20 post-close, will international Tweeps receive this in U.S. dollars through their brokerage account (ex: Schwab) or will it be converted into local currency and deposited into their payroll?

Finance and Payroll are working on this now, however, the merger agreement provides that cash amounts paid in respect of unvested Twitter equity awards will be paid in U.S. dollars. We will share more information when it becomes available.

**New hires and offers**

Will new hires continue to receive RSUs?

Yes, we expect we will continue our current practices for new hire grants up until the close.

Are there any changes to the methodology for how new hire grants are converted to shares?

No, until the closing of the transaction, we expect we will continue our current equity granting practices.

How will this announcement affect new Tweeps who have signed an offer letter with RSUs, but have not yet joined the company? What should we tell candidates that have equity in their current offer letters?

New Tweeps will still be granted their RSUs subject to the terms of their offer letters, however depending on the timeline of closing and their vesting schedule, they may receive equivalent cash payments in respect of those RSUs.

What do we tell candidates if they ask us about this announcement during an interview?

> Please point them to the press release (Parag Tweeted a link to it) for all of the specific details related to the announcement.
>
> You may use this FAQ to answer questions for candidates and use the What's happening? section of this doc for key messages to third parties.

**ESPP**

> If you are a current ESPP participant, your accumulated ESPP contributions will be used to purchase shares on May 16, 2022, unless you withdraw in advance of the purchase date. There will not be a new offering period beginning on May 16, 2022, and any current ESPP participant who is enrolled in the ESPP offering period that began on May 15, 2021 will cease participating in the ESPP after May 16, 2022.
>
> If you are a current ESPP participant who is enrolled in the offering period that began on November 15, 2021, you may continue to participate in the ESPP following May 16, 2022. The final purchase date is scheduled to occur on November 15, 2022, or, if earlier, a date that is at least 10 business days prior to the date on which the transaction closes. Following the final purchase date, the ESPP will then terminate, subject to the closing of the transaction.
>
> If you are a current ESPP participant, you may not make any increases to your ESPP contribution rate.
>
> Shares received through the exercise of an ESPP purchase right will be converted at the closing of the transaction into the right to receive $54.20 per share in cash.
>
> You may opt out of the ESPP at any time through Charles Schwab. If you opt out of the ESPP prior to a purchase date, you will be refunded the accumulated but unused contributions in your ESPP account.

**Customers/Advertisers/Business Partners**
*Tweeps: *Please see the email from Sarah Personette with an email template to send to clients and partners**
How will this transaction impact business partners? Customers?

> The service has never been more important to our customers around the world, and the work of our teams is critical.
>
> Partners can continue to expect our best-in-class customer service, client solutions, and commitment to brand safety.
>
> We cannot speculate on changes Elon Musk may make post closing.
>
> While Twitter has signed the deal, there are still more steps to take in order to close, which is expected to be in 2022.
>
> For now, there will be no changes as a result of this announcement.
>
> Any changes will be communicated as they always have.

Will there be changes to how advertisers potentially leverage Twitter?

> During the period until closing, Twitter will operate as it always has.
> Advertisers can continue to turn to Twitter to drive awareness and consideration for their products and services when they want to launch something new or connect with what's happening.
> We remain focused on delivering priority solutions in areas such as performance marketing, measurement, shopping, brand strategy, and more.
> Any changes will be communicated as they always have.

Will there be any changes to our advertising model?

> Until the transaction closes, it is business as usual for us.
> We remain committed to our product roadmap that helps businesses Launch something, connect with what's happening, and help people buy their products or services.
> We continue to support businesses - big and small - to be able to do this with both our native and paid solutions.
> Our commitment to our customers remains unchanged.

Will there be any changes to our commitment to brand safety in light of freedom of speech comments?

> Until the transaction closes, it is business as usual for us, including with respect to our terms of service.
> Everything we do centers around people.
> At the core of Twitter, we are an organization focused on how we create a space for all voices to have a chance to participate in the public conversation.
> For us, we seek to tackle it by focusing on our Policies, Products, and Partnerships.
> We have no planned changes to our commitment to brand safety and will continue to lead in products that protect, policies that lead, and partnerships that matter.

**Company culture and benefits**

How will our acquisition impact our IDEA goals, and how can we ensure that Twitter maintains its values and commitment to social responsibility?

> Twitter is an open service that's home to a world of diverse people, perspectives, ideas, and information, and our IDEA principles and commitment to social responsibility will continue to be an integral part of our company's core.
> Our Tweepforce representation goals remain in place, and we are committed to delivering on our IDEA roadmap during this period.

**Benefits/perks**

What does the future hold for reimbursements, allowances, and other perks?

> We do not expect any changes to these programs at the moment.

Are there any changes to parental leave benefits or medical, dental, and vision benefits?

> We do not expect any changes to these programs at the moment.
> The agreement provides for Tweep benefits, base salary, and bonus opportunities (short/long term incentives) to continue on a comparable basis for at least one year following the close of the transaction.

Are there any plans to adjust benefits for hourly employees prior to the closing?
> We do not expect any benefits to change for our hourly Tweeps at this time.

**Remote work**

Will our commitment to flexible/remote work change?

> We do not expect our policies around remote work to change at this time. A significant portion of our workforce is either fully or partially remote. That is how we have worked the last several years and that is how we currently expect to work going forward during this time.

**Contractors and Interns**

How will this announcement affect contractors? Will their contracts be cut short upon close?

> We do not expect any changes to our contingent workforce at this time.

Will contractor conversions to FTE be considered in 2022 while we wait for the deal to close?

> These decisions will be handled on a case-by-case basis. As always, please stay close to your S&O and FP&A partners, as well as your Staff lead for hiring and conversion decisions.

Are there any changes to our intern program?

> We have no current plans to change our intern program.

**Immigration/Visas**

What impact will there be for employees being sponsored through work visas?

> There is no impact to employer-sponsored visas at this time. When the deal closes, we anticipate that your employing entity will remain the same, and thus there will be no impact to your visa status. If you have questions about your individual immigration status, please contact talentmobility@twitter.com.

**Communications**

What are we doing to prevent leaks?

Employees are held to the standards laid out in our Playbook, which includes communications guidelines.
Leaks hurt the company's ability to communicate in the best way possible.
We do our part to investigate how information leaks and handle accordingly.

Why do Twitter employees find out big news like this at the same time as the public?

We do our best to share information with all of you as soon as we're able.
In this case, there are laws in place (such as Regulation FD) that require we disclose information to all members of the investment community at the same time. These laws help to ensure investors receive information at the same time. Given employees are also shareholders, we cannot selectively disclose information ahead of other audiences.

I'm being approached by the press, or people I don't know, for comments on Twitter. What should I do?

Please continue to handle any inquiries in accordance with Twitter's policies. Press or other inquiries should be directed to the appropriate parties within Twitter for response. Please raise any concern to CorpSec@, even if you're unsure about the intention of the question. If you are approached by the press, please forward any inquiries to press@twitter.com.

**Future of Twitter**
How will the product be impacted? Will there be any changes to the user experience?

Until the transaction closes, it is business as usual for us, including with respect to our products. We are always iterating to make Twitter the best it can be for people on the service. When there are changes, we will be sure to communicate as we always have.

Will our policies around content moderation change?

Until the transaction closes, it is business as usual for us, including with respect to our terms of service. As we always do, we will continue evolving and iterating to improve the product and the health of the public conversation during this time.

Should we be prepared to dial back our work over the next few months, and correspondingly our budgets?

Between now and close, we should continue operating Twitter in normal course as a public company.
We should always be mindful of our expenses and ensure we're seeing a corresponding return on investment.

Are our priorities changing as a company, or should we continue working on existing projects? Should we still focus on our current OKRs?

Until the transaction closes, it remains business as usual and we are continuing to operate normally as an independent, publicly-traded company.

While the deal is still pending, we must continue to execute and advance our existing strategy.

**Protections**

How will the closing of the transaction affect employee benefits and compensation?

The merger agreement provides special protection for Tweep compensation and benefits for one year following the closing of the transaction.

Specifically, the agreement specifically provides that, for one year following the closing of the transaction, the purchasing entity will:

- Maintain existing base salary and wage rates of continuing Tweeps
- Provide continuing Tweeps with short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those than existing compensation opportunities, although equity compensation may or may not be granted in the future
- Provide continuing Tweeps with employee benefits (excluding equity and equity-based awards) that are substantially comparable in the aggregate to existing benefits
- Provide continuing Tweeps whose employment are terminated during such period with severance payments and benefits that are no less favorable than those applicable to an applicable employee prior to the closing of the transaction
- Recognize continuing Tweeps' service to Twitter in determining eligibility, vesting and determination of the level of benefits applicable to such employees following the closing of the transaction
- Waive requirements for continuing Tweeps to satisfy any deductible, co-payment, out-of-pocket maximum or similar requirements under the acquiring entity's benefits plans to the extent the employee has made correlating previously credited payments under a Twitter benefit plan
- Waive waiting periods, preexisting condition exclusions and requirements to show evidence of good health for continuing Tweeps

What will happen to Twitter user data/IP after the deal closes? Will any of our policies regarding data protection, including with regard to employee specific information, be impacted by this announcement?

We will continue to treat information with the utmost protection and operate consistent with the laws.

If I'm on a company sponsored visa, are there any risks if I travel outside of the country during the closing period?

We recognize that there are a lot of questions about Tweeps working on a company sponsored visa. For specific questions about your individual status, please contact talentmobility@twitter.com.

**Compliance**

Do we expect any potential risks as a private social media company from a regulatory standpoint?

As a private company, Twitter will still have to comply with any rules and regulations that govern the activities of social media companies. The same risks apply as they do now and if you have any questions, you should consult with the Compliance team.

**Additional Information and Where to Find It**

On May 17, 2022, Twitter Inc. ("Twitter") filed a preliminary proxy statement in connection with its Special Meeting of Stockholders (the "Special Meeting") related to the pending acquisition of Twitter (the "Transaction"). Prior to the Special Meeting, Twitter will furnish a definitive proxy statement to its stockholders, together with a proxy card. STOCKHOLDERS ARE URGED TO READ THE DEFINITIVE PROXY STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION. Detailed information regarding the names, affiliations and interests of individuals who are participants in the solicitation of proxies of Twitter's stockholders is available in Twitter's preliminary proxy statement.

Stockholders may obtain, free of charge, Twitter's proxy statement (in both preliminary and definitive form), any amendments or supplements thereto, and any other relevant documents filed by Twitter with the U.S. Securities and Exchange Commission (the "SEC") in connection with the Special Meeting at the SEC's website (http://www.sec.gov). Copies of Twitter's definitive proxy statement, any amendments or supplements thereto, and any other relevant documents filed by Twitter with the SEC in connection with the Special Meeting will also be available, free of charge, at Twitter's investor relations website (https://investor.twitterinc.com) or by writing to Twitter, Inc., Attention: Investor Relations, 1355 Market Street, Suite 900, San Francisco, California 94103.

**Forward-Looking Statements**

This communication contains forward-looking statements that involve risks and uncertainties, including statements regarding: the Transaction, including the expected timing of the closing of the Transaction; considerations taken into account by Twitter's Board of Directors in approving the Transaction; and expectations for Twitter following the closing of the Transaction. If any of these risks or uncertainties materialize, or if any of Twitter's assumptions prove incorrect, Twitter's actual results could differ materially from the results expressed or implied by these forward-looking statements. Additional risks and uncertainties include those associated with: the possibility that the conditions to the closing of the Transaction are not satisfied, including the risk that required approvals from Twitter's stockholders for the Transaction or required regulatory approvals to consummate the Transaction are not obtained; potential litigation relating to the Transaction; uncertainties as to the timing of the consummation of the Transaction; the ability of each party to consummate the Transaction; possible disruption related to the Transaction to Twitter's current plans and operations, including through the loss of customers and employees; and other risks and uncertainties detailed in the periodic reports that Twitter files with the SEC, including Twitter's Annual Report on Form 10-K filed with the SEC on February 16, 2022, and Quarterly Report on Form 10-Q filed with the SEC on May 2, 2022, which may be obtained on the investor relations section of Twitter's website (https://investor.twitterinc.com). All forward-looking statements in this communication are based on information available to Twitter as of the date of this communication, and Twitter does not assume any obligation to update the

forward-looking statements provided to reflect events that occur or circumstances that exist after the date on which they were made, except as required by law.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WOLFRAM ARNOLD, ERIK
FROESE, TRACY HAWKINS,
JOSEPH KILLIAN, LAURA CHAN
PYTLARZ, and ANDREW
SCHLAIKJER,

                Plaintiffs,

      v.

X CORP. f/k/a TWITTER, INC., X
HOLDINGS CORP. f/k/a X
HOLDINGS I, INC. and ELON MUSK,

                Defendants.

C.A. No. 1:23-cv-00528-CFC

## NOTICE OF SERVICE OF SUBPOENA

PLEASE TAKE NOTICE that, pursuant to Rules 30 and 45 of the Federal

Rules of Civil Procedure, Plaintiffs Wolfram Arnold, Erik Froese, Tracy Hawkins,

Joseph Killian, Laura Chan Pytlarz, and Andrew Schlaikjer (collectively,

"Plaintiffs"), through their counsel, have caused to be issued the attached

Subpoena to Produce Documents (Ex. 1), to be served on Simpson Thacher &

Bartlett LLP.

Dated: August 30, 2023

Akiva Cohen (*pro hac vice*)
Dylan M. Schmeyer (*pro hac vice*)
Michael D. Dunford (*pro hac vice*)
Lane A. Haygood (*pro hac vice*)
KAMERMAN, UNCYK, SONIKER & KLEIN P.C.
1700 Broadway, 16th Floor
New York, NY 10019
Tel: (212) 400-4930
acohen@kusklaw.com
dschmeyer@kusklaw.com
mdunford@kusklaw.com

*/s/ Joseph L. Christensen*
Joseph L. Christensen (#5146)
CHRISTENSEN & DOUGHERTY LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Tel: (302) 212-4330
joe@christensendougherty.com

*Attorneys for Wolfram Arnold, Erik Froese, Tracy Hawkins, Joseph Killian, Laura Chan Pytlarz, and Andrew Schlaikjer*

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | |
|---|---|
| WOLFRAM ARNOLD, ERIK FROESE, TRACY HAW | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. C.A. No. 1: 23-cv-00528 CFC |
| X CORP. f/k/a TWITTER, INC., X HOLDINGS CORP. f/k/a X HOLDINGS I, INC. and ELON MUSK | ) |
| *Defendant* | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:           Simpson Thacher & Bartlett LLP

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule A

| Place: Kamerman, Uncyk, Soniker & Klein, P.C.,<br> 1700 Broadway, 16th Floor<br> New York, NY 10019 | Date and Time:<br><br>09/14/2023 9:00 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      08/31/2023

|  |  |
|---|---|
| *CLERK OF COURT* | OR |
| _____<br> *Signature of Clerk or Deputy Clerk* | /s/ Akiva M. Cohen<br> _____<br> *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

 Akiva M. Cohen, Kamerman, Uncyk, Soniker & Klein, P.C., 1700 Broadway, 16th Floor, New York, NY 10019, acohen@kusklaw.com, 212.400.4930

### Notice to the person who issues or requests this subpoena
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   C.A. No. 1: 23-cv-00528 CFC

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❑  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
  **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
  **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

**I.      DEFINITIONS**

1.   The terms "and" and "or" shall be construed both conjunctively and disjunctively to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

2.   The term "any" means any and all.

3.   The term "each" means each and every.

4.   The term "including" means including but not limited to.

5.   Terms in the present tense include the past and future tenses. Terms in the past tense include the present and future tenses. Terms in the future tense include the present and past tenses.

6.   The singular form of terms includes the plural, and the plural form of terms includes the singular.

7.   Terms in the masculine, feminine or neuter form shall include each of the other genders.

8.   The term "THIS ACTION" means the civil action *Arnold et al. v. X Corp et al*. and bearing the case number 1:23-cv-00528. which was filed in the Federal District Court of Delaware on or about May 16, 2023.

9.   The term "MERGER AGREEMENT" means the Agreement and Plan of Merger By and Among X Holdings I, Inc., X Holdings II, Inc., and Twitter, Inc., dated April 25, 2022.

10. The term ACQUISITION FAQ means the document annexed hereto as Exhibit 1, including all prior versions thereof.

11. The term "TWEEP" means "Company Service Provider" as it is defined in the
MERGER AGREEMENT.

12. The terms "YOU" and "YOUR" mean and refer individually and collectively to the
law firm of Simpson Thacher & Bartlett LLP and any attorneys, paralegals, assistants, staff
members, or any other persons acting at its direction or under its supervision, whether during
their time as partners or employees of or when partners or employees of any other law firm. The
terms "YOU" and "YOUR" further mean and refer to any present or former agents,
representatives, employees, attorneys, investigators, and other persons acting under YOUR
authorization, employment, direction, or control, whether employed or retained on a full-time,
part-time, independent contractor, commission, or other basis.

13. The terms "PERSON" and "PERSONS," and the possessive forms of those terms,
mean and include natural persons, corporations, partnerships, limited partnerships, associations,
organizations, joint ventures, governmental units or entities, and any other kind of business or
other entity whether or not employed by YOU; and the acts of a PERSON are defined to include
the acts of a director, officer, owner, member, employee, agent, consultant or attorney acting on
the PERSON's behalf.

14. The term "COMMUNICATION" means any recording of any transfer of information,
ideas, opinions, or thoughts made by any means, at any time or place, under any circumstances,
INCLUDING by a single person hearing or seeing by any means, personal meeting, telephone,
letter, facsimile, and e-mail. COMMUNICATIONS are not limited to direct transfers between
PERSONS, but include other transfers and memorializations, such as records, memoranda to file,
electronic or magnetic transfer of computer files, facsimile transmissions, and teletype
transmission. COMMUNICATIONS may be embodied in any means or media, including

writing, electronic or magnetic storage or computer files, electronic mail, voice mail, answering machine, digital recording, sound recording, and facsimile transmission.

15. The term "DOCUMENTS" means and refers to all "Documents and things" identified in, or within the scope of Federal Rule of Civil Procedure 34(a) and the 1970 Advisory Committee Note thereto, the Local Rules of the United States District Court for the District of Delaware, the District of Delaware Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI"), and any decision interpreting one or more of such rules, and all forms of "writings" and "recordings" as defined by Federal Rule of Evidence 1001(1) and includes, without limitation, all tangible record of intelligence or information, whether handwritten, typed, printed or otherwise visually or orally reproduced, including information stored on magnetic or optical media or in solid state storage devices, notes, drafts, reports, art-work, films, videotape, e-mails, drawings, graphs, photographs, agreements, letters, test data, circuit diagrams, software structure charts, software flow charts, software code, data flow diagrams, hardware schematic diagrams, hardware logic diagrams, field maintenance print sets, timing diagrams, technical summaries, product description documents, software description documents, laboratory or engineers' notebooks, project or progress reports, database information, whether for prototypes or production products, and the like. A draft or non-identical copy bearing on any sheet (front or back), margins, attachment, or enclosure thereof, any mark that is not a part of the original text or reproduction thereof, is a separate document within the meaning of this term.

16. When referring to a human person, "IDENTIFY" means to give, to the extent known, the person's full name, present or last known address, phone number and the present or last known place of employment, if known. Once a person has been identified in accordance with

this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person. When referring to a business or other entity, "IDENTIFY" means to state the entity's full name, present or last known address, and present or last known telephone number, and to describe the nature of its business or other operations. When referring to Documents, "IDENTIFY" means to give, to the extent known, the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s) and all recipient(s), including "cc"s and "bcc"s. When referring to electronically stored information "IDENTIFY" means to give (i) the type of electronically stored information; (ii) its format; (iii) its location; (iv) its date; (v) its author(s), addressee(s) and all recipient(s), including "cc"s and "bcc"s.

17. The term "RELATING TO" or any variants thereof, when used in conjunction with any DOCUMENT, shall be understood to apply if the DOCUMENT directly or indirectly evidences, mentions, discusses, constitutes, concerns, supports, contradicts, refers to, or in any way deals with the subject matter described in the Request in which the term appears.

## II.   INSTRUCTIONS

1.   If, in responding to this Request for Production, the responding party encounters any ambiguities when construing a request of definition, the response shall set forth the matter deemed ambiguous and the construction used in responding.

2.   These Requests call for all DOCUMENTS, electronically stored information, and tangible things on the particular subject (a) in YOUR possession, custody or control, (b) in the possession, custody or control of anyone acting on YOUR behalf, irrespective of who generated, prepared, received, sent, or signed the DOCUMENTS or tangible things.

3.   DOCUMENTS, electronically stored information, and tangible things responsive to these Requests shall be produced as they are kept in the usual course of business, or should be

4

organized and labeled to correspond to categories set forth in these Requests. When produced as kept in the ordinary course of business or as organized and labeled to correspond with the categories set forth in these Requests, the DOCUMENTS and tangible things shall be produced with the folders (or copies thereof) kept by the Person who had the DOCUMENTS in his, her, or its possession, custody or control so that Plaintiffs will know who had the DOCUMENTS or things in his, her, or its possession, custody or control. Please produce DOCUMENTS in such a manner as will facilitate their identification with the particular request or category of requests to which they are responsive. File folders with table or labels identifying DOCUMENTS must be produced intact with the DOCUMENTS. DOCUMENTS attached to each other should not be separated. Selection of DOCUMENTS from files and other sources shall be performed in a manner sufficient to ensure that the source of each Document may be determined, if necessary. To the extent that YOU process hard copy documents for YOUR internal review, including by OCR, such documents should be produced together with all associated electronic information. With respect to electronically stored information, each document produced must be accompanied with filepath information sufficient to identify the storage location and full folder tree information associated with that document and available to YOU when and if the file is viewed in the location in which it is maintained in the ordinary course of business.

    4.  Electronically stored documents should be produced in native format and accompanied by a Concordance/Opticon load file that includes the following metadata fields/information: (1) VOLUME/volume the data was produced on; (2) Custodian/Source of data, indicated, for individuals, as follows: [Last name], [First name]; (3) BEGNO/Start Bates (including prefixes), no spaces; (4) ENDNO/End Bates (including prefix); (5) DOCID/Identical to BEGNO; (6) BEGATTACH/First Bates Number in attachment range; (6) ENDATTACH/Last

Bates Number in attachment range; (7) Record Type/File Type, e-mail, attachment; (8) Subject/As set forth in e-mail; (9) From Author/ [Last name], [First name]; (10) TO/ / [Last name], [First name]; (11) CC/ [Last name], [First name]; (12) BCC/ [Last name], [First name]; (13) Sent Date/E-mail sent date; (14) TITLE/ File name; (15) Date Created/From file header metadata; (16) Date last modified/From file header metadata; (17) File Size/in KB; (18) Application/Application used to create the file; (19) File Path/Original location of the file for loose files email folder location for email and attachments; (20) Doclink/Link to native file on production volume; (21) EXTRACTED TEXT/OCR/Filepath on production volume for extracted text/OCR; and (22) md5hash/Hash value.

5. <u>Partial Production</u>. Whenever a DOCUMENT is not produced in full please state with particularity the reason(s) it is not being produced in full and describe, to the best of YOUR knowledge, information and belief, and with as much particularity as possible, those portions of the DOCUMENT that are not produced and the reasons therefore. If a deposition transcript or other DOCUMENT cannot be produced because it is proprietary or believed to be proprietary, please produce an invoice thereof or otherwise provide information sufficient for Plaintiffs to obtain such transcript or other DOCUMENTS.

6. <u>Documents Withheld</u>. Whenever in these Requests YOU are asked to IDENTIFY or produce a DOCUMENT that is deemed by YOU to be properly withheld from production, Identify the portion of the request, *i.e.*, request number(s), to which the withheld DOCUMENT is responsive and:

      a.   If You are withholding the DOCUMENT under claim of privilege (including but not limited to the work product doctrine), please provide the information set forth in Federal Rule of Civil Procedure 26(b)(5), including:

i)     The type of DOCUMENT;

ii)    The general subject matter of the DOCUMENT;

iii)   The date of the DOCUMENT;

iv)   Such other information as is sufficient to IDENTIFY the DOCUMENT, including, where appropriate, the length of the DOCUMENT, as well as the author, addressees, custodian, and any other recipient of the DOCUMENT, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other, in a manner that, without revealing the information claimed to be protected, will enable this party to assess the applicability of the privilege or protection claimed by YOU;

v)     The nature and basis of the privilege claimed;

vi)   If the privilege claimed is the attorney-client privilege, an indication of which author(s) or addressee(s) is/are attorney(s); and

vii)  Any other information necessary to support the claim of privilege.

b.   If production of any requested DOCUMENT(s) is objected to on the ground the production is unduly burdensome, describe the burden or expense of the proposed discovery;

c.   If YOU are withholding the DOCUMENT for any reason other than an objection that it is beyond the scope of discovery or that a request is unduly burdensome, provide the reason for withholding the DOCUMENT, and the information requested in sections 6(i)(a)-(d) above. Regardless of whether a Protective Order is entered by the Court, in all instances in which YOU are withholding

DOCUMENTS or things on the ground of confidentiality, please so indicate in YOUR responses.

7. Whenever a DOCUMENT contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material. If a privilege is asserted with regard to part of the material contained in a DOCUMENT, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a DOCUMENT has been redacted or altered in any fashion, IDENTIFY as to each DOCUMENT the reason for the redaction or alteration, the date of the redaction or alteration, and the Person performing the redaction or alteration. Any redaction must be clearly visible on the redacted DOCUMENT.

8. To the extent information is maintained in both hard copy and magnetic or electronic form, produce both forms.

9. If a DOCUMENT is in a language other than English, produce both the original and any translation thereof.

10. <u>Orderly Response</u>. Please produce DOCUMENTS in such a manner as will facilitate their identification with the particular request or category of request to which they are responsive. File folders with tabs or labels identifying DOCUMENTS must be produced intact with the DOCUMENTS. DOCUMENTS attached to each other should not be separated. Selection of DOCUMENTS from files and other sources shall be performed in a manner sufficient to ensure that the source of each DOCUMENT may be determined, if necessary.

11. <u>Duty to Produce Continues</u>. Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these discovery requests are intended to be continuing in nature so as to require supplemental or amended responses or answers, or production of additional DOCUMENTS, if

any additional information or DOCUMENTS are obtained in the future. Such supplemental or amended responses or answers or such production of additional DOCUMENTS shall be furnished within ten (10) days of the date on which any additional information or document is obtained.

12. <u>Inability to Produce</u>. If any or all of the DOCUMENTS IDENTIFIED herein are no longer in YOUR possession, custody, or control because of destruction, loss, or any other reason, then please provide the following information for each such Document:

      d.    A description of the content of that Document;

      e.    The location of all copies of the Document;

      f.    A description of the reason why that Document no longer remains in YOUR possession, custody or control; and

      g.    The date of, and the identity of the Person responsible for, its destruction, loss, transfer, or other action by which the Document left YOUR possession, custody or control.

## III.    REQUESTS

### <u>REQUEST NO. 1.</u>

All DOCUMENTS and COMMUNICATIONS RELATING TO Section 6.9 of the MERGER AGREEMENT, including but not limited to DOCUMENTS and COMMUNICATIONS RELATING TO its meaning, intent, purpose, and enforceability, and specifically including any work product, drafts, client communications, comments, or discussions related thereto.

### <u>REQUEST NO. 2.</u>

All DOCUMENTS and COMMUNICATIONS RELATING TO Section 9.7 of the MERGER AGREEMENT, including but not limited to DOCUMENTS and

COMMUNICATIONS RELATING TO its meaning, intent, purpose, and enforceability, and specifically including any work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 3.**

All DOCUMENTS and COMMUNICATIONS RELATING TO the ACQUISITION FAQ, including any work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 4.**

All DOCUMENTS and COMMUNICATIONS RELATING TO communications with TWEEPS regarding the MERGER AGREEMENT, specifically including work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 5.**

To the extent not produced in response to prior requests, all DOCUMENTS and COMMUNICATIONS pertaining to communications with TWEEPS regarding severance or other benefits, from March 1, 2022 through the present, including any work product, drafts, client communications, comments, or discussions related thereto.

**REQUEST NO. 6.**

To the extent not produced in response to prior requests, all DOCUMENTS and COMMUNICATIONS pertaining to TWEEP severance or other benefits, from March 1, 2022 through the present, including work product, drafts, client communications, comments, or discussions.

# EXHIBIT 1



**Table of contents**

Updated as of October 27, 2022
Updates as of October 24, 2022
Updates as of October 21, 2022
Updates as of October 20, 2022
Updates as of October 17, 2022
Updates as of October 6, 2022
Updates as of October 4, 2022
Updates as of September 13, 2022
Updates as of August 30, 2022
Updates as of August 4, 2022
Updates as of July 26, 2022
Updates as of July 13, 2022
FAQs previously provided on May 19, 2022
　　What's happening? (Overview)
　　Process and timeline
　　The Board
　　Leadership
　　Compensation
　　Customers/Advertisers/Business Partners
　　Company culture and benefits
　　Future of Twitter

**Updates as of October 27, 2022**

Please see Elon Musk's Tweet on October 27, 2022 titled, "Dear Twitter Advertisers."

> "I wanted to reach out personally to share my motivation in acquiring Twitter. There has been much speculation about why I bought Twitter and what I think about advertising. Most of it has been wrong.
>
> The reason I acquired Twitter is because it is important to the future of civilization to have a common digital town square, where a wide range of beliefs can be debated in a healthy manner, without resorting to violence. There is currently great danger that social media will splinter into far right wing and far left wing echo chambers that generate more hate and divide our society.
>
> In the relentless pursuit of clicks, much of traditional media has fueled and catered to those polarized extremes, as they believe that is what brings in the money, but, in doing so, the opportunity for dialogue is lost.

That is why I bought Twitter. I didn't do it because it would be easy. I didn't do it to make more. I did it to try to help humanity, whom I love. And I do so with humility, recognizing that failure in pursuing this goal, despite our best efforts, is a very real possibility.

That said, Twitter obviously cannot become a free-for-all hellscape, where anything can be said with no consequences! In addition to adhering to the laws of the land, our platform must be warm and welcoming to all, where you can choose your desired experience according to your preferences, just as you can choose, for example, to see movies or play video games ranging from all ages to mature.

I also very much believe that advertising, when done right, can delight, entertain and inform you; it can show you a service or product or medical treatment that you never knew existed, but is right for you. For this to be true, it is essential to show Twitter users advertising that is as relevant as possible to their needs. Low relevancy ads are spam, but highly relevant ads are actually content!

Fundamentally, Twitter aspires to be the most respected advertising platform in the world that strengthens your brand and grows your enterprise. To everyone who has partnered with us, I thank you. Let us build something extraordinary together."

**Updates as of October 24, 2022**

*Reposting this information that was published in a companywide FAQ from a team@ email on May 13, 2022.*

What is our general severance package if a position is eliminated?

> Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:
>> Two months base salary or On Target Earnings for employees on the Sales Incentive Plan
>> Pro-rated Performance Bonus Plan compensation at target
>> Cash value of equity that would have vested within three months from the separation date
>> A cash contribution for health care continuation.
>
> For Tweeps who are on a work-related visa, we also consider an extended notice period to enable additional time to transfer their visa to a new employer.
>
> Of course, we also comply with local employment laws and apply any additional statutory severance for redundancies that may occur outside of the United States.

**Updates as of October 21, 2022**

> All vested TWTR shares and cash held in EAC accounts have been transferred to your connected Charles Schwab brokerage accounts. Please note that the trading window will remain closed for current employees.

**Updates as of October 20, 2022**

> With the anticipated closing of the merger agreement, there are a lot of teams working in the background to prepare for the transition. We will continue to update go/AcquisitionFAQ on a rolling basis and also send proactive updates and answers to overarching questions.

Please know, as we get closer to deal close, there will continue to be tons of public rumors and speculation. Two things to clarify.

First, we do not have any confirmation of the buyer's plans following close and recommend not following rumors or leaked documents but rather wait for facts from us and the buyer directly.

Second, earlier in the year and as we have shared in public proxy filings, there were targeted cost savings discussions and planning. Those discussions stopped once the merger agreement was signed. As we've shared at #OneTeam meetings, since the merger agreement has been in place, there have been no plans for any company-wide layoffs.

We will continue to keep you all updated with relevant information and updates as we approach closing.

**Updates as of October 17, 2022**

***From the Twitter Equity Award Center (posted October 17, 2022):***

We are writing to let you know of an update related to our Equity Award Center. There is no immediate action for you to take.

In anticipation of the closing of the pending acquisition of Twitter by an entity controlled by Elon Musk (the "Acquisition"), it will be necessary to freeze all activity in the Equity Award Center (EAC) beginning at close of the market today, October 17, 2022. This freeze allows Schwab to perform final reconciliation of employee accounts prior to close of the Acquisition. You will not be able to access balances or transact in the EAC any longer. All vested TWTR shares and cash held in EAC accounts will be transferred to your connected Charles Schwab brokerage accounts and available to you by end of day on Monday, October 24, 2022; however the trading window will remain closed for current employees.

When the Acquisition closes your vested TWTR shares will be automatically converted into the right to receive $54.20 per share in cash in accordance with the terms of the Merger Agreement for the Acquisition. More information about this can be found in go/AcquisitionFAQ.

Participants may also wish to download any personal documents including a copy of their grant agreement PDFs for future reference (watch the tutorial for instructions starting at 1:03). We expect that access to the EAC will cease upon the closing of the Acquisition as Twitter will no longer be a public company and the related equity plans will be terminated. Please note that participants will still have access to their Charles Schwab brokerage accounts after the Acquisition is completed.

***From "ESPP Supplemental Update" (sent October 12, 2022):***

In connection with the execution of the agreement involving the pending acquisition by an entity owned by Elon Musk (the "Acquisition"), participants in Twitter's Employee Stock Purchase Plan (ESPP) previously received an ESPP Update that summarized the treatment of the ESPP leading up to the closing of the Acquisition. The ESPP Update described, in part, that due to the Acquisition, the ESPP offering period that began on November 15, 2021, may have a final purchase date that occurs earlier than its normally scheduled purchase date of November 15, 2022, and that a follow-up notice about any final purchase date would be provided at a later date. Additional information regarding the Acquisition is included in Twitter's definitive proxy statement dated July 26, 2022, filed with the Securities and Exchange Commission (the "SEC")

in connection with the solicitation of proxies to approve the Acquisition and in other relevant documents filed by Twitter with the SEC.

**In anticipation of the possible closing of the Acquisition, the final purchase date under the ESPP for the offering period that began November 15, 2021, has been set to be October 14, 2022.**

Any Tweep who is enrolled in this offering period and remains an ESPP participant through this date will have his or her accumulated ESPP contributions applied to the purchase of shares on October 14, 2022, and then cease participating after such final purchase. No additional ESPP contributions will be deducted after this date, and any accumulated ESPP deductions remaining in any ESPP accounts after the purchase of shares on the final purchase date will be returned to the appropriate participants, in cash, promptly after the final purchase occurs.

The purchase price on the final purchase date will be 85% of the <u>lower of</u> the closing price of a share of Twitter's common stock on (i) November 15, 2021, or (ii) the final purchase date.

More details regarding treatment of the ESPP in connection with the Acquisition can be found in the previous ESPP Update. You also can review the FAQs at go/AcquisitionFAQ if you have any more questions.

**Updates as of October 6, 2022**

> The Chancellor has ordered a stay on our trial, meaning that we will no longer be going to court on October 17. We will work with our buyer to close the acquisition by October 28, per the order.
> If the buyer is unable or unwilling to close by then, we will reconvene with the Chancellor to reschedule the trial for November.
> Our intention remains the same: to close the acquisition at the price and terms in the original merger agreement.

**Updates as of October 4, 2022**

> We received the letter from the Musk parties which they have filed with the SEC. Our intention is to close the transaction at $54.20 per share.
> We are still continuing to litigate this matter in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition. As a reminder, our five-day trial is scheduled to begin October 17, 2022.

**Updates as of September 13, 2022**

What was the result of the stockholder vote?

> Our stockholders approved the adoption of the Merger Agreement between Twitter and affiliates of Elon Musk for $54.20 per share in cash. You can see our press release here.
> Based on a preliminary tabulation following the Special Meeting of Stockholders, approximately 98.6% of the votes cast at the Special Meeting approved the proposal. The approval of our stockholders satisfies the final condition precedent to the closing of the merger (other than those conditions that by their nature are to be satisfied at closing). After certification by the Special Meeting's inspector of

elections, the final voting results will be filed with the SEC. We do not expect that the voting outcome will change after certification.

Obtaining stockholder approval is an important step forward in this process, however we are still continuing to litigate this matter in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition. As a reminder, our five-day trial is scheduled to begin October 17, 2022.

What is happening with Elon Musk's purported termination of the merger agreement?

As previously announced, affiliates of Mr. Musk have delivered notices purporting to terminate the merger agreement. Twitter continues to believe that Mr. Musk's purported termination of the merger agreement is invalid and without merit, and that the Musk parties continue to be bound by the merger agreement and obligated to complete the merger on the agreed terms and conditions. Twitter has filed a lawsuit in the Delaware Court of Chancery to compel Mr. Musk to complete the acquisition, and Twitter remains committed to doing so on the price and terms agreed upon with Mr. Musk.

**Updates as of August, 30, 2022**

What is our response to the buyer's second termination letter?

The buyer sent a second termination letter, and we responded, which you can read in full here. As was the case with the buyer's previous termination letter, his second termination letter is invalid and wrongful. Twitter has breached none of its representations or obligations under the Agreement, and Twitter has not suffered and is not likely to suffer a Company Material Adverse Effect. We remain committed to closing the transaction on the price and terms agreed upon with Mr. Musk.

**Updates as of August 4, 2022**

What is mDAU?

Twitter defines monetizable daily active usage or users (mDAU) as people, organizations, or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day through twitter.com, Twitter applications that *are able to* show ads, or paid Twitter products, including subscriptions. Monetizable means they could see ads or pay Twitter through a subscription, not that they will see ads on any given day. As our filings state, they are on a monetizable client or application.

How does Twitter determine mDAU?

When an account logs in or is otherwise authenticated on Twitter on any given day through twitter.com, Twitter applications that are able to show ads, or paid Twitter products, including subscriptions.

Average mDAU for a period represents the number of mDAU on each day of such period divided by the number of days for such period. Changes in mDAU are a measure of changes in the size of our daily "logged in" or otherwise authenticated active total accounts.

Why do we measure mDAU?

Audience metrics are seldom one size fits all but some form of daily active usage is a typical metric in our industry. Different products have different definitions they employ tailored to their specific service.

mDAU (monetizable daily active user) is designed to be our baseline to gauge broad usage and growth on the Twitter platform.

Monetizable means they *could* see ads or pay for a subscription, not that they *will* see ads. They are on a monetizable client or application.

We are committed to providing something valuable to people on Twitter every day.

As stated in our SEC filings, "We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement."

Our goal is not to disclose the largest user number we can but rather one that has more relevance. mDAU is designed to provide relevance and context to external stakeholders that reflects our goal of delivering value to people on Twitter every day and monetizing that usage.

Why do advertisers trust Twitter?

Twitter has historically built integrity through transparency and consistent operating principles. This approach is unwavering and something that differentiates us.

Twitter has never been more important to our customers around the world. We are working closely with our clients and partners, who can continue to expect our best-in-class customer service, client solutions and commitment to brand safety. We remain focused on delivering priority solutions in areas such as performance marketing, measurement, shopping, brand strategy and more.

We stand by our reporting methods and are transparent with the process for estimating our mDAU, accounts that are spam within mDAU and when updates are made.

As stated in our SEC filings, "We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement."

How do advertisers measure success on Twitter?

The results and metrics associated with campaign objectives are what best determines advertiser ROI.

Campaign objectives could focus on areas such as reach, video views, website traffic, app installs, followers, engagements, etc.

Targeting can focus on: followers, custom audiences, geography, language, interests, device type, etc.

Success metrics may include: Video views, impressions, Site visits, number of app downloads, various cost per data points (i.e. CPI, CPM, CPC, CPE), conversions, brand sentiment, etc.

We work with a variety of first and third party measurement companies to help validate.

Twitter has solutions that help advertisers measure the success of a campaign, maintain privacy, and brand safety:

Twitter First-Party Measurement Solutions

Advertisers can leverage Twitter's suite of first-party measurement solutions to garner learnings such as brand lift, media metrics, viewability, conversions, and more.

Third-Party Measurement Solutions

Advertisers know their ads are being seen using third-party accredited viewability reporting partners

See more here for information on our partners who help advertisers with measurement, Ad analytics, targeting, creative and more.

Twitter + Third-Party Brand Lift Surveys

We help advertisers measure the impact of campaigns on key brand metrics such as awareness, association, favorability, and consideration, using our first-party and third-party Brand Lift Surveys.

Third-Party Viewability — Moat, IAS, DV Direct Integration

We help brands measure the quality of impressions and video views of their media buys with our third-party partners such as MOAT, IAS, and DV.

Advertiser audience targeting:

Via a suite of intuitive, performant, and privacy-compliant tools, we enable advertisers to refine campaign delivery and reach the people that are most likely to be receptive to a brand's message. Advertisers on Twitter can:

Reach people based on who they are with Demographic targeting.

Reach people based on how they access Twitter with Device targeting.

Reach people based on how they engage on Twitter with Audience Features.

Leverage off-platform data to build Custom Audiences on Twitter.

Let Twitter find the people most likely to drive results with Automated Targeting.

Extend reach to people similar to core audience with Audience Expansion.

Enriched Twitter Audiences and Account Based Marketing

Twitter can help advertisers drive even more results with powerful ways to reach our audiences.

Enriched Twitter Audiences are hyper-targeted custom audiences that expand reach, increase engagement, and improve overall

performance. These custom audiences are created by trusted partners using Twitter's data.

For B2B advertisers, Account Based Marketing campaigns identify business decision makers and their influential communities on Twitter.

Across many verticals including gaming, fashion, and pharma, these solutions are making it easier for customers to drive results.

Campaign Planner: New as of June 2022

The tool enables customers to forecast reach, impressions, average frequency, and CPM against a specific audience, campaign duration, frequency setting, placement, and budget for auction-based campaigns.

We've also made it easier than ever to execute reach campaigns by allowing advertisers to start and save a draft campaign directly from the tool.

Campaign Planner is available to advertisers in the United States, United Kingdom, and Japan.

Partners can also tap into tools such as Audience Estimate.

See more here for examples of successful advertising campaigns that include key campaign metrics.

How does Twitter calculate spam?

We shared a comprehensive blog post and Tweet thread about how we define and calculate spam/bots here and here, respectively.

Customers org: If clients have questions, you can use this client-facing language reactively.

Does Twitter use AI and ML to identify spam and bots on the platform?

We do! Specifically, Twitter deploys spam detection capabilities that have resulted, and continue to result, in the suspension of typically more than one million spam accounts every day, including both automated and manual reviews of accounts and activity on the Twitter platform during and after sign-up. Twitter also locks millions of accounts each week that cannot pass human-verification challenges, such as CAPTCHAs or phone verifications.

Our processes encompass a mix of human engagement and automation to identify malicious spam and bots.

We are always testing and exploring ways to further advance our systems for detection and remediation.

Separate from these automated and manual spam-detection processes, Twitter estimates the prevalence of false and spam accounts within mDAU through multiple human reviews (in replicate) of thousands of randomly selected accounts each quarter using both public and private data.

Did Twitter cooperate by providing the Buyer's team the information they were requesting?

Yes. Twitter has continuously shared information with the buyer to consummate the transaction in accordance with the terms of the merger agreement.

Throughout this process we have and will continue to protect proprietary and confidential information of Twitter advertisers and our customers' private user data.

Why didn't Twitter choose to redact any information from the acquirer's countersuit?

We fully stand by our SEC filings, the methodologies we use to calculate mDAU, and our statements about the percentage of spam accounts on our platform.

What is our public response to the countersuit?

The counterclaims are factually inaccurate, legally insufficient, and commercially irrelevant.

Why did Twitter recast its mDAU values three days after signing the agreement?

The updated values for mDAU reflected a change of less than 1% for each impacted period.

Twitter has historically built integrity through transparency and consistent operating principles. We reported this out of an abundance of transparency. Twitter disclosed this recast when we announced Q1 2022 Earnings in April.

Why did Twitter move from disclosing MAU to mDAU in 2019?

We want to provide something valuable to people on Twitter every day, and we believe that mDAU, and its related growth, are the best ways to measure the success of our objectives and to show the size of our audience and engagement.

**Updates as of July 26, 2022**

What's the schedule for our case?

The judge set a schedule for our case in the Delaware Court of Chancery for a five-day trial in October.

Does our Board of Directors recommend how stockholders should vote?

Yes, the Twitter Board of Directors recommends that stockholders vote in favor of the transaction ("FOR").

When is the Special Meeting of Stockholders?

The meeting is scheduled for September 13, 2022 at 10am PT. Anyone who owns TWTR stock (including Tweeps) as of July 22, 2022 is entitled to vote prior to or during the meeting.

What should stockholders expect?

Each stockholder will receive voting materials in the very near future. The materials describe easy ways to vote electronically, over the phone, or by mail. If you received your voting materials by email, you can simply click the "Vote Now" button in the email. Otherwise, the easiest way to vote your shares is to go to proxyvote.com and enter the Control Number(s) provided to you in the materials. Please note that if you hold Twitter shares in more than one account (e.g., in our employee share purchase plan (ESPP), in registered name, or through a personal bank or brokerage account), you'll receive separate emails or hard copies of voting materials for each account. To make sure that all your shares are represented, you must submit a vote for each account in which you hold Twitter shares. You will receive a separate Control Number for each account in which you own shares.

What communications will stockholders receive from Innisfree, our proxy solicitor?

We asked Innisfree to work with us to ensure our shareholders are educated about this important proposal, so you will likely receive more communications from them over the coming weeks via email, phone call and traditional mail. If you have any questions, please call Innisfree at +1 (877) 750-8338 (US/Canada) or +1 (412) 232-3651 (all other countries).

**Updates as of July 13, 2022**

What does Mr. Musk's notice mean? Is the deal now officially off?

No. Mr. Musk's purported termination is invalid and wrongful.
As we noted in our press release and commentary from the Chairperson of our Board, the Twitter Board is committed to closing the merger on the $54.20 price and terms agreed upon with Mr. Musk and plans to pursue legal action to specifically enforce the merger agreement.
Please understand that the Twitter Board and executive management team are continuing to actively manage the process related to the acquisition. We will share information with you as we can, but this is an evolving situation and we may not have, or be able to share, answers to all of your questions.

What is Mr. Musk's goal?

We are not in a position to speculate about Mr. Musk's objectives.

Given that we plan to pursue legal action to enforce the merger agreement, how long will it take to resolve that?

As with many legal matters, it is difficult to predict the duration of this process. We have a group of internal team members and external advisers who are dedicated to this workstream. It is important to remember that during this process, it is business as usual for all of us at Twitter. That means we should continue the important and meaningful work of driving Twitter forward and continuing to deliver value to our users and customers.

Have we shared bot information with Mr. Musk as requested?

We have met our obligations under the merger agreement.

Has Twitter breached the merger agreement?

As stated in the letter attached to our 8-K filing from July 11, 2022, "Twitter has breached none of its obligations under the Agreement," and "As it has done, Twitter will continue to provide information reasonably requested by Mr. Musk under the Agreement and to diligently take all measures required to close the transaction.

Anything more you can share with us about the complaint that we filed on July 12, 2022?

The complaint is public and details why Mr. Musk's purported termination is invalid and wrongful.

Given this is active litigation, we are limited in what we can say beyond our public filings.

We have a group of internal team members and external advisers who are dedicated to this workstream. It is important to remember that during this process, it is business as usual for all of us at Twitter. That means we should continue the important and meaningful work of driving Twitter forward and continuing to deliver value to our users and customers.

What is the likelihood of a settlement? What is our desired outcome?

The Twitter Board is committed to closing the merger on the $54.20 price and terms agreed upon with Mr. Musk.

Why haven't we implemented retention packages or similar for Tweeps?

Tweeps are the heart of Twitter and will always be essential to our success. On June 20, 2022, we sent Mr. Musk a formal request for consent to two tailored employee retention programs that had been vetted by the board and the compensation committee with the assistance of an outside compensation consultant.  Mr. Musk has not provided his consent to implement these programs.

How do we plan to retain talent?

Our attrition is slightly higher than best practice for normal macroeconomic times, but remains inline with current industry trends. We will continue to monitor it to ensure that we can quickly identify any areas of concern and help mitigate where possible.

What's the plan to support the transition of our current projects and work?

Until the transaction closes, we'll be focused on continuing to drive the business forward. We are confident plans for transition will be properly created.

Is there a possibility for layoffs, now or post-close?

We're not looking at company-wide layoffs. However, teams from across the company are reprioritizing and making changes to ensure we are operating responsibly and efficiently in the current operating environment. We may continue to see restructuring and org changes as we continue to align with our revised business needs (as we always have in the past).

What regulatory agencies will need to approve the transaction?

As of July 13, 2022, stockholder approval of the Merger Agreement is the only remaining approval or regulatory condition to consummating the closing of the Merger under the Merger Agreement.

**FAQs previously provided on May 19, 2022**

**What's happening?**

Twitter has entered into a definitive agreement to be acquired by a private entity affiliated with Elon Musk. The purchase price is $54.20 per share. We expect the transaction to close in 2022, subject to the satisfaction of customary closing conditions. Upon completion of the transaction (or the "closing"), Twitter will become a privately held company.

Twitter's board of directors (the "Board") undertook a thoughtful, comprehensive, and deliberate process to review the proposal and unanimously determined the transaction was in the best interests of our stockholders.

There are still several steps to close. Completion of the transaction is subject to the approval of Twitter stockholders, the receipt of applicable regulatory approvals, and the satisfaction of other customary closing conditions.

Upon the closing, Twitter equity awards will be canceled and converted into the right to receive a cash amount of $54.20 (less any applicable exercise price) for each underlying share. The cash amount payable for unvested Twitter equity awards will be payable over the same pre-transaction vesting schedule as the award that was canceled.

The terms of the agreement specifically provide for Tweep annual base salary, bonus opportunities (short/long term incentive (excluding equity) opportunities) and employee benefits so that, in each case, they are no less favorable in the aggregate than the comparable opportunities or benefits, as applicable for at least one year from the closing date.

Between now and closing, we generally will operate Twitter in normal course - just like we always have. In general, we do not expect any changes to Tweep compensation programs and benefits. Twitter RSUs and other equity awards will vest as they normally have. Business decisions will continue to be made by Twitter's leadership.

**Process and timeline**

Why did Twitter enter into this transaction and why do we feel it is still best for stockholders?

The Twitter Board undertook a thoughtful and comprehensive process to review Elon Musk's proposal, with a deliberate focus on value, certainty, and financing. The Twitter Board considered, among other things, Twitter's go-forward prospects in the current market as well as other potential value-creating opportunities.

The Board still believes this transaction, which delivers a substantial cash premium to stockholders, is the best path forward for Twitter's stockholders.

Why did we announce the transaction when we did?

> We announced the deal to employees and the public at the same time as we had a legal and fiduciary responsibility as a public company to do so.

How long will it take for this deal to close?

> We expect the transaction to close in 2022 subject to the satisfaction of customary closing conditions.

Why did we implement a Shareholder Rights Plan ("poison pill")?

> The Board adopted the Shareholder Rights Agreement on April 15, which has been referred to as a "poison pill" in the press. The Board adopted the rights plan to enable all stockholders to realize the full value of their investment in Twitter by reducing the likelihood that any entity, person or group gains control of Twitter through open market accumulation without paying all stockholders an appropriate control premium or without providing the Board sufficient time to make informed judgments and take actions that are in the best interests of shareholders.

Is there a go-shop provision?

> No. All of these details are laid out in the merger agreement that has been filed with the SEC.

What does it mean to become a privately held company? What are the benefits?

> Generally, private companies' shares are not publicly traded or held by a broad group of shareholders.
> Private companies typically do not have to incur costs related to public reporting and may have more flexibility to operate.
> Until the transaction closes, it remains business as usual, and we are continuing to operate normally as an independent, publicly traded company.

Once the deal closes, is there a test for the debt coverage capabilities?
> In an acquisition like this one, it is common for the party acquiring a target company to add debt to the target's balance sheet. In assessing the deal, prospective lenders have considered the leverage ratio, which is one of the credit metrics used to measure the ability of the target company to use its cash flows to repay all its debt obligations, including principal and interest payments.

What does the acquisition mean for our debt?
> The debt balance on our balance sheet will be higher. If you are reading news externally, you have probably seen that Mr. Musk's affiliates received $13B of commitments from banks for loans to partially finance the deal. Twitter will ultimately incur such loans after the transaction closes. A portion of Twitter's existing debt balance, which is $5.2B today, is expected to be repaid in

connection with the closing, and new debt securities are expected to be issued by Twitter.

What are the upcoming major milestones of the deal and when will Tweeps find out?

We expect the transaction to close in 2022, subject to satisfaction of customary closing conditions, including required regulatory and stockholder approvals. In terms of next milestones, we expect to file a preliminary proxy statement in the near future relating to the special meeting of stockholders to vote to approve the merger agreement. Once that document clears SEC review, we will file a definitive proxy statement and then hold the special meeting on the timeline specified in the proxy statement. We will aim to keep you informed of major updates.

Where are we in the acquisition cycle? Do the changes to hiring and cost savings have any implications on this?

We're still on track and working to close the transaction in a timely manner. We expect the transaction to close in 2022, subject to satisfaction of customary closing conditions, including required regulatory and stockholder approval.

**The Board**

What factors did the Board use to evaluate whether this would be in the best interest of stockholders?

As mentioned above, the Board undertook a thoughtful and comprehensive process to review the proposal, with a deliberate focus on value, certainty and financing. The Board's vote to approve the transaction was unanimous.
The Board considered the proposal in light of the company's go-forward prospects and the current market environment, among numerous other considerations.
Additional details of the Board's process will be made available in our future SEC filings.

Did the Board get a fairness opinion? From whom?

Yes, Goldman Sachs and JP Morgan each provided a fairness opinion.

Did the Board lose confidence in the business?

Absolutely not. The Twitter Board considered the proposal in light of Twitter's go-forward prospects and the current market environment, among numerous other considerations.
This transaction is a great outcome for stockholders and demonstrates the tremendous value of Twitter.

**Leadership**

What will Twitter's leadership team look like post-close?

It's too early to speculate on that right now.

For now, our team is focused on continuing to operate our business as we have and taking steps to secure the approvals we need to close the transaction and set Twitter up for continued success as a private company.

Will we have a board of directors post-close? Who will hold our new owner accountable?

Private companies are operated differently than public companies, but they are also subject to many of the same governance requirements and regulations as a public company. Twitter is incorporated in Delaware, which provides rules that dictate our governance.

Are the recent changes to Staff, cost savings, and hiring pause connected to the acquisition? These changes are ones that Twitter has been contemplating and is driving as part of our ordinary course operations and operational improvements. In order to responsibly manage the organization as we sharpen our roadmaps and our work, we need to continue to be intentional about our teams, hiring, and costs. We will continue to remain focused on strengthening our work through increased accountability and execution to make Twitter everything it can be.

## Compensation and Equity Awards

Will this announcement impact promotion decisions and related compensation increases?

No. Until the deal closes, it is business as usual for Twitter, including with respect to promotion decisions or related comp changes.

What will our compensation program look like without RSUs? How will we stay competitive?

Tweeps are the heart of Twitter and will always be essential to our success. We expect our compensation program will reflect that.
It is too early to determine the future of our incentive programs as a private company, but we will share more information as soon as it becomes available. We currently expect to continue to offer competitive rewards (regardless of the underlying currency of those rewards) to attract and retain talent.

Will we grant new Twitter equity awards between now and deal close for promotions and role changes?

We will continue to grant Twitter equity awards until the transaction closes, as we normally would for promotions and role changes. After the transaction closes, we expect our compensation program will be reviewed and updated to account for the fact that we will operate as a privately-held company. We will share more information when it becomes available.

## Existing Twitter Shares and Equity Awards

Will the trading window change as a result of this announcement?

No, the trading window will not change. We're still a public company and we will still report quarterly earnings on the same cadence that we did before, so we expect our calendars generally will be the same. We expect this to be the case until the deal closes.

Should I or can I sell Twitter stock that I own?

As long as you are not in possession of any material nonpublic information (MNPI) regarding Twitter, you are free to trade Twitter stock when trading windows are open. You are still bound by all black-out periods and the other terms of our insider trading policy.

What happens to my existing Twitter equity awards if the transaction closes?

Unless and until the transaction closes, the terms of your Twitter equity awards will remain the same.

Once the transaction closes, then your Twitter equity awards (whether granted under our 2013 Equity Incentive Plan or assumed in an acquisition of your prior employer) will be treated as described below:

**RSUs**

Each vested RSU will be converted into the right to receive the $54.20 purchase price in cash as described below. If RSUs were subject to performance-based vesting, the number of vested RSUs subject to that award will be based on actual achievement.

Each unvested RSU will be converted into the right to receive an amount in cash equal to $54.20. This cash amount will vest in installments on the same vesting schedule that applied to the canceled unvested RSUs it is replacing, subject to continued service through the applicable vesting date. If unvested RSUs were subject to performance-based vesting, the number of RSUs subject to that award will be deemed earned at the target level of achievement.

For example, if you have 100 RSUs that vest on November 1, 2022 (assuming the transaction closes before that date), then you will receive a cash amount equal to $5,420, less applicable tax withholding, on November 1, 2022 through payroll.

Under the terms of the deal, all unvested RSU awards are converted into the right to receive cash in an amount equal to the product of the total number of unvested RSUs and the per share purchase price ($54.20). The resulting cash amount then vests and will be paid to you according to the original vesting schedule subject to your continued service through the applicable vesting dates, which will remain in place.

**Options**

Each vested option will be converted into the right to receive an amount in cash equal to the difference between $54.20 and the option exercise price for each underlying share.

Each unvested option will be converted into the right to receive an amount in cash equal to the difference between $54.20 and the option exercise price for each underlying share. This cash amount will vest on the same vesting schedule that applied to those canceled unvested options it is replacing, subject to continued service through the applicable vesting date.

**Restricted Stock Awards**

Each restricted stock award will be converted into the right to receive $54.20 in cash. This cash amount will vest on the same vesting schedule that applied to the canceled award it is replacing, subject to continued service through the applicable vesting date.

When will the cash amounts for my Twitter equity awards described be paid?

Generally, amounts payable to you for your vested equity awards will be paid to you, less applicable tax withholding, within five business days after the closing of the transaction.

Generally, amounts payable to you for your unvested Twitter equity awards will be paid to you, less applicable tax withholding, through payroll on the same vesting schedule that applied to those equity awards before the transaction, subject to your continued service through the applicable vesting date.

Please consult with your tax advisor as to the tax consequences to you of these payments.

What happens to cash amounts payable for unvested Twitter equity awards if a Tweep departs before the cash amounts are vested?

The cash amounts payable in respect of your unvested Twitter equity awards will only vest and be paid to you if you remain in continuous service with Twitter through the applicable vesting date. If your service with Twitter (or a subsidiary) ends before a portion of such cash amount is vested, you will not receive that portion of the cash amount and it will be forfeited to Twitter.

Do Twitter RSUs have a "change in control" clause that will accelerate vesting if layoffs occur within one year?

Generally, no. Unless you are party to a separate agreement with Twitter, your Twitter equity awards (or the cash amounts payable for such equity awards) will not receive accelerated vesting if your employment is involuntarily terminated following the closing of the transaction (known colloquially as a "double trigger").

As is customary in our industry, only a few of our executives and other senior employees currently have a "double trigger" provision.

Do all Tweeps have the same vesting schedule?

Generally, Twitter equity awards are granted through the annual refresh process or promotion process vest on a quarterly vesting schedule (with vesting dates in February, May, August, and November); however, depending on when a Tweep was hired, their new hire grant may vest outside of those normal dates. The award agreement provided to you upon the grant of your Twitter equity award will contain your applicable vesting schedule.

Will the $54.20 purchase price change with the fluctuation of Twitter's current stock price or because of inflation?

No, the transaction price of $54.20 per share is fixed, including for purposes of future cash payouts for equity awards on the same vesting schedule.

For International Tweeps, as individual RSUs convert into the cash equivalent of $54.20 post-close, will international Tweeps receive this in U.S. dollars through their brokerage account (ex: Schwab) or will it be converted into local currency and deposited into their payroll?

Finance and Payroll are working on this now, however, the merger agreement provides that cash amounts paid in respect of unvested Twitter equity awards will be paid in U.S. dollars. We will share more information when it becomes available.

**New hires and offers**

Will new hires continue to receive RSUs?

Yes, we expect we will continue our current practices for new hire grants up until the close.

Are there any changes to the methodology for how new hire grants are converted to shares?

No, until the closing of the transaction, we expect we will continue our current equity granting practices.

How will this announcement affect new Tweeps who have signed an offer letter with RSUs, but have not yet joined the company? What should we tell candidates that have equity in their current offer letters?

New Tweeps will still be granted their RSUs subject to the terms of their offer letters, however depending on the timeline of closing and their vesting schedule, they may receive equivalent cash payments in respect of those RSUs.

What do we tell candidates if they ask us about this announcement during an interview?

> Please point them to the press release (Parag Tweeted a link to it) for all of the specific details related to the announcement.
> You may use this FAQ to answer questions for candidates and use the What's happening? section of this doc for key messages to third parties.

**ESPP**

> If you are a current ESPP participant, your accumulated ESPP contributions will be used to purchase shares on May 16, 2022, unless you withdraw in advance of the purchase date. There will not be a new offering period beginning on May 16, 2022, and any current ESPP participant who is enrolled in the ESPP offering period that began on May 15, 2021 will cease participating in the ESPP after May 16, 2022.
> If you are a current ESPP participant who is enrolled in the offering period that began on November 15, 2021, you may continue to participate in the ESPP following May 16, 2022. The final purchase date is scheduled to occur on November 15, 2022, or, if earlier, a date that is at least 10 business days prior to the date on which the transaction closes. Following the final purchase date, the ESPP will then terminate, subject to the closing of the transaction.
> If you are a current ESPP participant, you may not make any increases to your ESPP contribution rate.
> Shares received through the exercise of an ESPP purchase right will be converted at the closing of the transaction into the right to receive $54.20 per share in cash.
> You may opt out of the ESPP at any time through Charles Schwab. If you opt out of the ESPP prior to a purchase date, you will be refunded the accumulated but unused contributions in your ESPP account.

**Customers/Advertisers/Business Partners**
*Tweeps: *Please see the email from Sarah Personette with an email template to send to clients and partners**
How will this transaction impact business partners? Customers?

> The service has never been more important to our customers around the world, and the work of our teams is critical.
> Partners can continue to expect our best-in-class customer service, client solutions, and commitment to brand safety.
> We cannot speculate on changes Elon Musk may make post closing.
> While Twitter has signed the deal, there are still more steps to take in order to close, which is expected to be in 2022.
> For now, there will be no changes as a result of this announcement.
> Any changes will be communicated as they always have.

Will there be changes to how advertisers potentially leverage Twitter?

> During the period until closing, Twitter will operate as it always has.
> Advertisers can continue to turn to Twitter to drive awareness and consideration for their products and services when they want to launch something new or connect with what's happening.
> We remain focused on delivering priority solutions in areas such as performance marketing, measurement, shopping, brand strategy, and more.
> Any changes will be communicated as they always have.

Will there be any changes to our advertising model?

> Until the transaction closes, it is business as usual for us.
> We remain committed to our product roadmap that helps businesses Launch something, connect with what's happening, and help people buy their products or services.
> We continue to support businesses - big and small - to be able to do this with both our native and paid solutions.
> Our commitment to our customers remains unchanged.

Will there be any changes to our commitment to brand safety in light of freedom of speech comments?

> Until the transaction closes, it is business as usual for us, including with respect to our terms of service.
> Everything we do centers around people.
> At the core of Twitter, we are an organization focused on how we create a space for all voices to have a chance to participate in the public conversation.
> For us, we seek to tackle it by focusing on our Policies, Products, and Partnerships.
> We have no planned changes to our commitment to brand safety and will continue to lead in products that protect, policies that lead, and partnerships that matter.

## **Company culture and benefits**

How will our acquisition impact our IDEA goals, and how can we ensure that Twitter maintains its values and commitment to social responsibility?

> Twitter is an open service that's home to a world of diverse people, perspectives, ideas, and information, and our IDEA principles and commitment to social responsibility will continue to be an integral part of our company's core.
> Our Tweepforce representation goals remain in place, and we are committed to delivering on our IDEA roadmap during this period.

## **Benefits/perks**

What does the future hold for reimbursements, allowances, and other perks?

We do not expect any changes to these programs at the moment.

Are there any changes to parental leave benefits or medical, dental, and vision benefits?

We do not expect any changes to these programs at the moment.
The agreement provides for Tweep benefits, base salary, and bonus opportunities (short/long term incentives) to continue on a comparable basis for at least one year following the close of the transaction.

Are there any plans to adjust benefits for hourly employees prior to the closing?
We do not expect any benefits to change for our hourly Tweeps at this time.

## Remote work

Will our commitment to flexible/remote work change?

We do not expect our policies around remote work to change at this time. A significant portion of our workforce is either fully or partially remote. That is how we have worked the last several years and that is how we currently expect to work going forward during this time.

## Contractors and Interns

How will this announcement affect contractors? Will their contracts be cut short upon close?

We do not expect any changes to our contingent workforce at this time.

Will contractor conversions to FTE be considered in 2022 while we wait for the deal to close?

These decisions will be handled on a case-by-case basis. As always, please stay close to your S&O and FP&A partners, as well as your Staff lead for hiring and conversion decisions.

Are there any changes to our intern program?

We have no current plans to change our intern program.

## Immigration/Visas

What impact will there be for employees being sponsored through work visas?

There is no impact to employer-sponsored visas at this time. When the deal closes, we anticipate that your employing entity will remain the same, and thus there will be no impact to your visa status. If you have questions about your individual immigration status, please contact talentmobility@twitter.com.

## Communications

What are we doing to prevent leaks?

Employees are held to the standards laid out in our Playbook, which includes communications guidelines.
Leaks hurt the company's ability to communicate in the best way possible.
We do our part to investigate how information leaks and handle accordingly.

Why do Twitter employees find out big news like this at the same time as the public?

We do our best to share information with all of you as soon as we're able.
In this case, there are laws in place (such as Regulation FD) that require we disclose information to all members of the investment community at the same time. These laws help to ensure investors receive information at the same time. Given employees are also shareholders, we cannot selectively disclose information ahead of other audiences.

I'm being approached by the press, or people I don't know, for comments on Twitter. What should I do?

Please continue to handle any inquiries in accordance with Twitter's policies. Press or other inquiries should be directed to the appropriate parties within Twitter for response. Please raise any concern to CorpSec@, even if you're unsure about the intention of the question. If you are approached by the press, please forward any inquiries to press@twitter.com.

**Future of Twitter**

How will the product be impacted? Will there be any changes to the user experience?

Until the transaction closes, it is business as usual for us, including with respect to our products. We are always iterating to make Twitter the best it can be for people on the service. When there are changes, we will be sure to communicate as we always have.

Will our policies around content moderation change?

Until the transaction closes, it is business as usual for us, including with respect to our terms of service. As we always do, we will continue evolving and iterating to improve the product and the health of the public conversation during this time.

Should we be prepared to dial back our work over the next few months, and correspondingly our budgets?

Between now and close, we should continue operating Twitter in normal course as a public company.
We should always be mindful of our expenses and ensure we're seeing a corresponding return on investment.

Are our priorities changing as a company, or should we continue working on existing projects? Should we still focus on our current OKRs?

Until the transaction closes, it remains business as usual and we are continuing to operate normally as an independent, publicly-traded company.

While the deal is still pending, we must continue to execute and advance our existing strategy.

**Protections**

How will the closing of the transaction affect employee benefits and compensation?

The merger agreement provides special protection for Tweep compensation and benefits for one year following the closing of the transaction.

Specifically, the agreement specifically provides that, for one year following the closing of the transaction, the purchasing entity will:

Maintain existing base salary and wage rates of continuing Tweeps

Provide continuing Tweeps with short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those than existing compensation opportunities, although equity compensation may or may not be granted in the future

Provide continuing Tweeps with employee benefits (excluding equity and equity-based awards) that are substantially comparable in the aggregate to existing benefits

Provide continuing Tweeps whose employment are terminated during such period with severance payments and benefits that are no less favorable than those applicable to an applicable employee prior to the closing of the transaction

Recognize continuing Tweeps' service to Twitter in determining eligibility, vesting and determination of the level of benefits applicable to such employees following the closing of the transaction

Waive requirements for continuing Tweeps to satisfy any deductible, co-payment, out-of-pocket maximum or similar requirements under the acquiring entity's benefits plans to the extent the employee has made correlating previously credited payments under a Twitter benefit plan

Waive waiting periods, preexisting condition exclusions and requirements to show evidence of good health for continuing Tweeps

What will happen to Twitter user data/IP after the deal closes? Will any of our policies regarding data protection, including with regard to employee specific information, be impacted by this announcement?

We will continue to treat information with the utmost protection and operate consistent with the laws.

If I'm on a company sponsored visa, are there any risks if I travel outside of the country during the closing period?

We recognize that there are a lot of questions about Tweeps working on a company sponsored visa. For specific questions about your individual status, please contact talentmobility@twitter.com.

**Compliance**

Do we expect any potential risks as a private social media company from a regulatory standpoint?

> As a private company, Twitter will still have to comply with any rules and regulations that govern the activities of social media companies. The same risks apply as they do now and if you have any questions, you should consult with the Compliance team.

**Additional Information and Where to Find It**

On May 17, 2022, Twitter Inc. ("Twitter") filed a preliminary proxy statement in connection with its Special Meeting of Stockholders (the "Special Meeting") related to the pending acquisition of Twitter (the "Transaction"). Prior to the Special Meeting, Twitter will furnish a definitive proxy statement to its stockholders, together with a proxy card. STOCKHOLDERS ARE URGED TO READ THE DEFINITIVE PROXY STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION. Detailed information regarding the names, affiliations and interests of individuals who are participants in the solicitation of proxies of Twitter's stockholders is available in Twitter's preliminary proxy statement.

Stockholders may obtain, free of charge, Twitter's proxy statement (in both preliminary and definitive form), any amendments or supplements thereto, and any other relevant documents filed by Twitter with the U.S. Securities and Exchange Commission (the "SEC") in connection with the Special Meeting at the SEC's website (http://www.sec.gov). Copies of Twitter's definitive proxy statement, any amendments or supplements thereto, and any other relevant documents filed by Twitter with the SEC in connection with the Special Meeting will also be available, free of charge, at Twitter's investor relations website (https://investor.twitterinc.com) or by writing to Twitter, Inc., Attention: Investor Relations, 1355 Market Street, Suite 900, San Francisco, California 94103.

**Forward-Looking Statements**

This communication contains forward-looking statements that involve risks and uncertainties, including statements regarding: the Transaction, including the expected timing of the closing of the Transaction; considerations taken into account by Twitter's Board of Directors in approving the Transaction; and expectations for Twitter following the closing of the Transaction. If any of these risks or uncertainties materialize, or if any of Twitter's assumptions prove incorrect, Twitter's actual results could differ materially from the results expressed or implied by these forward-looking statements. Additional risks and uncertainties include those associated with: the possibility that the conditions to the closing of the Transaction are not satisfied, including the risk that required approvals from Twitter's stockholders for the Transaction or required regulatory approvals to consummate the Transaction are not obtained; potential litigation relating to the Transaction; uncertainties as to the timing of the consummation of the Transaction; the ability of each party to consummate the Transaction; possible disruption related to the Transaction to Twitter's current plans and operations, including through the loss of customers and employees; and other risks and uncertainties detailed in the periodic reports that Twitter files with the SEC, including Twitter's Annual Report on Form 10-K filed with the SEC on February 16, 2022, and Quarterly Report on Form 10-Q filed with the SEC on May 2, 2022, which may be obtained on the investor relations section of Twitter's website (https://investor.twitterinc.com). All forward-looking statements in this communication are based on information available to Twitter as of the date of this communication, and Twitter does not assume any obligation to update the

forward-looking statements provided to reflect events that occur or circumstances that exist after the date on which they were made, except as required by law.