# Exhibit 4

1. DOCUMENTS[1] and COMMUNICATIONS RELATED TO Twitter, Inc.'s severance program or policy as it existed prior to the MERGER, including but not limited to the TWITTER SEVERANCE MATRIX and all drafts or versions thereof and COMMUNICATIONS RELATED THERETO.

2. DOCUMENTS and COMMUNICATIONS RELATED TO deviations from the TWITTER SEVERANCE MATRIX since January 1, 2019.

3. DOCUMENTS and COMMUNICATIONS RELATED TO Section 6.9 of the MERGER AGREEMENT, including but not limited to DOCUMENTS and COMMUNICATIONS RELATED TO its negotiation, interpretation, and enforceability.

4. To the extent not produced in response to a prior Request, DOCUMENTS and COMMUNICATIONS RELATED TO TWITTER's intent, prior to executing the MERGER AGREEMENT, to obligate the acquiring party to pay SEVERANCE to terminated CONTINUING EMPLOYEES.

5. To the extent not produced in response to a prior Request, DOCUMENTS and COMMUNICATIONS RELATED TO MUSK's and/or X HOLDINGS' intent, prior to executing the MERGER AGREEMENT, to pay SEVERANCE to terminated CONTINUING EMPLOYEES, including but not limited to any intent not to pay such SEVERANCE.

6. DOCUMENTS SUFFICIENT TO SHOW the total amount of SEVERANCE that would have been owed to all terminated CONTINUING EMPLOYEES, as a group, had RESPONDENTS paid each terminated CONTINUING EMPLOYEE the full SEVERANCE applicable to them under TWITTER'S SEVERANCE MATRIX.

7. DOCUMENTS and COMMUNICATIONS RELATED TO any COMMUNICATION from TWITTER to its employees RELATING TO SEVERANCE, from January 2019 through the present, including but not limited to COMMUNICATIONS between, among, or within any of the

---

[1] Terms written in all-caps are defined in the relevant document requests.

RESPONDENTS RELATING TO COMMUNICATIONS with such employees, and including but not limited to discussions of the expected or intended impact of such COMMUNICATION.

8. DOCUMENTS and COMMUNICATIONS RELATED TO any COMMUNICATION from TWITTER to its employees RELATING TO the MERGER AGREEMENT, including but not limited to COMMUNICATIONS between, among, or within any of the RESPONDENTS RELATING TO COMMUNICATIONS with such employees.

9. DOCUMENTS and COMMUNICATIONS RELATED TO any COMMUNICATION from TWITTER to its employees RELATING TO the MERGER, including but not limited to COMMUNICATIONS between, among, or within any of the RESPONDENTS RELATING TO COMMUNICATIONS with such employees.

10. To the extent not produced in response to a prior Request, DOCUMENTS and COMMUNICATIONS RELATED TO the ACQUISITION FAQ, including but not limited to DOCUMENTS RELATED TO its purpose, drafting, editing, review, publication, authorization, impact, and intended impact.

11. To the extent not produced in response to a prior Request, DOCUMENTS and COMMUNICATIONS RELATED TO the SEVERANCE POLICY EMAIL, including but not limited to DOCUMENTS RELATED TO its purpose, drafting, editing, review, publication, authorization, impact, and intended or expected impact.

12. To the extent not produced in response to a prior Request, DOCUMENTS and COMMUNICATIONS RELATED TO TWITTER's employee retention in the period between the execution of the MERGER AGREEMENT and the close of the MERGER, including but not limited to DOCUMENTS and COMMUNICATIONS RELATED TO how TWITTER could retain employees, the anticipated impact of the MERGER AGREEMENT on employee retention, concerns about employee retention, and messaging to TWITTER employees in connection therewith.

13. To the extent not produced in response to a prior Request, DOCUMENTS and COMMUNICATIONS RELATED TO YOUR decision to extend the SEVERANCE OFFER, including but not limited to DOCUMENTS and COMMUNICATIONS RELATED TO the making of the decision, the communication of the decision to the affected employees, and DOCUMENTS sufficient to show who approved the decision.

14. DOCUMENTS and COMMUNICATIONS RELATED TO the meaning and enforceability of the provision of the TWITTER offer letter that recites that employees will be provided benefits in accordance with TWITTER's benefits plans.

15. To the extent not produced in response to a prior Request, DOCUMENTS and COMMUNICATIONS RELATED TO YOUR obligations under the MERGER AGREEMENT in connection with SEVERANCE and benefits, including but not limited to analyses of such obligations or their budgetary impact.

16. To the extent not produced in response to a prior Request, YOUR budgetary projections for TWITTER, limited, solely for responsive DOCUMENTS created by or at TWITTER, to such budgetary projections created on or after January 1, 2022.

17. DOCUMENTS and COMMUNICATIONS RELATED TO the ORGANIZATION CHARTS, including but not limited to the ORGANIZATION CHARTS, DOCUMENTS RELATED TO how members of the TRANSITION TEAM came to appear on the ORGANIZATION CHARTS, and DOCUMENTS RELATED TO how members of the TRANSITION TEAM obtained the positions reflected on the ORGANIZATION CHARTS.

18. DOCUMENTS and COMMUNICATIONS RELATED TO how members of the TRANSITION TEAM were compensated, including but not limited to any contracts, pay stubs, and hiring documents.

19. DOCUMENTS and COMMUNICATIONS RELATED TO MUSK's direct control of and domination over TWITTER, including but not limited to DOCUMENTS RELATED TO any

TWITTER moderation decisions over which MUSK had influence (such as the decision to ban the @ElonJet account), DOCUMENTS RELATED TO TWITTER's decision to change its brand to "X" (including but not limited to brand studies, if any, on the impact of the change), DOCUMENTS RELATED TO MUSK's influence on hiring and firing decisions, DOCUMENTS RELATED TO any adjustment of the Twitter algorithm or other "back-end" work in connection with increasing the visibility of or engagement with MUSK's tweets (including but not limited to DOCUMENTS sufficient to show any corporate benefit to TWITTER from such work), and DOCUMENTS RELATED TO MUSK's influence on TWITTER's decisions with respect to paying its bills (including but not limited to rent, vendors, insurance, and other bills).

20. DOCUMENTS and COMMUNICATIONS RELATED TO the commingling of assets between and among MUSK ENTITIES, including but not limited to DOCUMENTS sufficient to show: (a) what assets (including funds and employees) of other MUSK ENTITIES were used for the benefit of TWITTER, (b) when and how, if at all, TWITTER compensated such other MUSK ENTITIES for the use of such assets, (c) what assets of TWITTER were used for the benefit of other MUSK ENTITIES, and (d) when and how, if at all, TWITTER was compensated by such other MUSK ENTITIES for the use of such assets.

21. DOCUMENTS and COMMUNICATIONS sufficient to confirm or deny MUSK's claim, publicly available at https://x.com/elonmusk/status/1616706530841333761?s=20, that less than 10 employees of the MUSK ENTITIES worked for Twitter.

22. DOCUMENTS sufficient to show the shareholders in X HOLDINGS and the percentages held by each shareholder, including changes to the list of shareholders or their percentages since April 20, 2022

23. A copy of any Shareholder's Agreement, bylaws, or other documents governing the relationship among shareholders of, or the operations of, X HOLDINGS.

24. DOCUMENTS and COMMUNICATIONS relating to any agreements between TWITTER or X HOLDINGS, on the one hand, and any MUSK ENTITY on the other.

25. DOCUMENTS and COMMUNICATIONS RELATED TO layoffs or terminations performed since the execution of the Merger Agreement, including but not limited to plans, considerations, charts, spreadsheets, and analyses RELATED THERETO, the full content of any Slack channels in which layoff criteria or lists were discussed by individuals with input into the layoffs, DOCUMENTS and COMMUNICATIONS RELATED TO "kill," "real human," and "must keep" lists, and evaluative metrics used in connection therewith, including but not limited to metrics RELATED TO time in the office or contributions within three months of the close of the MERGER, and including but not limited to any disparate impact analysis performed by TWITTER in connection with such layoffs or terminations or DOCUMENTS and COMMUNICATIONS RELATED TO the decision not to perform such an analysis.

26. DOCUMENTS and COMMUNICATIONS RELATED TO any plans or hopes for any voluntary reduction in force, including but not limited to MUSK's text messages RELATED THERETO.

27. DOCUMENTS and COMMUNICATIONS RELATED TO discrimination claims made by MUSK ENTITY employees, contractors, or vendors and against MUSK, any member of the TRANSITION TEAM, or any MUSK ENTITY, including but not limited to TWITTER, and including but not limited to claims made only informally.

28. DOCUMENTS and COMMUNICATIONS RELATED TO any complaint for discrimination presented to Twitter HR since the execution of the Merger Agreement.

29. DOCUMENTS and COMMUNICATIONS RELATED TO comments on race, gender, sexuality, national origin, ethnicity, disability, age, religion, gender identity or expression, or other protected status by MUSK, members of the TRANSITION TEAM, or other TWITTER employees, officers, or directors, including but not limited to MUSK's tweets (including deleted tweets)

RELATING TO such issues, and specifically including but not limited to DOCUMENTS RELATED TO the alteration of TWITTER's Headquarters sign to read "TITTER".

30. DOCUMENTS and COMMUNICATIONS since the close of the MERGER RELATED TO TWITTER's Diversity, Equity, and Inclusion efforts and initiatives, if any.

31. DOCUMENTS sufficient to show the job descriptions for each employee terminated by TWITTER since October 28, 2022.

32. DOCUMENTS and COMMUNICATIONS RELATED TO retaining or firing any employee who was on family or medical leave at the time the decision to fire or retain the employee was made.

33. DOCUMENTS and COMMUNICATIONS RELATED TO retaining or firing any employee who had provided notice of an upcoming family or medical leave prior to the time the decision to fire or retain the employee was made.

34. DOCUMENTS sufficient to show the demographic information of each employee terminated by TWITTER since the close of the MERGER, including but not limited to those employees TWITTER contends resigned as a result of the FORK IN THE ROAD email, and including but not limited to DOCUMENTS sufficient to show whether such employees were on leave at the time of their termination, had returned from leave within three months of their termination, or were scheduled to take leave within three months of their termination.

35. DOCUMENTS and COMMUNICATIONS sufficient to show the date on which access to the Twitter systems was terminated for every employee TWITTER contends resigned as a result of the FORK IN THE ROAD email.

36. DOCUMENTS and COMMUNICATIONS sufficient to show TWITTER's benefits package as it existed prior to the EFFECTIVE DATE, including but not limited to the value to of the benefits package to each CONTINUING EMPLOYEE and the average cost to TWITTER per CONTINUING EMPLOYEE of such benefits package.

37. DOCUMENTS and COMMUNICATIONS sufficient to show changes to TWITTER's benefits package for the period from the EFFECTIVE DATE to the present day, including but not limited to the value of the package to each CONTINUING EMPLOYEE before and after each change and the per-CONTINUING EMPLOYEE cost to TWITTER before and after each change, and including but not limited to DOCUMENTS sufficient to show changes to TWITTER's parental leave policies.

38. DOCUMENTS and COMMUNICATIONS RELATING TO CONTINUING EMPLOYEES' access to benefits while on non-working leave, including but not limited to charitable matching, cell phone and internet reimbursements, health, wellness, and learning allowances, and other expense reimbursement and processes relating thereto.

39. DOCUMENTS and COMMUNICATIONS RELATING TO payment of OTE, commissions, or other incentive-based payments to CONTINUING EMPLOYEE S on non-working leave.

40. DOCUMENTS, COMMUNICATIONS, and RECORDS relating to any work that any CONTINUING EMPLOYEE was asked to perform while on non-working leave, including but not limited to consulting, sharing of information, or brainstorming and problem-solving, including but not limited to DOCUMENTS and COMMUNICATIONS RELATING TO the decision to ask that CONTINUING EMPLOYEE to perform work, the method by which the CONTINUING EMPLOYEE was contacted, engaged, and compensated for that work, and the benefit of that work to TWITTER.

41. DOCUMENTS and COMMUNICATIONS RELATING TO policies that YOU contend applied to CONTINUING EMPLOYEES during non-working leave.

42. DOCUMENTS and COMMUNICATIONS RELATING TO the impact of staffing levels on TWITTER'S short and long term financial situation.

43. DOCUMENTS and COMMUNICATIONS RELATING TO the suspension of benefits for CONTINUING EMPLOYEES on non-working leave.

44. DOCUMENTS and COMMUNICATIONS RELATING TO the suspension of access to internal resources for CONTINUING EMPLOYEES on non-working leave, including but not limited to WORKDAY and CONCUR.

45. DOCUMENTS and COMMUNICATIONS RELATING TO the performance and function of the "peoplequestions@twitter.com" email address, including but not limited to the staffing, policies for responsiveness, and Google form associated with the address, including but not limited to DOCUMENTS and COMMUNICATIONS sufficient to show the average time to a substantive response to questions submitted to the email address and DOCUMENTS and COMMUNICATIONS sufficient to show what percentage of questions submitted to the email address were ever substantively answered.

46. DOCUMENTS and COMMUNICATIONS RELATING TO leave payments to CONTINUING EMPLOYEES on non-working notice, including but not limited to short- and long-term disability leave, parental leave, personal medical leave, and sabbatical leave.

47. DOCUMENTS and COMMUNICATIONS RELATING TO WARN compliance, including but not limited to, compliance with the WARN Acts of individual states, such as the California WARN Act and the New York WARN Act.

48. DOCUMENTS and COMMUNICATIONS RELATING TO purported voluntary reductions in force, including but not limited to FORK IN THE ROAD.

49. DOCUMENTS and COMMUNICATIONS RELATING TO YOUR expectations regarding and implementation of FORK IN THE ROAD, including but not limited to COMMUNICATIONS from employees who did not "click the button" but who were willing to continue working at TWITTER, YOUR expectations and assumptions about who would or would not "click the button", YOUR expectations and assumptions about how many CONTINUING

EMPLOYEES would or would not "click the button," and YOUR plans for what to do if vital employees did not "click the button."

50. DOCUMENTS and COMMUNICATIONS RELATING TO accommodations for CONTINUING EMPLOYEES after the close of the MERGER, including but not limited to disabled CONTINUING EMPLOYEES, CONTINUING EMPLOYEES with caregiving responsibilities, and CONTINUING EMPLOYEES whose religious practices could affect their availability after the close of the MERGER.

51. DOCUMENTS and COMMUNICATIONS after the close of the MERGER RELATING TO employees' right to return to a similar job at the end of leave under FMLA/CFRA.

52. DOCUMENTS constituting, reflecting, or RELATING TO YOUR policies and practices regarding the termination of any employee, from January 1, 2019 through the present.

53. DOCUMENTS sufficient to IDENTIFY all PERSONS involved in developing YOUR policies and practices regarding the termination of any employee, from January 1, 2019 through the present.

54. DOCUMENTS sufficient to IDENTIFY all PERSONS involved in implementing YOUR policies and practices regarding the termination of any employee, from January 1, 2019 through the present.

55. DOCUMENTS constituting, reflecting, or RELATING TO any training YOU provide to PERSONS involved in implementing YOUR policies and practices regarding the termination of any employee, from January 1, 2019 through the present.

56. DOCUMENTS that describe or IDENTIFY the PERSONS involved in making and reviewing decisions regarding the termination of any employee, from January 1, 2019 through the present.

57. DOCUMENTS that describe or relate to the criteria YOU use to make and review decisions regarding the termination of any employee, from January 1, 2019 through the present.

58. DOCUMENTS that reflect or relate to YOUR policies and practices for reviewing YOUR decisions regarding the termination of any employee for compliance with all federal and state wage and hour and anti-discrimination laws, from January 1, 2019 through the present.

59. DOCUMENTS that reflect or relate to any reviews, studies, or evaluations of demographic disparities in YOUR decisions regarding termination decisions, including but not limited to DOCUMENTS reflecting the findings of any such reviews, studies, or evaluations; any reports based on such reviews, studies, or evaluations; COMMUNICATIONS among YOUR managers, officers, and/or directors regarding such reviews, studies, or evaluations; and any DOCUMENTS reflecting changes to YOUR policies and practices in response to such reviews, studies, or evaluations.

60. COMMUNICATIONS RELATED TO TWITTER between MUSK and/or the TRANSITION TEAM and Parag Agrawal or any other TWITTER executive.

61. DOCUMENTS and COMMUNICATIONS RELATING TO Parag Agrawal's understanding of TWITTER's commitments to the CONTINUING EMPLOYEES in light of the change in the ownership of the company.

62. DOCUMENTS and COMMUNICATIONS from and/or between MUSK, the TRANSITION TEAM, or members of TWITTER's Board of Directors RELATING TO layoffs, terminations, and the offer of one-month's salary as severance to CONTINUING EMPLOYEES.

63. DOCUMENTS and COMMUNICATIONS relating to the ACQUISITION FAQ, including but not limited to DOCUMENTS and COMMUNICATIONS sufficient to show the authorship and approval of the ACQUISITION FAQ.

64. DOCUMENTS and COMMUNICATIONS RELATING TO the payment of vested RSUs to CONTINUING EMPLOYEES during the period beginning November 1, 2022 and ending June 30, 2023.

65. DOCUMENTS and COMMUNICATIONS RELATING TO employee retention, from April 15, 2022 through October 31, 2022, including but not limited to DOCUMENTS and COMMUNICATIONS relating to the review, delay, suspension, or timing of payment of retention bonuses.

66. DOCUMENTS and COMMUNICATIONS RELATING TO YOUR intent at any time not to comply with any particular provision of the MERGER AGREEMENT, including but not limited to the provisions requiring payment of SEVERANCE or payment for Director & Officer Insurance.

67. DOCUMENTS and COMMUNICATIONS RELATING TO TWITTER's parental leave policies.

68. DOCUMENTS and COMMUNICATIONS RELATING TO TWITTER's refusals to pay contractors or vendors.

69. DOCUMENTS and COMMUNICATIONS RELATING TO TWITTER's Carrot benefit program, including but not limited to COMMUNICATIONS to TWITTER employees about the benefit prior to the MERGER.

70. DOCUMENTS and COMMUNICATIONS RELATING TO YOUR decision to make changes to the Carrot benefit after the MERGER, including but not limited to COMMUNICATIONS involving the effects of reduction of benefits on affected employees, discussions regarding the amount of notice to provide, discussions regarding the reduction or discontinuation of benefits while employees were still making their payments for participation, and discussions involving the resumption of payments to the program.

71. DOCUMENTS and COMMUNICATIONS RELATING TO Andrew Musk's, James Musk's, Ross Nordeen's, Steve Davis's, Jehn Balajadia's and/or Ashok Elluswaarmy's work for TWITTER, including but not limited to, for each such individual, any employment contract or independent contractor agreement, document outlining a scope of work or placement within

TWITTER's reporting structure, performance reports or supervisor evaluations, and W2 or 1099 forms for calendar years 2022 and 2023.

72. DOCUMENTS and COMMUNICATIONS RELATING TO the employment and/or work for TWITTER of any member of the TRANSITION TEAM, including but not limited to employment contracts or independent contractor agreements, documents outlining a scope of work or placement within TWITTER's reporting structure, performance reports or supervisor evaluations, and W2 or 1099 form for calendar years 2022 and 2023.

73. DOCUMENTS and COMMUNICATIONS RELATING TO any input by members of the TRANSITION TEAM into TWITTER's hiring, firing, or employee retention decisions.

74. DOCUMENTS and COMMUNICATIONS RELATING TO the enforceability of §6.9(a) of the MERGER AGREEMENT.

75. DOCUMENTS and COMMUNICATIONS RELATING TO the final paystubs received by TWITTER's CONTINUING EMPLOYEES terminated as of January 4, 2023, including but not limited to how their January hours were reflected on such paystubs.

76. [Client Name]'s[2] PERSONNEL FILE, and any other FILES maintained by YOU RELATED TO [Client Name].

77. DOCUMENTS and COMMUNICATIONS RELATING TO the decision to lay off [CLIENT NAME].

78. To the extent not encompassed by a prior Request, DOCUMENTS and COMMUNICATIONS from anyone at TWITTER, made either directly to CLIENT or in a location accessible by CLIENT, including but not limited to TWITTER's employee Slack channels, that reference the MERGER AGREEMENT or severance.

79. DOCUMENTS RELATED TO the calculation of Claimant's SEVERANCE, including but not limited to DOCUMENTS reflecting Claimant's salary, Claimant's RSU Grant Agreements,

---

[2] The following 8 requests were included in each document request submitted by a claimant in arbitration.

and Claimant's full Workday Profile, and DOCUMENTS and COMMUNICATIONS RELATED TO any claim that RESPONDENTS exercised discretion in adjusting Claimant's SEVERANCE, including but not limited to DOCUMENTS and COMMUNICATIONS RELATING TO any factors relevant to such purported exercise of discretion and how such discretion was purportedly exercised.

80. All DOCUMENTS you intend to enter into evidence or use as an exhibit .

81. All DOCUMENTS and COMMUNICATIONS referred to or relied upon in your answers to interrogatories.

82. To the extent not otherwise produced in response to a prior Request, all DOCUMENTS YOU believe RELATE TO the claims or defenses in this arbitration.

83. To the extent not otherwise produced in response to a prior Request, all DOCUMENTS produced in response to Requests for Production submitted in any litigation or arbitration against YOU in which YOU are alleged to have breached the MERGER AGREEMENT or engaged in unlawful discrimination in connection with the termination of a CONTINUING EMPLOYEE, other than those documents that solely relate to the performance or termination of the particular CONTINUING EMPLOYEE on whose behalf such Requests for Production were served.