**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WOLFRAM ARNOLD, ERIK FROESE, | ) | |
| TRACY HAWKINS, JOSEPH KILLIAN, | ) | |
| LAURA CHAN PYTLARZ and ANDREW | ) | |
| SCHLAIKJER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 23-528-JLH-CJB |
| | ) | |
| X CORP. f/k/a TWITTER, INC., X | ) | |
| HOLDINGS CORP. f/k/a X HOLDINGS I, | ) | |
| INC. and ELON MUSK, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Plaintiffs Wolfram Arnold, Erik Froese, Tracy Hawkins, Joseph Killian, Laura Chan Pytlarz and Andrew Schlaikjer (collectively, "Plaintiffs") are former employees of X Corp., f/k/a Twitter, Inc. ("Twitter") and they bring various claims against Twitter, X Holdings Corp. f/k/a X Holdings I, Inc. ("X Holdings I" and collectively with Twitter, the "Twitter Defendants") and Elon Musk ("Musk," and collectively with the Twitter Defendants, "Defendants") following Musk's acquisition of Twitter. Pending before the Court is the Twitter Defendants' renewed motion to dismiss Counts I, II, III, IV, V, VI and XIV of the Amended Complaint ("FAC") pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1) and 12(b)(6) (the "Twitter motion to dismiss"). (D.I. 77) For the reasons set forth below, the Court recommends that the Twitter motion to dismiss be GRANTED-IN-PART and DENIED-IN-PART.[1]

## I.    BACKGROUND

---

[1]    As explained further below, *see infra* n.8, the Court will hold in abeyance the portion of the Twitter motion to dismiss seeking dismissal of Count XIV.

A.     **Factual Background**

1.     **The Parties**

Plaintiffs are long-time former employees of Twitter (such employees, including Plaintiffs, may be hereinafter referred to as "Tweeps"—a term Plaintiffs use in the FAC).  (D.I. 10 at ¶ 1)  Plaintiff Arnold was employed by Twitter from November 2013 through his termination on January 4, 2023, most recently as a Staff Software Engineer.  (*Id.* at ¶ 12)  He resides in Northern California.  (*Id.* at ¶ 11)  Plaintiff Froese was employed by Twitter from January 2013 through his termination on February 27, 2023, most recently as a Senior Manager, Software Engineering.  (*Id.* at ¶ 15)  He resides in Westchester, New York.  (*Id.* at ¶ 14)  Plaintiff Pytlarz was employed by Twitter from January 2013 through her termination in January 2023, most recently as the Global Strategy and Operations Lead, Food and Events.  (*Id.* at ¶¶ 22-23) She resides in Central Texas.  (*Id.* at ¶ 21)  Plaintiff Schlaikjer was employed by Twitter from July 2011 through his termination on January 20, 2023, most recently as Senior Staff Machine Learning Engineer.  (*Id.* at ¶¶ 25-26)  He resides in Northern California.  (*Id.* at ¶ 24)  At the time of their termination, Plaintiffs Arnold, Froese, Pytlarz and Schlaikjer (collectively, the "terminated employees") were performing in satisfactory manners, with performance evaluations rating them as on- or ahead-of-track.  (*Id.* at ¶¶ 13, 16, 23, 26)

Plaintiff Hawkins was employed by Twitter from May 2013 through her resignation on November 4, 2022, most recently as Vice President, Real Estate and Workplace.  (*Id.* at ¶ 18) Plaintiff Killian was employed by Twitter from March 2010 through his resignation on December 10, 2022, most recently as Lead Project Manager of Global Design and Construction. (*Id.* at ¶ 20)  Hawkins and Killian both reside in Northern California.  (*Id.* at ¶¶ 17, 19)

Defendant X Corp. is a Nevada corporation that is the successor to Twitter, a Delaware corporation, following a merger that will be discussed in more detail below. (*Id.* at ¶ 27) Defendant X Holdings Corp. is a Nevada corporation that is the successor to X Holdings I following the same merger. (*Id.* at ¶ 28) The principal place of business of Twitter and X Holdings I is alleged to be located in San Francisco, California. (*Id.* at ¶¶ 27-28) Defendant Musk resides in Boca Chica, Texas. (*Id.* at ¶ 29)

### 2. Musk's Acquisition of Twitter

In late March 2022, Musk declared that he intended to purchase Twitter and take the company private. (*Id.* at ¶¶ 36, 53-54) On April 25, 2022, Twitter's Board of Directors announced that it had voted to approve the sale of Twitter to Musk. (*Id.* at ¶¶ 37, 55) On that same date, Musk and his companies X Holdings I (as the "Parent") and non-party X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter (the "merger agreement"). (*Id.*; D.I. 16, ex. A)[2] Pursuant to the merger agreement, the Acquisition Sub would merge with Twitter, and Twitter would survive as a wholly owned subsidiary of X Holdings I. (D.I. 10 at ¶ 37)

On May 12, 2022, Musk tweeted that the deal was "temporarily on hold[,]" and on July 8, 2022, Musk sent Twitter a letter that purported to terminate the merger agreement. (*Id.* at ¶¶ 57-58) On July 12, 2022, Twitter filed suit in the Delaware Court of Chancery, seeking specific performance of the merger agreement (the "Chancery Court action"). (*Id.* at ¶ 59) On October 4, 2022, on the eve of his deposition in the Chancery Court action, Musk announced that he

---

[2]    The merger agreement, which both parties attached as exhibits to declarations accompanying their briefing on the motion, is cited herein, as it is integral to the FAC and referenced therein. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 606 n.1 (D. Del. 2018); *see also infra* n.7.

would proceed with purchasing Twitter. (*Id.* at ¶ 60) Many Tweeps, including Arnold, then voted their shares in favor of the merger. (*Id.* at ¶ 61) The deal closed on October 27, 2022. (*Id.*)

### 3.    The Merger Agreement

Section 6.9(a) of the merger agreement provides that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to "provide [to Continuing Employees][3] severance payments and benefits . . . no less favorable than" those provided under Twitter's policies immediately prior to the merger ("Section 6.9(a)" or the "Severance Stability Promise"). (D.I. 16, ex. A at § 6.9(a); *see also* D.I. 10 at ¶¶ 38, 72-73) By April 26, 2022, the day after the merger agreement was announced, Twitter had published an Acquisition FAQ (the "Acquisition FAQ") to its employees that relayed that:

- The merger agreement "specifically protect[s] Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." (D.I. 10 at ¶ 39);

- "[I]n the event of a layoff, any employee whose job is impacted would be eligible for severance." (*Id.* at ¶¶ 39, 85); and

- In the event of a layoff following the merger, "all unvested [equity] awards ['RSUs'] are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." (*Id.* at ¶ 40)

---

[3]    Section 6.9(a) defines "Continuing Employees" as employees of Twitter or its subsidiaries immediately prior to the effective date of the merger who remain employees of X Holdings I, Twitter or any of their affiliates following the effective date of the merger. (D.I. 16, ex. A at § 6.9(a); *see also id.* at 1, 8, 12, § 2.1, § 2.3(a))

Plaintiffs allege that, despite the last of these statements in the Acquisition FAQ, Twitter reassured Tweeps that if Twitter carried out a layoff in the year following the merger, they would be able to keep at least some of their unvested RSUs. (*Id.*)

Following an "all-hands meeting" during which Twitter promised Tweeps that their severance was protected by the merger agreement, Twitter sent an email in May 2022 stating that its severance policy was to provide "at a minimum": (1) two months base salary (or incentive-based salary for sales employees), (2) prorated performance bonuses as if all triggers for these bonuses were achieved, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "severance package"). (*Id.* at ¶¶ 41, 87, 94-96)  Twitter's existing policy also provided each employee with severance of one additional week of salary for each full year at Twitter, with Vice Presidents and above receiving six months of salary and RSU vesting. (*Id.* at ¶ 42)

Twitter made these communications to Tweeps while Musk and Twitter were litigating over whether Musk could escape his agreement to buy Twitter, a dispute that had generated significant uncertainty and concern among employees. (*Id.* at ¶ 43)  Twitter made the same representation to Tweeps regarding severance again on October 24, 2022. (*Id.* at ¶ 99)

### 4. Plaintiffs' Terminations and/or Resignations Following the Acquisition

Musk took over as the owner of Twitter on October 26, 2022. (*Id.* at ¶ 108) Shortly after the merger, Musk began laying off thousands of Twitter employees. (*Id.* at ¶ 120) Froese and Pytlarz were notified (along with half of Twitter's workforce) that they were being laid off on November 4, 2022. (*Id.* at ¶¶ 131, 133)  The email to these employees advised them that "'[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees)[.]'" (*Id.* at ¶ 135)  Musk subsequently announced that Twitter

was ending its remote work policy and requiring all workers to report to work at a Twitter office, even though many such employees lived and worked remotely many hours from the nearest Twitter office.  (*Id.* at ¶¶ 138-39)  In mid-November, Musk sent an email requiring any Twitter employee to check a box on an online form consenting to a more "hardcore" working environment, meaning "long hours at high intensity"; the email instructed that those who did not check the box would be deemed to have "voluntarily resigned" in exchange for two months of non-working leave and a single month of separation pay.  (*Id.* at ¶ 143)  Many employees, including Arnold and Schlaikjer, were laid off as part of this wave of layoffs.  (*Id.* at ¶ 148)

Hawkins resigned on November 4, 2022, after Musk and the transition team allegedly directed her to cause Twitter to intentionally breach its leases and other contracts.  (*Id.* at ¶¶ 167-212)  If she had complied with these directions, she would have become permanently unemployable in her field, as her role required her to maintain relationships with other corporate real estate management professionals.  (*Id.* at ¶¶ 163-68, 218-25)

Killian was assigned Hawkins' duties and given responsibility for managing Twitter's portfolio of leases after Hawkins' resignation.  (*Id.* at ¶ 227)  By December 9, 2022, it is alleged that Killian had been instructed to break Twitter's leases and close offices regardless of its outstanding obligations regarding those leases.  (*Id.* at ¶¶ 241, 246-47)  He was allegedly also instructed to, *inter alia*, violate California building code and Twitter's lease agreement in the process of installing "hotel rooms" for overworked employees at Twitter's headquarters.  (*Id.* at ¶¶ 264-90)  As a result of these demands, on December 10, 2022, Killian resigned.  (*Id.* at ¶¶ 291-92)

Defendants have not paid Plaintiffs the severance consistent with Twitter's severance policy as it existed prior to the merger.  (*Id.* at ¶¶ 45, 159, 314, 316-17)

Additional relevant factual allegations will be discussed below in Section III.

**B.    Procedural Background**

On May 16, 2023, Plaintiffs filed the initial Complaint, (D.I. 1); one month later,

Plaintiffs filed the operative FAC, (D.I. 10).  The FAC contains fourteen Counts:

- Count I:  Declaratory Judgment (all Plaintiffs against all Defendants).  (*Id.* at ¶¶ 313-19);

- Count II:  Breach of Merger Agreement (all Plaintiffs against all Defendants).  (*Id.* at ¶¶ 320-24);

- Count III:  Breach of Contract (all Plaintiffs against Twitter and Musk).  (*Id.* at ¶¶ 325-31);

- Count IV:  Promissory Estoppel (all Plaintiffs against Twitter and Musk).  (*Id.* at ¶¶ 332-40);

- Count V:  Breach of Offer Letter (all Plaintiffs against Twitter and Musk).  (*Id.* at ¶¶ 341-52);

- Count VI:  Fraud (all Plaintiffs against all Defendants).  (*Id.* at ¶¶ 353-69);

- Count VII:  Federal Warn Act (the terminated employees against Twitter and Musk).  (*Id.* at ¶¶ 370-90)

- Count VIII:  Violation of the California Warn Act (Arnold, Pytlarz and Schlaikjer against Twitter and Musk).  (*Id.* at ¶¶ 391-403);

- Count IX:  Violation of the New York Warn Act (Froese against Twitter and Musk).  (*Id.* at ¶¶ 404-11);

- Count X:  Wage Theft (all Plaintiffs against all Defendants).  (*Id.* at ¶¶ 412-20);

- Count XI:  Penalties Under the California Private Attorney General Act for Violations of Cal. Labor Code §§ 201-03, 226, 227.3 and 1400 *et seq.* (Killian and Arnold, Individually and in a Representative Capacity against all Defendants).  (*Id.* at ¶¶ 421-40);

- Count XII:  Family Medical Leave Act Interference (29 U.S.C. § 2615(a)(1)) (Arnold and Schlaikjer against Twitter and Musk).  (*Id.* at ¶¶ 441-50);

- Count XIII:  California Family Rights Act Interference (Cal. Code Regs. tit. 2, § 11094(b)) (Arnold and Schlaikjer against Twitter and Musk).  (*Id.* at ¶¶ 451-69); and

- Count XIV:  Discrimination Under California Fair Employment and Housing Act ("FEHA"), Government Code § 12940, *et seq*. (Pytlarz and Arnold against all Defendants).  (*Id.* at ¶¶ 470-544)[4]

In lieu of filing an answer, on July 31, 2023, the Twitter Defendants filed the instant motion to dismiss the FAC.  (D.I. 14)[5]  Briefing on the motion was completed on September 5, 2023.  (D.I. 38)  Plaintiffs submitted a notice of subsequent authority on November 1, 2023. (D.I. 53)  But then on December 19, 2023, the case was stayed pending mediation of the parties' claims, with the parties requesting that the Court defer ruling on both motions to dismiss until after February 12, 2024.  (*See* D.I. 70)  Accordingly, the Court denied the motions to dismiss without prejudice to renew.  (D.I. 71)

The matter did not settle, so the stay was thereafter lifted.  (*See* D.I. 76)  The Twitter Defendants renewed their motion to dismiss on February 29, 2024 (with Musk also renewing the Musk motion to dismiss on the same date).  (D.I. 77; D.I. 78)[6]

---

[4]    On July 18, 2023, another former Twitter employee, Chris Woodfield, filed a class action lawsuit on behalf of himself and all others similarly situated against Defendants in this Court relating to severance payments allegedly promised by Twitter (the "*Woodfield* action").  *Woodfield v. Twitter, Inc. et al*., Civil Action No. 23-780-JLH, D.I. 1 (D. Del. July 18, 2023).

[5]    Musk also filed a motion to dismiss the FAC (the "Musk motion to dismiss") that remains pending before the Court.  (D.I. 17; *see also* D.I. 78)

[6]    On September 19, 2023, United States Chief District Judge Colm F. Connolly had referred discovery disputes and the then-pending motions to dismiss to the Court.  (D.I. 41) On January 12, 2024, the case was reassigned to United States District Judge Jennifer L. Hall,

On August 26, 2024, at the parties' request, the Court granted a partial stay of the case (as well as the *Woodfield* action) due to an agreement between Defendants and former Tweeps represented by Plaintiffs' counsel; pursuant to the agreement, the parties are to conduct bellwether arbitration hearings followed by a mediation. (D.I. 82; D.I. 83) However, third-party discovery in the cases is continuing and the parties have requested that the Court resolve the Twitter Defendants' motion to dismiss (and the Musk motion to dismiss and a pending discovery dispute motion, as well as motions pending in the *Woodfield* action) notwithstanding the partial stay of the cases. (D.I. 82; D.I. 83)

## II.    LEGAL STANDARD

The sufficiency of pleadings for non-fraud claims is governed by Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). If a Rule 12(b)(6) movant asserts that the plaintiff's complaint fails to plead sufficient facts necessary to set out a plausible claim, then the reviewing court conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11. Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).[7]

---

who thereafter referred the renewed motions to dismiss (as well as a renewed discovery dispute motion) to the Court. (D.I. 80)

[7]    In resolving a motion to dismiss, a court typically considers the allegations in the complaint, the exhibits attached thereto, documents or facts that are incorporated by reference into the complaint or that are otherwise integral to the complaint's allegations, matters of public record and items for which the court can take judicial notice. *See Siwulec v. J.M. Adjustment Servs., LLC*, 465 F. App'x 200, 202 (3d Cir. 2012); *ING BANK, fsb v. PNC Fin. Servs. Grp., Inc.*, 629 F. Supp. 2d 351, 354 (D. Del. 2009).

In assessing the plausibility of a claim, the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id.* at 210 (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

However, with regard to a claim alleging fraud or mistake, there a plaintiff must meet the more stringent pleading requirements of Rule 9(b). Fed. R. Civ. P. 9(b). Rule 9(b) mandates that the "circumstances constituting fraud" be "state[d] with particularity[.]" *Id.*; *see also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). To do so, a party "must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200.

## III.    DISCUSSION

Below, the Court will take up, in turn, the Twitter Defendants' arguments for dismissal of Plaintiffs': (1) declaratory judgment and breach of merger agreement claims (Counts I and II); (2) breach of contract, promissory estoppel and breach of offer letter claims (Counts III to V); and (3) fraud claim (Count VI).[8]

### A.    Plaintiffs' Declaratory Judgment and Breach of Merger Agreement Claims (Counts I and II)

Count I alleges that "Plaintiffs are entitled to a declaration that [they] have standing to enforce the Merger Agreement and that the Merger Agreement required Twitter to provide [them] with severance consistent with Twitter's severance policy as it existed prior to the merger." (D.I. 10 at ¶ 319) Count II alleges that Defendants breached the merger agreement by

---

[8]    With respect to Plaintiffs' FEHA claim (Count XIV), Plaintiffs rely on their briefing in opposition to the Musk motion to dismiss. (*See* D.I. 24 at 15) The Court will therefore take up the portion of the Twitter motion to dismiss relating to Claim XIV shortly, when it resolves the Musk motion to dismiss.

failing to pay Plaintiffs such severance.  (*Id.* at ¶¶ 322-23)  Pursuant to the merger agreement's choice-of-law provision, Delaware law applies to contract interpretation issues relating to Counts I and II.  (D.I. 16, ex. A at § 9.8; *see also* D.I. 15 at 4); *Bus Air, LLC v. Woods*, Civil Action No. 19-1435-RGA-CJB, 2019 WL 6329046, at *12 n.15 (D. Del. Nov. 26, 2019); *see also Hadley v. Shaffer*, No. Civ.A. 99-144-JJF, 2003 WL 21960406, at *1, *5, *8 (D. Del. Aug. 12, 2003) (reviewing Delaware contract law in order to determine whether a plaintiff was a third-party beneficiary of a given contract, where the contract stated that Delaware law applied to disputes regarding the contract).

Delaware law provides that only parties to a contract and intended third-party beneficiaries have standing to sue for breach of the contract.  *See Crispo v. Musk* ["*Crispo I*"], C.A. No. 2022-0666-KSJM, 2022 WL 6693660, at *2 (Del. Ch. Oct. 11, 2022); *see also, e.g.*, *Dolan v. Altice USA, Inc.*, C.A. No. 2018-0651-JRS, 2019 WL 2711280, at *7 (Del. Ch. June 27, 2019) ("Since Plaintiffs were not parties to the Merger Agreement,[] they must demonstrate they have standing to enforce the contract as third-party beneficiaries.").  Plaintiffs are not parties to the merger agreement, but allege that they:  (1) were "Continuing Employees" as defined in Section 6.9(a) of the merger agreement; and (2) are therefore third-party beneficiaries of the merger agreement who have standing to enforce Section 6.9(a)'s promise to provide them with severance consistent with Twitter's severance policy as it existed before the merger.  (D.I. 10 at ¶¶ 314-19)

The Twitter Defendants disagree.  They argue that Plaintiffs are not intended third-party beneficiaries under the merger agreement—and that Counts I and II should therefore be dismissed under Rule 12(b)(1) and Rule 12(b)(6) for lack of standing and failure to state a claim.

(D.I. 15 at 7; D.I. 38 at 1-4)[9]  In support of this argument, the Twitter Defendants first emphasize Section 6.9(e)(ii) of the merger agreement.  This section provides that "[n]othing contained in this Section 6.9, expressed or implied, shall . . . give any Company Service Provider [defined to include current and former employees of Twitter] or other Person any third-party beneficiary or other rights[.]"  (D.I. 16, ex. A at 6, § 6.9(e)(ii) (*cited in* D.I. 15 at 5-6; D.I. 38 at 1-2))  Next, they highlight Section 6.9(e)(i), which provides that nothing contained in Section 6.9 shall "constitute a limitation on rights to amend, modify, merge or terminate after" the merger "any Company Benefit Plan, Post-Closing Plan or other employee benefit plan[.]"  (*Id.* at § 6.9(e)(ii) (*cited in* D.I. 15 at 6))  Finally, they point to Section 9.7, which is specifically titled "No Third-Party Beneficiaries" and provides that the agreement "is not intended to and shall not confer upon any Person other than the parties hereto any rights or remedies hereunder[,]" with the exception of three specific categories of intended beneficiaries, none of which include Plaintiffs. (*Id.* at § 9.7 (*cited in* D.I. 15 at 6-7; D.I. 38 at 2))

The Court agrees with the Twitter Defendants that these contractual provisions preclude Plaintiffs from asserting Counts I and II of the FAC.  In order to adequately allege standing as a third-party beneficiary, Plaintiffs must plead facts demonstrating that:  (1) the contracting parties intended that the third-party beneficiary benefit from the contract; (2) the benefit was intended as

---

[9]      Rule 12(b)(1) authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, or if the plaintiff lacks standing to bring its claim.  Motions brought under Rule 12(b)(1) may present either a facial or factual challenge to the court's subject matter jurisdiction. *See Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (citing *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009)).  In reviewing a facial challenge under Rule 12(b)(1), which is at issue here, the same standards relevant to Rule 12(b)(6) apply. In this regard, the court must accept all factual allegations in the complaint as true, and the court may only consider the complaint and documents referenced therein or attached thereto. *Id.*; *see also Church of Univ. Brotherhood. v. Farmington Twp. Supervisors*, 296 F. App'x 285, 288 (3d Cir. 2008).

a gift or in satisfaction of a pre-existing obligation to that person; and (3) the intent to benefit the third-party was a material part of the parties' purpose in entering into the contract. *Crispo I*, 2022 WL 6693660, at *3. "Contracting parties will often specify their intent as to third-party beneficiaries on the face of the agreement, typically by disclaiming an intent to convey third-party beneficiary status." *Crispo v. Musk*, 304 A.3d 567, 574 (Del. Ch. 2023). That type of provision (a "no-third-party beneficiary provision") is a "helpful starting point" for a court in considering whether contracting parties intended to benefit third parties, and Delaware courts ascribe such provisions a "non-trivial amount of weight." *Id.* That said, these provisions are not entitled to special deference beyond that generally granted to contractual terms, and they may yield to contrary language in the contract pursuant to standard rules of contract interpretation. *Id.* at 575. For example, if a contract contains both a "general" no-third-party beneficiary provision as well as more specific language that demonstrates an intent to benefit a third party, then the no-third-party beneficiary provision should be disregarded. *Id.* On the other hand, where a no-third-party beneficiary provision is "customized" by the inclusion of a carve-out, this signals a "strong intent" to disclaim third-party beneficiaries that do not fall within the carve-out. *Id.*; *see also, e.g.*, *Fortis Advisors LLC v. Meds. Co.*, C.A. No. 2019-0236-KSJM, 2019 WL 7290945, at *4 (Del. Ch. Dec. 18, 2019) (explaining that the inclusion of a no-third-party beneficiary provision, which disclaimed an intent to benefit third parties generally but also contained a carve-out providing that "Financing Sources" shall each be a third-party beneficiary under the agreement, made it clear that the parties knew how to expressly confer third-party beneficiary status, and that other third parties were not intended beneficiaries).

Here, the provisions highlighted by the Twitter Defendants demonstrate that the contracting parties to the merger agreement did not intend Plaintiffs to be third-party

beneficiaries. Indeed, it is hard to think of a scenario where the contracting parties could have made this intent much clearer. To explain why, the Court turns back to the key terms of the agreement in this regard.

Section 6.9 of the agreement is entitled "Employee Benefits[.]" (D.I. 16, ex. A at 51) Now, it is true that subsection (a) of Section 6.9 states that X Holdings I shall provide, or cause Twitter to provide, severance payments to "Continuing Employees" that are no less favorable than those available to the employees immediately before the merger. (*Id.*) But in subsection (e) of the *very same section*, the agreement: (1) expressly provides that *nothing in Section 6.9* (which, of course, includes Section 6.9(a)) gives any employee *any third-party beneficiary rights*; and (2) expressly provides that the acquiror can, for example, terminate any employee benefit plan after the effective date of the merger.[10] So Section 6.9(e) makes it fairly explicit that—notwithstanding the content of Section 6.9(a)—the parties to the merger agreement did not intend for Continuing Employees to be third-party beneficiaries. (D.I. 15 at 6; D.I. 38 at 1-2, 5 n.2); *see also, e.g.*, *Sapp v. Indus. Action Servs., LLC*, Civil Action No. 19-912-RGA, 2024 WL 3444633, at *4 (D. Del. July 17, 2024) ("The express terms of the 'No Third Party Beneficiary' clause, however, are a sufficient basis to establish at the motion-to-dismiss stage that RelaDyne is not a beneficiary."). And lest there be any doubt, the parties *also* included an additional, *customized* no-third-party beneficiary provision—Section 9.7—making it even clearer that they did not intend to confer third party beneficiary status to anyone (other than those in the three categories specifically enumerated therein). *See, e.g.*, *Crispo I*, 2022 WL 6693660, at *5

---

[10]    Plaintiffs offer that the merger agreement "allows Twitter to change its benefits, including by terminating particular plans, but prohibited Twitter from making benefits *worse* or severance 'less favorable' for a year after the merger." (D.I. 24 at 6 (emphasis in original)) This ignores the language of Section 6.9(e)(i), which gives the acquiror the right to terminate or modify any employee benefit plan after the effective date of the merger, full stop.

(considering the same merger agreement at issue here with respect to a lawsuit brought by a stockholder, and noting that "Section 9.7 . . . is more customized than other 'no third-party beneficiaries' provisions enforced by this court" and "[t]he presence of three carve-outs in Section 9.7 makes the negative implication" that other third parties are not intended beneficiaries "stronger"); *Fortis Advisors LLC*, 2019 WL 7290945, at *4 (finding that the carve-out from the no-third-party beneficiary provision "reveals that the parties knew how to expressly confer third-party beneficiary status, and the Court presumes that excluding the former Rempex equityholders from the carve-out was intentional").

Plaintiffs make a few arguments to the contrary, but they are not persuasive.

First, Plaintiffs state that Delaware law provides that "a third-party beneficiary's right to enforce [a] contract is a legal result of the contracting parties' intentional conferral of a *benefit*, and does not require that the parties intend to confer [upon the third parties] a *right to enforce* [the contract]." (D.I. 24 at 3 (emphasis in original))  And from there, they appear to argue that since Section 6.9(a) of the merger agreement provides that Continuing Employees should receive certain severance *benefits* (e.g., severance payments and benefits that are no less favorable than those provided under Twitter's policies immediately prior to the merger), then that provision trumps any other provision of the agreement indicating that no third party beneficiary rights are being extended to Plaintiffs.  (*See id.* at 5 ("Neither [of the provisions cited by the Twitter Defendants] disclaims the intent to *confer a benefit*[, they] merely declare[] that they do not confer *rights*.  But the Delaware test turns on whether the parties intended to confer a *benefit*; rights flow as a legal consequence of the intentional conferral of a benefit.") (emphasis in original))  In support of this somewhat-hard-to-follow proposition, Plaintiffs cite to *Wilmington Hous. Auth., for Use of Simeone v. Fid. & Deposit Co. of Md.* ["*WHA*"], 47 A.2d 524 (Del.

1946).  But *WHA* does not do the work that Plaintiffs want it to.  (*See* D.I. 38 at 2)  That (nearly 80-year old) case addressed a specific issue that is not at play here:  whether Delaware law would allow third-party beneficiaries to enforce sealed instruments, as it did for "simple contracts."  *WHA*, 47 A.2d at 525, 527; *see also id*. at 531 ("The question presented is narrow:  Should this Court renounce the English Rule and adopt in its place the American view . . . under which a third party beneficiary is permitted to recover upon a sealed instrument impliedly made for his benefit, but to which he is not a party?") (Terry, J., dissenting); *see also* (D.I. 38 at 2).  Prior to *WHA*, while a third-party beneficiary could sue with respect to a "simple contract," in a "sealed instrument the parties named in the premises are the only parties having a suable interest, no matter for whose benefit the instrument is made, unless other parties are expressly given that right in the remainder of the instrument."  *WHA*, 47 A.2d at 527 (internal quotation marks and citation omitted).  The *WHA* Court held that a third-party beneficiary *could* sue to enforce a sealed instrument even if there was not an express statement in the contract that he had such a right.  *Id.* at 528.  But the contract at issue in *WHA* did not include a no-third-party beneficiary provision.  And so the Court cannot see how the holding of *WHA* has any real impact on what we are dealing with here.[11]

---

[11]    Plaintiffs also cite to *Dolan v. Altice USA, Inc.*, C.A. No. 2018-0651-JRS, 2019 WL 2711280 (Del. Ch. June 27, 2019) in support of their argument that if a contract purports to convey a benefit to a third party, that party has the right to enforce that provision (notwithstanding any other language in the contract to the contrary).  (D.I. 24 at 3, 5)  But in *Dolan*, the court found that two employees were *not* third-party beneficiaries of the merger agreement—despite a provision requiring the acquiror to operate the acquired television news network in accordance with the network's existing business plan—where the contract contained an "Employee Benefits" provision indicating that nothing in the agreement was intended to create any third-party beneficiary rights in any employee of the company.  2019 WL 2711280, at *3-5, *8.  Here, similarly, the merger agreement makes clear that Continuing Employees are not third-party beneficiaries of the merger agreement.  (*See* D.I. 38 at 3)

Plaintiffs also suggest that "where nobody other than the third[ ]party [at issue] could enforce [a contract] provision, courts should find [that] the third[ ]party may do so." (D.I. 24 at 6) They point out that here, only the Continuing Employees could enforce Section 6.9(a) for the promised severance pay (since Twitter could not sue itself to enforce the provision). (*Id.*) In support, Plaintiffs cite to *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, Civil Action No. 2822-CC, 2008 WL 4182998 (Del. Ch. Sept. 11, 2008). (*Id.*; *see also* D.I. 38 at 3) But that case is readily distinguishable. In *Amirsaleh*, the plaintiff was a member of the predecessor to the defendant (the Board of Trade of the City of New York, Inc.), and although the plaintiff was not a party to the merger agreement at issue, he argued that he was an intended third-party beneficiary of that agreement. 2008 WL 4182998, at *1, *4. The *Amirsaleh* Court found that the merger agreement, in turn, manifested an unambiguous intent to benefit members of the defendant, in that: (1) it provided that they would receive compensation for their shares; and (2) the merger required shareholder approval. 2008 WL 4182998, at *2, *4. The *Amirsaleh* Court stated that although the agreement contained a "general" no-third-party beneficiary provision, that provision was overridden by the agreement's specific grant of benefits to members like the plaintiff. *Id.* at *5. In other words, *Amirsaleh* was a case where the court found there was somewhat weak evidence of an intent to exclude the third party at issue from a contract's benefits, and stronger evidence that the third party should be able to sue to enforce the agreement. *See Crispo I*, 2022 WL 6693660, at *7 (describing *Amirsaleh* as a case where the court rejected the notion that "a generalized 'no third-party beneficiaries' clause could override specific provisions granting clear and unique election rights to members").

Here, in contrast, the evidentiary record is the reverse. That is, here while one provision of Section 6.9 does purport to require X Holdings I/Twitter to provide a certain type of severance

benefit to Continuing Employees like Plaintiffs, there are *three other provisions* in the merger agreement that make it very clear that the Continuing Employees are *not* intended third-party beneficiaries of that agreement. So this case is just not like *Amirsaleh*.

Finally, Plaintiffs make a one-sentence argument that "having represented to Plaintiffs that the Merger Agreement protected their severance, Defendants are equitably estopped from denying that here." (D.I. 24 at 7) The Court is not persuaded; as the Twitter Defendants retort, "[i]n a dispute about enforcement of a bargained-for contract right, equitable estoppel is not the proper remedy." (D.I. 38 at 4 (quoting *Hallisey v. Artic Intermediate, LLC*, C.A. No. 2019-0980-MTZ, 2020 WL 6438990, at *4 (Del. Ch. Oct. 29, 2020)))

For these reasons, the Court recommends grant of the Twitter motion to dismiss as to Counts I and II as to the Twitter Defendants, with prejudice.

> **B.    Plaintiffs' Breach of Contract, Promissory Estoppel and Breach of Offer Letter Claims (Counts III, IV and V)**

Next, the Twitter Defendants contend that Plaintiffs' breach of contract, promissory estoppel and breach of offer letter claims should be dismissed for several different reasons. The Court will address these various asserted reasons in turn.

> **1.    Hawkins' and Killian's Breach of Contract and Promissory Estoppel Claims**

The Twitter Defendants' first challenge relates solely to Plaintiffs Hawkins' and Killian's breach of contract and promissory estoppel claims. On this score, the FAC alleges that on May 13, 2022, Twitter sent an email to Tweeps containing the Acquisition FAQ (the "Severance Policy Email") promising certain severance benefits "in the event of a position elimination[.]" (D.I. 10 at ¶¶ 94, 96) Count III alleges that the Severance Policy Email "and related communications" constituted an offer from Twitter to its employees that Twitter would provide the severance described therein in exchange for the employees remaining employed at Twitter

through the merger, that Plaintiffs accepted that offer, and that Twitter breached the agreement by not paying Plaintiffs the promised severance. (*Id.* at ¶¶ 326-30) Count IV alleges that Twitter's representations about severance to its employees, including in the Severance Policy Email and Acquisition FAQ, constituted enforceable promises that Plaintiffs relied upon in staying with the company. (*Id.* at ¶¶ 333-39) The FAC also alleges that Hawkins and Killian "were constructively discharged when Twitter drastically changed the terms and conditions of their employment after the Musk acquisition such that, for each of them, resigning was the only rational option available to them." (*Id.* at ¶ 161; *see also id.* at ¶ 5)

The Twitter Defendants argue that these claims of Hawkins and Killian must be dismissed because the respective Counts assert that Continuing Employees were promised certain benefits if the company *fired* them—but the FAC pleads that Hawkins and Killian *resigned*. (D.I. 15 at 9) And the Twitter Defendants assert that the allegations do not otherwise establish that these resignations were the result of a constructive discharge under California law[12] (i.e., the legal equivalent of a termination).[13] (*Id.* at 9-10; D.I. 38 at 6 n.4) According to the Twitter Defendants, Hawkins' and Killian's "disagreements with certain personnel directives and purported conflicting moral commitments are insufficient to rise to the level of a constructive discharge." (D.I. 15 at 9)

---

[12]    It is undisputed that California law applies to these claims as to Hawkins and Killian, since they lived in California and worked for Twitter in California. (D.I. 24 at 15 n.11; *see also* D.I. 15 at 9)

[13]    "Constructive discharge is not a cause of action, but can be attached to a tort or contract claim, transforming an employee's resignation into a termination for purposes of that tort or contract claim." *Lenk v. Monolithic Power Sys., Inc.*, Case No. 15-cv-01148 NC, 2016 WL 1258862, at *1 (N.D. Cal. Mar. 31, 2016) (citation omitted).

The Court does not agree. Pursuant to California law, in order to establish constructive discharge, employees must demonstrate that they were subjected to working conditions that were so intolerable or aggravated at the time of resignation that a reasonable person in the employee's circumstances would be forced to resign. *Brome v. Cal. Highway Patrol*, 44 Cal. App. 5th 786, 801 (Cal. Ct. App. 2020). While "[t]he mere existence of illegal conduct in a workplace does not, without more, render employment conditions intolerable to a reasonable employee[,]" in some circumstances, "a single intolerable incident, such as . . . an employer's ultimatum that an employee commit a crime, may constitute a constructive discharge." *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1247 n.3, 1254 (Cal. 1994). The amount of time that has passed between the commencement of the purportedly unbearable conditions and the employee's resignation can also be significant to the determination of whether a reasonable employee would find the conditions intolerable. *Id.* at 1255. And assessments about what is sufficiently intolerable so as to give rise to constructive discharge can be an "inherently fact-bound" question. *Brooks v. Corecivic of Tenn. LLC*, Case No.: 20cv0994 DMS (JLB), 2020 WL 5294614, at *5 (S.D. Cal. Sept. 4, 2020); *see also Vasquez v. Franklin Mgmt. Real Est. Fund, Inc.*, 222 Cal. App. 4th 819, 827 (Cal. Ct. App. 2013) ("Although situations may exist where the employee's decision to resign is unreasonable as a matter of law, [w]hether conditions were so intolerable as to justify a reasonable employee's decision to resign is normally a question of fact.") (internal quotation marks and citations omitted).[14]

---

[14] The Court notes that the three opinions that the Twitter Defendants cite in support of their argument here were all resolved at the summary judgment stage, which is not the stage we are at now. (D.I. 15 at 9 (citing *Rodriguez v. Wells Fargo Bank, Inc.*, No. 2:15-cv-01303-KJM-CMK, 2016 WL 4595064 (E.D. Cal. Sept. 2, 2016); *Turner*, 7 Cal. 4th 1238; *Casenas v. Fujisawa USA, Inc.*, 67 Cal. Rptr. 2d 827 (Cal. Ct. App. 1997))

Here, Plaintiffs have pleaded facts sufficient to show, at the pleading stage, that Hawkins and Killian were compelled to resign.

With regard to Hawkins, who was responsible for Twitter's office leases and managing Twitter's physical offices before the merger, the FAC alleges that Twitter directed her to wrongfully breach its leases; this put her at risk of being "held professionally responsible for a scheme to defraud landlords out of the rent or other fees admittedly due to them[.]" (D.I. 10 at ¶¶ 162, 207-14) According to the FAC, if Hawkins followed through with Twitter's instructions, she would not only have violated the law, but would have traversed her industry's code of professional ethics, rendering her permanently unemployable in her field. (*Id.* at ¶¶ 166, 218-25) The FAC also alleges that around this same time, Twitter stripped Hawkins of her core job responsibilities—by announcing that another team would handle lease negotiations going forward and that the company would no longer be working with brokers to procure leases. (*Id.* at ¶¶ 194-95) These allegations, taken as true, could constitute sufficiently intolerable working conditions such that a reasonable employee would feel compelled to resign. *See Ringelstein v. Renaissance Learning, Inc.*, Case No. 16-cv-05057-VC, 2017 WL 7243352, at *1 (N.D. Cal. Feb. 22, 2017) ("If Renaissance truly stripped Ringelstein of all duties, save for the occasional 'make-work' assignment, for a significant period of time, and if it did so with the intent to make working conditions intolerable for him, this may (depending on the specific facts and circumstances) allow a jury to find that he was constructively discharged."); *cf. Turner*, 7 Cal. 4th at 1247 n.3 & 1254 (suggesting that were an employee required to participate in illegal conduct, this could support a claim for constructive discharge).

As for Killian, the FAC alleges that he was given responsibility for managing Twitter's portfolio of leases after Hawkins left Twitter. (D.I. 10 at ¶ 227) In December 2022, he was

instructed to break Twitter's leases and close Twitter's offices—even if Twitter had outstanding obligations on those leases.  (*Id.* at ¶¶ 246-47)  Killian was also told that Musk wanted to add a bathroom next to his office, and not to bother with obtaining permits or hiring licensed tradespeople to install it.  (*Id.* at ¶¶ 256-62)  Furthermore, Killian was instructed to disconnect the landlord's lighting control system at Twitter's headquarters because the lights were bothering overworked employees who were living in hotel rooms that had been installed there.  (*Id.* at ¶¶ 264-65, 275-77)  He was also told to install space heaters in the hotel rooms in violation of Twitter's lease, and to place cheap locks on the doors of the hotel rooms that were not code compliant.  (*Id.* at ¶¶ 282-90)  The FAC alleges that "[b]etween the demands that he effectively participate in theft and fraud and instructions to take actions in violation of California law and that could put his colleagues' lives at risk in the event of a fire—a possibility only increased by the unlicensed use of space heaters—Killian" was forced to resign.  (*Id.* at ¶ 291)  That allegation seems a plausible one, all things considered.  *See United States ex rel. Macias v. Pac. Health Corp.*, CV 12-00960 RSWL (JPR), 2016 WL 8722639, at *1, *8 (C.D. Cal. Oct. 7, 2016) (finding that the plaintiff sufficiently alleged constructive discharge, where she pleaded that the defendants were involved in an illegal scheme to unnecessarily hospitalize patients via fraudulent 5150 psychiatric holds and then fraudulently bill Medicare—and that plaintiff's pay was reduced and she was not placed on the work schedule after she complained about this illegal scheme and failed to initiate the 5150 holds); *cf. Turner*, 7 Cal. 4th at 1254.  Therefore, Hawkins and Killian have sufficiently pleaded constructive discharge with respect to their breach of contract and promissory estoppel claims.

      **2.**       **Whether Plaintiffs Sufficiently Pleaded the Existence of a Contract**

Next, the Twitter Defendants make three separate arguments as to why the breach of contract claim in Count III should be dismissed as to all Plaintiffs. All of these arguments relate to whether Plaintiffs have sufficiently pleaded the existence of a contract. Below the Court will first review some relevant law regarding the assessment of breach of contract claims at the pleading stage. Then it will address these three arguments in turn.

Pursuant to California, New York and Texas law,[15] a plaintiff pleading a breach of contract claim must plead sufficient facts to establish: (1) the existence of a contract; (2) plaintiff's performance or excuse for non-performance; (3) the defendant's breach; and (4) damages to the plaintiff as a result of defendant's breach. *See., e.g.*, *Buschman v. Anesthesia Bus. Consultants LLC*, 42 F. Supp. 3d 1244, 1250 (N.D. Cal. 2014) (California law); *Brown v. Petty Flying Serv., Inc.*, No. 11-23-00134-CV, 2024 WL 4701586, at *2 (Tex. App. Nov. 7, 2024) (Texas law); *Canzona v. Atanasio*, 118 A.D.3d 837, 838 (N.Y. App. Div. 2014) (New York law). "[T]he *Twombly-Iqbal* standard of federal pleading require[s] a complaint to identify, in non-conclusory fashion, the specific terms of the contract that a defendant has breached. Otherwise, the complaint must be dismissed." *Lamoureux v. Trustco Bank*, 592 F.

---

[15]    In their opening brief, the Twitter Defendants noted that Plaintiffs did not plead the state laws under which they were asserting their breach of contract and promissory estoppel claims; the Twitter Defendants stated that they assumed that these claims would be governed by the law of the state in which the respective Plaintiffs were employed (i.e., California for Arnold, Hawkins, Killian and Schlaikjer; New York for Froese; and Texas for Pytlarz). (D.I. 15 at 10 (citing D.I. 10 at ¶¶ 11, 14, 17, 19, 21, 24)) They also cited to California, New York and Texas law in discussing Plaintiffs' fraud claim. (*Id.* at 15-18) Plaintiffs do not dispute that these claims would be governed by the law of the state in which Plaintiffs were employed. (D.I. 24 at 7-14) To a great degree, the Court does not understand (and the parties have not really argued) that these respective states' laws differ in any material way in terms of what they require of a plaintiff at the pleading stage regarding Counts III to VI. So below, unless otherwise noted, to the extent that the Court cites to cases applying the law of only one of these states in assessing these counts, it does so assuming that the law is no different in the other two states on that particular point.

23

Supp. 3d 14, 36 (N.D.N.Y. 2022) (internal quotation marks and citations omitted).  As described above, Plaintiffs' breach of contract claim alleges that the "Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide its pre-merger severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger."  (D.I. 10 at ¶ 326)

The Twitter Defendants' first argument here is that these documents cannot create contractual obligations independent of the merger agreement.  (D.I. 15 at 11)  In support, the Twitter Defendants note that the Acquisition FAQ references the merger agreement 21 times, and that the merger agreement is an integrated document.  (*Id.* at 11 & n.3 (citing D.I. 16, ex. A at §§ 9.6; D.I. 16, ex. B at ex. 1))[16]  For example, in response to the question "[a]re there any changes to parental leave benefits or medical, dental, and vision benefits[,]" the Acquisition FAQ states that *"[t]he [merger] agreement* provides for Tweep benefits, base salary, and bonus opportunities (short/long term incentives) to continue on a comparable basis for at least one year following the close of the transaction."  (D.I. 26, ex. 4 at 226 (emphasis added))

Plaintiffs retort that Twitter's written representations (i.e., that the merger agreement protected their severance and that they would receive severance at least as favorable as they would have received prior to the merger as a result), created *separate* enforceable obligations from those at issue in the merger agreement.  (D.I. 24 at 7-8)  The FAC alleges that Plaintiffs relied on these separate representations in deciding to remain at Twitter through the merger.  (*See* D.I. 10 at ¶¶ 39-41, 43-44)

---

[16]     Like the merger agreement, both parties attached the Acquisition FAQ as exhibits to declarations accompanying their briefing on the motion; the Acquisition FAQ is cited herein, as it is integral to the FAC and referenced therein.  *See Pension Benefit Guar. Corp.*, 998 F.2d at 1197; *Harrison*, 320 F. Supp. 3d at 606 n.1.

In the Court's view, simply because the Twitter Defendants entered into the merger agreement among themselves and with a third party—an agreement that discussed the subject of severance payments—that does not mean that they could not have *separately* made enforceable contractual promises to *Plaintiffs* regarding that same subject matter.  (D.I. 16, ex. A at § 9.6 (merger agreement's integration clause noting that it applies to supersede all other agreements "*among the parties*" to the merger agreement as to the subject matter discussed therein) (emphasis added)); *cf. Pregis Performance Prod. LLC v. Rex Performance Prod. LLC*, C.A. No. N18C-03-157 WCC CCLD, 2019 WL 4344369, at *6 (Del. Super. Ct. Sept. 4, 2019).  And the Twitter Defendants have not sufficiently explained why the allegations at issue do not plausibly allege the existence of just such separate contractual promises (promises that, unlike any in the merger agreement, were made directly to Plaintiffs).  *Cf. Menghini v. Neurological Surgery, P.C.*, CV 15-3534, 2016 WL 3034482, at *4 (E.D.N.Y. May 24, 2016) (rejecting the defendant's argument that an employment agreement was the sole operating contract between the parties and so no breach of contract claim was stated, where "[p]laintiff has sufficiently alleged that a contract was created between the parties when she accepted by her letter of March 9, 2015 [d]efendants' offer to pay her eight weeks of severance pay in lieu of the terms of her employment agreement that required ninety days notice of a termination" and the plaintiff "further alleges that this agreement was breached by Defendants when she complained that her termination was unlawful and they failed to pay her the amounts agreed").

The Twitter Defendants' second argument is that the alleged promises in the Acquistion FAQ are too vague and indefinite to create an enforceable contract.  They say this is because those promises at times include phraseology like "[g]enerally speaking" or words suggesting that

they only related to the "current" severance package.  (D.I. 15 at 11; D.I. 38 at 5; *see also* D.I. 26, ex. 4 at 207)  The Court again cannot agree.

"The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."  *Moncada v. W. Coast Quartz Corp.*, 164 Cal. Rptr. 3d 601, 608 (Cal. Ct. App. 2013).  The Acquisition FAQ elsewhere represents that the merger agreement provides that X Holdings Corp. would furnish Continuing Employees with severance payments "that are no less favorable than those applicable to an applicable employee prior to the closing of the transaction[.]"  (D.I. 26, ex. 4 at 228)  That is a fairly direct and specific statement.  So too are the statements that were alleged to have been made in the May 2022 email sent to Tweeps, in which Twitter told them that its policy "at a minimum"[17] was to provide certain specified severance benefits that were explicitly listed in the email.  (D.I. 10 at ¶¶ 41, 96)  *See Moncada*, 164 Cal. Rptr. 3d at 610 (finding that the complaint alleged facts sufficient to state a cause of action for breach of contract, where "[t]he promise was clear and definite: continue working at West Coast until the company is sold, and at that time, we will pay you a bonus that will enable you to retire" and where plaintiffs understood that promise and performed on their end by continuing to work at West Coast until the company was sold).

The Twitter Defendants' third and final argument regarding the purported lack of an enforceable contract is that an allegation of breach cannot lie where it is premised (as here) on a severance policy or similar plan that could be changed or eliminated at any time.  (D.I. 15 at 12)

---

[17]    The FAC alleges that the May 2022 email's reference to "at a minimum" was a shorthand reference to Twitter's policy of also providing employees with severance of an additional week of salary for each year at Twitter, and to the fact that Vice Presidents and above received a more generous severance.  (D.I. 10 at ¶¶ 41-42)  Thus, Plaintiffs assert that the "[g]enerally speaking" reference in the Acquistion FAQ would be understood to be a synonym for "at a minimum"—since the Acquisition FAQ goes on to spell out the same benefits as those that were set out in the May 2022 email.  (D.I. 24 at 8-9)

This argument relies on Section 6.9(e)(i) of the merger agreement.  Again, Section 6.9(e)(i) states that nothing contained in Section 6.9 shall "constitute a limitation on rights to amend, modify, merge or terminate after" the merger "any Company Benefit Plan, Post-Closing Plan or other employee benefit plan[.]"  (D.I. 16, ex. A at § 6.9(e)(i) (*cited in* D.I. 15 at 11-12); *see also* D.I. 38 at 5-6)  As was noted earlier, however, Plaintiffs' breach of contract claim is not based on the merger agreement.  It is based on the Severance Policy Email and related communications. (D.I. 10 at ¶ 326)  And the Twitter Defendants do not point to anywhere in *those communications* where Twitter represented that it could modify or terminate its promise regarding severance at any time.[18]

For these reasons, the Court is not persuaded that dismissal of Plaintiffs' breach of contract claim is warranted at this stage.

---

[18]    The cases that the Twitter Defendants cite in support of their argument here (i.e., for the proposition that "no breach of contract claim lies based on a severance or other plan that could be changed or eliminated at any time") are inapposite.  (D.I. 15 at 12)  In *Schwarzkopf v. Int'l Bus. Machs., Inc.*, No. C 08-2715 JF (HRL), 2010 WL 1929625 (N.D. Cal. May 12, 2010), the court concluded, at the summary judgment stage, that a "Quota Letter" did not constitute a contract, but where *that letter* included a disclaimer providing that the defendant retained the right to modify or cancel employee commission.  2010 WL 1929625, at *1-2, *7-8.  In *Scott v. Pac. Gas & Elec. Co.*, 11 Cal. 4th 454 (Cal. 1995), a post-trial case, the Supreme Court of California noted that "courts will not enforce vague promises about the terms and conditions of employment that provide no definable standards for constraining an employer's inherent authority to manage its enterprise" such as, for example, a promise to an employee that he is to receive "'reasonable'" salary increases and annual bonuses.  11 Cal. 4th at 472-73.  In *Drummond v. Akselrad*, 23-cv-179 (LJL), 2023 WL 3173780 (S.D.N.Y. May 1, 2023), the court granted a motion to dismiss the plaintiff's breach of contract claim, but where the plaintiff's complaint failed to allege facts demonstrating "a written or oral contract pursuant to which he was grandfathered into the prior PTO policy and exempted from the 2017 Policy."  2023 WL 3173780, at *5-6.  Finally, in *Sawyer v. E.I. Du Pont de Nemours & Co.*, 430 S.W.3d 396 (Tex. 2014), the court, in concluding at the summary judgment stage that "an at-will employee cannot bring an action for fraud that is dependent on continued employment[,]" noted that "if the employer or employee can avoid performance of a promise by exercising a right to terminate the at-will relationship, which each is perfectly free to do with or without reason at any time, the promise [of continued at-will employment] is illusory and cannot support an enforceable agreement."  430 S.W.3d at 401-02.

### 3.    Plaintiffs' Promissory Estoppel Claim

The Court next turns to the Twitter Defendants' challenge to Plaintiffs' promissory estoppel claim in Count IV.  To establish this type of a claim, a plaintiff must plead facts alleging:  "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance."  *Oster v. Caithness Corp.*, Case No. 16-cv-03164-WHO, 2017 WL 3727174, at *13 (N.D. Cal. Aug. 30, 2017) (internal quotation marks and citation omitted).  In Count IV, Plaintiffs allege that to the extent that Twitter's communications and Plaintiffs' conduct did not create an enforceable contract between Plaintiffs and Twitter regarding the severance issue, then Twitter's representations in the Severance Policy Email and Acquisition FAQ regarding severance amounted to a promise that Plaintiffs reasonably relied upon to their detriment.  (D.I. 10 at ¶¶ 332-40)

The Twitter Defendants argue that the FAC fails to state a promissory estoppel claim for two reasons.  (D.I. 15 at 14-15)  Neither warrants dismissal of the claim.

First, the Twitter Defendants contend that Plaintiffs do not plausibly allege that they *reasonably* relied on the promises at issue.  This is purportedly because those promises "contradict provisions in the [merger a]greement that prevent any third-party beneficiary enforcement rights and grant Twitter discretion to modify or terminate any severance policy." (*Id.* at 14)  Plaintiffs retort that the issue of whether Plaintiffs' reliance on Twitter's representations about severance was reasonable in light of any contradictory provisions in the 73-page merger agreement is a question of fact that is not appropriate for resolution at this stage.  (D.I. 24 at 10 (citing cases))

The Court agrees with Plaintiffs.  Whether "Twitter's employees should have independently understood the potential interplay between [Section] 6.9(a) and the [no-third-party beneficiary provision] found 50-plus pages into a 73-page contract" is a question not suitable for resolution at the pleading stage.  (*Id.*); *see also e.g.*, *Healthcare Ally Mgmt. of Cal., LLC v. Space Expl. Techs. Corp.*, Case No.: 2:22-cv-05098-AB-JEM, 2023 WL 4206106, at *9 (C.D. Cal. May 25, 2023) (finding that whether the plaintiff's reliance on an oral communication was reasonable in light of an earlier written communication regarding similar subject matter "is a question of fact that can't be resolved on a motion to dismiss").

Second, the Twitter Defendants assert that the FAC fails to sufficiently plead that Plaintiffs took any action *in reliance* on the alleged promise and were *harmed* as a result.  (D.I. 15 at 14-15)  On this score, the Court first notes that the FAC alleges, in Count IV itself, that Plaintiffs' reliance "negatively impacted their ability to find alternative employment in advance of the merger."  (D.I. 10 at ¶ 338)  And the FAC elsewhere reiterates that Plaintiffs relied upon Twitter's representations regarding severance, and that these promises convinced them to remain at Twitter through the merger (because Plaintiffs knew they would have a "safety net" if Twitter ultimately decided to conduct a mass layoff or targeted firings).  (*Id.* at ¶¶ 34, 44, 103-07)  These are not conclusory allegations of reliance.  And many courts have held that refraining from seeking other employment is a sufficient form of reliance that can demonstrate harm as to a promissory estoppel claim.  (D.I. 24 at 10); *see, e.g.*, *Moncada*, 164 Cal. Rptr. 3d at 610 (concluding that plaintiffs' allegations satisfied the requirements of promissory estoppel where, *inter alia*, plaintiffs relied on defendants' promise to pay them an amount sufficient to retire if they remained employed at defendant, to plaintiffs' "detriment by remaining employed at West Coast, and forgoing other employment and residential opportunities").

So Plaintiffs' promissory estoppel claim is sufficiently pleaded.

### 4.    Plaintiffs' Breach of Offer Letter Claim

 The Twitter Defendants' final challenge to this group of claims relates to Plaintiffs' breach of offer letter claim in Count V.  Count V alleges that before beginning employment at Twitter, Plaintiffs each executed an offer letter that constituted a binding contract.  (D.I. 10 at ¶¶ 342-48)  The FAC further asserts that:  (1) the offer letters provided that Plaintiffs "were eligible to receive benefits" pursuant to the terms of Twitter's benefit plans; (2) the severance policy constituted such a benefit plan; and (3) Twitter did not provide Plaintiffs with severance in accordance with its benefit plan.  (*Id.* at ¶¶ 349-51)

The Twitter Defendants argue that this claim fails because:  (1) the FAC does not allege that Twitter had a duty to maintain any benefit employment plan, nor a duty to conform the plan's terms to the severance benefits they currently seek; (2) Twitter was free to modify or terminate any severance plan at any time; and (3) the alleged contract described in the offer letters is too indefinite to constitute an enforceable promise.  (D.I. 15 at 13)  Plaintiffs only specifically respond to the Twitter Defendants' second argument here.  (D.I. 24 at 9)

At a minimum, the Twitter Defendants' third argument is enough to win the day.  The FAC does not plead that the offer letters specifically promised that one benefit that Plaintiffs were entitled to receive was severance.  Nor does it plead the specific severance benefits that Plaintiffs were to receive pursuant to the offer letters.  In fact, Count V hardly contains any detail at all about the nature or key wording of the contractual provision that is supposed to have been allegedly breached here.  (D.I. 10 at ¶¶ 341-52)  In the absence of such allegations, the Court cannot discern what exactly Twitter promised in the offer letters with respect to "benefits" or severance, let alone whether it is plausible that such a promise was breached.  *See, e.g., Maye v.*

*Online Land Sales, LLC*, No. 2:23-cv-00173-DAD-CKD, 2024 WL 4804063, at *6 (E.D. Cal. Nov. 15, 2024) ("To allege formation of a contract under California law, a plaintiff must allege[, *inter alia*,] that there was . . . sufficiently definite terms so as to ascertain the parties' obligations[.]"); *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999) (explaining that to give rise to an enforceable contract under New York law, there must be a "sufficiently definite offer" as "definiteness as to material matters is of the very essence of contract law") (internal quotation marks and citation omitted); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook.").[19]

The Court therefore recommends that Count V be dismissed as to Twitter. That said, it seems possible that Plaintiffs might be able to plead the missing facts in a further amended complaint. In light of this, and because Federal Rule of Civil Procedure 15 states that leave to amend should be freely permitted "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), the Court will recommend that such dismissal be without prejudice.

### C.    Plaintiffs' Fraud Claim (Count VI)

Lastly, we turn to the Twitter Defendants' challenges to Plaintiffs' fraud claim, which is found in Count VI. To state a claim for fraudulent misrepresentation or omission requires alleging: (1) a material misrepresentation or omission of fact; (2) made with knowledge of its

---

[19]    *Cf. Henry v. Ala. State Dep't of Educ.*, Case No. 2:21-cv-107-RAH-SMD, 2023 WL 7118750, at *6 (M.D. Ala. Oct. 4, 2023) ("The offer letter, which does not discuss or contain specific terms of employment beyond Henry's title, salary and start date . . . does not include 'the necessary essential terms with the requisite definiteness to be considered a valid, enforceable contract.'") (internal citations omitted) (citing Alabama law), *report and recommendation adopted sub nom. Henry v. Glasscock*, 2023 WL 7115169 (M.D. Ala. Oct. 27, 2023).

falsity; (3) with an intent to defraud; and (4) reasonable reliance on the part of the plaintiff; (5) that causes damage to the plaintiff.  *See, e.g.*, *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003); *Lee v. Mondelez Int'l, Inc.*, 637 F. Supp. 3d 116, 138 (S.D.N.Y. 2022).

In Count VI, Plaintiffs allege that Twitter made representations to its employees that if they were laid off in the first year after the merger, they would receive severance benefits no less favorable than they would have received pre-merger, and that Musk, X Holdings I and (non-party) X Holdings II intended Twitter to make such representations in order to allay concerns regarding the merger.  (D.I. 10 at ¶¶ 354, 356)  Furthermore, the FAC alleges that Defendants intended that Twitter's employees would rely on these representations and that the employees did in fact do so—but that Musk, X Holdings I or X Holdings II did not intend to follow through on the promises regarding severance (and Twitter either knew or was reckless to the fact that the representations were untrue).  (*Id.* at ¶¶ 355, 357-59, 366)

The Twitter Defendants posit that Plaintiffs' fraud claim must be dismissed for a few different reasons.  The Court will address each below.

First, the Twitter Defendants contend that Count VI must be dismissed because the law requires a plaintiff asserting fraud against a corporation to allege "the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written"—but the FAC fails to allege *who* at Twitter made the alleged representations or whether they had authority to do so.  (D.I. 15 at 15-16 (quoting *Khan v. CitiMortgage, Inc.*, 975 F. Supp. 2d 1127, 1140 (E.D. Cal. 2013)); *see also* D.I. 38 at 7).  In support, the Twitter Defendants point to allegations like the following:

> 34.  Twitter made these promises many times and in many ways. Twitter made these promises in their initial offer letters to the plaintiffs.  Twitter made this same promise explicit in its agreement to sell the company to Musk, negotiating for a clause in the

agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management.  And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction. . . .

41.  After Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so.  Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) prorated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date. . . .

354.  In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

(D.I. 10 at ¶¶ 34, 41, 354 (*cited in* D.I. 15 at 16))

Plaintiffs retort that the FAC is not required to identify a human author because the fraudulent statements at issue "come from a piece of paper . . . not a person" and it is Defendants who possess the full information of who drafted the written statements at issue.  (D.I. 24 at 12-13 (quoting *Vogel v. Travelers Cas. Ins. Co. of Am.*, SACV 17-00612 AG (JDEx), 2017 WL 5642302, at *2 (C.D. Cal. May 18, 2017)))

While the FAC does plead that certain of the misrepresentations were made by Twitter in writing, it also makes reference to other statements that were orally communicated to employees. (D.I. 10 at ¶¶ 41, 86-88)  The Court agrees that to the extent the fraud claim intends to rely upon

these oral representations,[20] the FAC does not sufficiently plead fraud as to them under Rule 9(b)

because it does not allege *who* made these statements.  *Compare Mountjoy v. Bank of Am. Home*

*Loans*, No. 2:15-cv-02204-TLN-AC, 2016 WL 4192416, at *5 (E.D. Cal. Aug. 9, 2016)

(dismissing plaintiff's fraud claim where, *inter alia,* plaintiff failed to enumerate who made the

fraudulent misrepresentations), *and Khan*, 975 F. Supp. 2d at 1141 (finding that the complaint

failed to plausibly allege misrepresentation where it "identifie[d] no person making alleged

misrepresentations with required specificity to hold defendants accountable"), *with Foran v.*

*Ulthera, Inc.*, No. 1:20-cv-00267-DAD-BAM, 2022 WL 507271, at *11 (E.D. Cal. Feb. 18,

2022) (finding that the plaintiff's fraud claim was sufficiently pleaded, where the

misrepresentations at issue were made in written and online communications and while "plaintiff

does not allege in the FAC who specifically made the claimed misrepresentations by creating the

marketing materials, plaintiff is not required to plead the authors' identities when such facts [are

within defendants' knowledge] and plaintiff has provided notice by clearly identifying the user

manual and specific marketing materials in the [complaint's] exhibits") (citing cases), *and Vogel*,

2017 WL 5642302, at *2 (citation omitted).

    Second, the Twitter Defendants argue that the fraud claim should be dismissed because

the FAC does not allege sufficient facts showing that they had an intent to defraud Plaintiffs

when they made the alleged misrepresentations.  (D.I. 15 at 16; D.I. 38 at 8)  Instead, according

to the Twitter Defendants, the FAC relies solely on *Musk's* alleged fraudulent intent when

---

[20]    Within the fraud claim (i.e., within Count VI itself), the FAC merely alleges that
"[i]n signing the [m]erger [a]greement, and *in its subsequent statements to its employees, Twitter*
*represented* that if it laid off employees in the first year following the merger, it would pay
severance no less favorable than it had paid previously."  (D.I. 10 at ¶ 354 (emphasis added))  So
it is a little unclear as to whether Plaintiffs are relying on certain oral statements made at
meetings in setting out the fraud claim in Count VI.

seeking to plead a fraud claim against the *Twitter Defendants*, which Rule 9(b) cannot not permit (in part due to the fact that that Musk was not yet even in control of Twitter at the time that the representations were made). (D.I. 15 at 16; D.I. 38 at 8)

Plaintiffs do not respond to this particular argument. And the Court agrees with the Twitter Defendants' position here. While Rule 9(b) does not require plaintiffs to allege intent with particularity, the plaintiff "must still allege facts that give rise to a strong inference of fraudulent intent." *Lee*, 637 F. Supp. 3d at 138 (internal quotation marks and citation omitted); *see also, e.g.*, *Vinewood Cap., L.L.C. v. Al-Maal*, Civil Action No. 4:06-CV-316-Y, 2007 WL 2791876, at *11 (N.D. Tex. Sept. 26, 2007) ("While Rule 9(b) allows allegations of intent to be averred generally, a mere allegation that a defendant had the intent to commit fraud is insufficient."), *aff'd sub nom. Vinewood Cap., LLC. v. Dar Al-Maal Al-Islami Tr.*, 295 F. App'x 726 (5th Cir. 2008). Within Count VI, when it comes to the Twitter Defendants, the FAC alleges only that "[o]n information and belief, Twitter either knew or was reckless to the fact that its representations to the Tweeps were untrue" and that "[o]n information and belief, [X Holdings I] never intended to follow through on the Severance Stability Promise." (D.I. 10 at ¶¶ 359, 366)[21] These brief and conclusory allegations are not sufficient to plead fraud with respect to the Twitter Defendants. *See, e.g.*, *Vinewood Cap., L.L.C.*, 2007 WL 2791876, at *12 (explaining that there is no "inference of fraudulent intent not to perform from the mere fact that a promise made is subsequently not performed" and dismissing a fraud claim where the complaint failed to allege any facts that would support an inference that, at the time defendants made the statements

---

[21]    Indeed, as to Twitter, the FAC earlier alleges to the contrary that it had negotiated for provisions in the merger agreement "specifically to protect and benefit its employees" by ensuring that benefits such as severance would remain stable following the merger. (D.I. 10 at ¶ 71)

at issue, they were anything but genuine) (internal quotation marks and citation omitted); *see also U.S. Bank, N.A. for Registered Holders of ML-CFC Com. Mortg. Tr. 2007-7 v. Miller*, CASE NO. CV 12-5632 MMM (MANx), 2013 WL 12183652, at *8 (C.D. Cal. May 8, 2013) ("Instead of relying solely on U.S. Bank's subsequent purported breach of contract, defendants must allege, *with particularity*, facts showing that U.S. Bank had no intention of performing its contractual promises at the time it executed the contract.") (emphasis in original).

Third, the Twitter Defendants suggest that Plaintiffs' fraud claim is redundant of their breach of contract claim. They note that, in at least some of the relevant states at issue here, a fraud claim survives only if the plaintiff either: "i) demonstrate[s] a legal duty separate from the duty to perform under the contract; or ii) demonstrate[s] a fraudulent misrepresentation collateral or extraneous to the contract; or iii) seek[s] special damages that are caused by the misrepresentation and unrecoverable as contract damages." (D.I. 15 at 17 (quoting *Kulas v. Adachi*, No. 96 CIV. 6674(MBM), 1997 WL 256957, at *9 (S.D.N.Y. May 16, 1997)); *see also Kulas*, 1997 WL 256957, at *9 ("[W]here a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract.") (internal quotation marks and citations omitted))[22] According to the Twitter Defendants, Plaintiffs' fraud claim must also be

---

[22] It is not clear to the Court whether this is the law not only in New York but also in California and Texas. *See, e.g.*, *Heller Fin., Inc. v. Grammco Comput. Sales, Inc.*, 71 F.3d 518, 527-28 (5th Cir. 1996); *Hosp. Mktg. Concepts, LLC v. Six Continents Hotels, Inc.*, Case No. SACV 15-01791 JVS (DFMx), 2016 WL 9045621, at *6 (C.D. Cal. Jan. 28, 2016); *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, No. SA CV10-01172 JAK, 2012 WL 5447959, at *9 (C.D. Cal. Oct. 4, 2012). For now, the Court need not decide that issue, as Count VI is also being dismissed on other independent grounds. But Plaintiffs should carefully review the law in question on this point if they intend to replead the Count.

dismissed because the FAC does not allege a separate legal duty or promises collateral to the contract.  (D.I. 15 at 17-18)

For their part, Plaintiffs retort that the FAC alleges that Defendants made misrepresentations that the merger agreement provides them with "special protections," including specified severance, in order to induce Plaintiffs to remain at the company—statements collateral to the contract and not duplicative of the breach of contract claims.  (D.I. 24 at 13-14 (citing D.I. 10 at ¶¶ 39-42))  But Plaintiffs' arguments are unsupported.  The phrase "special protections" does not appear at all in the FAC.  And the representation described in the fraud claim is "Twitter['s] represent[ations] that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously."  (D.I. 10 at ¶ 354)  That is the same promise alleged in Plaintiffs' breach of contract claim—i.e., that "Twitter would provide its pre-merger severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger."  (*Id.* at ¶ 326)  The Court, therefore, does not understand how Plaintiffs' fraud claim "rel[ies] on a separate legal duty or on any promises or representations collateral to the contract[.]"  *Kulas*, 1997 WL 256957, at *9.  And it therefore must be dismissed for this reason too as to the Twitter Defendants (at least to the extent that the claim is made on behalf of those Plaintiffs who worked in states where the law requires what is set out above).[23]

---

[23]     Plaintiffs also assert that the fraud claim is not duplicative for the additional reason that they seek punitive damages for the fraud claim but not the breach of contract claims. (D.I. 24 at 14)  But relevant courts have still found that fraud claims are duplicative of breach of contract claims where, apart from unelaborated requests for punitive damages in connection with the fraud claim, the plaintiff seeks the same damages as it does via the breach of contract claim. *See, e.g.*, *Somnia, Inc. v. Change Healthcare Tech. Enabled Servs., LLC*, 19-CV-08983 (PMH), 2021 WL 639529, at *5 n.6 (S.D.N.Y. Feb. 16, 2021); *see also* (D.I. 38 at 9).  And that is the case here.  (*See* D.I. 10 at ¶¶ 331, 352, 369)

For the above reasons, the Court recommends grant of the motion as to Count VI.  Here again, because it seems possible that Plaintiffs might be able to replead this claim in order to fix the deficiencies noted above, the Court recommends that dismissal be without prejudice.

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends that the Twitter motion to dismiss be GRANTED-IN-PART and DENIED-IN-PART.  Specifically, the Court recommends grant of the Twitter motion to dismiss as to Counts I and II as to the Twitter Defendants with prejudice, and as to Counts V and VI as to the relevant Twitter Defendants without prejudice.  In all other respects, the Court recommends that the Twitter motion to dismiss be denied.  As to those portions of the Court's decision where it recommends a denial without prejudice, to the extent that Plaintiffs later seek to amend the FAC, the Court also recommends that they be required to do so by filing a motion for leave to amend.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated:  December 5, 2024

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

38