# Exhibit 1

CONFIDENTIAL

```
 1                      JAMS ARBITRATION

 2                         --oOo--

 3   KEENE NIEMACK,

 4          Claimant,

 5   vs.                           JAMS Reference No.:

                                   1601002285

 6   TWITTER, INC. and X CORP.

 7          Respondents.

     _____/

 8

 9

10

11

12                   CONFIDENTIAL

13

14     VIDEO-RECORDED DEPOSITION OF JULIANNA HAYES

15             SAN FRANCISCO, CALIFORNIA

16              FRIDAY, MAY 10, 2024

17

18

19

20

21

22

23   Reported by:

24   Anrae Wimberley, CSR No. 7778

25   Job No.  6695346
```

                                              Page 1

CONFIDENTIAL

**Page 2**

```
1            JAMS ARBITRATION
2              --oOo--
3   KEENE NIEMACK,
4        Claimant,
5   vs.              JAMS Reference No.:
                       1601002285
6   TWITTER, INC. and X CORP.
7        Respondents.
    _____/
8
9
10
11
12            CONFIDENTIAL
13
14
15      Transcript of video-recorded deposition
16  of JULIANNA HAYES, taken at Quinn Emanuel
17  Urquhart & Sullivan, LLP 50 California Street,
18  22nd Floor, San Francisco, California 94111,
19  beginning at 9:07 a.m. and ending at 2:27 p.m. on
20  FRIDAY, MAY 10, 2024, before Anrae Wimberley,
21  Certified Shorthand Reporter No. 7778.
22
23
24
25
```

**Page 4**

```
1   Also present:
2       CASSIA LEET, Videographer
3       VERITEXT LEGAL SOLUTIONS
4
5       MARY HANSBURY, In-House Counsel at X Corp.
6              --oOo--
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1   APPEARANCES:
2   For the Claimant Keene Niemack:
3       LICHTEN & LISS-RIORDAN, P.C.
4       BY:  SHANNON LISS-RIORDAN, ESQ.
5       729 Boylston Street, Suite 2000
6       Boston, Massachusetts 02116
7       (617) 994-5800
8       sliss@llrlaw.com
9
10  For the Respondents Twitter, Inc. and X Corp.:
11      QUINN EMANUEL URQUHART & SULLIVAN, LLP
12      BY:  VICKI PARKER, ESQ.
13         LAURENNE BABAYAN, ESQ.
14      50 California Street, 22nd Floor
15      San Francisco, California 94111
16      (415) 875-6503
17      vickiparker@quinnemanuel.com
18      laurennebabayan@quinnemanuel.com
19  -and-
20      MORGAN LEWIS & BOCKIUS LLP
21      BY:  ERIC MECKLEY, ESQ.
22      One Market, Spear Street Tower
23      San Francisco, California 94105
24      (415) 442-1013
25      eric.meckley@morganlewis.com
```

**Page 5**

```
1              I N D E X
2   EXAMINATION BY:              PAGE
3   Ms. Parker              9
4   Ms. Liss-Riordan        146
5   Ms. Parker              149
6              --oOo--
7
8            E X H I B I T S
9   EXHIBIT     DESCRIPTION        PAGE
10  Exhibit 1   Employment agreement dated    20
                June 1, 2012, Bates labeled
11              X-ARBS_000070844 through
                X_ARBS_000070859; 16 pages
12
    Exhibit 2   E-mail dated November 7,      27
13              2022, Bates labeled
                X_ARBS_000070861; 1 page
14
    Exhibit 3   Demand for Arbitration        33
15              Form; 27 pages
16  Exhibit 4   Document titled "Q3 2022      43
                Actual vs. Forecast," Bates
17              labeled X_ARBS_000064947
                through X_ARBS_000064957;
18              11 pages
19  Exhibit 5   Document titled "Q3 2022      45
                Close Review, Bates labeled
20              X_XARBS_000064961 through
                X_ARBS_000064994; 34 pages
21
    Exhibit 6   Spreadsheet, Bates labeled    62
22              X_ARBS_000070478 through
                X_ARBS_000070566; 2 pages
23
    Exhibit 7   E-mail dated May 14, 2022,    63
24              Bates labeled
                X_ARBS_000024037; 1 page
25
```

CONFIDENTIAL

**Page 6**

E X H I B I T S (Cont'd)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | E-mail dated July 7, 2022, Bates labeled X_ARBS_000009347; 1 page | 65 |
| Exhibit 9 | Twitter Acquisition: Tweep FAQ, October 2022, Bates labeled TWITTER_ARB_000002050 through TWITTER_ARB_000002076; 27 pages | 76 |
| Exhibit 10 | E-mail chain dated November 1, 2022, Bates labeled X_ARBS_000009312; 1 page | 102 |
| Exhibit 11 | E-mail chain dated November 2, 2022, Bates labeled X_ARBS_000065522; 1 page | 104 |
| Exhibit 12 | E-mail dated December 9, 2022, Bates labeled X_ARBS_000065521; 1 page | 104 |
| Exhibit 13 | E-mail dated November 7, 2022, Bates labeled X_ARBS_000035422 through X_ARBS_000035424; 3 pages | 125 |
| Exhibit 14 | Letter to Julianna Hayes from Leslie Berland, dated October 18, 2018; 3 pages | 140 |
| Exhibit 15 | Letter to Julianna Hayes from Jennifer Christie, dated November 30, 2021; 13 pages | 141 |

--oOo--

**Page 7**

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

| PAGE | LINE |
|---|---|
| 129 | 16 |
| 131 | 24 |
| 143 | 18 |

--oOo--

**Page 8**

FRIDAY, MAY 10, 2024;

SAN FRANCISCO, CALIFORNIA;

9:07 A.M.

- - -

THE VIDEOGRAPHER: Good morning. We are going 9:07:04AM on the record at 9:07 a.m. on May 10th, 2024.

Please note that the microphones are sensitive and may pick up whispering and private conversations. Audio and video recording will continue to take place unless all parties agree to go off the record. 9:07:23AM

This is Media Unit 1 of the video-recorded deposition of Julianna Hayes taken by counsel for respondents in the matter of Keene Niemack versus Twitter, Inc. and X Corp. filed in JAMS arbitration. JAMS Reference No. 1601002285. 9:07:46AM

The location of the deposition is 50 California Street, 22nd Floor, San Francisco, California 94111.

My name is Cassia Leet representing Veritext Legal Solutions and I am the videographer. 9:08:08AM The court reporter is Anrae Wimberley from the firm Veritext Legal Solutions.

I am not related to any party in this action, nor am I financially interested in the outcome. 9:08:20AM

**Page 9**

Will counsel and all present please state 9:08:22AM your appearances and affiliations for the record beginning with the noticing attorney.

MS. PARKER: Vicki Parker of Quinn Emanuel on behalf of respondents. And with me today is 9:08:33AM Laurenne Babayan, also of Quinn Emanuel; Eric Meckley of Morgan Lewis and Mary Hansbury of X Corp. Adam Mehes, also of X Corp., may join on the line throughout the day.

MS. LISS-RIORDAN: And I'm Shannon Liss-Riordan 9:08:52AM for the claimant and for the witness today, Ms. Hayes.

THE VIDEOGRAPHER: Thank you. Would the court reporter please swear in the witness and then counsel may proceed. 9:09:01AM

JULIANNA HAYES, sworn in personally as a witness by the Certified Shorthand Reporter, testified as follows:

EXAMINATION

BY MS. PARKER: 9:09:04AM

Q. Good morning. As I just said, my name is Vicki Parker. I will be asking you questions today. Could you please state your name for the record.

A. Julianna Hayes. 9:09:30AM

3 (Pages 6 - 9)

CONFIDENTIAL

| | |
|---|---|
| 1    A.  Yes.                              11:16:58AM | 1    Q.  Were there any other models that you ran? 11:20:06AM |
| 2    Q.  Did you run any financial models as to how | 2    A.  Not that I recall. |
| 3  much severance would cost the company? | 3    Q.  When you ran the simplified to three |
| 4    A.  Yes. | 4  months for everyone model, do you remember if WARN |
| 5    Q.  What scenarios did you run?        11:17:15AM | 5  was taken into account at all?            11:20:22AM |
| 6    A.  We ran many. | 6    A.  I don't remember. |
| 7    Q.  What were they? | 7    MS. PARKER:  Okay.  Why don't we take a break. |
| 8    A.  We started at what the full severance -- | 8  We've been going for over an hour. |
| 9  our interpretation of the full severance would be, | 9    THE VIDEOGRAPHER:  This marks the end of Media |
| 10  which was Twitter's standard severance package by   11:17:30AM | 10  Unit 1 of the deposition of Julianna Hayes.  The   11:20:32AM |
| 11  level. | 11  time is 11:20 a.m.  We're off the record. |
| 12       We had two models.  One was a very | 12    (Recess taken.) |
| 13  detailed and large equity file that was run per | 13    THE VIDEOGRAPHER:  We are back on the record at |
| 14  employee because every employee's equity was unique. | 14  11:40 a.m.  This marks the beginning of Media Unit 2 |
| 15  And then we had a Google Sheet, I believe, that ran   11:17:58AM | 15  of the deposition of Julianna Hayes.  Please        11:40:03AM |
| 16  the different kind of cash scenarios for different | 16  continue. |
| 17  salaries and PBP, kind of the cash components.  And | 17  BY MS. PARKER: |
| 18  then we would put those two together to get the | 18    Q.  Great.  So before the break we were |
| 19  final cost. | 19  talking about severance models that you ran. |
| 20    Q.  And when you ran this model off of what   11:18:17AM | 20    A.  Yes.                              11:40:13AM |
| 21  you call the full severance package, did you account | 21    Q.  So there was one that you said was based |
| 22  for WARN notice? | 22  on your understanding of the full severance package |
| 23    A.  We used -- not -- I would say not | 23  and one that was simplified to three months for |
| 24  specifically. | 24  everyone; is that right? |
| 25    Q.  Was the severance calculated to go in    11:18:35AM | 25    A.  Yes.                              11:40:25AM |
| Page 86 | Page 88 |

| | |
|---|---|
| 1  addition to WARN notice or was WARN notice baked   11:18:39AM | 1    Q.  Were there any other severance models?   11:40:25AM |
| 2  into part of the numbers of the severance? | 2    A.  Well, eventually we got down to two |
| 3    A.  There was no discussion of WARN to me.  It | 3  months.  And I don't remember if there were other |
| 4  was the standard formula of essentially two months | 4  ones in there.  There might have been. |
| 5  plus a week and then the six plus months for         11:19:01AM | 5    Q.  When you say eventually you got down to   11:40:36AM |
| 6  directors and above or VPs and above, I can't | 6  two months, when was that? |
| 7  remember. | 7    A.  I don't recall, but -- I don't remember |
| 8       I don't recall anything specific to WARN | 8  kind of when it went down to two. |
| 9  in those calculations. | 9    Q.  In addition to the three months of pay, |
| 10    Q.  So you said you ran multiple calculations. 11:19:14AM | 10  what else went into the severance model?            11:40:56AM |
| 11       What was the next calculation that you | 11    A.  I know we had an equity vest and I can't |
| 12  ran? | 12  remember if we put in something for the PBP or not. |
| 13    A.  I recall Alex Spiro thought it was odd | 13    Q.  And was this in the full severance package |
| 14  that -- | 14  or in the simplified severance package or both? |
| 15    Q.  I would not disclose what Alex Spiro said. 11:19:29AM | 15    A.  It would have been in both.          11:41:17AM |
| 16       Can you just tell me what the next numbers | 16    Q.  Okay.  So both packages included pay, an |
| 17  you . . . | 17  equity vest and some version of PBP? |
| 18    A.  The next numbers were everyone getting the | 18    A.  To start.  And then I do remember over |
| 19  same, so senior leadership not getting the six | 19  time there was a difference, and I can't remember |
| 20  months plus but everyone getting the more standard.  11:19:44AM | 20  what it was, but between New York state employees   11:41:39AM |
| 21    Q.  And when you say "standard" do you mean | 21  and everyone else. |
| 22  two months plus a week? | 22       And then there were also a few |
| 23    A.  I can't remember if we were doing two | 23  international differences, but I don't recall what |
| 24  months plus a week or if we had already simplified | 24  those were. |
| 25  it to three months.  I can't remember.        11:19:58AM | 25    Q.  Were you running different models for     11:41:55AM |
| Page 87 | Page 89 |

23 (Pages 86 - 89)

Case 1:23-cv-00528-TMH    Document 146-1    Filed 03/24/25    Page 6 of 21 PageID #: 2988

CONFIDENTIAL

**Page 90**

1 people in different locations?                11:41:57AM
2   A. I definitely remember the New York state
3 employees were treated differently. And then I
4 can't remember internationally if we ran those in
5 detail or just made some estimates.          11:42:07AM
6   Q. When you say "we ran," who is "we"?
7   A. Yeah, there were many people involved.
8 Off the top of my head, it was a combination of
9 people in the finance team and people in HR.
10 Braden -- I can't remember his last name. Amudson, 11:42:33AM
11 I think -- was helping with the model; Lisa
12 Cummings; Mike Foley; Peter Lenke, I believe; Matt
13 Chronert; I can't remember who else.
14     Q. Do you know if Mark Schobinger was
15 involved?                                    11:42:56AM
16   A. Mark was around. I don't think he was
17 involved in the modeling.
18     Q. Did you -- well, did you end up presenting
19 options to anyone?
20   A. We did. I don't recall everybody. Alex  11:43:30AM
21 Spiro was one. I don't -- Steve Davis was involved.
22 I think David Sacks.
23     Q. And without disclosing any communications
24 that took place in the meeting, do you remember when
25 the meeting took place?                      11:43:59AM

**Page 91**

1   A. It would have been between probably, I    11:44:01AM
2 would say, 10/30 and November 2nd, in that time
3 frame.
4     Q. Do you remember how many models --
5 different scenarios were presented?           11:44:16AM
6   A. I don't.
7   Q. Was more than one?
8   A. Yeah, we went through multiple scenarios.
9   Q. Did you make a recommendation as to which
10 scenario should be adopted?                   11:44:30AM
11   A. We recommended at first how -- the
12 standard Twitter package.
13   Q. And who is "we" in that context?
14   A. Myself, Jon Chen, Kathleen Pacini. I
15 can't remember who else.                      11:44:47AM
16   Q. Ultimately -- well, in making that
17 recommendation, did you present a business case for
18 the recommendation?
19   A. We showed the total cost.
20   Q. And did you think that the company could  11:45:09AM
21 sustain that cost?
22   A. It was just a cost.
23   Q. And based -- so based on your view of the
24 financials, you thought the company could absorb
25 that cost at that point?                      11:45:29AM

**Page 92**

1   A. Yeah.                                    11:45:31AM
2   Q. Did you present any options to Elon?
3   A. I don't remember which meetings Elon was
4 in. He saw the final. I don't remember if we
5 showed him the other options.                 11:45:59AM
6   Q. When you say "the final," which one did
7 that -- which -- what was the final?
8   A. The final was, I believe, the two months
9 severance plus an additional month for the -- for a
10 release.                                     11:46:15AM
11   Q. Do you remember what else went into that
12 model?
13   A. I don't.
14     That did -- sorry. That -- New York
15 employees had another month, which got them another 11:46:27AM
16 month of pay but also got them another vesting
17 cycle.
18   Q. Who else was present when you made this
19 presentation to Elon?
20   A. The same -- this was the final RIF     11:46:44AM
21 presentation. It was the same meeting.
22   Q. So the large group of people that we --
23   A. Correct.
24   Q. -- talked about earlier?
25     Was your presentation oral? Were there  11:46:54AM

**Page 93**

1 PowerPoints? How did you make the presentation?    11:46:58AM
2   A. I think we showed a Google Sheet. We
3 either showed the sheet directly or we put it in a
4 presentation. And we went through the numbers.
5   Q. During that presentation, did you tell    11:47:17AM
6 Elon that the company had a contractual obligation
7 to provide a higher level of severance?
8   A. I don't remember.
9   Q. Did you tell Elon that you believe the
10 company had promised Twitter employees a higher     11:47:35AM
11 level of severance?
12   A. I don't remember. I don't think so.
13   Q. Did you ever tell anyone else that you
14 believed Elon was breaching a contractual obligation
15 by not providing a higher level of severance?       11:47:56AM
16   A. I don't remember saying that.
17   Q. Did you tell anyone else that you believed
18 he was breaking a promise made to Twitter employees
19 by not offering more severance?
20   A. I don't remember saying that, but that's  11:48:10AM
21 what I felt.
22   Q. So at this point you agreed that the
23 company needed to cut costs to some extent; correct?
24   A. Yes.
25   Q. And providing more in severance is more   11:48:23AM

24 (Pages 90 - 93)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

**Page 150**

1  I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4  That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were administered an oath; that
8  a record of the proceedings was made by me using
9  machine shorthand which was thereafter transcribed
10  under my direction; that the foregoing transcript is
11  a true record of the testimony given.
12  Further, that if the foregoing pertains to
13  the original transcript of a deposition in a Federal
14  Case, before completion of the proceedings, review
15  of the transcript ( ) was (X) was not requested.
16  I further certify that I am neither
17  financially interested in the action nor a relative
18  or employee of any attorney of any party to this
19  action.
20  IN WITNESS WHEREOF, I have this date
21  subscribed my name.
22  Dated:  May 11, 2024
23
24
25  ANKAE WIMBERLEY, CSR No. 7778

**Page 152**

1  __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2  Transcript - The witness should review the transcript and
3  make any necessary corrections on the errata pages included
4  below, noting the page and line number of the corrections.
5  The witness should then sign and date the errata and penalty
6  of perjury pages and return the completed pages to all
7  appearing counsel within the period of time determined at
8  the deposition or provided by the Federal Rules.
9  __ Federal R&S Not Requested - Reading & Signature was not
10  requested before the completion of the deposition.

**Page 151**

1  SHANNON LISS-RIORDAN, ESQ.
2  sliss@llrlaw.com
3            May 11, 2024
4  RE: NIEMACK vs. TWITTER, INC.
5  May 10, 2024, JULIANNA HAYES, JOB NO. 6659346
6  The above-referenced transcript has been
7  completed by Veritext Legal Solutions and
8  review of the transcript is being handled as follows:
9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10  to schedule a time to review the original transcript at
11  a Veritext office.
12  _x_ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13  Transcript - The witness should review the transcript and
14  make any necessary corrections on the errata pages included
15  below, noting the page and line number of the corrections.
16  The witness should then sign and date the errata and penalty
17  of perjury pages and return the completed pages to all
18  appearing counsel within the period of time determined at
19  the deposition or provided by the Code of Civil Procedure.
20  Contact Veritext when the sealed original is required.
21  __ Waiving the CA Code of Civil Procedure per Stipulation of
22  Counsel - Original transcript to be released for signature
23  as determined at the deposition.
24  __ Signature Waived – Reading & Signature was waived at the
25  time of the deposition.

**Page 153**

1  NIEMACK vs. TWITTER, INC.
2  JULIANNA HAYES (#6659346)
3            E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  WITNESS            Date
25

39 (Pages 150 - 153)

# Exhibit 2

Page 1

JAMS ARBITRATION
Before Arbitrator Michael Loeb, Esq.

KEENE NIEMACK,            )
          Claimant,       )
                          )
VS.                       )  JAMS Ref No.: 1601002285
                          )
TWITTER, INC.,            )
          Respondent.     )


***********************************************
ORAL AND VIDEOTAPED DEPOSITION OF

ELON MUSK

MAY 9, 2024

***CONFIDENTIAL***
***********************************************

          ORAL AND VIDEOTAPED DEPOSITION OF ELON

MUSK, produced as a witness at the instance

of the Claimant, and duly sworn, was taken in

the above-styled and numbered cause on May 9,

2024, from 8:39 a.m. to 4:38 p.m., before

Donna Wright, CSR in and for the State of

Texas, reported by machine shorthand, at the

law offices of QUINN EMANUEL URQUHART &

SULLIVAN, LLP, 300 West 6th Street, Suite 2010,

Austin, Texas, pursuant to the Texas Rules of

Civil Procedure and the provisions stated on

the record or attached hereto.



Page 6

1  THE VIDEOGRAPHER:  Today is May
2  9th, 2024, and the time is 8:39 a.m.
3  We are on the record.
4  (Discussion off the record)
5  THE VIDEOGRAPHER:  Will counsel   08:39:21
6  and all parties present state their
7  appearances and whom they represent.
8  MS. LISS-RIORDAN:  For
9  Claimant, I'm Shannon Liss-Riordan.
10  With me are --
11  MR. MANEWITH:  Bradley Manewith
12  for Claimant.
13  MR. FOWLER:  And Thomas Fowler,
14  also for Claimant.
15  MS. LISS-RIORDAN:  And we have   08:39:35
16  several other attorneys from our firm
17  attending by Zoom.  Jeremy Abay,
18  Samuel Davis, Matthew Carrieri --
19  MR. MANEWITH:  And Jack
20  Bartholet.                          08:39:47
21  THE REPORTER:  And -- pardon?
22  MR. MANEWITH:  Jack Bartholet.
23  THE REPORTER:  Okay.
24  MR. SPIRO:  This is Alex Spiro
25  on behalf of Mr. Musk, and present   08:39:50

Page 7

1  with me is Adam Mehes from X.  On the
2  line is Phil Jobe from Quinn Emanuel
3  and Mary Hansbury from X.  Thank you.
4  THE REPORTER:  Okay.
5  MS. LISS-RIORDAN:  Please swear
6  in the witness.
7  ELON MUSK,
8  having been first duly sworn, testified as
9  follows:
10  EXAMINATION
11  BY MS. LISS-RIORDAN:
12  Q.    All right.  Good morning, Mr.
13  Musk.  Nice to meet you.
14  A.    Good morning.
15  Q.    I have heard a lot about you,   08:40:19
16  so nice to meet in person.
17  As you probably know, I'm going
18  to be asking you questions today about
19  various lawsuits and arbitrations that we
20  have brought against Twitter, now X.   08:40:31
21  Throughout this deposition, I may call
22  Twitter and X, I may use those terms
23  interchangeably.
24  But you understand that if I
25  refer to Twitter, I'm referring to the   08:40:42

Page 8

1  company that is now called X, and vice versa,
2  if I refer to X, the company that used to be
3  Twitter?
4  A.    You are not referring to my
5  son, for example.                    08:40:54
6  Q.    I was not planning to ask you
7  about your son.
8  A.    Right.
9  Q.    But if he has anything relevant
10  to add --                            08:40:58
11  A.    Everything is called X,
12  basically, at this point.
13  Q.    All right.  And so I know you
14  have been through this before, but as you
15  know, we have the court reporter taking down   08:41:01
16  what we're both saying.  So when I ask a
17  question, if you could listen to my question
18  and wait until I'm finished, even if you
19  think you know what I'm about to ask, that
20  way we can get a good record of my questions   08:41:14
21  and your answers.  Okay?
22  A.    Yeah.
23  Q.    And also, please answer with
24  spoken words, not just nods of the head so we
25  can also get a record of your answers.  Okay?   08:41:24

Page 9

1  A.    Yes.
2  Q.    Okay.
3  MS. LISS-RIORDAN:  Is the sound
4  good?  Can the videographer pick
5  everything up?                       08:41:29
6  THE VIDEOGRAPHER:  Yes.
7  MS. LISS-RIORDAN:  I know
8  you're -- we're both speaking a little
9  softly.  I just want to make sure that
10  it's all being picked up.            08:41:34
11  Q.    (BY MS. LISS-RIORDAN)  Okay.
12  Have you taken any medications that might
13  impair your ability to give truthful and
14  accurate testimony today?
15  A.    No.                        08:41:46
16  Q.    Okay.  Is there any reason that
17  you can't testify truthfully and accurately
18  today?
19  A.    Not that I'm aware of.
20  Q.    Okay.  And you understand that   08:41:56
21  you're under oath today as though you are
22  testifying in a court of law under penalty of
23  perjury?
24  A.    Yes, I just swore an oath.
25  Q.    Yes.  Okay, thank you.         08:42:05

3  (Pages  6  to  9)





Page 14

```
 1              Obviously at that point -- it
 2   might have been three or four months after
 3   the deal, a few months after the deal, after
 4   the -- after the proposal.
 5        Q.   Okay.  So during that summer --    08:46:38
 6        A.   So somewhere between the --
 7   perhaps partway between when the offer was
 8   made and when the deal concluded.
 9        Q.   So you made the offer in April
10   2022, right?                    08:46:49
11        A.   I believe so.
12        Q.   And the deal closed in October
13   of 2022?
14        A.   Yes.
15        Q.   Okay.  So sometime during that   08:46:55
16   time period, you realized that the finances
17   of the company were such that if you did
18   acquire the company, you would need to do
19   layoffs?
20        A.   Correct.             08:47:03
21        Q.   Did you have an idea in your
22   mind about what proportion of the workforce
23   may need to be laid off?
24        A.   I did not know precisely,
25   except that -- that it was some significant    08:47:16
```

Page 15

```
 1   portion and this obviously would be
 2   exacerbated by the debt load, because another
 3   thing also happened during that year, which
 4   is that the -- there was an unprecedented
 5   rise in the interest rates.  So the debt      08:47:32
 6   servicing burden was amplified dramatically
 7   through the course of the year due to the Fed
 8   having to pass this rate increase in history.
 9              So, yeah, there was significant
10   debt amplified by a much higher interest      08:47:53
11   burden than initially expected because of the
12   ramp in Fed rates and that -- that sort of
13   added additional weight to the significant
14   layoff that they were planning already, thus
15   exacerbating the situation.             08:48:11
16        Q.   Okay.  But once you decided to
17   go ahead with the deal in October of 2022 and
18   then leading up to the closing --
19        A.   Didn't have a choice.
20        Q.   Okay.  So -- but leading up to    08:48:19
21   the closing, you realized that one of the
22   first orders of business was going to be to
23   do some mass layoffs, right?
24        A.   There was clearly no -- either
25   we did -- if we did not do mass media cost    08:48:29
```

Page 16

```
 1   reduction, my rough estimate at the time was
 2   the company would be bankrupt within four
 3   months.
 4        Q.   Okay.  So what did you estimate
 5   or calculate would need to be cut, what       08:48:41
 6   portion of the workforce as you were leading
 7   up to the date of the closing -- I'm sorry,
 8   leading up to the date of, yes, the closing,
 9   what were you estimating the proportion of
10   the workforce was that you would need to      08:48:55
11   exit?
12        A.   Leading up to the closing?
13        Q.   Yes.
14        A.   I mean, I didn't have detailed
15   up-to-date data right up to the closing.  So  08:49:07
16   there wasn't -- the magnitude of the
17   situation was not apparent until shortly
18   after the closing.
19        Q.   You did get information from
20   Twitter throughout the -- throughout 2022     08:49:23
21   about their finances and any information that
22   your team requested, didn't you?
23        A.   No.
24             MR. SPIRO:  Objection.
25        Q.   (BY MS. LISS-RIORDAN) All        08:49:37
```

Page 17

```
 1   right.  Actually, let me ask this.
 2              My understanding is that you
 3   purchased -- you signed the deal in April and
 4   then you waived diligence; is that right?
 5             MR. SPIRO:  Objection.  I'm not   08:49:49
 6   sure how this fits into categories
 7   that we are here for today.
 8             MS. LISS-RIORDAN:  Well, it's
 9   related to the decisions to make
10   layoffs.                    08:49:59
11        Q.   (BY MS. LISS-RIORDAN)  So
12   you -- did you waive diligence?
13        A.   There was a waiver of
14   diligence.  However, a presumption for a
15   public company is that you can rely upon the   08:50:15
16   public statements.  This is why people can
17   trade in and out of public -- can buy and
18   sell public stock without needing to do due
19   diligence because one should be able to rely
20   upon the public statements.             08:50:32
21             Unfortunately, the public
22   statements were false.  And so it's not --
23   it's not as though I thought it would be okay
24   if they made a series of false statements
25   publicly, but that if the public statements   08:50:47
```




Page 62

```
 1        buy a house and there's a leaky roof, you own
 2        it.  If you waive the inspection contingency,
 3        you're stuck with a leaky roof?
 4               MR. SPIRO:  I'm not going to
 5        let him answer these questions.  This      09:38:10
 6        isn't part of these deposition topics.
 7        It's misleading.  You're trying to use
 8        some legal analogy.  This is -- I
 9        don't think the arbitrator would let
10        you ask this question -- or this
11        series of questions.
12               MS. LISS-RIORDAN:  Okay.
13               MR. SPIRO:  So I'll give you a
14        little -- I mean, I just --
15               MS. LISS-RIORDAN:  It's just a     09:38:19
16        couple.  I'm not -- I'm not going to
17        go long down this road.
18               MR. SPIRO:  Okay.  I just --
19        this is -- I don't know how to -- I'm
20        a lawyer and I don't know how to      09:38:22
21        answer this question.
22               MS. LISS-RIORDAN:  Well, I just
23        want to hear Mr. Musk's thoughts about
24        this.
25               MR. SPIRO:  Okay.
```

Page 63

```
 1        Q.    (BY MS. LISS-RIORDAN) You
 2   understand that if you buy a house and it has
 3   a leaky roof and you didn't know about the
 4   leaky roof ahead of time, you -- it's your
 5   house and you've got to fix the leaky roof.    09:38:34
 6   You can't go back to the prior owner and say,
 7   "You didn't tell me about this leaky roof"?
 8        A.    Yeah, I guess I would have to
 9   fix the leaky roof.
10        Q.    Right.                    09:38:45
11        A.    Yeah.
12        Q.    You would have to -- couldn't
13   go back to the prior owner and say, "Hey, I
14   want a discount now"?
15               MR. SPIRO:  I'm going to      09:38:50
16        object.  This is --
17               THE WITNESS:  Well, I -- we've
18        got a metaphor going here.
19        Q.    (BY MS. LISS-RIORDAN) Yeah,
20   yeah, yeah.  But, I mean --
21        A.    This is -- I mean, a metaphor
22   is not a --
23        Q.    Yes.
24        A.    You know, I don't know what
25   the -- how legally binding a metaphor is.     09:39:00
```

Page 64

```
 1               (Simultaneous crosstalk)
 2               MR. SPIRO:  Yeah, this is
 3        actually a very complicated --
 4        sometimes you can go back.
 5               MS. LISS-RIORDAN:  Well, okay.    09:39:07
 6        Well, I just want to know what's in
 7        his head.
 8        Q.    (BY MS. LISS-RIORDAN) What's
 9   your understanding of that?
10        A.    I mean, we're dealing with a     09:39:11
11   house metaphor here.
12        Q.    Yes.
13        A.    That if you -- yes, I think if
14   you waive inspections -- now, I'll tell you
15   where I think this metaphor doesn't apply.    09:39:23
16   But if you waive inspections on a house and
17   it has a leaky roof, then you have an
18   obligation to fix the leaky roof.
19        Q.    Right.
20        A.    I agree with that.          09:39:32
21        However, if the -- if there was
22   a presumption that the leaky roof needed to
23   be disclosed, which would be -- would be true
24   of a public company, you are required to
25   disclose material elements, then -- publicly   09:39:44
```

Page 65

```
 1   disclose them, then the failure to disclose
 2   material issues would, in my opinion, violate
 3   the law.  In fact, it does violate the law.
 4        Q.    Okay.  So, now, coming back to
 5   Twitter, if the prior management had told     09:40:04
 6   employees that they would be receiving a
 7   certain severance more than what you
 8   ultimately offered in the event that there
 9   were layoffs after you acquired the company
10   and they hadn't disclosed that to you, do you  09:40:17
11   think that means that you weren't responsible
12   for complying with that promise?
13               MR. SPIRO:  Objection, all the
14        same objections, calls for legal
15        conclusion.                 09:40:30
16               As you know, our position is he
17        was not required.
18               MS. LISS-RIORDAN:  Right.  I
19        know.
20        Q.    (BY MS. LISS-RIORDAN) But I     09:40:35
21   just want to understand your understanding of
22   it.
23        A.    I don't -- I'm not a lawyer, so
24   I don't know what the legal obligation would
25   be in that case.                   09:40:44
```



Page 174

```
 1    times because of work obligations.
 2         Q.   Right.  You're a little off the
 3    charts extraordinary in your commitment and
 4    dedication to working long hours.  Would you
 5    agree?  I mean, from everything I've read I    11:53:57
 6    agree.  But do you agree?
 7         A.   I would like to work less.
 8         Q.   All right.  But you -- but you
 9    have made those decisions and choices to work
10    extremely long hours?              11:54:11
11         A.   At great personal pain, yes.
12         Q.   Yeah.  Other people don't make
13    those choices?
14              MR. SPIRO:  Is that -- is that
15    a question?                        11:54:30
16              MS. LISS-RIORDAN:  Yes, that's
17    a question.
18              MR. SPIRO:  Some people
19    don't --
20         Q.   You agree not everyone makes    11:54:34
21    that choice that you've made?
22         A.   Not everyone is willing or able
23    to take pain.
24         Q.   So --
25         A.   And I'm tired of it myself.    11:54:46
```

Page 175

```
 1    And this -- this proceeding only adds salt to
 2    the wound.
 3         Q.   I understand that.
 4         A.   Yeah.
 5         Q.   You could take care of this    11:55:03
 6    proceeding, you know.  Let me just --
 7         A.   What would that entail?
 8         Q.   Let me just --
 9              MR. SPIRO:  It's a settlement
10    request.                           11:55:11
11         Q.   Let me just ask you this.  I
12    mean, you paid -- you paid $44 billion to
13    purchase Twitter, right?
14         A.   Uh-huh.
15         Q.   If you -- do you have any    11:55:17
16    estimate of how much it would cost to pay the
17    employees back the severance that they
18    thought they were going to get?
19              MR. SPIRO:  Well, okay.  I'm
20    going to object to this on several    11:55:25
21    grounds.  First of all, not a single
22    one of these people e-mailed Mr. Musk
23    or e-mailed HR head or me or anybody
24    and purported to believe they were
25    going to get one thing and then get    11:55:37
```

Page 176

```
 1    another.  So this whole idea that they
 2    thought they were going to get
 3    different severance is fiction.  So
 4    that's not true.  I'm not going to
 5    have him answer that question.    11:55:47
 6              MS. LISS-RIORDAN:  Okay.  Well,
 7    let me --
 8              MR. SPIRO:  If you're asking
 9    him does he know how much money you
10    want to settle this lawsuit or how    11:55:50
11    much he's willing to pay to settle
12    this lawsuit -- I don't know if that's
13    the question, but you can't ask the
14    question as if you're -- because
15    you're presuming a fact that is -- is    11:55:58
16    not true.
17              MS. LISS-RIORDAN:  Okay.  All
18    right.
19              MR. SPIRO:  And I don't think
20    you even think that every single one    11:56:02
21    of these employees believed that they
22    were going to get something that they
23    didn't get.  I mean, this is not the
24    reality.
25              MS. LISS-RIORDAN:  Okay.  All    11:56:09
```

Page 177

```
 1    right.  Well, let's just -- I want to
 2    talk to Mr. Musk about this.
 3              MR. SPIRO:  Okay.
 4              MS. LISS-RIORDAN:  I enjoy
 5    talking to you, Alex, but let me ask    11:56:13
 6    Mr. Musk.
 7              MR. SPIRO:  Okay.
 8              MS. LISS-RIORDAN:  Okay.
 9         Q.   Right.  I mean, there are
10    lawsuits that have been filed, there have    11:56:18
11    been arbitration demands and some employees
12    have sought this.  But have you ever done a
13    calculation or had anyone do a calculation of
14    what it would cost to pay the severance that
15    the employees are asking for through these    11:56:28
16    legal proceedings?
17         A.   I don't know what -- there
18    hasn't been a monetary request that I'm aware
19    of.
20         Q.   Okay.  If it -- you paid $44    11:56:39
21    billion for the company.  If it would cost
22    you less than --
23         A.   It wasn't just me.  It was a
24    lot of investors.
25         Q.   Right, right.  Okay.  Well, you    11:56:48
```



Page 182

```
1    recover my clients' money they think is owed
2    to them.  That's what I do as a trial lawyer,
3    and the way trial lawyers get paid is by
4    recovering money that people think they're
5    owed.                          11:59:47
6         A.   You're looking for a big
7    payday.  That's the reason you're doing this.
8         Q.   Just let me ask you this.
9              I mean, you're aware that
10   because this case has now turned into nearly   11:59:54
11   2,000 arbitrations that our firm has paid,
12   that Twitter has been ordered to pay
13   arbitration fees for all of those cases.
14             Have you done the math on how
15   much it's going to pay in arbitration fees?   12:00:04
16   Why not -- why not just pay the employees?
17             MR. SPIRO:  I don't -- I don't
18        see how this is related to any of
19        these deposition topics.  I have
20        already told you I think these       12:00:14
21        questions are objectionable.  No
22        arbitrator or judge would let you ask
23        them.  Let's move on.
24             MS. LISS-RIORDAN:  I just want
25   to know whether Mr. Musk has thought      12:00:22
```

Page 183

```
1    about that.
2              MR. SPIRO:  I don't see that as
3    relevant to any of these topics,
4    whether he has thought about what
5    leverage you're putting on him by       12:00:28
6    filing over and over and over
7    arbitrations, many of which are
8    completely facially frivolous.  So
9    that --
10        Q.   (BY MS. LISS-RIORDAN)  Well, it   12:00:35
11   would be much more efficient, wouldn't it,
12   Mr. Musk, if we were just in court doing one
13   class action and it could all be decided up
14   or down do you owe the employees or not.
15             But because your -- because       12:00:44
16   your company insisted that the cases be filed
17   individually in arbitration, that's why we're
18   facing 2,000 individual arbitrations that are
19   going to have to be paid for because the
20   arbitrators are going to have to be paid to   12:00:59
21   decide this.
22             MR. SPIRO:  Okay.  Let's move
23        on.  His view on the class action
24        system is well known.
25             THE WITNESS:  The class action   12:01:06
```

Page 184

```
1    system is very broken in the United
2    States because people can represent a
3    class even when the class doesn't
4    agree with that.
5         Q.   (BY MS. LISS-RIORDAN)  Okay.  I
6    mean, class members --
7         A.   It's broken.
8         Q.   Class members can opt out of a
9    class action if they don't want to be a part
10   of it, right?                     12:01:18
11             MR. SPIRO:  Please, let's just
12        move on.
13             MS. LISS-RIORDAN:  Okay.  I'm
14   not --
15             THE WITNESS:  We need legal
16        reform, actually.
17        Q.   (BY MS. LISS-RIORDAN)  I'm
18   going to -- I'm going to move on for now.
19             So the solution, then, is to
20   not have a class action and have people bring   12:01:26
21   individual claims so we do the same case
22   2,000 times over again in arbitration?  You
23   think that's a better system?
24        A.   I think there are too many
25   lawyers in California.              12:01:40
```

Page 185

```
1         Q.   I'm from Massachusetts.
2              MR. SPIRO:  Let's move on.
3              THE WITNESS:  Massachusetts,
4    too.  Too many lawyers in --
5              MR. MEHES:  I'm from Chicago,   12:01:49
6    so --
7              (Simultaneously speaking)
8              THE WITNESS:  There are too
9    many talented people in the legal
10   profession.  It's a compliment and a   12:01:54
11   criticism.
12        Q.   (BY MS. LISS-RIORDAN)  Okay.
13   Pressing claims for people who believe they
14   have legal claims.  That's how our system
15   works, correct?  You have brought legal   12:02:02
16   claims, too, yourself and have relied on
17   lawyers, haven't you?
18             MR. SPIRO:  Let's move on to
19        another topic.  This is becoming too
20        personal.  This isn't relevant to any   12:02:11
21        of the topics we're here for today.
22        Let's just move on.
23             MS. LISS-RIORDAN:  Okay.
24             MR. SPIRO:  Pleasant enough.
25             MS. LISS-RIORDAN:  Just the one   12:02:13
```

47 (Pages 182 to 185)




Page 186

```
 1          last thing.
 2          Q.   (BY MS. LISS-RIORDAN)  It
 3     doesn't really make a lot of sense to have
 4     people, instead of doing a class action
 5     because you think people might get scooped in   12:02:19
 6     who don't want to be a part of it, to have
 7     2,000 people say, "I want to bring a claim,"
 8     and have them do it individually.
 9          That makes a lot of sense to
10     you?                                12:02:27
11          MR. SPIRO:  I'm not -- we're
12     not going to get into a policy debate
13     here.  That's not one of the
14     questions.  Let's just move on.
15          MS. LISS-RIORDAN:  Okay.  Okay.   12:02:33
16     We will move on.  When was that lunch
17     coming, Alex?
18          MR. SPIRO:  We have got a
19     little bit of time.  It's not here
20     yet.
21          MS. LISS-RIORDAN:  Okay.  I'll
22     keep going.
23          Q.   (BY MS. LISS-RIORDAN)  And, Mr.
24     Musk, no offense taken.  I'm just doing my
25     job for my clients.  I'm sure you understand.   12:02:45
```

Page 187

```
 1          You're laughing.  What does
 2     that mean?
 3          A.   Well, I mean, I think
 4     you're doing it on behalf of yourself, not
 5     the clients.                        12:02:56
 6          Q.   Do you think my clients aren't
 7     going to get any money if we recover money
 8     from these legal actions?
 9          A.   No, I think your motivations
10     are to have a big payday, not for the benefit   12:03:00
11     of your clients.
12          Q.   All right.  Have you ever
13     started a company in order to have a big
14     payday?
15          A.   No.                       12:03:07
16          Q.   No?  You have had some big
17     paydays.
18          MR. SPIRO:  Okay.  Next section
19     of the deposition topics that were
20     delineated for this very busy witness.   12:03:20
21          MS. LISS-RIORDAN:  Okay.  All
22     right.
23          THE WITNESS:  Yeah, philosophy
24     debate or a deposition?
25          Q.   (BY MS. LISS-RIORDAN)  What's   12:03:27
```

Page 188

```
 1     that?  Okay.
 2          MR. SPIRO:  After, maybe, if
 3     there's time.
 4          Q.   (BY MS. LISS-RIORDAN)  All
 5     right.  I also wanted to talk to you not just   12:03:27
 6     about the Foundation trilogy, but The
 7     Hitchhiker's Guide to the Galaxy, which is my
 8     second favorite book.
 9          THE REPORTER:  I couldn't hear
10     you.
11          MS. LISS-RIORDAN:  The
12     Hitchhiker's Guide to the Galaxy is my
13     second favorite book.
14          THE WITNESS:  If you like those
15     books so much, why -- why are you    12:03:37
16     doing this?
17          MR. SPIRO:  You seem
18     inconsistent with the message of those
19     books.
20          THE WITNESS:  You're inhibiting   12:03:41
21     our progress in space.
22          Q.   (BY MS. LISS-RIORDAN)  Right.
23     Well, no, I think -- you know, I was a big
24     space fan as a kid, so, I mean, I think it's
25     very exciting what you're doing.      12:03:49
```

Page 189

```
 1          MR. SPIRO:  Okay.  Next
 2     deposition topic.
 3          Q.   (BY MS. LISS-RIORDAN)  I always
 4     thought there were civilizations out there
 5     that we just haven't contacted yet.   12:03:59
 6          A.   There may be, but we have not
 7     seen any evidence of that.
 8          MR. SPIRO:  Which topics do we
 9     have left here?
10          Q.   (BY MS. LISS-RIORDAN)  Okay.   12:04:09
11     All right.  Okay.  So, I mean, Mr. Musk,
12     you -- you do see the law as an impediment to
13     your doing what you want to do in some sense,
14     don't you?
15          A.   I think it -- I largely agree   12:04:28
16     with the law, but I also think that there are
17     some legal reforms that would be beneficial
18     to the people.
19          Q.   I think I saw you post just the
20     other day that if we keep passing laws, if   12:04:39
21     there are so many laws everything will be
22     illegal one day or something to that effect.
23          A.   Yes.  This is -- a natural
24     consequence of an extended period of
25     prosperity is that when new laws and      12:04:53
```

48  (Pages 186 to 189)





Page 190

1    regulations are passed every year, those laws
2    and regulations are immortal, and humans are
3    not immortal.
4              So over time, eventually
5    everything becomes illegal.  This is why the    12:05:06
6    California high-speed rail has made almost no
7    progress after spending, I think, $7 billion,
8    for example.
9         Q.    So sometimes -- I mean, you
10   believe that laws hinder progress?        12:05:21
11        A.    No.  I believe that there
12   should be law, but that over time you can
13   have an excess of law and regulation buildup
14   that is ultimately not in the interest of the
15   people.                        12:05:39
16        Q.    I mean, do you feel that
17   sometimes laws constrain you from doing what
18   you think is best?
19        A.    At times, there are laws that I
20   disagree with or there are simply too many    12:05:51
21   laws.  And I think any rational person
22   looking at the system would have to, I think,
23   agree that over time, unless there is some
24   process for removing laws and regulations, in
25   addition to adding them, then eventually    12:06:13

Page 191

1    there will be so many laws and regulations
2    that you can't keep track of them and,
3    therefore, they are contradictory and that
4    will prevent progress.
5         Q.    Have you ever said any words to    12:06:27
6    the effect of, "Do I look like someone who
7    cares about the law?"
8         A.    I don't recall that.
9         Q.    Okay.  There have been -- there
10   have been quotes that you have said words to    12:06:40
11   that effect.
12             Do you remember saying anything
13   like that?
14        A.    I don't remember saying words
15   to that effect, no.                  12:06:50
16        Q.    Has Mr. Spiro here said words
17   to the effect of, "Elon puts rockets into
18   space, he is not afraid of the law"?
19             MR. SPIRO:  I never said -- I
20   never said that.                   12:07:02
21        Q.    (BY MS. LISS-RIORDAN)  Words to
22   that effect?
23        A.    I'm not aware of that.
24             As for whether -- I mean, if
25   what you're getting at is do I think one    12:07:11

Page 192

1    should obey the law, I agree, one should obey
2    the law.  And of the truly vast number of
3    laws and regulations that me and my companies
4    are subject to, which may range into the
5    millions, it is actually very rare for me to    12:07:28
6    disagree with the law or regulation,
7    extremely rare.
8         Q.    You may disagree, but you --
9    but you try to not do things that the law, as
10   it's currently written, says you need to do?    12:07:44
11             MR. SPIRO:  Is this --
12             THE WITNESS:  No, that is
13   false.
14             MR. SPIRO:  We have got to tie
15   this back to the topics or we're going    12:07:49
16   to get too far afield again.
17             MS. LISS-RIORDAN:  Okay.
18             MR. SPIRO:  Yeah, I mean -- and
19   so I'm trying to give lots and lots
20   and lots of leeway.  But I'm just    12:07:54
21   saying, like at a certain point --
22             THE WITNESS:  I understand the
23   logic point you are getting at, which
24   is, I think, do I respect and follow
25   the law, do I believe the law applies    12:08:03

Page 193

1    to me or do I think that I'm above the
2    law.
3              I do not think I'm above the
4    law.  And what I'm -- what I'm trying
5    to say and what I said previously was    12:08:09
6    that there are literally millions --
7    millions of laws and regulations that
8    apply to me and my companies, which we
9    adhere to.
10             On very rare occasion we may    12:08:20
11   disagree with a law or regulation and
12   we may challenge it, but I do not
13   think I'm above the law.
14        Q.    (BY MS. LISS-RIORDAN)  All
15   right.  Do you think -- do you think laws    12:08:30
16   that prohibit discrimination against people
17   on the basis of sex, race, age, disability,
18   et cetera, are important laws?
19        A.    I think we should not have
20   discrimination on anything other than merit.    12:08:51
21        Q.    Okay.  But do you believe that
22   laws that prohibit sex discrimination, for
23   instance, do you think that's a proper law?
24        A.    I don't think we should have
25   discrimination on the basis of anything other    12:09:06




Page 322

1    MS. LISS-RIORDAN:  No, this is
2  a different -- that, "Nope, T" --
3    Q.    Someone suggested you switch it
4  around so it's not TITS, it's TIST, and you
5  said, "Nope, the T has to come first?"    15:17:40
6    Do you remember saying that?
7    MR. SPIRO:  And you think this
8  is probative in this case --
9    MS. LISS-RIORDAN:  Yes.
10    MR. SPIRO:  -- to go over this    15:17:44
11  topic a third time?
12    MS. LISS-RIORDAN:  Yes, because
13  Mr. Musk has denied that this was a
14  joke about women's body parts.
15    Q.    And I just want to know, are    15:17:50
16  you still maintaining that this was not a
17  joke about women's body parts?
18    A.    I think there should be a Texas
19  Institute of Technology and Science.  And,
20  you know, California has got MIT -- I mean,    15:18:01
21  California got California Institute of
22  Technology, Massachusetts has Massachusetts
23  Institute of Technology, and it makes sense
24  for Texas to have one too.
25    Q.    Okay.  But it wouldn't be the    15:18:14

Page 323

1  same if it were called Texas Institute of
2  Science and Technology, though?
3    A.    Well, I mean, Massachusetts and
4  California, it's MIT and CIT.
5    MR. MEHES:  Sorry to interrupt,    15:18:29
6  but the people on Zoom can't hear or
7  see anything.
8    THE VIDEOGRAPHER:  Let's take a
9  quick break.
10    MR. SPIRO:  Why is that    15:18:36
11  happening?
12    THE WITNESS:  Tech support.
13    THE VIDEOGRAPHER:  Can we take
14  a break?
15    MR. SPIRO:  If you want to take    15:18:49
16  a one-minute break to fix this, that's
17  fine.
18    THE VIDEOGRAPHER:  The time is
19  3:19 p.m., and we are off the record.
20    (Discussion off the record)
21    THE VIDEOGRAPHER:  It's 3:20
22  p.m., and we are on the record.
23    Q.    (BY MS. LISS-RIORDAN)  Mr.
24  Musk, do you remember getting into a public
25  spat with an employee at Twitter who had a    15:20:19

Page 324

1  disability and you questioned the legitimacy
2  of his disability?
3    A.    You're talking about Halli?
4    Q.    Yes.
5    A.    Yes.    15:20:33
6    Q.    Okay.  What do you remember
7  about that spat?
8    A.    Well, I didn't realize he had a
9  disability because he was posting on Twitter
10  frequently, so -- he was saying that he could    15:20:46
11  not work, and I was like, "Well, if you can
12  post on Twitter as frequently as you do, why
13  can you not work?"
14    Q.    Okay.  And then did -- once you
15  learned that he had a disability, did you    15:21:06
16  claim that he did no actual work, claimed as
17  his excuse that he had a disability that
18  prevented him from typing, yet was
19  simultaneously tweeting up a storm?
20    A.    Yeah.    15:21:22
21    Q.    All right.  So you thought that
22  his disability was an excuse for not working?
23    A.    That was what I thought at the
24  time.
25    Q.    Is that an assumption that you    15:21:28

Page 325

1  make about people who are disabled and need
2  accommodations, that they're not really
3  working?
4    A.    No, of course not.  I'm simply
5  saying that if somebody is -- it seems -- it    15:21:40
6  seems inconsistent if somebody is frequently
7  posting on social media but is also saying
8  that they cannot do a job that involves
9  typing.
10    Q.    All right.  You made up with    15:21:58
11  Halli after that little spat?
12    A.    Yeah, I would say we're
13  friends.
14    Q.    The landlord of the Twitter
15  headquarters on Market Street didn't want you    15:22:29
16  to cover up the "w" on the Twitter sign,
17  right?
18    MR. SPIRO:  What's the
19  relevance of that?  That's not a
20  deposition topic.  We can move on.    15:22:41
21  He's not answering that.
22    Q.    Well, you figured out a way
23  still to make it Titter over having to come
24  up with a clever way around the landlord's
25  concern; is that right?    15:22:52

82  (Pages 322 to 325)




Page 342

```
1    brought lawsuits and arbitrations against
2    Twitter for?
3              MR. SPIRO:  What -- which topic
4    does this go under?
5              MS. LISS-RIORDAN:  This is --    15:52:34
6    this is his understanding of the
7    claims brought against the company.
8              MR. SPIRO:  That's not a topic.
9    Where is that topic?
10             MS. LISS-RIORDAN:  Well, this    15:52:39
11   is the topic of the decision to
12   implement layoffs --
13             MR. SPIRO:  No, it's not.
14             MS. LISS-RIORDAN:  -- and to
15   reduce costs.  These are claims       15:52:48
16   related to these topics.
17             MR. SPIRO:  No, that's true.
18   That's not accurate.  It was one thing
19   about the merger agreement, which you
20   were explicitly allowed to -- you are    15:52:55
21   not here to ask him about his -- his
22   understanding of legal claims.  That's
23   not -- that's not a category.
24             MS. LISS-RIORDAN:  All right.
25   So I'll move on.                      15:53:04
```

Page 343

```
1         Q.    (BY MS. LISS-RIORDAN)  Mr.
2    Musk, throughout the time that you were --
3    following the time that you announced that
4    you would be buying Twitter and through your
5    acquisition of the company and then later    15:53:26
6    through your running of the company, how were
7    you communicating with the people around you
8    who were working with you on these efforts?
9         A.    With words.
10        Q.    Electronically?            15:53:48
11        A.    Vocally and electronically.
12        Q.    You texted with people?
13        A.    Mostly I use e-mail.
14        Q.    What -- what e-mail account or
15   account?                             15:54:04
16        A.    Just the erm@twitter, e@x.com.
17   I guess some of them may have been my SpaceX
18   account or my Tesla account.
19        Q.    Any other e-mail accounts that
20   you have used in connection with your work    15:54:28
21   with Twitter or any acquisition leading up to
22   your -- the period leading up to your
23   acquisition of Twitter?
24        A.    Not that I can think of.
25        Q.    Okay.  You do sometimes text as    15:54:43
```

Page 344

```
1    well regarding Twitter?
2         A.    Sometimes, but it's rare.
3         Q.    Okay.  And do you have one
4    personal device that I've seen you using or
5    do you have multiple?               15:54:57
6         A.    Just one.
7         Q.    Okay.  Has there been any
8    effort made to search your phone for texts
9    that are related to your work at Twitter or
10   your acquisition of Twitter or your running    15:55:11
11   of Twitter after you acquired it?
12        A.    I believe so.
13        Q.    All right.  Did you hand over
14   your phone for documents to be produced to us
15   in this litigation?                 15:55:25
16        A.    I think I did.
17        Q.    Okay.  And your e-mails also,
18   do you know whether your e-mails have been
19   searched for documents that are relevant to
20   the claims that we have brought?     15:55:36
21        A.    I believe they have.
22        Q.    Are there other ways that you
23   have communicated with people, such as
24   Signal?  Do you use Signal?
25        A.    Rarely.                    15:55:48
```

Page 345

```
1         Q.    Have you used Signal at all in
2    connection with Twitter?
3         A.    Not that I recall.
4         Q.    All right.  Is -- do you use
5    Signal with the delete function active?    15:56:02
6         A.    Not that I recall.
7         Q.    Are there any other ways that
8    you communicated with anyone in writing
9    regarding Twitter?
10        A.    No, I don't think so.        15:56:15
11        Q.    There was a biography that was
12   published of you not too long ago written by
13   Walter Isaacson.
14             Are you aware of that?
15        A.    Really?                     15:56:44
16        Q.    I will say that I read it on my
17   last vacation and was quite impressed.
18             Have you read the book?
19        A.    No.  I asked Walter if I should
20   read it and he said I should -- he           15:57:02
21   recommended I should not read it, so I did
22   not read it.
23        Q.    Okay.  Do you believe him to be
24   an accurate reporter?
25        A.    Everyone makes mistakes, and    15:57:14
```

87 (Pages 342 to 345)





Page 350

```
 1   latest I've heard.
 2       Q.   Right.  And that's also always
 3   an option for companies.  We spent a long
 4   time talking today about how if a company
 5   can't pay its bills, it can file for      16:01:23
 6   bankruptcy.
 7           But it can also go and get more
 8   investment money, right?
 9       A.   It can try.
10       Q.   Have you done any calculations   16:01:33
11   about how much it's going to cost Twitter --
12   it's going to cost X to defend against the
13   2,000 arbitration claims that we have
14   brought?
15           MR. SPIRO:  We're not doing       16:01:50
16   this.  Keep moving.  We're not talking
17   about that.  It's not a topic.  It's
18   not relevant.  The arbitrator won't
19   let you ask that question.
20           We -- you filed several           16:01:58
21   arbitrations to try to put economic
22   pressure on the company.  That's our
23   view and that has nothing to do with
24   this in either direction, probably.
25       Q.   (BY MS. LISS-RIORDAN)  We could  16:02:07
```

Page 351

```
 1   just be in court in a class action, but X
 2   wouldn't let us do that and instead moved to
 3   compel our arbitration and that's why we have
 4   2,000 individual arbitrations.
 5           Are you aware of that, Mr.         16:02:19
 6   Musk?
 7           MR. SPIRO:  What is the
 8   relevance of this and what is the
 9   topic that this is under?  You are not
10   going to be able to ask either of       16:02:26
11   those questions, nor do you actually
12   think the arbitrator will let you go
13   into this if we were at trial.  You
14   know -- you know that he would -- I
15   don't even think it's a close          16:02:31
16   question.  So we're not going to --
17   we're not going to do this for a
18   second time.
19           What else on the topics?  He
20   has been -- we have been doing this    16:02:37
21   for a long time now.  There has been a
22   lot of repetition.
23       Q.   (BY MS. LISS-RIORDAN)  You have
24   said, Mr. Musk, have you not, "I think
25   everyone is wrong to some degree and right to 16:02:58
```

Page 352

```
 1   some degree"?
 2           Is that your words?
 3       A.   Nobody is perfect.
 4       Q.   All right.  And did you say the
 5   words "I think everyone is wrong to some    16:03:08
 6   degree and right to some degree"?
 7       A.   Those sound like words I would
 8   say.
 9       Q.   You may be wrong here, Mr.
10   Musk.  You may owe these 2,000 employees    16:03:21
11   severance that they thought they were
12   entitled to based on promises they believe
13   that were made to them.
14           MR. SPIRO:  Objection to form.
15   Objection, assumes facts.               16:03:31
16           What's the relevance of this?
17   What topic is this under?  What's the
18   question?
19           THE WITNESS:  This seems to be
20   going beyond the scope of the --        16:03:41
21           MR. SPIRO:  It is.  What is the
22   question?
23           THE WITNESS:  I mean, are you
24   simply dragging this out or do you
25   have a purpose to the questions or is   16:03:49
```

Page 353

```
 1   there -- are you just -- at this
 2   point --
 3       Q.   (BY MS. LISS-RIORDAN)  I'm just
 4   trying -- yeah, no, I'm just trying to
 5   understand why --                        16:03:55
 6       A.   -- you're coming up with random
 7   questions.
 8       Q.   You're a very extremely
 9   successful person who obviously has much more
10   important things to be doing than answering  16:04:02
11   my questions all day today, and we have about
12   2,000 cases ahead of us of which we will call
13   you to testify.  And it just seems to be a
14   better use of your time to move on to other
15   much more productive activities for yourself,  16:04:15
16   your businesses and the future of our world.
17           So I'm just wondering, on
18   behalf of my clients, why you don't just make
19   good on the severance that they believe they
20   were promised and move on.                16:04:29
21           MR. SPIRO:  We think your legal
22   claims are bogus and we don't think
23   that you should be making them, and
24   that's why his lawyers and him have
25   decided to fight the case.  It's not    16:04:38
```




Page 354

```
1     about whether or not he possibly could
2     pay.  It's not relevant.
3            That's why judges and
4     arbitrators don't let questions about
5     Mr. Musk's net worth or anything else    16:04:46
6     like that come into play.  He -- he
7     disputes your allegations.  He didn't
8     do anything discriminatory, he doesn't
9     owe them the severance, and that's our
10    position.                                16:04:56
11           So these are not relevant
12    questions and an arbitrator wouldn't
13    let you ask them at a trial.  So -- in
14    all 2,000 of them, I don't think a
15    single arbitrator is going to let you    16:05:06
16    ask that question.  So move on.
17    Q.    (BY MS. LISS-RIORDAN)  Mr.
18    Musk, you never looked at the main lawsuit we
19    filed to start this litigation, the Cornet
20    complaint that I showed you a moment ago.
21           Why do you think that the
22    claims in that case for the severance for the
23    employees is not accurate?
24           MR. SPIRO:  We are not -- I
25    have already said this again.  He's      16:05:21
```

Page 355

```
1     not answering that question.  You can
2     keep going.  So I'm directing him not
3     to answer these -- this line of
4     questioning.
5     Q.    (BY MS. LISS-RIORDAN)  Similar    16:05:31
6     to what you did to the vendors, saying to
7     your team, don't pay them, make them sue you,
8     you have insisted on employees coming after
9     you one by one and filing 2,000 individual
10    arbitrations; isn't that right?          16:05:47
11           MR. SPIRO:  I'm not letting him
12    answer that question either.  Keep
13    going.  It's basically the same
14    question dressed up.
15           MS. LISS-RIORDAN:  Let's take a   16:06:07
16    break.  I may be just about done.
17           THE VIDEOGRAPHER:  The time is
18    4:06 p.m., and we are off the record.
19           (Recess from 4:06 p.m. to 4:11
20    p.m.)                                    16:11:10
21           THE VIDEOGRAPHER:  The time is
22    4:11 p.m., and we are on the record.
23    Q.    (BY MS. LISS-RIORDAN)  All
24    right.  Mr. Musk, the "fork in the road"
25    e-mail that we had talked about before, I    16:11:23
```

Page 356

```
1     asked you if you had any expectation of how
2     many employees would click yes in response to
3     that, and you said you didn't know.
4            Were you and others placing
5     bets on how many people would click yes and    16:11:39
6     wouldn't click yes?
7     A.    I don't recall.
8     Q.    Do you recall being with others
9     who were involved in that planning
10    celebrating when you saw how many employees    16:11:54
11    did not click yes?
12    A.    I don't recall.
13    Q.    The promises that the employees
14    we represent claim were made by prior
15    management about what severance they would    16:12:19
16    receive if there were layoffs have put you in
17    a bit of a bind here, haven't they?
18           MR. SPIRO:  Objection, form.
19    I don't know what that means.
20    Q.    (BY MS. LISS-RIORDAN)  Do you    16:12:42
21    blame prior management for making promises
22    that you don't believe they should have made?
23           MR. SPIRO:  To the degree you
24    have the information sufficient to
25    make personal knowledge of that -- of    16:13:06
```

Page 357

```
1     that information or if you know what
2     promises they did make.
3            THE WITNESS:  I mean, I don't
4     agree with everything prior management
5     did.                                     16:13:19
6     Q.    (BY MS. LISS-RIORDAN)  Do you
7     believe that prior management may have made
8     promises that have now put you in a bind with
9     the employees who you laid off?
10           MR. SPIRO:  Objection to form.    16:13:40
11           THE WITNESS:  A bind?
12    Q.    (BY MS. LISS-RIORDAN)  Right.
13    A.    What's a bind?
14    Q.    You are facing lawsuits in
15    2,000 individual arbitrations regarding    16:14:01
16    claims for severance pay.
17           Do you blame prior management
18    for their actions that may have led to these
19    claims?
20    A.    Do I blame them?  I don't know    16:14:13
21    that I blame them.
22    Q.    So it's reasonable for them to
23    make assurances to employees?
24           MR. SPIRO:  Objection, form.
25           Objection, asked and answered.    16:14:38
```

90  (Pages 354 to 357)





Page 378

```
 1              CHANGES AND SIGNATURE
 2    WITNESS NAME: ELON MUSK
 3    DATE OF DEPOSITION: MAY 9, 2024
 4    PAGE  LINE   CHANGE        REASON
 5         _____
 6         _____
 7         _____
 8         _____
 9         _____
10         _____
11         _____
12         _____
13         _____
14         _____
15         _____
16         _____
17         _____
18         _____
19         _____
20         _____
21         _____
22         _____
23         _____
24         _____
25         _____
```

Page 379

```
 1    _____
 2         I, ELON MUSK, have read the
      foregoing deposition and hereby affix my
 3    signature that same is true and correct,
      except as noted above.
 4
 5
 6         _____
 7         ELON MUSK
 8
      THE STATE OF _____)
 9    COUNTY OF _____)
10        Before me, _____,
11    on this day personally appeared ELON MUSK,
12    known to me (or proved to me under oath or
13    through _____)
14    (description of identity card or other
15    document) to be the person whose name is
16    subscribed to the foregoing instrument and
17    acknowledged to me that they executed the
18    same for the purposes and consideration
19    therein expressed.
20        Given under my hand and seal of office
21    this ____ day of _____, _____.
22
      _____
23    NOTARY PUBLIC IN AND FOR
      THE STATE OF _____
      COMMISSION EXPIRES:_____
24
25
```

Page 380

```
 1              JAMS ARBITRATION
         Before Arbitrator Michael Loeb, Esq.
 2
      KEENE NIEMACK,     )
 3       Claimant,    )
                      )
 4    VS.              ) JAMS Ref No.: 1601002285
                      )
 5    TWITTER, INC.,     )
         Respondent.  )
 6
 7
           REPORTER'S CERTIFICATION
 8         DEPOSITION OF ELON MUSK
                MAY 9, 2024
 9
10        I, DONNA WRIGHT, Certified Shorthand
11    Reporter in and for the State of Texas,
12    hereby certify to the following:
13        That the witness, ELON MUSK, was duly
14    sworn by the officer and that the transcript
15    of the oral deposition is a true record of
16    the testimony given by the witness;
17        That the deposition transcript was
18    submitted on _____, 2024, to the
19    witness or to the attorney for the witness
20    for examination, signature and return to me
21    by _____, 2024;
22        That the amount of time used by each
23    party at the deposition is as follows:
24        Ms. Shannon Liss-Riordan - 6 hr. 32 min.
         Mr. Alex Spiro - 3 min.
25
```

Page 381

```
 1        That pursuant to information given to
 2    the deposition officer at the time said
 3    testimony was taken, the following includes
 4    counsel for all parties of record:
 5        Ms. Shannon Liss-Riordan, Mr. Bradley
 6    Manewith, and Mr. Thomas Fowler, Attorneys
      for Claimant;
 7        Mr. Alex Spiro and Mr. Phillip B. Jobe,
      Attorneys for Elon Musk;
 8        Mr. Adam G. Mehes, Attorney for X;
 9        I further certify that I am neither
10    counsel for, related to, nor employed by any
11    of the parties or attorneys in the action in
12    which this proceeding was taken, and further
13    that I am not financially or otherwise
14    interested in the outcome of the action.
15        Further certification requirements
16    pursuant to Rule 203 of TRCP will be
17    certified to after they have occurred.
18        Certified to by me this _____ of
19    _____, 2024.
20
21
22    _____
      DONNA WRIGHT, Texas CSR 1971
23    Expiration Date:  11/30/24
      MAGNA LEGAL SERVICES
24    1635 Market Street, 8th Floor
      Philadelphia, PA  19103
25    Firm Registration No. 633
```



96 (Pages 378 to 381)

