# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WOLFRAM ARNOLD, ERIK FROESE, TRACY HAWKINS, JOSEPH KILLIAN, LAURA CHAN PYTLARZ, and ANDREW SCHLAIKJER,

　　　　　　　　Plaintiffs,

　　v.

X CORP. f/k/a TWITTER, INC., X HOLDINGS CORP. f/k/a X HOLDINGS I, INC. and ELON MUSK,

　　　　　　　　Defendants.

Case No. 1:23-cv-528-JLH-CJB

## PLAINTIFFS' VEIL PIERCING SURREPLY

**OF COUNSEL**

Akiva Cohen (*pro hac vice*)
Dylan M. Schmeyer (*pro hac vice*)
Michael D. Dunford (*pro hac vice*)
Lane A. Haygood (*pro hac vice*)
KAMERMAN, UNCYK, SONIKER & KLEIN P.C.
1700 Broadway, 16th Floor
New York, NY 10019
Tel: (212) 400-4930
acohen@kusklaw.com dschmeyer@kusklaw.com
mdunford@kusklaw.com

Dated: June 13, 2025

Joseph L. Christensen (#5146)
CHRISTENSEN LAW LLC
1201 N. Market Street, Suite 1404
Wilmington, Delaware 19801
Tel: (302) 212-4330
joe@christensenlawde.com

*Counsel for Wolfram Arnold, Erik Froese, Tracy Hawkins, Joseph Killian, Laura Chan Pytlarz, and Andrew Schlaikjer*

# TABLE OF CONTENTS

A.  California Law Applies to Plaintiffs' Veil Piercing Claims ...............................................1

B.  Applying California Veil Piercing Law, the Claims are Sufficiently Pled .....................5

  1.  Plaintiffs adequately pled a unity of interest ........................................................5

  2.  The Amended Complaint sufficiently alleged a risk of an inequitable result .10

C.  Conclusion .........................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aliya Medcare Fin., LLC v. Nickell*,
No. CV 14-07806, 2015 WL 11072180 (C.D. Cal. Sept. 25, 2015) ...................................................11

*Brinker v. Axos Bank*,
No. 22-CV-386 (DDL), 2023 WL 4535529 (S.D. Cal. July 13, 2023) .................................................7

*Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*,
714 F. Supp. 3d 416 (S.D.N.Y. 2024)*, aff'd*, No. 24-423-CV, 2025 WL 289499 (2d Cir. Jan. 24, 2025)....................................................................................................................................................3

*Citron v. EZTD Inc*,
No. CV 19-1676-CFC-SRF, 2020 WL 3542332 (D. Del. June 30, 2020)*, report and recommendation adopted sub nom. Citron v. ETZD Inc.*, No. CV 19-1676-CFC, 2020 WL 4015277 (D. Del. July 16, 2020).........................................................................................................................................................2

*Curci Invs., LLC v. Baldwin*,
14 Cal. App. 5th 214 (2017)...............................................................................................................2

*Davies US Inc. v. Weston*,
No. 1:24-CV-00164-SB, 2025 WL 947734 (D. Del. Mar. 28, 2025)....................................................1

*Does 1-26 v. Musk, et al*,
Case No. 8:25-cv-00462 (D. Md., Feb. 28, 2025) D.I. 53 ................................................................14

*Dollar Tree Stores Inc. v. Toyama Partners LLC*,
No. C 10-0325, 2011 WL 872724 (N.D. Cal. Mar. 11, 2011) ...........................................................11

*Federal Reserve Bank of San Francisco v. HK Systems*,
No. C–95–1190, 1997 WL 227955 (N.D.Cal. Apr.24, 1997) .............................................................7

*Jackson v. Tesla, Inc.*,
No. 22-CV-04380-PCP, 2025 WL 901009 (N.D. Cal. Mar. 25, 2025) ...............................................2

*McCann v. Foster Wheeler LLC*,
48 Cal. 4th 68, 225 P.3d 516 (2010)..................................................................................................2

*McCombs v. Rudman*,
197 Cal. App. 2d 46 (Ct. App. 1961) ...............................................................................................10

*McDermott Inc. v. Lewis*,
531 A.2d 206 (Del. 1987) ..................................................................................................................4

*Mesler v. Bragg Mgmt. Co.*,
39 Cal. 3d 290 (1985) ......................................................................................................... 5

*Mieuli v. DeBartolo*,
No. C-00-3225 JCS, 2001 WL 777447 (N.D. Cal. Jan. 16, 2001) ...................................... 5

*Ming-Hsiang Kao v. Holiday*,
58 Cal. App. 5th 199 (2020) ........................................................................................... 2, 10

*New Mexico, et al. v. Musk, et al.*,
Case No. 1:25-cv-00429 (D.D.C. February 17, 2025) ................................................. 14, 15

*Pac. Mar. Freight, Inc. v. Foster*,
No. 10-CV-0578, 2010 WL 3339432 (S.D. Cal. Aug. 24, 2010) ........................................ 7

*Prompt Staffing, Inc. v. United States*,
321 F. Supp. 3d 1157 (C.D. Cal. 2018) ............................................................................... 2

*Ranza v. Nike, Inc.*,
793 F.3d 1059 (9th Cir. 2015) ........................................................................................... 10

*Relentless Air Racing, LLC v. Airborne Turbine Ltd. P'ship*,
222 Cal. App. 4th 811 (2013) ....................................................................................... 11, 12

*Rincon EV Realty LLC v. CP III Rincon Towers, Inc.*,
No. A161541, 2022 WL 1447615 (Cal. Ct. App. May 6, 2022) ........................................ 12

*Salzberg v. Sciabacucchi*,
227 A.3d 102 (Del. 2020) .................................................................................................... 4

*Stark v. Coker*,
20 Cal. 2d 839 (1942) .......................................................................................................... 6

*In re Teleglobe Commc'ns Corp.*,
493 F.3d 345 (3d Cir. 2007), *as amended* (Oct. 12, 2007) ................................................ 1

*Tornetta v. Musk*.
310 A.3d 430 (Del. Ch. 2024) .......................................................................................... 8, 9

*United States v. Healthwin-Midtown Convalescent Hosp. & Rehab. Ctr., Inc.*,
511 F. Supp. 416 (C.D. Cal. 1981), *aff'd*, 685 F.2d 448 (9th Cir. 1982) ........................ 11

*VantagePoint Venture Partners 1996 v. Examen, Inc.*,
871 A.2d 1108 (Del. 2005) .................................................................................................. 4

*X. Corp. v. Media Matters for America*,
23-cv-01175-O (N.D. Tex.) .................................................................................................. 3

*Zoran Corp. v. Chen*,
  185 Cal. App. 4th 799 (2010)..................................................................................................6, 7

**Other Authorities**

Restatement of Conflict of Laws.................................................................................................1

Defendants' argument for dismissal of Plaintiffs' veil piercing claims proceeds from bad premises (that the claims are governed by Delaware law) to bad conclusions (that they should be dismissed). As shown below, applying standard choice-of-law principles to Plaintiffs' veil piercing claims mandates that those claims be assessed under California law; indeed, other than being the forum state, Delaware has *no* interest in seeing its veil piercing law applied to Defendants X. Corp. and X Holdings Corp. (Nevada corporations) or Musk (a California and Texas resident). In contrast, California has a strong interest in applying its own veil piercing law to veil piercing claims arising out of the operation of corporations headquartered within its borders and brought, in the main, by California citizens that were employed in California. Applying California veil piercing law, Plaintiffs' veil piercing claims are more than sufficiently pled, and should not be dismissed.

A.     **California Law Applies to Plaintiffs' Veil Piercing Claims**

Before assessing whether Plaintiffs' veil piercing claims against Musk have been sufficiently pled, the Court must first apply Delaware's choice-of-law rules to assess which state's law governs those claims.   *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 358 (3d Cir. 2007), *as amended* (Oct. 12, 2007) ("As a federal court exercising jurisdiction over state-law claims, we apply the choice-of-law rules of Delaware, the forum state"). Delaware's test for determining which state's law applies to particular claims is well settled: the Court must apply the law of the state "with the 'most significant relationship' to the claim under factors set out in the Second Restatement of Conflict of Laws." *Davies US Inc. v. Weston*, No. 1:24-CV-00164-SB, 2025 WL 947734, at *3 (D. Del. Mar. 28, 2025), *citing Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017). The factors to be considered include "the place where the injury occurred, the place where the conduct causing the injury occurred, the domicile of the parties, and the place where the relationship, if any, between the parties is centered." *Id.* (cleaned up).

There can be no serious dispute that application of this standard choice of law analysis

mandates that California law governs Plaintiffs' veil piercing claims. Plaintiffs' suffered injury in their states of residence: Hawkins, Arnold, Killian, and Schlaikjer in California, Froese in New York, and Pytlarz in Texas. The Amended Complaint alleges that Defendants X. Corp. and X Holdings Corp. are domiciled in California, the location of X Corp.'s principal place of business, as well as being citizens of Nevada, their state of incorporation. *See Citron v. EZTD Inc*, No. CV 19-1676-CFC-SRF, 2020 WL 3542332, at *2 (D. Del. June 30, 2020)*, report and recommendation adopted sub nom. Citron v. ETZD Inc.*, No. CV 1676-CFC, 2020 WL 4015277 (D. Del. July 16, 2020). The conduct causing the injury occurred in California, where Twitter had its headquarters. And the relationship between the parties was centered in California, where Twitter had its headquarters and where the bulk of its employees – including Hawkins, Arnold, Killian and Schlaikjer – worked.

Beyond that, California has a strong policy interest in seeing its veil piercing law apply to claims against shareholders of corporations that maintain a principal place of business in California. The entire purpose of California veil piercing law is to avoid injustice that may result, in particular cases and on particular facts, where a business is operated in a particular manner that would render inequitable allowing its owners to use the corporate form as a shelter from liability. *Curci Invs., LLC v. Baldwin*, 14 Cal. App. 5th 214, 221 (2017). As discussed below, the focus of the veil piercing analysis is on the manner in which the corporation is operated: its acts, the extent to which assets are intermingled and the corporation's separate existence disregarded in practice. *Prompt Staffing, Inc. v. United States*, 321 F. Supp. 3d 1157, 1175 (C.D. Cal. 2018); *see also Ming-Hsiang Kao v. Holiday*, 58 Cal. App. 5th 199, 206, (2020). California's interest in regulating the conduct of corporations doing business within its borders is at its apex where the corporation is headquartered in California and the acts that justify (or fail to justify) veil piercing occur in California. *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 97, 225 P.3d 516, 534 (2010); *see also Jackson v. Tesla, Inc.,* No. 22-CV-04380-PCP, 2025 WL 901009, at *10 (N.D. Cal. Mar. 25, 2025).

Delaware, in contrast, has next to no relationship to the claims. *See Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, 714 F. Supp. 3d 416, 435 (S.D.N.Y. 2024) (law of state of incorporation would not apply to veil piercing claims where corporation has "little contact, apart from the fact of its incorporation, with the state of incorporation"), *aff'd*, No. 24-423-CV, 2025 WL 289499 (2d Cir. Jan. 24, 2025). Indeed, the corporate defendants are no longer even incorporated in Delaware, having transferred their state of incorporation to Nevada. *See* D.I. 10, ¶¶ 27-28; *X. Corp. v. Media Matters for America*, 23-cv-01175-O (N.D. Tex.), D.I. 1 at ¶ 15 (X. Corp.'s complaint alleging it is a Nevada corporation           headquartered           in           San           Francisco),           *available           at* https://storage.courtlistener.com/recap/gov.uscourts.txnd.383454/gov.uscourts.txnd.383454.1.0_4. pdf; Declaration of Akiva M. Cohen at Exs. 1 & 2 (Nevada Secretary of State records for X Corp. and X. Holdings Corp., respectively).[1] Because California's contacts with the facts of this case **and** with the parties predominate, application of Delaware's conflict-of-law rules mandates that Plaintiffs' veil piercing claims are governed by California law.

Perhaps for that reason, Defendants made no effort to argue in their reply brief that Delaware had a more significant interest in the claims at issue in this action than California, instead arguing that the "internal affairs doctrine" ought to determine the governing law regardless given Delaware's "interest in its own corporate law determining the status of one of its corporations." *See* D.I. 37 at 4-5, n. 3. But Defendants' reliance on the internal affairs doctrine is misplaced, for two reasons. First, because the Defendant corporations moved their state of incorporation from Delaware to Nevada, they stripped Delaware of any interest at all in seeing its law apply to these claims and rendered the internal affairs doctrine wholly irrelevant as a reason to apply Delaware law.[2] And second, because

---

[1] The Court may take judicial notice of the relevant corporate filings. *See, e.g.*, Nikolouzakis v. Exinda Corp., No. CA 11-1261-LPS-MPT, 2012 WL 3239853, at *5 (D. Del. Aug. 7, 2012).

[2] Plaintiffs' Amended Complaint identified Defendants as Nevada entities. D.I. 10, ¶¶ 27-28. And Defendants obviously were well aware of their own state of incorporation. Yet Defendants never argued for the application of Nevada law to

liability to Plaintiffs – who are not shareholders, officers, or directors of the Defendant entities – is not in any sense a matter of the corporation's "internal affairs," Delaware's Supreme Court has made clear that the doctrine is inapplicable as a conflict of laws principle. *See VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005) ("The internal affairs doctrine does not apply where the rights of third parties external to the corporation are at issue, *e.g.*, contracts and torts"); *McDermott Inc. v. Lewis*, 531 A.2d 206, 216 (Del. 1987) (internal affairs doctrine means law of state of incorporation is "regarded as conclusive in determining the law to be applied in *intracorporate* disputes," in contrast to other contexts in which the conflict of laws 'most significant interests' test governs) (emphasis in original). "Corporations and individuals alike enter into contracts, commit torts, and deal in personal and real property," and the internal affairs doctrine has no applicability to "[c]hoice of law decisions relating to such corporate activities." *Salzberg v. Sciabacucchi*, 227 A.3d 102, 127 (Del. 2020) (alteration in original), *quoting McDermott*, 531 A.2d at 214 (Del. 1987) (internal affairs doctrine applies to "*activities* which are peculiar to the corporate entity") (emphasis added).[3]

Simply put, Delaware applies the "most significant interest" test to conflict of laws questions, and while the internal affairs doctrine provides the answer to that question for entirely *intra*corporate disputes, it has no impact on the viability of Plaintiffs' claims, brought as strangers to the corporation, that Musk ought to be held personally liable for debts of the corporation. As the parties appear to

---

the veil piercing claims, addressing only California and Delaware law in both the footnote on their original motion, D.I. 18 at 10-11, n. 4, and again on reply. D.I. 37 at 4-7. Defendants have thus waived any argument that Nevada law ought to apply to the veil piercing claims.

[3] Defendants' reply brief quotes a portion of *Salzberg's* reference to the doctrine applying to "matters peculiar to the corporation" – in a quote from *McDermott* – while omitting the balance of the quote that makes clear that applies only to entirely intracorporate disputes over intracorporate activities. *Compare* D.I. 37 at 5, n. 3 (describing *Salzberg* as "(recognizing that the "internal affairs doctrine" applies to "matters peculiar to corporations," such as "the relationships [ ] of the corporation, its directors, officers and shareholders") (alteration in D.I. 37) *with Salzberg*, 227 A.3d at 128 ("**Rather, this doctrine governs the choice of law determinations involving** matters peculiar to corporations**, that is, those activities concerning** the relationships *inter se* of the corporation, its directors, officers and shareholders") (omitted portions emphasized). It is only by deleting "*inter se*" and "that is, those activities concerning" that Defendants can essentially flip that quote on its head and suggest that *Salzberg* supports the broader application of the internal affairs doctrine to determine what state's law governs Musk's veil piercing liability to third parties such as Plaintiffs.

agree that California is the state with the most significant relationship to the claims (Defendants having

not offered any other basis to assert that Delaware has a more significant relationship), the Court

should apply California law to Plaintiffs' veil piercing claims.

**B.  Applying California Veil Piercing Law, the Claims are Sufficiently Pled**

In general, a party seeking to pierce the corporate veil under California law must show at trial

that there is a unity of interest between the shareholder and the entity and that failing to pierce the

veil would create a risk of an unjust result. *Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 300 (1985). "The

question of whether or not to pierce the corporate veil is a 'peculiarly factual issue'" and a motion to

dismiss California veil piercing claims under Rule 12(b)(6) thus should not be granted where the

allegations in support of piercing go beyond purely conclusory recitations that there is a unity of

interest and injustice. *Mieuli v. DeBartolo*, No. C-00-3225 JCS, 2001 WL 777447, at *9 (N.D. Cal. Jan.

16, 2001) (denying motion to dismiss) *quoting Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App. 4th 1269,

1284 (1994).

1.  Plaintiffs adequately pled a unity of interest

Under California law, there should be no question that Plaintiffs sufficiently alleged that Musk

and Defendants have the requisite unity of interest. Indeed, California courts have recognized that a

vast array of factors can establish that unity of interest in different cases:

> "The alter ego test encompasses a host of factors: '[1] **[c]ommingling**
> **of funds and other assets, failure to segregate funds of the**
> **separate entities, and the unauthorized diversion of corporate**
> **funds or assets to other than corporate uses** ...; **the treatment by**
> **an individual of the assets of the corporation as his own** ...; the
> failure to obtain authority to issue stock or to subscribe to or issue the
> same ...; the holding out by an individual that he is personally liable for
> the debts of the corporation ...; the failure to maintain minutes or
> adequate corporate records, and the confusion of the records of the
> separate entities ...; the identical equitable ownership in the two
> entities; **the identification of the equitable owners thereof with the**
> **domination and control of the two entities**; identification of the
> directors and officers of the two entities in the responsible supervision
> and management; sole ownership of all of the stock in a corporation

by one individual or the members of a family ...; the use of the same office or business location; the employment of the same employees and/or attorney ...; **the failure to adequately capitalize a corporation**; the total absence of corporate assets, and **undercapitalization** ...; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation ...; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities ...; **the disregard of legal formalities and the failure to maintain arm's length relationships among related entities** ...; **the use of the corporate entity to procure labor, services or merchandise for another person or entity** ...; **the diversion of assets from a corporation by or to a stockholder or other person or entity**, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another ...; the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions ...; and the formation and use of a corporation to transfer to it the existing liability of another person or entity.' ... **This long list of factors is not exhaustive.** The enumerated factors may be considered '[a]mong' others 'under the particular circumstances of each case.'"

*Zoran Corp. v. Chen*, 185 Cal. App. 4th 799, 811–12 (2010) (quoting *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft, LLP,* 69 Cal.App.4th 223, 249–250 (1999)) (emphasis added).

For that reason, whether a particular defendant is subject to alter ego liability under California law "is normally a question of fact," and the facts that can support veil piercing claims are as varied as the particular circumstances in which such claims can be raised. *Zoran Corp.*, 185 Cal. App. 4th at 811. That renders veil piercing claims under California law uniquely ill-suited for 12(b)(6) dismissal: "The conditions under which the corporate entity may be disregarded, or the corporation be regarded as the alter ego of the stockholders, necessarily vary according to the circumstances in each case inasmuch as the doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court." *Stark v. Coker*, 20 Cal. 2d 839, 846 (1942).

*Zoran* is particularly instructive. In *Zoran*, the California Court of Appeals reversed a trial court's grant of summary judgment dismissing the plaintiff's veil piercing claims. Reviewing the record,

the court held that there was sufficient evidence that the individual shareholder "dominated and controlled" the corporations where the plaintiff provided evidence that he had provided the company's funding, passed on its compensation decisions, and had a hand in its day-to-day affairs. *Zoran Corp. v. Chen*, 185 Cal. App. 4th 799, 814 (2010). While that record did not require a finding that there was a sufficient unity of interest to support veil piercing, it did raise issues of fact sufficient to require a trial on that issue. *Id.* at 815. As *Zoran* (which was decided at summary judgment, not the pleading stage) suggests, the pleading requirement for a veil piercing claim under California law is "not strict" – rather, simply pleading facts supporting "two or three" factors relevant to the unity of interest inquiry is sufficient. *Pac. Mar. Freight, Inc. v. Foster*, No. 10-CV-0578, 2010 WL 3339432, at *6 (S.D. Cal. Aug. 24, 2010), *citing Federal Reserve Bank of San Francisco v. HK Systems*, No. C–95–1190, 1997 WL 227955, at *6 (N.D.Cal. Apr.24, 1997). *See also Brinker v. Axos Bank*, No. 22-CV-386 (DDL), 2023 WL 4535529, at *5 (S.D. Cal. July 13, 2023) (denying motion to dismiss and finding "rather conclusory" allegations sufficient "[b]ecause the most damning evidence of the unity of 'interest and identity' is often in the hands of the corporation and its principals and can be found nowhere else").

On that standard, Plaintiffs have more than sufficiently alleged Musk's unity of interest with Twitter. Plaintiffs pled that Musk has personal control of Twitter policy and decision-making that extends down to day-to-day matters such as content moderation and payments. D.I. 10, ¶¶ 295-304. Plaintiffs further pled that Musk commingled assets and undercapitalized Twitter. *Id.*, ¶¶ 305-309. Those allegations were not conclusory recitations of the standard: Plaintiffs alleged particular facts demonstrating Musk's extensive personal control, commingling of assets, and undercapitalization. Particularly at the motion to dismiss stage those facts are sufficiently specific, under *Zoran*, *Brinker*, *Pacific Maritime Freight*, and *HK Systems*, to preclude 12(b)(6) dismissal of Plaintiffs' veil-piercing claims.[4]

---

[4] In any event, Plaintiffs intend to amend their claims to include additional allegations, such as Musk's description of an advertiser boycott of *Twitter* as an attempt to blackmail *him, personally* - an attempt he mocked as ludicrous given his

Indeed, Defendants' desultory attempt to address those facts in their briefing essentially concedes that this issue cannot be resolved via a motion to dismiss. Defendants argue only that Plaintiffs did not detail "facts explaining *how* Twitter allegedly became undercapitalized 'specifically as a result of Musk's purchase of the corporation.'" D.I. 37 at 6, n. 4. But that is simply false, as a factual matter: Plaintiffs specifically alleged that the undercapitalization was a result of the debt Musk loaded onto Twitter as part of his acquisition. D.I. 10, ¶ 308.[5] And Defendants entirely ignored Plaintiffs' allegations that Musk dominated and controlled Twitter's day to day operations and Plaintiffs' allegations that Musk commingled assets by directing people from his other corporations to work at Twitter. All of that is more than enough to support the "two or three" factors that were all Plaintiffs needed to allege to overcome a motion to dismiss.

And it is relevant to the plausibility of Plaintiffs' allegations that Twitter would not be the first company Musk has maintained operational control over, which he then exercised for personal rather than corporate benefit, despite not being its 100% owner. In *Tornetta v. Musk*, 310 A.3d 430 (Del. Ch. 2024), the Delaware Court of Chancery held that Musk was a controller of Tesla, finding that "Tesla and Musk are intertwined, almost in a Mary Shelley ('You are my creator ...') sort of way," *id.* at 504, and that Musk "wields unusually expansive managerial authority, equaling or even exceeding the imperial CEOs of the 1960s." *Id.* at 506-07. So pervasive was the unity of Musk's interests with Tesla's that its compensation committee, comprised of theoretically-independent members of the board,

personal finances while simultaneously conceding that it could kill the company itself. New York Times Events, YouTube, "Elon Musk on Advertisers, Trust, and the 'Wild Storm' in His Mind | Dealbook Summit 2023," Nov. 30, 2023, https://www.youtube.com/watch?v=2BfMuHDfGJI at 11:17-11:35 (encouraging advertisers not to advertise on Twitter because "[i]f someone's gonna try to blackmail me with advertising? Blackmail me with money? Go fuck yourself! Go. Fuck. Yourself. Is that clear? I hope it is"); 11:45-13:03 (explaining that an advertising boycott would kill the company, but that the world would blame the advertisers, not Musk, for the loss of Twitter). Plaintiffs sought to obviate this briefing by obtaining Defendants' consent to leave to amend, but Defendants refused, and Plaintiffs will be filing an opposed motion for leave to amend, along with a proposed amendment, in the near future.

[5] Indeed, as will be included in the proposed Second Amended Complaint, witnesses have since expressly conceded that Twitter's precarious financial position was due in part to the appearance of the acquisition debt and interest payments as a significant new line item on its balance sheet.

worked closely with Musk in structuring his compensation package, "actively advanc[ing] Musk's interests" and doing "what feels fair for *Musk*." (emphasis in original) *Id.* at 532. The Court based its findings on many factors also applicable here, including that Musk had the power to direct operational decisions (*compare Tornetta* at 505 with D.I. 10 at ¶¶ 5, 7, 114-15, 138-143, 152-155, 244, 256-62, 295-304; that all financial plans must be approved by Musk (*compare Tornetta* at 505 with D.I. 10 at ¶ 237); that Musk makes hiring, firing, and compensation decisions for senior personnel and fires people on a whim (*compare Tornetta* at 505 with D.I. 10 at ¶¶ 189-90); and that Musk makes up positions and titles for himself. (*compare Tornetta* at 505 with D.I. 10 at ¶ 62). The most striking factual overlap between the findings in *Tornetta* and the claims in the instant case may revolve around the Transition Team, the collection of employees from Musk's other entities who temporarily decamped from their "main" jobs to assist Musk in re-forming Twitter in conformance with Musk's vision. At the *Tornetta* trial, Musk testified that he had asked fewer than 50 Tesla engineers, *Tornetta* Trial Transcript ("TTT") at 657:17-18, to spend "a few hours" evaluating the Twitter engineering team on a "voluntary basis," TTT at 656:4-5, but that it was "very short term" – "I think it lasted a few days and it was over." TTT at 657:5-6. Even this rosy picture of the facts was sufficient for the *Tornetta* court to find that Musk used Tesla resources to address projects at Twitter, *Tornetta* at 506; the reality, that Musk brought nearly 100 employees from his many companies and had them working full-time at Twitter for months overseeing the transition and performing significant operational work, only makes the point clearer. D.I. 10 at ¶ 177-181.

All in all, the *Tornetta* court found that "the avalanche of evidence [supporting the conclusion that Musk was a controller] is so overwhelming that it is burdensome to set out in prose," *Tornetta* at 504. And that was at Tesla, a publicly-traded company with a Board of Directors. Twitter has no Board since Musk took it private, and Musk fired Twitter's prior executives hours after the deal closed; with no one to oppose him except for the cadres of sycophants he brought with him from the other entities

9

he owned, it beggars belief that history would not repeat itself.

California law also allows veil piercing where the corporation was used as an instrumentality or conduit for a single venture or the business of an individual. *Ming-Hsiang Kao v. Holiday*, 58 Cal. App. 5th 199, 206 (2020). Plaintiffs have pled facts sufficient to support such a finding, including that Musk made up his own title at Twitter, D.I. 10 ¶ 62; that Musk's control over Twitter after the close of the merger was "near-total," *id.* ¶ 109; that Musk alone created and modified Twitter's Return-To-Office policy, *id.* ¶¶ 138-140; that the new policies and procedures implemented after the change in control were done for no reason other that "Elon wants this," *id.* at ¶ 198; that Musk's personal approval was required to approve payment for even mundane operational expenses, *id.* at ¶ 237; that Musk could – and did – cause Twitter to breach its contractual obligations to landlords and property owners by his sole authority and whim, in disregard for the harm that conduct would cause to Twitter, *id.* at ¶¶ 241-51, 255-62; and that Musk directs Twitter's decision-making and operations in accordance with his own beliefs, principles, and desires, ¶¶ 296-304.[6] And Such facts are sufficient at the pleading stage to allege that Musk "dictates every facet of the subsidiary's business—from broad policy decisions to routine matters of day-to-day operation" as required to satisfy the alter ego test. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015).

2.  The Amended Complaint sufficiently alleged a risk of an inequitable result

Plaintiffs likewise sufficiently alleged that failure to pierce the corporate veil would risk an inequitable result. At the pleading stage, Plaintiffs do not need to allege that failing to pierce the

---

[6] Plaintiffs also intend to amend their complaint to include additional facts learned through discovery (or via Musk's public statements after Plaintiffs filed the Amended Complaint), such as X Holdings I's testimony at deposition that Musk is the sole authority and decision-maker for that entity, that Musk's personal approval is required for termination, hiring, and compensation decisions at Twitter as well as for allowing Twitter employees access to tools and resources needed to do their jobs, and that Musk personally identifies himself with Twitter *See* n. 5, *supra* ("If someone's gonna try to blackmail *me* with advertising? Blackmail *me* with money? …") (emphasis added). *Cf. McCombs v. Rudman*, 197 Cal. App. 2d 46, 50 (Ct. App. 1961) ("Throughout Len's testimony, and on occasions too numerous to mention, Len spoke of himself and the Company as 'we,' 'we were engaged,' 'we had a contract,' 'we entered into a contract just like I do in other contracts'")

corporate veil would, with certainty, lead to an inequitable result, merely that it would subject Plaintiffs to a *risk* of an inequitable result. *See United States v. Healthwin-Midtown Convalescent Hosp. & Rehab. Ctr., Inc.*, 511 F. Supp. 416, 420 (C.D. Cal. 1981) (veil piercing justified because Healthwin's undercapitalization "subjected all its creditors, including plaintiff, to inequitable *risks* regarding Healthwin's obligations to them") (emphasis added), *aff'd*, 685 F.2d 448 (9th Cir. 1982). Potential insolvency and attendant inability to pay a judgment is a sufficient risk of an inequitable result to warrant veil piercing. *See Relentless Air Racing, LLC v. Airborne Turbine Ltd. P'ship*, 222 Cal. App. 4th 811, 813 (2013) (result was inequitable as a matter of law where defendant's insolvency meant plaintiff could not collect its judgment from the corporation). The law does not require any proof that the inequitable result was a product of bad faith or ill-intent. *Id.* at 816 ("The trial court erred in requiring Relentless to prove that the Fultons acted with wrongful intent. The law does not require such proof. … the Fultons' intent is beside the point").

That is particularly true where, as Plaintiffs alleged here, a corporation is undercapitalized relative to its risk. "If the capital [of a corporation] is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege." *Aliya Medcare Fin., LLC v. Nickell*, No. CV 14-07806, 2015 WL 11072180, at *21 (C.D. Cal. Sept. 25, 2015) (alteration in original), *quoting Commodity Futures Trading Comm'n v. Topworth Intern., Ltd.*, 205 F.3d 1107, 1113 (9th Cir. 1999). "The status of an entity as undercapitalized is an independent basis for inequitable result." *Dollar Tree Stores Inc. v. Toyama Partners LLC*, No. C 10-0325, 2011 WL 872724, at *2 (N.D. Cal. Mar. 11, 2011). As Plaintiffs alleged, Musk acquired Twitter by loading it down with billions of dollars in debt, subjecting it to severe risk of bankruptcy according to Musk himself. D.I. 10, ¶¶ 308-309. He did so despite having more than enough assets to have acquired Twitter outright, and Musk has since driven Twitter's valuation ever downward by treating the corporation as an extension of his personal preferences. *See, e.g.*, Ricker, T., *Musk's 44 Billion Twitter Now Valued at Just 9.4B*, The Verge,

(9/30/2024) (reporting on Fidelity writing down its stake in Twitter by 79%);[7] Katstrenakes, J. & Sato, M., *Elon Musk tells advertisers: 'Go fuck yourself'*, The Verge (11/29/2023) (reporting on Musk's warning that his stance could "kill the company").[8]

This type of undercapitalization and bankruptcy risk is – as the California Court of Appeals held in *Relentless* – sufficient *as a matter of law* to establish a risk of an inequitable result, and is not a mere complaint about "potential difficulty a plaintiff faces collecting a judgment," as Musk characterized it in his Objection. D.I. 134 at 9.[9] And to the extent that the Central District of California held in 2003 in *Neilson* that California law requires more, subsequent California decisions, such as *Relentless*, show that to be an inaccurate statement of California law. *See, e.g., Rincon EV Realty LLC v. CP III Rincon Towers, Inc.*, No. A161541, 2022 WL 1447615, at *4 (Cal. Ct. App. May 6, 2022) ("under California law, an inequitable or unjust result may be found without proof of wrongful intent"). As Plaintiffs alleged, Musk has repeatedly asserted that the debt load *created by his acquisition of Twitter* has driven Twitter to the edge of bankruptcy. D.I. 10, ¶¶ 304-305. Musk *chose* to saddle Twitter with crushing debt that threatened its ability to pay its obligations in order to facilitate his ownership of the company. That is sufficient to allege that Twitter was undercapitalized, *id.*, ¶¶308-310, and that allowing him to use that (perhaps deliberate) undercapitalization to avoid liability for obligations taken on *in that very acquisition* would be inequitable and unjust. No more is necessary at the pleading stage.

Similarly, Musk's disregard for the separate corporate existence of the entities he controls has

---

[7] Available at https://www.theverge.com/2024/9/30/24258129/musks-44-billion-twitter-now-valued-at-just-9-4b-as-x.

[8] Available at https://www.theverge.com/2023/11/29/23981928/elon-musk-ad-boycott-go-fuck-yourself-destroy-x.

[9] The distinction is relatively simple. The mere fact that a company faces economic headwinds that may, despite its best efforts and appropriate capitalization at the outset, make collection difficult in practice for a particular creditor is not a risk of an unjust result; shareholders are not guarantors of a corporation's market performance. But *undercapitalization* is different: an undercapitalized corporation enters the marketplace unprepared (deliberately or negligently) to meet its obligations. It is unjust for a business owner to offload such risks to the company's creditors, and, for that reason, California law recognizes undercapitalization as a sufficient basis, in and of itself, to establish the risk of injustice for purposes of veil piercing. Here, Plaintiffs alleged not that Twitter's performance in the market has left it potentially unable to pay its obligations, but that the very structure of the transaction by which Musk acquired Twitter loaded it down with sufficient debt to create the risk of non-payment, leaving it undercapitalized. Under California law, that is a distinction with a difference.

created a *risk* of inequitable result by opening the door to a potential defense by Defendants that the wrongful conduct alleged was committed by third parties acting at Musk's behest, not by corporate defendants or employees. For instance, Plaintiffs' terminations were determined, at least in significant part, by employees of Musk's other corporations that he placed at Twitter without, as far as Plaintiff is aware, any formal direct relationship between those employees and Twitter. *See, e.g.,* D.I. 10 ¶¶ 126, 179-80, 230-35. Similarly**,** Killian and Hawkins have specifically alleged constructive discharge based in significant part on the actions of individuals employed at other Musk-owned or -influenced entities, such as Steve Davis, Nicole Hollander, Pablo Mendoza, and others whose formal roles at Twitter were and are at best unclear. *Id.*, ¶¶192-197 (Davis); 207-210 (Davis); ¶¶ 230-31 (Davis, Mendoza, Hollander, and Liz Jenkins); ¶¶ 267-270 (Hollander); ¶¶ 277-278 (Hollander); ¶¶ 245-251(Mendoza). By intermingling his corporate assets in the alleged conduct without formally having Twitter contract with the employees of his other companies, Musk has created a situation where – absent claims against Musk himself – the corporate defendants could argue the discriminatory or other wrongful activity was engaged in by Tesla, SpaceX, or Boring Company employees working as *Musk's* agents, not Twitter's. Indeed, Defendants would have every incentive to do so. The only way to avoid such a shell-game is to recognize that Musk's decision to treat his various corporations as interchangeable personal playthings whose assets can be used across entities opens him to personal liability for their actions.

Indeed, the risk posed by this type of uncertainty was recently made starkly clear by Mr. Musk in another context involving many of the same players. When President Trump created DOGE, he famously and publicly announced that Musk would head the agency.[10] Musk publicly took, and

---

[10] https://www.econclubny.org/documents/10184/109144/20240905_Trump_Transcript.pdf, at 14 ("I will create a Government Efficiency Commission tasked with conducting a complete financial and performance audit of the entire federal government and making recommendations for drastic reforms. [...] And Elon, because he's not very busy, has agreed to head that task force.")

continues to take, credit for much DOGE's work.[11] And Musk's own attorneys have claimed, in this very court, that Musk should be able to avoid discovery within this litigation on the grounds that he is the head of DOGE. D.I. 144 at 3 ("The White House has designated Musk a 'special government employee' **in charge of** Establishing and Implementing the President's Department of Government Efficiency ('DOGE').'' (emphasis added). Yet when litigants have raised claims relating to DOGE's activity in court, the response has been that Musk was not in fact the head of the entity and that the plaintiffs were identifying the wrong defendants. For example:

> **THE COURT:** So is there a piece of paper that – you know, an appointment paper, one of those -- I mean, I think you work in the federal government, you've seen these before, where maybe it's SF-50, I'm not sure, that says you've got this job now.
>
> Is there one that says Elon Musk, Senior Advisor to the President?
>
> **MR. GARDNER:**[12] Sorry, let's just back up a step. So now you're not talking about the DOGE administrator, but you're now talking about Elon Musk?
>
> **THE COURT:** Well, I mean, they are disputing – they are saying he was the head of DOGE. You're saying he wasn't but we can't tell you who was.
>
> **MR. GARDNER:** Right.
>
> **THE COURT:** Which, admittedly, is highly suspicious. I'm not saying that you're not being candid, but just the whole operation, it raises questions.

*Does 1-26 v. Musk, et al*, Case No. 8:25-cv-00462 (D. Md., Feb. 28, 2025) D.I. 53 (transcript of preliminary injunction hearing) at 87:6-22.[13] *See also* Declaration of Joshua Fisher, *New Mexico, et al. v. Musk, et al.*, Case No. 1:25-cv-00429 (D.D.C. February 17, 2025), D.I. 24 at ¶ 6 ("Mr. Musk is an

---

[11] *See, e.g.,* Elon Musk (@elonmusk), Twitter. February 2, 2025 at 10:54 P.M. Eastern. https://x.com/elonmusk/status/1886307316804263979 ("We spent the weekend feeding USAID into the wood chipper. Could gone to some great parties. Did that instead.")

[12] A Department of Justice attorney and counsel to Defendants in *Does 1-26 v. Musk*.

[13] Available at https://storage.courtlistener.com/recap/gov.uscourts.mdd.576293/gov.uscourts.mdd.576293.53.0.pdf.

employee in the White House Office. He is not an employee of the of the U.S. DOGE Service or U.S. DOGE Service Temporary Organization. Mr. Musk is not the U.S. DOGE Service Administrator.")[14] Months later, the question of who actually runs DOGE is still unresolved, with litigants across the country seeking discovery on the topic.[15] Simply put, the kind of strategic ambiguity Musk has engaged in – in other contexts and in this one – creates risks of unjust results that would not exist here had Musk simply abided by standard corporate formalities. As a matter of California law, veil piercing is the appropriate response to Musk's creation of such risks by ignoring those formalities.

## C.    Conclusion

For all of these reasons, Plaintiffs' veil piercing claims are proper. Because California has a significant interest in regulating the conduct at issue and determining who, if anyone, might have liability for it, and Delaware has none, California law, not Delaware law, governs Plaintiffs' veil piercing claims. Applying California law, the burden on a plaintiff seeking to sufficiently allege a alter ego liability is light, and Plaintiffs have more than carried it with the allegations of the Amended Complaint. The motion to dismiss the veil piercing claims should therefore be denied.

---

[14] Available at https://storage.courtlistener.com/recap/gov.uscourts.dcd.277463/gov.uscourts.dcd.277463.24.1.pdf.

[15] *See, e.g.,* Plaintiff's Motion for Limited Discovery, D.I. 21 in *American Oversight vs. U.S. Department of Government Efficiency, et al.,* Case No. 1:25-cv-00409 (D.D.C. June 2, 2021), available at https://storage.courtlistener.com/recap/gov.uscourts.dcd.277367/gov.uscourts.dcd.277367.21.0.pdf.

**OF COUNSEL**

Akiva Cohen (*pro hac vice*)
Dylan M. Schmeyer (*pro hac vice*)
Michael D. Dunford (*pro hac vice*)
Lane A. Haygood (*pro hac vice*)
KAMERMAN, UNCYK, SONIKER & KLEIN
P.C.
1700 Broadway, 16th Floor
New York, NY 10019
Tel: (212) 400-4930
acohen@kusklaw.com dschmeyer@kusklaw.com
mdunford@kusklaw.com

Dated: June 13, 2025

**CHRISTENSEN LAW LLC**

*/s/ Joseph L. Christensen*
Joseph L. Christensen (#5146)
1201 N. Market Street, Suite 1404
Wilmington, Delaware 19801
Tel: (302) 212-4330
joe@christensenlawde.com

*Counsel for Wolfram Arnold, Erik Froese,
Tracy Hawkins, Joseph Killian, Laura Chan
Pytlarz, and Andrew Schlaikjer*

16