# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WOLFRAM ARNOLD, ERIK FROESE, TRACY HAWKINS, JOSEPH KILLIAN, LAURA CHAN PYTLARZ, and ANDREW SCHLAIKJER, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| X CORP. f/k/a TWITTER, INC., X HOLDINGS CORP. f/k/a X HOLDINGS I, INC. and ELON MUSK, | ) ) ) ) |
| Defendants. | ) ) |

C.A. No. 1:23-cv-00528-TMH

## **MEMORANDUM OPINION**

**HUGHES, UNITED STATES CIRCUIT JUDGE, SITTING BY DESIGNATION:**

Plaintiffs Wolfram Arnold, Erik Froese, Tracy Hawkins, Joseph Killian, Laura Chan Pytlarz and Andrew Schlaikjer (collectively, Plaintiffs) are former employees of X Corp. f/k/a Twitter, Inc. and X Holdings Corp. f/k/a X Holdings I, Inc. (collectively, Twitter Defendants). Pending before the court is the Report and Recommendation of Magistrate Judge Christopher Burke (D.I. 110) (Report I), which recommends that the court grants-in-part and denies-in-part the Twitter Defendants' motion to dismiss as to Counts I, II, III, IV, V, and VI of the Plaintiffs' First Amended Complaint (FAC). (D.I. 10). Also pending is a second Report and Recommendation from Judge Burke (D.I. 121) (Report II), which, as relevant here, recommends that the court grants-in-part and denies-in-part the Twitter Defendants' motion to dismiss as to Count XIV of the FAC. This Court has considered the parties' objections *de novo* and concluded that Report I should be adopted for the reasons stated by Judge Burke, and that Report II, as it relates to Count XIV of the FAC, should be adopted-in-part and rejected-in-part.

## I.  BACKGROUND

The court incorporates by reference the factual and procedural background set out in Report I. (D.I. 110 at 2–9). Additional relevant factual allegations will be discussed in Section III, and an overview of the pertinent procedural developments is produced below.

In 2023, Twitter Defendants and Defendant Elon Musk filed separate motions to dismiss the FAC. (*See* D.I. 14; D.I. 17). The Twitter Defendants' motion seeks to

2

dismiss Counts I, II, III, IV, V, VI and XIV of the FAC pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1) and 12(b)(6). (D.I. 15). Following the expiration of a stay pending mediation (D.I. 76), Twitter Defendants renewed their motion to dismiss on February 29, 2024, (D.I. 77). On December 5, 2024, Judge Burke issued Report I. (D.I. 110). As to the relevant Twitter Defendants, Report I recommends that the court dismiss Counts I (Declaratory Judgment) and II (Breach of Merger Agreement) with prejudice, dismiss Counts V (Breach of Offer Letter) and VI (Fraud) without prejudice, and deny the motion to dismiss as to Counts III (Breach of Contract) and IV (Promissory Estoppel). (D.I. 110). Judge Burke held the portion of the Twitter Defendants' motion to dismiss relating to Count XIV (Discrimination Under California Fair Employment and Housing Act (FEHA)) in abeyance for consideration in a second Report and Recommendation (D.I. 121) (Report II), dated January 8, 2025, which mainly addresses Musk's renewed motion to dismiss the claims against him in his individual capacity.[1] (D.I. 78). As applicable here, Report II recommends that the court grant-in-part and deny-in-part the Twitter Defendants' motion to dismiss Count XIV of the FAC.[2] (D.I. 121 at 15–20).

On December 18, 2024, Plaintiffs objected to Report I (D.I. 111) (Plaintiffs' Objection), arguing that Judge Burke erred in finding that Plaintiffs are not third-

---

[1] *See* D.I. 110 at 10 n.8 (explaining that Count XIV would be evaluated in Report II because Plaintiffs relied on their briefing in opposition to Musk's motion to dismiss to respond to the Twitter Defendants' challenge to Count XIV).

[2] The court will consider the remainder of Report II, regarding challenges to the claims against Musk, in a separate opinion.

party beneficiaries of the Merger Agreement and lack standing to bring claims for its breach. (D.I. 111). On December 19, 2024, Twitter Defendants also objected to Report I (D.I. 113) (Defendants' Objection), claiming that Judge Burke erred in finding that Plaintiffs—including Hawkins and Killian, who allege that they were constructively discharged—sufficiently pled breach of contract and promissory estoppel. (D.I. 113).

Plaintiffs responded to the Twitter Defendants' Objection on January 9, 2025 (Plaintiff's Response). (D.I. 123). Twitter Defendants responded to the Plaintiffs' Objection the same day (Defendants' Response). (D.I. 122). The court heard oral argument relating to Plaintiffs' and Defendants' objections to Report I and Report II on April 15, 2025. (D.I. 141; D.I. 150).

## II. Legal Standard

"When reviewing the decision of a Magistrate Judge on a dispositive matter, the Court conducts a *de novo* review." *Masimo Corp. v. Philips Elec. N. Am. Corp.*, 62 F. Supp. 3d 368, 379 (D. Del. 2014) (citing 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3)); *see also Truinject Corp. v. Nestlé Skin Health. S.A.*, No. 19-cv-00592, 2020 WL 1270916, at *1 (D. Del. Mar. 17, 2020). "Under the Local Rules of this Court, a motion to dismiss is considered a dispositive motion." *Bench Walk Lighting LLC v. LG Innotek Co.*, 530 F. Supp. 3d 468, 474 (D. Del. 2021) (citing D. Del. L.R. 72.1(3)). The court may "accept, reject, or modify the recommended disposition" of the magistrate judge. Fed. R. Civ. P. 72(b)(3).

In Report I, the court set out the familiar standard of review for a Rule 12(b)(6) motion to dismiss for failure to state a claim, as articulated by the Third Circuit in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). (D.I. 110 at 9–10). The court incorporates that standard into this opinion by reference and will follow it herein. The court also incorporates by reference the standard that applies to a claim alleging fraud, which was also set out in Report I. (*Id.* at 10).

### III. Discussion

Below, the court addresses the arguments raised by the Plaintiffs' and Defendants' Objections and Responses. This includes Plaintiffs' arguments for rejecting Report I's proposed dismissal of Plaintiffs' declaratory judgment and breach of merger agreement claims (Counts I and II) as well as Twitter Defendants' arguments for dismissing Plaintiff's breach of contract and promissory estoppel claims (Counts III and IV). The court also briefly addresses the recommendations to which neither party objected; specifically, Report I's recommendation to dismiss Plaintiff's breach of offer letter and fraud claims (Counts V and VI) without prejudice, and Report II's recommendation to find that Plaintiffs Pytlarz and Arnold adequately pled sex and sexual orientation discrimination by the Twitter Defendants under FEHA (Count XIV), but not age discrimination.

#### A. Plaintiffs' Declaratory Judgment and Breach of Merger Agreement Claims (Counts I and II)

The court agrees with Report I that the merger agreement precludes Plaintiffs from asserting that they are third-party beneficiaries with standing to enforce

5

Section 6.9(a), and that Counts I and II should accordingly be dismissed with prejudice. (*See* D.I. 110 at 10–18).

Musk and his companies, including X Holdings, entered into a merger agreement with Twitter on April 25, 2022 (merger agreement) (D.I. 10 ¶ 37; D.I. 16, Ex. A).[3] Section 6.9 of the agreement is entitled "Employee Benefits." (D.I. 16, Ex. A at 51). Section 6.9(a) of the merger agreement provides that for one year following the merger, X Holdings shall provide, or cause Twitter to provide, "severance payments and benefits" to "Continuing Employees" that are "no less favorable" than those that were available to Twitter employees prior to the merger. (D.I. 16, Ex. A at 51; *see also* D.I. 10 ¶¶ 314–19 (alleging that Plaintiffs are Continuing Employees as defined by Section 6.9(a))). Section 6.9(e)(i), however, clarifies that "[n]othing contained in this Section 6.9 shall . . . constitute a limitation on rights to amend, modify, merge, or terminate" any employee benefit plan. (D.I. 16, Ex. A at 52). As Judge Burke explained, this language "gives the acquiror the right to terminate or modify any employee benefit plan after the effective date of the merger, full stop." (D.I. 110 at 14 n.10).

The merger agreement also includes two separate no-third-party-beneficiary provisions. Section 6.9(e)(ii) states that "[n]othing contained in this Section 6.9, express or implied, shall . . . give any Company Service Provider [defined to include

---

[3] As in Report I, the court cites to the merger agreement because it is referenced by the FAC, and both parties attached it as exhibits to declarations accompanying their briefing regarding the Twitter Defendants' motion to dismiss. (*See* D.I. 15; D.I. 27) (both parties requesting judicial notice of the merger agreement).

6

employees] any third-party beneficiary or other rights." (D.I. 16, Ex. A at 52; *see also Id.* at 6 (defining Company Service Provider)). In addition, Section 9.7, entitled "No Third-Party Beneficiaries," confirms that the "Agreement is not intended to and shall not confer upon any Person other than the parties hereto any rights or remedies hereunder," except for three expressly defined categories of individuals, none of which includes Continuing Employees. (*Id.* at 69).

"A third-party beneficiary's rights are measured by the terms of the contract," *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 270–71 (Del. 2022) (internal citation omitted), and here, as Report I recognizes, the contracting parties included three provisions indicating that Continuing Employees do not have rights to enforce Section 6.9 of the merger agreement. (*See* D.I. 110 at 18). "Under Delaware law, only parties to a contract and intended third-party beneficiaries have standing to sue for breach of the contract." *Crispo v. Musk*, No. 2022-0666, 2022 WL 6693660, at *2 (Del. Ch. Oct. 11, 2022) ("*Crispo I*"). "Delaware courts have construed no-third-party-beneficiaries provisions that are customized by a carve-out," such as Section 9.7, "as indicating a strong intent to disclaim third-party beneficiaries" not included in the carve-out. *Crispo v. Musk*, 304 A.3d 567, 575 (Del. Ch. 2023) ("*Crispo II*"). In fact, "[t]he three carve-outs of Section 9.7 of the Merger Agreement render it more customized than other no-third-party-beneficiaries provisions enforced by" Delaware courts. *Id.* at 578. Section 9.7, in substance and in title, taken together with Sections 6.9(e)(ii) and 6.9(e)(i), reveal that the contracting parties did not intend to convey any third-party beneficiary rights to Continuing Employees.

7

Central to Plaintiffs' Objections are the Court of Chancery's decisions in *Crispo I* and *Crispo II*. Crispo, a Twitter stockholder, sued Elon Musk, X Holdings I, Inc., and X Holdings II, Inc., on behalf of a class of Twitter stockholders for specific enforcement of the same merger agreement at issue here, and, alternatively, damages. In *Crispo I*, the Court of Chancery held that Crispo did not adequately allege third-party beneficiary standing to specifically enforce the merger agreement. *Crispo I*, 2022 WL 6693660, at *11. In *Crispo II*, the court considered the separate question of whether stockholders have standing to pursue claims for lost-premium damages under Section 8.2 of the merger agreement, which states that contracting parties could be held liable for "the benefits of the transactions contemplated by this Agreement lost by the Company's stockholders . . . including lost stockholder premium." *Crispo II*, 304 A.3d at 572. The court concluded that there were two reasonable ways to interpret the scope of the so-called "Lost Premium Provision." *Id.* at 584–85. Either "the parties took the risk that the provision would be unenforceable" in view of Section 9.7, which "does not expressly confer third-party beneficiary status on stockholders and it is customized," or Section 8.2 grants "stockholders third-party beneficiary status that vest in exceptionally narrow circumstances and for the limited purpose of seeking lost-premium damages" when specific performance is unavailable. *Id.* The court did not opine on which interpretation was more accurate, because under either view Crispo would have lacked standing to enforce the merger agreement at the time he filed the complaint. *Id.* at 586.

Plaintiffs argue that Report I nullifies the guarantees in Section 6.9(a), and in so doing, conflicts with *Crispo II*'s purported finding that the merger agreement does "not bar any action after the merger closed for damages from breach of Twitter's post-close obligations." (D.I. 111 at 6). But *Crispo II* made no such finding and offers no support for Plaintiffs' proposed reading of Section 6.9(a) as allowing Continuing Employees to enforce Twitter Defendants' post-merger obligations to them. (*see* D.I. 111 at 6). Neither *Crispo I* nor *Crispo II* considered the terms of Section 6.9(a). Furthermore, *Crispo II*'s second interpretation of Section 8.2, as conferring limited standing, responds to the "general/specific canon" and the idea that the specific language of Section 8.2 anticipating lost-premium damages, which is enforceable only by stockholders, could modify the relatively more general terms of Section 9.7. *Crispo II*, 304 A.3d at 579, 585; *see also DCV Holdings, Inc. v. ConAgra, Inc.,* 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."). Report I already rejected the argument that Section 6.9(a) is a similarly specific provision overriding a general one. (D.I. 110 at 17). As relevant here, there are two provisions that specifically exclude Continuing Employees from third-party beneficiary status (Sections 9.7 and 6.9(e)(ii)), one provision that prohibits the construction of Section 6.9, including Section 6.9(a), as a limitation on the acquirors right to amend employee benefits (Section 6.9(e)(i)), and only one provision which promises the maintenance of certain severance payments to Continuing Employees (Section 6.9(a)). Which is to say, the provision generally

9

describing the maintenance of certain employment benefits is outnumbered and belied by the merger agreement's inclusion of specific exclusions of Continuing Employees from third-party beneficiary status.

"The goal of contract interpretation is to effectuate the parties' intent." *Prime Victor Int'l Ltd. v. Simulacra Corp.*, 682 F. Supp. 3d 428, 438 (D. Del. 2023) (internal quotation marks and citation omitted). The court is compelled by the Twitter Defendants' argument that "[a]lthough [Section] 6.9(a) articulates the parties' intent to maintain a certain level of severance benefits, [Section] 6.9(e)(i) clarifies that Twitter was not committing itself to do so . . . Thus, [Section] 6.9, read in its entirety, makes clear that Twitter was not advancing any promise of future performance." (D.I. 122 at 3–4). To the degree Plaintiffs ask us to construe the merger agreement's no-third-party beneficiary provisions as only prohibiting pre-merger claims for specific performance, and as allowing post-merger claims for damages resulting from breach of contract, such a distinction between pre- and post-merger rights does not find support in the text of either Section 9.7 nor Section 6.9(e)(i). (*See* D.I. 16, Ex. A at 52, 69) (both Sections referring to "*any* [third-party beneficiary] rights"). The court is obliged to give effect to the contracting parties' unambiguous intent to exclude Continuing Employees from third-party beneficiary rights to enforce the employee benefits listed in Section 6.9(a). In view of the strong evidence demonstrating such intent, the merger agreement is not, as Plaintiffs contend, ambiguous as to Plaintiffs' third-party beneficiary status. (D.I. 111 at 8, 10; *see also* D.I. 150 at 54–55).

### B. Plaintiffs' Breach of Contract Claim (Count III)

Having reviewed the pleadings and the arguments *de novo*, Twitter Defendants have failed to persuade the court that Judge Burke erred in finding that Plaintiffs have sufficiently pled the existence of a contract. For the reasons stated in Report I, the court agrees that Plaintiffs have plausibly alleged that the "Severance Policy Email" (D.I. 10 ¶ 96) and related communications, including Twitter's "Acquisition FAQ" published to employees (D.I. 10 ¶¶ 39–41), created enforceable obligations directly to Plaintiffs separate from the obligations at issue in the merger agreement, and that Twitter Defendants' motion to dismiss as to Count III should be denied. (D.I. 110 at 22–27).

The Acquisition FAQ explicitly states that, as a result of the merger agreement, X Holdings Corp. will furnish continuing employees terminated within a year of the merger with severance payments "no less favorable than those applicable to an applicable employee prior to the closing of the transaction." (D.I. 26, Ex. 4 at 228; *see also* D.I. 10 ¶ 38). The Severance Policy Email—circulated to employees a little over two weeks after the Acquisition FAQ was first published and again two days before the merger—represented that Twitter's "current" severance policy "in the event of position elimination" was to provide specific severance benefits, including two months of base salary, explicitly listed in the email. (D.I. 10 ¶¶ 41, 96, 99). Judge Burke reasonably characterized both communications as "fairly direct and specific" statements to Plaintiffs. (D.I. 110 at 26).

11

Twitter Defendants' Objection focuses on the Severance Policy Email. They argue that the email is either "wholly separate from the Merger Agreement and fails to make a definite offer" because it only generally describes a current policy, or, Report I erroneously incorporated the merger agreement into the email, which does not reference the agreement, "render[ing] any promise illusory" because the terms of the agreement do not give plaintiffs any third-party beneficiary rights. (D.I. 113 at 3–6).

The court rejects these arguments. The FAC alleged that "[t]he Severance Policy Email and related communications constituted an offer from Twitter to its employees." (D.I. 10 ¶ 326). Accordingly, Report I did not evaluate the terms of the Severance Policy Email in isolation, but in the context of related communications, most pertinent being the Acquisition FAQ. The FAC alleges that the Acquisition FAQ—the terms of which *do* promise to maintain pre-merger severance payments and benefits for a year post-merger (D.I. 26, Ex. 4 at 228)—was published on April 26, 2022 (D.I. 10 ¶ 39), and that, in response to employee concerns about what exactly the pre-merger severance policy was (D.I. 10 ¶¶ 90–94), on May 13, 2022, Twitter sent the Severance Policy Email establishing the details of its current policy. (D.I. 10 ¶ 94–96). Plaintiffs have thus plausibly alleged that the Acquisition FAQ, either alone or in combination with the Severance Policy Email, constitutes an offer made by Twitter to its employees. The lack of a definite promise for future severance payments in the text of the Severance Policy Email, alone, is not enough to result in the dismissal of Count III.

The court agrees with Plaintiffs' Response that "[n]o incorporation [of the merger agreement] by reference was needed; Twitter represented to its employees that the Merger Agreement protected their existing severance by ensuring it could not be reduced after the merger closed, and then, when pressed by employees for details . . . provided those details [by] email." (D.I. 123 at 3). The court also agrees with Report I that such promises are not illusory because they are separate representations from the merger agreement, and they do not state, as the merger agreement does, that Twitter could modify or terminate its promises regarding severance at any time. (D.I. 110 at 25, 27). Put differently, to determine whether Plaintiffs plausibly alleged the existence of a contract, what matters is not the terms of the merger agreement explicitly or implicitly referenced by the Severance Policy Email and Acquisition FAQ, but whether the Severance Policy Email and Acquisition FAQ represent a meeting of the minds supported by consideration. *See Coleman v. Reich,* 417 S.W.3d 488, 491 (Tex. App. 2013) (listing the elements to establish the existence of a contract); *Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999).[4] Plaintiffs have plausibly alleged that Twitter Defendants offered to maintain their severance policy in return for employees remaining at the company through the merger, and that Plaintiffs accepted and provided consideration by staying. (D.I. 10 ¶¶ 325–94).

---

[4] As in Report I, the court looks to the state laws of New York and Texas because these are the states where Plaintiffs were employed. (D.I. 110 at 23 n.15).

13

### C. Plaintiffs' Promissory Estoppel Claim (Count IV)

The court agrees with Judge Burke that Plaintiffs have adequately pled promissory estoppel, as an alternative to breach of contract, for the reasons stated in Report I (D.I. 110 at 28–30).

Defendants' only objection is that Report I erred in finding that the Severance Policy Email and Acquisition FAQ amounted to a clear and unambiguous promise by Twitter to maintain certain severance payments and benefits. (D.I. 113 at 6–8). They claim that any promises contained in these documents are illusory because they merely repeat and summarize the terms of the merger agreement, which did not convey any rights to Plaintiffs. (*Id.*) The court rejects this argument for the same reason that the court rejected it with respect to Plaintiffs' claim for breach of contract. Even though the Severance Policy Email and Acquisition FAQ summarize parts of the merger agreement, Plaintiffs have plausibly alleged that they are separate representations made directly to Plaintiffs, giving rise to a new set of promises that were independently relied upon. (D.I. 10 ¶¶ 39–44, 332–40). Accordingly, the court denies Twitter Defendants' motion to dismiss Count IV.

### D. Hawkins' and Killian's Breach of Contract and Promissory Estoppel Claims (Count IV)

Unlike the other Plaintiffs, who were laid off after the merger, Hawkins and Killian resigned. (*See* D.I. 110 at 5–6). For the reasons stated in Report I, the court agrees with Judge Burke that "Plaintiffs have pled facts sufficient to show, at the pleading stage, that Hawkins and Killian were compelled to resign" or constructively

discharged. (D.I. 110 at 21). Twitter Defendants do not object to this finding but argue that Hawkins and Killian cannot allege breach of contract or promissory estoppel because constructive discharge is not "position elimination." (D.I. 113 at 8–10). They emphasize this term because the Severance Policy Email refers to Twitter's current severance policy "in the event of a position elimination." (D.I. 10 ¶ 96). Twitter Defendants ask the court to look to definitions of "position elimination" and how the phrase has been interpreted by other courts to conclude that Hawkins and Killian fail to allege that they were subject to "position elimination." (D.I. 113 at 8–10).

The Twitter Defendants again assume that the terms of the Severance Policy Email alone provide the basis for Plaintiffs' breach of contract and promissory estoppel claims. Not so. Count III of the FAC alleges that the "Severance Policy Email *and* related communications constituted an offer" (D.I. 10 ¶ 326) (emphasis added), while Count IV of the FAC alleges that Twitter made a promise to maintain its severance policy "orally and in the Severance Policy Email and Acquisition FAQ." (D.I. 10 ¶ 335). For its part, the Acquisition FAQ states that employees "whose employment[s] are *terminated*" within a year of the merger will receive "severance payments and benefits that are no less favorable than those applicable" prior to the merger. (D.I. 26, Ex. 4 at 228) (emphasis added). Thus, the court cannot conclude that the Twitter Defendants' alleged offer, or alternatively, their promise to maintain their severance policy, was limited to employees who would experience position elimination and excluded employees who would be terminated by different means.

15

Furthermore, a motion to dismiss is not the proper place to resolve factual disputes, and it is unclear from the Plaintiffs' allegations in the FAC or the documents referenced by the FAC if the "current severance package" referenced in the Severance Policy Email only applies in the event of position elimination. The case Twitter Defendants describe as "instructive" on this issue, *Karamsetty v. Wells Fargo & Co.*, 967 F. Supp. 2d 1305 (N.D. Cal. 2013), is distinguishable. (*See* D.I. 113 at 9). In *Karamsetty*, on a motion for summary judgment, the court reviewed the relevant severance policy—which limited "salary continuance pay" to "Position Elimination or a Substantial Position Change"—to determine that the plaintiff was not subject to a position elimination because he was constructively terminated. *Karamsetty*, 967 F. Supp. 2d at 314. Here the court cannot make such a determination because this case is at a much earlier stage, and the parties have not yet had the opportunity to submit evidence, including the underlying severance policy at issue.

The court rejects the Twitter Defendants' claim that Report I "erred in determining that a constructive discharge constitutes a position elimination" (D.I. 113 at 10), as it did not make such a determination. Neither the Severance Policy Email nor the Acquisition FAQ excludes constructively terminated employees from the severance policy that Twitter allegedly represented it would maintain. Given that Hawkins and Killian sufficiently pled constructive termination, the court agrees with Report I that Hawkins and Killian have also sufficiently pled breach of contract and promissory estoppel.

### E. Plaintiffs' Breach of Offer Letter Claim (Count V)

The court agrees with Report I that Plaintiffs' breach of offer letter claim should be dismissed, at a minimum because "[t]he FAC does not plead that the offer letters specifically promised that one benefit that Plaintiffs were entitled to receive was severance." (D.I. 110 at 30). The court also adopts Report I's recommendation to dismiss these claims without prejudice to allow Plaintiffs to supply further, relevant factual allegations in an amended complaint.

### F. Plaintiffs' Fraud Claim (Count VI)

For the reasons stated in Report I, the court agrees that Plaintiff's fraud claim against Twitter Defendants should be dismissed. (D.I. 110 at 31–38).[5] As above, the court adopts Report I's recommendation to dismiss the claim without prejudice.

### G. Pytlarz and Arnold's Discrimination Under FEHA Claim (Count XIV)

Report II arrives at conflicting determinations regarding the Twitter Defendants' challenge to Count XIV. It appears to recommend "that the Twitter motion to dismiss be denied as to Pytlarz and Arnold's FEHA sex and sexual

---

[5] In their Objections to Report II, Plaintiffs suggest that "Judge Burke recommended dismissing the fraud claims against Twitter and Musk; Plaintiffs' fraud claim against X Holdings I, Inc. (n/k/a X Holdings Corp.) remains." (D.I. 135 at 1 n.1, 5). Report I makes no statement suggesting that Plaintiff plausibly alleged fraud by X Holdings I, Inc. On the contrary, Report I repeatedly recommends that the Twitter Defendants' motion to dismiss as to Count VI be granted, meaning, it be granted as to *both* Twitter Defendants, including X Holdings I, Inc. Plaintiffs did not object to Judge Burke's recommendations in Report I as to Count VI and cannot circumvent timeliness requirements by doing so through their objections to Report II. *See* Federal Rule of Civil Procedure 72(b)(2); Standing Order Relating to Utilization of Magistrate Judges C(1)(e). To clarify, Plaintiffs fraud claims are dismissed as to both Twitter Defendants.

orientation claims, respectively" (D.I. 121 at 20), but then in a footnote it recommends that the "Twitter motio[n] to dismiss be granted with respect to Arnold's FEHA age discrimination claim, without prejudice" (*Id.* at 18 n.19). For the reasons explained in Report II (*Id.* at 15–21), the court adopts the first recommendation and agrees with the determination that Plaintiffs Pytlarz and Arnold "pleaded just enough to state FEHA claims as to sex and sexual orientation discrimination, respectively," against the relevant Twitter Defendants. (*Id.* at 18). However, we reject Report II's determination that Plaintiffs had not pled facts sufficient to allow the court to infer that Arnold was laid off due to his age. The court concludes that they have because they allege that "Twitter retained employees who were not members of protected groups who had lower performance or seniority, or were less qualified, than Arnold." (D.I. 10 ¶ 533). Although minimal, at the pleading stage this is sufficient to suggest discrimination motivated by Arnold's age. These allegations of age discrimination are unlike those found to be insufficient to defeat a motion to dismiss in *Weinberg v. Twitter*, where plaintiffs only alleged that Twitter's new work requirements would impose higher burdens on older employees but did not allege facts illustrating a pattern of age discrimination. *Weinberg v. Twitter*, No. 23-cv-04016, 2024 WL 3908112, at *6–7 (N.D. Cal. Aug. 21, 2024).

IV. **Conclusion**

The court has considered the parties' remaining arguments and find them unpersuasive. Accordingly, and in view of the foregoing reasons, the court overrules both Plaintiffs' Objections and Twitter Defendants' Objections. The court adopts

18

Report I's recommendation that it grants the motion to dismiss as to Counts I and II as to the relevant Twitter Defendants with prejudice, and as to Counts V and VI as to the relevant Twitter Defendants without prejudice. It also adopts the recommendation of Report I that, with respect to Counts III and IV, the Twitter Defendants' motion to dismiss is denied.

The court rejects Report II's recommendation that Twitter Defendants' motion to dismiss with respect to Count IX be granted-in-part and denied-in-part. Twitter Defendants' motion to dismiss as it relates to Count IX is denied as to all claimed discrimination. As to those claims denied without prejudice, the court requires that Plaintiffs file a motion for leave to amend to the extent that they seek to amend the FAC.