# Exhibit 1






IN ARBITRATION BEFORE JAMS

JOY SU,

    Claimant,

v.                   JAMS REFERENCE NO. 1601002394

TWITTER, INC. and X HOLDINGS, INC., et al.,

    Respondents.

_____

TRANSCRIPT OF

ARBITRATION PROCEEDINGS

DAY 3

TAKEN ON

WEDNESDAY, MAY 21, 2025

9:03 A.M.

BEFORE

THE HONORABLE RICHARD J. McADAMS

2 EMBARCADERO CENTER, SUITE 1500

SAN FRANSCISCO, CALIFORNIA 94111

```
 1                        APPEARANCES
 2
 3   Appearing on behalf of the Claimant:
 4   AKIVA M. COHEN, ESQUIRE
 5   DYLAN SCHMEYER, ESQUIRE
 6   THOM PRINCE, ESQUIRE
 7   KAT FARLEY, ESQUIRE
 8   LANE HAYGOOD, ESQUIRE
 9   Kamerman, Uncyk, Soniker & Klein P.C.
10   1700 Broadway, 16th Floor
11   New York, New York 10019
12   (646) 845-6085
13   acohen@kusklaw.com
14   dschmeyer@kusklaw.com
15   tprince@kusklaw.com
16   kat.farley@kusklaw.com
17   lane.haggood@kusklaw.com
18
19
20
21
22
23
24
25
```

```
 1                    APPEARANCES (CONTINUED)
 2
 3   Appearing on behalf of the Claimant:
 4   MICHELLE G. LEE, ESQUIRE
 5   MEGAN LOISEL, ESQUIRE
 6   Rudy, Exelrod Zieff & Lowe, LLP
 7   351 California Street, Suite 700
 8   San Francisco, California 94104
 9   (415) 434-9800
10   mgl@rezlaw.com
11   mfl@rezlaw.com
12
13   -and-
14
15   KAELYN R. MAHAR, ESQUIRE
16   Outten & Golden LLP
17   One California Street, 12th Floor
18   San Francisco, California 94111
19   (415) 846-2599
20   kmahar@outtengolden.com
21
22
23
24
25
```

```
 1
 2              APPEARANCES (CONTINUED)
 3
 4   Appearing on behalf of the Respondent:
 5   KAISER H. CHOWDHRY, ESQUIRE
 6   Morgan Lewis & Bockius LLP
 7   1111 Pennsylvania Avenue Northwest
 8   Washington, DC 20004
 9   (202) 739-5230
10   kaiser.chowdhry@morganlewis.com
11
12   -and-
13
14   T. CULLEN WALLACE, ESQUIRE
15   Morgan Lewis & Bockius LLP
16   1000 Louisiana Street, Suite 4000
17   Houston, Texas 77002
18   (713) 890-5000
19   cullen.wallace@morganlewis.com
20
21
22
23
24
25
```

```
 1              APPEARANCES (CONTINUED)
 2
 3   SARI M. ALAMUDDIN, ESQUIRE
 4   Morgan Lewis & Bockius LLP
 5   110 North Wacker Drive
 6   Chicago, Illinois 60606
 7   (312) 324-1000
 8   ssari.alamuddin@morganlewis.com
 9
10   Appearing on behalf of the Respondent:
11   ASHLEE N. CHERRY, ESQUIRE
12   Morgan Lewis & Bockius LLP
13   1400 Page Mill Road
14   Palo Alto, California 94304
15   (650) 843-4000
16   ashlee.cherry@morganlewis.com
17
18   Also Present:
19   Mary Hansbury, Global Head of
20        Employment Law, Twitter, Inc.
21   Frankie Pegg, Litigation Paralegal,
22        Rudy, Exelrod Zieff & Lowe, LLP
23   Kathryn Tewson, Paralegal,
24        Kamerman, Uncyk, Soniker & Klein P.C.
25   Scott Duval, Litigation Technician, FTI Consulting
```

1    A.    The HRBPs?

2    **Q.    Yes.**

3    A.    Yes.

4    **Q.    Okay.  That would have been the case both**
5    **before and after the merger?**

6          MR. COHEN:  Objection, lacks foundation.
7    She wasn't involved.

8          MR. ALAMUDDIN:  First of all, who's --
9    who's counsel for her?

10         MR. COHEN:  I'm going to -- I'm going to
11   be doing the cross.  You're on direct.

12         MR. ALAMUDDIN:  Okay.  Then secondly, she
13   testified that she was in HR the whole time, and she
14   was designated as a corporate representative.

15         ARBITRATOR McADAMS:  Overruled.

16         MR. COHEN:  Is she -- she is designated as
17   a corporate representative on this stuff as well.

18         MR. ALAMUDDIN:  On severance.

19         MR. COHEN:  Here, today.  She's here --

20         MR. ALAMUDDIN:  Yes.

21         MR. COHEN:  -- testifying as a corporate
22   --

23         MR. ALAMUDDIN:  She is.

24         MR. COHEN:  Okay.

25         ARBITRATOR McADAMS:  That's my

```
 1  understanding.
 2           MR. COHEN:  That's perfect.
 3           ARBITRATOR McADAMS:  So overruled.
 4  BY MR. ALAMUDDIN:
 5       Q.   You may answer.
 6       A.   Sorry.  What was the question?
 7       Q.   Was it the case both before and after the
 8  merger agreement that Human Resources business
 9  partners were involved in determining severance in a
10  particular situation?
11       A.   Yes, they were involved.
12       Q.   All right.  Let's try and sort of clear up
13  a few of the pay statement, payroll issues that you
14  were asked about on direct examination first.  I'm
15  going to just get that out of the way, okay.
16       A.   Okay.
17       Q.   First of all, someone like Ms. Su, she was
18  a salaried employee, correct?
19       A.   That's correct.
20       Q.   And does Twitter ask salaried employees to
21  record their hours?
22       A.   No, we don't.
23       Q.   Does the pay of the salaried employee like
24  Ms. Su depend on the number of hours she worked in
25  any particular pay period?  If she's on regular
```

1    Q.   Describing basically that -- the fact that
2  Twitter's entered into this merger agreement with
3  Mr. Musk?
4    A.   Yes.
5    Q.   All right.  And this would have been the
6  -- at least according to this document, the first of
7  several FAQs that were updated and defined in this
8  one FAQ, acquisition FAQ, correct?
9    A.   Yes, that's my understanding.
10   Q.   All right.  So if we go to 64595, which is
11 part of the May 19 update, do you see the
12 protections language here?
13   A.   I do.
14   Q.   Now, the protections language doesn't
15 refer to a specific package or even a general
16 package, correct?
17   A.   Are you talking about severance?
18   Q.   Correct, yes.  The general severance
19 package that was described in Respondent's Exhibit
20 36, which is the company update, that's not
21 reflected in the May 19 acquisition FAQ is it?
22   A.   Correct.
23   Q.   But there is a reference to protections
24 here, correct?
25   A.   Yes.

(800) 528-3335  NAEGELI DEPOSITION & TRIAL  Established 1980  NAEGELIUSA.COM

```
 1       Q.    And what did you understand these
 2  protections to be referring to?
 3       A.    I believe this is a summary of 6.9(a) in
 4  the merger agreement.
 5       Q.    So it was summarizing the protections that
 6  were laid out in the merger agreement; is that
 7  right?
 8       A.    That's correct.
 9       Q.    Did you believe that these were in fact
10  protections?
11       A.    Yes.
12       Q.    Why do you say that?
13       A.    Because Twitter specifically negotiated
14  these on behalf of the employee -- employees.  If
15  they wouldn't have, they wouldn't have been -- they
16  wouldn't have been included in the merger agreement.
17       Q.    What did you understand these protections
18  to be?
19       A.    More or less to maintain the status quo
20  for a time period following close of the
21  acquisition.
22       Q.    What do you mean by maintaining the status
23  quo?
24       A.    So, I mean, maintaining existing salary,
25  just not -- I -- I see them as an attempt to have
```